IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Twana Ahmed**,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | No. 4:23-cv-02823 |
| | § | |
| Universal Protection Service, LP, d/b/a | § | Jury |
| Allied Universal, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

---

**APPENDIX IN SUPPORT OF TWANA AHMED'S RESPONSE
TO DEFENDANTS' MOTION TO STRIKE JURY DEMAND**

---

### INDEX OF EXHIBITS

1   DEFENDANT'S ARBITRATION AGREEMENT…………………..………………………3

2   *Laubenstein v. Conair Corp.* No. 5:14-CV-05227, 2014 U.S. Dist. LEXIS 163410
(W.D. Ark. Nov. 19, 2014)…………………………………………………………..11

3   *Rudel v. Serv. Corp. Int'l,* No. 2:13-CV-351, 2015 U.S. Dist. LEXIS 49343
(S.D. Tex. Apr. 15, 2015)…………………………………………………………...17

4   *Vine v. PLS Financial Servs., Inc.,* 807 F. App'x 320 (5th Cir. 2020)………..……..20

Appendix 001

# Exhibit 1

# Defendant's Arbitration Agreement

## ARBITRATION POLICY AND AGREEMENT

## (Revised: August 19, 2019)

In recognition that differences may arise during the employment relationship and/or as a result of the termination of that relationship, the "Company" (defined in Section 1) has adopted this Arbitration Policy and Agreement ("Agreement"), effective as of the revision date above, to provide for the mutually-agreed use of a streamlined and efficient arbitration process for the resolution of any such disputes as an alternative to litigating such claims in court.

The Company and you agree as follows:

1.  **Parties and Effective Date:** The "Company" means Universal Services of America, LP; and its subsidiaries, affiliates, and related companies, and their successors and assigns. The Company specifically includes, but is not limited to, the following entities: Allied Universal Security Services; Universal Protection Service LLC; Universal Protection Service LP; Universal Building Maintenance, LLC; Universal Thrive Technologies, LLC; Universal Protection Security Systems, LP; AlliedBarton Security Services (NC) LLC; Peoplemark, LLC; Allied Universal Security Systems; Allied Universal Janitorial Services; Allied Universal Staffing Services; U.S. Security Associates, Inc.; Andrews International Government Services, Inc.; Staff Pro, Inc.; Securadyne Systems, LLC; SFI Electronics, LLC; and UPS Seattle, LLC. You are referred to herein as the "Employee." The Company and the Employee are collectively referred to herein as the "Parties." This Agreement is effective as of the date that the Employee receives it (the "Effective Date"), but it shall not be binding on either Party if the Employee timely elects to Opt Out as described in Section 3.

2.  **Arbitration Overview**: In arbitration, each side in the dispute presents its case, including evidence, to a neutral third party called an arbitrator, rather than a judge or jury. The arbitrator is either an attorney or a retired judge. During the arbitration proceeding, you are entitled to be represented by your own legal counsel in the arbitration proceeding, just as the Company is entitled to be represented by its own legal counsel. After reviewing the evidence and considering the arguments of the Parties, the arbitrator makes a decision (also called an award) to resolve the dispute. The arbitrator's decision is final and binding, which means there is no trial by a judge or jury or appeal of the arbitrator's decision, except as provided by law.

3.  **Opt-Out Rights; Acceptance**:  Arbitration is not a mandatory condition of employment with the Company. You have 30 calendar days after receiving this Agreement to opt out of arbitration (the "Deadline"). Opting out means that you do not want to be bound by this Agreement and do not want to arbitrate any claims you or the Company may have against each other. If you opt out by the Deadline, neither you nor the Company will be bound by this Agreement.

    To opt out, you must provide notice to the Company by the Deadline, in writing, of your desire to opt out of arbitration, which writing must be dated, signed and delivered by either: (1) electronic mail to newhire@aus.com, or (2) by certified mail, postage prepaid and return receipt requested, or by any nationally recognized delivery service (e.g, UPS, Federal Express, etc.) that is addressed to:

    Allied Universal<br>
    c/o Corporate HR Manager<br>
    1551 N. Tustin Ave, Suite 650<br>
    Santa Ana, CA 92705

    In order to be effective, (a) the writing must clearly indicate your intent to opt out of this Agreement, (b) the writing must include your name, phone number, email address, and employee ID, and (c) the email or envelope containing the signed writing must be sent by the Deadline. If you are emailing your intent to opt-out, you must send it from the same email address you used

Appendix 003

to either submit your application or complete the onboarding process.

If you do not opt out of this Agreement by the Deadline, continuing your employment after receiving this Agreement constitutes mutual acceptance of the terms of this Agreement by you and the Company, and binding arbitration will be the sole method by which disputes between you and Company are resolved, except to the extent set forth herein. You have the right to consult with counsel of your choice concerning this Agreement.

If you have previously agreed to an arbitration provision with the Company, you may opt out of any revisions to your prior arbitration agreement made by this Agreement in the manner specified in this section, but opting out of this arbitration provision has no effect on any previous, other, or future arbitration agreements that you may have with the Company.

4. **Claims Covered by this Agreement:** To the fullest extent authorized by law, the Parties mutually agree to the resolution by binding arbitration of all claims or causes of action that the Employee may have against the Company, or the Company against the Employee, which could be brought in a court of law, unless otherwise set forth in this Agreement. Examples of claims covered by this Arbitration Policy and Agreement specifically include, but are not limited to, claims for breach of any contract (written or oral, express or implied); fraud, misrepresentation, defamation, or any other tort claims; claims for discrimination and/or harassment; claims for wrongful termination; claims relating to any offers, promotions, or transfers made by the Company; claims for retaliation; claims for non-ERISA-covered benefits (such as vacation, bonuses, etc.); claims for wages or other compensation, penalties or reimbursement of expenses; breaks and rest period claims; claims relating to background checks; and claims for violation of any law, statute, regulation, ordinance or common law, including, but not limited to, all claims arising under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967; the Older Workers' Benefit Protection Act of 1990; the Americans with Disabilities Act; the Family and Medical Leave Act; the Consolidated Omnibus Budget Reconciliation Act of 1985; the Fair Labor Standards Act; and any other applicable federal, state, or local laws relating to discrimination in employment, leave, and/or wage and hour laws, whether currently in force or enacted hereafter.

All claims for permanent injunctive and/or other equitable relief shall be covered by this Arbitration Policy and Agreement. However, both Parties retain the right to seek, in a court of competent jurisdiction, a temporary restraining order, preliminary injunction or other emergency/provisional injunctive relief, in order to protect their rights pending final resolution of any disputes in arbitration. This provision includes, but is not limited to, disputes over the enforceability of any employment-related restrictive covenants, the disclosure of trade secrets or confidential/proprietary information, and defamation.

Covered claims include any claim arising from incidents, facts, or circumstances occurring prior to the Effective Date of this Agreement; any claims that arise thereafter; and claims that are the subject of purported putative class, collective, consolidated, or representative action litigation brought by any other employee.

The Parties also agree that this Agreement is intended to benefit certain third parties. To that end, claims covered by this Agreement also include any claim or cause of action that the Employee may have against the Company's former or current clients (and their employees, contractors, representatives, or agents), customers, vendors, employees, contractors, directors, officers, shareholders, or other agents, or that the Company may have against the Employee's former or current business partners or other agents, where such claims arise out of or are in any way related to the Employee's employment with the Company. Such third parties have the right to demand arbitration under the terms and conditions of this Agreement.

You may learn more about your legal rights by visiting websites hosted by federal, state, and local

governmental agencies. Current links to some of these federal websites are listed, although they are subject to change by the hosting agencies: www.nlrb.gov, www.dol.gov, and www.eeoc.gov.

Nothing in this Agreement shall be deemed to preclude or excuse a Party from bringing an administrative claim before any agency in order to fulfill the Party's obligation to exhaust administrative remedies before making a claim in arbitration.

5. **No Class or Collective Action Claims:** To the fullest extent permitted by law, the Parties agree that each may bring and pursue claims against the other only in their individual capacities, and may not bring, pursue, join or act as a plaintiff or class member in any purported class or collective proceeding.

   The Parties agree that any challenges to this section must be presented before a court, not an Arbitrator. If a court determines that any portion of this section is not enforceable, the Parties agree that any class or collective action that is allowed to proceed must proceed in a court, not in Arbitration.

   If a court determines that any portion of this section is not enforceable and that therefore a class or collective action must proceed in court, the Parties agree that any remaining individual claims otherwise covered by this Agreement must be arbitrated, and that the non-arbitrable class or collective claims would be stayed in Court pending the completion of the arbitration.

6. **Rules For California Employees Relating to Representative and PAGA claims:** This Agreement does not apply to or compel the arbitration of claims brought under California's Private Attorney General Act of 2014, California Labor Code Sections 2699 et seq. ("PAGA Claims"). Notwithstanding any other provision in this Agreement to the contrary, PAGA Claims must be pursued in the appropriate court of law. The Parties agree that the arbitrator may not consolidate more than one individual's claims, and may not otherwise preside over any form of representative proceeding, including, but not limited to, any representative action under California Business and Professions Code Sections 17200 et seq. If either Party has non-PAGA Claims against the other Party, then the Parties agree that those non-PAGA Claims must first be pursued in arbitration, regardless of which claims or actions were filed first. The pending court PAGA action shall be stayed pending full and final resolution of the arbitration pursuant to California Code of Civil Procedure Section 1281.2 and related law.

7. **Severability:**   If a court determines that any portion of this Agreement, including the class, collective and/or representative action waiver, is unenforceable, the Parties intend for the remainder of that provision and the Agreement to be enforced to the fullest extent permitted by law. However, the Parties expressly do not agree to the resolution of any class, collective or representative claim in arbitration. Therefore, in the event a court were to determine that the class, collective and/or representative action waiver of this Agreement is unenforceable, such class, collective or representative proceeding must be heard in a court of law. In no event may the arbitrator consolidate more than one individual's claims or otherwise preside over any form of a class, collective, or representative proceeding. Any arbitration ruling by an arbitrator consolidating the disputes of two or more employees or allowing class or collective action arbitration would be contrary to the intent of this Agreement.

8. **Claims Not Covered by this Agreement:**   This Agreement does not cover claims the Employee may have for workers' compensation, unemployment compensation benefits, medical or other employee welfare or pension benefits under the Employee Retirement Income Security Act (ERISA), claims brought under the National Labor Relations Act, claims covered by an applicable collective bargaining agreement, or any other claims found not subject to mandatory arbitration by governing law. Additionally, nothing in this Arbitration Policy and Agreement precludes Employee from filing a charge or from participating in an administrative investigation of a charge before an appropriate government agency such as the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, the National Labor Relations Board, or similar

Appendix 005

state or local agency. Moreover, disputes that may not be subject to pre-dispute arbitration agreements as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act are excluded from the coverage of this Agreement. Additionally, this Agreement does not apply to claims involving an employee who is covered by a collective bargaining agreement at the time the dispute arises or is filed.

9. **Non-Waiver of Rights**:  No remedies or defenses that would otherwise be available to the Parties individually in a court of law are being forfeited under this Arbitration Policy and Agreement. Notwithstanding the unavailability of class, representative, or collective arbitration under this Agreement, nothing herein is intended to limit your rights under the National Labor Relations Act, and you will not experience any retaliation for exercising such rights.

10. **Interpretation; Governing Law:** Any dispute concerning the validity or enforceability of this Agreement shall be resolved by a court of law. Any dispute over the arbitrability of any particular claim shall be resolved by a court of law. The interpretation and enforceability of this Agreement shall be governed by the Federal Arbitration Act.

11. **Arbitration Procedures:**

   a. Applicable Rules.

   Any arbitration under this Arbitration Policy and Agreement shall be conducted pursuant to the Employment Arbitration Rules of JAMS. These Rules are available for review on JAMS website at www.jamsadr.com. If the Employee would like a copy of the Rules, the Employee may request a copy by sending an electronic mail request to the Company's Employment Practices Group at employmentpracticesgroup@aus.com, or via written request to:

   Employment Practices Group c/o Legal Services Group
   Allied Universal
   Eight Tower Bridge
   161 Washington Street, Suite 600
   Conshohocken, PA 19428

   If there is any discrepancy between JAMS Rules and this Arbitration Policy and Agreement, this Arbitration Policy and Agreement shall prevail. The Parties may mutually agree to use a different but comparable arbitration service provider other than JAMS.

   The arbitration shall take place in the state and county where the Employee was hired to perform work, performs work or performed work for the Company, unless the Parties mutually agree to conduct the arbitration elsewhere.

   b. Selection of Neutral Arbitrator and Scope of Authority.

   The arbitrator shall be a neutral arbitrator, selected by the agreement of the Parties, who has previous experience arbitrating employment law disputes. If the Parties cannot agree on a neutral arbitrator, the Employee and the Company will use the strike and ranking method provided for under JAMS rules.

   The neutral arbitrator shall have exclusive authority to resolve any dispute covered by this Agreement.

   The arbitrator shall apply state and/or federal substantive law to determine issues of liability and damages regarding all claims to be arbitrated. The arbitrator is authorized to award any remedy or relief that would have been available to the Parties, in their

Appendix 006

individual capacity, had the matter been heard in court.

The arbitrator may not, however, add to or modify this Arbitration Policy and Agreement. No arbitrator shall have the authority to alter the at-will employment status of the Employee or to impose any limit on the Company's discretion to discipline or discharge the Employee, except as otherwise provided by law.

The same statutes of limitations, remedies, and defenses that would apply to and be available in a claim in court will apply to and be available on the claim in arbitration.

No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration.

The Parties further agree that they shall have the right to bring a dispositive motion in arbitration (e.g., Motion to Dismiss, Motion for Judgment on the Pleadings, Motion for Summary Judgment, etc.) and that any such motion will be decided under the appropriate standards set forth in the Federal Rules of Civil Procedure.

c. Discovery.

The Parties agree that reasonable discovery is essential to the just resolution of any claims which may be covered by this Arbitration Policy and Agreement. Accordingly, nothing in this Arbitration Policy and Agreement or in the JAMS Rules shall be interpreted to limit the Parties' rights to reasonable discovery. Rather, reasonable discovery shall be allowed that is sufficient to ensure the adequate arbitration of any claims covered by this Arbitration Policy and Agreement. Generally, the Parties agree that reasonable discovery means up to three depositions per side, one set of requests for production of documents with up to 35 requests, and one set of interrogatories with up to 25 interrogatories. In the event that the Parties believe this scope of discovery is inadequate, the Parties shall meet and confer and try to reach agreement on the scope of discovery and the arbitrator shall have discretion to resolve any disagreement concerning the scope of discovery and to allow discovery determined by the arbitrator to be reasonably necessary to the just resolution of the dispute considering the streamlined nature and purpose of arbitration.

d. Post-Hearing Briefs, Written Opinion and Award.

At the election of either Party, the arbitrator shall direct the Parties to submit post-hearing briefs within 30 days of the close of the arbitration hearing. The arbitrator shall issue a written opinion and award within 30 days following the deadline for submission of post-hearing briefs. The written opinion and award shall be signed and dated, and shall generally set forth the reasons for the arbitrator's decision. The arbitrator shall be permitted to award those remedies and damages that are available under applicable law and that would otherwise be available in a court of law. The arbitrator's decision regarding the claims shall be final and binding upon the Parties, unless a court of competent jurisdiction finds that the arbitrator manifestly disregarded the applicable law. The arbitrator's award shall be enforceable in any court having proper jurisdiction. Any Party may be represented by an attorney or other representative. The Parties' appeal rights are governed by the Federal Arbitration Act.

e. Arbitration Fees and Costs.

The Employee will be required to pay a reasonable cost to initiate the arbitration equal to what the Employee would be charged to initiate a lawsuit in state court in the county where the arbitration proceeding is pending. The Company shall pay all fees and costs that are unique to the arbitration process, including the arbitrator's fees. The Employee

Appendix 007

shall not be required to pay any type or amount of expense if such requirement would invalidate this Agreement or would otherwise be contrary to the law as it exists at the time of the arbitration. The arbitration hearing is not required to be stenographically recorded, but may be at the option of either Party. The Party requesting the arbitration hearing to be stenographically recorded is responsible for paying for the court reporter's service.

Except as set forth above, each Party shall pay its own attorneys' fees and costs. If, however, any Party prevails on a statutory claim that affords the prevailing Party attorneys' fees and costs, or if there is a written agreement providing for attorneys' fees and costs, the arbitrator may award reasonable fees and costs to the prevailing Party in accordance with applicable law.

12. **Term of Agreement and Modification:** This Arbitration Policy and Agreement shall remain in effect even after the termination of the Employee's employment with the Company. However, the Parties may mutually agree, in writing, not to arbitrate any claim or dispute that otherwise may be covered by this Arbitration Policy and Agreement. The Parties may also mutually agree, in writing, to modify the rules or conditions relating to any arbitration arising from this Agreement. Additionally, the Company reserves the right to modify this Agreement at any time, provided that any such unilateral modification will only take effect 30 days after notice is given to the Employee. Any such modification will have prospective effect only, and will not alter the terms of this Agreement with respect to any claim arising prior to the effective date of the modification.

13. **Entire Agreement:** This is the complete agreement of the Parties on the subject of arbitration of disputes (except for any arbitration agreement that may exist in connection with any pension or benefit plan). This Agreement supersedes any prior or contemporaneous oral or written understanding on the subject. No Party is relying on any promises, oral or written, on the subject of the effect, enforceability, or meaning of this Agreement, except as specifically set forth in this Agreement. However, if the Employee chooses to Opt-Out of this Agreement prior to the Deadline, any prior agreement between the Parties mandating arbitration will continue to be enforced.

14. **Waiver of Trial By Judge Or Jury:** The Parties understand and fully agree that by entering into this Agreement providing for binding arbitration, they are giving up their right to have a trial in front of a judge or jury. The Parties anticipate that by entering this Agreement they will gain the benefits of a speedy, impartial dispute resolution procedure.

15. **Not an Employment Contract:** This Arbitration Policy and Agreement is not, and shall not be construed to create, a separate contract of employment, express or implied, nor shall this Arbitration Policy and Agreement be construed in any way to change the relationship between the Company and the Employee from that of at-will employment.

16. **Consideration:** The Parties agree and promise to resolve the claims covered in this Agreement by arbitration. In addition to the at-will employment being offered and/or provided by the Company, these mutual promises are consideration for each Party.

17. **Copies of this Agreement:** You are encouraged to print or save a copy of this Agreement for your own records. Current versions of this Agreement are also available online through eHub, and this version of the Agreement can be provided to you upon written request to Human Resources.

## Acknowledgment of Receipt of arbitration policy and agreement

I, the undersigned employee, acknowledge that I have received a copy of the Company's Arbitration Policy and Agreement (the "Agreement"), in effect as of August 19, 2019. I understand that I am bound by the terms of the Agreement, unless I affirmatively opt-out of the Agreement within 30 days of my receipt of

the Agreement in the manner described in Section 3 of the Agreement.

By my electronic signature below, I acknowledge that I have had an opportunity to read the Agreement, that I have had an opportunity to ask questions about the Agreement, and that I understand the Agreement. I further acknowledge that I understand how to obtain this Agreement for later reference.

I also acknowledge that I understand and can read English. If I do not read and understand English, I agree that I will not proceed with this onboarding and will instead email newhire@aus.com immediately to request Spanish-language translations of these documents. I understand that oral requests may not be honored.

Yo támbien reconozco que puedo entender y leer inglés. Si yo no puedo leer o entender inglés, yo acepto que no procederé con este proceso y que envíare un correo electronico a newhire@aus.com immediatamente para peticionar traducciones en español de estos documentos. Yo entiendo que peticiones orales no seran honoradas.

☑ **Employee Signature** Twana Ahmed 12/15/2021 2:35 PM
(checking the checkbox above is equivalent to a handwritten signature)

Appendix 009

AUS 00077

# Exhibit 2

## *Laubenstein v. Conair Corp.*



⚠ Caution
As of: November 18, 2024 8:56 PM Z

## *Laubenstein v. Conair Corp.*

United States District Court for the Western District of Arkansas, Fayetteville Division

November 19, 2014, Decided; November 19, 2014, Filed

CASE NO. 5:14-CV-05227

**Reporter**

2014 U.S. Dist. LEXIS 163410 *; 2014 WL 6609164

BARBARA LAUBENSTEIN, PLAINTIFF v. CONAIR CORPORATION, DEFENDANT

**Subsequent History:** Motion granted by, in part, Motion denied by, in part *Laubenstein v. Conair Corp., 2015 U.S. Dist. LEXIS 74519 (W.D. Ark., June 5, 2015)*

**Counsel:** [*1] For Barbara Laubenstein, Plaintiff: Donald B. Kendall, LEAD ATTORNEY, Kendall Law Firm, Rogers, AR; Susan Keller Kendall, LEAD ATTORNEY, Kendall Drewyor Law Firm, Rogers, AR.

For Conair Corporation, Defendant: Kim F. Coats, LEAD ATTORNEY, Littler Mendelson P.C., Fayetteville, AR; Eric Savage, Littler Mendelson P.C., New York, NY.

**Judges:** TIMOTHY L. BROOKS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** TIMOTHY L. BROOKS

## Opinion

## OPINION AND ORDER

Currently before the Court are Defendant Conair Corporation's Motion to Stay Proceedings, Compel Arbitration, and Strike Jury Demand (Doc. 9) and brief and exhibits in support (Doc. 10), Plaintiff Barbara

Laubenstein's Response in Opposition (Doc. 15), and Defendant Conair's Reply (Doc. 17). For the reasons set forth herein, Defendant's Motion to Stay Proceedings, Compel Arbitration, and Strike Jury Demand (Doc. 9) is **DENIED**.

## I. BACKGROUND

On July 16, 2014, Plaintiff Barbara Laubenstein filed a Complaint in this Court alleging that her former employer, Defendant Conair, created a hostile work environment, subjected her to adverse employment actions, and ultimately terminated her employment all "in retaliation for having reported Conair Corporation's fraudulent activities." *See* Doc. [*2] 1, ¶¶ 45, 46. Ms. Laubenstein's Complaint sets forth two counts, arising from the same set of alleged retaliatory acts by Conair: violation of the Sarbanes-Oxley Act ("SOX") and wrongful termination in violation of Arkansas law. *Id.* at ¶¶ 47 - 57. Ms. Laubenstein has requested a jury trial. *Id.* at ¶ 58. On September 2, 2014, Conair filed this Motion (Doc. 9) asking the Court to: (1) compel Ms. Laubenstein to arbitrate her wrongful termination claim pursuant to a purported arbitration agreement between Ms. Laubenstein and Conair, (2) stay the underlying action pending the conclusion of the arbitration, and (3) strike Ms. Laubenstein's demand for a jury trial pursuant to the same

arbitration agreement.

## II. DISCUSSION

### A. Motion to Compel Arbitration; Motion to Stay Proceedings

Conair contends that Ms. Laubenstein entered into an arbitration agreement with Conair on March 14, 2012, and that this agreement compels arbitration of Ms. Laubenstein's wrongful termination claim. This purported arbitration agreement provides a long list of claims that must be arbitrated, including "actions and causes of action arising out of or in connection with the employment relationship with the Company, the [*3] termination of that relationship, and/or post-employment retaliation and defamation (including but not limited to any claims for wrongful discharge . . .)." (Doc. 10-2, p. 1). Conair concedes that under a recent Dodd-Frank amendment to the SOX, Ms. Laubenstein's SOX claim is not subject to arbitration. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 922(c)(2), 124 Stat. 1376, 1848 (2010) (codified at *18 U.S.C. § 1514A(e)*). However, Conair argues that *18 U.S.C. § 1514A(e)* does not bar arbitration of non-SOX claims that are brought alongside SOX claims, such as Ms. Laubenstein's state-law wrongful termination claim. Ms. Laubenstein insists, to the contrary, that the language of *18 U.S.C. § 1514A(e)* renders the arbitration agreement unenforceable in its *entirety*.

The Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . .

shall be valid, irrevocable, and enforceable, save upon any grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C. § 2*. The Supreme Court has repeatedly recognized this to be the enunciation of a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion, __ U.S. __, 131 S. Ct. 1740, 1745, 179 L. Ed. 2d 742 (2011)* (quoting [*4] *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983))*. However, as with any other statutory requirement, the FAA's mandate "may be overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)*. Ms. Laubenstein and Conair agree that *18 U.S.C. § 1514A(e)* is one of those contrary congressional commands; they merely disagree on the scope of its contrariness.

Ms. Laubenstein bears the burden of showing that Congress intended for *18 U.S.C. § 1514A(e)* to preclude enforcement of the arbitration agreement with regard to her wrongful termination claim. *Shearson, 482 U.S. at 227*. The Supreme Court observed in Shearson that if such congressional intent exists, then it "will be deducible from the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *See id.* (internal alteration, citation, and quotation marks omitted). However, and as always, "[statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985)*. If the text of the statute is unambiguous, then that is the end of the matter.

*See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)*.

18 U.S.C. § 1514A(e)(2) states: "No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this [*5] section." At first glance, this text is ambiguous. There would be no doubt on the face of it that its meaning comported with Ms. Laubenstein's preferred interpretation if, for example, it were to provide that "no predispute arbitration agreement shall be valid or enforceable, if the agreement *includes a requirement* that a dispute arising under this section be arbitrated." Similarly, there would be no doubt that its meaning comported with Conair's preferred interpretation if, for example, it were to provide that "no predispute arbitration agreement shall be valid or enforceable *to the extent that* it requires arbitration of a dispute arising under this section."

However, this latter "to the extent that" example provides the key to the resolution of § 1514A(e)(2)'s ambiguity because it is the exact language used in a different section of the Dodd-Frank Act concerning whistleblowing by employees who offer or provide financial products or services. *See* Pub. L. No. 111-203, § 1057(d)(2), 124 Stat. 1376, 2035 (2010) (codified at 12 U.S.C. § 5567(d)(2)). As Ms. Laubenstein correctly points out, federal courts—including the Supreme Court—have long recognized a canon of construction to the effect that "[w]here Congress includes particular language in one section of a statute but omits it in another [*6] section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L.*

*Ed. 2d 17 (1983)* (quoting *United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)*). In other words, given that Congress explicitly imposed a "to the extent that" limitation on a different arbitration override in the same piece of legislation, this Court must presume that Congress knew how to do so and that it intentionally chose not to impose such a limitation on the arbitration override at issue in the instant case.

Conair counters Ms. Laubenstein's reliance on this canon by citing *Gonzales v. Oregon* for the proposition that "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *546 U.S. 243, 267, 126 S. Ct. 904, 163 L. Ed. 2d 748 (2006)*. There is some force to this point, but it can be satisfied through the exercise of judicial restraint. At the present moment, this Court only needs to decide whether Congress intended to bar arbitration of a claim, such as Ms. Laubenstein's wrongful termination claim, that is "entangled with the SOX dispute and [that] arise[s] from the same nucleus of operative facts." *Stewart v. Doral Fin. Corp.., 997 F. Supp. 2d 129, 139 (D.P.R. 2014)*. It would not be appropriate, given the facts of this [*7] case, for this Court to decide whether Congress intended to bar arbitration of every claim brought alongside a SOX claim.

Adopting Conair's preferred interpretation not only would run counter to the canons of construction discussed above; it would frustrate the statute's purpose of "Whistleblower Protection"—which is the title given to § 922 of the Dodd Frank Act—by forcing SOX whistleblowers with entangled claims to choose between either engaging in duplicative and costly litigation in multiple forums or

abandoning potentially meritorious claims.[1] Anticipating this point, Conair cites several Supreme Court cases for the proposition that the FAA has been interpreted to compel arbitration of pendent arbitrable claims even when doing so might result in duplicative litigation in multiple forums. *See, e.g.*, *KPMG LLP v. Cocchi, 132 s. ct. 23, 24, 181 L. Ed. 2d 323 (2011)* (per curiam); *Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985)*. In a similar vein, Conair cites to *Green Tree Fin. Corp.-Alabama v. Randolph* for its holding that, under the FAA, a party who seeks to invalidate an arbitration agreement on the grounds that enforcement would be prohibitively expensive "bears the burden of showing the likelihood of incurring such costs." *531 U.S. 79, 92, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)*. However, these cases are inapposite; this Court's present task is not [*8] to interpret the FAA, but rather to interpret a different statute that *overrides* the FAA.

This Court finds that, as pleaded, Ms. Laubenstein's wrongful termination claim is entangled with, and arises from the same nucleus of operative facts as, her SOX claim. Therefore, and given the foregoing analysis, this Court holds that *18 U.S.C. § 1514A(e)(2)* precludes enforcement of the arbitration agreement between Ms. Laubenstein and Conair with regard to Ms. Laubenstein's wrongful termination claim. Accordingly, the Court does not reach the issue of whether the arbitration agreement is invalid under state law. Furthermore, this ruling renders Conair's motion to stay the underlying action **MOOT**.

## B. Motion to Strike Jury Demand.

---

[1] The Court does not, by this observation, express any opinion as to the merits of Ms. Laubenstein's claims.

Conair argues that by entering into the arbitration agreement, Ms. Laubenstein waived her right to have a jury hear her SOX claim. (Doc. 9, ¶ 4; Doc. 10, p. 14). Conair also argues in its Reply that Ms. Laubenstein waived her right to a jury on the wrongful termination claim through the same instrument. (Doc. 17, p. 10). Specifically, Conair points to the provision in the arbitration agreement [*9] that states, "arbitration shall be the exclusive method for resolving any employment related dispute, and both the Company and the employee are giving up any right that they might otherwise have to have a judge or jury decide any such employment related dispute . . . ." (Doc. 10, p. 14; Doc. 10-2, p. 1).

Ms. Laubenstein's SOX claim is brought under *18 U.S.C. § 1514A(b)(1)*. *See* Doc. 1, ¶¶ 47 - 53. *18 U.S.C. § 1514A(e)(1)* states: "The rights and remedies provided for in this section may not be waived by . . . a predispute arbitration agreement." One of the rights explicitly provided for in that section is the right to have an action brought under *subsection (b)(1)* tried before a jury. *18 U.S.C. § 1514A(e)(1)*. Therefore, Ms. Laubenstein has not waived her right to try her SOX claim before a jury.

The Court has already held supra that the arbitration agreement is unenforceable as to Ms. Laubenstein's wrongful termination claim. The provision of the arbitration agreement cited by Conair, if enforceable, would bar trial of the wrongful termination claim before a judge every bit as much as it would bar trial of the same before a jury. *See* Doc. 10-2, p. 2 (". . . both the *Company* and the employee are giving up any right that they might otherwise have to have a *judge* or jury decide [*10] any such employment related dispute . . . .") (emphasis added)). The Court does not see any way to enforce the terms of the judge-or-jury waiver

without also compelling arbitration. Therefore, Ms. Laubenstein also has not waived her right to try her wrongful termination claim before a jury.

## III. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion to Stay Proceedings, Compel Arbitration, and Strike Jury Demand (Doc. 9) is **DENIED**.

**IT SO ORDERED** this 19th day of November 2014.

/s/ Timothy L. Brooks

TIMOTHY L. BROOKS

UNITED STATES DISTRICT JUDGE

---

**End of Document**

Appendix 015

# Exhibit 3

## *Rudel v. Serv. Corp. Int'l*

No *Shepard's* Signal™
As of: November 18, 2024 8:46 PM Z

### *Rudel v. Serv. Corp. Int'l*

United States District Court for the Southern District of Texas, Corpus Christi Division

April 15, 2015, Decided; April 15, 2015, Filed

CIVIL NO. 2:13-CV-351

**Reporter**

2015 U.S. Dist. LEXIS 49343 *

JOHNATHAN B. RUDEL, Plaintiff, VS. SERVICE CORPORATION INTERNATIONAL, et al, Defendants.

**Counsel:** [*1] For Johnathan B. Rudel, Plaintiff: Mark Anthony Sanchez, LEAD ATTORNEY, Gale, Wilson & Sanchez, PLLC, San Antonio, TX; Christopher J Gale, The Gale Law Group, Corpus Christi, TX.

For Service Corporation International, SCI Texas Funeral Services, Inc., doing business as Memory Gardens Funeral Home, Defendants: Tonya Beane Webber, LEAD ATTORNEY, Porter Rogers et al, Corpus Christi, TX; Lisa Poole Alcantar, Porter Rogers Dahlman Gordon PC, San Antonio, TX.

**Judges:** Hilda Tagle, Senior United States District Judge.

**Opinion by:** Hilda Tagle

## Opinion

### <u>ORDER</u>

Defendants Service Corporation International and SCI Texas Funeral Services, Inc. DBA Memory Gardens Funeral Home filed a motion to strike Plaintiff's jury demand. D.E. 53. Defendants concede that Plaintiff timely requested a jury trial. *Id.*, p. 1, ¶ 1. Plaintiff

responded and opposes Defendants' motion. D.E. 55. After considering, the motion, the response, the evidence and the arguments of counsel, the Court denies Defendants' motion.

Plaintiff Jonathan Rudel (Rudel) signed a document entitled Principles of Employment in 1999, after an SCI entity bought his prior employer. D.E. 53-2, 39-1 (affidavit Rudel). The document states in part, "In order to ensure equitable and cost-effective [*2] resolution of these matters, *employment related disputes will be resolved by arbitration*, in accordance with the following procedures." D.E. 53-2, p. 2 (emphasis added). As part of the agreement, there is a "**NOTICE TO EMPLOYEE**" that states,

> **BY SIGNING THIS AGREEMENT, YOU ARE AGREEING TO HAVE ANY AND ALL DISPUTES BETWEEN YOU AND YOUR COMPANY EXCEPT THOSE SPECIFICALLY EXCLUDED IN SECTION 2 ABOVE) DECIDED BY BINDING ARBITRATION AND YOU ARE WAIVING YOUR RIGHT TO A JURY OR COURT TRIAL**.

*Id.* (emphasis in original).

Defendants do not seek to enforce the arbitration agreement. Instead, Defendants argue that the arbitration agreement also constitutes a waiver of a trial by jury, separate

and apart from the arbitration clause.

Defendants rely upon *Montalvo v. Aerotek, Inc., 5:13-CV-997, 2014 U.S. Dist. LEXIS 164884, 2014 WL 668041 (W.D. Tex. Nov. 14, 2014)* to support their position. In *Montalvo*, the district court enforced a jury waiver that read, "By executing this agreement, the parties hereto knowingly and willingly waive any right they have under applicable law to a trial by jury in any dispute arising out of or in any way related to this agreement or the issues raised by any such dispute." *2014 U.S. Dist. LEXIS 164884, [WL] at *13-14*.

Although the right of trial by jury in civil actions is protected by the *Seventh Amendment to the Constitution*, that right can be waived by the prior written agreement of the parties. *Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 848-49, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986)*. A jury trial waiver must be made knowingly and [*3] voluntarily, and courts will indulge every reasonable presumption against finding a waiver. *Id. at 848*.

Unlike the jury waiver found enforceable in *Montalvo*, the plain language of the contractual provision in this case waives both a jury and a court trial in favor of arbitration. D.E. 53-2 ("YOU ARE WAIVING YOUR RIGHT TO A JURY OR COURT TRIAL"). Defendants do not seek arbitration, but only to proceed to a bench trial. The Court finds that the contractual agreement does not constitute a separate jury trial waiver.

Accordingly, the Court DENIES Defendants' motion (D.E. 53) to strike Plaintiff's jury demand.

**It is so ORDERED**.

Dated this 15th day of April, 2015.

/s/ Hilda Tagle

Hilda Tagle

Senior United States District Judge

---

**End of Document**

Appendix 018

# Exhibit 4

## *Vine v. PLS Financial Servs., Inc.*

 Caution
As of: November 18, 2024 8:44 PM Z

## *Vine v. PLS Fin. Servs.*

United States Court of Appeals for the Fifth Circuit

March 30, 2020, Filed

No. 19-40353 Consolidated with 19-40414

**Reporter**
807 Fed. Appx. 320 *; 2020 U.S. App. LEXIS 9889 **; 2020 WL 1522438

LUCINDA VINE; KRISTY POND, Plaintiffs - Appellees v. PLS FINANCIAL SERVICES, INCORPORATED; PLS LOAN STORE OF TEXAS, INCORPORATED, Defendants - Appellants

**Prior History:** [**1] Appeals from the United States District Court for the Eastern District of Texas. USDC No. 4:18-CV-450.

*Vine v. PLS Fin. Servs., 2019 U.S. Dist. LEXIS 48901 (E.D. Tex., Mar. 25, 2019)*

**Disposition:** AFFIRMED.

## Case Summary

### Overview

HOLDINGS: [1]-Appellate jurisdiction existed under *9 U.S.C.S. § 16(a)* to review the district court's denial of a payday lender's motion to reconsider because the order was an order denying an application to compel arbitration. The lender had a good faith argument that a state court decision was a change in the law; [2]-The lender's motion to reconsider was properly denied because whether the lender waived arbitration by substantially invoking the judicial process was a question of federal law, and the state court's disagreement on a question of federal law could not change the law of the case; [2]-The district court did not err in finding that individualized proof of damages would not predominate for purposes of *Fed. R. Civ. P. 23(b)(3)* or in finding that proof of reliance on the lender's misrepresentation that the borrowers had committed theft by check would not defeat predominance.

**Outcome**
Orders affirmed.

**Counsel:** For Lucinda Vine, Kristy Pond, Plaintiff - Appellees (19-40353): Daniel Raymond Dutko, Rusty Hardin & Associates, L.L.P., Houston, TX; Howard Mark Burck, Hanszen Laporte, L.L.P., Houston, TX.

For Pls Financial Services, Incorporated, Pls Loan Store of Texas, Incorporated, Defendant - Appellants (19-40353): Jeffrey Mark Tillotson, J. Austen Irrobali, Jonathan Robert Patton, Tillotson Law, Dallas, TX.

For Texas Appleseed, Amicus Curiae (19-40353): Ricardo Gonzalez Cedillo, Davis, Cedillo & Mendoza, Incorporated, San Antonio, TX.

For Lucinda Vine, Kristy Pond, Plaintiff - Appellees (19-40414): Daniel Raymond Dutko, Rusty Hardin & Associates, L.L.P., Houston, TX; Howard Mark Burck, Hanszen Laporte, L.L.P., Houston, TX, M. Mitchell Moss, ScottHulse, P.C., El Paso, TX.

For Pls Financial Services, Incorporated,

Defendant - Appellant (19-40414): Jeffrey Mark Tillotson, Tillotson Law, Dallas, TX.

For Pls Loan Store of Texas, Incorporated, Defendant - Appellant (19-40414): Jeffrey Mark Tillotson, Tillotson Law, Dallas, TX.

For Texas Appleseed, Amicus Curiae (19-40414): Ricardo Gonzalez Cedillo, [**2] Davis, Cedillo & Mendoza, Incorporated, San Antonio, TX.

**Judges:** Before CLEMENT, HIGGINSON, and ENGELHARDT, Circuit Judges.

## Opinion

[*323]  PER CURIAM:[*]

We hold that this court's prior opinion in *Vine v. PLS Financial Services, Inc. (Vine I), 689 F. App'x 800 (2017)*, remains the law of the case, and therefore affirm the district court's order denying PLS's motion to reconsider. We also affirm the district court's class-certification order.

[*324]  **I**

*Vine I* describes the background of this case in detail, so we will add only the subsequent developments.

After this court affirmed the district court's denial of PLS's motion to compel arbitration, the parties conducted discovery. The district court later granted PLS summary judgment on several of Vine and Pond's (the "Borrowers") claims. Among these were the Borrowers' malicious-prosecution claims, which the district

court dismissed because the district attorney never filed criminal charges against the Borrowers in response to PLS's worthless-check affidavits. The partial grant of summary judgment left pending only the claims for common-law fraud and for violating *Texas Finance Code § 393.305*, which prohibits a "credit services organization" like PLS from "directly or indirectly engag[ing] in a fraudulent or deceptive act, practice, or course of business relating to the [**3] offer or sale of [its] services." *See also TEX. FIN. CODE § 393.504* (designating a violation of *§ 393.305* as a "deceptive trade practice actionable under" the *Texas Deceptive Trade Practices Act*).

The following month, the Texas Supreme Court decided *Henry v. Cash Biz, LP, 551 S.W.3d 111 (Tex. 2018)*. Under facts largely mirroring this case, the court held that "providing information to the district attorney and letting the chips fall where they may" did *not* amount to a substantial invocation of the judicial process, and thus did not waive the defendant's contractual right to arbitrate. *Id. at 118*. The court noted that its decision conflicted with *Vine I*, and it expressly agreed with the *Vine I* dissent. *Id. at 118-19*.

Back in the Western District of Texas, the district court then asked the parties for status updates "regarding whether the present case should proceed any differently in light of the clarification of state law" in *Cash Biz*. Per the court's order, the parties filed their status updates a few days later. PLS argued that *Cash Biz* obligated the district court to reconsider its arbitration order. The Borrowers, unsurprisingly, argued that it did not.

On May 15, 2018, the district court held a status conference. The court stated: "I think there is nothing in [*Cash Biz*] I see that binds [**4] me to a certain result given the fact

---

[*] Pursuant to **5TH CIR. R. 47.5**, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in **5TH CIR. R. 47.5.4**.

that issues relating to Texas substantive law and the Federal Arbitration Act are quite different. I will leave it at that." But the court went on to say that it would "watch that [case] and other litigation that may be going on that contains similar issues," and that it would "wait and see what happens." Counsel for PLS asked the court to clarify whether it planned "to actually issue some sort of order or opinion" on the effect of *Cash Biz*. The court responded: "I don't know I have a pending motion. I don't anticipate I will be issuing anything other than what has been issued to date."

At this conference, the court also discussed whether venue was proper in the Western District of Texas given the Borrowers' and the identified class members' domiciles. The following day, the court issued an order to show cause why it should not transfer the case to the Eastern District of Texas. The parties responded, and the court transferred the case to the Eastern District on June 25, 2018. Pursuant to the Eastern District's local rule, the transfer mooted any pending motions. *See* LOCAL RULE CV-7.

The next month, the Borrowers filed a motion for class certification [**5] in the Eastern District. Five days later, PLS filed a motion to reconsider the arbitration order in light of *Cash Biz*. The district court denied the motion to reconsider on March 25, 2019, and granted the motion for class [*325] certification on March 30. The court certified a class containing (1) "all Texas residents who defaulted on a payday loan from a PLS store," (2) "against whom [PLS] filed a criminal complaint to the District Attorney," and (3) "who paid some or all of the additional fines and fees to the D.A.'s office in connection with the letter" the DA sent threatening prosecution if the recipient did not pay.

On April 15, PLS filed a notice of appeal from the Eastern District's March 25 and March 30 orders, as well as the original arbitration order entered in the Western District.

## II

Before we address the merits of the appeal, we must verify that we have appellate jurisdiction.

We have jurisdiction to review the district court's class-certification order because this court granted PLS's timely petition for permission to appeal. *See Fed. R. Civ. P. 23(f)* ("A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule . . . ."); *28 U.S.C. § 1292(e)* (authorizing Supreme [**6] Court to prescribe rules permitting interlocutory appeals).

Whether we have jurisdiction to review the order denying PLS's motion to reconsider its original motion to compel arbitration is more complicated. The *Federal Arbitration Act* provides that "[a]n appeal may be taken from . . . an order . . . denying an application . . . to compel arbitration." *9 U.S.C. § 16(a)*. As with other civil appeals, the notice of appeal "must be filed . . . within 30 days after entry of the judgment or order appealed from." *FED. R. APP. P. 4(a)(1)(A)*. PLS filed its notice of appeal on April 15, 2019, nearly three years after the district court entered its original order denying PLS's motion to compel arbitration on June 6, 2016.

PLS argues that its notice was timely because the 30-day window to appeal began when the Eastern District denied PLS's motion to reconsider the arbitration order in light of *Cash Biz*. The Borrowers, by contrast, argue that the motion to reconsider did not toll the time for

Appendix 022

appealing the original arbitration order because PLS filed the reconsideration motion long after the time to appeal the original order had passed. True enough. This is not a case about "tolling" the time for appeal. *See* FED. R. APP. P. *4(a)(4)(A)*. We do not have jurisdiction [**7] to review the original arbitration order. Rather, for us to have appellate jurisdiction, the Eastern District's order denying the motion to reconsider must *itself* be an immediately appealable order denying an application to compel arbitration. *See* 9 U.S.C. § 16(a).

As the Borrowers correctly point out, a party cannot circumvent jurisdictional time-limits for an appeal by filing a successive motion that "presents the same factual and legal bases" as the first motion and then appealing the denial of the successive motion. *Kossman Contracting Co. v. City of Houston, 128 F. App'x 376, 377-78 (5th Cir. 2005)*; *see also Charles L.M. v. N.E. Indep. Sch. Dist., 884 F.2d 869, 870 (5th Cir. 1989)* ("We have squarely held that where an appellant files a second motion to reconsider 'based upon substantially the same grounds as urged in the earlier motion,' the filing of the second motion does not interrupt the running of the time for appeal, and the appeal must be dismissed."). There is, however, an exception to this general rule "against appealing from a successive motion if there are changed circumstances, new evidence, or a change in the law." *Kossman, 128 F. App'x at 378* (quoting *Birmingham Fire Fighters Ass'n 117 v. Jefferson County, 290 F.3d 1250, 1254 [*326] (11th Cir. 2002))*. In assessing changed circumstances, we must not conflate this threshold jurisdictional question with the merits of the appeal. *See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 627-29, 129 S. Ct. 1896, 173 L. Ed. 2d 832 (2009)*. The purpose of this rule is to separate "manipulative" litigation tactics that [**8] are "nothing more than an

attempt to circumvent the . . . time restriction applicable to the appeal" from "good faith" arguments—even if they are ultimately unsuccessful—that changed circumstances should alter the outcome of the motion. *French v. Wachovia Bank, 574 F.3d 830, 833-34 (7th Cir. 2009)*.[1]

Here, PLS had a good-faith argument that the *Cash Biz* decision constituted a change in the law that justified a renewed motion to compel arbitration. We do not believe that PLS filed the motion to reconsider for the purpose of evading *Rule 4*'s time restrictions. Thus, whether PLS's motion to reconsider has merit or not, the district court's order denying that motion was an order denying an application to compel arbitration, and we have jurisdiction to review the order pursuant to 9 U.S.C. § 16(a).[2]

# III

Having confirmed our jurisdiction, we turn to the district court's denial of PLS's motion to reconsider the motion to compel arbitration. The Western District's initial arbitration order concluded that PLS waived its right to arbitrate by "substantially invok[ing] the judicial process

---

[1] Thus, our jurisdictional holding does not dictate the result of our law-of-the-case inquiry. *See infra* part III.

[2] The Borrowers assert that this was actually PLS's *second* motion to reconsider in light of *Cash Biz*. By the Borrowers' account, PLS's response to the Western District's request for a status update was effectively a motion to reconsider, which the Western District then denied at the status conference. If this were correct, then the time to appeal that order expired before PLS filed the successive motion, meaning that the motion did not toll the appeal deadline. But the transcript of the status conference contradicts the Borrowers' argument. True, the district court expressed doubt that *Cash Biz* made a relevant change in the law. But it explicitly left the issue open for further discussion. The court also made clear it was not entering an order regarding *Cash Biz* because there had been no motion to reconsider. So there was nothing for PLS to appeal at that point.

to the detriment or prejudice of the other party." *Subway Equip. Leasing Corp. v. Forte, 169 F.3d 324, 326 (5th Cir. 1999)* (quoting *Miller Brewing Co. v. Ft. Worth Distrib. Co., 781 F.2d 494, 497 (5th Cir. 1986)*). Ordinarily, a district court is free to revise an interlocutory order like this one "at any [**9] time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Fed. R. Civ. P. 54(b)*.

Here, however, given our previous decision in *Vine I*, the law-of-the-case doctrine potentially limited the district court's review. "Under that doctrine, the district court on remand, or the appellate court on a subsequent appeal, abstains from reexamining an issue of fact or law that has already been decided on appeal." *United States v. Teel, 691 F.3d 578, 582 (5th Cir. 2012)*. Reexamination is permitted only if (1) there is a substantial change in the evidence, (2) there is a change in controlling law, or (3) the original decision was clearly erroneous and failing to correct it would be manifestly unjust. *Fuhrman v. Dretke, 442 F.3d 893, 897 (5th Cir. 2006)*. Whether the law of the case precludes reconsideration is a question of law that we review de novo. *Med. Ctr. Pharm. v. Holder, 634 F.3d 830, 834 (5th Cir. 2011)*. We agree with the district court that none of the exceptions applies here.

[*327] Two of the exceptions are quickly dismissed. First, *Cash Biz* is not an intervening change in controlling law. Whether PLS substantially invoked the judicial process is a question of federal substantive law. *See Miller Brewing, 781 F.2d at 497 n.4* ("dismiss[ing] out of hand" the argument that it was a question of state contract law). The fact that the Texas Supreme Court disagreed with this [**10] court on a question of federal law cannot change the law of the case.

Second, PLS cannot show that *Vine I* was clearly erroneous or that relying on it would cause manifest injustice. For us to ignore the law of the case under this exception, the prior decision must be "dead wrong." *Hopwood v. Texas, 236 F.3d 256, 273 (5th Cir. 2000)*. Multiple courts have now issued thoughtful—though divergent—opinions on whether filing worthless-check affidavits waives arbitration. Even if *Vine I* was wrong, "the question is close." *Vine I, 689 F. App'x at 807* (Higginson, J., dissenting). *Vine I* was not dead wrong.[3]

Only the new-evidence exception requires a closer look. At the time *Vine I* was decided, the parties had yet to conduct discovery. Accordingly, the court accepted the Borrowers' well-pleaded facts as true, *Vine I, 689 F. App'x at 802*, including the allegation that PLS "file[d] criminal charges against borrowers." Discovery later revealed that, though the DA had threatened to have the Borrowers arrested and prosecuted, the Borrowers ultimately avoided prosecution by paying the DA's office the amounts of their bounced checks plus fees. PLS argues that the absence of criminal charges of prosecution undermines *Vine I*'s holdings that PLS substantially invoked the judicial process and that the [**11] Borrowers suffered any prejudice. We disagree with PLS on both counts.

*Vine I* held that PLS substantially invoked the judicial process by "submitting false worthless[-]check affidavits" to the DA's office, thereby "initiat[ing] a process that invite[d] [the DA] to address issues that [were] at stake in the

---

[3] Were this panel writing on a blank slate, we might have agreed with the Texas Supreme Court that submitting affidavits to the DA's office is not sufficient invocation of the judicial process to waive arbitration. In fact, the Texas Supreme Court cited the dissenting opinion from *Vine I* that a member of this panel wrote. *See Cash Biz, 551 S.W.3d at 118-19*. But we too are constrained by the law of the case.

instant action." *Vine I, 689 F. App'x at 806*. Nothing in this holding depended on whether the DA actually prosecuted the Borrowers. Per *Vine I*, PLS's "invocation" was complete as soon as PLS *tried* to use the criminal-justice system rather than arbitration to collect from the Borrowers.

On the prejudice prong, *Vine I* held that the borrowers showed sufficient prejudice because they "*would have* borne the costs of defending against any theft by check prosecution," and "*would have* suffered the preclusive effect of a conviction in any subsequent litigation." *Id. at 807* (emphasis added). This hypothetical language suggests that the ultimate lack of prosecution does not undermine *Vine I*'s holding. In any event, PLS was successful in using the criminal-justice system to get exactly what it wanted from the Borrowers—repayment of the loans—and additional fees to boot. These out-of-pocket expenses are independently sufficient to [**12] constitute "prejudice."

PLS asserts that the Borrowers suffered no prejudice because PLS later refunded them an amount greater than the fees they paid to the DA. Assuming this is true (something Vine and Pond dispute), PLS sent the checks years after causing [*328] the prejudice, and only after the Borrowers had filed suit. PLS has provided no argument or authority that supports it having the ability to "buy back" its right to arbitrate years after invoking the judicial process to the Borrowers' detriment. Thus, even if there is a factual dispute about the existence or amount of the refunds, this ultimately goes to the Borrowers' damages claims, not to PLS's waiver of arbitration.

**IV**

We next address the district court's class-certification order. "We review a district court's certification of a class for abuse of discretion, but if the court's error is a matter of law, the court necessarily abuses its discretion." *Torres v. S.G.E. Mgmt., L.L.C., 838 F.3d 629, 635 (5th Cir. 2016)* (en banc). We review questions of law de novo. *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc., 482 F.3d 372, 380 (5th Cir. 2007)*.

PLS argues that the district court abused its discretion in certifying this case as a class action because (1) the Borrowers signed a waiver of their right to participate in a class action, and (2) the class does not meet the requirements [**13] of *Rule 23(b)(3) of the Federal Rules of Civil Procedure*. We conclude that the district court did not abuse its discretion in either respect.

PLS argues that the Borrowers' loan agreements waived their right to participate in a class action. The relevant language appears in section 2(c) of the loan agreement's "Waiver of Jury Trial and Arbitration Provision":

> 2. You acknowledge and agree that by entering into this Arbitration Provision:
> (a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US . . . ;
> (b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT, OTHER THAN A SMALL CLAIMS TRIBUNAL, RESOLVE ANY DISPUTE ALLEGED AGAINST US . . . ;
> (c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, OR TO PARTICIPATE AS A MEMBER OF A CLASS OF

CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US . . . . YOUR DISPUTE MAY NOT BE CONSOLIDATED WITH THE DISPUTE OF ANY OTHER PERSON(S) FOR ANY PURPOSE(S).

We agree with the district court that "the most plausible way to interpret a class action waiver in the middle of an arbitration provision is as part of the explanation of the rules, rights, and procedures that apply if a dispute is arbitrated—'*not* as an independently [**14] effective waiver of the right to pursue a class action outside the arbitration context,'" (quoting *Meyer v. Kalanick, 185 F. Supp. 3d 448, 454 (S.D.N.Y. 2016)*. The Borrowers gave up their right to participate in a class action *by virtue of* their agreement to resolve disputes exclusively through individual arbitration. But once PLS waived the arbitration provision, the Borrowers were free to select another form of dispute resolution, including a class action.

The loan agreement's jury-trial waiver provision confirms our conclusion. The right to a jury trial, like a class action, is included as one of the rights given up as a result of agreeing to arbitrate. But the loan agreement includes an *additional* jury-trial waiver outside the arbitration provision to show that the parties waived [*329] their right to a jury trial, full stop—not just as a consequence of agreeing to arbitrate. PLS chose to treat the class-action waiver differently when it drafted the form contract. *See Gonzalez v. Mission Am. Ins. Co., 795 S.W.2d 734, 737 (Tex. 1990)* ("It is well-established law that where an ambiguity exists in a contract, the contract language will be construed strictly against the party who drafted it since the drafter is responsible for the language used."). Thus, once PLS waived the arbitration provision, the Borrowers [**15] were free to proceed as part of a class action.

**B**

Finally, we address the district court's findings that this case meets the requirements for class certification under *Rule 23 of the Federal Rules of Civil Procedure*. Our review of these findings is deferential. *Torres, 838 F.3d at 635*. "Implicit in this deferential standard is a recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Allison v. Citgo Petroleum Corp., 151 F.3d 402, 408 (5th Cir. 1998)*.

We need not spend much time discussing the district court's findings on numerosity, commonality, typicality, or adequacy of representation. *See Fed. R. Civ. P. 23(a)(1)—(4)*. We affirm these findings for essentially the same reasons that the district court articulated.

The parties' principal dispute about *Rule 23* is whether the district court abused its discretion in finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Fed. R. Civ. P. 23(b)(3)*. PLS argues that individualized questions predominate because the case will require individualized proof of each class member's (1) damages and (2) actual and justifiable reliance on PLS's misrepresentations.

The district court did not abuse its discretion in concluding that individualized proof of damages would [**16] not predominate over common questions. Its finding that the requests for actual economic damages are "fairly uniform" is supported by the evidence. The "merchant fee" and DA "service fee" are set by statute. And the DA's office provided a table from its database showing the amount it collected from each class member. Even if

Appendix 026

damages required separate litigation, that would not preclude class certification on the central, common questions. *See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016).*[4]

Nor did the court abuse its discretion in finding that proof of the Borrowers' reliance on PLS's misrepresentation would not defeat predominance. Generally, "[f]raud actions that require proof of individual reliance cannot be certified as [*Rule 23(b)(3)*] class actions because individual, rather than common, issues will predominate." *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.,* 319 F.3d 205, 211 (5th Cir. 2003). But this rule has an exception. As the en banc court in *Torres* explained, common issues can still predominate if common evidence of fraudulent misrepresentation "gives rise to a reasonable inference that that misrepresentation induced [the class members' actions] and caused their losses." *838 F.3d at 641*. Other circuits have likewise "permitted inferences of reliance when [they] follow[] logically from the nature of the scheme, and [*330] there is [**17] common, circumstantial evidence that class members relied on the fraud." *Id.*

Here, the district court rejected two of the Borrowers' fraud theories because they fell within the general rule. But it found that the third fraud theory—that PLS filed affidavits with the DA's office fraudulently representing that the Borrowers had committed theft by check—could rely on common evidence and reasonable inferences to prove reliance. This was not an abuse of discretion under *Torres*. The record contains enough evidence for a jury

to find that PLS knew that post-dated checks offered as security for a loan could not be referred to the DA's office for collection or prosecution as theft-by-check cases. Yet PLS filed affidavits representing to the DA's office that the Borrowers' bounced checks were not post-dated. In other words, PLS represented to the DA that the Borrowers' checks were the type that could be collected by the DA on threat of arrest and prosecution. A jury could find that PLS did so hoping that the DA, relying on PLS's assertion, would threaten prosecution and that the Borrowers, fearing prosecution, would then repay the loans. Under these circumstances, a jury may reasonably infer [**18] that the Borrowers would not have paid the DA's office had they not believed that their bounced checks could actually constitute theft by check—the very misrepresentation PLS made in its affidavits and that the DA's threat of prosecution conveyed to the borrowers. *See Torres, 838 F.3d at 643*.

This case is much like *In re U.S. Foodservice Inc. Pricing Litigation*, which the *Torres* majority relied on. *See 729 F.3d 108 (2d Cir. 2013)*. There, the Second Circuit explained that, "[i]n cases involving fraudulent overbilling, payment may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." *Id. at 120*. Just as it may reasonably be inferred that someone who paid a bill did so because they believed what the bill told them, a jury may infer that the Borrowers believed what the DA's letter told them, which was in turn based on what PLS's affidavits told the DA. Under these circumstances, the district court did not abuse its discretion in concluding that class-wide

---

[4] The Borrowers have expressly disclaimed any request for damages from reputational harm, such as reduced credit scores. Thus, we do not decide whether a request for such damages would preclude class certification.

issues will predominate over individual ones.

AFFIRMED.

---

**End of Document**

Appendix 028