# EXHIBIT 1

# Deposition Transcript

Case Number: 4:23-cv-02823
Date: September 13, 2024

In the matter of:

# TWANA AHMED v UNIVERSAL PROTECTION SERVICE, LP, et al.

# Anna Soja - PMK

Reported by:
Alyssa A. Repsik



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

```
 1            UNITED STATES DISTRICT COURT FOR THE
 2         SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
 3                           -  -  -
    TWANA AHMED,                ) CIVIL DIVISION
 4                              )
             Plaintiff,         ) NO. 4:23-cv-02823
 5                              )
        -vs-                    )
 6                              )
                                )
 7   UNIVERSAL PROTECTION       )
     SERVICE, LP, d/b/a ALLIED  )
 8   UNIVERSAL SECURITY         )
     SYSTEMS,                   )
 9                              )
             Defendant.         )
10
                              -  -  -
11
12              REMOTE VIDEOTAPED DEPOSITION OF ANNA
13      SOJA, PMK, located in Texas, commencing at 8:30
14      A.M. CST, 9:30 A.M. EST, on Friday, September
15      13, 2024, before ALYSSA A. REPSIK, Court
16      Reporter and Notary Public in and for the
17      Commonwealth of Pennsylvania.
18
19
20
21
22
23
24
25
```

Page 2

1   APPEARANCES VIA ZOOM:
2   FOR THE PLAINTIFF:
3   AH LAW, PLLC
4   BY:  AMANDA C. HERNANDEZ, ESQ.
5   5718 WESTHEIMER, SUITE 1000
6   HOUSTON, TX 77057
7   Amanda@ahfirm.com
8
9   FOR THE DEFENDANT:
10  MARTENSON, HASBROUCK & SIMON, LLP
11  BY:  NATHAN A. SHINE, ESQ.
12  500 DAVIS STREET, SUITE 1003
13  EVANSTON, IL 60201
14  Nshine@martensonlaw.com
15
16  OTHER APPEARANCES:
17  JENNIFER MUNTER STARK, ESQ.
18  LEGAL VIDEOGRAPHER - TIMOTHY COX
19
20              ---o0o---
21
22
23
24
25

Page 3

1                  INDEX
2               ---o0o---
3                                                 PAGE
    EXAMINATION:  ATTORNEY HERNANDEZ               6
4
5               ---o0o---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        P R O C E E D I N G S
2            THE VIDEOGRAPHER:  Good
3   morning.  We are now on the record at 8:36 a.m.
4   Central Time on September 13, 2024, to begin
5   the deposition of Anna Soja, Universal
6   Protection Services, LP, doing business as
7   Allied Universal Security Services, pursuant to
8   Fed. R. Civ. P. 30(b)(6), in the matter of
9   Twana Ahmed versus Universal Protection
10  Services, LP, d/b/a Allied Universal -- or
11  doing business as Allied Universal.
12           The venue for this case is in the
13  United States District Court for the Southern
14  District of Texas, Houston Division.  The case
15  number is 4:23-CV-02823.
16           This deposition is taking place via
17  Zoom video conference.  The legal videographer
18  is Timothy Cox, here on behalf of Steno, and
19  our court reporter is Sara Acklin [sic], also
20  here on behalf of Steno.
21           So would counsel please identify
22  yourselves and state who you represent.
23           ATTORNEY HERNANDEZ:  Amanda
24  Hernandez for plaintiff, Twana Ahmed.
25           ATTORNEY SHINE:  Nathan Shine,

Page 5

1   for Universal Protection Service, LP, doing
2   business as Allied Universal Security Services.
3            THE VIDEOGRAPHER:  Thank you,
4   Counsel.
5            Would the reporter please swear in
6   the witness.
7            ANNA SOJA, PMK, a witness
8   herein, having been first duly sworn, was
9   examined and testified as follows:
10                EXAMINATION
11  BY ATTORNEY HERNANDEZ:
12      Q.   Thank you.
13           Do you agree that companies must
14  protect employees from discrimination in the
15  workplace?
16      **A.   Yes, I do.**
17      Q.   Is that important?
18      **A.   Yes, it is.**
19      Q.   On a scale of 1 to 10 where 1 is not
20  important at all, and 10 is the most important,
21  how important is it that companies protect
22  employees from discrimination in the workplace?
23      **A.   10.**
24      Q.   Why is that important?
25      **A.   It is important for us to be able to**

Page 6

1 protect our employees from any discrimination
2 based on any race, religion, national origin,
3 or any protected classes as stated by the law.
4   Q.   Is there any other reason why it's
5 important besides the law?
6   A.   Yes.  It is good for us to foster a
7 safe and comfortable environment for all of our
8 employees, to foster an inclusive and diverse
9 environment for our employees.
10       So it is very important for us to be
11 able to have an environment where individuals
12 are able to come into work, feel comfortable
13 when they're in the work environment and the
14 individuals they are working with.
15   Q.   Do you agree that companies must
16 protect employees from retaliation when they
17 report discrimination?
18   A.   Yes, I do.
19   Q.   Is that important?
20   A.   Yes, it is.
21   Q.   On the same scale of 1 to 10, how
22 would you rate that?
23   A.   10.
24   Q.   And why is it important to protect
25 employees from retaliation?

Page 7

1   A.   It is important for us to protect
2 employees from retaliation in order for them to
3 feel comfortable in the environment they are
4 working with and to protect them from any
5 lawful behaviors conducted by other
6 individuals.
7       And to make sure that they have an
8 environment that they could work in where they
9 don't fear that they will be retaliated against
10 if they brought any matters to our attention.
11   Q.   Do you agree that companies must
12 protect employees from retaliation when they
13 request religious accommodations?
14   A.   Yes, I do.
15   Q.   And on the same scale of 1 to 10,
16 how important is that?
17   A.   10.
18   Q.   And why is that important?
19   A.   It is important for us -- for our
20 companies -- or Allied Universal -- to ensure
21 that an individual is able to bring to our
22 attention a reasonable accommodation request
23 and for us to review the accommodation request
24 and be able to provide them with an interactive
25 conversation to protect their rights and for us

Page 8

1 to be able to review all the information that
2 was provided to us to ensure that we are
3 protecting their rights and reviewing the
4 information they brought to us in regards to
5 any accommodations.
6   Q.   Do you agree that not protecting
7 employees from discrimination or retaliation
8 can be unsafe?
9   A.   I do.
10   Q.   Is it fine with you if I refer to
11 "Allied Universal" or "Universal Protection
12 Services, LP," as just "Allied"?
13   A.   Yes.  Yeah.
14   Q.   Thank you.
15       Are Allied's policies and procedures
16 mandatory?
17   A.   Yes, they are.
18   Q.   Allied has a zero-tolerance policy
19 for discrimination and harassment; correct?
20   A.   Yes, they do.
21   Q.   And Allied also has a zero-tolerance
22 policy for retaliation in the work place?
23   A.   That is correct, yes.
24   Q.   On a scale of 1 to 10, 1 being not
25 important at all and 10 being the most

Page 9

1 important, how important is it to Allied that
2 it follow its policies and procedures?
3   A.   10.
4   Q.   Okay.  And on the same scale of 1 to
5 10, how important is it to Allied that there be
6 no discrimination in the workplace?
7   A.   10.
8   Q.   And same scale, that there be no
9 retaliation in the workplace?
10   A.   10.
11   Q.   And same scale, that there be no
12 harassment in the workplace?
13   A.   10.
14   Q.   How does Allied ensure that there is
15 no discrimination in the workplace?
16   A.   Well, Allied does provide several
17 trainings for all individuals for -- from every
18 level, from a security professional to senior
19 management, to ensure that they are well aware
20 of what is determined to be discrimination,
21 harassment, retaliation so they're well versed
22 and understand that.
23       And we also provide all of our
24 employees on every level a platform to report
25 any reports of discrimination, harassment,

Page 10

1  retaliation, hostile work environment,
2  bullying, anything that they have felt was an
3  inappropriate conduct in the workplace.
4       Q.   You mentioned that Allied provides
5  training to all levels of employees.  Does
6  Allied provide different training to security
7  professionals than it does to, say, supervisors
8  or managers?
9       A.   It does -- it does determine on the
10 role.  We do have standardized training that
11 everybody receives across the board that's the
12 same.  For example, like, new employee
13 orientation training is the same across the
14 board.
15           There are more significant levels of
16 training for higher leadership roles than maybe
17 a security professional would receive.  But
18 security professionals would receive training
19 that's specific to their specific roles, and
20 same goes for anything that's any levels above
21 that.
22      Q.   And just to clarify, so let's say
23 we're talking about a security professional.
24 What -- setting aside their training for their
25 specific role, what training does Allied

Page 11

1  provide on antidiscrimination and
2  antiretaliation laws?
3       A.   Sure.  During new employee
4  orientation, all employees must come -- must
5  complete three modules followed by a final
6  exam.
7            The first module outlines the
8  antiharassment policy, which goes over
9  discrimination, harassment, the different types
10 of harassment there is, and ways of reporting
11 that harassment.
12           There's an addition -- could be some
13 additional training.  If it's State required,
14 then Allied Universal would also conduct that
15 training.
16           For example, in Illinois, it is
17 mandatory to provide annual training on, you
18 know, harassment or discrimination, but it is
19 sometimes state specific.
20      Q.   And then aside from that initial
21 training on the module, is there any other
22 training that Allied requires of security
23 professionals throughout their tenure with
24 Allied?
25      A.   Yes.  There's continuous training.

Page 12

1  It depends on how long they've been with the
2  organization, but there is continuous training.
3            We do have something that's called
4  core training, that they have to complete as
5  mandatory training, all paid.  There's several
6  levels of the training.  It depends on their
7  specific role.
8            So for example, for security
9  professionals, there's guidelines of what
10 training they are mandatory to complete.
11           There's also voluntary training
12 available for all of our security professionals
13 through an online platform.
14           There's also site-specific
15 client-requested training that security
16 professionals go through.
17           So it's continuous throughout their
18 employment.
19      Q.   And -- excuse me.
20           I probably asked the question
21 incorrectly.
22           But specific to training on
23 discrimination and retaliation, aside from the
24 new -- the new employee orientation module, are
25 employees required to take additional training

Page 13

1  on discrimination and retaliation?
2       A.   Yes, if it's State mandated.
3       Q.   Okay.  So, for example, in Texas are
4  they required to?
5       A.   The State does not require it in
6  Texas.
7       Q.   Okay.  And so if so, Twana Ahmed who
8  was working at Allied, he would have completed
9  the module that you referred to when he was
10 initially hired?
11      A.   That is correct.
12      Q.   Okay.  And so would there be
13 evidence of that completion in the test that
14 was taken somewhere?
15      A.   So there is -- so there's a
16 compliance code that is entered into the
17 compliance tracker in their employee file, that
18 outlines that new employee orientation was
19 completed, and that means that it was
20 successfully completed because there is a final
21 exam at the end.
22           If an employee or new hire at new
23 employer orientation does not pass that exam,
24 we do not move forward with employment for
25 them.  So in Mr. Ahmed's situation, he would

Page 14

1  have completed it and must have passed the exam
2  if we moved forward with his employment.
3        Q.    Okay.  Excuse me.
4              You have -- so the module -- how
5  long is the module that's for
6  antidiscrimination and antiretaliation laws?
7        A.    They are self-paced.  The time to
8  complete all three modules are back to back to
9  one another with questions in between, but it's
10 a three-hour course to complete all three
11 modules.
12             Again, it is self-paced, so it would
13 be up to the candidate for how long it took
14 them to complete any specific module.
15       Q.    Okay.  Thank you.
16             And so when supervisors are
17 initially hired or promoted, do supervisors
18 have any different training on discrimination
19 or harassment or retaliation at Allied?
20       A.    Supervisors will receive the same
21 training as the security professional on those
22 particular matters.
23       Q.    Okay.  And what about managers?
24       A.    Managers do receive -- if, for
25 example, if it's a new manager going and

Page 15

1  bringing -- from an external candidate coming
2  into the organization or if it's a promotion,
3  they are required to complete a new employee
4  orientation for administrative employees which
5  is -- differs from the security professional
6  and supervisor modules.  It's a little more
7  extensive.
8        Q.    The specific part on discrimination
9  and retaliation and harassment is more
10 extensive?
11       A.    The training is more extensive.  Our
12 policies and training in regards to harassment,
13 retaliation are the same across the board.
14       Q.    I see.  Can you give me an example
15 of how the training is more extensive?
16       A.    Well, they have more requirements as
17 far as, you know, investigating reports, making
18 sure that reports are submitted in a timely
19 fashion.
20             So for example, security
21 professional they are told, you know, "You are
22 -- you have to report, you know, these type of
23 incidents."
24             From a manager perspective, as soon
25 as they become aware of such incidents, they

Page 16

1  should be conducting investigations.  They
2  should be reporting it.
3              So their training is to -- how to
4  properly react to a situation as soon as they
5  become aware of any type of discrimination,
6  harassment, retaliation occurring as opposed to
7  an SP reporting it out.
8        Q.    I see.  Okay.  And is that also just
9  given to them when they're initially promoted
10 or hired, and then that's it if it's not
11 required by the State?
12       A.    That is correct.
13       Q.    Okay.  Would there be written
14 materials that explain the training that
15 managers must follow when they're investigating
16 reports?
17       A.    Yes.  It is outlined in the
18 administrative handbook.
19       Q.    As far as you know, has the
20 administrative handbook been produced in this
21 case?
22       A.    I'm not -- I'm not sure.
23       Q.    Okay.  Is the administrative
24 handbook something that -- you might have said
25 this.

Page 17

1              Is the administrative handbook
2  something that only the managers must follow or
3  do supervisors also need to follow the
4  administrative handbook?
5        A.    Supervisors and security
6  professionals follow the security professional
7  handbook.  Any managers and administrative
8  roles and above follow the admin handbook.
9        Q.    Okay.  Thank you.
10             Patrick Freeney, what was his title
11 at Allied in --
12       A.    He was an operations manager.
13       Q.    An operations manager.  So he would
14 have been following the administrative
15 handbook?
16       A.    That is correct.
17       Q.    Okay.  And can you tell me when
18 Patrick Freeney was first hired?
19       A.    I believe it was January of 2021,
20 from the best of my recollection.
21       Q.    Okay.  So he was hired in directly
22 as a manager?
23       A.    I do believe so, yes.
24       Q.    Okay.  And I'm sorry.  You said
25 January of 2021?

Page 18

1  A. Correct.
2  Q. Okay. And what level of education
3  or experience did he have?
4  A. I do not recall.
5  Q. Do you know what level of experience
6  he had?
7  A. From my recollection, he would have
8  had previous leadership experience. I just --
9  I just do not recall at this time.
10 Q. If you wanted to find out, how would
11 you do that?
12 A. We have a platform that we're able
13 to look at his employment application, r sum
14 submitted, and anything he would disclose
15 during his onboarding process.
16    So I would be able to verify, had
17 I -- I'm able to view that information.
18 Q. Okay. During the course of his
19 employment, was Patrick Freeney the subject of
20 any investigation at Allied?
21 A. Yes, he was.
22 Q. Was it just one investigation?
23 A. Yes, it was. I'm sorry. There was
24 two incidents. I apologize.
25 Q. Okay. What was the first incident?

Page 19

1  A. We received a concern regarding
2  him -- it was an anonymous complaint submitted
3  through or our NAVEX hotline regarding him
4  potentially requiring his supervisors to
5  complete schedules on his behalf.
6  Q. Was that against Allied's policy?
7  A. It is not.
8  Q. Okay. And what was the outcome of
9  that investigation?
10 A. It was not substantiated.
11 Q. Who conducted that investigation?
12 A. I do not recall.
13 Q. When did that investigation take
14 place?
15 A. I want to say somewhere mid-2022.
16 Q. And then what were the circumstances
17 surrounding the second incident?
18 A. The second complaint that we
19 received through our employee hotline was
20 submitted by the plaintiff.
21 Q. And what was the outcome of that
22 investigation?
23 A. So it was a twofold piece. So
24 the -- the allegations regarding Patrick
25 Freeney making inappropriate comments was

Page 20

1  unsubstantiated.
2     The allegations in regard to
3  requesting the plaintiff to shave his beard
4  were unsubstantiated.
5     We reviewed the termination, because
6  that was included also in the complaint, and we
7  reviewed that the termination was justified.
8  Q. Is -- you said there was a twofold
9  piece. Was that the first part, or is there --
10 or were you explaining both parts?
11 A. Both parts. So the first part would
12 be that there was comment that -- there was
13 allegations that Patrick Freeney was making
14 inappropriate comments to the plaintiff. And
15 the second piece that it was a wrongful
16 termination.
17 Q. And Patrick Freeney no longer works
18 for Allied; correct?
19 A. That's correct.
20 Q. When was his last day?
21 A. It was on or about June 2022.
22 Q. And what -- why did he leave?
23 A. He resigned for personal reasons.
24 Q. Do you know where he's working now?
25 A. I do not.

Page 21

1  Q. Was Patrick Freeney disciplined in
2  any way during his time at Allied?
3  A. He was not.
4  Q. Okay. Do you agree that
5  discrimination in the workplace is a
6  foreseeable danger to employees?
7  A. Yes, it is. It could be, yes.
8  Q. Okay. Why is that?
9  A. Well, it depends. If an
10 organization becomes aware of such instance and
11 doesn't act on it, it could escalate between
12 the individuals involved. So it could pose a
13 danger if the company doesn't become involved
14 in the matter.
15 Q. In developing Allied's policies and
16 procedures applicable to preventing
17 discrimination and retaliation in the
18 workplace, did Allied consider any statistics
19 related to, say, the percentage of employees
20 that experience discrimination?
21 A. I do not know.
22 Q. In your experience as an HR
23 professional, have you encountered any studies
24 showing percentages of employees that report
25 having experienced discrimination?

Page 22

1   A.   I do not.
2        ATTORNEY SHINE:  Objection to
3   outside the scope, Amanda.
4   BY ATTORNEY HERNANDEZ:
5   Q.   In your education and training and
6   experience, are you aware that oftentimes
7   employees that experience discrimination often
8   do not report it out of fear of retaliation?
9        ATTORNEY SHINE:  Again,
10  objection.  Outside the scope.
11  BY ATTORNEY HERNANDEZ:
12  Q.   You can still answer.
13       ATTORNEY SHINE:  To the extent
14  she has any knowledge, she can answer.
15       THE WITNESS:  And I'm sorry.
16  Can you rephrase the question?
17  BY ATTORNEY HERNANDEZ:
18  Q.   Sure.  At -- you are an HR
19  professional; correct?
20  A.   That is correct.
21  Q.   Okay.  How long have you been
22  working in HR?
23  A.   A little over 10 years.
24  Q.   And so in your experience as an HR
25  professional, are you aware that oftentimes

Page 23

1   employees that experience discrimination will
2   not report it out of fear of retaliation?
3        ATTORNEY SHINE:  My objection
4   stands.
5        THE WITNESS:  Yes.
6        ATTORNEY SHINE:  But she may
7   answer.
8        THE WITNESS:  Yes.
9   BY ATTORNEY HERNANDEZ:
10  Q.   Okay.  Have you -- in your studies,
11  have you seen a report noted by the EEOC that
12  roughly 75 percent of employees that have
13  reported workplace conduct have experienced
14  retaliation?
15       ATTORNEY SHINE:  Objection.
16  Outside the scope.
17       To the extent she has any personal
18  knowledge, she may answer.  However, this is
19  not the appropriate question for a 30(b)(6)
20  witness.
21  BY ATTORNEY HERNANDEZ:
22  Q.   You may answer.
23  A.   I do not.
24  Q.   How does Allied ensure the
25  discrimination and harassment is not occurring

Page 24

1   in its workplace if employees do not self
2   report?
3   A.   Well, we do provide all of our
4   employees guidelines in the employee handbook
5   on how to report any type of discrimination
6   that they may be -- discrimination, harassment,
7   retaliation -- that they become aware of.
8        They are able to report these
9   matters anonymously through our hotline which
10  is available to them 24/7.
11       Also, during our trainings and new
12  employee orientation, we also outline the
13  individuals that observe somebody being
14  discriminated against, harassed, retaliated
15  against for them to also speak up and report
16  those matters to us.
17  Q.   Okay.  So if an employee is fearful
18  of retaliation and does not self-report, does
19  Allied do anything to ensure that
20  discrimination is not happening?
21       For example, does it monitor the
22  workplace in any way?
23  A.   Well, in our industry, it's a little
24  more difficult to do that because we are
25  contract security.  So we provide security

Page 25

1   services through multiple clients throughout,
2   you know, throughout cities, throughout the
3   country, and it's very site-specific.
4        So we're not in one environment
5   together where we're able to do that.  It's all
6   very spread out.
7   Q.   Okay.  So just so I have a clear
8   answer, does Allied monitor the workplace to
9   ensure that discrimination is not happening?
10  A.   I would say, yes, we do monitor.  We
11  ensure that our managers are, you know, well
12  trained to observe these matters, but again,
13  depending on the location, some -- some sites
14  have just one security professional by
15  themselves in a guard shack, for example.
16  Right.  So it would be difficult for us to be
17  able to monitor in a situation like that.
18       In a larger location, yes, it would
19  probably be much easier for a manager to be
20  able to monitor that.
21  Q.   Is anyone monitoring the managers to
22  ensure that they are not engaging in
23  discriminatory or retaliatory behavior?
24  A.   I would say that yes.  I mean, we --
25  you know, there's definitely meetings occurring

Page 30

1  Zepeda, Alexander Bergeron, and Nathan
2  Hernandez. I want to say it was a Nathan for
3  sure. I just might be recalling the last name
4  incorrectly.
5       Q.   Were -- so you listed four people.
6  Were those four subordinates considered
7  supervisors of the security professionals?
8       A.   They are field supervisors that,
9  yes, they -- in the hierarchy, it would be
10 Patrick, the field supervisors, and then all
11 security professionals below them.
12      Q.   So is Patrick also -- so were the
13 security professionals also Patrick Freeney's
14 subordinates?
15      A.   Yes. They were considered under
16 him. Yes.
17      Q.   And who is Patrick Freeney's
18 immediate supervisor?
19      A.   It was Felicia Solis-Ramirez.
20      Q.   And what is Felicia's title?
21      A.   Branch manager.
22      Q.   When was Felicia hired by Allied?
23      A.   From my understanding, January 2018.
24      Q.   What's her level of education?
25      A.   I do not recall. She had 10 years

Page 31

1  of leadership experience prior to her hiring.
2       Q.   And 10 years of management
3  experience doing what?
4       A.   In the management roles.
5       Q.   Do you know where?
6       A.   I do not recall.
7       Q.   Did she have a security professional
8  background?
9       A.   I do not recall.
10      Q.   Was Felicia always the branch
11 manager from 2018 until the time she left?
12      A.   That is correct.
13      Q.   Would Felicia have been required to
14 follow the administrative handbook?
15      A.   Yes.
16      Q.   Would Felicia have been required to
17 do any additional training on discrimination,
18 retaliation, or harassment while at Allied?
19      A.   She would have completed training on
20 those topics.
21      Q.   Aside from the initial onboarding
22 training, would she have been required to
23 complete training -- like, yearly training or
24 more frequent training?
25      A.   I do not know.

Page 32

1       Q.   Was she based in Texas?
2       A.   Yes, she was.
3       Q.   And so if Texas didn't require it,
4  would she have been required to undergo
5  additional training on discrimination,
6  harassment, or retaliation?
7       A.   I do not know.
8       Q.   And if she had completed that
9  training, would Allied have a record of it?
10      A.   Yes, we would.
11      Q.   And when was Felicia's last day of
12 work with Allied?
13      A.   I believe -- gosh. I believe
14 potentially May 2024.
15      Q.   And what were the circumstances of
16 her departure?
17      A.   She resigned.
18      Q.   Did she resign in lieu of
19 termination?
20      A.   I do not believe so, no.
21      Q.   Do you know why she resigned?
22      A.   I do not.
23      Q.   Do you know where she is working
24 now?
25      A.   I do not.

Page 33

1       Q.   Did Patrick Freeney resign in lieu
2  of termination?
3       A.   I do not know, but I don't believe
4  so.
5       Q.   Is there somebody that would know?
6       A.   Yeah. Most definitely there would
7  be somebody from the Texas group that would
8  definitely know that.
9       Q.   Who would know?
10      A.   We -- we could request that
11 information to be provided. There would be
12 record of it. The Texas branch leadership
13 would know that information.
14      Q.   And who is considered Texas branch
15 leadership?
16      A.   At this time, I believe Bill Keene.
17 No. Sorry. He's -- I don't think he's no
18 longer with the company.
19           Well, our HR manager would
20 definitely be able to look that information up,
21 which is Katherine Alyea. Alyea.
22      Q.   Okay. So Katherine -- I'm sorry.
23 How do you pronounce her last name?
24      A.   "Alyea," I believe.
25      Q.   Katherine Alyea is the HR manager

Page 34

1  for Texas?
2      A.  For the Houston branch.
3      Q.  Okay.  And you mentioned Bill Keene.
4  You said he no longer works with Allied?
5      A.  Yes.  At the time, he would have
6  been Felicia's direct report, but he's no
7  longer with Allied.
8      Q.  What was his title?
9      A.  He was regional vice president.
10     Q.  When did he leave?
11     A.  I do not know.
12     Q.  Do you know why he left?
13     A.  I do not.
14     Q.  You said Bill Keene would have been
15 Felicia's direct supervisor, I believe?
16     A.  At the time, yes.
17     Q.  At the time.  Did she have any other
18 supervisors?
19     A.  No.  Not in the hierarchy, no.
20     Q.  And in the hierarchy, who -- was
21 Felicia Patrick Freeney's only direct
22 supervisor?
23     A.  Yes.
24     Q.  Is there anyone else that Patrick
25 Freeney would have reported to?

Page 35

1      A.  No.  She would be his direct
2  supervisor.
3      Q.  Okay.  Could you briefly tell me
4  what Patrick Freeney's general duties were as
5  account manager?
6          ATTORNEY SHINE:  I'm just
7  objecting to misstating the testimony.
8          ATTORNEY HERNANDEZ:  I'm
9  sorry.
10 BY ATTORNEY HERNANDEZ:
11     Q.  What was his title?  What was
12 Patrick Freeney's title?
13     A.  Operations manager.
14     Q.  Thank you.  Can you let me know --
15 can you explain what his general duties were as
16 operations manager?
17     A.  The general duties of an operations
18 manager, it's scheduling, doing call-offs,
19 filling the schedules, dealing with day-to-day
20 concerns from employees, maintaining
21 compliance, ensuring training is occurring.
22         There are several criterias that
23 managers must meet.  A standard -- for example,
24 advanced scheduling, ensuring payroll is
25 adequately submitted.  They're responsible for

Page 36

1  payroll records.  They're responsible for
2  managing that employees are calling in, calling
3  out.  Responsible for ensuring that employees
4  are following company guidelines as far as
5  utilizing our technology while they're on post.
6          And interacting with clients and the
7  general public to make sure that our security
8  professionals are meeting company standards and
9  client requirements.
10     Q.  Was Patrick Freeney considered the
11 Elite account manager?
12     A.  He -- I don't -- I wouldn't say that
13 he was the Elite account manager.  He oversaw
14 the AGB account, and the Elite program was
15 embedded into that account.
16     Q.  And did he oversee that for all of
17 Houston?
18     A.  I do not know.
19     Q.  Okay.  Do you know how many security
20 professionals he managed?
21     A.  I do not know.
22     Q.  Did Pat -- did Patrick have
23 authority to hire new members to his team?
24     A.  Yes, he did.
25     Q.  Did he have authority to discipline

Page 37

1  members of his team?
2      A.  Yes, he did.
3      Q.  Did he have authority to approve
4  whether members of the team worked overtime?
5      A.  Yes, he did.
6      Q.  And I think you said this already,
7  but he had authority to set employee schedules
8  or alter employee schedules?
9      A.  Yes.
10     Q.  And did he have authority to fire
11 members of his team?
12     A.  Yes.
13     Q.  It was Patrick Freeney that
14 recommended Twana Ahmed be fired from Allied;
15 true?
16     A.  Yes.
17     Q.  What is your title with Allied?
18     A.  Human resources director, regional
19 for the Midwest.
20     Q.  And how long have you worked with
21 Allied?
22     A.  Eight years.
23     Q.  Have you always been the human
24 resources director?
25     A.  No.

**Page 70**

1  that we find through the course of
2  investigation. Right.
3       It's not really black and white when
4  these investigations are occurring. The more
5  questions that we ask, the more patterns that
6  we are looking at, we are able to then possibly
7  determine what our next steps are.
8       So it really depends on each
9  situation. There's not one -- there's no
10 situations that are all the same, so it really
11 would depend on what we are able to collect,
12 what we are able to find through the course of
13 these investigations.
14      So it's really difficult to say,
15 "Here's what the exact next step we would
16 take." It would just depend on the information
17 we're able to collect.
18     Q.   Okay. What is Allied's policy on
19 security professionals having beards?
20     A.   Our policy -- our standard policy is
21 they must be clean shaven.
22     Q.   Okay. And if a security
23 professional must keep a beard for religious
24 purposes, is there an exception?
25     A.   Well, we do ask for a religious

**Page 71**

1  accommodation to be completed so we have record
2  of it, but it would be the same thing. They're
3  allowed to keep their beard. It just has to be
4  clean shaven.
5      Q.   Can you define "clean shaven"?
6      A.   So I believe there's a standard
7  regarding, you know, them making sure it's
8  shaved correctly right above the collar line.
9      Q.   Okay.
10     A.   It's not, like, messy. That it's,
11 you know, well groomed.
12     Q.   Okay. So a beard is allowed as long
13 as it's above the collar line and not messy?
14     A.   Correct.
15     Q.   Okay. Are supervisors and managers
16 trained that they should allow beards as long
17 as it's above the collar line and not messy?
18     A.   Yes. It's provided in the grooming
19 standards. Yes.
20     Q.   Okay. If a security professional
21 tells his supervisor that he needs to keep his
22 beard for religious purposes, what should
23 happen?
24     A.   They could ask for a religious
25 accommodation, but it would have -- something

**Page 72**

1  to be reviewed depending on what they're
2  requesting for their beard to be. Are they
3  saying that they can't shave, be clean shaven
4  during this time, the kind of questions we
5  would ask.
6       But they would be allowed to have
7  their beard.
8      Q.   Okay. That's probably -- I probably
9  asked a bad question, but what should the
10 supervisor do if -- if the security
11 professional is indicating that they want to
12 keep their beard for religious purposes?
13     A.   They should be able to allow them as
14 it's not a violation of policy.
15     Q.   Okay. So -- and it's -- it's
16 against policy for the supervisor to
17 continually pressure the employee to shave
18 after they've expressed that request to keep
19 the beard, right, for religious purposes?
20     A.   There wouldn't be an exact policy
21 saying that you can't continue to ask someone
22 that, but no, there would be -- there shouldn't
23 be a reason why a supervisor is pressuring
24 someone to do so.
25          ATTORNEY HERNANDEZ: Okay. If

**Page 73**

1  it's okay, I'd like to take just a short
2  10-minute break to run to the restroom and then
3  come back on the record.
4           THE VIDEOGRAPHER: Okay. We
5  are now off the record. The time is 9:57 a.m.
6  Central Time.
7           (A recess was taken.)
8           THE VIDEOGRAPHER: We are now
9  on the record. The time is 10:09 a.m. Central
10 Time.
11 BY ATTORNEY HERNANDEZ:
12     Q.   You testified earlier that Allied
13 trains investigators to follow investigation
14 guidelines; correct?
15     A.   Correct.
16     Q.   Are the guidelines mandatory?
17     A.   They're not mandatory. They're just
18 a guideline as a best practice provided to our
19 investigators as a way to kind of show how
20 investigations should be done, but no, they're
21 not mandatory.
22     Q.   Could an employee or an investigator
23 be disciplined for not doing a proper
24 investigation?
25     A.   Yes.

ANNA SOJA - PMK  
SEPTEMBER 13, 2024  
JOB NO. 1171182

Page 74

1   Q.   In your history there at Allied, has
2   anyone been disciplined for not doing a proper
3   investigation?
4          ATTORNEY SHINE:  Objection.
5   Outside the scope of the 30(b)(6) witness.
6          To the extent you're asking for her
7   personal knowledge, she may testify.
8          THE WITNESS:  In my personal
9   experience, yes, there -- there definitely have
10  been.  Again, we're -- it's region by region,
11  so it depends on the region how they would view
12  that.
13         But, yes, there have been, in my
14  experience.
15  BY ATTORNEY HERNANDEZ:
16  Q.   What were the circumstances
17  surrounding what -- that discipline?
18         ATTORNEY SHINE:  Again,
19  objection.  Outside the scope.
20         To the extent she's answering from
21  her personal and information, she may testify.
22         THE WITNESS:  If this is
23  something under my review -- we review, you
24  know, cases all the time.  Either if an
25  employee, you know, brings it to out attention

Page 75

1   that they felt that the investigation was
2   inadequately completed or we did our own review
3   and found the investigation was inadequately
4   completed, we review what was done what was not
5   done, and determine what level of discipline
6   based on what was not properly conducted during
7   that investigation.
8          So it depends on kind of the
9   circumstances surrounding it.
10  BY ATTORNEY HERNANDEZ:
11  Q.   Can you give me an example of
12  when -- of an improper investigation?
13         ATTORNEY SHINE:  Objection.
14  Outside the scope.
15         To the extent she's answering from
16  her personal knowledge, she may testify.
17         THE WITNESS:  Sure.  In one of
18  the experiences that I, you know, we've had, we
19  found that a manager didn't respond to a
20  complaint.  They received a text message of
21  concerns regarding their supervisors.  The
22  manager failed to even respond or act on it.
23         And then it was brought to our
24  attention later that the employee was leaving
25  the organization because they were not -- they

Page 76

1   felt that we didn't do any actions to act on
2   their complaint.
3          And the manager was subsequently
4   placed on a final with additional training due
5   to failure to react to a complaint that was
6   brought to their attention.
7   BY ATTORNEY HERNANDEZ:
8   Q.   Okay.  But the manager was not
9   terminated?
10  A.   No, was not terminated.
11  Q.   So you mentioned -- what -- under
12  Allied's policies, what are managers supposed
13  to do when somebody reports discrimination?
14  A.   Managers are supposed to intake a
15  statement immediately from the reporting party.
16  They're also required to ask all the relevant
17  questions; who was involved, when did it occur,
18  has it happened previously, was this previously
19  reported, are there any witnesses.  Asking for,
20  you know, potential areas of where it was.  If
21  there's potential camera footage, they may go
22  review it.  It just depends if there is or
23  isn't.
24         They are to report it to HR
25  immediately.  And we partner with the managers

Page 77

1   to conduct the investigation really depending
2   on what type of allegation it is.
3   Q.   Okay.  Is Allied's use of force
4   policy mandatory?
5   A.   Yes, it is.
6   Q.   Okay.  And so the use of force
7   policy allows security professionals to use
8   some force if they fear for their own safety or
9   the safety of others; true?
10  A.   No.  It has to be in a very extreme
11  level.  So it's not just if they feel that
12  there's harm, there has to be deadly threat
13  towards them or others in order for them to
14  engage into any physical activity with someone.
15  But it would have to be a threat of fatality.
16         So it's kind of hard to say yes if
17  that's the, you know, case.  It has to be an
18  extreme measure.
19  Q.   For any -- are you saying there has
20  to be a threat of deadly force for any level of
21  the continuum in the use of force policy?
22  A.   No.  That would be the final one.
23  There's several levels of the use of force
24  policy.  Our security professionals are trained
25  that they should never engage or physically

Page 82

1   A.   Yes, yes.
2   Q.   Okay. So in looking at this, is
3   Level 4 allowing the use of pepper spray when
4   the officer has a fear for their own safety or
5   the safety of others?
6   A.   Yes.
7   Q.   Okay. And so does Allied issue
8   pepper spray to its security professionals in
9   anticipation that there may be some
10  circumstances in which they would need to use
11  the pepper spray for their own safety or the
12  safety of others?
13  A.   Yes. Extreme measures, yes.
14  Q.   Then the next level below that would
15  be Level 3; correct?
16  A.   Yes.
17  Q.   And so I think this is what you were
18  referring to before where there's -- it says,
19  "Use of hands, control hold, and restraints";
20  right?
21  A.   Yes.
22  Q.   And so Allied issues its security
23  professionals handcuffs in anticipation that
24  there may be some circumstances in which they
25  need to use the handcuffs; right?

Page 83

1   A.   Yes.
2   Q.   And under the policy, are security
3   professionals allowed to use handcuffs if they
4   fear for their own safety or the safety of
5   others?
6   A.   Yes, but again, I would have to
7   be -- that has to be somebody posing a real
8   threat to them.
9        But, yes, that's what they would
10  need.
11  Q.   Okay. And so under -- and then
12  below that is Level 2, which is just verbal
13  communication; right?
14  A.   Yes. I wouldn't say "just." This
15  is the key one. This is what our security
16  professionals are predominantly trained on as
17  their best efforts is to verbally attempt to
18  de-escalate the situation.
19       They truly -- at this point, if
20  they're being unsuccessful with de-escalating a
21  situation with an individual, the police should
22  be involved in this matter.
23       All levels higher than this, these
24  are just extreme in a situation where there
25  is -- there's a threat of harm that poses a

Page 84

1   true harm towards individuals. Our security
2   professionals are really trained on one and
3   two. Verbal commands are the ones that they
4   really are trained to help de-escalate a
5   situation, causing a space in between
6   themselves and the individuals they're speaking
7   with.
8        And if that's not working, they
9   should really be getting the police involved at
10  that point.
11  Q.   So are you saying that the security
12  professionals are not trained on Levels 3
13  through 6?
14  A.   No. That is not what I'm saying.
15  They're 100 percent trained on all these
16  matters, Level 3, 4, and 6. 3 -- sorry. 3, 4,
17  5, and 6 are the worst-case scenarios.
18  Q.   Okay.
19  A.   Where you would need to get involved
20  and de-escalate it to these sections if
21  there's, again, threats that pose harm to
22  themselves or others.
23       We do not only want to train
24  individuals that they don't have to get to that
25  level by attempting to de-escalate the

Page 85

1   situation by providing verbal commands to the
2   individuals and involving the police, as it
3   should be a police matter. If that doesn't
4   work and the police maybe don't arrive in time
5   and the situation is escalating, then they move
6   on to the next levels.
7   Q.   Okay. Excuse me. I lost my train
8   of thought for a second.
9        These -- these levels allow for some
10  discretion on the part of the professional;
11  correct?
12  A.   Yes.
13  Q.   I'm going to stop sharing my screen.
14       Can you give me an example of when
15  it would be okay for the security professional
16  to use their TASER?
17  A.   If an individual displayed a weapon
18  such as a gun or a knife and attempted -- was
19  maybe, like, walking towards them or another
20  individual.
21  Q.   Can you give me an example of when a
22  security professional would be allowed to use
23  pepper spray?
24  A.   If an individual was potentially
25  charging at them in an aggressive manner or

Page 86

1  towards somebody else in an aggressive manner.
2     Q.   Okay.  And can you give me an
3  example of when the security professional is
4  allowed to use handcuffs?
5     A.   If the individual is charging at
6  themselves or another individual in an
7  aggressive manner.
8     Q.   So is that -- that was the same
9  example as Level 4; correct?
10    A.   Correct.  And that -- all armed
11 security officers have all means available to
12 them.  Some just might have a firearm and
13 handcuffs.  Some might just have TASERs and
14 handcuffs.  Some might just have OC spray and
15 handcuffs.  It depends on the contract.  It
16 depends on what the post orders and
17 requirements are.
18         So it's difficult to say that in
19 each scenario, they should use first their
20 handcuffs, then their OC spray, TASER, deadly
21 force, when not all of our armed security
22 officers may have all of those items available
23 to them per the contract requirement.
24    Q.   Okay.  So assuming they have all of
25 those items available, can you give me an

Page 87

1  example of when it would be okay to use the
2  handcuffs and not the pepper spray?
3         Because pepper spray is a level
4  above the handcuffs; correct?
5     A.   Correct.  So for an example, if we
6  had an individual that -- handcuffs would be a
7  good situation if there's an individual
8  attacking another person or attempting to harm
9  another person where our security professionals
10 were able to intervene and grab their arms and
11 handcuff them securely.
12         If they have a circumstance where
13 they're unable to do that, they could probably
14 escalate to the next level.  But this would be
15 a circumstance where an individual is
16 getting -- attacking another individual, our
17 security professional is able to intervene and
18 potentially grab the individual's arms and
19 restrain them.
20    Q.   Okay.  If the individual is
21 attacking property, not anyone else, is it --
22 would the security professional be justified in
23 using a TASER?
24    A.   Not necessarily, no.
25    Q.   You said, "not necessarily."  So

Page 88

1  there may be some circumstances where they
2  would be allowed to use the TASER?
3     A.   If the property damage was resulting
4  in somebody getting injured, then yes.  But if
5  it's just property damage -- for example,
6  somebody is just in a room and breaking
7  things -- then that's a police matter, and our
8  employees would have to refrain from, you know,
9  interacting with that individual.
10         If it was -- if the property damage
11 was causing harm -- potential harm to another
12 person, then we would see potential use for the
13 OC spray.
14    Q.   I'm sorry.  The question was
15 regarding a TASER, not the spray.
16    A.   I'm sorry.  A TASER.  Then they
17 could potentially use a TASER, yes.
18    Q.   Okay.  But if the property damage
19 was not harming an individual, would they be
20 justified in using the TASER?
21    A.   No, they would not.
22    Q.   And if they did use the TASER
23 because of property damage, would that security
24 professional be fired?
25    A.   We would have to do a review whether

Page 89

1  the use of force was justified or unjustified.
2  If there was no immediate harm to any persons
3  involved in the matter, then there wouldn't
4  really be a reason why to use the TASER.
5     Q.   Okay.  Do all violations of the use
6  of force policy result in termination?
7     A.   If they are justified.  I mean, I'm
8  sorry.  If it's an unjustified use of force.
9     Q.   Then if -- if it's an unjustified
10 use of force, then every security professional
11 is terminated --
12    A.   Correct.
13    Q.   -- at that point?  Okay.
14         Do all use -- do all -- excuse me.
15         Do all uses of force result in a
16 root cause analysis?
17    A.   No.
18    Q.   Okay.  When is a root cause analysis
19 used?
20    A.   First, the situation is evaluated.
21 In situations like a verbal or physical
22 altercation between, for example, two security
23 professionals, a root cause analysis would not
24 be used, but it is considered a use of force.
25         When there is an individual that is

Page 94

 1  would determine which level of discipline is
 2  warranted for that individual and additional
 3  training.
 4       Q.   Okay.  But that would not be a
 5  termination?
 6       A.   It's a case-by-case basis.  It would
 7  determine, you know, how egregious was the
 8  complaint, you know, how it was mishandled.
 9  You know, is there a history of this.
10            It really depends, you know, if it's
11  a new employee that maybe just didn't know what
12  to do.  You know, we put that into perspective.
13  If it's a tenured employee that should have
14  known better, that would play into
15  circumstances.
16            So it would depend on the
17  circumstances surrounding that.
18       Q.   Can you clarify what you mean by if
19  it's an egregious complaint?
20            Does that mean that HR is allowed to
21  ignore complaints that are not considered as
22  egregious?
23       A.   No.
24       Q.   Okay.  Should any report of
25  discrimination ever be ignored?

Page 95

 1       A.   No.
 2       Q.   Okay.  What date was Twana Ahmed
 3  suspended?
 4       A.   I believe it was April 4, 2022.
 5       Q.   And when was he terminated?
 6       A.   The termination date that we have on
 7  file is April 4, 2022.
 8       Q.   What does that mean, "the
 9  termination date that we have on file"?  Is
10  that the actual termination date?
11       A.   It's the -- it would be his last day
12  worked.  I don't know the exact date of when --
13  it was maybe processed.
14            But the termination date we have on
15  file for Twana is April 4th.
16       Q.   So if Twana's root cause analysis --
17  if the root cause analysis was performed for
18  Twana after April 4th, how could he have been
19  terminated before the analysis was performed?
20       A.   I do not know.
21       Q.   Is it normal procedure for Allied to
22  first conduct the root cause analysis and get
23  approval for that termination before the
24  employee is terminated?
25       A.   Yes.

Page 96

 1       Q.   Okay.  Who has to approve the
 2  termination once a root cause analysis is
 3  performed?
 4       A.   Once a root cause analysis is
 5  performed, it is the 10-7 document that's
 6  completed at the direction of our general
 7  counsel, David Buckman.
 8            We -- then it is reviewed by a panel
 9  of individuals.  The manager overseeing that
10  security professional is the ultimate
11  decision-maker, but it is reviewed to determine
12  whether or not the use of force was justified
13  or unjustified.
14            Based on the determination of the
15  panel review, then the manager makes the final
16  decision on whether termination is warranted
17  based on our findings.
18       Q.   The manager makes the final
19  decision.  So in this situation -- in this
20  circumstance would be Patrick Freeney?
21       A.   Correct.
22       Q.   Under Allied policies, if an
23  employee is suspended for more than one day,
24  then an HR professional must be involved;
25  correct?

Page 97

 1       A.   No.
 2       Q.   Let me pull up -- give me a second
 3  so I can share screen again.
 4            Are you able to see what I believe
 5  to be the Allied's -- part of Allied's
 6  disciplinary matrix?
 7       A.   Yes.
 8       Q.   This is Bates labeled AUS_00746.
 9            At the bottom here, do you see where
10  it says, "Suspensions without pay of greater
11  than one day require review with regional HR
12  manager or regional HR director in advance"?
13            Did I read that correctly?
14       A.   Yes.
15       Q.   Is that a requirement, then, that if
16  an employee is suspended for greater than one
17  day without pay, that either the HR manager or
18  the HR director needs to be involved?
19       A.   It's a guideline.  Depending on the
20  investigation type -- like, for example, use of
21  force incidents, they are predominantly handled
22  by management, and you know, determining the
23  outcome would be based on the root cause
24  analysis.
25            So this is a guideline of the

Page 98

1  expectation, but it doesn't necessarily mean
2  that a manager would need to be involved -- an
3  HR manager, HR director would have to be
4  notified of every suspension in this policy.
5       Q.   Okay.  So despite the word
6  "required," you're saying this is not
7  mandatory?
8       A.   It's a guideline.
9       Q.   Okay.  Who completed -- let me stop
10 sharing.
11           Who completed Twana's root cause
12 analysis?
13      A.   It would have been Patrick Freeney.
14 And the second reviewer was Felicia
15 Solis-Ramirez.  And Bill Keene was also
16 involved in the review.  The completion was
17 done by Patrick Freeney.
18      Q.   Okay.  And you're saying that's
19 normal procedure?
20      A.   Correct.
21      Q.   Was Patrick Freeney trained in how
22 to conduct root cause analysis -- analysis?
23      A.   He had to work in support of his
24 direct manager Felicia because that was his
25 first incident of a use of force incident.

Page 99

1       Q.   Okay.  So the question was:  Was
2  Patrick Freeney trained in how to conduct root
3  cause analysis?
4       A.   I'm sorry.  I do not know.
5       Q.   Okay.  I want to ask about the --
6  just in general general background on some of
7  the supervisors for Twana.
8            I believe you mentioned Alex
9  Bergeron.  I -- is that how you pronounce his
10 last name?
11      A.   I believe so, yes.
12      Q.   Alex Bergeron, when was he first
13 hired with Allied?
14      A.   I do not recall the exact dates.  We
15 have records I can refer back to.  I can get
16 exact dates, but I do not recall at this time.
17      Q.   Would you be able to refer to it
18 right now?
19      A.   I would have to log into our systems
20 to review it, yeah.
21      Q.   Okay.  Does Alex Bergeron still work
22 for Allied?
23      A.   Yes, he does.
24      Q.   What is his title?
25      A.   His current title is an armed

Page 100

1  security professional.
2       Q.   What was his title -- when -- so was
3  he demoted to armed security professional?
4       A.   Yes, he was.
5       Q.   Okay.  When was he demoted?
6       A.   I don't recall the exact dates, but
7  it was somewhere in the middle of 2022.
8       Q.   And why was he demoted?
9       A.   I do not recall the exact reason.
10      Q.   Was it a result of -- of the
11 incident that happened with Twana Ahmed?
12      A.   I do believe there was that.  He may
13 not have instructed Twana properly to complete
14 an incident report immediately, but I'm not
15 certain that that was the exact reason for the
16 demotion.
17      Q.   Who demoted him?
18      A.   It would have been his immediate
19 supervisor, which would have been Patrick
20 Freeney.
21      Q.   Has Alex Bergeron ever been the
22 subject of an investigation at Allied?
23      A.   I do not know.
24      Q.   Would you be able to find out?
25      A.   I believe so, yes.

Page 101

1       Q.   Has Alex Bergeron ever been
2  disciplined while at Allied?
3       A.   Yes.  I do believe when his demotion
4  occurred, he was disciplined at that time.
5       Q.   Was there a disciplinary form
6  issued?
7       A.   Yes.
8       Q.   Catherine Barnes, what is her role
9  at Allied?
10      A.   Her current role is an account
11 manager.
12      Q.   Would that be the -- okay.  Can you
13 explain what an account manager does?
14      A.   It's a manager that oversees one
15 specific location.
16      Q.   And what location -- what location
17 does she oversee?
18      A.   I do not know.
19      Q.   Is she based in Houston?
20      A.   Yes.
21      Q.   Okay.  What was -- when did she
22 become an account manager?
23      A.   I believe, if I recall correctly, it
24 would have been very recently in 2024.
25      Q.   What was her role previous to

Page 122

1   A.   No, not necessarily.  No.
2   Q.   Okay.  So sorry.  Going back, I
3   believe you just testified that it -- that a
4   witness is required when an employee is given a
5   notice of counseling.
6   A.   Yes.  On the bottom of the form, we
7   do have space that -- to provide where the
8   employee that's receiving the disciplinary, the
9   manager that's issuing, and then a witness
10  that's part of the -- that's in the room
11  witnessing the counseling or termination
12  transpiring should sign it, as well.
13  Q.   Okay.  Thank you.
14       If it's determined that a witness's
15  signature was falsified, is that a potential
16  red flag of retaliation?
17  A.   If a witness signature is falsified?
18  Q.   Yes.
19  A.   No, no.
20  Q.   Would that be a red flag at all to
21  you --
22  A.   It would be a red flag, yes.
23  Q.   What would it be a red flag of?
24  A.   Improper recordkeeping.
25  Q.   So if a manager wanted to retaliate

Page 123

1   against -- retaliate against an employee by
2   creating a paper trail of concerns and forging
3   witness signatures, would that be a red flag to
4   you of potential retaliation?
5        ATTORNEY SHINE:  Objection.
6   Outside the scope of the 30(b)(6) witness.
7        To the extent you're asking for her
8   personal knowledge or opinion, she can answer.
9        THE WITNESS:  Yeah.  And in my
10  personal opinion, yes, that would.
11  BY ATTORNEY HERNANDEZ:
12  Q.   Okay.  Is it against Allied's
13  policies for somebody to fake signatures on
14  counseling forms?
15  A.   I'm sorry.  Can you reask the
16  question?
17  Q.   Is it against Allied's policy for a
18  manager to fake signatures of witnesses on
19  counseling forms?
20  A.   Yes.
21  Q.   Is it against Allied's policies for
22  a manager to backdate counseling forms?
23  A.   I guess I would have to understand
24  what the backdate would be.  Is it backdating
25  to not the date of the actual meeting?  I would

Page 124

1   just need to get clarity on that question.
2   Q.   Right.  Fair enough.  Is it
3   against's Allied's policy to -- for managers to
4   create counseling forms that were never
5   actually given?
6   A.   Yes.
7        ATTORNEY HERNANDEZ:  Okay.
8   Pass the witness.
9        ATTORNEY SHINE:  I have no
10  questions.
11       THE VIDEOGRAPHER:  Okay.
12  Ms. Repsik, would you like to confirm
13  transcript orders first?
14       THE REPORTER:  Yes.
15       Mr. Shine, do you need a copy of the
16  transcript?
17       ATTORNEY SHINE:  Yes, please.
18       THE REPORTER:  Does anyone
19  need a rough draft?
20       ATTORNEY SHINE:  No.
21       ATTORNEY HERNANDEZ:  No
22  thanks.
23       THE REPORTER:  All right.
24  Thank you.
25       THE VIDEOGRAPHER:  Okay.  And

Page 125

1   then just need to confirm video records on
2   record.
3        Ms. Hernandez, we have your standard
4   order, if that's all right?
5        ATTORNEY HERNANDEZ:  Yes.
6        THE VIDEOGRAPHER:  Okay.  And,
7   Mr. Shine, would you like a copy of the video?
8        ATTORNEY SHINE:  That's not
9   necessary.
10       THE VIDEOGRAPHER:  Okay.  Then
11  with that, this concludes the deposition of
12  Anna Soja, Universal Protection Services, LP,
13  doing business as Allied Universal Security
14  Services, pursuant to Fed. R. Civ. P. 30(b)(6),
15  in the matter of Twana Ahmed versus Universal
16  Protective Services, LP, doing business as
17  Allied Universal.
18       We are now off the record.  The time
19  is 11:32 a.m. Central Time.
20              - - -
21       (Thereupon, the deposition was
22  concluded at 11:32 a.m. CST, 12:32 p.m. EST.
23  Signature was waived.)
24              - - -
25

```
                                              Page 126
 1   COMMONWEALTH OF PENNSYLVANIA    )
                                     ) SS
 2   COUNTY OF BERKS                 )
 3                CERTIFICATE
 4     I, Alyssa A. Repsik, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, ANNA SOJA, PMK, was
     by me first duly sworn to testify the truth,
 6   the whole truth, and nothing but the truth;
     that the foregoing deposition was taken at the
 7   time and place stated herein; and that the said
     deposition was recorded stenographically by me
 8   and then reduced to typewriting under my
     direction and constitutes a true record of the
 9   testimony given by said witness.
10     I further certify that I am not a relative,
     employee, or attorney of any of the parties or
11   a relative or employee of either counsel and
     that I am in no way interested directly or
12   indirectly in this action.
13     IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 24th
14   day of September 2024.
15
16
             [signature: Alyssa A. R.]
17          Alyssa A.  Repsik, Notary Public
            Court Reporter
18          Notary Public
            Berks County
19          My Commission Expires March 12, 2028
            Commission Number 1296614
20
21
22
23
24
25
```