# EXHIBIT 5

# Deposition Transcript

Case Number: 4:23-cv-02823
Date: September 13, 2024

In the matter of:

# TWANA AHMED v UNIVERSAL PROTECTION SERVICE, LP, et al.

# Katherine Marie Alyea

Reported by:
Alyssa A. Repsik



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

1  UNITED STATES DISTRICT COURT FOR THE
2  SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
3                         - - -
   TWANA AHMED,            ) CIVIL DIVISION
4                          )
          Plaintiff,        ) NO. 4:23-cv-02823
5                          )
      -vs-                 )
6                          )
                           )
7  UNIVERSAL PROTECTION    )
   SERVICE, d/b/a ALLIED   )
8  UNIVERSAL SECURITY      )
   SYSTEMS,                )
9                          )
          Defendant.        )
10
                           - - -
11
12        REMOTE VIDEOTAPED DEPOSITION OF
13  KATHERINE MARIE ALYEA, located in Texas,
14  commencing at 1:33 P.M. CST, 2:33 P.M. EST, on
15  Friday, September 13, 2024, before ALYSSA A.
16  REPSIK, Court Reporter and Notary Public in and
17  for the Commonwealth of Pennsylvania.
18
19
20
21
22
23
24
25

Page 2

```
 1   APPEARANCES VIA ZOOM:
 2   FOR THE PLAINTIFF:
 3   AH LAW, PLLC
 4   BY:  AMANDA C. HERNANDEZ, ESQ.
 5   5718 WESTHEIMER, SUITE 1000
 6   HOUSTON, TX 77057
 7   Amanda@ahfirm.com
 8
 9   FOR THE DEFENDANT:
10   MARTENSON, HASBROUCK & SIMON, LLP
11   BY:  NATHAN A. SHINE, ESQ.
12   500 DAVIS STREET, SUITE 1003
13   EVANSTON, IL 60201
14   Nshine@martensonlaw.com
15
16   OTHER APPEARANCES:
17   JENNIFER MUNTER STARK, ESQ.
18   LEGAL VIDEOGRAPHER - TIMOTHY COX
19
20              ---o0o---
21
22
23
24
25
```

Page 3

```
 1              INDEX
 2              ---o0o---
 3                                          PAGE
     EXAMINATION: ATTORNEY HERNANDEZ          6
 4
 5              ---o0o---
```

Page 4

```
 1           P R O C E E D I N G S
 2           THE VIDEOGRAPHER:  Good
 3   afternoon.  We are on the record at 1:33 p.m.
 4   Central Time on September 13, 2024, to begin
 5   the deposition of Katherine Marie Alyea in the
 6   matter of Twana Ahmed versus Universal
 7   Protection Services, LP, doing business as
 8   Allied Universal.
 9           The venue for this case is in the
10   United States District Court for the Southern
11   District of Texas, Houston Division.  The case
12   number is 4:23-CV-02823.
13           This deposition is taking place via
14   Zoom video conference.  The legal videographer
15   is Timothy Cox, here on behalf of Steno, and
16   the court reporter is Sara Acklin [sic], also
17   here on behalf of Steno.
18           So would counsel please identify
19   yourselves and state whom you represent.
20           ATTORNEY HERNANDEZ:  Amanda
21   Hernandez for the plaintiff, Twana Ahmed.
22           ATTORNEY SHINE:  Nathan Shine
23   for defendant, Universal Protection Service,
24   LP, doing business as Allied Universal Security
25   Services.
```

Page 5

```
 1           THE VIDEOGRAPHER:  Thank you,
 2   Counsel.
 3           Would the reporter please swear in
 4   the witness.
 5           KATHERINE MARIE ALYEA, a
 6   witness herein, having been first duly sworn,
 7   was examined and testified as follows:
 8                EXAMINATION
 9   BY ATTORNEY HERNANDEZ:
10      Q.   Ms. Alyea, do you agree that
11   companies must protect employees from
12   discrimination in the workplace?
13      A.   Yes.
14      Q.   Is that important?
15      A.   Yes, it is.
16      Q.   On a scale of 1 to 10 where 1 is not
17   important at all and 10 is the most important,
18   how important is it that companies protect
19   employees from discrimination in the workplace?
20      A.   Well, I would say a 10, in my
21   perspective.
22      Q.   And why is it so important?
23      A.   Because I think it's -- well, in my
24   opinion, you always want to provide a safe work
25   environment for all your employees.
```

Page 6

1   Q.   Why is that?
2   A.   Why? Because I think that that's
3   the responsibility of the employer, in my
4   opinion.
5   Q.   Do you agree that companies must
6   protect employees from retaliation when they
7   report discrimination?
8   A.   Yes.
9   Q.   And on the same scale of 1 to 10,
10  how important is it that companies protect
11  employees from retaliation when they report
12  discrimination?
13  A.   10.
14  Q.   Do you agree that companies must
15  protect employees from retaliation when they
16  request religious accommodations?
17  A.   Yes.
18  Q.   And on the same scale of 1 to 10,
19  how important is it that companies protect
20  employees from retaliation when they request
21  religious accommodations?
22  A.   10.
23  Q.   And is it fine with you if I refer
24  to "Allied Universal" as just "Allied"?
25  A.   Yes.

Page 7

1   Q.   Okay. Are Allied's policies and
2   procedures mandatory?
3           ATTORNEY SHINE: Objection.
4   This witness is not a 30(b)(6) witness.
5           But to the extent she has personal
6   knowledge, she can answer.
7           THE WITNESS: What was the
8   question, again? I'm sorry.
9   BY ATTORNEY HERNANDEZ:
10  Q.   Are Allied's policies and procedures
11  mandatory?
12  A.   In my opinion, I would say yes.
13  We're obligated to follow them.
14  Q.   Okay. And Allied has a
15  zero-tolerance policy for discrimination and
16  harassment; correct?
17  A.   That's correct.
18  Q.   And also, Allied has a
19  zero-tolerance policy for retaliation in the
20  workplace; correct?
21  A.   That's correct.
22  Q.   Would you agree that discrimination
23  in the workplace is a foreseeable danger to
24  employees?
25  A.   No.

Page 8

1   Q.   And why not?
2   A.   Well, in my opinion, I think that if
3   we're doing what we're supposed to be doing,
4   they shouldn't experience those things if we're
5   following the policies.
6   Q.   So would that mean that you believe
7   that discrimination and retaliation in the
8   workplace are preventable?
9   A.   I would think so, yes, in my
10  opinion.
11  Q.   And in your experience, what does
12  Allied do to ensure that there is no
13  discrimination or retaliation in the workplace?
14  A.   Well, I would believe that our
15  training would help accommodate some of those
16  things or educate people on what's -- what your
17  behavior should be in the workplace.
18  Q.   Okay. Anything else besides
19  training?
20  A.   Well, training, policy. All of
21  those things.
22  Q.   Okay. Anything else besides
23  training and the policy?
24  A.   Well, I would think that the
25  managers are -- like I said, would uphold the

Page 9

1   company standards.
2   Q.   How does Allied ensure that the
3   managers uphold the company standards?
4   A.   Well, we have reporting procedures
5   if they're not holding the standards. We have
6   training, like I said. Remedial training.
7   It's ongoing.
8   Q.   Okay. How long have you been with
9   Allied?
10  A.   10 years.
11  Q.   And what is your title?
12  A.   It's senior regional HR manager.
13  Human resources manager.
14  Q.   Have you always held that title?
15  A.   No.
16  Q.   Okay. When you were first hired,
17  what was your title?
18  A.   My first title was with Allied
19  Barton, and I was the district support manager.
20  Q.   Was that an HR role?
21  A.   Yes, it was an HR function.
22  Q.   Was that in Houston?
23  A.   Correct, in Houston.
24  Q.   So you said 10 years, so would that
25  have been in 2014?

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024
JOB NO. 1171183

Page 26

1  report and the discipline be a potential sign
2  of retaliation?
3      A.   Yes.
4      Q.   Could ignoring reports of
5  discrimination be a sign of retaliation?
6      A.   Yes.
7      Q.   Could physical threats after a
8  protected activity be a sign of retaliation?
9           ATTORNEY SHINE:  Objection.
10  Calls for a legal conclusion.
11          ATTORNEY HERNANDEZ:  Let me
12  back up.
13  BY ATTORNEY HERNANDEZ:
14      Q.   In your experience and training, are
15  you familiar with what a protected activity is,
16  and how would you define "protected activity"?
17      A.   I would say it's something like --
18  are you -- well, it's just -- I don't know.
19  I'm trying to think of an example, but
20  typically, like, our social media or religious
21  beliefs, all those things are, to me, are
22  protected activities on some level.
23      Q.   Would a report of discrimination be
24  considered protected activity?
25      A.   Mm-hmm.

Page 27

1      Q.   Would opposing discrimination be
2  considered protected activity?
3      A.   Yes.
4      Q.   Would requesting an accommodation be
5  considered protected activity?
6      A.   Yes.
7      Q.   In your experience, could threats to
8  fire an employee after his protected activity
9  be a red -- potential red flag of retaliation?
10      A.   Yes.
11      Q.   Could physical threats after
12  protected activity be a potential red flag of
13  retaliation?
14      A.   Yes.
15      Q.   Could visible anger after protected
16  activity be a sign or red flag of retaliation?
17      A.   Yes.
18      Q.   Could threats to revoke the
19  employee's security license after protected
20  activity be a sign or a red flag of potential
21  retaliation?
22      A.   Yes.
23      Q.   And could failure to follow policies
24  be a potential sign of retaliation?
25      A.   Yes.

Page 28

1      Q.   What was your involvement with the
2  investigation into Twana Ahmed's report of
3  discrimination?
4      A.   I'm sorry?  What?
5      Q.   What was your involvement with the
6  investigation into Twana Ahmed's report of
7  discrimination?
8      A.   So typically, if one of my reports
9  has an investigation of that nature, I'll coach
10  them.  I'll ask them questions, where they are
11  along with it, where they are in the process
12  and any other suggestions that I may have, that
13  they'll bring any concerns to me, and then I'll
14  assist them.
15      Q.   Okay.  Maybe I didn't ask it in the
16  right way.  But were you involved with
17  investigating the report that Twana Ahmed made?
18      A.   No.  I mean typically, if they are
19  assigned the case, it's their case.  But I do
20  have -- like, we have weekly meetings where we
21  cover certain items, like, if they have
22  questions or -- I mean, I office with Wayne, so
23  if he has questions, you know, they can come
24  and talk to me as they go through the process.
25      Q.   I see.

Page 29

1      A.   I'm a resource for them.
2      Q.   I see.  Did you assign the
3  investigation to Wayne when it came in?
4      A.   I don't remember being the one that
5  assigned it to him.  I would say it was
6  probably my supervisor that assigned it to him.
7      Q.   And who is your supervisor at the
8  time?
9      A.   LaShonda Tenner.
10      Q.   Okay.  In Wayne's investigation into
11  Twana Ahmed's report of discrimination, did you
12  find it unusual that Patrick Freeney did not
13  type out his notices of counseling?
14      A.   I would not find that totally
15  unusual because sometimes those are issued in
16  the field, and they may not have their
17  computers.
18          I have other sites that, you know,
19  don't have a computer at all, so typically -- I
20  mean, I prefer them to be typed, but it's not
21  unusual.
22      Q.   Why do you prefer them to be typed?
23      A.   Because of handwriting or
24  penmanship, so to say.  It's easier to read
25  sometimes if they're typed.

KATHERINE MARIE ALYEA                                            JOB NO. 1171183
SEPTEMBER 13, 2024

```
                                                   Page 50                                                   Page 51
 1          Were you involved in -- in Alex                  1  personal knowledge, she can testify.
 2  Bergeron's demotion?                                     2          THE WITNESS:  Can you say the
 3      A.   No.                                             3  question again?
 4      Q.   Do you have knowledge of it?                    4  BY ATTORNEY HERNANDEZ:
 5      A.   Only due to what I found out during             5      Q.   Sure.  In your experience at Allied,
 6  this -- the course of discovery and stuff like           6  when managers receive reports of discrimination
 7  that.                                                    7  or supervisors, what are they supposed to do?
 8      Q.   And what did you find out?                      8      A.   They are supposed to report it to
 9      A.   That he stated he was demoted                   9  HR.
10  because of -- from Patrick.                             10      Q.   Okay.  Is it ever okay to ignore a
11      Q.   And was he, in fact, demoted?                  11  report of discrimination?
12      A.   In our system, it shows that he was            12      A.   No.  If you're in a supervise- -- I
13  possibly demoted, yes.                                  13  mean, I have -- no.  They should definitely
14      Q.   Do you know why he was demoted?                14  pass it along.
15      A.   I do not know that.                            15      Q.   Okay.  Do you understand what I mean
16      Q.   Okay.  When a manager demotes a                16  when I say "N word"?
17  supervisor, does that need to get approval by           17      A.   I'm sorry?
18  anyone?                                                 18      Q.   Do you understand what I mean when I
19      A.   No.                                            19  say "N word"?
20      Q.   Okay.  When managers or members of             20      A.   I think so.  In a racial context?
21  HR receive reports of discrimination, what are          21      Q.   Yes.
22  they supposed to do?                                    22      A.   Okay.  Yes.
23          ATTORNEY SHINE:  Objection.                     23      Q.   Do you agree that the N word is a
24  This is not a 30(b)(6) witness.                         24  racial slur?
25          However, to the extent she has                  25      A.   Absolutely.

                                                   Page 52                                                   Page 53
 1      Q.   And is it against Allied's policies             1  harmful, how harmful is it to call someone a
 2  to use the N word?                                       2  "sand N word"?
 3          ATTORNEY SHINE:  Objection.                      3          ATTORNEY SHINE:  Objection.
 4  She is not a 30(b)(6) witness.                           4  Calls for speculation.
 5          However, in her personal experience,             5          But to the extent she has a
 6  she can testify.                                         6  responsive answer, she can testify.
 7          THE WITNESS:  What was the                       7          THE WITNESS:  I would say it's
 8  question again?                                          8  a 10.
 9  BY ATTORNEY HERNANDEZ:                                   9  BY ATTORNEY HERNANDEZ:
10      Q.   Is it against Allied's policies to             10      Q.   All right.  I think I'm almost done.
11  use the N word in the workplace?                        11  I'm just going to take a couple minutes to look
12      A.   Yes.                                           12  over my notes.
13      Q.   And then would it be against policy            13          Give me five minutes, okay?
14  for managers to call workers a "sand N word"?           14      A.   Okay.
15          ATTORNEY SHINE:  Same                           15      Q.   And we'll go off the record.
16  objection, but you can answer.                          16          THE VIDEOGRAPHER:  We are now
17          THE WITNESS:  I don't have any                  17  off the record.  The time is 2:44 p.m. Central
18  knowledge of anybody using that phrase.                 18  Time.
19  BY ATTORNEY HERNANDEZ:                                  19          (A recess was taken.)
20      Q.   Right.  That wasn't the question.              20          THE VIDEOGRAPHER:  We are now
21          Is it against policy for managers to            21  on the record.  The time is 2:49 p.m. Central
22  call employees a "sand N word"?                         22  Time.
23      A.   Yes.                                           23          ATTORNEY HERNANDEZ:  I pass
24      Q.   On a scale of 1 to 10, with 1 being            24  the witness.
25  not harmful at all and 10 being extremely               25          ATTORNEY SHINE:  I have no
```

Page 54
1  questions.
2              THE VIDEOGRAPHER: Okay.
3  Ms. Repsik, you want to confirm transcript
4  orders?
5              THE REPORTER: Mr. Shine, do
6  you need a copy of this transcript?
7              ATTORNEY SHINE: Yes, please.
8              THE REPORTER: Thank you.
9  Does anyone need a rough draft?
10             ATTORNEY HERNANDEZ: No.
11             ATTORNEY SHINE: No.
12             THE VIDEOGRAPHER: Okay. And
13 then for the video orders, Ms. Hernandez, we
14 have your standard order. Is that still good?
15             ATTORNEY HERNANDEZ: Yes.
16             THE VIDEOGRAPHER: And,
17 Mr. Shine, would you like a copy of the video
18 deposition?
19             ATTORNEY SHINE: No. Thank
20 you.
21             THE VIDEOGRAPHER: Okay. So
22 this concludes the deposition of Katherine
23 Marie Alyea in the matter of Twana Ahmed versus
24 Universal Protection Services, LP, doing
25 business as Allied Universal.

Page 55
1              We are now off the record. The time
2  is 2:50 p.m. Central Time.
3                     - - -
4              (Thereupon, the deposition was
5  concluded at 2:50 p.m. CST, 3:50 p.m. EST.
6  Signature was not waived.)
7                     - - -

Page 56
1           C E R T I F I C A T E
2                  - - -
3   I, KATHERINE MARIE ALYEA, do hereby certify
4   that I have read the foregoing transcript and
5   it is a true and correct copy of my deposition,
6   except for the changes, if any, made by me on
7   the attached Deposition Correction Sheet.
8
9
10
         _____
11
         _____
12           Date

Page 57
1  ERRATA SHEET       REASON FOR
   PAGE      LINE     CHANGE/CORRECTION
2  _____     _____    _____
3  _____     _____    _____
4  _____     _____    _____
5  _____     _____    _____
6  _____     _____    _____
7  _____     _____    _____
8  _____     _____    _____
9  _____     _____    _____
10 _____     _____    _____
11 _____     _____    _____
12 _____     _____    _____
13 _____     _____    _____
14 _____     _____    _____
15 _____     _____    _____
16 _____     _____    _____
17 _____     _____    _____
18 _____     _____    _____
19 _____     _____    _____
20 _____     _____    _____
21 _____     _____    _____
22 _____     _____    _____
23 _____     _____    _____

Page 58

```
 1  COMMONWEALTH OF PENNSYLVANIA    )
                                    ) SS
 2  COUNTY OF BERKS                 )
 3              CERTIFICATE
 4    I, Alyssa A. Repsik, a notary public in and
    for the Commonwealth of Pennsylvania, do hereby
 5  certify that the witness, KATHERINE MARIE
    ALYEA, was by me first duly sworn to testify
 6  the truth, the whole truth, and nothing but the
    truth; that the foregoing deposition was taken
 7  at the time and place stated herein; and that
    the said deposition was recorded
 8  stenographically by me and then reduced to
    typewriting under my direction and constitutes
 9  a true record of the testimony given by said
    witness.
10
      I further certify that I am not a relative,
11  employee, or attorney of any of the parties or
    a relative or employee of either counsel and
12  that I am in no way interested directly or
    indirectly in this action.
13
      IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office this 24th
    day of September 2024.
15
16
17     _____
       Alyssa A.  Repsik, Notary Public
18     Court Reporter
       Notary Public
19     Berks County
       My Commission Expires March 12, 2028
20     Commission Number 1296614
21
22
23
24
25
```