# EXHIBIT 6

# In The Matter Of:

*Twana Ahmed vs.*
*Universal Protection Service, et al*

---

*Twana Ahmed*
*September 19, 2024*

---

*CONTINENTAL COURT REPORTERS, INC.- HOUSTON*

*2 Riverway, Suite 750*

*Houston, Texas 77056*

*(713) 522-5080 (800) 779-6981*

*www.TexasDepos.com*

Original File 240919TA_ts.txt

Min-U-Script® with Word Index

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 3 of 45

Twana Ahmed vs.                                              Twana Ahmed
Universal Protection Service, et al                    September 19, 2024

Page 1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   TWANA AHMED,                    :

 4          Plaintiff,              :
                                    :
 5   VS.                  :  C.A. NO.  4:23-cv-02823
                                    :
 6   UNIVERSAL PROTECTION           :
     SERVICE, LP d/b/a              :
 7   ALLIED UNIVERSAL               :
     SECURITY SERVICES,             :
 8                                  :
            Defendant.              :

 9
     **************************************************
10
           ORAL AND VIDEOTAPED DEPOSITION OF
11                    TWANA AHMED

12               SEPTEMBER 19, 2024

13   **************************************************

14

15          THE ORAL AND VIDEOTAPED DEPOSITION OF

16   TWANA AHMED, produced as a witness at the instance of

17   the Defendant, and duly sworn, was taken in the

18   above-styled and numbered cause on the 19th day of

19   September, 2024, from 9:45 a.m. to 6:58 p.m., before

20   Andrea L. Desormeaux, CSR in and for the State of

21   Texas, reported by machine shorthand, at the offices of

22   Vorys, Sater Seymour & Pease, 909 Fannin, Suite 2700,

23   Houston, Texas, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.
```

Page 2

```
 1        A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4     Ms. Amanda C. Hernandez
       AH Law, PLLC
 5     5618 Westheimer, Suite 1000
       Houston, Texas 77057
 6     Phone: (713) 588-4359
       amanda@ahfirm.com
 7

 8   FOR THE DEFENDANT:

 9     Mr. Nathan A. Shine
       Martenson Hasbrouck & Simon, LLP
10     500 Davis Street, Suite 1003
       Evanston, Illinois 60201
11     Phone: (224) 350-3123
       nshine@martensonlaw.com
12

13   THE VIDEOGRAPHER:

14     Mr. Bryan Birmingham
       Continental Legal Video Services
15     Two Riverway, Suite 750
       Houston, Texas 77056
16     Phone: (713) 522-5080

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                      INDEX

 2   Stipulations ...................................    1
     Appearances ....................................    2
 3
     TWANA AHMED
 4
       Examination by Mr. Shine ...............    7
 5       Examination by Ms. Hernandez ..........  300
         Examination by Mr. Shine ...............  328
 6
     Changes and Signature ..........................  333
 7   Reporter's Certificate .........................  335

 8                     EXHIBITS

 9   NO./DESCRIPTION                             PAGE

10   No. 1 ..........................................   19
       Original Petition and Jury Demand
11   No. 2 ..........................................   21
       12/10/21 email from Allied Universal to
12     Twana Ahmed; AhmedAllied000479 - 000480
     No. 3 ..........................................   22
13     12/10/21 email from Sam from Allied
       Universal to Twana Ahmed; AhmedAllied000481
14   No. 4 ..........................................   25
       12/14/21 email from Angelica Blake to Twana
15     Ahmed; AhmedAllied000477
     No. 5 ..........................................   28
16     Training Certificate - New Employee
       Orientation; AUS 00663
17   No. 6 ..........................................   30
       Training Certification - Preventing
18     Unlawful Discrimination & Harassment; AUS
       00664
19   No. 7 ..........................................   45
       Packet of new employee forms; AUS 00036 -
20     00080
     No. 8 ..........................................   58
21     Detention and Legal Arrest; AUS 00121
     No. 9 ..........................................   63
22     Personal Appearance; AUS 00141
     No. 10 .........................................   64
23     ID Cards and Licenses/Registration;
       AUS 00147
24   No. 11 .........................................   66
       Security Professional ID Badge Receipt and
25     Acknowledgement; AUS 665
```

Page 4

```
 1              EXHIBITS (Continued)

 2   NO./DESCRIPTION                             PAGE

 3   No. 12 .........................................   71
       Religious Accommodations; AUS 00172
 4   No. 13 .........................................   86
       Copy of a photograph; AhmedAllied000590
 5   No. 14 .........................................   88
       Copy of a photograph; AUS 001804
 6   No. 15 .........................................   92
       3/26/22 Inspection Report; AUS 00731 -
 7     00732
     No. 16 .........................................   99
 8     Copies of four photographs;
       AhmedAllied000584 - 000587
 9   No. 17 .........................................  134
       Hot Sheet - AUS Security Office Post
10     Orders; AUS 01036 - 01042
     No. 18 .........................................  139
11     H-E-B Store Officer Training Checklist;
       AUS 00644 - 00652
12   No. 19 .........................................  159
       Text messages; AhmedAllied000594 - 000595
13   No. 20 .........................................  165
       Copy of a photograph; AhmedAllied000588
14   No. 21 .........................................  188
       Incident Report; AUS 00671 - 00674
15   No. 22 .........................................  195
       City of Bellaire Police Department CFS -
16     Command Log; AhmedAllied000526 - 000540
     No. 23 .........................................  211
17     Weapon Issue/Return; AhmedAllied000448
     No. 24 .........................................  212
18     Weapon Issue/return; AhmedAllied000449
     No. 25 .........................................  233
19     Hotline complaint; AUS 01257 - 01259
     No. 26 .........................................  239
20     5/26/22 email string between Wayne Oliver,
       Catherine Alyea, Twana Ahmed; AUS 01265 -
21     01266
     No. 27 .........................................  243
22     6/8/22 email from Twana Ahmed to Wayne
       Oliver; AUS 1332 to 1334
23   No. 28 .........................................  251
       EEOC Charge of Discrimination; AUS 00001 -
24     00002

25
```

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

10:09:55-10:11:38                                                    Page 25

1    Q.  Can you describe what she looked like?
2    A.  It was multiple persons, not one.  One of
3  them, she was an Asian, a little brown skin.  The
4  second one, an older lady with gray hair, an African
5  American.
6    Q.  Was it just those two people?
7    A.  I believe there was a third one.  The third
8  one was not an interview, just reviewing paperwork.
9    Q.  And was that a male or a female?
10    A.  It was a female too.
11    Q.  And what did she look like?
12    A.  Tall, younger black lady.
13    Q.  After your interview, what happened next?
14    A.  My -- after my interview -- my interview was
15  really quick.  Just reviewing my -- reviewing
16  documents.  And they wanted me to make copies of my
17  documents and fill up the form, application, and start
18  the process of employment with them.
19    Q.  Did you receive an offer letter?
20    A.  Receive an offer letter?  It doesn't ring any
21  bell.  I don't think so.
22         (Exhibit No. 4 marked.)
23    Q.  (By Mr. Shine)  Twana, you've been handed a
24  copy of an email that you provided in discovery,
25  labelled AhmedAllied 477.  What is the date of this

10:11:43-10:12:48                                                    Page 26

1  email?
2    A.  That's the 14 of 2021, and next day the 13th.
3    Q.  Fair to say it says December 14th of 2021?
4    A.  Yeah.
5    Q.  And what email address was it sent to?
6    A.  That is from my email address.
7    Q.  And after reading this email, is it fair to
8  say that you were offered a position with Allied?
9    A.  That is correct.
10    Q.  What position were you offered?
11    A.  Security officer.
12    Q.  Was it for armed or unarmed?
13    A.  It was -- it was armed.
14    Q.  And in your understanding, what does armed
15  mean?
16    A.  Yes.  Armed means you carry a firearm.
17    Q.  After receiving this email, did you accept the
18  offer?
19    A.  Yes.
20    Q.  Turning back to your complaint, Twana, which
21  was marked as No. 1, the first document that you
22  received.
23    A.  Okay.
24    Q.  In looking at the bottom right-hand corner of
25  the complaint, it says page -- a page number, page 1 of

10:12:52-10:15:02                                                    Page 27

1  18, for example.  Do you see where I'm referring to?
2    A.  Yeah.
3    Q.  Can you turn to page 8.  And do you see how
4  your paragraphs are numbered?  For example, on page 8
5  it says 41, 42, 43.  Do you see where I'm referring?
6    A.  Yes.
7    Q.  Specifically looking at paragraph 41, can you
8  please read that paragraph to yourself and look up when
9  you're finished.
10    A.  "In December of 2021" --
11    Q.  I'm sorry.  You can read it quietly to
12  yourself and then look up when you're finished.
13    A.  Oh, okay.
14         Some of it's blurry.  I cannot see it
15  very well.  But some of it, I can see it.
16    Q.  Does that indicate you are finished reading?
17    A.  Yeah.
18    Q.  Based on what you just read, is it fair to say
19  that this paragraph states that Allied does not train
20  its new security guards at the time of hiring?
21    A.  No, they don't train at this -- at the hiring
22  program, no.
23    Q.  Okay.  So when did you first get trained?
24    A.  I got -- I got -- I got trained after when I
25  was already working in the field.

10:15:05-10:16:40                                                    Page 28

1    Q.  About how long after?
2    A.  Month or two, if not more.
3    Q.  Did you complete a new employee orientation?
4    A.  A new employee orientation?  I believe so.
5    Q.  Did you complete any other trainings?
6    A.  Yes.  The Elite training.
7    Q.  And it is your testimony you weren't trained
8  until a couple of months after starting?
9    A.  Yes.
10         (Exhibit No. 5 marked.)
11    Q.  (By Mr. Shine)  Twana, you've been handed a
12  training certificate for your New Employee Orientation.
13  Have you seen this document before?
14    A.  I've seen it in the computer.
15    Q.  And is that your name in the middle?
16    A.  Yes.
17    Q.  Is that your handwriting?
18    A.  Yes.
19    Q.  And what date did you complete New Employee
20  Orientation?
21    A.  That was on the 15 -- on 10, 11 -- 12/15/2021.
22    Q.  And when did you start your employment?
23    A.  A couple days or a week.  A week,
24  approximately.  I don't remember.  I was already in the
25  field after when I got my equipment.

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

---

10:16:43-10:17:56                                           Page 29

1    Q.   Okay.  At the time that you completed New
2  Employee Orientation on December 15th of 2021, you had
3  just started.  Is that fair to say?
4    A.   Started working, basically?
5    Q.   Correct.
6    A.   No.  Because I didn't receive any uniform or
7  anything like that.  How will I be working?
8    Q.   Twana, if you can look at what's been marked
9  as No. 4, which is your offer letter received from
10  Allied Universal.  It's going to be one of the
11  documents on the side with a little yellow sticker that
12  says Number 4.
13    A.   Oh, I see it.
14    Q.   There should be one that says Number 4.
15    A.   This one?
16    Q.   Yes.
17    A.   Okay.
18    Q.   What is the date of that offer letter?
19    A.   It's the 14th.
20    Q.   And the date of your New Employee Orientation?
21    A.   It's the -- right here on the 15th.
22    Q.   So you were trained through New Employee
23  Orientation the day after you received your offer
24  letter, correct?
25         MS. HERNANDEZ: Objection; misstates

---

10:17:58-10:19:33                                           Page 30

1  testimony.
2    A.   That's the 14th.  That's the 15th.  There was
3  no actual training.  Let's just go through it, go
4  through it, go through it so you can be in the field
5  working.
6    Q.   (By Mr. Shine)  Was there an exam or a test
7  that you had to complete during new employee
8  orientation?
9    A.   I believe so.  But they would give you answer
10  at the same time of the test.  So basically when you
11  take a test, they give you the answer because they just
12  wanted me to be in the field.  So was it a test?  Was
13  it not a test?  Don't know what exactly was -- was
14  done.  It was on the computer.
15    Q.   But you received New Employee Orientation as
16  of December 15th, correct?
17    A.   According to this, yes.
18         (Exhibit No. 6 marked.)
19    Q.   (By Mr. Shine)  Twana, you've been handed a
20  second training certificate for a course on Preventing
21  Unlawful Discrimination & Harassment.  Have you seen
22  this document before?
23    A.   I don't remember.
24    Q.   At the bottom of the page, is that your
25  handwriting?

---

10:19:33-10:20:53                                           Page 31

1    A.   That is, yes.
2    Q.   And does that spell your name?
3    A.   Yes.
4    Q.   And what date does it say you completed this
5  training?
6    A.   12/15/21.
7    Q.   Other than the two training certificates that
8  we just discussed, did you complete any additional
9  training at the time you were hired?
10    A.   I don't remember.
11    Q.   I want to go back to your complaint.  It's
12  that first document that we started talking about.
13    A.   This one?
14    Q.   It's been marked as Number 1.
15    A.   Okay.
16    Q.   Still on page 8, starting on paragraph 42.  Do
17  you see where I'm referring to?
18    A.   Yeah.
19    Q.   Please read paragraph 42 to yourself and look
20  up when you are finished.
21    A.   Okay.
22    Q.   Is it fair to say that you completed something
23  known as Elite training?
24    A.   Elite training, that's correct.
25    Q.   And what is your understanding of the

---

10:20:56-10:22:19                                           Page 32

1  requirements to become an Elite security guard with
2  Allied?
3    A.   Well, it is a qualification course to qualify
4  for your firearm and Taser and how to use them.
5    Q.   And when did you take that course?
6    A.   After when I was already working in the field.
7    Q.   How long after?
8    A.   I don't remember how long after but probably a
9  month or two.  I'm not too sure.
10    Q.   One to two months?
11    A.   Maybe.
12    Q.   Where were you working prior -- in the field
13  prior to completing that training?
14    A.   Before the Elite training, I was working at --
15  excuse me -- different sites, H-E-B sites, different
16  ones.
17    Q.   You said H-E-B sites?
18    A.   Yes.
19    Q.   And what do you understand H-E-B to be?
20    A.   It's a grocery store.
21    Q.   Did you work only at H-E-B?
22    A.   No.  They have different stores under their
23  logo with different names.
24    Q.   Okay.  When you said you were working at sites
25  before the Elite training --

---

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

10:22:20-10:23:48                                    Page 33

1    A.  Yeah.
2    Q.  -- where specifically did you work?
3    A.  Specific store addresses?
4    A.  Yes.
5    A.  I worked at a -- one in downtown, close by
6    here.  I worked in... close to San Felipe, I believe
7    so, that they had a store over there too still.  And
8    more.  I don't remember the actual street names.
9    Q.  Did you work at any location other than an
10   H-E-B store?
11   A.  No.  The only one I worked, it was under H-E-B
12   with different company names.  The same H-E-B but
13   different names.  They don't call it H-E-B.
14   Q.  How long was the Elite training program?
15   A.  A week.
16   Q.  Where was it held?
17   A.  It was two -- it was -- there was a field and
18   there was office training.
19   Q.  So in the office, where was it held?
20   A.  On 45.
21   Q.  I don't know what that means.
22   A.  45 South, the Allied office.
23   Q.  And in the field, where was it held?
24   A.  It was somewhere an hour and 45 minutes away
25   from the office, middle of nowhere.

10:23:51-10:25:12                                    Page 34

1    Q.  And when you say "field," what type of field
2    was it?
3    A.  It was a big -- I don't know how many hundreds
4    of acre of land.  It was -- they had a range.  We had
5    to qualify over there.
6    Q.  When you say a range, what do you mean by
7    that?
8    A.  Fire range.
9    Q.  What are the topics that you covered during
10   the Elite training?
11   A.  Sorry?
12   Q.  What did you learn about during the Elite
13   training?
14   A.  They -- one of the trainings, for example, it
15   was about qualifying for the firearm.  One of them was
16   for when to use the Taser, when to not use it.  Like
17   basically if you pepper spray somebody, do not use the
18   Taser because that could become fire, it burns a
19   person.  When not to shoot it, which area; for example,
20   not in the face or anything like that.
21   Q.  Besides the firearm and the Taser, did you
22   learn about anything else?
23   A.  The baton, where -- if you have to use it,
24   there's areas that you don't want to use.  The
25   handcuff, how to handcuff somebody in the proper --

10:25:17-10:26:43                                    Page 35

1    proper way.
2    Q.  Did you learn about any of Allied's policies?
3    A.  I think so but I don't remember at this time.
4    Q.  Did you learn about Allied's Use of Force
5    Policy?
6    A.  Yes.
7    Q.  And you said the training was approximately
8    one week?
9    A.  It was one week, approximately, yeah.
10   Q.  And how do you define one week?  Is that five
11   days or seven days?
12   A.  It was seven days because it was -- it was
13   even on the weekend, Saturday, Sunday.  I remember
14   that.
15   Q.  How many people were in that Elite training
16   class?
17   A.  Ten, if not more.
18   Q.  Do you remember any of the names of the people
19   that you went to training with?
20   A.  Yes.
21   Q.  Who do you remember?
22   A.  One person.  Siboldi.
23   Q.  Siboldi.
24   A.  Siboldi, Sibolde, something like that.
25   Siboldi, Sibolde.

10:26:43-10:28:15                                    Page 36

1    Q.  Was that a first or a last name?
2    A.  I believe that's his last name.
3    Q.  Who was your training instructor?
4    A.  Ramos.  Ramo, Ramos.  Something like that.
5    Q.  Do you know someone by the name of Monroe?
6    A.  Yes, yeah.
7    Q.  Is that who you're referring to?
8    A.  Yes, yeah.
9    Q.  As your training instructor?
10   A.  Yes.  It was the firearm instructor.
11   Q.  Was Monroe your only instructor?
12   A.  It was -- we had -- yeah, it was the
13   instructor, yeah.
14   Q.  And turning back to your complaint which is
15   the document --
16   A.  Yes.
17   Q.  -- before you, starting at paragraph 43, can
18   you please read that paragraph to yourself and look up
19   when you are finished.
20   A.  Yes.
21   Q.  Was Patrick Freeney part of your Elite
22   training program?
23   A.  Patrick trainee -- Patrick Freeney?  What do
24   you mean by part of the Elite training program?  Was he
25   in the class with me?  Is that what you mean?

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

---

10:28:17-10:29:16                                    Page 37

1    Q.   Was he in the class with you?
2    A.   No.  He was just going back and forth, in and
3  out, in and out.  He was not sitting in the class.
4    Q.   Okay.  So in paragraph 43 when it says,
5  "During this training, one of Allied Universal's
6  managers named Patrick Freeney repeatedly makes fun of
7  a Hispanic guard's accent" --
8    A.   Yes.
9    Q.   -- is that accurate for what is stated in
10  paragraph 43?
11    A.   Yes.  But he was not in the class.  He comes,
12  say a couple of things and leave, come back and say a
13  couple of things and go and come.  Not constantly like
14  us in the classroom.
15    Q.   Okay.  Who is Patrick Freeney?
16    A.   I believe he was the account manager at the
17  time of the account I was working.
18    Q.   Was he your direct supervisor?
19    A.   He was the supervisor.
20    Q.   Was that the first time you met Patrick?
21    A.   That was the first time in the class.
22    Q.   What day of training was it when you first met
23  him?
24    A.   I don't remember.
25    Q.   And who is the Hispanic guard that you're

---

10:29:23-10:30:39                                    Page 38

1  referring to in paragraph 43?
2    A.   I don't remember.  But he was in the class
3  with us.
4    Q.   Can you describe what he looked like?
5    A.   It was a -- short, my height, gray -- a little
6  bit gray hair with an accent on him.
7    Q.   Male?
8    A.   A gentleman.
9    Q.   And when you say short, my height,
10  approximately how tall are you?
11    A.   5'6".
12    Q.   And what specifically did Patrick Freeney say
13  to him?
14    A.   When somebody talks like, blah, blah, blah,
15  blah, blah, make noises and things like that when
16  somebody speaks.
17    Q.   And Patrick did this in the training?
18    A.   Yes.
19    Q.   Were other people present at the time?
20    A.   Yes.
21    Q.   And is this something that you directly
22  observed or just heard from someone else?
23    A.   I was there.
24    Q.   Was the instructor Monroe present?
25    A.   At the time, I don't believe so.

---

10:30:42-10:32:04                                    Page 39

1    Q.   How many times did he allegedly make fun of
2  the --
3    A.   One.
4    Q.   -- Hispanic guard?
5    A.   One time.
6    Q.   When did this Hispanic guard quit?
7    A.   Don't remember.
8    Q.   Was it during training?
9    A.   I don't remember.
10    Q.   You testified that you personally observed
11  Patrick make fun of this guard, correct?
12    A.   Correct.
13    Q.   So why didn't you report it to someone at that
14  time?
15    A.   Because I didn't want to be involved in
16  anything.
17    Q.   Did you tell Monroe when he came back in the
18  room?
19    A.   No, I did not.
20    Q.   Did anyone tell Monroe when he came back in
21  the room?
22    A.   I don't -- I don't know.
23    Q.   If you could turn back to your complaint,
24  which is still before you, and look at paragraph 44.
25  Can you please read that paragraph to yourself and look

---

10:32:17-10:33:28                                    Page 40

1  up when you're finished.
2    A.   Okay.
3    Q.   Is it fair to say that the first sentence of
4  paragraph 44 says, "Patrick Freeney then tells the new
5  Kurdish guard that he must shave his beard"?
6    A.   Kurdish guard?  I'm the Kurdish guard.  Yes.
7    Q.   But is that a fair and accurate reading of
8  what is stated in the first sentence of paragraph 44?
9    A.   He told me that.  He didn't tell the Kurdish
10  guard.  He told me that.
11    Q.   What specifically did he say to you?
12    A.   He says, You need to shave your beard.
13    Q.   Was this in the training classroom?
14    A.   He pulled me to the side areas where we were
15  sitting.  He pointed at my beard and he said, You need
16  to shave it.
17    Q.   When he pulled you to the side area, was it
18  still in the training classroom?
19    A.   Close to the door.
20    Q.   But still withinside the training classroom?
21    A.   Yes.
22    Q.   And others were still in the room?
23    A.   It was a -- it was kind of like in a break.
24  Some of them were out, some of them were in, talking to
25  each other.

---

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

10:33:28-10:34:41                                      Page 41

1    Q.   Was Monroe present?
2    A.   I don't remember.
3    Q.   And Patrick said you need to shave your beard?
4    A.   That's correct.
5    Q.   Was that the first time he said this to you?
6    A.   That is the first time.
7    Q.   And what day of training did this happen?
8    A.   I don't remember.
9    Q.   What did you understand him to mean when he
10   asked you to shave your beard?
11   A.   I don't understand your question.
12   Q.   Let me try to rephrase for you.
13   A.   Okay.
14   Q.   When Patrick said you need to shave, how did
15   you understand you need to shave?
16   A.   Get rid of it.
17   Q.   And when you say "get rid of it," does that
18   mean like to your skin, or does that mean trimmed?  How
19   do you define "get rid of it"?
20   A.   Get rid of it means shave it all because it
21   was already trim and clean and looked professional.
22   Q.   Did you ask Patrick to clarify what he meant
23   by asking you to shave?
24   A.   It was clear as the sun.  Shave it.  Get rid
25   of it.  That's it.

10:34:42-10:36:01                                      Page 42

1    Q.   Did Patrick have a beard?
2    A.   I think he had a goatee.  I think so.  I'm not
3    too sure.
4    Q.   And what did you say in response to him?
5    A.   I have it for religious purposes, my beliefs.
6    That's why I have my beard.
7    Q.   And to clarify "religious purposes," what
8    religion do you practice?
9    A.   Islam.
10   Q.   How many other people were in the classroom at
11   that time?  Do you remember?
12   A.   I don't remember, no.
13   Q.   You testified previously that there were maybe
14   ten or more people in your training class, right?
15   A.   Approximately.  But it was during a break, so
16   people were in and out.  Don't remember how many
17   actually that were sitting because it was long hours of
18   class, people wanted to use restroom, people wanted to
19   call family, or somebody wanted to smoke or something.
20   So how many in the room at the time?  Don't remember.
21   Q.   Do you remember how many men were in that
22   training class?
23   A.   Except -- everybody was men except one girl.
24   Q.   And of the men, how many other people had a --
25   had a beard?

10:36:01-10:37:11                                      Page 43

1    A.   A couple.
2    Q.   Do you remember their names?
3    A.   Siboldi was one of them.
4    Q.   Anyone else?
5    A.   A couple of other guys.  Don't remember their
6    name.
7    Q.   When you say "couple," is that two, three
8    people or more?
9    A.   Probably two to three, yeah.
10   Q.   Any more than three?
11   A.   Maybe.
12   Q.   Any more than four?
13   A.   Not too sure.
14   Q.   Are you aware if they had any accommodation on
15   file?
16   A.   Accommodation for what?
17   Q.   To wear their beard.
18   A.   I don't think they had any accommodation or
19   anything like that.
20   Q.   Did you ever talk to them about their beards?
21   A.   I talked to them:  Have you guys been told to
22   shave your beard?  That's the only one.
23   Q.   And who did you talk to about that?
24   A.   Siboldi.
25   Q.   At that time were you familiar with Allied's

10:37:18-10:48:46                                      Page 44

1    Religious Accommodation Policy?
2    A.   No.
3    Q.   Did you report Patrick's comments at that
4    time?
5    A.   Regarding of the beard?
6    Q.   Yes.
7    A.   Don't remember.  I don't think so.
8    Q.   Why not?
9    A.   Because I wanted to get back to class and
10   graduate and go back to real work.
11       MR. SHINE:  We've been testifying for
12   about an hour-ish.  Do you need a break?
13       THE WITNESS:  If you want one.
14       MR. SHINE:  I'm asking you if you need a
15   break.
16       THE WITNESS:  We can take one.
17       MR. SHINE:  Can we go off the record?
18       THE VIDEOGRAPHER:  Off record at 10:37.
19   (Off the record 10:37 a.m. to 10:48 a.m.)
20       THE VIDEOGRAPHER:  Back on the record at
21   10:48.
22   Q.   (By Mr. Shine)  Twana, I want to back up a
23   little bit to go over a few things that you may have
24   completed at the start of your employment with Allied.
25       After being hired or sometime during that

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 9 of 45

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

1    hiring event at the hotel that you were testifying to,
2    do you remember being asked to complete some new
3    employee forms?  And what I mean by that is, like,
4    direct deposit, emergency contact.  Do you remember
5    completing forms like that?
6        A.  I think so.  For the banking, yes, and all
7    that stuff, yeah.
8            (Exhibit No. 7 marked.)
9        Q.  (By Mr. Shine)  Twana, I'm handing you a
10   packet of the new employee forms that you completed.
11   They are consecutively labeled AUS 36 through 80.
12           If you want to take a moment to flip
13   through these, you're more than welcome to, but my
14   question is:  Have you seen these forms before?
15       A.  Not -- not as a print, like, personally as a
16   print.  I don't remember that.
17       Q.  Do you recall seeing them on a computer?
18       A.  Maybe on the computer.  Maybe, yes.
19       Q.  So I'd like to go over a few of these forms
20   with you today.
21       A.  Yes.
22       Q.  Do you see at the bottom where I was referring
23   where it was labeled?  For example, on page 1 it's
24   AUS 36.
25       A.  I see that.

1        Q.  Could you turn to the next page which is
2    AUS 37.
3        A.  I see it, yes.
4        Q.  Is it fair to say at the top of the page it
5    reads "Use of Force Policy Acknowledgment"?  Did I read
6    that accurately?
7        A.  (No response.)
8        Q.  At the very top of the page.  I believe you're
9    looking at the wrong one.
10       A.  Oh.  This one?  Okay.  This page right here?
11   Yeah.
12       Q.  So again, just for clarity of the record, it
13   says Use of Force Policy Acknowledgment; is that
14   correct?
15       A.  Yeah.
16       Q.  And in the middle of the page, would you agree
17   that it outlines Allied Universal's Use of Force
18   Policy?
19       A.  As it says here, it's their Use of Force
20   Policy.
21       Q.  And inside the black box at the very bottom,
22   there's a red checkmark and the word "signature."  Do
23   you see where I'm referring?
24       A.  Yeah, I see that.
25       Q.  What does it say under the checked box?

1        A.  It says my name and the month and the date and
2    the year and time.
3        Q.  Okay.  And what date and time is represented
4    there?
5        A.  12/15/2021, 3:04 p.m.
6        Q.  And what does it say underneath your name and
7    the date and time?
8        A.  The checked box?  It's like signature checked
9    box mark.
10       Q.  So specifically underneath your name, is there
11   additional text?
12       A.  What do you mean "additional text"?
13       Q.  Underneath your name, is it fair to say that
14   it reads, "Checking the checked box above is equivalent
15   to a handwritten signature"?  Did I read that
16   correctly?
17       A.  Yeah, I see that, yeah.  Like if you check, it
18   means you agree to it.
19       Q.  And is it fair to say that you completed this
20   form?
21       A.  Well, we were not -- we were not gone through
22   the form.  They just told us:  Go through it, check.
23   Next check, next check, next check.  Don't worry about
24   reading anything or anything like that.
25       Q.  And so you just went along with it and checked

1    off forms without reading them?
2        A.  That's what they -- that's what they told us
3    and that's what we did.
4        Q.  I'm asking you personally.  You just went
5    along and checked off boxes without reading the
6    information?
7        A.  Yes.
8        Q.  Okay.  Looking at those numbers on the bottom
9    corner again --
10       A.  Yes.
11       Q.  -- can you flip to AUS 40?
12       A.  Do you mean Number 40?
13       Q.  Correct.
14       A.  I see -- yeah, I'm on page 40.
15       Q.  And there's a black box around text.  Is that
16   also fair to say?
17       A.  Do you mean all the way on the bottom, like
18   same as the other one?
19       Q.  Uh-huh.
20       A.  My name, yeah, I see that.
21       Q.  Okay.  And is there a red checkmark next to
22   your name?
23       A.  Yes.  Same as the other page.
24       Q.  And what does it say next to the red
25   checkmark?

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 10 of 45
Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

10:53:28-10:55:28                                    Page 49

1    A.   My name and the time and the month and the
2  year and the time.
3    Q.   What date and time is next to your name?
4    A.   11 -- no.  12/15/2021, 2:55.
5    Q.   And what do you understand this form to be?
6    A.   I don't know what exactly it's for.
7    Q.   In the black box, there's text that says,
8  "There are multiple options to receive your pay."  Do
9  you see where I'm referring to?  It's the very first
10  sentence.
11    A.   Number 1, yeah.
12    Q.   Above Number 1.  It says, "There are multiple
13  options to receive your pay.  Please select one method
14  you wish to use below."  Do you see where I'm referring
15  to, Twana?  It's the text right above Number 1.
16    A.   Yes.  The one that says checking, on a
17  checkmark.
18    Q.   So did you check next to Number 1?
19    A.   Yeah.  Checking.  Check, yeah.
20    Q.   I need you to look at the top of the page.
21  And do you see the black box that goes around the page?
22    A.   The black box, yes, I see it.
23    Q.   Correct.  Withinside the black box, do you see
24  the numbers 1, 2 and 3?
25    A.   I see, yeah.  And then A, B.

10:55:34-10:56:44                                    Page 50

1    Q.   Correct.
2    A.   Yeah.
3    Q.   Did you check any of the boxes next to 1, 2,
4  or 3?
5    A.   It looks like I checked, like, Number 2 has a
6  checkmark and number -- there's three checkmarks, yeah.
7    Q.   So Number 2 says direct deposit; is that
8  correct?
9    A.   Yeah.
10    Q.   Is it fair to say that you were electing to
11  receive your paycheck by direct deposit?
12    A.   That is correct.  That's how I was receiving
13  my payment.
14    Q.   And when you testified earlier about a
15  checking, did you check the box next to checking?
16    A.   Yeah.  Because it says checking or saving,
17  yeah.
18    Q.   And so would you agree with me that you had to
19  take multiple steps to complete this form?
20    A.   Just provide them with my bank account
21  information.
22    Q.   Where on this page does it ask you for your
23  bank account information?
24    A.   Like the paper, they asked me for the -- from
25  the bank, the -- that's the one I gave them to deposit

10:56:48-10:58:32                                    Page 51

1  the money.
2    Q.   And you're saying that says that on this page?
3    A.   I can't see that.
4    Q.   If you can turn to the next page which is
5  AUS 42.
6    A.   Okay.
7    Q.   At the top of the page it reads, "Direct
8  Deposit Processing Form"; is that correct?
9    A.   Yes, right here.
10    Q.   Is this the page you were talking about
11  providing your bank account information to?
12    A.   I think so.  Not too sure.
13    Q.   On the back of that page, which is AUS 43,
14  does it also have a signature box?
15    A.   That is correct.
16    Q.   And what's next to the signature box?
17    A.   My name, the month, the date, the year, and
18  the time.
19    Q.   And what date and time are listed next to your
20  name?
21    A.   11 -- 12/15/2021.  And the time 2:42 p.m.
22    Q.   Is it fair to say that you also completed this
23  form?
24    A.   According to this, yes.
25    Q.   If you could turn forward a couple of pages to

10:58:39-11:00:08                                    Page 52

1  AUS 47.
2    A.   47?  Okay.
3    Q.   At the top of the page it says, "Employee's
4  Withholding Certificate."  Did I read that correctly?
5    A.   Yes.
6    Q.   What do you understand this form to be?
7    A.   This is a tax, I believe for -- I think this
8  is a tax form or something like that.
9    Q.   Is this a form that you also completed?
10    A.   The tax form?  I completed something like
11  this, yes, tax form.
12    Q.   Is there a date and time also identified for
13  when you completed this form?
14    A.   Yes.  It's all of the way in the bottom.
15    Q.   And what date and time are listed?
16    A.   12/15/21, 2:17.
17    Q.   If you could turn to page AUS 53.
18    A.   Okay.
19    Q.   At the top of the page, it says, "Employee
20  Handbook Receipt and Acknowledgment (SP)."  Did I read
21  that correctly?
22    A.   Yes.  But I don't know what that means.  51,
23  correct.
24    Q.   53.
25    A.   53?  This one, yeah.

1    Q.   At the top of the page it says, "Employee
2  Handbook Receipt and Acknowledgment."  Did I read that
3  correctly?
4    A.   "SP" in the last?
5    Q.   Uh-huh.
6    A.   Yeah.
7    Q.   What do you understand this form to mean?
8    A.   I don't understand it, like, what to be
9  exactly.
10    Q.   At the -- do you see the black box that goes
11  around the text?
12    A.   I do.
13    Q.   The very first sentence says, "I certify and
14  acknowledge the following."
15         Do you see where I'm referring to?
16    A.   Right here?  Yeah.
17    Q.   Okay.  And would you agree with me that there
18  are four bullet points inside of that --
19    A.   Box?  There's four black dots.
20    Q.   Bullet points.
21    A.   Dots, yeah.
22    Q.   And the fourth one, it says, "I also
23  acknowledge that I am expected to read, understand, and
24  comply with the employee handbook and all company
25  policies and procedures."

1         Did I read that correctly?
2    A.   Yes.
3    Q.   Is there a signature attached to this part?
4    A.   There's a checkmark.
5    Q.   And what's next to the checkmark?
6    A.   My name, year, date, month, and time.
7    Q.   And what date and time are listed next to your
8  name?
9    A.   15, 2:50.
10    Q.   And when you say 15, can you read the full
11  date, please?
12    A.   12/15/21, time 2:50 -- five zero -- p.m.
13    Q.   Can you turn to page AUS 56.
14    A.   Yes.
15    Q.   At the top of the page it says, "Policy
16  Against Harassment and Discrimination."  Did I read
17  that correctly?
18    A.   Yes, all of the way on the top.
19    Q.   What do you understand this document to be?
20    A.   For somebody harassing you or discriminating
21  against you.
22    Q.   And what do you mean by for someone harassing
23  or discriminating against you?
24    A.   If somebody discriminated against you or
25  harassed you, that's what it means.  That's what the

1  form is for.
2    Q.   Would you agree this is Allied's policy
3  against harassment and discrimination?
4    A.   Yes.
5    Q.   And would you agree that the policy outlines
6  multiple ways that you can report harassment or
7  discrimination?
8    A.   Yes.
9    Q.   This policy covers a couple of pages, but if
10  you turn to page AUS 59, is there a signature box
11  there?
12    A.   Yes.
13    Q.   And what's next to the signature checkmark?
14    A.   My name, day and time, month.  12/15/2021,
15  time 2:49 -- 49 p.m.
16    Q.   Is it fair to say that you also completed this
17  form?
18    A.   It looks like I checked it.
19    Q.   Looking at the very next page which is AUS 60,
20  across the top it reads, "Emergency Contact
21  Information."  Did I read that correctly?
22    A.   Yeah, that's for emergency.
23    Q.   And what do you understand this form to be?
24    A.   It's for emergency contact.  If something
25  happen to you or something.

1    Q.   And did you identify an emergency contact?
2    A.   I don't remember at the time.
3    Q.   Okay.  In the middle of the page, do you see
4  where it says "Emergency Contact Information"?
5    A.   Second row, yes.
6    Q.   And there's a name listed, Muhammad.
7    A.   Yes.
8    Q.   Who is Muhammad.
9    A.   A friend of mine.
10    Q.   What's Muhammad's last name?
11    A.   I don't know his last name.
12    Q.   There's a telephone number listed for Muhammad
13  of (832) 896-9276.  That's your phone number, right?
14    A.   Yes, because I didn't know Muhammad numbers at
15  the time, and I didn't have it, so I was told to put my
16  phone number in there.  So I put that number.
17    Q.   Who told you to use your phone number?
18    A.   The person on the class.
19    Q.   What do you mean by "person on the class"?
20  Who was it?
21    A.   The lady was helping us to go through this
22  paperwork.
23    Q.   And do you remember her name?
24    A.   No.
25    Q.   What did she look like?

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 12 of 45
Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

11:05:35-11:07:38                                          Page 57

1    A.  Tall, short hair, young black lady.
2    Q.  And is -- did you complete this form?
3    A.  Yes.  The checkmark, I see it.
4    Q.  And what's after the checkmark?  Or
5  underneath, I should say, the checkmark.
6    A.  My name.  12/15/2021 -- 2021, 2:48.
7    Q.  I'm sorry.  What was the last part?
8    A.  2:48 p.m.
9    Q.  And finally, can you please flip to AUS 71.
10   A.  Yes.
11   Q.  And at the top of the page, it says,
12 "Arbitration Policy and Agreement."  Did I read that
13 correctly?
14   A.  Yes.
15   Q.  This policy covers a couple of pages.  If you
16 flip to AUS 77.
17   A.  I see that.
18   Q.  Did you complete this form?
19   A.  It looks like I checked it, yes.
20   Q.  And what's next to the checkmark?
21   A.  My name, day and -- month and day and year and
22 time.
23   Q.  And what date and time is listed?
24   A.  12/15/21 -- 2021, 2:35 p.m.
25   Q.  I know we only reviewed a few of these forms,

11:07:53-11:10:00                                          Page 58

1  but you recall filling out these forms somewhere at the
2  time of you being hired, right?
3    A.  Checked them, yes.
4    Q.  Did you ever review Allied's employee
5  handbook?
6    A.  Don't remember on top of my head, exactly.
7    Q.  Did you ever ask any questions about the
8  policies and procedures of Allied?
9    A.  Don't remember exactly.  I think so, I did.
10   Q.  And what policies or procedures did you ask
11 about?
12   A.  One of them I remember about a patrol car they
13 would provide.
14   Q.  And what did you ask about the patrol car?
15   A.  Where to park it, what gas, where to put gas,
16 how can I put gas.  Things like that.
17   Q.  Besides asking about the patrol car, did you
18 ask about any other questions -- or I'm sorry -- any
19 other policies or procedures of Allied?
20   A.  Don't remember on top of my head.
21   Q.  I'd like to go through a couple of the
22 policies that are contained within Allied's handbook
23 with you.
24   A.  Okay.
25       (Exhibit No. 8 marked.)

11:10:00-11:11:35                                          Page 59

1    Q.  (By Mr. Shine)  I'm handing you a copy of
2  Allied's policy for detention and legal arrest as it's
3  contained within this employee handbook.  Have you seen
4  this or read this policy before?
5    A.  I might but don't remember exactly.
6    Q.  Twana, why would you sign and acknowledge that
7  you had received the handbook if you didn't intend to
8  read it?
9    A.  Because when they give us something, they
10 don't give us the opportunity to review the form
11 because they want us to be done with it fast as we
12 could.  Like basically just check, check, hit next,
13 check, hit next, check, hit next, check, hit next.
14   Q.  But would you agree with me that you testified
15 you had to enter information like your checking
16 account, your emergency contact information, your tax
17 withholding information?  So you did actually have to
18 do some additional work, right?
19   A.  The -- when it comes to that, yeah.  We had to
20 fill up the bank account informations because that's
21 how I get my pay.
22   Q.  So is it -- do you think that the policies
23 don't apply to you because you didn't read them?
24   A.  No.  The policy applies to everybody when you
25 are employed by the company.

11:11:39-11:13:11                                          Page 60

1    Q.  So based on the policy that's before you, can
2  you read the first sentence of the policy?  Can you
3  read it out loud?  It starts with "Security
4  professionals."
5    A.  This one?  "Security professionals, as..."
6  This one?
7    Q.  Uh-huh, the very first sentence.
8    A.  I need to translate these words.  I don't
9  understand them, these right here.
10   Q.  I will read it aloud, and please tell me if I
11 read it correctly.
12   A.  Okay.
13   Q.  "Security professionals, as a result of their
14 position, have no elevated legal duty or authority to
15 arrest a subject."
16       Did I read that correctly?
17   A.  What do you mean by "subject"?  A person?
18   Q.  I'm just asking if I read the words correctly
19 off the policy.
20   A.  Yeah.
21   Q.  And based on your understanding as a security
22 guard for Allied, you weren't a police officer,
23 correct?
24   A.  That is correct.
25   Q.  Were you considered what they sometimes refer

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 13 of 45

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

11:13:14-11:14:25                                                Page 61

1  to as a peace officer?
2    A.  No.
3    Q.  Were you otherwise deputized with police
4  powers?
5    A.  No.
6    Q.  Did you have the ability to issue criminal
7  charges?
8    A.  To charge somebody criminally?
9    Q.  Correct.  Did you have that ability as a
10  security guard?
11    A.  No.
12    Q.  Were you able to transport someone to jail?
13    A.  No.
14    Q.  Were you given an Allied vehicle to use when
15  you were employed?
16    A.  Yes.  At the post, not to drive around with.
17    Q.  Was it a police car?
18    A.  It was a security car.
19    Q.  Are you aware of how Texas classifies a felony
20  for retail theft?
21    A.  Retail theft, I think when it comes to retail
22  theft, the -- can you repeat the question, the end of
23  it?
24    Q.  Are you aware of how Texas classifies --
25    A.  Yeah, classifies.

11:14:27-11:15:48                                                Page 62

1    Q.  -- a felony for retail theft?
2    A.  I think -- I think by the amount of the theft.
3    Q.  Do you know what that amount needs to be?
4    A.  Don't remember on top of my head.
5    Q.  In the middle of the policy that's before you,
6  the Detention and Legal Arrest, which is AUS 121, in
7  the very middle of the page it says, "Though state laws
8  vary..."  Do you see where I'm referring to?
9    A.  Are you talking about...
10    Q.  Right there.  "Though state laws vary."
11    A.  Right here?
12    Q.  Uh-huh.
13    A.  Okay.
14    Q.  So please follow along.  "Though state laws
15  vary, a citizen's arrest generally can only be made if
16  all three of these conditions have been met."
17         Did I read that accurately?
18    A.  Correct, met, yeah.
19    Q.  And the first bullet point under there says,
20  "A felony has been committed in your presence"; is that
21  correct?
22    A.  Correct, this by the first dot.
23    Q.  Underneath the three bullet points, there's a
24  sentence that starts, "Making a physical arrest..."
25         Do you see where I'm referring to?

11:15:50-11:17:42                                                Page 63

1    A.  Yes.
2    Q.  And it reads, "Making a physical arrest should
3  be an act of last resort, and local law enforcement
4  must be immediately notified."
5         Did I read that correctly?
6    A.  Yeah.
7    Q.  Twana, would you also agree with me that
8  Allied has certain appearance and grooming standards
9  that were applicable to its employees?
10    A.  I don't understand what grooming means.
11    Q.  Are there certain policies that Allied has for
12  your physical appearance, how you're supposed to look?
13    A.  Look professional.
14         (Exhibit No. 9 marked.)
15    Q.  (By Mr. Shine)  I'm handing you a copy of
16  Allied's Personal Appearance Policy as it's contained
17  in its employee handbook.  Are you familiar with this
18  policy?
19    A.  I think so.
20    Q.  Have you read this policy before today?
21    A.  Don't remember exactly.
22    Q.  At the bottom of the page -- and for the
23  record, this is labeled AUS 141 -- do you see where it
24  says "Facial Hair"?  It's in the center of the page,
25  towards the bottom, in white text.

11:17:43-11:19:24                                                Page 64

1    A.  Yeah.
2    Q.  And there are two bullet points underneath
3  that, correct?
4    A.  Two dots, yes.
5    Q.  The last bullet point says, "Where mustaches
6  and/or beards may be permitted under customer
7  standards, such facial hair must be neatly trimmed and
8  conform to the contours of the face."
9         Did I read that correctly?
10    A.  Yes.
11    Q.  It further says, "Exceptions may be made for
12  medical or religious reasons as a reasonable
13  accommodation."
14         Did I also read that correctly?
15    A.  Yes.
16    Q.  Based on this policy, would you agree with me
17  that Allied allows employees to have facial hair,
18  including a beard?
19    A.  That's not what I was told, though.
20    Q.  The question is:  Based on this policy, would
21  you agree with me that Allied allows its employees to
22  have facial hair, including beards?
23    A.  Based of what I see here, that's a yes.
24         (Exhibit No. 10 marked.)
25    Q.  (By Mr. Shine)  Twana, I'm handing you a copy

Case 4:23-cv-02823   Document 27-6   Filed on 11/18/24 in TXSD   Page 14 of 45
Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

11:31:27-11:32:33                                          Page 73

1    Q.  Uh-huh.  And you previously testified that
2  there are four, sort of, black dots, correct?
3    A.  According to the paper I see is in front of
4  me, correct.
5    Q.  The very first one, please read along.  It
6  says, "I have been given access to the current version
7  of the Allied Universal employee handbook, and I can
8  access the most recent version of the handbook at the
9  link below."
10        Did I read that correctly?
11   A.  Yeah.
12   Q.  It further says, "As a condition of my
13  employment, I agree to read and abide by the rules and
14  regulations contained therein, unless otherwise stated
15  in a union or other contract."
16        Is that correct?  Did I read that
17  correctly?
18   A.  Yes.  What do you mean by "union"?
19   Q.  The question is:  Did I read that correctly?
20   A.  Oh, yes.
21   Q.  It further reads, "I understand that the
22  policies, rules, and benefits described are subject to
23  change and may be updated, revised, or deleted at any
24  time and that it is my responsibility to keep myself
25  apprised of any changes."

11:32:37-11:33:58                                          Page 74

1        Did I read that correctly?
2    A.  Yes.
3    Q.  So would you agree with me that by signing
4  this form, you agreed to review and read the employee
5  handbook?
6    A.  They told us to sign it and go through it.
7    Q.  Do you see the link above the signature box
8  that says, "Please use this link to view the employee
9  handbook"?
10   A.  Yes, I see that, the one with the blue
11  writing, correct.
12   Q.  Did you ever click on that?
13   A.  I don't remember.
14   Q.  During your employment with Allied, did you
15  ever click on that?
16   A.  I can't recall that.
17   Q.  Turning back to the Religious Accommodation
18  policy, which was identified as Number 12 and labeled
19  as AUS 172.  Based on this policy, Twana, would you
20  agree that Allied Universal allows religious
21  accommodations?
22   A.  According to this, what I see, yes.  But we
23  never got told that.
24   Q.  Again, because it was in a handbook you never
25  read?

11:33:59-11:35:47                                          Page 75

1        MS. HERNANDEZ: Objection; argumentative.
2        You can answer.
3    A.  They never gave us the opportunity to read it.
4    Q.  (By Mr. Shine)  And you never asked any
5  questions about it?
6    A.  At that time of the class, no -- of hiring
7  event.  Sorry.
8    Q.  You previously testified, Twana, that you
9  practice the Muslim religion; is that correct?
10   A.  That is correct, yeah.
11   Q.  And as part of your practice, are you required
12  to wear or maintain a beard?
13   A.  Yes.
14   Q.  Are there any times that you might shave or
15  otherwise grow it longer?
16   A.  Have a beard, that's the requirement.
17   Q.  Okay.
18   A.  Shave -- shaving, it's not -- it's part of the
19  religion to have a beard.
20   Q.  When you first told Patrick Freeney that you
21  kept a beard for religious purposes, was this around
22  Ramadan or some other observed holiday in your
23  religion?
24   A.  Don't remember but Ramadan is -- it's a -- has
25  nothing to do with a beard.  It's a month of fast --

11:35:57-11:37:40                                          Page 76

1  fasten -- fasting.
2    Q.  Fasting?
3    A.  Fasting.
4    Q.  Okay.  Can you explain what the religion
5  requires for a beard?
6    A.  The religion require -- like, required for a
7  beard, to grow your beard.  And doesn't -- doesn't --
8  how should I try to say?  Doesn't bother -- or it's not
9  bother.  Like, go down too much on your mouth, cover
10  your mouth, and things like that.  Like, I don't want
11  to -- it's not bother.  I don't know how to say it
12  right.  It's like being involved with the food you eat,
13  like touch the food that you eat, like disturb the food
14  that you eat or something like that.
15   Q.  And you're saying it's not supposed to?
16   A.  It's not supposed to.  Like, keep it not like
17  to bother the food or something.  Like, keep it clean.
18   Q.  Okay.  How long was your beard whenever
19  Patrick asked you to shave it?
20   A.  It was this -- like this (indicating).  It was
21  not like here or here.  It was like here.
22   Q.  So by the way you're gesturing, is it a little
23  longer than what you have now?
24   A.  It could be, yeah.
25   Q.  Was it shorter than what you're wearing right

Case 4:23-cv-02823   Document 27-6   Filed on 11/18/24 in TXSD   Page 15 of 45

Twana Ahmed vs.                                                    Twana Ahmed
Universal Protection Service, et al                           September 19, 2024

| 11:37:48-11:39:21 | Page 77 | 11:41:12-11:42:38 | Page 79 |
|---|---|---|---|

**Page 77**

1 now?
2 A.  No, it was not -- it was not shorter, no.
3 Q.  Do you know when Ramadan was in 2021?
4 A.  Ramadan, it's always during the summertime.
5 Sometimes it change.  Some years it change, some years
6 it doesn't change.
7 Q.  And what would cause it to change?
8 A.  The time -- I believe the time of the
9 calendar.  The calendar.  Sometimes it change, I
10 believe so.  And sometimes it change because of the
11 time.  Because in Middle East, it's a different time
12 over here, so it change the time of fasting.  Let's
13 see, over there you fast -- you break your fasting
14 earlier.  Let's say you break it over there at 6:00.
15 Since you live in the US, the time difference, you
16 might break your fast at 8:30 at night.
17 Q.  Okay.  So are you following the time in the
18 Middle East?
19 A.  No, no.  The time over here.
20 Q.  Okay.  So --
21 A.  But the time change.  Like -- like, because
22 over there, they -- they -- like, let's say over there
23 is daytime, over here is nighttime.  So it's a big
24 different over here.  Over here they give us a paper
25 that tells you the time of when to break the fast, when

**Page 79**

1 Q.  Okay.
2 A.  In Islam they call it Quran.  And Jewish
3 religion it's Torah.
4 Q.  So you listen to the Quran?
5 A.  Yes.
6 Q.  What else do you do to practice your religion?
7 A.  Help people in need when I'm able to.  It
8 doesn't matter -- it doesn't have to be financial need.
9 It could be somebody who could be sick, that needed
10 help.  If you are able to help you, you can help them
11 with anything that you are capable of.
12 Q.  Do you also participate in the prayer?
13 A.  Yes.  But I don't go to masjid or -- or mosque
14 or anything like that.
15 Q.  And why not?
16 A.  I just -- it's like basically if you pray at
17 home, it's the same as mosque; it's you and your God.
18 If you pray here, it's the same as mosque; it's you and
19 your God.  It's like between you and your God.  God
20 will accept it at the house, He accept it at the
21 mosque.  If He accept it at the mosque, accept it at
22 the house.  It's the same thing.
23 Q.  Okay.
24 A.  The mosques are different here than from
25 overseas.  Overseas, they have imam.  Here they have

| 11:39:27-11:41:05 | Page 78 | 11:42:41-11:44:09 | Page 80 |
|---|---|---|---|

**Page 78**

1 to do this and do that because the time difference and
2 things like that.
3 Q.  Okay.  Do you know when Ramadan was in 2022?
4 A.  Don't remember when exactly.
5 Q.  How long have you been a practicing Muslim?
6 A.  Since I was born.  That's my -- that's my --
7 that's my religious, yeah.
8 Q.  Okay.  And other than keeping a beard, do you
9 observe other practices of the Muslim religion?
10 A.  Can you explain the question more?
11 Q.  Sure.  Let me try to rephrase.
12 A.  Okay.
13 Q.  So besides wearing a beard, do you do anything
14 else to practice your religion?
15 A.  Of course.  There's a lot of stuff you have to
16 practice.  And some of them, it's like helping -- part
17 of your religion to help people in need.  Pray.
18 Q.  What do you specifically do to practice your
19 religion, besides wearing a beard?
20 A.  Listen to Quran.  I don't know if you know
21 that.  Like, Quran, listen to it.
22 Q.  That's your religious text, correct?
23 A.  What does it mean by "text"?
24 Q.  Like a -- like a book?
25 A.  It's like in Christianity, they call it Bible.

**Page 80**

1 imam, but over there it will be -- they read the Quran
2 to you, they interpret the Quran to you in Arabic.
3 It's an Arabic Quran, but they interpret it to you the
4 way it is.
5          Over here it's -- the Quran, is in
6 Arabic, but some copies in English.  When they
7 translate it, let's say, from Arabic to English, it's
8 not the same way it sounds in Arabic.  So when I listen
9 to it in Arabic, let's say, somebody, like, in the
10 Internets reads it and I listen to it, I understand it
11 more clearly and will feel more comfortable and relaxed
12 and relieves me when I hear it -- when I hear it.
13 Q.  Okay.  In looking further at your complaint,
14 Twana --
15 A.  Yes.
16 Q.  -- after Patrick asked to you shave your
17 beard --
18 A.  Yes.
19 Q.  -- your complaint said a few weeks later that
20 a supervisor also asked you to shave; is that right?
21 A.  Yes.
22 Q.  What do you mean by "a few weeks"?
23 A.  When I was at the field, after that, they have
24 to issue equipments to me because I was missing
25 equipments because I was just carrying the firearm that

Case 4:23-cv-02823   Document 27-6   Filed on 11/18/24 in TXSD   Page 16 of 45

Twana Ahmed vs.                                         Twana Ahmed
Universal Protection Service, et al                    September 19, 2024

| 11:44:13-11:45:31 | Page 81 |
| --- | --- |

1  was issued to me.  That's all.  One of their -- part of
2  their equipments was the Taser.  I was not issued one.
3  The supervisor came to the scene and issued me a
4  nonoperational Taser.
5      Q.  What date was that?
6      A.  I don't remember.  But I remember it was
7  during winter because it was cold.  I didn't have --
8  the reason I remember it was winter because I was cold
9  and freezing and never got issued Allied uniform
10  jackets.  And I asked for one from the supervisor, and
11  the supervisor told me they don't have any.  And when
12  he opened his trunk to give me the Taser, I clearly saw
13  in front of me jackets.  I don't know, they call them
14  beanies.
15      Q.  Okay.
16      A.  The one for winter, the black one that says
17  "Allied," he had some of those and they never issued me
18  one.
19      Q.  When you say it was winter and cold -- I'm
20  from Chicago so I don't know what it gets like here --
21  what type of temperature are we talking about?
22      A.  Houston gets cold.
23      Q.  Sure.  So what do you recall on this date?
24      A.  All I know it's winter and cold.
25      Q.  What was the supervisor's name?

| 11:45:34-11:47:16 | Page 82 |
| --- | --- |

1      A.  Mauroso, Mauricio, something like that.
2  Mauricio.  I don't remember his name exactly.
3      Q.  Is this the same Hispanic supervisor --
4      A.  That's correct.
5      Q.  -- you talked about earlier?
6      A.  That's correct.
7      Q.  And he met you in the field?
8      A.  That is correct.
9      Q.  And remind me where he met you.
10      A.  H-E-B site on San Felipe Street.  It was
11  approximately, time-wise, from 6:30 to 7:00 to 8:00.
12  Somewhere between those couple of hours, three hours.
13  It was nighttime because I remember the sun was not out
14  and -- the sun was, like, gone, I think, and it was
15  cold.
16      Q.  Did the supervisor also have a beard?
17      A.  He did have one, yes.
18      Q.  How long was his beard?
19      A.  I don't remember.
20      Q.  Was it shorter or longer than yours?
21      A.  I think a little bit shorter.  I'm not sure.
22      Q.  Do you know if he -- if he had a religious
23  accommodation?
24      A.  Oh, I never asked him that.  I don't think
25  so I asked him that.

| 11:47:16-11:48:35 | Page 83 |
| --- | --- |

1      Q.  Do you know if he had any accommodation for
2  wearing his beard?
3      A.  I never asked him that.
4      Q.  But you claim he asked you to shave your
5  beard?
6      A.  Yes.
7      Q.  How did you understand what he meant by shave
8  your beard?
9      A.  He -- he told me twice to shave my beard.
10  Shave it.  Like shave it off.
11      Q.  He didn't ask you to shave it like his, just
12  trim it down?
13      A.  No.  Trim it down is trim it and all that.
14  And my beard was completely trimmed and clean, lined
15  up, clean, everything clean, looking perfect, sharp.
16      Q.  And so your testimony is that you shaved down
17  to the skin?  You had no facial hair?
18      A.  I shaved.  Down to the skin, I don't remember.
19  But I did shave.  I had to shave.
20      Q.  And when did you do that?
21      A.  Not -- not long after that.
22      Q.  What does "not long" mean?  An hour?
23      A.  No.
24      Q.  A day?
25      A.  Less than a week or a week.  And I started,

| 11:48:49-11:50:30 | Page 84 |
| --- | --- |

1  like, wearing the face mask.
2      Q.  When the supervisor asked you to shave, how
3  did you respond?
4      A.  I told him I had a beard for a long time and
5  it's part of my belief to have one.  He goes, like, but
6  that's policy of the company.  You're not -- they don't
7  want you to have beard.
8           I did not argue.  I did not say anything.
9  I was like, okay, I understand.
10      Q.  At that time, Twana, if it was part of your
11  religion, why didn't you refuse to shave?
12      A.  Sorry?
13      Q.  At that time, as you say it was part of your
14  religion, why did you not refuse to shave?
15      A.  I needed the job to take care of my family,
16  and I needed the money to take care of my family and
17  myself.  I had to do what I had to do to keep my family
18  fed and myself.
19      Q.  And did you report the supervisor asking you
20  to shave your beard to anyone?
21      A.  I couldn't report it to anyone because if I
22  report it to the account manager -- I'm pretty sure it
23  came from the account manager.  So I couldn't report it
24  to anyone.
25      Q.  Do you remember when we were talking about the

---

11:50:32-11:51:51                                          Page 85

1  company's harassment and discrimination policy?
2      A.  Yes, you talked about it.
3      Q.  And you agreed with me at that time that an
4  employee has multiple ways it can report harassment and
5  discrimination, right?
6      A.  You said that, yes.
7      Q.  But you still chose not to report it to
8  anyone?
9      A.  Well, just like I said, they didn't give us
10  the opportunity to view the documents or go through the
11  documents, or they gave us, let's say, a specific card
12  that said, hey, if something goes wrong with you in the
13  company, contact this number or anything like that.
14          Everything they give us:  Hit checkmark,
15  hit next, hit checkmark, hit next, hit checkmark and go
16  hit next.  Basically like go through it -- like, run
17  through it fast as we could -- fast as you can because
18  we don't have enough time.
19      Q.  But that doesn't mean that the policies don't
20  apply to you, right?
21      A.  The policy applies to everyone.
22      Q.  So you would agree that whether you read it or
23  not, the policy applies to you at that time?
24      A.  I was not aware of the policy.  So I had to do
25  whatever they told me to do because I was employed by

---

11:51:53-11:53:34                                          Page 86

1  them at the time and I have to listen to what the
2  supervisor says because the supervisor is above me.
3  And whatever he says, the supervisor, I will do because
4  how would I know if the supervisor just made that up?
5  I'm pretty sure I have to listen to him.
6      Q.  If you would have read the policy, you would
7  have known if he had made it up, right?
8      A.  Well, they don't let us read the policy.
9          (Exhibit No. 13 marked.)
10      Q.  (By Mr. Shine)  Twana, you're being handed a
11  photo that you provided in discovery.  It's labeled
12  AhmedAllied 590.  Have you seen this photo before?
13      A.  Yes, of course.
14      Q.  Who is in this photo?
15      A.  It's me.
16      Q.  And who is next to you?
17      A.  The instructor.
18      Q.  Do you recall his name?
19      A.  Mauro -- Monroe.  Mauro.  Monroe.
20      Q.  Monroe?
21      A.  Monroe.
22      Q.  Okay.  And you said he was your instructor?
23      A.  He was the firearm instructor, Taser
24  instructor, baton instructor.  Like the instructor for
25  the company.

---

11:53:35-11:54:56                                          Page 87

1      Q.  When was this photo taken?
2      A.  During the training, the -- I believe the last
3  day -- the last days of the training.  It could be the
4  last -- one of the last, last day or one day before the
5  last day.
6      Q.  Okay.  Where was this photograph taken?
7      A.  At the office.
8      Q.  When you say "the office," which office are
9  you referring to?
10      A.  On 45.
11      Q.  That's the Allied office?
12      A.  Correct.
13      Q.  Do you know who took this photo?
14      A.  I'm not too sure but I think, if I'm not --
15  Siboldi -- Siboldi.  I think so.  I'm not too sure.
16      Q.  Does this photo represent what your beard
17  looked like at the time you were in training?
18      A.  I didn't understand your question.  Like
19  what --
20      Q.  Sure.  Let me try to rephrase.
21      A.  Okay.  Thank you.
22      Q.  In this picture it's fair to say you have a
23  beard, right?
24      A.  Correct, yeah.
25      Q.  And you said this was during training?

---

11:54:58-11:56:06                                          Page 88

1      A.  Yes.
2      Q.  Did your beard ever get shorter or longer than
3  this?
4      A.  It never got longer -- longer than that.
5      Q.  Okay.
6          (Exhibit No. 14 marked.)
7      Q.  (By Mr. Shine)  Twana, you're being handed
8  another photograph labeled AUS 1804.  Have you seen
9  this photo before?
10      A.  I don't think so.
11      Q.  Do you recognize who's in the photograph?
12      A.  It's me.
13      Q.  Do you recognize where the photo was taken?
14      A.  Yes.
15      Q.  And where was that?
16      A.  That's the field -- the field training area
17  that I told you earlier.
18      Q.  Okay.  And again, that's you in the
19  photograph?
20      A.  That is correct.
21      Q.  Fair to say that you also have a beard in that
22  picture?
23      A.  Yes.  That was during training, yes.
24      Q.  You said this was during training.  Is that
25  the Elite training that you referred to?

---

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

12:01:49-12:03:11                                    Page 93

1    of an Inspection Report that was completed on you
2    during employment with Allied.  Have you seen this
3    document before?
4        A.  I -- I've seen this one.
5            MR. SHINE:  And for the record, it's
6    labeled AUS 731 to 732.
7        Q.  (By Mr. Shine)  On the first page, Twana, does
8    it give a date for when this was completed?
9        A.  Yes.
10       Q.  And what date is listed?
11       A.  The 26th of 2022, 6:15 a.m.
12       Q.  Sure.  And you said the 26th of 2022.  Is
13   there a month identified?
14       A.  Yes.
15       Q.  What month?
16       A.  By number, I don't know it by number.  I don't
17   know how to say it by number.
18       Q.  Okay.  Would you agree with me that it says 26
19   MAR 2022?
20       A.  Yes, MAR, yes.
21       Q.  And would you agree with me that MAR is short
22   for March?
23       A.  By number it will be more understandable to
24   me.
25       Q.  March is the third month of --

12:03:14-12:04:35                                    Page 94

1        A.  Yeah, yeah, yeah.  3/26/2022, 6:15.
2        Q.  Okay.  And you were the officer being
3    reviewed, correct?
4        A.  Yes.
5        Q.  Okay.  If you turn to the second page, which
6    is AUS 732, there's two photographs, right?
7        A.  Yes.
8        Q.  And is that a photograph of you?
9        A.  That is me, yes.
10       Q.  Do you have a beard in this photo?
11       A.  Yes.
12       Q.  In March of 2022, is this before or after the
13   supervisor asked you to shave?
14       A.  I don't remember.
15       Q.  The picture as it's represented on AUS 732, is
16   this beard shorter or longer than the other pictures we
17   looked at today?
18       A.  It's not clear enough.
19       Q.  And did you shave or trim your beard in this
20   picture?
21       A.  Lined it up.
22       Q.  You lined it up?
23       A.  Yes.
24       Q.  Okay.
25       A.  You can call that trimming to keep it clean.

12:04:39-12:06:21                                    Page 95

1        Q.  And were there any issues with your beard at
2    this point in March of 2022?
3        A.  At the site?  Nobody had an issue with it at
4    H-E-B at all.
5        Q.  What about with Allied?  Did anyone complain
6    about your beard at this point?
7        A.  They didn't want the beard but -- Patrick
8    Freeney didn't want the beard.  He told me about it.
9        Q.  In March of 2022?
10       A.  I don't remember the exact date or March or
11   anything like that.  Before that, during the training,
12   he told me about it.  After that and that specific
13   date, I don't remember.
14       Q.  And again, was this before or after you
15   shaved?
16       A.  That's -- I remember I trimmed it out.
17   Trimmed.  Maybe lowered it.  I don't remember.
18       Q.  So when you testified earlier that you
19   shaved --
20       A.  Yes.
21       Q.  -- is this how it looked after you were done?
22       A.  Lower.
23       Q.  In your complaint, Twana, you also claim that
24   there were other security professionals with beards,
25   some that were longer than yours, right?

12:06:25-12:07:48                                    Page 96

1        A.  That's correct.
2        Q.  Who did you specifically see with a beard that
3    was longer than yours?
4        A.  The gentleman, he was working at a site that I
5    came from a place.  The time was 4:30 because that's
6    when I was scheduled.  It was a heavyset Hispanic male
7    tatted up on both arms.  His beard was like this long
8    (indicating).
9        Q.  When you say "this long," approximately, what,
10   a foot?
11       A.  You can say that.  And I have asked him, did
12   anybody came up to you and ask you to shave your beard?
13   He says no.  I was like, Well, they're telling me to
14   shave my beard.  He laughed and no comment.
15       Q.  Do you remember his name?
16       A.  No.
17       Q.  Did you ask him if he had an accommodation?
18       A.  No, I did not ask him.
19       Q.  Do you know if he had an accommodation?
20       A.  No, I don't know.
21       Q.  Besides this heavier set Hispanic male, is
22   there anyone else that you identified as having a beard
23   longer than yours?
24       A.  I don't remember exactly, like, if somebody
25   had it longer.

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

12:07:50-12:09:32                                        Page 97

1    Q.  Anyone else, Twana, that you can identify that
2  had a beard like yours, meaning the same length as
3  yours?
4    A.  Like, trimmed and cleaned?  No.  But Siboldi
5  had a beard.  It was my -- you can say my classmate
6  because he was in a class with me.  He had a beard.  A
7  couple of other guys, they had a beard.  Was it trimmed
8  out or anything like that?  I don't think so.  I was
9  the -- one of the guys who had my beard clean and
10 trimmed and looked professional.
11   Q.  And again, do you know if Siboldi had an
12 accommodation?
13   A.  I don't think he had accommodation.  I don't
14 think so.  But did I ever ask him?  I don't remember,
15 honestly.
16   Q.  Another thing that you allege in your
17 complaint, Twana, is that you were not issued a
18 body-worn camera but others were.
19   A.  That is correct.
20   Q.  Is that right?
21   A.  Yes, sir.
22   Q.  Were others in your training program issued
23 body-worn cameras?
24   A.  Everybody was issued body cameras, badges --
25 metal badges -- probable -- probable uniform.

12:09:48-12:11:22                                        Page 98

1    Q.  So speaking specifically about the body-worn
2  cameras, you said everyone.  So all ten people or so
3  that were in your Elite training class received
4  body-worn cameras?
5    A.  Yes.  Siboldi had a body camera when he was in
6  the class.  Had it in a vest.  It's part of your policy
7  to have the body camera.
8    Q.  And what policy is that?
9    A.  They told us it's part of their policy to have
10 the proper uniform, equipments and everything.  Like,
11 have the badge and camera, metal badge, identification.
12 So the metal badge goes here, the identification card
13 goes here; shows your pictures, identify who you are.
14 The firearm, Taser, baton, one pair of handcuffs.  I
15 didn't have --
16   Q.  And whose policy was this?
17   A.  The company.  Like, they told us that's -- you
18 have to have these.  It's part of their Elite policy.
19 You have to be complete.
20   Q.  Who specifically issued the equipment during
21 training?
22   A.  The instructor.
23   Q.  Monroe?
24   A.  That is correct.  But the body camera, it
25 really didn't matter.  Anybody, like, from the

12:11:25-12:13:05                                        Page 99

1  office -- with the Elite program, they could have
2  issued it to you, you know.
3    Q.  Did you report not getting a body-worn camera
4  to anyone?
5    A.  Yes.
6    Q.  Who did you report it to?
7    A.  I talked to the supervisor.
8    Q.  Who is the supervisor?
9    A.  Mauroso -- Mauricio.  He came to the field.  I
10 told him, Hey, I don't have this, I don't have that.  I
11 don't have a body camera.  I don't have this.  And he
12 was like, Don't worry about it.
13         (Exhibit No. 16 marked.)
14   Q.  (By Mr. Shine)  Twana, I'm handing you a
15 packet of photos that you provided in discovery.  These
16 are consecutively labeled AhmedAllied 584 through 587.
17         Starting with the first page which is
18 548, who is the security guard?
19   A.  He's Allied employed with the Elite program.
20   Q.  And what's his name?
21   A.  Don't know his name.
22   Q.  And was he in your training program?
23   A.  I can't recall him, no.
24   Q.  When was he hired by Allied?
25   A.  Not aware of that.

12:13:07-12:14:17                                       Page 100

1    Q.  When did he complete Elite officer training?
2    A.  Not aware of that.
3    Q.  He wasn't in your training class?
4    A.  He was not.
5    Q.  Do you know if he attended training before
6  you?
7    A.  I don't know.
8    Q.  Do you know if he attended training after you?
9    A.  Don't know that.
10   Q.  Who took the photo?
11   A.  I did.
12   Q.  When did you take the photo?
13   A.  Don't remember when.
14   Q.  Where was this photo taken?
15   A.  One of the posts that I worked at.
16   Q.  Do you know where specifically this was taken?
17   A.  Don't remember the address but it was one of
18 the H-E-B stores.
19   Q.  And you testified you don't know what date it
20 was taken.  Was this before or after your training
21 program?
22   A.  This is way -- that's after my training.
23   Q.  How long after?
24   A.  A little bit while.
25   Q.  When you say "a little bit while," is that one

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

12:14:22-12:15:20                                      Page 101

1   day?
2   A.  No.  Longer than that.
3   Q.  Two weeks?
4   A.  Longer than that.
5   Q.  Two months?
6   A.  Longer than that.
7   Q.  Three months?
8   A.  Longer than that.
9   Q.  How long were you employed with Allied?
10  A.  Four, five months.  Somewhere around there.
11  Don't remember exactly how long.
12  Q.  Do you know when this officer was issued a
13  body-worn?
14  A.  No, I do not know.
15  Q.  Do you know who issued him a body-worn?
16  A.  No, I do not.
17  Q.  If you turn to the next page which is
18  AhmedAllied 585.
19  A.  Yes.
20  Q.  Is it fair to say that's the same security
21  guard?
22  A.  That's correct.
23  Q.  So turning to the next page, AhmedAllied 586.
24  A.  Yes.
25  Q.  Who are these guards?

12:15:21-12:16:42                                      Page 102

1   A.  Allied Universal employees, the same program
2   that I was in, the Elite program.
3   Q.  And what's her name?
4   A.  I don't remember her name.  Don't know his --
5   sorry.  Do not know her name.
6   Q.  And what's his name?
7   A.  Don't -- don't know his name either.
8   Q.  Do you know when this female officer was
9   hired?
10  A.  No, I do not.
11  Q.  Is she an Elite officer?
12  A.  Yes.
13  Q.  How do you know that?
14  A.  The shirt, the badge, the camera, the holster
15  of the firearm, the vest, the Taser.
16  Q.  Do officers not in the Elite program get
17  issued the same stuff?
18  A.  No, no.
19  Q.  And how do you know that?
20  A.  You don't -- like, you don't get issued a
21  firearm like this with a holster.  That's what I'm
22  aware -- like, know of.  Like, they don't issue, like,
23  so much equipments like this, expensive equipments,
24  like a Taser.  The Taser is approximately $3,500 Taser,
25  you know.  I have not seen anybody work for Allied that

12:16:46-12:17:57                                      Page 103

1   I had come encounter with that have those equipments.
2   Q.  Still looking at the female officer, did she
3   attend Elite training with you?
4   A.  No, she did not.  I don't -- I never seen her
5   in my training class.
6   Q.  Do you know when she was -- when she completed
7   training?
8   A.  I have no idea.
9   Q.  Who took this photo?
10  A.  I did.
11  Q.  And where was the photo taken?
12  A.  That was at H-E-B store.
13  Q.  Which location?
14  A.  I believe West Houston.  I don't know if it's
15  West or South.  I think West Houston.
16  Q.  And what date was this photo taken?
17  A.  Do not remember the date exactly.
18  Q.  Do you know who issued her the body-worn?
19  A.  No, I do not.
20  Q.  Do you know when she was issued the body-worn?
21  A.  No, I was -- I do not.
22  Q.  Was this photograph taken around the same time
23  of the other officer that we talked about, the guy --
24  A.  The first one?
25  Q.  Yeah, on 584 and 585.

12:18:00-12:19:14                                      Page 104

1   A.  Approximately but not same date or -- probably
2   not same week but close by, you can say that.
3   Q.  And what about the male officer?  Do you know
4   when he was hired?
5   A.  No, I do not.
6   Q.  Did he attend training with you?
7   A.  No, he didn't -- no, I didn't have -- I don't
8   recall him in my class.
9   Q.  Is this the Hispanic male that you were
10  referring to previously?
11  A.  No.  But he give -- he give the familiarity of
12  him like -- a little bit closer like him, but the other
13  gentleman a little bit heavyset and tattoo on arm, and
14  his beard was longer than that beard.
15  Q.  Again, do you know what his name is?
16  A.  No, I do not.
17  Q.  Do you know if he took the Elite training
18  before you?
19  A.  I do not.
20  Q.  Do you know if he took Elite training after
21  you?
22  A.  I'm not aware of that.
23  Q.  And who -- it's fair to say you took this
24  photo because he's in a --
25  A.  That is correct, yeah.

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

12:19:15-12:20:09                                    Page 105

1   Q.  Do you know when he was issued a body-worn
2   camera?
3   A.  I am not -- I'm not aware of that.
4   Q.  And do you know who issued the body-worn
5   camera to him?
6   A.  I am not aware of that.
7   Q.  If you turn to the last page in here, which is
8   AhmedAllied 587, is it fair to say that that's --
9   A.  The same photo.
10  Q.  -- the same individuals?
11  A.  Yes, you can say that, yeah.
12  Q.  And sort of briefly returning to our
13  discussion that we've had, Twana, about your beard --
14  A.  Yeah.
15  Q.  -- in looking at this officer's beard, is his
16  beard the same length as yours was before you shaved?
17  A.  That's longer.
18  Q.  It's longer.  Okay.  Do you know if he was
19  given an accommodation?
20  A.  Not aware of that.
21  Q.  Did you ever ask him if he was given --
22  A.  No, I did not.
23  Q.  -- an accommodation?
24  A.  No.
25  Q.  After you took these photographs, did you show

12:20:13-12:22:04                                    Page 106

1   them to anyone at Allied Universal?
2   A.  At Allied?  No.
3   Q.  Why did you take these photographs?
4   A.  To see the difference between what I got and
5   they got.  To see the difference the way they were
6   getting the equipments and I was -- I got my
7   equipments.  The treatment -- the treatment of -- they
8   received and the treatment I received.
9   Q.  Did you ever take a photo of yourself in full
10  uniform?
11  A.  I don't remember.
12  Q.  Did you ever talk to any of these officers in
13  these photos that we just talked about?
14  A.  These two, no.  And the other one, I don't
15  remember ever spoken to him before.
16  Q.  And when you told the supervisor that you
17  weren't issued a body-worn --
18  A.  Yes.
19  Q.  -- how did he respond?  Like, what did he --
20  what did he say back to you?
21  A.  Every time I asked for something:  Don't worry
22  about it or we don't have any available or don't worry
23  about it, it's all good.  And I told him, I'm like,
24  hey, I needed it.  I'm missing a lot of equipments.  I
25  get the same response from them.  Every time I asked

12:22:07-12:23:27                                    Page 107

1   for anything, I get the same response.
2        Let's say for the uniform, the Elite
3   you're supposed to have -- that's not black.  Navy
4   blue.  Like, full set because you worn a set -- you
5   worn a vest that's navy blue.  The shirts -- I got one
6   shirt.  It was four times bigger than my size.  And
7   they told me we don't have any, just put that on and go
8   work.  I had no choice.  I had to wear it and go to
9   work.
10  Q.  You started your employment with Allied in
11  December of 2021, right?
12  A.  Correct.
13  Q.  Would you agree with me that the COVID
14  pandemic was happening at that point?
15  A.  It was during COVID.  I am aware of that,
16  yeah.
17  Q.  And do you remember going to, say, a grocery
18  store and there being things out of stock or something
19  not available?
20  A.  I was not aware of that, no.
21  Q.  Do you -- do you ever watch the news or listen
22  to the news?
23  A.  Yeah.
24  Q.  Do you remember the shortage of, say, paper
25  towels, toilet paper, things like that?

12:23:29-12:37:46                                    Page 108

1   A.  People were going crazy over that, yes.
2   Q.  Right.  So when Allied told you that they
3   didn't have something, you somehow say that's
4   discriminatory?
5   A.  The reason is because when I asked them, they
6   said to me, We don't have any.  But the supervisor say
7   we took the last ones and they already had some, the
8   proper uniform.  Why would you take the last ones if
9   you know you have officers are missing the -- missing
10  the correct ones -- the -- missing proper uniform and
11  you just take it for yourself.  Or we have another
12  officers got issued shirts who came -- graduated with
13  me.  They issued the blue one.  I was the one who got
14  issued a different color.
15       MR. SHINE:  I think we're at a good
16  spot to take a break.
17       MS. HERNANDEZ:  Okay.
18       THE VIDEOGRAPHER:  Off the record at
19  12:24.
20       (Off the record 12:24 p.m. to 12:37 p.m.)
21       THE VIDEOGRAPHER:  Back on the record at
22  12:37.
23  Q.  (By Mr. Shine)  Twana, I'd like to turn back to
24  talk a little bit further about your -- your complaint
25  and some of the specific allegations that you've made.

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

01:05:31-01:07:34                                      Page 129

1   anything.  Just sign and things like that.  And then I
2   had a feeling -- go ahead.
3       Q.   How long was your conversation with this
4   woman?
5       A.   Ten minutes, 15, maybe more.
6       Q.   And do you know what her title was or is?
7       A.   I think she was in HR.
8       Q.   And so you signed the paperwork, you gave her
9   some of this information.  And then did you just get up
10  and leave?
11      A.   I signed the probable -- probable documents
12  and told her what exactly happened.  And I go ahead and
13  left.  I -- yes, I think I left her office.
14      Q.   Okay.  After you left her office, where did
15  you go?
16      A.   I think home.  I think so.
17      Q.   Other than talking to Patrick and talking to
18  this woman that you think was in HR, did you talk to
19  anyone else when you were at the branch office that
20  day?
21      A.   Don't remember.
22      Q.   Did you report any of your conversation with
23  Patrick to Allied's hotline number at that point?
24      A.   No.
25      Q.   Why not?

01:07:34-01:09:13                                      Page 130

1       A.   I was afraid -- I was afraid of losing my jobs
2   because I was in the really bad spot and I needed that
3   job.  I didn't want him -- I didn't want anybody to
4   retaliate against me.  If I say something, he's way
5   higher than me and way powerful than me.  I'm just a
6   lower man.  I might lose my job.  And not listen to me,
7   just like what Patrick did to me.  If I say something,
8   they're gonna listen to him because he's way above me.
9   So I had to deal with everything just to make my living
10  to feed my family and feed myself.
11      Q.   Okay.  Did you say anything to anyone outside
12  of Allied Universal about that conversation that day?
13      A.   That particular day?  I don't remember if I
14  spoke to anybody that particular day.
15      Q.   What about a few days after or a week after;
16  someone outside of Allied, did you talk to anyone about
17  that day?
18      A.   I do not remember if I spoke to anyone
19  regarding that.
20      Q.   Did you write down your interactions in any
21  way?  Like, did you make a note or diary for yourself?
22      A.   Right in front of him?  No, I did not.
23      Q.   What about after the fact?  Did you make a
24  note or a diary for yourself?
25      A.   No, I don't -- I don't remember I did anything

01:09:17-01:10:37                                      Page 131

1   like that.  Because it's just the way things shifted.
2   Things went away.  Like, things went the wrong way in
3   the office.  Never expected it to be treated like that.
4   So I was very shocked and surprised and shook my core.
5       Q.   Okay.  And you didn't write yourself a note or
6   talk to anyone, right?
7       A.   No.  I didn't, like, no.  I don't remember if
8   I wrote anything -- sorry to cut you off.
9            I didn't -- I don't remember if I wrote a
10  note or not.  Maybe I did, maybe I didn't.  I don't
11  remember.
12      Q.   Did you ever talk to Alex about that -- that
13  interaction?
14      A.   Maybe.  Maybe.  Not too sure.  Maybe.
15      Q.   I want to talk a little bit about just H-E-B.
16      A.   Yeah, go ahead.
17      Q.   I know we talked a lot about, you know, it's a
18  grocery chain --
19      A.   Yes.
20      Q.   -- they have a couple of different stores,
21  like Central Market, for example.
22      A.   Yes.
23      Q.   If I use the phrase "site location," does that
24  mean anything to you?
25      A.   Site location means the post.

01:10:40-01:11:26                                      Page 132

1       Q.   Okay.  And when you say "post," what do you
2   mean by that?
3       A.   Location.
4       Q.   So is that like a spot you're assigned to
5   work?
6       A.   It's like you need to be at this post or you
7   need to be -- it's like -- it's like meet me at this
8   office; I'll be at this office.
9       Q.   Okay.
10      A.   So be at this -- go to this store, this
11  address.  Or be at this site, at this address.  Or be
12  at this post, at this address.  It depends on the
13  person, the way they say it.
14      Q.   Okay.
15      A.   Everybody's different.
16      Q.   Sure.
17      A.   I say it by the street name.
18      Q.   The street name?
19      A.   Yeah.
20      Q.   Okay.  And if I were to say the phrase "post
21  orders," does that mean anything to you?
22      A.   Post orders?  It does.  I heard of that phrase
23  "post orders," yeah.
24      Q.   And what -- what do you understand a post
25  order to be?

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 23 of 45
Twana Ahmed vs.                                                        Twana Ahmed
Universal Protection Service, et al                               September 19, 2024

01:11:27-01:12:46                                    Page 133

1    A.  Post order is the post order.  They're
2  basically like the -- what you are supposed to do at
3  that post, like basically patrol the property, patrol
4  the parking lot.  Things like that.
5    Q.  Okay.  So it's -- when you're at a specific
6  site location, it sort of tells you what you're
7  supposed to do?
8    A.  Like, kind of.  It tells you that too, yeah.
9  But it's very, very -- it's very clear what we are
10  supposed to do.  Like, for example, patrol the
11  property, patrol the premises of the property, things
12  like that, you know.
13    Q.  Okay.  Would you agree they're sort of general
14  expectations of what you're supposed to do when you're
15  working?  Or am I mischaracterizing that?
16    A.  What do you mean?
17    Q.  So you've testified that it sort of tells you
18  to patrol or be in a certain area.
19    A.  Yeah.
20    Q.  And so the post order sort of tells you what
21  you're supposed to do when you're working?
22    A.  Basically, yeah.  But not -- not like, for
23  example, you're driving a patrol car, you leave the
24  property with a patrol car.  Things like -- you know
25  what I mean?  Like you patrol the premises of the

01:12:49-01:14:10                                    Page 134

1  property.
2    Q.  Okay.
3    A.  Have the light -- the lights on.  We -- we --
4  we know all that.  Have the lights on in the vehicle.
5    Q.  And that would be in a post order or some
6  other document about --
7    A.  I believe so.  I believe so.
8    Q.  Do you know if you could be disciplined for
9  not following a post order?
10    A.  I never broke any policy; so, I was never
11  disciplined on anything like that.
12    Q.  Are you aware if you can be terminated for not
13  following a post order?
14    A.  I never breaked any post order, so I'm not
15  aware of that.  I was always following the policy of
16  the property and Allied.
17         (Exhibit No. 17 marked.)
18    Q.  (By Mr. Shine)  Twana, I'm handing you a
19  document titled "Hot Sheet, AUS Security Officer Post
20  Orders."
21         Do you see that at the top of the page?
22    A.  The -- this one marked with yellow?
23    Q.  Yes.
24    A.  Yes, I see it.
25         MR. SHINE:  And for the record, this is

01:14:12-01:15:37                                    Page 135

1  labeled AUS 1036 consecutively through 1042.
2    Q.  (By Mr. Shine)  Have you seen this document
3  before?
4    A.  I do not remember.
5    Q.  On the first page there's a heading that says
6  "Security Objective."  It's the top heading on the
7  upper right-hand side.  Do you -- or I'm sorry --
8  upper left side.  Do you see where I'm referring to?
9    A.  Yeah.
10    Q.  And in reading that first paragraph it
11  identifies that these are post orders for working at an
12  H-E-B property.  Is that fair to say?
13    A.  According to the paper, yes.
14    Q.  In the bottom left-hand corner of the page,
15  there's a date after the word "revision."
16         Do you see where I'm referring to?
17    A.  The date, 11/26/2021.
18    Q.  Okay.  Would you agree with me that 11/26 of
19  2021 was prior to your start date with the company?
20    A.  That's before my employment.
21    Q.  Correct.
22    A.  Yeah, yeah.
23    Q.  If you could turn to the third page, which is
24  AUS 1038 or 1,038.
25    A.  Okay.

01:15:37-01:16:52                                    Page 136

1    Q.  Do you see in the middle of the page there's a
2  heading titled "Shoplifter"?
3    A.  Yeah.
4    Q.  Do you see where I'm referring to, where it
5  says "Shoplifter"?
6    A.  Yes.
7    Q.  And then under Shoplifter, there are four
8  black bullet points.  Do you see what I'm referring to?
9    A.  Right here, yeah.
10    Q.  Okay.  The second bullet point says, "If a
11  shoplifter is identified inside store and there is no
12  LP and if management specifically requests assistance,
13  the officer may assist but cannot restrain or
14  physically touch the shoplifter.  The officer is only
15  there as a uniformed presence."
16         Did I read that accurately?
17    A.  Yes.
18    Q.  So although you may not agree, Twana, is it
19  fair to say that Allied set clear expectations for how
20  you're supposed to interact with a shoplifter?
21    A.  Repeat the question, please, if you don't
22  mind.
23    Q.  Of course.  Let me try to rephrase.
24         Based on the information in these post
25  orders --

01:47:04-01:48:30                                        Page 157

1    Q.   This paragraph alleges a shoplifting in April
2   of 2022 at the H-E-B store, correct?
3    A.   Yes.
4    Q.   What specific date did this alleged
5   shoplifting happen?
6    A.   Which store are you talking about
7   specifically?
8    Q.   I'm asking you.  Your complaint says:  Not
9   long afterward in April of 2022, the Kurdish guard is
10  stationed at an H-E-B grocery store on duty.  The H-E-B
11  store manager sends the guard a text message with some
12  pictures of the man in -- of a man in the store.
13   A.   Are you talking about the --
14   Q.   What date did this happen?
15   A.   Don't remember the specific date.  It happened
16  on a city -- it happened on Bellaire.  The city of
17  Bellaire, at the H-E-B I was working over there.  I
18  don't remember the exact date.
19   Q.   This paragraph also identifies a store manager
20  sending you a text message.  Who was the store manager?
21   A.   Sent me a text message and a phone call.
22   Q.   And what was the store manager's name?
23   A.   Keevin.  Kevin.  Something like that.
24   Q.   What's Kevin's last name?
25   A.   I do not know his last name.

01:48:32-01:50:13                                        Page 158

1    Q.   What does Kevin look like?
2    A.   White male, black hair.
3    Q.   How tall?
4    A.   5'7" approximately.
5    Q.   And how old?
6    A.   Early 40s, if not less.
7    Q.   Did he have any facial hair?
8    A.   I don't think he had facial -- I don't
9   remember.
10   Q.   And you said he texted you and he called you?
11   A.   Yes.
12   Q.   Which did he do first?
13   A.   I think the text messages.
14   Q.   And what time did you receive the first text
15  message?
16   A.   Don't remember the time.
17   Q.   What time did you start your shift?
18   A.   I don't remember what time was my shift that
19  day.
20   Q.   Did you work a set schedule?
21   A.   No.  Sometimes -- some posts 11:00 in the
22  morning.  Sometimes 10:00.  Sometimes 4:30.  It depends
23  on the post.  Sometimes 12-hour shift, sometimes 8-hour
24  shift.  It depends on the post.
25   Q.   You said he called you?

01:50:15-01:51:49                                        Page 159

1    A.   Yes, he did call me.
2    Q.   What time did he call you?
3    A.   At around the same time that he texted me.
4    Q.   And what store were you working at?
5    A.   The one in Bellaire.
6    Q.   Do you know the address?
7    A.   No.
8    Q.   Is there more than one H-E-B store in
9   Bellaire?
10   A.   I think -- I don't know.  I think maybe one.
11  I'm not sure.  Maybe two.  Not sure.  That's the one
12  I'm aware of that I worked in.
13   Q.   At the time you were working, were you the
14  only Allied security guard assigned at that location?
15   A.   On that particular day, I was the only one
16  scheduled to be there.  Was it in a morning shift?  I
17  don't know.  But I was the only one, at the incident
18  time, that was there.
19        (Exhibit No. 19 marked.)
20   Q.   (By Mr. Shine)  Twana, I'm handing you a copy
21  of a text message that you provided in discovery which
22  is labeled AhmedAllied 594 and AhmedAllied 595.
23        At the top of the text message it says
24  "MIC Kevin."  Do you see where I'm referring to?
25   A.   Yes, yes.

01:51:50-01:52:56                                        Page 160

1    Q.   What does MIC Kevin mean to you?
2    A.   Kevin is the manager.  MIC, I think a manager,
3   store manager.  Don't know what exactly MIC stands for
4   but I think it's something with a manager.
5    Q.   Is this the Kevin that you were referring
6   to --
7    A.   Yeah.
8    Q.   -- that we just talked about?
9    A.   Yes, I am.
10   Q.   Do you see there's a little, sort of, M in an
11  orange circle and it says, "If on property, he needs to
12  leave."  Do you see where I'm referring to?
13   A.   Yes.
14   Q.   Is that Kevin texting you?
15   A.   Yes.
16   Q.   And on page 595, at the bottom there's the
17  text "Attempted beer theft."  Do you see where I'm
18  referring to?
19   A.   Yeah, I am.
20   Q.   And there's a time stamp.  What time stamp is
21  listed?
22   A.   4:50 p.m.
23   Q.   Is 4:50 p.m. the time that he texted you about
24  this particular alleged shoplifting?
25   A.   Yes, according to the paper, of course.

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

| 02:03:19-02:04:41 | Page 169 |
|---|---|

1  Q.  You didn't say anything to them?
2  A.  At that time, specific time, no, I did not.
3  Q.  So then what did you do?
4  A.  I just observed them.  Because they already
5  been told to leave the store.  And they were in back.
6  Just waiting for them.  They maybe have -- they're
7  gonna pay.  Maybe they brought money, they left and
8  brought money and they pay and they're gonna be normal
9  customers.  You never know.  So I just waited.
10  Q.  So did you take this photograph, which is 588,
11  at the first time you observed them?
12  A.  Yeah, I believe so, yeah.
13  Q.  So you observed them -- for how long did you
14  observe them?
15  A.  Don't -- I don't remember for how long.  But I
16  did observe them, keep my eyes on them.
17  Q.  After that observation -- I mean, was it more
18  than five minutes?
19  A.  I don't know.
20  Q.  Was it more than ten minutes?
21  A.  Maybe.  Maybe ten minutes, maybe more, maybe
22  less.  Not more than 20.
23  Q.  Did they say anything to you at that point?
24  A.  At that particular time, no.
25  Q.  Do you know if they saw you?

| 02:04:45-02:06:46 | Page 170 |
|---|---|

1  A.  I don't know.  I think they saw me.
2  Q.  So after they left this aisle, where did they
3  go?
4  A.  I don't remember where exactly they went.  I
5  think they were leaving the -- leaving the store.  I
6  think.  Not too sure.
7  Q.  Did you keep eyes on them the whole time?
8  A.  I don't remember if I kept eyes on them the
9  whole time.
10  Q.  So when did you first interact with them?
11  A.  I interacted with one, not both.
12  Q.  So which one did you interact with?
13  A.  The guy with the hat.
14  Q.  In looking at 588, both gentlemen are wearing
15  a hat.  Which one are you referring to?
16  A.  The -- both -- 588?  They both not wearing
17  hats.  One of -- this is the only person who's wearing
18  a hat.  I don't remember --
19  Q.  So looking at page 594, this is the gentleman
20  that you said you interacted with?
21  A.  This one (indicating).
22  Q.  And where did you interact with him?
23  A.  By the door.  When he went over -- when he
24  went -- when he went around the counter.
25  Q.  Okay.  I have not been to this location.  So

| 02:06:50-02:07:43 | Page 171 |
|---|---|

1  where is the door located?
2  A.  They have multiple doors.
3  Q.  So which door did he go to?
4  A.  Second floor by the electrical stairs.
5  Q.  Okay.  You said he went around the counter.
6  What counter are you talking about?
7  A.  Paying -- paying counter.  Cashier.  You can--
8  that's what they refer to.
9  Q.  Was he pushing a cart at that point?
10  A.  Yes.
11  Q.  Which cart was he pushing?
12  A.  The one he took the stuff.
13  Q.  Is that cart represented in the picture
14  labeled 588?
15  A.  Yeah, that cart, yeah.
16  Q.  Which cart?
17  A.  The cart they have in their hands.
18  Q.  The one in the back, in the middle of the
19  picture, right?
20  A.  Are you referring to this or that one
21  (indicating)?
22  Q.  That's what I'm asking for you to clarify.
23  A.  This one.  I'm talking about this one.
24  Q.  Okay.  So the one that --
25  A.  I don't know --

| 02:07:44-02:08:53 | Page 172 |
|---|---|

1  Q.  -- is closer to the two gentleman, right?
2  A.  Yes.  I don't -- I don't know if that's their
3  cart or not.  I don't remember that.  It could be
4  theirs.  It could be not.  I don't know that.  But
5  that's the cart they holding, so that is the cart they
6  have.
7  Q.  And you saw the gentleman with the hat, in the
8  blue checkered jacket, walk around the register?
9  A.  Yes.
10  Q.  Pushing a cart?
11  A.  Yes.
12  Q.  At that point how many -- what was in his
13  cart?
14  A.  Drinks, alcohol, food.  That's what I
15  remember.  How much they were worth, I'm not too sure.
16  I didn't price it up.  I didn't check the price.
17  Q.  Did you watch him walk around the corner -- or
18  walk around the counter?
19  A.  Yeah, yeah.  These are the register,
20  self-checkouts, a box, Register 1, 2, 3, 4, whatever.
21  10, 15, they've got cashiers.  He comes and goes around
22  all these cashiers and tried to exit without paying.
23  Q.  And you watched him the full way?
24  A.  Yes, because I was by the door watching him.
25  Q.  Where was the other guy?

02:08:54-02:10:03                                        Page 173

1     A.  The other guy left the store because the other
2  guy's a lookout.
3     Q.  You testified earlier that there might have
4  been three people.  Where's the third guy?
5     A.  There are usually three, for my last
6  experience with them before this one.
7     Q.  Okay.  But at this time, was there two or
8  three?
9     A.  Two, but the third one I did not observe.  It
10 could be somewhere in the property.
11    Q.  But you have no idea?
12    A.  Huh?
13    Q.  You have no idea?
14    A.  I didn't observe him, the third person; but
15 there are usually three.  But what I saw that day, two.
16    Q.  So how did you first approach him?
17    A.  I was by the door.  I was, like, Hey, you need
18 to pay.  You need to go back to the lane.  You need to
19 pay.  He was in the carts, he was -- you can smell the
20 odor of alcohol coming out of his mouth.  Completely
21 intoxicated.  Made a verbal threat towards me and I
22 acted on that threat.
23        Well, before that, the manager told me
24 not to let them leave.
25    Q.  How did the manager tell you that?

02:10:05-02:11:06                                        Page 174

1     A.  Don't let them leave the property with the
2  item.
3     Q.  And how did he -- how did he communicate that
4  to you?
5     A.  Physically, like, face-to-face.
6     Q.  Was the manager with you during this
7  observation?
8     A.  He stand behind the register on the other
9  side.  I was the only one in the -- in the front.
10 Before -- before -- before I go up there and all that,
11 like, before they get close, he pointed and was like,
12 Don't let them leave.  Don't let them leave.  I was
13 like, Okay.
14    Q.  So he told you orally don't let them leave, or
15 he just pointed at you and you --
16    A.  He said --
17    Q.  -- interpreted that as don't let them leave?
18    A.  No, No.  It's not I interpreted that.  The
19 length of distance between me and him, it was not that
20 far.
21    Q.  Great.  How far was it?
22    A.  5 feet.  It could be 5 feet or it could be
23 less.  He said to me, He's coming around.  If they
24 attempted to leave, don't let them leave; don't let
25 them take the merchandise.

02:11:07-02:12:01                                        Page 175

1          I was like, okay.  So I gave them -- they
2  came up -- he came up to me, one of them.  I didn't see
3  the second one.  The second one left.
4     Q.  Right.  You said the guy with the hat, the guy
5  in the blue jacket, right?
6     A.  Correct, correct.
7     Q.  Okay.  So when he came up to you and you said,
8  You need to pay for that, what did he say?
9     A.  He refused to pay for it.  He goes like, Move
10 out of -- move.  He came towards me with the carts.  He
11 said, I will cut you up.  So I took it as a threat to
12 cut you up.  He has a knife or something on him, so --
13    Q.  Did he say he had a knife on him?
14    A.  He said, I will cut you up.
15    Q.  Okay.  But did he specifically say, I have a
16 knife?
17    A.  Would you mind if I finish the whole thing
18 so --
19    Q.  Did he specifically say, I have a knife?
20    A.  Yes, he said that.  Let me finish, please.
21    Q.  Did he show you said knife?
22    A.  He did not pull out a knife.
23    Q.  Where were his hands during the interaction,
24 Twana?
25    A.  One of them was in the carts.

02:12:03-02:12:51                                        Page 176

1     Q.  Where was the other one?
2     A.  I believe on the side area.  I don't believe
3  both of --
4     Q.  Side area of what?
5     A.  His jacket or something.
6     Q.  But you were observing him the whole time,
7  right?
8     A.  I was observing him, yes.
9     Q.  Okay.
10    A.  I was watching him eye to eye.  And he was
11 completely intoxicated.  And he says, I will cut you up
12 if you don't move out of my way.
13        That's when I acted for a safety reason
14 to protect myself and protect the employees and
15 management and the customers of H-E-B at that time.
16    Q.  Sure.  So did he physically attack you?
17    A.  He came up to me with the carts in an
18 aggressive way.
19    Q.  What do you mean by "aggressive"?
20    A.  When somebody's, like, aggressive, like comes
21 towards you with the carts.  Before I interacted with
22 him, he saw me by the door.  He knows I'm gonna
23 approach him and talk to him.
24    Q.  How do you know that?
25    A.  What?

Case 4:23-cv-02823   Document 27-6   Filed on 11/18/24 in TXSD   Page 27 of 45
Twana Ahmed vs.                                                    Twana Ahmed
Universal Protection Service, et al                          September 19, 2024

02:12:52-02:13:47                                         Page 177

1    Q.   How do you know he knows --
2    A.   Because --
3    Q.   -- that you're going to approach him?
4    A.   Because I dealt with him before and they got
5  arrested because of me before in a different property.
6    Q.   Okay.
7    A.   The same group.  So they know me very well.
8  And they know I --
9    Q.   But that day, you're saying he knew you were
10 going to talk to him?
11   A.   Because he saw me by the door and he looked at
12 me.  He saw me clearly by the door, the glass door.  He
13 saw me very well.
14   Q.   And when you say he came up to you
15 aggressively, what does that mean?
16   A.   Aggressively, like when you see somebody just
17 come up to them with the carts, attempted to hit him
18 in the carts.
19   Q.   Did he touch you with the cart?
20   A.   I don't remember if he touched me -- touched
21 me with the carts, but he came towards me with the
22 carts.
23   Q.   Okay.  And so when he aggressively came
24 towards you, did he do any other gestures towards you?
25   A.   When he made the threat, I realized he was

02:13:52-02:15:17                                         Page 178

1  completely intoxicated.  He's not in his full mindset.
2  You never know what this person's capable -- capable
3  of.  So I used the proper force to detain him according
4  to Allied Universal guidelines and instructions and
5  policy.
6    Q.   Are you a corporate representative for Allied?
7    A.   I'm not a corporate representative for --
8    Q.   So do you know what Allied's policy --
9    A.   The policy says it's -- the policy says if
10 somebody makes a threat towards you or anything like
11 that, use the probable -- probable force.  So the
12 person is -- for example, if that person left the
13 property and he has -- I took the item away and he's
14 not in full his mindset, I don't know if he's walking
15 out and there's an 80-years-old -- older woman, he's
16 gonna grab a knife and stab her and take her car.  And
17 they're gonna be like, Where were you?  Why didn't you
18 do something?  That's one.
19        Two, if he goes back, grab a gun -- he's
20 so pissed off that I took his liquor away.  He's gonna
21 come back and I'm patrolling or the manager is inside,
22 he's gonna come and shoot somebody in the head and kill
23 somebody.  And that's when I'm gonna be in trouble in
24 both ways.
25        So the proper way is contact -- have him

02:15:20-02:16:18                                         Page 179

1  here, stand over here, call the proper authority.  The
2  proper authority will come and deal with him in the
3  legal matter.  So it's not gonna be under my
4  responsibility.  Why did you not did this or why did
5  you do this.  And both ways, I did not acted alone,
6  like, by myself.  I was told what to do by the property
7  manager.  If I didn't do what the property manager told
8  me to do, I'd be in trouble too.  Like, why did you
9  didn't listen to him.
10   Q.   Do you work for H-E-B?
11   A.   I'm hired by Allied Universal to --
12   Q.   Correct.  So Allied Universal was your
13 employer, right?
14   A.   Correct.
15   Q.   So Allied Universal's policies and procedures
16 controlled your employment, right?
17   A.   Correct.
18   Q.   And we just went through the post orders
19 together, right?
20   A.   Right.
21   Q.   And it says do not touch a shoplifter,
22 correct?
23   A.   Does H-E-B has those post orders and
24 management's aware of that?  Absolutely looks like not.
25 Why did they contact me?  Why would he contact me and

02:16:21-02:17:28                                         Page 180

1  said observe this guy?  They didn't -- he should --
2  let's say, for example, Kevin should know that's not my
3  job.  He should not contact me.  He shouldn't have told
4  me these are shoplifting.  If I'm on the second floor,
5  I'm patrolling.  Why would he text me and said these
6  people are shoplifting?  He should have never told me.
7    Q.   Twana, I'm going to stop you right there
8  because he didn't say they're shoplifting.  It says
9  attempted beer theft.
10   A.   It's the same thing.  It's shoplifting.
11   Q.   Shoplifting requires them to leave the store,
12 right?
13   A.   What's the difference between shoplifting and
14 beer theft?  They both are not paying.  They stole.
15 They stealing.  So both of categories against the law.
16 Whatever it is, in State of Texas, if you shoplift, it
17 don't matter if it's a dollar or $5, or $1.  If you
18 don't pay for it, it's -- it's against the law.  If I'm
19 steal this document, it's worth one penny.  In State of
20 Texas, if I refuse to pay for this document and I'm
21 leaving and I put hands on you, that's a felon in the
22 State of Texas.  So --
23   Q.   Are you a law enforcement?
24   A.   I'm not a law enforcement but I'm --
25   Q.   Are you a trained in law enforcement?

Case 4:23-cv-02823   Document 27-6   Filed on 11/18/24 in TXSD   Page 28 of 45
Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

02:17:30-02:18:23                                      Page 181

1    A.  I am -- I am aware of the law very clearly in
2   the State of Texas.
3    Q.  Great.  What's the Texas penal code that
4   you're referring to?
5    A.  I'm gonna -- I don't know the penal code
6   exactly by my head.
7    Q.  So how are you trained in the penal code,
8   Twana?
9    A.  I have been in the security business for --
10  for a period of time.  There are things you learn
11  within your experience.  For example, when I'm wearing
12  a uniform, the State of Texas says I'm a public
13  servant.  If you assault me, it means you assaulted a
14  police officer, you'll be charged as a -- charged a
15  police officer.  That's in the State of Texas law.
16  What's the law code?  I have no idea.
17   Q.  So you're saying anytime a security guard that
18  works for a private company is assaulted, the police
19  are going to charge them as assaulting a police
20  officer?
21   A.  Yes.  That's what the law is.  That's in the
22  State of Texas.
23   Q.  I'm glad you're so confident, Twana.
24   A.  That is the law.  It's a --
25   Q.  So going back to the relevant issue here, did

02:18:25-02:19:11                                      Page 182

1   this man physically touch you in any way?
2    A.  He came up to me aggressively.
3    Q.  Did he physically touch you in any way?
4    A.  He made a threat towards me.
5    Q.  Did he physically touch you in any way?
6    A.  He made a threat towards me.
7         MR. SHINE:  Counsel, please advise your
8   client to answer the question.  He's clearly being
9   evasive.
10        THE WITNESS:  I'm not.
11   Q.  (By Mr. Shine)  The question is:  Did he
12  physically touch you?  Yes or no?
13   A.  He came up to me with the carts, the pushing
14  carts.  Attempted to assault me with the pushing cart,
15  so I act on it.  It was -- it was a threat.
16        MR. SHINE:  Your client is not answering
17  the question.  And if he's going to continue to be
18  evasive --
19        MS. HERNANDEZ:  He's trying to answer --
20        MR. SHINE:  -- we'll go to the Court.
21        MS. HERNANDEZ:  -- to the best of his
22  ability.
23        MR. SHINE:  It's not.  It's a simple yes
24  or no, Counsel.  If he's refusing or continuing to be
25  evasive, I will go to Judge Rosenthal.

02:19:11-03:08:42                                      Page 183

1         MS. HERNANDEZ:  Are you refusing to
2   answer?
3         THE WITNESS:  I'm answering all his
4   questions.
5    Q.  (By Mr. Shine)  The question simply is:  Did
6   he physically touch you?
7    A.  You cannot -- some questions you cannot ask
8   them -- answer them by yes or no.  It's impossible to
9   ask somebody yes or no, some stuff.
10        MS. HERNANDEZ:  Do you understand what he
11  means by "physically"?
12        THE WITNESS:  No.
13        MR. SHINE:  We're going to stop.  We're
14  going to take a break.  Go off the record, please.
15        THE VIDEOGRAPHER:  Off the record at
16  2:19.
17        (Off the record 2:19 p.m. to 3:07 p.m.)
18        THE VIDEOGRAPHER:  Back on the record at
19  3:07.
20   Q.  (By Mr. Shine)  Twana, before we took a break,
21  there was a question that was posed to you with respect
22  to this guy that was allegedly shoplifting, right?  And
23  the question was:  Did he touch you or physically touch
24  you in any way?  So I'm going to ask the same question.
25  Did he touch you that day?

03:08:43-03:10:46                                      Page 184

1    A.  I do not remember.
2    Q.  You stopped him, right, from leaving the
3   store?
4    A.  I was told to stop him and I asked the -- I
5   asked him when he was leaving the store to -- I gave
6   him the opportunity to pay for the items or leave the
7   items and leave the premises of the property and the
8   store.
9    Q.  Okay.  But you stopped him at some point,
10  right?
11   A.  Correct.
12   Q.  And when you stopped him, he was still inside
13  the store, right?
14   A.  What do you mean, "inside the store"?  Like,
15  inside the store or in the property?  What exactly,
16  like --
17   Q.  Inside the store.
18   A.  I think so.  By the exit.
19   Q.  Okay.  But he hadn't -- he had not exited the
20  store at that point, right?
21   A.  I don't remember exactly if he was outside --
22  outside of the store.  He was in the store area.
23   Q.  Okay.  So where were you?  Were you inside the
24  store or outside the store?
25   A.  I was by the gate, by the door, the entrance

03:10:51-03:11:44                                    Page 185

1  or the exits of the store.
2      Q.  Right.  So you testified previously that you
3  had entered the store when the manager asked you to
4  come inside, right?
5      A.  Yes.
6      Q.  And then you observed these gentlemen and
7  followed him as he went towards the registers, right?
8      A.  I went towards the door after that.
9      Q.  Right.  And you stood inside the store at that
10 point, right?
11     A.  I was not inside the store, like, physically
12 inside the store.  I was by the gate.  Because there's
13 a metal barrier, glass.  I was by the metal barrier or
14 the glass.
15     Q.  Okay.  And you said he approached you with a
16 shopping cart, right?
17     A.  Yeah, that's correct.
18     Q.  And you said he approached you aggressively.
19 Your words, right?
20     A.  Yes.
21     Q.  Can you again describe what you mean by
22 "aggressively"?
23     A.  Coming towards me with the carts after I asked
24 him to -- like, approached him, went up to him or after
25 he saw me.

03:11:46-03:13:01                                    Page 186

1      Q.  And when he didn't follow your directions,
2  what did you do?
3      A.  He made the threat, and I acted on the threat.
4      Q.  When you say "he made the threat," what are
5  you talking about?
6      A.  "I'm gonna cut you up.  Move out of my way."
7      Q.  Okay.  And again, he never showed you a knife,
8  right?
9      A.  He didn't pull anything out, like, physically
10 show me or anything like that, no.
11     Q.  Okay.  And when -- again, he refused to stop
12 on your directions.  You said you acted, right?  What
13 did you do?
14     A.  Detained him.
15     Q.  And what do you mean by "detained him"?
16     A.  Put in handcuffs, attempt to put handcuffs on
17 him.
18     Q.  So putting him in handcuffs or attempting to
19 put him in handcuffs, to me, means two different
20 things.  What did you do?
21     A.  Because I -- I didn't complete the handcuffs
22 hundred percent when law enforcement showed up.  Like,
23 he was -- I'm putting handcuffs on him, the police
24 showed up behind me exactly.  They were there very fast
25 to respond back.  Faster than I ever thought about.

03:13:04-03:14:08                                    Page 187

1      Q.  Were you the one that called the police?
2      A.  No, I did not.
3      Q.  Do you know who called the police?
4      A.  The manager.
5      Q.  When you say "the manager," is that Kevin you
6  were talking about earlier?
7      A.  I believe so.  There were multiple managers.
8  Which one called 9-1-1?  Not too sure.
9      Q.  Okay.  And what police department arrived?
10     A.  Local police department.
11     Q.  I'm not sure what local means.  I'm not from
12 the area.  Can you tell me what local means to you?
13     A.  Whatever jurisdiction of police department
14 that area in, that particular agency showed up.
15 Whatever agency will patrol that area.
16     Q.  Okay.  So in your experience, what agency
17 paroles that area?
18     A.  Well, since it's a different city, it's not
19 HPD, it's -- it's a B police department.  So, Bellaire
20 Police Department, I believe they showed up.
21     Q.  And when you said you were attempting to place
22 him in handcuffs when the police arrived, what do you
23 mean by "attempting"?
24     A.  Because I was putting handcuffs on him and --
25 on one of the hand, and he was, like, resisting.  You

03:14:11-03:15:43                                    Page 188

1  know, not cooperative.  And I had to attempt to put the
2  other one handcuffs on.  The police showed up not
3  completely on, and police took him away immediately.
4      Q.  How many police officers showed up?
5      A.  On top of my head, I don't have a knowledge
6  of -- don't remember exactly.  Maybe three, maybe two.
7      Q.  After this incident occurred, Twana, did you
8  complete an incident report?
9      A.  I was never given the opportunity to do a
10 police -- sorry -- incident report.
11        (Exhibit No. 21 marked.)
12     Q.  Twana, I'm handing you a copy of an incident
13 report that you completed after this incident.  Would
14 you agree --
15        MR. SHINE:  This is, for the record,
16 AUS 671 through AUS 674.
17     Q.  (By Mr. Shine)  On the first page, 671, do you
18 see in the middle where it says "Name"?
19     A.  Yes.
20     Q.  That is your name?
21     A.  Yes.
22     Q.  Is that your handwriting?
23     A.  Yes.
24     Q.  Is that your phone number?
25     A.  Yes.

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

03:15:43-03:16:42                              Page 189

1    Q.  Above your name, does it say date of incident
2  of April 4th, 2022?
3    A.  Yes.
4    Q.  Does it say date of incident reported
5  April 4th of 2022?
6    A.  4/4/22, yes.
7    Q.  Again, is it your testimony today that you
8  were never given an opportunity to complete an incident
9  report?
10   A.  Not this incident report I'm talking about.
11  I'm talking about a complete incident report.
12   Q.  I'm asking if you completed an incident
13  report.  And your testimony today was, no, you were
14  never given the opportunity; is that correct?
15   A.  Which incident report that you're talking
16  about specifically?  Because there was supposed to be
17  two or three incident reports.
18   Q.  Okay.
19   A.  This is, I believe, one of them.
20   Q.  At the bottom of page 671, does it identify an
21  address of where the incident took place?
22   A.  Are you talking about 5106?
23   Q.  Yes.  What is the complete address?
24   A.  B-I-S-S-O-N-N-G-T Street.
25   Q.  If I said 5106 Bissonnet Street, does that

03:16:46-03:17:52                              Page 190

1  make sense to you?
2    A.  Bissonnet does rig a bell.  Bissonnet Street,
3  yes.
4    Q.  Okay.  And again, this is your handwriting,
5  correct?
6    A.  Best of my -- yeah, that is.
7    Q.  If you could turn your page to the next page,
8  672.  Again, it's a Use of Force Incident Report.  Is
9  that your handwriting?
10   A.  Yeah, it is.
11   Q.  So again, your testimony today was that you
12  were never given an opportunity to complete an incident
13  report.  Is that still true?
14   A.  A report of exactly what happened, I didn't do
15  a report like that, explain my situation.  I was never
16  given the opportunity to do an actual detailed report.
17  This is just saying fill this out.  It doesn't say what
18  happened, what's going on, why did you do it, why did
19  you not do it.
20   Q.  Great.  If you could turn to page 674, which
21  is the last page, Twana.  This again says "Employee
22  Statement."  Is there a date attached to this
23  statement?
24   A.  Yes.
25   Q.  What date is attached?

03:17:53-03:18:32                              Page 191

1    A.  Are you talking about the last page?
2    Q.  Yes.
3    A.  4/4/22.
4    Q.  And is that your handwriting?
5    A.  That is my handwriting.
6    Q.  And where it says employee information, does
7  that say "Twana Ahmed"?
8    A.  Right here?
9    Q.  Yes.
10   A.  Yes.
11   Q.  Is that your phone number?
12   A.  Yes.
13   Q.  And again, there's a handwritten portion in
14  the middle of that page, right?
15   A.  Yes.  That's when it says H-E-B?
16   Q.  Yes.
17   A.  Yes.
18   Q.  Great.  Please read that for me.
19   A.  I can't see it clearly.
20   Q.  But you would agree that's your handwriting,
21  right?
22   A.  That is my handwriting, yes.
23   Q.  So I'm going to ask that you try to read it
24  for me.
25   A.  I can't -- I cannot see it clearly what it

03:18:35-03:20:28                              Page 192

1  says.  Too blurry.
2    Q.  Then please read along while I read it aloud
3  for you.
4    A.  Okay.  All I --
5    Q.  It says:  "H-E-B MIC Kevin" -- there's an I --
6  "texted me on my post side phone about couple guys.
7  They are attempted to S-T-A-I merchandise from the
8  store.  He said already kicked store.  The might come
9  back again.  He called me back few minutes later."  Its
10  illegible.  "He" -- again illegible -- "come inside the
11  store.  Keep your eyes on them" -- illegible -- "back
12  inside the store.  They have a basket full of alcohol
13  and beer."
14          Is that a fair and accurate reading of
15  what it says?
16   A.  That's accurate.
17   Q.  Okay.  And you completed this -- this
18  statement on April 4th of 2022, right?
19   A.  I did not complete the report.  I did write
20  this, you are correct; but I did not give --
21   Q.  You completed this statement, Twana, on
22  April 4th of 2022, correct?
23   A.  Yeah, correct.
24   Q.  And nowhere in this statement does it say
25  anything about the guys allegedly having a knife,

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

03:20:30-03:21:22                                    Page 193

1   right?
2       A.   I was never given the opportunity to finish
3   the report.
4       Q.   Of course.  Nowhere in the report does it say
5   that one of the guys allegedly tried to cut you, right?
6       A.   I was -- it doesn't say in here because I was
7   never given the opportunity to finish it.
8       Q.   Who didn't give you the opportunity to finish
9   it.
10      A.   Alex.
11      Q.   And why didn't he give you the opportunity --
12      A.   He was rushing me because he was just:  Do
13  this, do this.  You need to be in the office tomorrow.
14  You've been taken off schedule.  You need to come to
15  meet the account manager.
16      Q.   Everything during your employment with Allied
17  was a rush?  You never took the time to slow down and
18  actually do what you were supposed to do?
19      A.   If they rush you, they rush you --
20           MS. HERNANDEZ: Objection; argumentative.
21      Q.   (By Mr. Shine)  Did you ever attempt to
22  supplement this document?
23      A.   What do you mean by "supplement"?
24      Q.   Write an additional statement.
25      A.   I tried.

03:21:23-03:21:53                                    Page 194

1       Q.   When?
2       A.   The same day.
3       Q.   With who?
4       A.   With Alex.
5       Q.   And even if Alex said, No, you can't do it,
6   why didn't you write it yourself?
7       A.   I didn't have the paper.  He took the paper.
8       Q.   Did you not have paper available at home?
9       A.   No, I did not.
10      Q.   Did you have a cell phone?
11      A.   A personal cell phone?
12      Q.   Yes.
13      A.   I do have a personal cell phone.
14      Q.   Can you send text messages on a personal cell
15  phone?
16      A.   Yes.
17      Q.   Can you write emails on a personal cell phone?
18      A.   Yes.
19      Q.   Can write notes on your personal cell
20  phone?
21      A.   Yes.
22      Q.   So you could have written yourself another
23  statement, right?
24      A.   Yes.
25      Q.   But you chose not to, right?

03:21:55-03:23:12                                    Page 195

1       A.   It's not I chose not to.  What different would
2   it make if I wrote one and given to Allied?  No
3   different because the decision's already made.
4       Q.   On this document you never identified that any
5   of these guys attacked anyone, right?
6       A.   I didn't say attacked, no.
7       Q.   On this statement you never identified that
8   anyone threatened anyone, right?
9       A.   At this particular document?  No.
10      Q.   The document you wrote after the incident
11  occurred, correct?
12      A.   This one, yes.
13      Q.   You said you think Bellaire PD showed up,
14  right?
15      A.   Yes.
16      Q.   And are you aware if Bellaire PD also wrote a
17  report?
18      A.   I believe so.  Of course.
19           (Exhibit No. 22 marked.)
20      Q.   (By Mr. Shine)  Twana, I'm handing you a copy
21  of the Bellaire PD report that you provided in
22  discovery which is consecutively labeled AhmedAllied
23  526 through 540.
24           Have you seen this document before?
25      A.   I think so.

03:23:12-03:25:25                                    Page 196

1       Q.   If you could turn to page 529 for me.
2       A.   529?  Yes, it's on 529.
3       Q.   And at the top of the page there's a heading
4   that says "Narrative."  Do you see where I'm referring
5   to?
6       A.   You're talking about right here?  528?
7       Q.   529.
8       A.   529.  Narrative?  Okay.
9       Q.   Do you see where it says "Narrative" at the
10  top of the page?
11      A.   Yeah.
12      Q.   Can you please read that narrative to yourself
13  and look up when you're finished.
14      A.   Okay.
15      Q.   Based on your review of that narrative, is it
16  fair to say that the men were stopped before they
17  exited the store?
18      A.   According to this, yes.
19      Q.   Also in reference to the narrative that you've
20  reviewed, it says that both were charged with public
21  intoxication, right?
22      A.   That's correct.
23      Q.   If you can turn to page 540, which is the last
24  page.  There's a narrative that starts at the top of
25  the page.  It says, "Suspect and his companion..."  Do

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

03:25:27-03:26:45                                    Page 197

1   you see where I'm referring to?
2   A.   Yes.
3   Q.   It reads:  "Suspect and his companion were
4   known shoplifters by H-E-B management and security.
5   H-E-B called police to wait for suspects to leave
6   store.  An over zealous security officer jumped the gun
7   and did not wait for suspects to pass final point of
8   payment before confronting suspects."
9            Is this a fair and accurate reading of
10  what is listed in that narrative?
11  A.   No.
12  Q.   What did I misstate?
13  A.   They didn't -- they went over the counter and
14  I was told to stop them.
15  Q.   The question was:  Did I read it accurately
16  from the page?
17  A.   Oh.  Yeah, you did, yeah.
18  Q.   If you could turn back to page 527, please.
19  In the middle of the page there's a heading that says
20  "Offense Information."  Do you see where I'm referring
21  to?
22  A.   Yeah, I see that.
23  Q.   And what were these individuals charged with
24  based on the police report?
25  A.   Drunk, like, public intoxication because --

03:26:52-03:27:44                                    Page 198

1   Q.   Fair to say they were not charged with
2   shoplifting?
3   A.   Because H-E-B refused to press charges on
4   them.  The officer asked the manager, and the manager
5   didn't want to press charges.  They said, Okay, we're
6   gonna take him on public intoxication if you don't want
7   to charge him for that, since we're already here.
8   Q.   But the question was:  What were they charged
9   with?  And you responded, "public intoxication,"
10  correct?
11  A.   That is correct, yeah.
12  Q.   Fair to say they were not charged with
13  shoplifting?
14  A.   That is correct.
15  Q.   If you need to review the police report in its
16  entirety, please do so.  But is it fair to say that
17  nowhere in the police report does it identify that a
18  weapon was recovered?
19  A.   It doesn't say that.
20  Q.   And nowhere does the police report identify
21  that a knife was recovered, right?
22  A.   Right.
23  Q.   And did you have an opportunity to talk to the
24  Bellaire PD?
25  A.   I don't remember.

03:27:49-03:29:24                                    Page 199

1   Q.   After Bellaire PD took the guys into custody
2   for public intoxication, what did you do next?
3   A.   When they put them in the car, they stayed to
4   price the item and try to see how much is it.  It's up
5   to the manager.  Told them, Can you ring these items up
6   and tell us the total amount they were stealing?  And
7   the manager came back with a receipt of the item.  And
8   he went up to him and says, Do you want to press
9   charges on them?  And the manager says, No.  The
10  officer says, Okay.  Are you sure?  He responded Yes,
11  we don't want to press charges.  He says, Okay.  We're
12  gonna take them anyway for public intoxication.  They
13  are drunk.  They put them in the car and charged them
14  with public intoxication and took them.
15  Q.   I appreciate you giving me a narrative of what
16  Bellaire PD did.  I'm asking what you did.
17          After Bellaire PD placed the individuals
18  in custody --
19  A.   Right.
20  Q.   -- what did you do?
21  A.   I went back to my -- I can't recall exactly.
22  I went back to my official duties.
23  Q.   Did you call anyone within Allied Universal?
24  A.   I can't recall.  I don't remember.
25  Q.   Did you text anyone within Allied Universal?

03:29:26-03:30:36                                    Page 200

1   A.   I do not remember.
2   Q.   At some point did Alex show up?
3   A.   Yes.
4   Q.   What time did he show up?
5   A.   After the incident.  When exactly, not too
6   sure.
7   Q.   Was it as they were being arrested?
8   A.   No.  After.
9   Q.   Was it five minutes after?
10  A.   Longer.
11  Q.   Ten minutes after?
12  A.   Longer.  Maybe an hour, two hours but not too
13  sure when exactly, a specific time.  Maybe an hour and
14  a half or two hours.  But it was before my shift.  I
15  was still on the clock and I was still patrolling.  But
16  when exactly, not too sure.  I cannot give you a
17  specific time.
18  Q.   Did you talk to Patrick Freeney that night?
19  A.   I don't think so.  No.
20  Q.   Did you talk to Alex that night?
21  A.   Yes, I did talk to Alex.
22  Q.   Okay.
23  A.   I tried -- I tried to explain things to Alex.
24  They don't want to listen.  It looks like the decision
25  already had been made in the office.  So come up to the

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 33 of 45
Twana Ahmed vs.                                                                    Twana Ahmed
Universal Protection Service, et al                                          September 19, 2024

03:30:39-03:31:49                                        Page 201

1   office.  You're not on schedule.  And they will talk to
2   you at the office.  That's all.
3       Q.  So when Alex showed up, the first thing he
4   said to you was you're off the schedule, go to the
5   office?
6       A.  He says you are off the schedule.  You need to
7   go to the office tomorrow, early as you can.  They want
8   to -- account manager would like to speak -- wants to
9   talk to you.
10          And that's what exactly happened.  I went
11  to the next -- they took me off schedule.  I was
12  supposed to work the next day.  I was not on schedule,
13  and I went to the office.
14      Q.  And Alex had you fill out those forms that
15  night, right?
16      A.  Whatever he gave me, I did fill it up, yeah.
17          THE REPORTER: I'm sorry.  I'm having a
18  hard time hearing you.
19      A.  Whatever he gave me, I filled out and -- tried
20  to fill out and complete it.
21      Q.  (By Mr. Shine)  Did you talk to anyone else
22  from Allied that night?
23      A.  I don't remember exactly.
24      Q.  Why did Alex show up at the site?
25      A.  I think Patrick told him to.  I think.  Not

03:31:55-03:32:45                                        Page 202

1   too sure.  Or the company send them whatever, the
2   reason he was there for.
3       Q.  Why would the company send him to the site?
4       A.  I have no idea.
5       Q.  Why would Patrick Freeney send him to the
6   site?
7       A.  Maybe because of the incident, to figure out
8   what's going on and what happened.  But they didn't
9   want to listen to what happened because they already --
10  the decision had been made by them.
11      Q.  How did -- how did Allied know that there was
12  an incident?
13      A.  How would they know it was an incident?  I
14  don't know.
15      Q.  You were the only officer on -- only Allied
16  officer at the site at that time, right?
17      A.  Correct.
18      Q.  So how would Allied know that an incident
19  occurred?
20      A.  Maybe management called them.  H-E-B
21  management.
22      Q.  Do you know if H-E-B management called them?
23      A.  Not too sure.
24      Q.  Did you ever talk to Kevin after the incident?
25      A.  No, not really.  Don't remember.

03:32:48-03:33:55                                        Page 203

1       Q.  So you said that Alex told you you were off
2   the schedule.  Did he say that you were suspended?
3       A.  No, he did not say that.  He said, You're off
4   the schedule.  You are scheduled to work tomorrow.  You
5   don't have to go to work.  It's already been taken care
6   of.  You're off the schedule.  Come to the office.
7       Q.  And so did you go to the office that night or
8   the next day?
9       A.  Oh, the next day.
10      Q.  What time did you get to the office?
11      A.  Morning.  Don't know the time.  11:00, 10:00
12  in the morning.  Somewhere around there.  Could be
13  later.  Not too sure, like, what time exactly, but it
14  was the next day.  Absolutely, like, a hundred percent
15  the next day.
16      Q.  Were you in uniform?
17      A.  No, I was not.  I was -- I believe I was in
18  civilian clothes because I was off the schedule.  Was I
19  in uniform, not too sure; but I think I was in civilian
20  clothes.
21      Q.  When you use the term "civilian," what do you
22  mean by that?
23      A.  Like regular clothes, not uniform.  Like
24  casual clothes like you and me, something like that.
25      Q.  Okay.

03:33:56-03:35:03                                        Page 204

1       A.  Not like shorts.  Not like actual professional
2   clothes.
3       Q.  So you show up at maybe 10:00, maybe 11:00?
4       A.  Somewhere around there, yes.
5       Q.  Who did you talk to first?
6       A.  I walked into the office.
7       Q.  And after you walked in, what did you do?
8       A.  I talked to the front desk lady.  Who are you
9   here to see?  Patrick.  Patrick came, grabbed me.
10  Like, grabbed me and took me to the office.  He walked
11  in first.  I walked in behind him.
12      Q.  Okay.  When you say that he grabbed you, did
13  he touch you?
14      A.  No.  Grabbed, like, Hey, come on in.  Like,
15  grab, you know.
16      Q.  So he never touched you?
17      A.  No, I didn't say grab, like, grab you, no.
18  Like, Hey, let's go.  Come on in.  Like, that's how I
19  mean by grabbing.
20      Q.  And the front person that was, you know, the
21  administrator or the receptionist, was it the same
22  woman that you talked about earlier?
23      A.  I think so.  She was the same, yeah.
24      Q.  And so Patrick got you, and you went to his
25  office again?

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 34 of 45
Twana Ahmed vs.                                                                    Twana Ahmed
Universal Protection Service, et al                                          September 19, 2024

1    A.   Yes.
2    Q.   And when you went to his office, did he go in
3  first?
4    A.   He went in first.
5    Q.   And where did he go after he entered his
6  office?
7    A.   He went behind the desk.
8    Q.   And where did you go?
9    A.   At the -- sit in the desk or the table or
10  chair.  The chair you sitting in.
11    Q.   So sort of opposite from him, right?
12    A.   Yes.  This is Patrick.  Assume there's a table
13  and this is me (indicating).
14    Q.   Was anyone else around at that time?
15    A.   I don't remember if it -- it was just -- I
16  don't remember if anyone else was over there.
17    Q.   Do you remember what day of the week this was?
18    A.   No.
19    Q.   And after you got into the office, what does
20  Patrick say?
21    A.   He has a form ready.  He said to me: Sign it,
22  date it, and give it to me.  I was trying to go over
23  it.  He goes, like, there's no time to go over it.
24  Sign it and give it to me.
25         I was like, What is this?

1         He goes, like, the incident report.
2         I was like, I did not wrote this and this
3  is not what happened and this isn't -- this is not what
4  exactly going on.  This is not what I wrote.  This is
5  not my side of story.
6         He says, I don't care.  Sign it, initial
7  it, date it, and give it to me.  Loud voice.
8  Aggressive voice.  Disrespectful voice.
9    Q.   Sure, I understand that's how you're
10  classifying it.  Was he sitting at his desk?
11    A.   Yes.
12    Q.   Did he ever stand up?
13    A.   I don't remember if he stand up or not.
14    Q.   Were you sitting down at this time too?
15    A.   I was sitting down, yes.
16    Q.   Did you ever stand up?
17    A.   I don't remember I standed up, no.
18    Q.   Okay.
19    A.   During the conversation?  No, I was sitting
20  down.
21    Q.   After you refused to sign this form, what
22  happened?
23    A.   He start threatening me.
24    Q.   When you say he started threatening you, what
25  do you mean by that?

1    A.   Threat.  Threat of taking my license away,
2  threatening to suspend my license.  Threatening calling
3  law enforcement on me, force charges on me, that I'm a
4  loose cannon in the company.  I was just trying to
5  explain my situation, I was explaining my side of
6  story.  He was telling me, I don't give a fuck what
7  happened or what you have to say.  What are you gonna
8  say?  This is the paper that you're gonna sign and
9  that's it.  You are suspended.  It's not -- you are
10  suspended.  You need -- if you refuse to sign, you
11  refuse to sign.  You need to come back early as
12  tomorrow, turn in your equipments until the outcome of
13  the investigation.
14    Q.   Okay.  Did you sign the form?
15    A.   I did not sign the form, no.  I refused to
16  sign it because it was not my testimony and not my
17  report.  And I told Patrick, You were not there.  Alex
18  was not there.  I was there.  I am a witness of what
19  happened.  I need to giving the actual opportunity to
20  fill up the actual report of what happened, exactly
21  what happened.  He refused to do that.  He refused to
22  give me the opportunity to do any reports or anything
23  like that.  He said --
24    Q.   I'm going to pause you for a second.
25    A.   Yes.

1    Q.   But you did have the opportunity on April 4th
2  with Alex.
3    A.   That was not the full opportunity to complete
4  the form.
5    Q.   Right.  And what prevented you from writing
6  your own statement, Twana?
7    A.   I needed the official documents from Allied
8  Universal for the incident.  They never provided to me.
9  Like incident report says "incident report."  They
10  never --
11    Q.   You couldn't just write it on a piece of
12  paper?
13    A.   Will they accept it?  I don't know.  But if
14  they gave me --
15    Q.   Did you try?
16    A.   I asked for incident reports.
17    Q.   Did you try to write it on a piece of paper?
18    A.   I didn't try and write it on a piece of paper
19  but --
20    Q.   Did you try to offer them a statement?
21    A.   Yes, of course, of course, absolutely, without
22  a reasonable doubt I asked for -- to fill out paper.  I
23  asked for actual paper to fill it out.  I told them,
24  give me a paper to fill it out.  They said, No.
25  Decision has been made.  You are suspended.  You're not

Case 4:23-cv-02823   Document 27-6   Filed on 11/18/24 in TXSD   Page 35 of 45
Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

03:39:46-03:40:41                                    Page 209

1   gonna do any paper.  You're not gonna fill up anything.
2   You sign this or you don't sign it.  If you don't sign
3   it, I'm gonna put "refused to sign."
4          I said, Okay.  I'm not signing anything.
5   This is not what happened with me.  I want to -- I want
6   to give the -- I want to be given the opportunity to
7   sign to -- sorry -- to fill out my own statement and do
8   my own statement.  And that's when he become really
9   pissed off and aggressive toward me.
10  Q.   Okay.  And again, I appreciate that
11  characterization.
12  A.   Thank you.
13  Q.   But the question two you, Twana --
14  A.   Yes.
15  Q.   -- was if Allied allegedly did not give you a
16  form to fill out --
17  A.   Right.
18  Q.   -- what stopped you from writing your own
19  statement on your own paper?
20  A.   I didn't know if they're gonna take it
21  because --
22  Q.   Did you try?
23  A.   Huh?
24  Q.   Did you try?
25  A.   I asked them.

03:40:42-03:41:44                                    Page 210

1   Q.   Did you try to submit a document that was not
2   accepted?
3   A.   I asked them, Do you guys need it, my report?
4   They said, No, we don't need nothing from you.
5   Q.   Twana, the question is:  Did you try to submit
6   a statement that was not accepted by Allied?
7   A.   I gave them the opportunity to fill up my
8   report, but they didn't want my report.  It's not -- I
9   tried to give them my reports and fill up a paper.
10  They didn't want it.  They didn't want it.
11  Q.   I will ask a third time.
12  A.   Yes.
13  Q.   The question was:  Did you try to write a
14  statement and provide it to Allied, on your own paper,
15  that was not accepted?
16  A.   Yes.  They don't want it.  They don't want
17  nothing.
18  Q.   Where is the piece of paper that you tried to
19  write a statement on?
20  A.   I didn't fill it up because they didn't want
21  to take it, take nothing from me.  I told them, Can I
22  do my own report?  They said, No.
23  Q.   So Patrick told you you were suspended, right?
24  A.   Correct.
25  Q.   Did he tell you you were fired at that point?

03:41:46-03:43:08                                    Page 211

1   A.   No.
2   Q.   You testified that he asked you to come back
3   the next day to turn in your -- your equipment, right?
4   A.   Correct, yes.
5   Q.   Did you turn in your equipment the next day?
6   A.   Hundred percent, yes.
7   Q.   And what did you turn in?
8   A.   Firearm, the rounds that you -- like, rounds,
9   bullets, the actual issue numbers, Taser and equipments
10  they -- whatever equipments they issued to me.  Main
11  equipments they wanted back from me was the firearm and
12  the Taser.
13          (Exhibit No. 23 marked.)
14  Q.   (By Mr. Shine)  Twana, you're being handed a
15  document that's your weapon return for what appears to
16  be your firearm, which is dated -- I'm sorry -- labeled
17  AhmedAllied 449.
18          Have you seen this document before?
19  A.   Yes, I have.
20          MS. HERNANDEZ: Objection; misstates the
21  Bates number.
22          MR. SHINE: 449?
23          MS. HERNANDEZ: The one you handed me is
24  448.
25          MR. SHINE: I apologize.

03:43:08-03:44:21                                    Page 212

1          THE WITNESS: This one is 448 too.
2          MR. SHINE: I apologize.  That's my
3   mess-up.
4          MS. HERNANDEZ: That's okay.
5   Q.   (By Mr. Shine)  Can I clarify what's been
6   marked 448?
7   A.   That's 23.
8   Q.   I apologize.  So what has been marked as 23 is
9   AhmedAllied 448.
10  A.   I believe this is for the Taser.
11  Q.   Correct.  So this is for your Taser, right?
12  A.   Correct, yeah.
13  Q.   And is --
14  A.   Because it has X3 on it.  That's a Taser.
15  Q.   And is that your signature at the bottom?
16  A.   Yeah, I'm aware of this document, yeah.  I
17  signed this document for returning my documents --
18  sorry -- returning my equipments.
19  Q.   Okay.
20          (Exhibit No. 24 marked.)
21  Q.   (By Mr. Shine)  Twana, you're being handed a
22  second document, which is a weapon return for --
23  properly -- for your firearm, which is labeled
24  AhmedAllied 449.
25          Again, is this your signature on this

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 36 of 45
Twana Ahmed vs.                                                                          Twana Ahmed
Universal Protection Service, et al                                             September 19, 2024

03:48:46-03:49:43                                                    Page 217

1  at you?
2  A.  Yes, he did.
3  Q.  And that it was --
4  A.  Not loaded.
5  Q.  Correct, unloaded.  But -- and what did you
6  say that made you feel?
7  A.  Very uncomfortable and freaked me out.
8  Q.  So why didn't you include that fact in your
9  complaint?
10  A.  I didn't include it in the complaint.
11  Q.  But that's a pretty important fact that you
12  would have included, right, if it actually happened?
13  A.  It did happen.
14  Q.  Okay.  So you come back from the bathroom and
15  you leave the door open?
16  A.  Yes, I did.
17  Q.  And is Patrick still in his office at that
18  point?
19  A.  He -- he came back, and then I told him,
20  Excuse me; I need to use the restroom.
21  Q.  Okay.
22  A.  He goes, like, help yourself up.
23         And I went to the restroom a few minutes.
24  Came back.  He was in the chair.  I left the door open
25  about this much, approximately.

03:49:44-03:51:01                                                    Page 218

1  Q.  When you say "this much," was that 2, 3 feet?
2  A.  Approximately 3 feet, yeah.
3  Q.  Okay.  Why did you leave the door open?
4  A.  I left it open because I want to talk to him.
5  And if he's gonna be aggressive with me or anything
6  like that, hopefully somebody can hear something
7  because he has done it before.
8  Q.  Okay.  Why did you want to talk to him?
9  A.  I wanted to talk to him about why this was
10  happening to me.  And I follow every guideline of
11  the -- guideline of the company.  I did what I was
12  supposed to do.  And I -- I did what I was supposed to
13  do and whatever they told me to do.
14  Q.  And did he talk to you?
15  A.  Yes, he did.
16  Q.  How long did you talk?
17  A.  Don't remember the exact time, how long.
18  20 minutes, 30 minutes.  Don't remember.  But we talked
19  about it.
20  Q.  Okay.
21  A.  He -- he didn't want to listen to me.  And
22  that's when he -- he repeated same -- multiple same
23  words that he repeated before in the past that he ever
24  told -- that he told me before:  This is not what you
25  come from -- sorry.  When I -- let me go back.

03:51:08-03:52:10                                                    Page 219

1         When he grabbed me and went to the
2  office, he was on the phone; he had headphones on.  Who
3  exactly he was speaking to, I was not -- I don't know
4  who he was speaking to.  But as soon as I sit down, he
5  told the person on the phone, I'm dealing with a sand
6  nigger.  I've got to call you back.
7         I didn't know what "sand nigger" mean.  I
8  didn't know what it come from.  I didn't know what he
9  translated it to.  But I found out later on what it
10  means.  He meant me, since I'm from Middle East and we
11  have a lot of deserts, we worship deserts.  That's what
12  he meant.
13  Q.  Do you know what he meant?
14  A.  Exactly.  Sand nigger.
15  Q.  Do you -- are you Patrick Freeney?
16  A.  What?
17  Q.  Are you Patrick Freeney?
18  A.  There is no way to translate that phrase in a
19  different language.
20  Q.  I'm simply asking:  Are you Patrick Freeney?
21  A.  Absolutely not.
22  Q.  So do you actually know what he meant?
23  A.  Of course.
24  Q.  Because you can read his mind, right?
25  A.  No.  I'm not a psychiatrist, but you can

03:52:14-03:53:04                                                    Page 220

1  understand those words when it comes out of somebody's
2  mouth, trust me.  When you call somebody "sand nigger"
3  and especially he's a Muslim and he's an immigrant from
4  Middle East.
5  Q.  Right.  So the first time you went through
6  this story, Twana, you said that he came out and got
7  you.  He sat behind the desk.  You had a conversation.
8  A.  Right.
9  Q.  Now you're going back and saying --
10  A.  No, no, no.  You --
11  Q.  Please don't interrupt me.
12  A.  Correct.
13  Q.  Now you're going back and saying he was
14  actually on the phone.  So which one is it?
15  A.  He was on the phone.  I forgot about that
16  phrase right there.  The phone.  I remember when I came
17  back from the restroom, I was like, Oh, yeah, he was on
18  the phone the first time.  He was on the phone.  He
19  hang up the phone, and that's when -- before he hang up
20  the phone, he says, I've got to call you back, I'm
21  dealing with this.
22         There was nobody else to deal with except
23  me.  I was the only one in his office.  I was the only
24  one there for a reason.  And that's what he meant.  Me.
25  He didn't mean somebody else.  He didn't mean the

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

1    person on the phone. He meant me.
2    Q. Sure. So who was he talking to?
3    A. I don't know.
4    Q. And you say he was on --
5    A. On his phone.
6    Q. -- headphones?
7    A. He was on the phone, and he had a small black
8    device in his ears.
9    Q. When you say "small black device," what do you
10   mean?
11   A. Headphones. Small headphones in his ears. He
12   was talking. And then he grabbed the phone. I
13   remember the phone was a black phone. I believe it was
14   android or something like that. He hang up the phone
15   and put the phone down.
16   Q. Okay. So again, after you talked to him for,
17   again, 20 to 30 minutes --
18   A. Yes.
19   Q. -- after you used the bathroom --
20   A. Yes.
21   Q. -- what did you do at that point?
22   A. I was talking to him while I -- I told him I
23   need to be given the opportunity to explain my
24   situation. I need an opportunity to do the reports and
25   do what I'm supposed to do.

1             He said to me: You are suspended until
2    outcome of the investigation. You are a loose fucking
3    cannon in this company. Even if you are not -- even if
4    you are not fired in the outcome of the investigation,
5    I'm gonna make sure you are fired and you are -- and
6    hire -- and unhirable. I don't know why a dumb ass
7    person like -- I don't know how a dumb ass person like
8    you served with the military and worked with the
9    military. That's what he said.
10            And I was -- he goes, like, clearly you
11   don't understand how things run this -- in this
12   country. You think it's like where you come from. If
13   you don't know how to -- if you -- if you don't know
14   how to, like -- if you don't know how to work over here
15   or survive over here -- something like that -- you need
16   to go back to wherever you came from. Absolutely you
17   do not belong in here.
18   Q. And you know that verbatim?
19   A. What do you mean "batim"?
20   Q. Verbatim. You repeated to us just now exactly
21   what Patrick said to you that day?
22   A. That's what happened. That's what he said to
23   me, yes.
24   Q. Are those his exact words?
25   A. That's exact his words, yes.

1    Q. So you remember his exact words --
2    A. I remember what he -- because --
3    Q. -- from --
4    A. Because --
5    Q. -- two years ago?
6    A. Because when somebody is racist against your
7    belief, against where you come from, against your
8    origins, you never forget that. That will be scars in
9    me.
10   Q. So why wasn't all of that included in your
11   complaint?
12   A. I left it open for the complaint. I talked to
13   HR about it. I brought it up to HR about it. Some of
14   it --
15   Q. So again, why -- why did you use the restroom
16   and go back to talk to him? Because you wanted to --
17   A. Because --
18   Q. -- have a conversation about the incident,
19   right?
20   A. No. Because he was not finished hundred
21   percent. Because I told you when I gave him the gun
22   and everything, he filled it up but I didn't get a copy
23   for my records. And I didn't sign it. How am I know
24   I'm gonna turn in the equipments and they gonna say,
25   without my records or my copy, and they gonna say, Oh,

1    he never got any copy -- he never turned in the
2    equipments, and I can get blamed for those items. So I
3    need a copy for my records.
4             So when he came back, I went back and
5    asked -- excused to go to restroom. And I did my thing
6    in the restroom, and then came whack in the office.
7    Q. To sign the documents?
8    A. Sign the documents and try to explain my
9    situation.
10   Q. But you testified previously that you signed
11   the documents when you turned the equipment in before
12   you went to the bathroom. So which one is it, Twana?
13            MS. HERNANDEZ: Objection; misstates
14   testimony.
15   A. Signed the documents and get copies from them.
16   Because I would not leave without a copy. I would have
17   took the stuff with me. Because he already threatened
18   me to press charges on me. He's already threatening me
19   to jail me. He's already threatening me to suspend my
20   license.
21   Q. (By Mr. Shine) Twana, the question was: Did
22   you sign the documents before or after you went to the
23   bathroom?
24            MS. HERNANDEZ: Objection; vague.
25   A. Would you mind letting me finish completely,

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

04:18:49-04:20:14                                    Page 233

1    A.  Yes, I did.
2    Q.  So you were given a phone number to the
3  hotline, right?
4    A.  Yes.
5    Q.  When did you call the hotline?
6    A.  Don't remember exact month or date, but I did
7  call the hotline.
8    Q.  Okay.
9    A.  Called them multiple times.  More than once.
10   Q.  And...
11         (Exhibit No. 25 marked.)
12   Q.  (By Mr. Shine)  Twana, I'm handing you a copy
13  of the hotline complaint that you filed which is
14  labeled AUS 1257 to 1259.  Is this a fair and accurate
15  copy of the hotline complaint that you made?
16   A.  I made it over the phone, not paper.
17   Q.  Okay.  So if you're looking at a page -- the
18  first page which is AUS 1257 or 1,257 --
19   A.  I see that number, correct.
20   Q.  Right under the heading that says "Case
21  Snapshot," it's the first text that appears in orange.
22  Do you see what I'm referring to?
23   A.  This one?  The first one?
24   Q.  Correct.
25   A.  Yes, I see that.

04:20:15-04:21:43                                    Page 234

1    Q.  There's an open date.  What date is listed
2  there?
3    A.  5/25/2022 at 10:05.  Is that what you're
4  talking about.
5    Q.  Yes.  It's 5/25/2022, correct?
6    A.  Yes.
7    Q.  Is there a time stamp?
8    A.  What do you mean "time stamp"?
9    Q.  Is there a time listed after the date?
10   A.  5/26/2022, 8:01 a.m.
11   Q.  Let me back you up just slightly.
12   A.  Okay.
13   Q.  Do you see where it says "Opened 5/25/2022"?
14   A.  5/25/2022, opened, yeah, I see that.
15   Q.  And there is a time stamp of 5:18 p.m.  Did I
16  read that accurately?
17   A.  5/26/22, 8:01 a.m.  Is that what you mean?
18  Yes.
19   Q.  Twana, a little further down in the orange
20  print, it says "case details."  Do you see where I'm
21  referring to?
22   A.  Yeah, I see that.
23   Q.  And then it says "Intake method:  Hotline
24  phone."  Do you see where I'm referring to there?
25   A.  Yeah.

04:21:43-04:23:10                                    Page 235

1    Q.  You testified earlier that you called in
2  through the hotline, right?
3    A.  Yeah, I did.
4    Q.  If you go a little further down, it says
5  "reporter contact information" and it lists a first and
6  last name with a phone number and email address.  I
7  recognize that it's typed C-W-A-N-A for the first name,
8  but is that your phone number?
9    A.  C-W -- are you saying...  There is no phone
10  number here.
11   Q.  Do you see where your last name is listed?
12   A.  Oh.  You're talking about right here.  That is
13  my phone number.
14   Q.  Okay.  Is it fair to say, Twana, that you
15  didn't type up this document, right?
16   A.  Oh, no, I did not.
17   Q.  So if someone got the spelling of your first
18  name wrong, that could just be an error?
19   A.  Yeah.  Now I know what you mean.  I see the
20  C-W-T -- C-W-A-N-A.  I know what you're talking about.
21  I didn't even know that's my name.  Yeah, that's wrong
22  and the last name is wrong too.
23   Q.  Correct.  But that is your phone number, the
24  832 number?
25   A.  Yeah, that is my number, yeah.

04:23:13-04:24:53                                    Page 236

1    Q.  And again, is it fair to say that you didn't
2  type this.  You were talking to someone on the other
3  line of a phone, right?
4    A.  Yeah, I did not write anything.
5    Q.  Okay.
6    A.  Even my email is wrong, I think.
7    Q.  On the next page, on AUS 1258, do you see
8  where there is some -- some text, like a narrative
9  that's written out under the heading "Details"?
10   A.  I see it, yeah.  I see that.
11   Q.  Okay.  In the second paragraph under "Details"
12  where it starts, "There had been an incident recently
13  regarding" -- what should be Twana -- "being addressed
14  by the general supervisor."
15         Do you see what I'm talking about?
16   A.  Yeah.
17   Q.  Who were you referring to as the general
18  supervisor?
19   A.  General -- general supervisor?  I did not say
20  that word.  Never mentioned general supervisor.  They
21  might understand it wrong.
22   Q.  Okay.  The sentence continues:  "Being
23  addressed by the general supervisor that he would need
24  to cut his beard even though it had been between the
25  period of Ramadan, which is a very significant and

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 39 of 45

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

04:24:57-04:26:16                                         Page 237

1  spiritual period for Muslims to keep their culture and
2  heritage strong."
3         Did I read that right?
4  A.  Yes.
5  Q.  What do you mean by "had been between the
6  period of Ramadan"?
7  A.  It means close to Ramadan or the end of
8  Ramadan.
9  Q.  Okay.  And I know I asked you previously but
10 do you recall when Ramadan was in 2021?
11 A.  I don't remember.
12 Q.  And what about in 2022?
13 A.  I can't recall the month exactly.
14 Q.  The next sentence continues with:  "The
15 general supervisor and Patrick had enforced the rule on
16 Twana to shave his beard."
17         Did I read that correctly?
18 A.  Yes.  But the phrase of -- you read it
19 correctly, yes.  But the general supervisor, I don't
20 know where that came from.
21 Q.  Okay.  So if it's talking about the general
22 supervisor and Patrick, would you have identified
23 someone else?
24 A.  Supervisor but not the word of general.
25 Q.  Okay.  This paragraph continues:  "To Twana's

04:26:31-04:28:01                                         Page 238

1  surprise, he had noticed that there had been
2  employees (names and job titles withheld) that had
3  longer beards than him at the facility."
4         Did I read that correctly?
5  A.  Yes, you did.
6  Q.  Why didn't you give names and job titles at
7  that time?
8  A.  Because I did not know their names
9  specifically.  Their -- the gentleman's name, the
10 Hispanic gentleman, the one with the tattoo.  And it
11 was very hard for me to say some names because of the
12 accent and things like that.  I don't -- I don't
13 remanize names, like remanize the -- memorize name.
14 I'm very bad at that.  Kind of like it's hard to say
15 sometimes.
16 Q.  In your review of this document, is this the
17 full complaint that you made on the phone that day?
18 A.  Yes.  But the person that I talked to over the
19 phone, they said to me -- excuse me -- we're gonna take
20 down but we have to breakdown the most important stuff.
21 You can tell me what's going on, what happened, but I
22 have to break it down.  By breaking down, basically
23 whatever you're saying, we're gonna written down the
24 most important parts, not the whole complete story of
25 what's going on and what happened.  That's the person

04:28:05-04:30:15                                         Page 239

1  said over -- that's what the person said to me over the
2  phone.
3  Q.  Why didn't you include that in your complaint
4  against the company?
5         MS. HERNANDEZ: Objection; vague.
6  A.  That was -- I believe that was their policy.
7  And if somebody told you something over the phone, I'm
8  gonna do it.
9  Q.  (By Mr. Shine)  After you filed the hotline
10 complaint, when were you next contacted by someone from
11 Allied regarding your complaint?
12 A.  I don't believe I ever was contacted.  I don't
13 recall somebody contacting me.  I don't remember on top
14 of my head.  I had to call them back myself, I think.
15 Q.  And again, looking at page AUS 1257, the
16 hotline complaint was opened on 5/25/2022, right?
17 A.  It was opened on the 25th, yes.
18 Q.  Okay.  And your testimony is that you were
19 never contacted about this?
20 A.  I don't remember somebody contacting me
21 regarding my phone call.  I don't remember that.
22         (Exhibit No. 26 marked.)
23 Q.  (By Mr. Shine)  Twana, I'm handing you an
24 email conversation which is labeled AUS 1265 to
25 AUS 1266.  At the very bottom of 1265, is that your

04:30:19-04:31:30                                         Page 240

1  email address?
2  A.  Yes, that is.
3  Q.  And what date is listed underneath your email
4  address?
5  A.  The 25th, 2022, 6:00 p. -- 6:00 a. -- 6:00
6  p.m.
7  Q.  And who was the email addressed to?
8  A.  To me.
9  Q.  Who did you send the email to?
10 A.  To whatever this person is.
11 Q.  Okay.  And just above that, did you receive a
12 response from this Catherine Alyea, A-L-Y-E-A?
13 A.  This lady?
14 Q.  Yes.
15 A.  Through email?  I believe so, I did.
16 Q.  Okay.  And in the middle of the page on 1256,
17 is there a date listed when an email was sent to you in
18 response to your email on the 25th?
19 A.  Repeat your question, please.
20 Q.  Sure.  In the middle of 1265, it says from
21 Catherine Alyea to twana_score202020@yahoo.com.  Do you
22 see where I'm referring to?
23 A.  Yes.
24 Q.  And there's a date when that email was sent to
25 you, which says Thursday May 26, 2022, correct?

05:33:25-05:34:55                                    Page 281

1    A.   A hundred percent the expenses.
2    Q.   And you testified earlier that you have a cell
3  phone, right?
4    A.   I do.
5    Q.   Do you pay for your cell phone?
6    A.   I do.
7    Q.   How much do you pay a month for your cell
8  phone?
9    A.   Approximately $60 to $55.
10   Q.   And that's per month?
11   A.   Per month, yeah.
12   Q.   Your cell phone, is that paid off or are you
13 making payments on it?
14   A.   No, no.  It's paid off.  It's a really old
15 phone.
16   Q.   Other than your cell phone bill, do you have
17 any other monthly expenses that you pay each month?
18   A.   If I have to buy something.  Let's say if I
19 want to go buy food or something like that, that's the
20 only stuff.  Services for my car because when you do
21 delivery, you need a lot of service for the car because
22 you put heavyset on your car.
23   Q.   Sure.
24   A.   That's the -- those are the one.  Buying
25 clothes and things like that, which I don't do that

05:34:58-05:36:20                                    Page 282

1  often, those are the stuff.
2    Q.   Since you left Allied Universal, have you left
3  the State of Texas at any point?
4    A.   Yes.
5    Q.   Where did you go?
6    A.   I went to -- I went overseas.
7    Q.   And where did you go overseas?
8    A.   To visit my family.
9    Q.   And you mentioned earlier that's Iraq?
10   A.   Yeah.
11   Q.   When did you go to Iraq?
12   A.   It was 2022, I think.
13   Q.   I'm sorry.  2022?
14   A.   I think so.
15   Q.   And who paid for that trip?
16   A.   I did.
17   Q.   Approximately how much did it cost for the
18 whole trip?
19   A.   It was not that much.  6-, $700 both ways.
20   Q.   Excuse me.  How long were you in Iraq for?
21   A.   A few months.
22   Q.   And when you say it was about 6- or $700, was
23 that just the airfare, or was that for the full trip,
24 even while you were staying in Iraq?
25   A.   Because when I was staying there, I didn't

05:36:22-05:37:46                                    Page 283

1  have to really buy anything, so...
2    Q.   Sure.  Other than this trip to Iraq, have you
3  traveled anywhere else since you left Allied Universal?
4    A.   I can't recall.  I don't -- I don't remember.
5  But that's my main trip that I -- main trip that I did.
6  That's the main one.  Going outside of Houston, like,
7  maybe 30 minutes, 40 minutes to different cities, yeah.
8  But like major, major thing, no.  The major one was out
9  of the country, that was it.
10   Q.   You testified that you believe Allied is
11 responsible for some of the emotional distress or
12 damages that you're claiming in this lawsuit, right?
13   A.   Yes.
14   Q.   Have you ever treated for anxiety, depression,
15 or other mental health conditions?
16   A.   I don't have the funds for them, so that was
17 very hard too.
18   Q.   Prior to working for Allied, had you ever
19 treated for anxiety, depression, or other mental health
20 conditions?
21   A.   Do you mean before Allied?
22   Q.   Before Allied.
23   A.   No, no.
24   Q.   And after Allied, you said you don't have the
25 funds?

05:37:46-05:39:37                                    Page 284

1    A.   I don't have the funds.
2    Q.   Have you looked into any, you know, free
3  clinics that might be available in Houston?
4    A.   No, I did not because a lot of those doctors,
5  they want health insurance and money and I don't have
6  the funds for them.
7    Q.   Are you currently taking any medications?
8    A.   Right now?  No.  At this moment, no.
9    Q.   So you claim that you've suffered emotional
10 distress because of how Allied treated you.  What are
11 your symptoms of emotional distress?
12   A.   The -- the emotional distress that happened to
13 me:  Loss of hair, the losing ability to sleep, growing
14 gray hair very fast, giving me the -- the -- to pull my
15 hair -- my hairs out of my face.  Being in a situation,
16 being in corner by myself and crying.  And sometimes I
17 wake up in the middle of the night.  I done it -- went
18 to the church in the middle of the night, sit outside
19 of the church and just cried and cried and cried.
20   Q.   When you say "the church," my understanding,
21 based on the Muslim religion --
22   A.   Yes.
23   Q.   -- is that it's a mosque?
24   A.   No.  Christian -- a Christian church.
25   Q.   Okay.  And you just went outside the church?

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

06:06:56-06:08:07                                              Page 301

     1              EXAMINATION
     2   BY MS. HERNANDEZ:
     3       Q.   Twana, I just want to clarify a couple of
     4   things in your testimony today to make sure that we
     5   have an accurate understanding.
     6            Earlier on I believe Nathan asked you
     7   when you first started thinking about filing a lawsuit
     8   against Allied.  Do you remember that question?
     9       A.   Nathan?
    10       Q.   I'm sorry.  His name is Nathan.  Opposing
    11   counsel's name is Nathan.
    12       A.   Oh.
    13       Q.   So he asked you -- do you remember that he
    14   asked you a question, something along the lines of when
    15   did you first start thinking about filing a lawsuit
    16   against Allied?
    17       A.   Yes.
    18       Q.   Okay.
    19       A.   I got confused.  Sorry I cut you off.  I got
    20   confused with another Nathan that he brought up the
    21   name.  I was like, No.
    22       Q.   Right.  And so if I remember correctly, I
    23   heard a couple of different answers.  Is it your
    24   testimony that you first started thinking about filing
    25   a lawsuit against Allied after your interaction with

06:08:12-06:09:06                                              Page 302

     1   Patrick?
     2       A.   Yes.
     3       Q.   Okay.  Would that have been in December of
     4   2021?
     5       A.   Somewhere around there.
     6       Q.   You were first hired in December of 2021,
     7   correct?
     8       A.   Yes.
     9       Q.   And I believe you testified it was about a
    10   month or two months after that that you went through
    11   the Elite training, correct?
    12       A.   That's correct.
    13       Q.   So that would have been either January or
    14   February of 2022, right?
    15       A.   Yes.
    16       Q.   And when did you first meet Patrick?
    17       A.   The first time I ever met Patrick, it was
    18   during the Elite training.
    19       Q.   Okay.
    20       A.   That's the first time I ever met him.
    21       Q.   So that would have been either in January of
    22   2022 or February of 2022, correct?
    23       A.   Correct.
    24       Q.   So is it accurate to say that you did not
    25   first start thinking about filing a lawsuit against

06:09:08-06:11:09                                              Page 303

     1   Allied until after or during that Elite training?
     2       A.   Of course, because I had no issue with Allied
     3   whatsoever before the Elite.  Absolutely not.
     4       Q.   Okay.  So that would not have been in December
     5   of 2021, right?
     6       A.   Yes.
     7       Q.   Okay.  While I'm looking, at the beginning,
     8   Nathan -- opposing counsel, the counsel for Allied,
     9   Nathan Shine --
    10       A.   Yes.
    11       Q.   -- handed you some documents that I'm looking
    12   for, but I believe one of them was like a certificate
    13   of new orientation training.  Do you remember that?
    14       A.   The documents?  Could you show me?  I don't
    15   remember that.
    16       Q.   Let me see if I can find it.
    17       A.   I think it was right below the paper on the
    18   bottom.
    19       Q.   Well, my question is -- oh, here it is.
    20   Sorry.  Okay.  I'm sorry.  Let me -- it's this document
    21   that's Bates labeled AUS 00663.
    22       A.   Yes.
    23       Q.   And it says New Employee -- Employee
    24   Orientation; is that right?
    25       A.   Correct.

06:11:09-06:12:45                                              Page 304

     1       Q.   Did you have any new employee training on this
     2   day that's listed on the certificate?
     3       A.   At that specific date?  Don't recall if I -- I
     4   don't remember if I had any training.  I might do, I
     5   might not.  Not too sure.
     6       Q.   So before you went through the Elite training,
     7   do you remember any other training that Allied gave
     8   you?
     9       A.   Before?  No.  They didn't -- their main
    10   training was the Elite training, the qualification for
    11   the firearm and Taser.  That was their main goal to get
    12   us that.  And during the Elite, they had another
    13   training class, the TMO.  But before -- after the Elite
    14   or anything like that, there was not any training that
    15   I received.
    16       Q.   Before Elite training, did you receive any
    17   other training from Allied?
    18       A.   No.
    19       Q.   Okay.  And then I'm showing you -- I don't
    20   know what exhibit number it is, but it's labeled
    21   AUS 664, and at the top it says "Training Certificate
    22   Preventing Unlawful Discrimination and Harassment."
    23            Did I read that correctly?
    24       A.   Yes, you did.
    25       Q.   Were you trained on preventing unlawful

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

06:12:49-06:14:00                                    Page 305

1  discrimination and harassment --
2     A.  No.
3     Q.  -- ever?
4     A.  No.  They just make us sign the documents and
5  then they take it away.
6     Q.  Do you remember, on this day or maybe the day
7  before, anybody going, like, over any slides with you
8  about discrimination or harassment?
9     A.  No, no.
10    Q.  Going back to something you said earlier --
11 and I think you just mentioned it right now.  During
12 the Elite training, you mentioned that Monroe was the
13 field instructor, correct?
14    A.  Correct.
15    Q.  And you -- I believe opposing counsel asked
16 you if he was the only instructor.  Do you remember
17 that?
18    A.  The main instructor for the class, for the
19 firearm and Taser, CPR, it was Monroe.  He was the main
20 instructor.
21    Q.  Okay.  And I think just a minute ago, you said
22 there was another instruction from TMO?
23    A.  TMO.
24    Q.  What --
25    A.  That's something called TMO.  I don't know

06:14:04-06:15:50                                    Page 306

1  what TMO is, but it's something from Allied.  I think
2  it's a third-party company, train the -- hired by
3  H-E-B, not by Allied.  They came in -- I think they
4  came in and the instructors left.  TMO came, gave us a
5  class.  It was during the Elite program.  I believe the
6  last days or the last two days of the Elite program,
7  they came in and they had a big screen showing us how
8  to observe people, how to follow people around, what to
9  do when things -- people try to break in and things
10 like that.  But after when the class over, Allied
11 Universal instructors came inside and all that.  They
12 said, Don't listen to whatever what they said.
13    Q.  Okay.  So the TMO instructors were not Monroe?
14    A.  It was not Monroe, no, ma'am.
15    Q.  Okay.  And to your understanding, they were
16 not Allied employees.
17    A.  No, they were not.  They were a third-party
18 company.
19    Q.  When you asked -- or strike that.
20       When you told your supervisor that you
21 wanted to keep your beard for religious purposes, did
22 the supervisor let you know you could request a
23 religious accommodation?
24    A.  No, he did not say regarding of that.
25    Q.  When you let Patrick Freeney know that you

06:15:52-06:17:31                                    Page 307

1  wanted to keep your beard for religious purposes, did
2  Patrick Freeney let you know you could request a
3  religious accommodation?
4     A.  No.
5     Q.  Going back, there's -- you mentioned that one
6  day you went to the office and you talked to Patrick
7  Freeney in his office involving the allegation that you
8  missed a day of work.
9     A.  Yes.
10    Q.  Do you remember that?  And you mentioned that
11 when you were walking out, you also met with someone
12 that you believed to be in HR.
13    A.  Correct.
14    Q.  Was that person's name Catherine Barnes?
15    A.  I believe it was Catherine, the name.
16    Q.  Okay.  And this was all before you were
17 suspended; is that right?
18    A.  Yes, those are before -- way before I was
19 suspended.
20    Q.  Okay.
21    A.  And I spoke to her regarding overtime too at
22 the same time.  And they mentioned something to me
23 to -- if I wanted -- if I wanted -- they had mentioned
24 to me if I wanted to work overtime, there is different
25 accounts I can go work over there.  For example, if

06:17:39-06:19:14                                    Page 308

1  this person is account manager and this person is
2  account manager, I can go to them, ask to -- if they
3  need a security officer to work for them.  The
4  instructor told me that too.  She told me that too.
5        After that, I met some -- like, I had a
6  phone number of somebody; I don't recall her name.  She
7  was account manager for one of the accounts.  She said,
8  I am willing to give you overtime, time to work with
9  me, and I can give you the difference by the overtime.
10 I can pay you in overtime.  I need you to work with me,
11 but you don't have to use your firearm -- like, the
12 Elite firearm equipments.  Do you have your own stuff?
13       I'm was like, Yes, I do.
14       She said, You need the permission of
15 Patrick Freeney for the overtime to -- you need the
16 permission to work with me from Patrick because you
17 work with him, that's his account -- that is your boss.
18 I never got the -- they refused me down to working that
19 account.
20    Q.  Who refused to let --
21    A.  Patrick.
22    Q.  Okay.  Did you tell Catherine Barnes this at
23 that time?
24    A.  At that time about the accounts?  No.  She
25 gave me the path to take and it didn't work.

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 43 of 45
Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

06:53:35-06:55:03                                    Page 329

1    A.   I can't recall that.
2    Q.   So as we sit here today, is it your
3  understanding that Allied paid you for all of your time
4  that you worked?
5    A.   There's times that I worked, they didn't pay
6  me for.  For example, when I went to that post and I
7  turned back, they told me to go home, they didn't pay
8  me for that.  It's an hour to go and an hour to come
9  back, they not pay me for that.
10    Q.   In your complaint or your petition, the
11  lawsuit that has been filed, is it fair to say that
12  you've raised no issues with overtime?
13    A.   That is correct.
14    Q.   Okay.  You testified that you remembered facts
15  that were not contained in your complaint, correct?
16          MS. HERNANDEZ: Objection; misstates
17  testimony.
18    A.   Correct.
19    Q.   (By Mr. Shine)  Did you ever try to amend your
20  complaint?
21    A.   Sorry?
22    Q.   Did you -- the lawsuit that you filed, did you
23  ever try to amend your lawsuit?
24    A.   What do you mean by "amend"?
25    Q.   To change the facts that were presented.  Did

06:55:10-06:56:35                                    Page 330

1  you ever try to add more facts to your lawsuit?
2    A.   If I knew.  I don't know how to do it.
3    Q.   Is it your understanding that your attorney
4  tried to amend your complaint?
5    A.   I will leave it up to her to amend the
6  complaint.  I don't know how to do it.
7    Q.   So is it fair to say --
8    A.   There's stuff -- sorry I cut you off.  There's
9  stuff are missing in the complaint, yes.  It's not like
10  hundred percent complete, yes, that is -- that is
11  correct.  But do I know how to add it?  I don't know
12  how to add it.
13    Q.   Did you ever try to add it?
14    A.   At the moment, no.
15    Q.   And then finally, when your attorney was
16  asking you if Catherine Barnes ever responded to your
17  email and you testified that she did but it may have
18  been a couple of emails, do you remember talking about
19  that with your attorney?
20    A.   Yeah, I do remember that, yeah.
21    Q.   When Catherine eventually responded to you to
22  say that she doesn't get involved in employee
23  complaints, do you remember her responding to you about
24  that?
25    A.   She don't get in like -- that's not part of

06:56:38-06:57:38                                    Page 331

1  her duty or --
2    Q.   Okay.
3    A.   -- or not part of her job.  She don't get in
4  the affair.  Something like that, in that category.
5    Q.   So if she had responded immediately with --
6  with that same statement or a week later with that same
7  statement, it doesn't change the fact that she didn't
8  get involved, right?
9    A.   It does gonna change the fact.
10    Q.   How does it change?
11    A.   If she were to provide me what to do and where
12  to go, I would have done it sooner.  If she would have
13  called me to the office and sat down with me and tried
14  to listen to me and give me an advice what to do, that
15  would have changed a lot.  If she would have told me,
16  Hey, call this person, come on into the office, I want
17  to talk to you personally about what's going on, that
18  would have changed a lot.  But none of those happened.
19    Q.   But at the end of the day, she still didn't
20  get involved with that type of complaint, right?
21    A.   She did not help.  That's basically the
22  answer.
23    Q.   Because her answer was that it's not her job,
24  right?
25    A.   Technically.  And I -- as I know what HR is,

06:57:43-06:58:03                                    Page 332

1  they are there for the employee.  You know, you go to
2  them to help you out if something going on.  I didn't
3  know HR will turn you around like that and not help
4  you.
5          MR. SHINE: No further questions.
6          MS. HERNANDEZ: We'll reserve the rest of
7  our questions for trial.
8          THE VIDEOGRAPHER: Off record at 6:57.
9          (Deposition concluded at 6:58 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 4:23-cv-02823    Document 27-6    Filed on 11/18/24 in TXSD    Page 44 of 45

Twana Ahmed vs.                                                    Twana Ahmed
Universal Protection Service, et al                           September 19, 2024

Page 333

```
 1              CHANGES AND SIGNATURE

 2  WITNESS NAME: _____ DATE OF DEPOSITION _____

 3

 4  PAGE   LINE   CHANGE          REASON

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____
```

Page 334

```
 1           I, TWANA AHMED, have read the foregoing
    deposition and hereby affix my signature that same is
 2  true and correct, except as noted above.

 3

 4

 5           _____
              TWANA AHMED
 6

 7  THE STATE OF _____:

 8  COUNTY OF _____:

 9           Before me, _____, on
10  this day personally appeared TWANA AHMED, known to me
    (or proved to me under oath or through _____)
11  (description of identity card or other document) to be
    the person whose name is subscribed to the foregoing
12  instrument and acknowledged to me that they executed
    the same for the purposes and consideration therein
13  expressed.

14

15           Given under my hand and seal of office
    this _____ day of _____, _____.

16

17

18           _____
              Notary Public in and for
19            The State of _____

20  My Commission Expires _____

21

22  Job No. 01-84948

23

24

25
```

Page 335

```
 1          UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
 2               HOUSTON DIVISION

 3  TWANA AHMED,              :
                             :
 4       Plaintiff,          :
                             :
 5  VS.                      :  C.A. NO. 4:23-cv-02823
                             :
 6  UNIVERSAL PROTECTION     :
    SERVICE, LP d/b/a        :
 7  ALLIED UNIVERSAL         :
    SECURITY SERVICES,       :
 8                           :
         Defendant.          :

 9            REPORTER'S CERTIFICATION
           DEPOSITION OF TWANA AHMED
10          TAKEN ON SEPTEMBER 19, 2024

11       I, ANDREA L. DESORMEAUX, Certified Shorthand
12  Reporter, hereby certify to the following:

13       That the witness, TWANA AHMED, was duly sworn by
    the officer and that the transcript of the oral
14  deposition is a true record of the testimony given by
    the witness;

15

16       That the deposition transcript was submitted on
    _____, _____, to the witness or to the
17  attorney for the witness for examination, signature and
    return to me by _____, _____;

18       That the amount of time used by each party at the
    deposition is as follows:
19
         Mr. Shine    - (06:53:50)
20       Ms. Hernandez - (00:46:07)

21       That pursuant to information given to the
    deposition officer at the time said testimony was
22  taken, the following includes counsel for all parties
    of record:

23
         Ms. Amanda C. Hernandez, attorney for Plaintiff.
24       Mr. Nathan A. Shine, attorney for Defendant.

25       I further certify that I am neither counsel for,
```

Page 336

```
 1  related to, nor employed by any of the parties or
    attorneys in the action in which this proceeding was
 2  taken, and further that I am not financially or
    otherwise interested in the outcome of the action.

 3

 4       Certified to by me this ____ day of _____,
 5  _____.

 6

 7

 8       _____
         ANDREA L. DESORMEAUX, TEXAS CSR NO. 4835
 9       Expiration Date:  July 31, 2026
         CONTINENTAL COURT REPORTERS, INC.
10       Firm Registration No. 61
         Expiration Date:  January 31, 2025
11       Two Riverway Building
         2 Riverway, Suite 750
12       Houston, Texas 77056
         (713) 522-5080

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Twana Ahmed vs.
Universal Protection Service, et al

Twana Ahmed
September 19, 2024

Page 337

FURTHER CERTIFICATION

1

2

3      The original deposition was/was not returned to the
deposition officer on _____;

4      If returned, the attached Changes and Signature
page contains any changes and the reasons therefor;

5

6      If returned, the original deposition was delivered
to Mr. Nathan A. Shine, Custodial Attorney;

7      That $_____ is the deposition officer's charges
to the Defendant's attorney for preparing the original

8  deposition transcript and any copies of exhibits;

9      That the deposition was delivered in accordance
with Rule 30(f), and that a copy of this certificate

10 was served on all parties shown herein on and filed
with the Clerk.

11

12     Certified to by me this ____ day of _____,
_____.

13

14

15     _____

16     Diane S. Richer
       Operations Manager

17     CONTINENTAL COURT REPORTERS, INC.
       Firm Registration No. 61

18     Expiration Date:  January 31, 2025
       Two Riverway Building

19     2 Riverway, Suite 750
       Houston, Texas 77056

20     (713) 522-5080

21

22

23

24

25