IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Twana Ahmed, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | No. 4:23-cv-02823 |
| | § | |
| Universal Protection Service, LP, d/b/a | § | Jury Demanded |
| Allied Universal Security Services, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

---

**PLAINTIFF TWANA AHMED'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I. NATURE AND STAGE OF PROCEEDING ...................................................................... 1

II. ISSUE & STANDARD OF REVIEW .......................................................................... 1

III. THE CIVIL RIGHTS AT ISSUE ............................................................................ 2

IV. STATEMENT OF FACTS ................................................................................... 3

A.      Foreseeability of the problem .......................................................................... 4

B.      Allied's systemic failure to protect workers from discrimination
and retaliation results in discrimination and retaliation ....................................... 6

      1.     Allied discriminates against its Muslim, Iraqi, employee.................................... 6
      2.     Allied fails to protect its worker who reports and opposes
discrimination and harassment ...................................................................... 7
      3.     Allied retaliates against the worker and terminates his employment ................. 8
      4.     Allied sees multiple red flags of discrimination and finds
evidence its Manager falsified documents, yet still fails to
protect its worker from retaliation .................................................................. 9

V. SUMMARY OF THE ARGUMENT ........................................................................ 11

VI. ARGUMENT & AUTHORITIES .......................................................................... 11

A.      A reasonable juror can find direct evidence of discrimination. ......................... 11

B.      A reasonable juror can find indirect [circumstantial] evidence of discrimination. .......... 15

      1.     A reasonable juror can find a prima facie case of
religious, race, and national origin discrimination .......................................... 16
           a.     A reasonable juror can find knowledge of
membership in a protected class. ........................................................ 17
           b.     A reasonable juror can find different treatment. ................................... 18

      2.     A reasonable juror can find a prima facie case of retaliation ............................. 19

      3.     A reasonable juror can find pretext. ............................................................. 20
           a.     Exhibiting racial, religious, or national origin animus. .......................... 22
           b.     Inconsistent statements .................................................................... 22
           c.     Departure from policies and prevention practices ................................. 23
           d.     Setup for failure and suspicious documentation ................................... 24
           e.     Expressions of anger and temporal proximity ...................................... 25

VII. Conclusion & Requested Relief ...................................................................................25

<u>I**NDEX OF** A**UTHORITIES**</u>

**Cases**

*Albemarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) ............................................................................ 21

*Allen v. United States Postal Serv.*,
    63 F.4th 292 (5th Cir. 2023)............................................................ 21, 24

*Aloqaili v. National Housing Corp.*,
    743 F. Supp. 1264 (N.D. Ohio 1990)................................................ 14

*Ayissi-Etoh v. Fannie Mae*,
    712 F.3d 572 (D.C. Cir. 2013) ........................................................ 19

*Bondwe v. Mapco Express, Inc.*,
    No. 13-cv-00419, 2015 WL 1825336 (M.D. Tenn. April 22, 2015) ................... 14

*Bostock v. Clayton Cty.*,
    590 U.S. 644, 664 (2020)............................................................... 2, 11

*Boyd v. State Farm Ins. Co.*,
    158 F.3d 326 (5th Cir. 1998) ........................................................... 14

*Brown v. E. Miss. Elec. Power Ass'n*,
    989 F.2d 858 (5th Cir. 1993) ........................................................... 12

*Burton v. Freescale Semiconductor, Inc.*,
    798 F.3d 222 (5th Cir. 2015) ....................................................... 21, 23

*Caldwell v. KHOU-TV*,
    850 F.3d 237 (5th Cir. 2017)........................................................... 21

*City of Waco v. Lopez*,
    259 S.W.3d 147 (Tex. 2008) .......................................................... 2

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ..................................................................... 22

*Crawford v. Metro. Gov't of Nashville & Davidson Cty.*,
    555 U.S. 271 (2009) ..................................................................... 3

*EEOC v. U.S. Steel Tubular Prods. Inc.*, No. 4:14-CV-02747,
    2016 U.S. Dist. LEXIS 205609, 2016 WL 11795815 (S.D. Tex. Aug. 4, 2016) .......... 3

*EEOC v. WC&M Enters., Inc.*,
    496 F.3d 393 (5th Cir. 2007) ............................................. 17

*Ellerbrook v. City of Lubbock*,
    465 Fed. Appx. 324 (5th Cir. 2012) ..................................... 20

*Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*,
    778 F.3d 473 (5th Cir. 2015) ............................................ 12

*Evans v. Houston*,
    246 F.3d 344 (5th Cir. 2001) ........................................ 21, 25

*Fierros v. Tex. Dep't of Health*,
    274 F.3d 187 (5th Cir. 2001) ............................................ 14

*Gee v. Principi*,
    289 F.3d 342 (5th Cir. 2002) ............................................ 21

*Goudeau v. Nat'l Oilwell Varco, L.P.*,
    793 F.3d 470 (5th Cir. 2015) ............................................ 15

*Hawkins v. Frank Gillman Pontiac*,
    102 F.App'x 394 (5th Cir. 2004) ......................................... 14

*Jones v. Robinson Property Group, L.P.*,
    427 F.3d 987 (5th Cir. 2005) ............................................ 14

*Laxton v. Gap Inc.*,
    333 F.3d 572 (5th Cir. 2003) .......................................... 2, 21

*Martinez v. Univ. of Tex. at Austin*,
    No. 23-50036 (5th Cir. Oct 05, 2023) .................................... 19

*Memon v. Deloitte Consulting, LLP*,
    779 F. Supp.2d 619, 634 (S.D. Tex. 2011) ............................ 16, 18

*McNeill v. Tyson Fresh Meats, Inc.*, No. 2:23-CV-041,
    2023 U.S. Dist. LEXIS 219122, 2023 WL 8532408 (N.D. Tex. Dec. 8, 2023) .............. 3

*Miller v. Raytheon Co.*,
    716 F.3d 138 (5th Cir. 2013) ............................................ 21

*McCorstin v. United States Steel Corp.*,
    621 F.2d 749 (5th Cir. 1980)........................................................................ 20

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ................................................................................ 16

*Myrtil v. Serra Chevrolet*,
    No. 22-cv-02595 (W.D. Tenn. Dec. 19, 2022)...................................... 14

*Patterson v. McLean Credit Union*,
    491 U.S. 164 (1989) ................................................................................ 20

*Portis v. First Nat'l Bank*,
    34 F.3d 325 (5th Cir. 1994)..................................................................... 14

*Pruitt v. Dallas Indep. Sch. Dist.*,
    No. 3-04-CV-0554, 2006 U.S. Dist. LEXIS 33054 (N.D. Tex. Apr. 21, 2006).............. 21

*Reed v. Neopost USA, Inc.*,
    701 F.3d 434 (5th Cir. 2012)................................................................... 22

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ........................................................................... 1,2,14

*Robinson v. Jackson State Univ.*,
    714 Fed. Appx. 354 (5th Cir. 2017)................................................... 20, 21

*Russell v. McKinney Hosp. Venture*,
    235 F.3d 219 (5th Cir. 2000) ............................................................ 14, 15

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ................................................................................ 21

*Starnes v. Wallace*,
    849 F.3d 627 (5th Cir. 2017) .................................................................. 21

*Teamsters v. United States*,
    431 U.S. 324 (1977) ................................................................................ 16

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ........................................................................... 16, 22

*Tolan v. Cotton*,
   572 U.S. 650 (2014) ................................................................. 1

*Turner v. Kan. City S. Ry. Co.*,
   675 F.3d 887 (5th Cir. 2012)..................................................... 16

*TWA v. Thurston*,
   469 U.S. 111 (1985) ................................................................. 15

*USPS Bd. of Governors v. Aikens*,
   460 U.S. 711 (1983) ................................................................. 15, 16

*Vaughn v. Woodforest Bank*,
   665 F.3d 632 (5th Cir. 2011) ..................................................... 20

*Wallace v. Performance Contractors, Inc.*,
   57 F.4th 209 (5th Cir. 2023)...................................................... 14

*Waterman v. McKinney Indep. Sch. Dist.*,
   No. 4:13-CV-170, 2014 U.S. Dist. LEXIS 130736 (E.D. Tex. 2014) ............................... 21

*Watkins v. Tregre*,
   997 F.3d 275 (5th Cir. 2021)...................................................... 25

*Woods v. Cantrell*,
   29 F.4th 284 (5th Cir. 2022) ..................................................... 19

*Young v. City of Houston*,
   906 F.2d 177 (5th Cir. 1990) ..................................................... 14

## Statutes and Rules

42 U.S.C. § 1981.......................................................................... 1

42 U.S.C. § 2000e-2(a) ................................................................ 2, 11

42 U.S.C. § 2000e-3(a) ................................................................ 3

TEX. LAB. CODE § 21.001(4)......................................................... 3

TEX. LAB. CODE § 21.001(7)......................................................... 3

TEX. LAB. CODE § 21.051.............................................................. 2

TEX. LAB. CODE § 21.055 ........................................................................... 3

**Articles and Books**

Alana Semuels, *The Problems Inside North America's Largest
Security Firm—and Third Biggest Employer,* TIME, May 11, 2023 .......................... 3

Cynthia Shapiro, *Corporate Confidential: 50 Secrets Your Company Doesn't
Want You to Know - and What to Do About Them* (St. Martin's Press 2005) ........................ 24

Lilia M. Cortina & Vicki J. Magley, *Raising Voice, Risking Retaliation: Events Following
Interpersonal Mistreatment in the Workplace*,
8:4 J. Occupational Health Psychol. 247 (2003) ..................................................... 5

*Monster Poll: Workplace Discrimination,* MONSTER, Sept. 6, 2022 ........................... 4

*New Study: 3 in 5 U.S. Employees Have Witnessed or Experienced Discrimination,*
GLASSDOOR, July 22, 2020 ...................................................................... 4

*Written Testimony of Mindy E. Bergman*, Workplace Harassment: Examining the
Scope of the Problem and Potential Solutions, Meeting of the E.E.O.C. Select
Task Force on the Study of Harassment in the Workplace (June 15, 2015) ........................ 4

*The State of Workplace Discrimination 2021,* ALLVOICES, Dec. 14, 2021 .............................. 4

*Select Task Force on the Study of Harassment in the Workplace,*
U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, June 2016 .................................... 5

"*Reducing a group to a slur or a stereotype reduces us all.*"[1]

## I.    NATURE AND STAGE OF PROCEEDING

This case concerns the civil rights of workers. It involves a Defendant that fails to protect its workers from retaliation when they report discrimination. It involves Defendant's Elite Client Manager threatening to physically harm a worker. It involves Defendant's Elite Client Manager telling the worker to go back where he came from. And it involves the same Manager calling the worker a sand-nigg*r while suspending him for refusing to sign a false incident report.

The civil rights at issue entail discrimination and retaliation under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1886 as revised and amended in 42 U.S.C. § 1981, and the Texas Commission on Human Rights Act (TCHRA) under Texas Labor Code Chapter 21. The Joint Pretrial Order and Motion in Limine deadline is April 4, 2025, and Docket call is set for April 11, 2025.

## II.    ISSUE & STANDARD OF REVIEW

There are disputed material issues of fact on discrimination and retaliation for a jury to decide. At issue is whether to deny summary judgment and permit Twana Ahmed to proceed to trial before a jury of his peers.

On summary judgment:[2]

- the "evidence of the nonmovant [Twana Ahmed] is to be believed." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014)(per curiam);

- courts "must draw all reasonable inferences in favor of" the nonmovant, Twana Ahmed. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000);

---

[1] Dr. DaShanne Stokes.

[2] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same.").

- courts "must disregard all evidence favorable to [Allied] that the jury is not required to believe." *Id.*, 530 U.S. at 151;

- courts must not make credibility determinations. *Id.*, 530 U.S. at 150;

- courts must not weigh the evidence. *Id.*

It is error to disregard important evidence favorable to the nonmovant.[3] And courts may only give credence to evidence favoring the movant if that evidence is (1) "uncontradicted and unimpeached" and (2) "comes from disinterested witnesses [or, presumably, the non-movant]."[4]

## III.    THE CIVIL RIGHTS AT ISSUE

The Civil Rights Act of 1866 (Section 1981), the Civil Rights Act of 1964 (Title VII), and the TCHRA establish basic civil rights for employees in the workplace. They all "address the specific evil of discrimination and retaliation in the workplace."[5] Employees have the right to work free from discrimination and retaliation. And companies have a duty to protect employees from discrimination and retaliation in the workplace. App., p. 177:13-16, p. 178:15-18, p. 179:11-14). Companies cannot treat an employee less favorably because of his race, religion, or national origin.[6] And companies cannot retaliate against an employee for requesting a religious accommodation, or

---

[3] *See Reeves,* 530 U.S. at 152 ("[T]he Court of Appeals misapplied the standard of review dictated by Rule 50. Again, the court disregarded critical evidence favorable to petitioner."); *id.* at 150 (noting that the "standard for granting summary judgment 'mirrors' the standard for judgment [under Rule 50], such that 'the inquiry under each is the same.'"); *see also Tolan,* 572 U.S. at 651 ("In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' … For that reason, we vacate its decision.").

[4] *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003) ("The court gives credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses."); *see also Reeves*, 530 U.S. at 151 ("[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'").

[5] *See, e.g., City of Waco v. Lopez,* 259 S.W.3d 147, 153-55 (Tex. 2008).

[6] *See* 42 U.S.C. §2000e-2(a)(1)&(2); Tex. Lab. Code § 21.051; *Bostock v. Clayton Cty.*, 590 U.S. 644 (2020).

for opposing and reporting discriminatory treatment.[7] These laws protect all of us in the workplace. They ensure "freedom from discrimination."[8] They preserve the public safety, health, and general welfare."[9] They are useless, however, if they are not enforced.

## IV.    STATEMENT OF FACTS[10]



David Zalubowski—AP; Getty Images

> Allied Universal is America's biggest company you've never heard of. With 800,000 employees globally and 300,000 in the U.S., it is the third-largest private employer in North America, after Walmart and Amazon. Most Americans interact with Allied employees daily—at airports, on public transit, in supermarkets, pharmacies and gas stations. Yet Allied has not faced the scrutiny that Walmart or Amazon have in recent years, perhaps because it doesn't sell goods and services to consumers. This lack of public visibility has enabled the company to deploy underpaid and under trained guards in cities across America, where they put themselves and the general public at risk.

Alana Semuels, *The Problems Inside North America's Largest Security Firm—and Third Biggest Employer,* TIME, May 11, 2023, https://time.com/6278534/allied-universal-security-problems/

Defendant Allied Universal is "a global security and facility services company with a workforce of more than 800,000 people worldwide and revenue of approximately $20 billion." App., p. 573

---

[7] *See, e.g.,* 42 U.S.C. § 2000e-3(a); Tex. Lab. Code § 21.055; *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 274 (2009); *EEOC v. U.S. Steel Tubular Prods. Inc.*, No. 4:14-CV-02747, 2016 U.S. Dist. LEXIS 205609, 2016 WL 11795815, at *16 (S.D. Tex. Aug. 4, 2016); *McNeill v. Tyson Fresh Meats, Inc.*, No. 2:23-CV-041, 2023 U.S. Dist. LEXIS 219122, 2023 WL 8532408, at *5 (N.D. Tex. Dec. 8, 2023).

[8] *See* TEX. LAB. CODE § 21.001(4).

[9] *See* TEX. LAB. CODE § 21.001(7).

[10] The attached Appendix in Support of Plaintiff Twana Ahmed's Response to Defendants' Motion for Summary Judgment is sequentially bates-numbered and includes supporting evidence. It is cited as "App.," followed by the appendix bates number and any applicable paragraph or line number.

¶ 1. It promises its workers that it "is committed to ensuring that no employee is discriminated against or harassed by a supervisor . . . or any other person in the workplace." App. p. 543 ¶ 2. It promises that "[a] safe, respectful, and inclusive work environment is paramount at Allied Universal." *Id.*

### A.  Foreseeability of the problem

> [F]ewer than 25% of people who experience harassment report it to anyone in power . . . . reporting at best does not make things worse and at worst leads to retaliation, minimization of complaints, and additional injury to the reporter.

*Written Testimony of Mindy E. Bergman*, Workplace Harassment: Examining the Scope of the Problem and Potential Solutions, Meeting of the E.E.O.C. Select Task Force on the Study of Harassment in the Workplace (June 15, 2015), https://www.eeoc.gov/written-testimony-mindy-bergman-associate-professor-psychology-texas-am-university

In 2019 a glassdoor survey revealed that 61%, or about three in five U.S. employees have witnessed or experienced discrimination in the workplace.[11] In its report on "the State of Workplace Discrimination 2021," AllVoices found that 55% of the employees surveyed have experienced discrimination at their current company.[12] In 2023, 91% of workers surveyed in a monster poll reported experiencing discrimination in the workplace.[13]

Harassment and discrimination are underreported.[14] The Equal Employment Opportunity Commission (EEOC) reports "75% of employees who spoke out against workplace mistreatment

---

[11] *See New Study: 3 in 5 U.S. Employees Have Witnessed or Experienced Discrimination,* GLASSDOOR, July 22, 2020, https://www.glassdoor.com/blog/new-study-discrimination/

[12] *See The State of Workplace Discrimination 2021,* ALLVOICES, Dec. 14, 2021, https://www.allvoices.co/blog/state-of-workplace-discrimination#:~:text=prevalent%20is%20it%3F-,55%25%20have%20experienced%20discrimination%20at%20their%20current%20company,45.1%25%20said%20they%20have%20not.

[13] *See Monster Poll: Workplace Discrimination,* MONSTER, Sept. 6, 2022, https://hiring.monster.com/resources/blog/monster-poll-workplace-discrimination/

[14] *See Written Testimony of Mindy E. Bergman*, Workplace Harassment: Examining the Scope of the Problem and Potential Solutions, Meeting of the E.E.O.C. Select Task Force on the Study of Harassment in the Workplace (June 15, 2015), https://www.eeoc.gov/written-testimony-mindy-bergman-associate-professor-psychology-texas-am-

faced some form of retaliation."[15] Allied's Human Resources Director, with over 10 years of HR experience, agrees that employees who experience discrimination will often not report it out of fear of retaliation. App., p. 194:21-195:5. Still, to ensure that its employees are protected from discrimination and retaliation, Allied chooses to rely primarily on employee reports. App., p. 195:24-197:6, 199:7-200:7.

Allied concedes that discrimination in the workplace is a foreseeable danger to employees. App., p. 193:4-7. Allied concedes that companies must protect employees from discrimination and retaliation. App., p. 177:13-16, 178:15-18, 179:11-14. Allied claims that protecting employees from discrimination in the workplace is *most important*. App., p. 177:13-23. Yet it chooses to do very little to ensure that workers are actually protected from discrimination and retaliation. Aside from a *one-time* new employee orientation computer module, Allied chooses not to require *any* additional yearly training on discrimination and retaliation—even for its managers and supervisors, no matter the length of their tenure. App., p. 184:22-185:6, 186:15-187:13, 188:8-12. Recent employees do not remember Allied ever providing any such training or orientation. *See* App., p. 7 at ¶ 21; p. 167 at ¶ 6. Allied claims there is no way to monitor its managers to ensure they are not discriminating against subordinates aside from "hosting meetings" with them. App. p. 199:7-14, 200:3-7.

In 2018, Allied is ordered to have an EEO Monitor that will ensure, among other things, that it "maintains and implements nation-wide an anti-discrimination, religious accommodation, and anti-retaliation policy and reporting procedure;" "maintains effective training for its employees;"

---

university ("It is actually underlined unreasonable for employees to report harassment to their companies because minimization and retaliation were together about as common as remedies and created further damage to people who had already been harassed. Further, because remediating the situation did not make the person whole-that is, did not overcome the damage caused by harassment-and helpful vs. hurtful responses were each found about 50% of the time, reporting is a gamble that is not worth taking in terms of individual well-being.").

[15] *See Select Task Force on the Study of Harassment in the Workplace,* U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, June 2016, https://www.eeoc.gov/select-task-force-study-harassment-workplace (citing Lilia M. Cortina & Vicki J. Magley, *Raising Voice, Risking Retaliation: Events Following Interpersonal Mistreatment in the Workplace*, 8:4 J. Occupational Health Psychol. 247, 255 (2003)).

and "maintains a system for monitoring any investigation of any complaint nation-wide of religious discrimination, failure to accommodate or retaliation." App. p. 560 ¶¶ 1-4. The order is in effect for three years.

### B. Allied's systemic failure to protect workers from discrimination and retaliation results in discrimination and retaliation

#### 1. Allied discriminates against its Muslim, Iraqi, employee

In January 2022, Allied's Client Manager Patrick Freeney and its Field Supervisor Mauricio Zepeda single out a Middle-Eastern, Muslim, Iraqi security officer and order him to shave his beard. App., p. 9 ¶ 28--p. 10 ¶ 31. The officer's name is Twana Ahmed. App., p. 3 ¶ 1. Allied's Manager and Supervisor hear Mr. Ahmed say that he has his beard for religious purposes, but do not tell him he may seek a religious accommodation. App., p. 9 ¶28-29, p. 12 ¶ 36. Instead, Allied's Manager and Supervisor tell Mr. Ahmed it's company policy to shave. App., p. 9 ¶28-29. A few weeks later, Allied's supervisor sees Mr. Ahmed working in the field and again orders him to shave his beard. App., p. 10-11 ¶32. Mr. Ahmed again states that he has the beard for religious purposes. *Id.* Allied's supervisor again tells Mr. Ahmed he cannot have facial hair under the company's policy. *Id.* He is lead to believe that he must shave his beard or lose his job. App., p. 11 ¶33. Allied does not pressure or tell other security officers, including two Hispanic males that held the same position that Mr. Ahmed held to shave their beard.  App., p. 9 ¶ 29; p. 11 ¶ 34; p. 168 ¶ 13.

Days later, on January 31, 2022, Allied's Client Manager Patrick Freeney yells at Mr. Ahmed, "**This is America, we run things differently here. It's not like where you come from.**" App., p. 18 ¶ 58. A shocked and scared Mr. Ahmed struggles to get the right English words out, and Manager Freeney mocks his accent. *Id.* Manager Freeney then physically threatens Mr. Ahmed, saying "**If you're lying to me, I'm gonna fry you like a fucking chicken. I'm gonna destroy your fucking life.**" *Id.*

**2. Allied fails to protect its worker who reports and opposes discrimination and harassment**

Allied claims its policies and procedures are mandatory. App., p. 180:15-17. For reporting discrimination and harassment, Allied directs its workers to report via one of various avenues. App., p. 546-47, p. 550. One way to report is directly to Allied's Human Resources Coordinator. *Id.*

The same day that Manager Freeney harasses Mr. Ahmed, he reports to HR Coordinator Catherine Barnes that he feels Manager Freeney is discriminating against him. App., p. 18 ¶ 60. Allied does not investigate the report of discrimination or otherwise act on it. *Id.* Allied does nothing to remove Mr. Ahmed from under Manager Freeney's control. *Id.* Manager Freeney has the power to fire any of his subordinates, including Mr. Ahmed. App., p. 208:22-209-12.

Two months later Manager Freeney suspends Mr. Ahmed after he refuses to sign a false incident report. App., p. 23 ¶ 77-p.26 ¶86. Manager Freeney blocks Mr. Ahmed from submitting his own report. App., p. 23 ¶¶ 78-80, p. 25 ¶ 84. While suspending Mr. Ahmed, Manager Freeney again, threatens him, "I don't give a fuck what happened or what you did or what you didn't do. You are a loose cannon. **I am gonna make sure your license is taken away. I will destroy you and fry you like a fucking chicken. If you don't like it, go back to where you came from.**". App., p. 24 ¶ 81. When Mr. Ahmed returns the next day to turn in his equipment, Manager Freeney is on the phone and tells the person on the phone, "I've got to call you back. **I'm dealing with a sand-nigg\*r.**" App., p. 25 ¶ 82.  And again, Manager Freeney berates Mr. Ahmed. Again, he says, "I'm gonna fry you like a chicken. **This is not like where you come from. We run things different in this country. If you don't know how to survive over here, you need to go back to wherever you came from. Clearly you do not belong here.**" *Id.* at ¶ 82.

Mr. Ahmed tells Allied's Manager Freeney that his is discriminating against him. *Id.* at ¶ 86. He asks to speak to someone with more authority. *Id.* Manager Freeney is visibly angry. App., p.

26 ¶ 86. He says, "Nobody wants to see your dumbass."*Id.*  He says, "You are suspended until the outcome of this investigation. You are a loose fucking cannon in this company. Even if you are not fired after the outcome of this investigation, I'm gonna me sure you are fired and unhirable. I don't know how a dumbass person like you served in the military." App., p. 452:1-9.

### 3. Allied retaliates against the worker and terminates his employment

Allied's Manager Freeney sets in motion Mr. Ahmed's termination by submitting a false incident report that indicates Mr. Ahmed violated Allied's use of force policy. App. p. 680-684. In truth Mr. Ahmed followed Allied's policy as he was instructed. App., p. 29-30 ¶ 98, p. 170 ¶¶ 17-18. Allied's use of force policy states that an employee may use force if he "reasonably believes that such force to be necessary to protect the employee or another individual from imminent bodily harm." App., p. 595. Allied concedes that the use of force policy allows for officer discretion. App., p. 250:9-12. Manager Freeney conducts his own "root cause analysis." App., p. 693. Though Allied's policies require including the security officer's statement when composing a root cause analysis, no one contacts Mr. Ahmed for his account. App., p. 256: 12-22, p. 27 ¶ 88. Instead, Manager Freeney falsely states that that Mr. Ahmed refused to provide a statement. App. p. 691.

Mr. Ahmed asks Allied's HR Coordinator Barnes about the status of his suspension. App., p. 27 ¶ 91. He asks for help and reports in writing the he is being discriminated against. *Id.* HR Coordinator Barnes does not respond. *Id.* at ¶ 92. Allied does not conduct an investigation or otherwise address the report of discrimination. App., p. 27 ¶ 92-p. 29 ¶ 95. Instead, one day later, Allied's Manager Freeney moves to process Mr. Ahmed's termination. App., p.702-705. Allied never tells Mr. Ahmed he is fired. Mr. Ahmed finds out a month later from Allied's recruiter that he is marked non-rehireable. App., p. 29 ¶ 95.

Mr. Ahmed reports the discrimination and harassment again to Allied's HR Manager and report hotline. *Id.* at ¶ 96.

#### 4. Allied sees multiple red flags of discrimination and finds evidence its Manager falsified documents, yet still fails to protect its worker from retaliation

After Mr. Ahmed's fourth report of discrimination Allied finally responds. App., p. 29 ¶ ¶96-97. Allied forwards Mr. Ahmed's report of discrimination and harassment and asks Manager Freeney for a statement. App., p. 636-37. Manager Freeney fails to respond until HR Representative Wayne Oliver asks Regional Vice President Kareem McKinnon to get involved. *Id.* That same day Manager Freeney quits and gives his two-week's notice. App., p. 659. Allied's HR asks Manager Freeney for any Ahmed discipline forms. App., p. 640. None were logged in his personnel record as required under Allied's policies. App., p. 274-275. Three days later, Manager Freeney submits what he purports to be Mr. Ahmed's discipline forms. App., p. 641. Mr. Ahmed has never seen these forms. App., p. 33 ¶ 108. He's never even seen Manager Freeney in the field. *Id.* HR Manager Katherine Alyea begins to question the forms:

> Who are the witnesses on both of these documents, I cannot read the signature? Is there a reason as to why they are not typed, were these reviewed by a member of the HR team or Don?

*Id*. Manager Freeney claims Alex Bergeron is the witness. *Id.* When HR Rep. Oliver checks with Alex Bergeron however, he learns this is false.

| From: | Oliver, Wayne on behalf of Oliver, Wayne <Wayne.Oliver@aus.com> |
|---|---|
| To: | alexthezander247@gmail.com |
| Cc: | Alyea, Katherine |
| Subject: | discipline forms |
| Date: | Wednesday, June 8, 2022 1:28:09 PM |
| Attachments: | 0937_001.pdf |

On the attached documents on Twana Ahmed are these your signatures as a witness?

**Wayne Oliver Jr.**
Regional HR Representative

App., p. 646.

| From: | Alexzander B on behalf of Alexzander B <alexthezander247@gmail.com> |
| To: | Oliver, Wayne |
| Cc: | Alyea, Katherine |
| Subject: | Re: discipline forms |
| Date: | Wednesday, June 8, 2022 1:33:41 PM |
| Attachments: | IMG_0217.jpg |
| | image_123927839.JPG |

No sir this is not my signature. I have never signed any documents that way.

App., p. 647.

A week later HR Manager Alyea plans to question Manager Freeney "concerning the falsification of the disciplinary [forms]." App., p. 653. The day she arrives to confront Manager Freeney; she finds he is gone. App., p. 536 [Alyea depo 38:14-39:20]. He has abandoned his job before completing his two weeks' notice. App., p. 662-63. There is no record in the investigation file that HR Manager Alyea tried to question Manager Freeney afterward, though it would have been best practice to do so. App., p. Alyea depo 47:7-49:25.

| Details present in Mr. Ahmed's reports that Allied concedes are red flags of discrimination | |
| --- | --- |
| racial slurs | App., p. 223:17-21 |
| accent mocked | App., p. 222:17-20 |
| pressured to shave after indicating a religious need to keep the beard | App., p. 221:21-25 |
| pressured to shave when others were not | App., p. 222:1-6 |
| told to go back to his country | App., p. 222:17-21 |
| cussing and physical threats | App., p. 222:22-223:3 |
| not issued equipment others in same position were issued | App., p. 222:12-16 |

| Details present in Mr. Ahmed's case that Allied concedes are signs of retaliation | |
| --- | --- |
| threats to revoke security license after protected activity | App., p. 229:9-11 |
| visible anger after protected activity | App., p. 229:2-4 |
| threats to fire after protected activity | App., p. 229:5-8 |
| disciplinary form is falsified | App., p. 230:7-9 |
| manager lies about having a witness present during a disciplinary meeting | App., p. 230:10-13 |

| ▶ ignored reports of discrimination and harassment | App., p. 228:21-23 |
| ▶ physical threats after protected activity | App., p. 228:24-229:1 |
| ▶ close timing between protected activity and discipline | App., p. 228 :16-22 |

Still, Allied deems Mr. Ahmed's reports of discrimination and harassment a "he said, he said" situation. App., 656-57 App., p. 535, Alyea depo 35:1-25. It marks the reports as "unsubstantiated." App., p. 192:18-193:4. And Mr. Ahmed remains ineligible for rehire. App., p. 703.

### V.    SUMMARY OF THE ARGUMENT

There is direct and indirect evidence that Allied discriminated and retaliated against Twana Ahmed. There is evidence of racial, religious, and national origin animus; falsified documents; inconsistent statements to the EEOC; and a set-up to fail. Allied's HR representatives investigating Ahmed's report of discrimination deemed it a "he said, he said" case. These are precisely the material facts that a jury must decide.

### VI.    ARGUMENT & AUTHORITIES[16]

"First, it's irrelevant what an employer might call its discriminatory practice, how others might label it, **or what else might motivate it.**" *Bostock v. Clayton Cty.*, 590 U.S. 644, 664 (2020) (emphasis added). Allied, through its Manager Patrick Freeney and others discriminated against Twana Ahmed. Even if that discrimination occurred "only in part" because of [his protected characteristics], that supplies no defense under Section 1981 and Title VII's §2000e-2(a) "sweeping standard." *See id.,* 590 U.S. 656-57, 663. It would certainly provide no defense under the "more forgiving" standard under the TCHRA and Title VII §2000e-2(m). Ahmed provides evidence Allied discriminated under both standards.

### A. A reasonable juror can find direct evidence of discrimination.

---

[16] Unless otherwise noted, Ahmed's attorneys have (1) supplied all emphases, (2) omitted from quoted passages in legal authority all internal quotation marks, internal citations, and internal footnotes, and (3) omitted from citations to legal authority all citing and quoting references.

*I'm gonna destroy your life. I will destroy you and fry you like a fucking chicken. If you don't like it, go back to where you came from.... you are suspended until the outcome of the investigation. How did your dumbass work for the military?*

[Next day, on phone with another when Twana Ahmed steps into office]: *I've got to call you back, I'm dealing with a sand-nigger*.

—Allied Manager Patrick Freeney (SOF)

"Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). The concept of direct evidence is not so cribbed as to require a decisionmaker to expressly state, *I am taking this particular employment action against you because of your religion, race, and national origin*. Without inference or presumption, the evidence need only directly suggest a decisionmaker with power over decision-making has discriminatory bias or animus in employment decision-making generally—that itself can prove it was "related to" a particular employment decision. Because direct evidence is just evidence "(1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision." *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015). On summary judgment, these relations and proximity are for a jury to decide—rather than a court; a court just assesses whether a reasonable juror can find such relations and proximity.

In assessing whether a reasonable juror can find direct evidence, consider *Etienne*, in which the Fifth Circuit reversed summary judgment. The Fifth Circuit stated, "no inference or presumption is required to get from this statement—that [waitress not promoted to casino management] was 'too black to do various tasks at the casino'—to the conclusion 'that race was *a* basis in employment decisions' made at [casino] with regard to [waitress]. The statement is therefore, for purposes of summary judgment, direct evidence of discrimination." *Id.* In short, the

Fifth Circuit did not require the evidence of bias or animus to specifically reference the exact management promotion decision at issue—it was enough that a juror could find the evidence directly showed bias or animus of a decisionmaker in making employment decisions generally. In other words, that provided the necessary relation between the bias ["too black to do various tasks"] and the particular challenged employment decision [promotion to casino management].

This is nothing new. Over twenty years earlier, in *Brown*, the Fifth Circuit even reversed and rendered a bench trial finding of no discrimination because of direct evidence: "[Supervisor]'s routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions.... [Supervisor]'s racism infected the disciplinary decisions of which [employee] complains. [Supervisor] directly participated in those decisions, first consulting with [General Manager] about the [customer complaint about employee] and then serving as a member of the triumvirate that decided to remove [employee] from his serviceman position after the [other customer] complaint. [Supervisor]'s 'I had to dust my little nigger' comment *about other instances in which he disciplined [employee]* demonstrates that his racism distorted [employee]'s employment record and extended to decisions of the type at bar." *Brown,* 989 F.2d at 861-62. So, as in *Etienne*, the direct evidence of a supervisor's general discriminatory animus—even in *other instances*—was sufficiently "related to" the challenged employment decision to be direct evidence.

But of course, here, a reasonable juror can find these *go back to where you came from* and *I'm dealing with a sand-nigger* statements were made in the very-suspension meetings at issue. And by the very person suspending. And were about the suspension at issue. So, these statements are even more direct than those requiring reversal of summary judgment in *Etienne* and rendering of judgment for an employee in *Brown*. But again, the question is not whether this Court finds they are direct evidence—but only whether a reasonable juror can find they are so.

Beyond *Etienne* and *Brown*, the Fifth Circuit has a long history of reversing summary judgment because direct evidence of discrimination exists.[17] With slurs in particular, "[t]his court [the Fifth Circuit] has implied that calling an employee a 'nigger' would be direct evidence of race discrimination." *Young v. City of Houston*, 906 F.2d 177, 180 (5th Cir. 1990). "We [the Fifth Circuit] have also previously observed that racial epithets undoubtedly demonstrate racial animus." *Jones v. Robinson Prop. Group, L.P.,* 427, F.3d 987, 993 (5th Cir. 2005). Similarly, courts have ruled that anti-immigrant *go-back-to-_____* remarks can be direct evidence of national origin discrimination.[18]

The motion addresses none of this for the Court. Instead, on slurs like "sand-nigger," the motion relies solely on *Boyd*—a *stray-remarks* case from 1998. *See* Motion at p. 24. Since then, the Fifth Circuit warns that "[I]n light of the Supreme Court's admonition in *Reeves* [*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)], our pre-*Reeves* jurisprudence regarding so-called 'stray remarks' must be viewed cautiously. [citing the 1998 *Boyd* case as such pre-*Reeves* jurisprudence]. Before *Reeves* was decided by the Supreme Court, we warned that the 'stray remark' jurisprudence is itself inconsistent with the deference appellate courts traditionally allow juries regarding their view of the evidence presented and so should be narrowly cabined." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir. 2000). And on *how* that pre-*Reeves* jurisprudence should be viewed cautiously and cabined, the Fifth Circuit relies on Judge Posner—who draws what he calls

---

[17] *See Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 220 (5th Cir. 2023); *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005); *Hawkins v. Frank Gillman Pontiac*, 102 F.App'x 394 (5th Cir. 2004); *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 195 (5th Cir. 2001); *Portis v. First Nat'l Bank*, 34 F.3d 325, 329 (5th Cir. 1994).

[18] *See, e.g., Myrtil v. Serra Chevrolet*, No. 22-cv-02595 (W.D. Tenn. Dec. 19, 2022), ECF No. 18, p. 16 (manager saying "la la la go back to Jamaica" and "get the 'F' out [of] here and go back to wherever you come from" are allegations that "if true, could constitute direct evidence of discrimination based on his perceived national origin."); *Bondwe v. Mapco Express, Inc.*, No. 13-cv-00419, 2015 WL 1825336 (M.D. Tenn. April 22, 2015), ECF No. 47, at pp. 10-11 (supervisor told employee to "to take his degree and to go back to Africa to find a job" and "a jury could find that [supervisor]'s statement constitutes direct evidence of national origin discrimination"); *Aloqaili v. National Housing Corp.*, 743 F. Supp. 1264, 1270 (N.D. Ohio 1990) (housing discrimination and apartment manager's statement to tenant "fine, if you don't like it here, I suggest you go back to your country" was direct evidence of discrimination "as a matter of law.").

a simple common sense distinction between slurs from those within the decision-making process [where it is evidence of discrimination] and remarks by those outside of it [where it may not be unless they had influence in the decision]. *See id.*

Here, of course, the slurs are by direct supervisor Patrick Freeney who was the decision-maker on suspension and termination. Here, the quoted racial/xenophobic epithet *go back to where you came from* is "related" to both national origin and race. The slur *sand-nigger* is related to religion, national origin, and race. They were made by the supervisor suspending the employee during that meeting and within days of the employee's firing. The same supervisor that made the termination decision. They even "related" to the decision to suspend and fire rather than some other decision [though that would suffice]. So, a reasonable juror can find direct evidence of discrimination.

### B. A reasonable juror can find indirect [circumstantial] evidence of discrimination.

"[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *TWA v. Thurston*, 469 U.S. 111, 121 (1985). But even where a reasonable juror cannot find evidence is direct, it can still be indirect [circumstantial] evidence of discrimination when a reasonable juror can find it shows "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475-76 (5th Cir. 2015). Here, defense concedes Patrick Freeney was that person. *See* App., p. 262:8-21. So, this same evidence is still relevant in the prima facie case method of proof even if not direct evidence of discrimination.

On what a prima facie case looks like, "[t]he prima facie case method established in McDonnell Douglas was never intended to be rigid, mechanized, or ritualistic." *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). Though formulas are attractive, from inception a prima facie case is flexible. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973). Rigid application

contravenes the very point of *McDonnell Douglas*: A prima facie case is just "evidence adequate to create an inference of discrimination." *Teamsters v. United States*, 431 U.S. 324, 358 (1977). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 1.    A reasonable juror can find a prima facie case of religious, race, and national origin discrimination

For discrimination, this Court recognizes that one method of establishing a prima facie case is showing: "(1) he is a member of a protected group; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated differently from those outside the protected class." *Memon,* 779 F. Supp.2d at 632. Each element exists here. Mr. Ahmed is a member of a protected class, qualified for the position, and suffered adverse conditions of his employment that those outside his protected class did not have to endure.

As shown in his statement of facts, Mr. Ahmed's employment was conditioned on him shaving his beard where others outside his protected class were not told to shave. He had to work without a body camera, a properly functioning gun and Taser, a full uniform (including a jacket and beanie), a badge, and an id card. Others outside his protected class, including Raymond Rodriguez, a Hispanic male, had the privilege and convenience of working with these items. This left Mr. Ahmed working under terms and conditions that were significantly less safe than the conditions that the other security officers worked. Mr. Ahmed was also blocked from working additional accounts in order to get more overtime hours where others were not. Mr. Ahmed was placed under suspension and ultimately terminated after using force, which defense alleges violated Allied's policy. The suspension and termination process was set in motion by Allied's Manager Patrick Freeney (the ultimate decision maker), and was based on false information, making the review tainted from the start. By contrast, Raymond Rodriguez's (Hispanic man) use of force (brandishing

and using a Taser, and handcuffs) did not result in any use of force report or subsequent review process. And security officer Rodriguez was not terminated.

On existence of a prima facie case, the motion only challenges whether (1) anyone at Allied knew plaintiff was Kurdish and (2) someone else was treated differently. *See* Motion at p. 15. There is evidence from which a reasonable juror can find both.

### a.    A reasonable juror can find knowledge of membership in a protected class.

[I]t is not necessary to show that the alleged discriminator knew the particular national origin group to which the complainant belonged. . . . [I]t is enough to show that the complainant was treated differently because of his or her foreign accent, appearance, or physical characteristics.

> — *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401 (5th Cir. 2007)
> (quoting EEOC's *Guidance on Discrimination Because of National Origin*
> and reversing summary judgment)

In *WC&M*, a trial court granted summary judgment, ruling that alleged discriminatory statements did not specifically reference the employee being from India. *See id.* at 399. Those statements included, "This is America. That's the way things work over here. This is not the Islamic country where you come from." *Id.* at 402. And references to the employee being *Taliban* and *Arab*. The Fifth Circuit reversed summary judgment, noting that references to national origin generally suffices—even when inaccurately describing the employee's actual country of origin [India]. *See id.* In short, knowledge of national origin and race is not cribbed. Indeed, it need not even be segregated from associated forms of discrimination. As this Court recognized in denying summary judgment, "[w]hen a plaintiff's race, religion, and national origin are commonly associated with one another, it is difficult, and unnecessary, to consider whether the various allegedly discriminatory incidents that plaintiff relies upon for his ... claims clearly point to either race-, religion-, or national-origin-based discrimination." *Memon v. Deloitte Consulting, LLP,* 779 F. Supp.2d 619, 634 (S.D. Tex. 2011) (Rosenthal, J.).

Here, defense contends there is "there is no evidence that anyone at Allied, including those on the panel who recommended his termination, even knew Plaintiff was Kurdish or of Kurdish ancestry." Motion at p. 15. This is unrequired. Ahmed presents evidence that Allied's Supervisor and Manager knew Ahmed said, "I need to keep my beard because of my religion," his employment paperwork and resident card showed he was from Iraq, his first and last name are foreign sounding, and he has an accent [which the manager made fun of]. Plus, much like in *WC&M*, he was told "this is America, we do things differently here, if you don't like it go back where you came from." And worse, he was called a "sand-nigger." From this, a reasonable juror can find sufficient knowledge of Ahmed's race, religion, and national origin.

### b.    A reasonable juror can find different treatment.

Defense contends "Allied terminated non-Kurdish employees, which negates the fourth element of Plaintiff's *prima facie* case." Motion at p. 15. This is akin to someone claiming they cannot be racist because they have a black friend. The prima facie case involves showing someone outside the protected was treated differently—not the employer showing anyone within the protected class was treated the same. Here, a reasonable juror can find another security officer (Raymond Rodriguez) was outside Ahmed's protected class and used *more* force (brandishing and using a Taser, and handcuffs) but it did not result in any use of force report or subsequent review process.[19] Besides, Ahmed's testimony and records demonstrate that he did follow Allied's use of force policy. Allied Manager Freeney's denial that Mr. Ahmed told him about the threat to his safety [belief the drunk trespasser had a knife, coupled with the threat to cut Ahmed] cannot negate Mr. Ahmed's testimony and records for summary judgment purposes. And unlike Ahmed, security officer Rodriguez was not terminated. This suffices for a reasonable juror to find differing

---

[19] *See Turner v. Kan. City S. Ry. Co.,* 675 F.3d 887, 892-93 (5th Cir. 2012) ("This court has held that [i]n work-rule violation cases, such as the instant case, a Title VII plaintiff may establish a prima facie case by showing either [1] that he did not violate the rule[,] or [2] that, if he did, white employees who engaged in similar acts were not punished similarly.")

treatment. A reasonable juror can also find non-Kurdish or non-Muslim employees were permitted to wear beards. And were given proper equipment.

A reasonable juror can also find a prima facie case of discriminatory treatment via harassment. As Justice Kavanaugh has noted, "[I]n my view, being called the n-word by a supervisor — as [Plaintiff] alleges happened to him — suffices by itself to establish a racially hostile work environment. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring). The recent Fifth Circuit case of *Woods v. Cantrell*, 29 F.4th 284 (5th Cir. 2022) is instructive. The district court in *Woods* dismissed plaintiff's harassment claim holding "a single utterance of a racial epithet" could not support the claim. *Id.* at 285. The Fifth Circuit reversed citing then Judge Kavanaugh's concurrence in *Ayissi-Etoh. Id.* Here, Allied's Manager repeatedly told Mr. Ahmed to "go back where [he] came from," threatened to physically harm him, threatened to put him in jail, take away his license, called him a dumbass, and called him a sand-nigger. This was more than a "single utterance of a racial epithet." In sum, a reasonable juror can find a prima facie case of race-, religion-, and national-origin-based discrimination.

### 2. A reasonable juror can find a prima facie case of retaliation

*To establish a prima facie retaliation claim, a plaintiff must show that (1) he engaged in conduct protected by Title VII; (2) he suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action.*

— *Martinez v. Univ. of Tex. at Austin*, No. 23-50036
(5th Cir. Oct 05, 2023), ECF No. 00516921601 at p. 7
(reversing summary judgment on prima facie case of retaliation)

Defense only disputes the existence of this third element—contending that termination preceded protected conduct, focusing on the hotline complaint and EEOC charge as the protected activity. *See* Motion at p. 24. But a reasonable juror can find relevant opposition preceded termination. Specifically, Ahmed engaged in protected activity when he requested to keep his

beard for religious purposes, reported discrimination to Allied's HR Coordinator Barnes on January 31, 2022, opposed Patrick Freeney's discrimination on April 6, 2022, and reported the discrimination harassment via email to HR Coordinator Barnes on April 25, 2022.

### 3. A reasonable juror can find pretext.

> Discrimination, unfortunately, exists in forms as myriad as the creative perverseness of human beings can provide.

—*McCorstin v. United States Steel Corp.*, 621 F.2d 749, 753-54 (5th Cir. 1980).

Evidence of pretext, in turn, is similarly unlimited. Pretext evidence "may take a variety of forms."[20] This evidence must be viewed as a whole. As the Fifth Circuit explains, an employee can establish pretext by showing an employer's "proffered explanation is false or unworthy of credence."[21] The employee does so if "this rebuttal evidence, *when viewed as a whole* and in the light most favorable to [employee], casts doubt on [employer's] proffered non-discriminatory reasons ... and undermines its credibility."[22]

Among the various ways an employee may demonstrate pretext are these: statements exhibiting animus by a decision-maker,[23] departure from typical policies or procedures,[24] ignoring

---

[20] *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989), *superseded by statute in part on other grounds*, 42 U.S.C. § 1981(b); *accord Robinson v. Jackson State Univ.*, 714 Fed. Appx. 354, 362 (5th Cir. 2017) (per curiam) (unpublished) ("Evidence of pretext 'may take a variety of forms.'"); *Ellerbrook v. City of Lubbock*, 465 Fed. Appx. 324, 333 (5th Cir. 2012) (per curiam) (unpublished) (emphasizing the variety of ways in which an employee may show pretext).

[21] *Vaughn*, 665 F.3d at 637 (citing *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)).

[22] *Id.* at 639 (citing *Reeves* 530 U.S. at 147) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

[23] *Laxton*, 333 F.3d at 583 ("An oral statement exhibiting discriminatory animus may be used to demonstrate pretext or, as is the case here, it may be used as additional evidence of discrimination."); *Russell v. McKinney Hospital Venture*, 235 F.3d 219, 225-26 (5th Cir. 2000) (discussing how statements that may not be direct evidence of discrimination may still prove pretext post-*Reeves*).

[24] *See, e.g., Russell*, 235 F.3d at 224; *Robinson*, 714 Fed. Appx. at 362 (5th Cir. 2017) (per curiam) (unpublished); *Pruitt v. Dallas Indep. Sch. Dist.*, No. 3-04-CV-0554, 2006 U.S. Dist. LEXIS 33054 * at 21 (N.D. Tex. Apr. 21, 2006

prevention practices,[25] set-up for failure,[26] suspicious documentation,[27] inconsistent statements,[28] expressions of anger after protected activity,[29] temporal proximity,[30] or simply demonstrating the employer's reason is false.[31] All exist here. Though addressed separately below, this is simply for the Court's ease of reference, and not to compartmentalize the analysis of each. As the U.S. Supreme Court noted in a different context: "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."[32]

Additionally, the prima facie case *itself* is pretext evidence that creates an inference of discrimination. Even though "the presumption of discrimination drops out of the picture once the defendant meets its burden of production . . .the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . .on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 (1981)). "Indeed, there may be some cases

---

[25] *Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975).

[26] *See Allen v. United States Postal Serv.*, 63 F.4th 292, 303-04 (5th Cir. 2023).

[27] *Evans v. Houston*, 246 F.3d 344, 355-56 (5th Cir. 2001).

[28] *See, e.g., Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017); *Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002); *Burton v. Freescale Semiconductor, Inc.,* 798 F.3d 222, 237 (5th Cir. 2015); *Miller v. Raytheon Co.,* 716 F.3d 138 (5th Cir. 2013)

[29] See *Laxton*, 333 F.3d at 583; *Starnes v. Wallace*, 849 F.3d 627 (5th Cir. 2017) (Evidence of pretext included, among other things the company President's "angry raised voice" after protected activity.); *Waterman v. McKinney Indep. Sch. Dist.*, No. 4:13-CV-170, 2014 U.S. Dist. LEXIS 130736, at *20 (E.D. Tex. 2014)

[30] *See, e.g., Evans*, 246 F.3d at 354 (5th Cir. 2001) ("We note that a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes.") (quotations omitted).

[31] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional [retaliation or] discrimination."); .

[32] *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Burdine*, 450 U.S at 255 n.10.

### a. Exhibiting racial, religious, or national origin animus

After *Reeves v. Sanderson Plumbing Products, Inc.*,[33] the Fifth Circuit ruled statements exhibiting animus demonstrate pretext—even if not direct evidence of discrimination under prior precedent. *See Laxton,* 333 F.3d at 583; *Russell* 235 F.3d at 225-26; *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) ("Where a plaintiff offers remarks as circumstantial evidence alongside other alleged discriminatory conduct, however, we apply a more flexible two-part test."). Thus, a statement demonstrating decisionmaker animus can show pretext regardless of whether it also qualifies as direct evidence of discrimination. A reasonable juror could find animus via Allied Client Manager Freeney's statements. "[T]he jury is permitted to infer discriminatory animus from [such] remark[s]."[34]

### b. Inconsistent statements

> We have also found an employer's rationale "suspect" where it had "not remained the same" between the time of the EEOC's investigation and the ultimate litigation.

—*Burton v. Freescale Semiconductor, Inc.,*
798 F.3d 222, 237 (5th Cir. 2015)

In its motion, defense claims that neither Manager Freeney nor Supervisor Zepeda asked Ahmed to shave. (Doc. 27, ECF p. 14 at *v.*). It goes on to claim *even if they did*, Ahmed did not mention his religion. *Id.* In its Position Statement to the EEOC, however, Allied represented to the EEOC:

> [Ahmed] was advised that, pursuant to Company policy, he needed to have his beard neatly trimmed to conform to the contours of the face. When Mr. Ahmed responded that he could not shave his beard due to his religious beliefs, Mr. Zepeda informed him that exceptions may be made for religious reasons as an accommodation and that Mr. Ahmed would need to speak to Mr. Freeney or human resources regarding an

---

[33] 530 U.S. 133 (2000).

[34] *Laxton,* 333F.3d at 583.

accommodation request. Mr. Zepeda also reiterated that he did not have to shave his beard completely and that it could look like his did, which was approximately one inch long. Mr. Ahmad's [sic] beard was approximately three inches long at that time. . . .

A few weeks later, while Mr. Zepeda was performing uniform inspections, **he noticed that Mr. Ahmed had not trimmed his beard. He reminded him** of the requirements unless he had obtained an approved accommodation request.

App., p. 589.

Likewise, Allied now claims that because of supply issues Ahmed did not receive a body camera. (Doc. 27, ECF p. 14 at ¶ 2). To the EEOC it represented that Ahmed eventually received both a baton and body camera. App., p. 590 ¶ 3).

### c. Departure from policies and prevention practices.

Allied says its "standard" is to immediately investigate reports of discrimination. App., p. 270:11-22). And that it is against Allied's policies to ignore reports of discrimination or harassment. App., p. 211:22-25). That no report of discrimination should ever be ignored. App., p.260:24-1. Allied's HR Manager agrees that ignoring reports of discrimination could create an unsafe working environment for the reporter and lead to continued harassment and unfair discipline. App., p. 271:14-272:8). Mr. Ahmed reported discrimination on January 31, 2022[35], April 6, 2022,[36] and April 25, 2022.[37] It was not until his reports on May 25, 2022 that Allied acknowledged his report and started an investigation. A reasonable juror could find that Allied *choosing* not to follow its established policy of immediate investigation—a policy aimed at protecting workers from discrimination and retaliation—makes its proffered explanations unworthy of credence.

For the investigation into his use of force and ultimate termination, Allied again failed to follow its policies and procedures. It did not include Mr. Ahmed in the "solution team" responsible for conducting the root cause analysis. (Allied incident report procedure). It did not include

---

[35] App., p. 19 ¶ 60.
[36] App., p. 26 ¶ 86.
[37] App., p. 19 ¶ 91.

photographs or video. It did not even allow Mr. Ahmed to provide his own statement of events. (SOF).

      **d.**    **Setup for failure and suspicious documentation**

> In some companies managing out can even include making an illegal firing appear legal. It involves setting up an employee with documentation that makes him look like a poor performer so he can be fired "for good cause."

—CYNTHIA SHAPIRO, CORPORATE CONFIDENTIAL:
50 SECRETS YOUR COMPANY DOESN'T WANT YOU TO KNOW
– AND WHAT TO DO ABOUT THEM 5 (St. Martin's Press 2005).

In *Allen v. USPS* the Fifth Circuit reversed summary judgement where the employee demonstrated via affidavit how her USPS supervisors "undermined her efforts to succeed," and set her up to fail so that she could be terminated for poor performance. *Allen,* 63 F. 292, 296. Like *Allen*, Ahmed has also averred via his declaration and deposition that he was blocked from submitting a full report of the incident that led to his termination. Though the "root cause analysis" that Allied conducted states Ahmed refused to provide a statement, that is contradicted by his testimony. Curiously, Allied's own documents show that Ahmed's supervisor Alex Bergeron was demoted for not ensuring Ahmed complete an incident report (contradicting the assertion that he refused to submit a statement—a point that purportedly contributed to the termination decision.) *See* App. p. 706-707, 697. Ahmed's testimony also details that he verbally told his Allied supervisor and Manager that he was threatened to be cut with a knife—a detail supported by his contemporaneous phone note. A detail that would have shown him to be in compliance with Allied's use of force policy.

Similarly, the documentation surrounding Ahmed's supposed discipline and termination is suspicious. Ahmed never saw the forms until well after he filed his charge of discrimination with the EEOC. Allied HR had to ask its Manager Patrick Freeney for the forms, which then appeared

to be falsified. (SOF). The purported termination form is also concerning. Allied claims that Ahmed was terminated "on or about April 7, 2022," yet the termination form states April 5, 2022. *See* App. p. 165. It is also visibly written with different colored ink. *Id.* A reasonable juror could believe that the forms were created only after Allied's HR representative began investigation Mr. Ahmed's report of discrimination. *See, e.g., Evans,* 246 F.3d at 355-56 ("We find that backdating the demotion notice could support a theory that the City was attempting to make it appear like Evans was demoted during her probationary period for the routine reason that her work was unsatisfactory. That would certainly support an argument of pretext. Thus, there is a fact question on whether the notice was backdated, and this fact question, along with the other evidence adduced by Evans, goes straight to the heart of the issue of pretext.")

### e.    Expressions of anger and temporal proximity

Patrick Freeney was visibly angry after Mr. Ahmed's voiced opposition to discrimination. And he quickly moved to terminate Ahmed just days after that voiced opposition. This too is powerful *evidence of pretext. See, e.g., Watkins v. Tregre,* 997 F.3d 275, 285 (5th Cir. 2021) ("Within two days after Watkins gave Lieutenant Carmouche the doctor's note, [he] initiated the disciplinary-review-board request that resulted in her firing; this 'carr[ies] significant weight' in our pretext inquiry.")

### VII.    CONCLUSION & REQUESTED RELIEF

There are disputed issues of material fact that warrant a jury trial. Twana Ahmed respectfully requests that the Court deny Defendant's summary judgment motion and grant such other and further relief to which he may show himself entitled.

Respectfully submitted,

*/s/Amanda C. Hernandez*
Amanda C. Hernandez
Attorney-in-charge
Texas State Bar No. 24064411
Southern District Bar No. 1531045

AH Law, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057
T: (713) 588-4359
F: (281) 572-5370
amanda@ahfirm.com

*and*

Amy E. Gibson
Of Counsel
Texas State Bar No. 00793801
Southern District Bar No. 20147
amy@gwfirm.com

David L. Wiley
Of Counsel
Texas State Bar No. 24029901
Southern District Bar No. 34134
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Twana Ahmed*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 22, 2025, she filed the foregoing *Response in Opposition to Defendant's Motion for Summary Judgment* via the Court's CM/ECF system, accordingly effecting service on Defendant's attorneys of record.

<u>*/s/Amanda C. Hernandez*</u>
Amanda C. Hernandez