IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Twana Ahmed, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | No. 4:23-cv-02823 |
| | § | |
| Universal Protection Service, LP, d/b/a | § | Jury |
| Allied Universal, | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

---

**APPENDIX IN SUPPORT OF TWANA AHMED'S RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**INDEX OF EXHIBITS**

**1**  Declaration of Twana Ahmed                                          3

**2**  Declaration of Mauro Siboldi                                       166

**3**  Allied Universal 30(b)(6) deposition excerpts                      173

**4**  Twana Ahmed deposition excerpts                                    281

**5**  Allied Human Resources Manager K. Alyea deposition excerpts        524

**6**  Allied Code of Ethics excerpts                                     542

**7**  Allied anti-discrimination and harassment policy excerpts          544

**8**  *EEOC v. Allied Universal* 2018 Consent Decree Order               552

**9**  Allied article — Allied named to fastest growing company list      572

APPENDIX 000001

**10** TIME article: *The Problems Inside North America's Largest Security Firm*    575

**11** Allied EEOC Position Statement    587

**12** Allied use of force policy    594

**13** Calvin Brown deposition excerpts    604

**14** Allied emails concerning T. Ahmed discrimination and harassment reports    633

**15** Patrick Freeney text — quitting    658

**16** Patrick Freeney separation form    660

**17** March 6, 2022 Allied Elite security officer list, including Raymond Rodriguez    664

**18** Allied Incident Reporting & Response Policy    669

**19** Allied emails discussing P. Freeney use of force report about T. Ahmed    679

**20** P. Freeney submission form terminating T. Ahmed April 26, 2022    701

**21** Allied discipline form demoting Alex Bergeron    706

**22** Civil Rights Act of 1866 (Section 1981) excerpts    708

**23** Civil Rights Act of 1964 (Title VII) excerpts    710

**24** Texas Commission on Human Rights Act (TCHRA) excerpts    713

APPENDIX 000002

# Exhibit 1

# Declaration of Twana Ahmed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Twana Ahmed, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:23-cv-02923 |
| | § | |
| vs. | § | Jury Demanded |
| | § | |
| Universal Protection Service, LP d/b/a | § | |
| Allied Universal Security Services, | § | |
| | § | |
| *Defendant.* | § | |

## DECLARATION OF TWANA AHMED

1. My name is Twana Ahmed. The facts and statements that I make in this declaration are true and accurate to the best of my recollection. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration. I was told that "personal knowledge" means that I personally witnessed or experienced something using one or more of my senses, like sight, hearing, smell, or touch. I was also told that "personal knowledge" includes how I feel.

2. When I talk about accurate copies of documents, pictures, videos, or images in this declaration, I'm talking about the documents, pictures, videos, or images without the things that I understand an attorney or law firm might add: (1) letters and numbers at the bottom — what I'm told are called "bates-labels" or "bates-numbers," (2) redactions, (3) highlighting, and (4) blue boxes around text, photos, or images. Unless otherwise stated or apparent from my testimony, any bates-labels, redactions, highlighting, or blue boxes were not part of the originals.

3. One of my attorneys added the captions and typeface in this declaration. The captions are not part of my testimony.

APPENDIX 000004

**Basics: race, religion, national origin, work experience**

4.  I am a Middle-Eastern, Kurdish male. I am over 18 years old. I am originally from Iraq; I was born in Iraq. I am Muslim. I practice Islam. I have been a Muslim since I was born.

5.  I became a United States resident in 2012. I speak a few different languages. My first language is Kurdish. I am also fluent in Arabic. I learned to speak some English as a young boy around 10 or 11 years old. In the past I have worked with the United States military translating verbal conversations from Arabic or Kurdish to English. When I speak English, sometimes words are difficult for me to say because of the accent. I've been told before by several people that I have an accent when speaking English. Writing in English is more difficult for me. It takes me some time to write and read in English. For writing in English, I sometimes use an app to help me write things by just speaking into the microphone. For example, I use a note app on my phone and speak what I would like to write down in English, then the app will write down what I am saying. It takes a while. And it is not always spelled the right way. Or if it does not understand what I am saying, sometimes the app writes down other words. Other times I use google translate (or something like that) to translate spoken and written words from Arabic to English.

6.  I have a lot of experience working as a security professional. After moving to the U.S, I worked as a security officer for Spartan, Eagle Security, and USAPD Security. I was also trained by the United States Army for security detail.

**Allied Universal: hiring and knowledge of Twana Ahmed's race, religion, and national origin**

7.  In 12/2021 I applied for a job with Allied Universal. I was scheduled for an interview on 12/13/2021 at an office. An accurate copy of the email scheduling me for the interview is attached as exhibit A.

8.  When I got to the location listed in the email, I told the receptionist that I was there for an interview. The receptionist told me Allied was having a hiring event at a different location and they would do the interview over there. She gave me the address, which was for a Marriott hotel off of Westheimer Road in Houston. I went to the hiring event that same day.

9.  When I got to the hiring event, I went to a table where there were two ladies sitting. One of the ladies, who told me she was from the Philippines, asked me what kind of license I had. She started reviewing my driver's license and security license. At

APPENDIX 000005

the time I had a Texas Commissioned Armed Security License. I told her that I speak a few different languages. She told the other lady, something like, "He has everything, we need to put him with the Elite." I remember hearing that they were short of staff and needed people fast, especially because of the busy holidays coming up.

10. I learned the "Elite" security officers are armed security officers for H-E-B owned grocery stores. And that the Elite security officers work at H-E-B, and the other grocery stores that H-E-B owns like Central Market, Mi Tienda, and Joe V's. That is the job that I was offered and I agreed to work. During my time working for Allied I worked at different H-E-B locations, and I worked at the Central Market by the Galleria, and Mi Tienda on Little York Road in Houston.

11. Then, the other lady told me to stand against the wall and she took a full body picture of me. She called the account manager at the time and told him that she had sent him a picture of me. She told me something like, "They want you. We need you to start as soon as possible." That was about it for the interview. Based on what I saw and heard, it seemed to me they just wanted anyone that had a Texas Commissioned Armed Security License ("security license").

12. After that, either that day or a couple of days later, I was at the same hiring event and I was taken to a room with a woman who I now know to be Catherine Barnes (Allied's Human Resources Coordinator), and another person. I sat down and they had paperwork and a lot of computers there. Probably 10-15 computers. Catherine handed me a lot of paperwork and told me, "Sign here, sign here," without explaining what any of the paperwork meant. Someone told me not to worry about reading the paperwork. This was Catherine Barnes' email signature during the time that I was working for Allied:



13.  I understand that Allied says they did not know my race or ancestry, my religion, or where I was born. These are examples of ways that they did know:

14.  My first language is not English. When I speak English, sometimes cannot pronounce some words or do not know some words. I speak with a different accent. Some words are hard to say because of the accent.

15.  I remember filling out a form that had to do with my security license. The form asked for my country of birth, and I listed Iraq. This is what the top of the form looks like:



An accurate copy of the empty form is attached as exhibit B.

16.  I also remember that someone copied my permanent resident card. It also lists my country of birth as Iraq. An accurate copy of my resident card is shown below and also attached as exhibit C.



APPENDIX 000007

17. About a week after I started working at H-E-B, Allied's Human Resources Coordinator Catherine Barnes asked me to come in and fill out some forms. I met with her on 12/29/2021. I remember that one of the forms I filled out was the same Texas Department of Public Safety security license form that I filled out before. The form that I filled out is attached as exhibit D. I also had to re-fill an I-9 form to correct an error with my date of birth. Catherine also copied my permanent resident card again at that time. Both the Texas security license form and my permanent resident card list my country of birth as Iraq.

18. Based on what I observed, it is my opinion that Allied knew that I was Muslim. For several reasons. Because of my name. Because of where I was born, in a country known for having a population that is almost all Muslim. Because of my Middle-Eastern accent. ,And because I told them, my supervisor and my manager that I needed to keep my beard for religious purposes. Based on my experience, most people know that it is part of practicing Islam for men to keep a beard.

**Allied Universal: rushes to put armed security guards out in the field: no discrimination and harassment training.**

19. There were other people in the hiring event room also filling out paperwork and on the computers. I don't remember exactly what they did on the computer, but some of it was asking for my bank account, address, and phone number. There was no actual training that day. There was nothing on the computer about harassment or discrimination, or anything like that. If I had any problem filling out the information, Catherine would tell me what to do.

20. I signed everything. I did not read everything, but I did notice part of the paperwork included some certificates. I believe they were the certificates attached as exhibit E.

21. The certificates say that I completed a new employee orientation and discrimination and harassment training on 12/15/2021. I did not complete any orientation that day. For the entire time that I worked for Allied, I do not remember Allied or anyone from Allied ever giving me any training on discrimination or harassment. I do not remember Allied or anyone from Allied giving me any new employee orientation.

22. About a month after I was first hired, in 01/2022, one of the supervisors told me I needed to go to training for the Elite program. I remember the training was for

APPENDIX 000008

seven days. Part of the training was at a gun range somewhere by Sealy, Texas. The other part was at the Allied office on Interstate 45 in Houston.

**Allied Universal: pressures its Muslim officer to shave even after requests to keep the beard for religious purposes**

23. The first time I met Patrick Freeney was in that Elite training class on Interstate 45. He came in and introduced himself to the whole class. I remember learning he had just been hired with Allied not too long before that. He said he was the new account manager of the H-E-B account. He said he was our boss. After that he left. We continued the class.

24. This is an accurate copy of Patrick's email signature after he became my new manager and for the rest of the time that I worked for Allied.

Patrick G. Freeney
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802

25. Patrick Freeney was there going in and out, in and out. I believe he was supposed to take the training with us, but he never actually stayed for the training, he kept coming in and out. I remember specifically that he kept coming in and out because the instructor was trying to teach us and we kept getting interrupted when he would come in.

26. One time he came in and someone asked him a question. The person that asked a question was a Hispanic male with an accent. Patrick started making fun of him, and saying "duh duh duh duh duh." At the same time, Patrick picks up his hand and interrupted the guy, moving his hand like a doll that you would move the mouth with your hand. I remember Patrick didn't answer the question and just walked off.

27. I observed other people asking questions, and Patrick was not answering those questions either. I also asked a simple question. Patrick did not acknowledge my question. Patrick seemed to me to ignore my question and instead just kept talking. In my opinion, based on everything I saw and heard, it seemed like Patrick did not want to answer anybody's questions. In my opinion, from what I was observing,

he was rude and disrespectful, and was ignoring questions. For example, if you were talking, he would cut you off right away and not answer the question.

28.  During one of our fifteen minute breaks, I was standing by the door. I was wearing a facemask, so you couldn't really see my beard. Patrick came up to me and told me, "You need to shave your beard." I told him that I have my beard for religious purposes. He said something like, "it is policy to shave your beard." When I went to sit down, I asked Mauro Siboldi, a Hispanic Elite security officer that was in training with me, if they asked him to shave his beard. He said no. I told him that Patrick just told me to shave my beard.

29.  Then when we were in class, and before the class started again, Supervisor Mauricio Zepeda came inside the room, and saw me, and told me, "You need to shave your beard." I turned around, looked at everybody, a lot of them had a beard. But I did not hear him tell anyone else that they needed to shave their beard. I said, "I have it because of a religious reason." He said something like, "it's a policy of the company." I thought it was weird that Patrick just told me the same thing, and then he comes in and tells me to shave my beard. My beard was trimmed up and clean. It was not messy.

30.  This is a picture of me on the right and Monroe McClain, Allied's training instructor on the left. This is what my beard looked like during the training class. The picture is also attached as exhibit F.



31.    This is a picture of some of the people in my training class. I am not in the picture. If you look closely, even with masks on, you can see that many of the guys have beards. A copy of the picture is also attached as exhibit G.



32.    After the Elite training class, a few weeks later, when it was still cold and still Winter, I was working at an H-E-B site on San Felipe Street and was told again that I needed to shave my beard. It was supervisor Mauricio Zepeda again. I had

already told him in the past that it was part of my religion. I told him again that I had a beard for a long time and it's part of my religious belief to have one. Zepeda told me "You need to shave your beard, it is policy of the company, you can't have facial hair."

33.  A day or two later I shaved my beard. I felt like I was missing a part of me. I felt like I had to shave to keep my job. I did not want to be fired for breaking a policy. It made me depressed. My beard has been with me for years. It hurt me and I felt like I was discriminated against. But I shaved it because I needed the job to take care of my family, and I needed the money. I felt like I had to do what I had to do to keep my family fed and myself fed.

34.  After that, I was switching posts one day at the H-E-B on San Felipe Street in Houston. A Hispanic male with a beard around eight to twelve inches long was there working, and I was relieving him—he was an Allied Elite Security Officer too. I asked him, hey did they ever tell you to shave your beard? He laughed and said something like, "no, no one told me to shave."

35.  I've seen other Allied Elite Security Officers with beards, also with longer beards than mine. Here is a picture that I took of one of them. It is also attached as exhibit H.



36.  No one from Allied ever told me I could keep my beard with a religious accommodation.

**Allied Universal: withholds equipment from its Middle-Eastern, Muslim, Iraqi officer that others are issued.**

37.  I understand that Allied says they did not treat me differently than other security guards because of my religion, national origin, or race. Besides making me shave my beard and not telling other security officers to shave, these are more examples of ways that I was treated differently than other security officers that were not Muslim, Middle Eastern-Kurdish, from Iraq:

38.  I know now that one of the forms that I signed during the hiring event was this ID badge receipt form. A copy of the form is attached as exhibit I.



39.  Allied never gave me an ID badge. They never gave me an Allied metal badge or an Allied photo ID card, which was a required part of the Elite uniform. I saw many Elite security guards with these equipments. Some were Hispanic males, or white males, and some were Black males.

40.  While I was working for Allied, I asked my supervisors for a badge and an Allied photo ID card at least ten times. I was told something like "they don't have any more cards, that is why you don't have one. "Or they would say "you'll get it later on." But I know that is not true, because I saw people at some of the posts where I worked that had photo ID cards. When I asked those people when they were hired, I learned they were hired after me. I was also at the office on Interstate 45

one day and I had asked one of my supervisors, when am I gonna get my picture ID card? He said something like, "we don't have the cards." As I was walking out to leave the office, I saw a Black, thin, short- haired male Allied security guard picking up a picture ID card. The receptionist was giving it to him. I saw her printing out the ID card.

41.    Supervisor Zepeda came to the H-E-B  on San Felipe Street in Houston while I was in the field a few times. I would ask him, "when am I going to get my proper equipment, I don't have a metal badge, I don't have a body camera. When am I going to get my stuff?" He said something like, "don't worry about it, you'll get it." I've seen many officers with body cameras, Allied ID's and Allied metal badges out in the field. The Black officers in exhibits H and J also have them. And Raymond Rodriguez, a Hispanic male working for Allied as an Elite security officer had them.

42.    The uniform I got was not the correct uniform. Allied gave me a yellow shirt and black pants. Elite officers are supposed to wear navy blue. Below is a picture of what the Elite uniform looks like. It is also attached as exhibit J.



43.   Below is an accurate picture of the shirt that Allied gave to me. I was also not given an Allied jacket.



44.   I wear size small. The shirt that Allied gave to me was about four times my size. The pants that Allied gave to me were about three times my size. They were really long and from the stomach area they were really wide. I was not able to wear them. I told Allied the pants and shirt were not my size. They said just put them on, we need you to work today. That is all we have for now. After I had been working in the field, I saw people working in the field that were hired after me that were getting the navy colored uniform. To my knowledge, they were not Kurdish, or Muslim, or from Iraq.

45.   I was also given equipments that was broken or didn't work. I was issued a gun and a Taser that didn't work, when the other officers got guns and Tasers that worked.

46.   Allied knew that my gun was broken. When we trained at the gun range for a few days. One of the final days of training at the gun range everyone had to shoot targets to qualify, like a test. Monroe, Allied's instructor gave us the ammo. Each of us had to shoot a certain number of rounds. We were lined up to shoot the targets. And every time I pressed the trigger; my gun would malfunction. It would fire the first round, and the casing was supposed to eject, but it would get stuck in the barrel, so the second round could not reload in the gun. And then I had to clear it—take the magazine out and pull the slide to the back to make sure the casing would eject, and then re-load the gun and shoot again. And it would jam again. The entire time the gun was jamming. Everyone else was shooting. Some of the guys that were with me, they had never shot a gun before, never held a gun before, and they qualified—passed the test way ahead of me.

47.  I told Monroe, that my gun was not working, it was malfunctioning. We went all the way to the back, we put CLP gun oil on it, and went back to shoot again. And the gun jammed again. One of the guys was right next to me. He even told me he never shot a gun and had the least experience. He pointed the gun at my feet and I had to say loudly at him, "hey man you're pointing the gun at my feet." He qualified way ahead of me.

48.  We had to go to the back again. Monroe took the gun apart. He took the barrel out, and took the spring out. He said, something like "I know what's wrong with it, the spring is bent. We can replace it for you later on. I'm gonna give you a different gun to qualify with." I took a different gun and I qualified right away.

49.  This picture below was taken after I qualified. It is also attached as exhibit K. You can see that there are two scores marked on the paper. One of the scores is crossed out. I was not hitting the targets because the gun kept jamming on me. I had to do the test again with the borrowed gun and then qualified right away. The second score that is not crossed out is the score I got with the borrowed gun.



50.  Monroe took his gun back and gave me the broken one. The broken gun is the gun that I had to use for the rest of the time that I was working for Allied.

51. I am familiar with guns and I think Allied never should have let anyone go to work with that gun because it was in such bad condition. Not too long after that training I told my supervisor, my gun is not working, I need a new one. He said something like, "we're gonna look into it."

52. One time I went to the Allied office on 45 and I gave Monroe a gift. Traditionally, in Islam, you give sweets to show appreciation. I gave Monroe and Catherine Barnes some Baklava. When I was there, I told Monroe, "Hey, I still have my same gun, the one that is not working." Monroe said something like, "Let me see what I can do." The whole time I was working with Allied, Allied never gave me a new gun.

53. Allied Supervisor Zepeda was the one that gave me a Taser that same day that he told me to shave my beard. It was when I was in the field at the H-E-B on San Felipe Street in Houston. It was the second shift, the evening shift. Zepeda took me a Taser. I tested it in the field by taking the cartridge out—you flip the safety on it, and you press the trigger. I did that test and it was not working. I told Zepeda, this thing is not working. He said, "Yeah, it's dead. Just have it on you for the look of it, so they can see you carrying one." I know that other Elite officers, including Raymond Rodriguez, a Hispanic male had working Tasers.

54. I remember I was freezing. It was cold. It was winter. I had seen people working that I relieved wearing an Allied issued jacket. That day I asked Zepeda for a beanie and a jacket. He was driving a gray dodge car. He said, "we don't have any." When he opened the trunk, I noticed there were a bunch of jackets in there.

**Allied Universal: Client Manager Patrick Freeney initial harassment—racial/xenophobic remarks, physical threats**

55. Sometime in 01/2021, Allied Supervisor Alex Bergeron called me saying he had extras hours for me to work, and asked if I was willing to take it. And I said yes to him. I told him, send me the location, time and date, and all the information. The post was at an H-E-B store like 45-50 minute drive away from me. It was outside of Houston. I go there early in the morning. Before I got out of my car, I drive around, drive around, looking for the Allied patrol car. I don't see a patrol car. I get out, go inside the store, looking to see if there was a security guard. I didn't see anyone. So, I decide to call Alex. Alex was off work on that day. I said, "Hey Alex, I'm here at the post, I'm looking for the patrol car, I don't' see one. This is the day you told me to be here, and the location." He said, something like "I got no time, it is my day off, go ahead and leave and we will pay you for the time driving." I got frustrated because I drove all the way over there for nothing. So, I picked up

the phone and I called Patrick Freeney and I explained everything to Patrick. I told him what exactly happened. And I sent him a picture of the schedule.  Patrick told me to go ahead and leave, and he will get to the bottom of what was going on and he will get back with me. I left and didn't hear back from Patrick.

56.    A few days later one of the supervisors, either Mauricio Zepeda or Nathan Hernandez, called me and said, something like "why didn't you show up to work, you missed a date." And I said, "what are you talking about? I never missed a date." They said, "you agreed to a shift and you never showed up." I said "that's not right," and I showed them that I had no text messages from Supervisor Alex showing I should work.

57.    Then Patrick Freeney called me and told me I needed to show up at the office. When I arrived at the office, I texted Patrick to let him know I was there. This is an accurate picture of that text message. It is also attached as exhibit L.



58.    Patrick came and got me and took me to his office. And he starts telling me, "Why did you miss a day?" I told him I didn't miss any day. He was getting very argumentative with me, and very confrontational. I was trying to explain to him what happened exactly. In my opinion, from observing how he was acting with me, he didn't want to listen to me. He kept cutting me off and talking over me. And I was like, "I have the text messages that prove I went to the post. I called you and told you what happened that particular day. You were supposed to get back with me and you never did." And I said, "you can't listen to one side of the story, you need

to listen to both sides of the story. You need to bring Alex in here and listen to both of us at the same time." Then he starts yelling in a loud voice, "this is America, we run things different, not like where you come from. Thing's don't get run like that over here." I was shocked and at the same time I was scared. I was struggling to get the right words out, and sometimes I stutter when I speak English, because of the accent. Patrick started making fun of my accent and said, "duh duh duh duh duh, keep talking, keep talking." The way he said it made me feel like it was a threat to me if I keep talking. Then he said something like, "If you are lying to me, I'm gonna fry you like a fucking chicken." He goes, "if you're lying, I'm gonna destroy your fucking life. He was not saying it like a joke. He was saying it like a threat to me. And I felt like he was saying very discriminatory things to me, telling me that this is not where I am from, that this is America.

59. Then he said something like, "You're gonna be hearing from me." But I never heard back from him. I guess he realized I was correct. He never called or texted me and never apologized for what he did to me in the office.

**Allied Universal: does not investigate or otherwise address report of discrimination**

60. When I left Patrick's office that day I ran into Catherine Barnes. She wanted me to fill out some paperwork. She said that I was missing a paper. It turned out it was the same Texas licensing paper for the Texas Department of Public Safety that I had already filled out twice before. The same form that is attached as exhibit C. I told her, "I did this paper twice. This is the third time I do it." I filled it out again and then I asked her for help. I told her, "I have been asking for overtime and more hours because I am in a bad spot for money. I really need to work and I don't mind anywhere, if you can help me with that." Then I told her, "I wanted to say, I think I'm being discriminated against by my account manager. The way he's talking to me and the way he's taking hours away from me. I'm losing a lot of overtime. Because in the beginning when I started working with Allied, I was getting a lot of overtime. But since Patrick became the account manager, things have changed around me." She did not respond. All she ever said was "just sign."

61. I believe that Catherine Barnes told Patrick what I said. Thinking back, I remember seeing them before in the office laughing and talking together, like they were good friends.

62. I was shocked and scared after that. I got very depressed. This is when I started pulling my hairs out, from being so depressed. I still have scars from that. It

APPENDIX 000019

affected my work. I knew based on everything that happened that any small mistake or anything I did, Patrick was watching me. In my opinion he was targeting me.

### Allied Universal: Patrick Freeney's retaliation

63. About a month or so later, I was talking with Monroe, my Elite training instructor, and explaining to him that I needed overtime hours. I had heard that there are different account managers at Allied and Security Officers are able to work with different accounts. I asked Monroe if he knew anyone, so that he could help me out. Monroe told me he would check and get back with me.  Monroe later said he would help me out and talked with Ms. Travis, who was the account manager with the City of Houston. This was still an Allied job, but it would be under a different account manager.

64. Attached as exhibit M is an accurate copy of the text messages I had with Monroe about me working the City of Houston Allied account with Ms. Travis.

65. I remember talking to Ms. Travis and she said, I have 12 hour shifts with City of Houston. It was in a parking lot. She told me you cannot use your Elite equipment, like the Elite Taser. She said I would need to use my own equipment. She said, something like, "since you would be working with me too, I need to talk to your account manager to get permission from him. I would pay the overtime difference" My account manager was Patrick Freeney at that time. She got back with me later on and said, "He didn't give permission." Patrick didn't approve it. I felt like Patrick was blocking me specifically from getting overtime. Based on what I observed, I knew that other officers were allowed to work on different accounts and got Patrick's approval. In my opinion I was being targeted by Patrick.

66. On 3/19/2022, I was working at the H-E-B on San Felipe Street in Houston and I remember it was evening time. As I was patrolling, I saw someone passed out drunk on the property of H-E-B, on the sidewalk close to the street. The H-E-B manager, Meredith Rodriguez called me. She said she had people stealing in the store and she needs my help. I told her I have someone passed out over here near the store, I'm not sure what is wrong with him. Afterwards she told me she recognized him.

67. I walked over to help the manager and I saw there were two Hispanic males. One of them came towards me in the parking lot  and we were near a car, he kept coming towards me and I was getting close to being pushed up against the car. The man grabbed my hands and we started struggling. Another manager, a male came and

helped me out. The manager pushed the guy off of me. The two Hispanic males were getting very aggressive. Houston Police Department came, and the ambulance came. The ambulance checked them out, and found out that there was nothing medically wrong with them, just that they were drunk out of control. I understand that they got arrested for theft and trespassing, and they were told that they had been trespassing, and they were not allowed to come back to that property or any other property owned by H-E-B, because that was not the first time that they were stealing from that particular store. The H-E-B manager told the police they had just been stealing from the same H-E-B store the day before.  After that the manager told me, thank you for what you did, you did a great job, making sure you had everything under control.  I did not hear from Allied. I did not hear anything, but it was kind of weird, because a supervisor showed up. I asked him, are you here for the incident? He said, I don't know what incident you're talking about, but don't worry about it. I told him there were a couple of guys that got arrested and they went to jail. He didn't talk to anyone or do anything about it. I asked him if I needed to fill anything out. He said, no.

68. This an accurate picture of the two guys that were arrested on 3/19/2022. A copy is also attached as exhibit N.



The police records also attached in exhibit N provide an accurate account of what happened that day.

69. On 4/4/ 2022, I was working at the H-E-B in Bellaire, Texas. I was patrolling the property in the Allied patrol car. And the H-E-B manager, Kevin texted me a couple of pictures. He texted them to the site phone. This is a screenshot of those text messages. They are also attached as exhibit O.



70. Then the H-E-B manager Keven starts calling over and over on the site phone He said something like, "they are back on the property, I have kicked them out already and they are back in the store again." He said "they are still inside the store." I went to the second floor and I walked inside the store, and saw Kevin, the H-E-B manager. He gave me directions to where exactly they were. So, I went there and took pictures of them. They were loading their carts with beer, wine, and meat or food. This is a picture that I took of them that day. It is also attached as exhibit P.



APPENDIX 000022

71. I immediately recognized the guys from the encounter I had with them at the H-E-B on San Felipe Street in Houston. I remember that they were very violent from that encounter with them before when they were arrested. And I knew they were not supposed to step foot on H-E-B property. They had a criminal trespass warning. They were the same guys that had just been arrested on 3/19/2022 at the H-E-B on San Felipe Street. They are a team of three working together but this day they were a team of two.

72. The H-E-B manager Kevin asked me, "do you want me to call the police?" I said yes, if you want to, call them. The manager then called the police.  So I went by the door, close to the door area. The manager was about 20 feet away from me. He said, "stop them, don't let them leave with the merchandise." I believe one of the guys had already left the store. There was just one left and he was pushing the shopping cart. He walked around the cashiers and went to exit the store.

73. When he came toward me, I told the guy, "Hey, you need to go back to the register and pay for the merchandise that you have." The guy came at me with the shopping cart. I put my hand out and stopped the cart so I would not get hit with it. Then I said again, "you need to go back and pay for the merchandise. Go back behind the register." His tone completely changed and his eyes start opening up and looked angry and very red. The next part happened in a matter of seconds. He said, "move out of my way. I'm gonna cut you up, I have a knife on me." He was aggressive and hostile. He smelled very strong of alcohol. He seemed 100% drunk. And he seemed not in a right state of mind. I looked to his sides to observe anything sharp on him he might grab, and I saw by his right side of his jacket it did not look normal. I saw something shiny and I thought I saw a knife. I was scared that he was going to cut me. He appeared to me to be not in full mental capacity to be in the public. He seemed to me completely drunk out of his mind. I was worried for my safety and the safety of everyone else on the property. At the same time, I was not sure what he would do because he seemed so drunk. He could hurt me or himself, or anyone else around him. I quickly went around him and I started to put one handcuff on him. I did not handcuff him completely. He was fighting me with the other hand. Then the police arrived and said we are taking over. The police finished putting the handcuffs on, using my handcuffs.

74. The police officers did not ask me for a statement or question me at all. The police asked, where is the merchandise, and how much was it? The manager brought the amount to them. The police officer looked at it and asked, "do you want to press charges?" The manager said "no." The policer officer said something like, "well they are going to jail anyway for public intoxication." They arrested him for public

APPENDIX 000023

intoxication. I saw they had already arrested the other guy as well. I remember seeing him handcuffed behind the police car. To my knowledge, the police did not review anything like camera footage. It happened so quick; the police didn't go inside the store completely. The police left with my handcuffs. A couple hours later they came back and gave me the cuffs back. They quickly came and handed me the cuffs and then left. I went back to working and everything went back to normal until Allied Supervisor Alex Bergeron showed up.

75.    Alex showed up a few hours after the guys were arrested. I was downstairs in the patrol car when I saw Alex in an Allied patrol car in the parking lot. It looked like he had just gotten there. I did not see him ever go inside the store to talk to anyone. We both got out of the car and were standing in the parking lot. When Alex showed up he said, something like "you handcuffed somebody. You need to write a statement of what happened. He handed me the paper and I told him I write very slowly. I was trying to tell him everything that happened. I explained everything to Alex, including that the manager called me inside the store, I tried to show him the pictures. He wouldn't look at them. It seemed like he didn't want to look at anything or listen to me. Based on what I observed, it is my opinion that Alex just wanted to get out of there. I told him, "The guy threatened me. He made a threat toward me and he said he had a knife and he was gonna cut me up. I took it seriously." It seemed like Alex did not want to listen to my side of the story. Because he did not seem to be paying attention to me. As I was trying to talk to him, he was on his personal phone looking at something. He said something like, "Yeah, yeah, I understand." It seemed like Alex was in a rush. He told me something like, "you're taking too long, hurry up." I do not write in English very fast.  Usually when I write something in English I have to translate it on my phone. So, it was taking me a long time. In my opinion he was super impatient and didn't want to wait. He said something like, "don't worry about it, you don't have to finish it. Give me the paper. You need to go see Patrick tomorrow at the office in the morning. The decision has already been made." That's when I told him, "I have to work tomorrow. He said, "no, you have the day off." He took the paper and left.

76.    After Alex left, I stayed working and finished my shift, which ended when the store closed, at around 11pm. Sometime before the end of my shift I tried to write a report on my phone. I got into my phone notes app and spoke into the microphone and it converted what I said into the note attached as exhibit Q.

**Allied Universal: Patrick Freeney's retaliation and discrimination continue**

77.    The next day, on 4/5/2022, I went to see Patrick Freeney at the Allied office on Interstate 45. I told the receptionist when I got there that I was there to see Patrick.

Patrick texted me saying he would be out to get me after his meeting. An accurate screenshot of that text message is attached as exhibit R.

78. Patrick came and got me and we went into the office. He shut the door. We were sitting down. And he had his foot up against the table and he was rocking his chair. He had a statement there typed up by a computer. It was not a hand-written statement. There was a metal steel pen right next to the paper ready for me to sign.

79. Patrick said, you need to sign this document. I asked, what is this? He said, this is a statement about what happened. I said, the statement should be written by me. And that's when he flipped. The statement was not right. It said I got out of my patrol car and approached the man for no reason and then pushed and handcuffed him. It is not true.

80. I tried to show Patrick the note on my phone. He told me "I don't want to see anything." He said something like, "this is what happened, (pointing to the typed statement), are you refusing to sign it?" He never looked at my statement on my phone. I told Patrick, "That guy threatened me." He said something like, "I don't want to listen to that bull-shit. I don't care what happened. You need to sign this form." And I said, "this is not what happened. You were not there, I was there. You didn't hear what happened. I did. I was there. It happened to me." I told him, "I didn't write this paper that you are trying to make me sign." One of the things that the paper said was that I acted alone without the manger telling me what to do. Which was not true. The manager told me to go into the store. I asked him to correct it. He said, you need to sign this paper, and he started yelling at me.

81. He yelled, "I don't give a fuck what happened or what you did or what you didn't do. You are a loose cannon. I am gonna make sure your license is taken away." At the time I thought he had authority to do that. I was really scared. He started telling me he would press charges on me and put me in jail. He said, "I'm gonna destroy your life. I will destroy you and fry you like a fucking chicken. If you don't like it, go back to where you came from." He said "you are suspended until the outcome of the investigation. How did your dumbass work for the military? You need to come back tomorrow and turn in your equipment." This made me feel like I was nothing. I thought how I was willing to sacrifice myself to serve this country, when so many other Americans are not willing to do the same, and still I'm treated like this?

**Allied Universal: continued retaliation and harassment—racial slurs, physical threats**

82. I went back the next day on 4/6/2022 to turn in my equipment, the gun and the Taser. Same as the day before, I checked in with the receptionist and Patrick came out and grabbed me. He was on the phone. He had like headphones on and he was talking to someone on the phone. We went into his office and he shut the door. As soon as I sit down, he told the person on the phone, "I've got to call you back, I'm dealing with a sand-nigger."

83. I gave him the Taser. He looked at it, he put it down. He opened the gun case. He didn't clear the gun or anything. He turned the gun toward me. I got freaked out. I moved the chair out to the side to be out of the way. I knew the gun was not loaded but it's a gun, you never trust a gun. You never know what's inside it. When he pointed the barrel toward me, he flipped the other side, and his finger was really close to the trigger. He looked at the serial number and wrote it down. The he just threw it back on the desk. I was shocked that he did that.

84. After Patrick threatened me with taking away my security license, or pressing charges on me, I was really scared about what he would do. I was worried about what Patrick would say if I left without a receipt to prove that I turned in my equipment. So, I asked him for a paper proving that I turned in my equipment. He got up and went somewhere. When he came back, I wanted to explain to him again about what happened to me. I told him that I needed to have the opportunity to fill out the report of what actually happened. He refused to give me that opportunity. He started yelling and talking over me. He said, "shut your fucking mouth and listen. You're not fucking listening to me." I got up and told him I needed to use the restroom. I got up and went to wash my hands and when I came back, I opened the door and I left the door open on purpose, to try to see if someone would hear what he was yelling at me. I think that I tried to open the door twice, but he got up both times and closed the door.

85. Patrick continued to berate me. In my opinion he was he was like a psychopath to me. And he was talking in an angry and aggressive tone of voice. I tried again to explain my situation but he would just talk over me and it felt to me like he was trying to intimidate me on purpose. Every time I tried to talk, he would go "no no no no no, we're not doing this, shut your mouth and listen." He was disrespectful in ways that I've never seen in my life. He said again, "I'm gonna fry you like a chicken. This is not like where you come from. We run things different in this country. If you don't know how to survive over here, you need to go back to wherever you came from. Clearly you do not belong here."

86. I told him, "You are discriminating against me and you are attacking me." I asked if I could see somebody over him. His supervisor or someone like that. He turned

red and his eyes bulged out. You could see the white of his eyes come out. He had a metal pen down and he tossed it down. He said something like "I don't care what you say. Nobody wants to see your dumbass." He stopped filling out the equipment return forms. Then he went and grabbed more paperwork and he was writing the serial number down and counting the bullets. I would try to talk and he said, "No I don't want to listen to that bullshit. There is nothing coming out of your mouth I want to listen to." He said, "when the investigation's over, I'm gonna make sure you're gonna be fired. Even if you're not fire-able because I don't' need somebody like you in this company."

87.   Again I was having problems saying certain words. Again Patrick would make fun of me and go, "Duh duh duh duh. Keep talking keep talking. What you're saying, it doesn't make no sense to me." Every time I tried to say something he would tell me to shut up. "Just shut your fucking mouth."

88.   All at the same time I didn't want to jeopardize my job. He was already threatening to press charges and jail me. I was trying to just swallow everything and deal with it. He says "You're suspended until the outcome of the investigation." I asked him "how long will that take?" He said, "I don't know, you will be hearing from me." I did not hear back from Patrick after that. No one from Allied ever contacted me to ask me for my statement of what happened or asked me to submit a full incident report.

89.   Five days later, on 4/11/2022, I got an email from Catherine Barnes, the same Allied HR Coordinator that I had talked with before. Patrick Freeney was copied on the email. In the email Catherine was asking me to fill out the same form again, the Texas Security form from the DPS. This is what Catherine said in the email.

**From:** "Barnes,Catherine" <Catherine.Barnes@aus.com>
**To:** "twana_202020@yahoo.com" <twana_202020@yahoo.com>
**Cc:** "Freeney, Patrick" <Patrick.Freeney@aus.com>
**Sent:** Mon, Apr 11, 2022 at 6:00 PM
**Subject:** Allied Universal Security License

Good evening Ahmed,

We are emailing you due to missing documents needed for your security license affiliation, please complete the attachment by completing the applicant information section, acknowledgments, sign and date and return asap.

An accurate copy of the email is attached as S. Allied produced a copy of the email and the attachment, but it does not show the date. Allied's copy is also attached in exhibit S. It is the same email that I received on 4/11/2022.

**Allied Universal: does not respond to or investigate written report of discrimination**

90.  I texted Catherine Barnes on 4/21/2022 asking her to call me at her earliest convenience. An accurate copy of that text message is attached as exhibit T. She did not call me or text me back.

91.  Then I wrote back to Catherine Barnes on 4/25/2022. An accurate copy of my email is attached as exhibit U. This was my email to Catherine:

> Hello Katherine this is Officer Ahmed I'm replying to your message in regards to this form I have completed this form 3 times previously I've filled it two times with you personally and once at the event at the hotel when I got hired. I wanted to let you know because I feel as though I am being discriminated against and I have been on suspension for over 2 week. I performed my duties to the best of my ability I did nothing wrong and have been under suspension for two weeks now.
>
> I have been targeted by the account manager he has been rude to me he has stated to me Racial slurs and threatened me I have been silent under the risk of losing my job. He has pulled me into office doors closing the door behind them and threaten me on the property he said he will (fry) me and to go back to my country and that there is a certain way things go in this country not where I'm from he said. I am not aware if he has had problems with other Muslim employees but he has made it clear to me that he has a problem with me.
>
> He made me shave my beard even after I told him I have to keep it for religious purposes and most recently he stated to me that he was going to make sure I get my license taken away from me and I'll never be able to work security for the rest of my life why he is threatening me like that I really don't know.
> I've never missed a day I've never called in sick I have been a good employee and have considered the interests of the property and this company. I can't even get another job because I don't know if I'll lose this one. I do not want to leave this company it has treated me well other than patricks racism I wish to continue working for this company.
>
> Please Catherine give me call back at your earliest convenience thank you.

92.  Catherine did not respond to that email. I emailed her again on 5/6/2022 asking her to please respond. She responded on 5/9/2022 saying, "This is the first email I've received." I wrote back the next day asking her what the status of my suspension was, and I told her I had written about being targeted by a manager. The following are accurate copies of the emails we exchanged after that. All of these emails I had with Allied HR coordinator Catherine Barnes are attached as exhibit V.

On Tue, May 10, 2022 at 8:01 AM, Barnes,Catherine
<Catherine.Barnes@aus.com> wrote:

Good morning Twana,

I am unfamiliar with the suspension you are speaking of nor did I receive anything detailing
your suspension. For further assistance please contact the AUS hotline for at 1-888-260-
5948.

Best regards,
Catherine Barnes
Human Resources Coordinator
Allied Universal
11811 North Freeway I Suite #810 I Houston, TX 77060
W: 832-786-3911 I **catherine.barnes@aus.com**
License # C15802



From: Twana Kaka <twana_202020@yahoo.com>
Sent: Wednesday, May 11, 2022 7:47 PM
To: Barnes,Catherine <Catherine.Barnes@aus.com>
Subject: RE: RE:

Thank you for your response but why cant I receive information from don't you handle
employee affairs and take complaints?

On Thu, May 12, 2022 at 8:11 AM, Barnes,Catherine
<Catherine.Barnes@aus.com> wrote:

Good morning,

No I do not.

Best regards,
Catherine Barnes
Human Resources Coordinator
Allied Universal
11811 North Freeway I Suite #810 I Houston, TX 77060
W: 832-786-3911 I **catherine.barnes@aus.com**
License # C15802



**Allied Universal: never tells its employee he was fired, fails to protect him from retaliation**

93.  After that, on 5/16/2022 I emailed Catherine Barnes again to ask her I was still employed by Allied or if I was still suspended or if I was fired. Catherine never responded to that email. An accurate copy of that email is attached as exhibit W.

94.  This whole time I thought I was still suspended, and no one would answer my question about if I was still suspended or not. I looked up Allied and found a different address. I remembered that with Allied you are allowed to work for different accounts. I went to a different address, a different office location and I met Krystal Balanta, an Allied recruiter there. I told her my situation and I asked if she could help me out.  And she said, we have a lot of open posts, I got plenty of posts and I can try to give you one and help you out, what is your social. I gave her my social. She typed it into the computer and she called someone from HR. Then she said, I emailed Katherine.

95.  The next day, I got a text message from Krystal saying that I was not rehirable, and I needed to contact Katherine Alyea from HR. Attached as exhibit X is an accurate copy of that text message.

96.  I emailed Katherine Alyea that same day, on 5/25/2022, and also called the hotline that same day to report what happened to me. The hotline person told me they would not write down everything, but just the most important things. Katherine told me to contact Wayne Oliver, an Allied HR Representative. A copy of those emails and the hotline summary are attached as exhibit Y.

97.  I started talking to Wayne Oliver and reported everything that happened to me again on the phone. He also asked me to send an email, which was harder for me. I never was notified that the investigation was closed. Wayne Oliver contacted me and did his own investigation. We were talking in the summer. It was hot. We were talking on the phone. He said to me, something like "I believe that you got treated unfairly, but there is nothing I can do. I believe what you said to me." And he said "there is nothing that I can do. I believe what Patrick did to you. But there is nothing I can do about that; the decision has already been made from higher up."

98.  I know that I followed Allied's use of force policy. We were instructed to use the proper force necessary for the threat. And the policy says you can use force to protect yourself or others from harm when there is a threat. A man I observed to be drunk out of his mind threatened to cut me with a knife and was being aggressive toward me. At the time I thought he had a knife on him. And he did not seem in a

right state of mind based on the way he looked and was acting. I had a gun on me and a Taser. I did not use using those. I used the lowest amount of force I thought necessary for the threat. And no one was hurt. The man was never pushed on the ground or anything like that. I believe based on what I saw, heard, and observed from other security officers that have used force at Allied, that I was setup and targeted by Patrick Freeney. He promised he would to everything he could to get me fired, and he did it because he did not like who I am or where I am from, my religion and origin.

99. The whole situation made me lose ability to sleep. I lost some of my hair, and I was pulling my hairs out without even realizing. It still affects me today. I wake up in the middle of the night sometimes and I've went to a church that was close to me and just cried and cried. It wasn't a mosque but it was a place of worship, and it was close. I was drawn there to try to feel better. What Patrick did made me very depressed. Based on what I felt and sensed and heard Patrick Freeney say and do to me, it is my opinion that he has no care for me as a human being because of my religion and where I come from. He treats people badlly, but he treated me worse. I felt like he had a target on me.

### Allied Universal: other security officers using force

100. I met Raymond Rodriguez, at H-E-B on San Felipe Street in Houston. He was also an H-E-B Elite Security Officer under Patrick Freeney. I met him there when I was relieving him from a shift. We were friendly. I saw him carrying a knife. We were not supposed to carry a knife. You are also not supposed to carry a gun on your thigh, you are supposed to use the Allied Universal issued holster. Everything was supposed to be issued by Allied. He had his own stuff, his own equipment. I knew that was against policy.

101. One day, I went to the H-E-B on the corner of Kempwood Drive and Gessner Road in Houston to buy gasoline for my car. And I saw Raymond Rodriguez. He is a Hispanic male, working for Allied as an Elite Security Officer at that time. He brought up an incident that had just happened with him  one or two days before with him. He told me that he had to us the Taser on somebody at the H-E-B gas station. The guy was a double-amputee. And he said he dropped him to the floor. I asked him, was the account manager notified?  He said, yes, he was notified. He was on the phone with me. The reason I asked was because of the way Patrick acted with me using the handcuffs at H-E-B. I asked him if he recorded the incident, and he said, yeah, I recorded it on my body camera. He told me the guy was trying to break the glass.

102. A couple weeks later, I went back to buy gasoline at the same location. I saw a different Allied security guard. I asked him, hey have you seen Raymond? He told me, yeah, he had a problem going on. I asked what? He said, this time he dragged somebody off the shelf and out of the store. He said, he still works for the company. He didn't get fired or anything. He just got moved to a different account and doesn't work for the Elite account anymore.

103. After I found out that Allied said they have no incident report or use of force report for what Raymond did, I went to the police station to see if they had a report of Raymond's use of force. A copy of that report is attached as exhibit Z.

104. I listened to the 911 call linked on exhibit AA and I recognize Raymond's voice in that recording. The police reports and the transcripts of the 911 calls also match some of what Raymond told me happened to him when he had to pull the Taser on the double amputee. The calls and reports say Raymond tazed the man and put handcuffs on him. Those are attached on exhibit BB.

105.  As far as I know, Allied did not even do a use of force report or incident report for what Raymond did. I did not even pull out my Taser and Allied suspended me and fired me. My opinion is that they were retaliating against me and targeting me.

106. I also saw on the news that an Allied security officer at a Kroger in Houston, who was working during the time that I worked for Allied, pepper sprayed and dragged a lady out of the store because he thought she was stealing. I saw the news report that he was still working there, not fired, two months after using pepper spray and dragging the lady. That news report is attached on exhibit CC.

107. The video linked on exhibit DD is video of a location where I worked as an Elite officer for Allied Universal. It is video of a Mi Tienda store on Little York Street in Houston. There is a white male and an African American Allied Elite officer. They are beating a man on the floor with batons and they kick him. I remember working at that location. It is in a big shopping center. I recognize the guards' uniforms in the video as the Elite Security Officer Uniform. They have the same navy uniform, with Allied badges and Allied ID cards. They also have body cameras, and the same type of Taser that the Elite officers are issued. If you look at the video closely, you can also see that both of the Allied Security officers have long beards. These are some screenshots of that video.



**Allied Universal: falsification of discipline and termination forms**

108. After I filed my Charge of Discrimination with the EEOC, after Allied sent their Position Statement to me, and months after my case was at the EEOC, that was the first time I ever saw the discipline forms attached as exhibit EE. I was shocked when I saw them. They are completely false and fake. Patrick Freeney never once came to meet me in the field. Not once. No one ever told me that my pants were dirty. I always wore black shoes. I always took care of my uniform. Everything was clear and clean. Always washed and laundered every time. And every time I met Patrick in his office, there were never any witnesses there. I never saw the form saying I was terminated. Patrick always told me I was suspended. I would have remembered this form. I would have noticed that it looks like it has two different colored inks on it.

**My name is Twana Ahmed. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my recollection. Executed on __Jan 21, 2025_____.**


Twana Ahmed (Jan 21, 2025 20:06 CST)
Twana Ahmed

APPENDIX 000033

# Ahmed Declaration Exhibit A

# email scheduling interview with Allied

## Confirmation with Allied Universal

From:  Sam from Allied Universal (noreply@emails.allyo.com)

To:    twana_202020@yahoo.com

Date:  Friday, December 10, 2021 at 06:18 PM CST

Hi Twana,

Thanks for applying with Allied Universal. We are delighted to confirm that your in-person interview has been scheduled for Monday, Dec 13, 1:00PM CST. If you are unable to make the interview, please text me at (323) 214-3111 to reschedule. I will text you the morning of the interview to confirm your attendance.

Please arrive 10 minutes early, dress professionally, and bring a copy of your resume.

**Interview Information**

**When:** Monday, Dec 13, 1:00PM CST

**Where:** 11811 North Freeway suite 810, Houston, Tx, 77060

**Interviewer Email:** alana.phillips@aus.com

**Position:** Security Officer Armed (673342)

**Additional Instructions (if applicable):** No additional notes.

If you have any other questions or concerns please reach out to alana.phillips@aus.com.

Best,

Sam

AhmedAllied000481

# Ahmed Declaration Exhibit B

# blank private security form requiring country of birth

**Texas Department of Public Safety**
**Regulatory Services Division**
www.dps.texas.gov

**PRIVATE SECURITY**

## EMPLOYEE INFORMATION UPDATE

### APPLICATION INFORMATION

Submission of an employee information update form (PSP-14) affiliates the individual with the new employer, it does not generate a new pocket card or renew the individual license.

⌐ THE ABOVE SPACE IS RESERVED FOR OFFICE USE ONLY ⌐

### APPLICANT INFORMATION (EMPLOYEE INFORMATON)

| | | |
|---|---|---|
| Applicant Last Name | Applicant First Name | Middle Initial |
| Applicant Social Security Number | Applicant Email Address | |
| Date Of Birth | Country Of Birth | State |

| | | |
|---|---|---|
| ☐ State Issued DL   ☐ USA Passport | DL/ID Issuing State | DL/ID, Passport Or Military ID Number |
| ☐ State Issued ID   ☐ Military ID | | |

| | |
|---|---|
| Home Address | County |
| City | State (2-Letter Code)   Zip   Home Phone |
| Mailing Address | County |
| City | State (2-Letter Code)   Zip |

| I am licensed as: (Select all that apply) | ☐ Alarm System Installer ☐ Continuing Education Instructor ☐ Non-Commission Security Officer | ☐ Alarm System Monitor ☐ Electronic Access Control Device Installer ☐ Personal Protection Officer | ☐ Commission Security Officer ☐ Locksmith ☐ Private Investigator |
|---|---|---|---|

### EMPLOYER INFORMATION (UPDATING TO)

| | |
|---|---|
| Company Name   Allied Universal Security Services | Company License Number   C15802 |
| Date of Employment with Employer | Expiration Date of Pocket Card   PENDING |
| Owner or Company Representative First Name   BILL | Owner or Company Representative Last Name   KING |

| The individual is employed as: (Select all that apply) | ☐ Alarm System Installer ☐ Continuing Education Instructor ☐ Non-Commission Security Officer | ☐ Alarm System Monitor ☐ Electronic Access Control Device Installer ☐ Personal Protection Officer | ☐ Commission Security Officer ☐ Locksmith ☐ Private Investigator |
|---|---|---|---|

### PAYMENT INFORMATION

☐ Employee Information Update Fee: $15 update fee + $2 subscription fee = $17 total

### ACKNOWLEDGEMENTS

☐ I understand that all fees submitted to DPS are non-refundable, are not transferable and that, in accordance with Administrative Rule 35.23, I will have 90 days from the date of notice of a deficiency to turn in all required documentation, supplemental information and/or fees OR this application will be abandoned and I will be required to reapply. (required)

☐ I verify that the information provided is true and correct, and I understand that this is an official Government record and that any false statement made on this document or any other supplement provided to DPS may result in criminal prosecution. (required)

Applicant Signature _____ Date _____

Owner or Company Representative Signature _____ Date _____

Bill King

Page 1 of 2

Revised 08-2020

PSP-14

APPENDIX 000037                                    AUS 01548

# Ahmed Declaration Exhibit C

## United States permanent resident card showing Iraq as country of birth



AUS 01562

# Ahmed Declaration Exhibit D

## completed private security form with Iraq as country of birth



**Texas Department of Public Safety**
Regulatory Services Division

**PRIVATE SECURITY**



Last Name: **AHMED**   First Name: **TWANA**   M

Country of Birth: **IRAQ**

County: **USA**

City: **HOUSTON**   State: **TX**   Zip: **77042**   Phone: **832-896-9276**

Employer: **Allied Universal Security Services**   **C15902**

**PENDING**

**BILL**   **KING**

Applicant Signature: **AA**   Date: **12-29-21**

Officer or Company Representative Signature:   **Bill King**

# Ahmed Declaration Exhibit E

# onboarding certificates


**ALLIEDUNIVERSAL**
SECURITY SERVICES
_____There for you.

This is to certify that

TWANA AHMED

has successfully completed Allied Universal Security Services'
**New Employee Orientation (NEO)**

RAArdg
Trainer/Facilitator

12-15-21
Date

AUS 00663

APPENDIX 000043

AUS 00664

# TRAINING CERTIFICATION

## Preventing Unlawful Discrimination & Harassment



This form certifies that I have received training and understand the subject of Discrimination and Harassment. This training has included:

- *Allied Universal's Equal Employment Opportunity (EEO) Policy against discrimination;*

- *Prevention of workplace discrimination;*

- *What constitutes "harassing" conduct;*

- *What the various types of sexual harassment are, as well as corrective actions to take;*

- *Examples of conduct which may constitute "harassment".*

I understand the importance and necessity of the elimination of harassment and discrimination from the workplace. I agree to report all instances of impermissible discrimination and harassment involving myself, or those that I know of, to the responsible management.

NAME (please print)

SIGNATURE

DATE  12-15-21

TRAINER

APPENDIX 000044

# Ahmed Declaration Exhibit F

# picture of Ahmed with beard during training



AhmedAllied000590

# Ahmed Declaration Exhibit G

# picture of some people in training class with beards



APPENDIX 000048

AUS 001803

# Ahmed Declaration Exhibit H

# picture of Allied Elite Security Officer with beard



AhmedAllied000586

# Ahmed Declaration Exhibit I

## onboarding identification badge receipt form



## Security Professional ID Badge Receipt and Acknowledgement

I certify and acknowledge the following:

- I was issued an ID badge by the local Allied Universal Branch office on _____

  Date

- I understand I must wear and display this ID badge on my outer most garment while on duty for Allied Universal.

- I understand the ID badge must always be visible while on duty for Allied Universal.

- I understand this ID badge is the property of Allied Universal and as such must be returned to Allied Universal if my employment ends.

- I understand this ID badge is not a state Security Guard license and it is for internal Allied Universal identification purposes only.

- I understand if I am found on duty without my ID badge displayed and visible I may be subject to disciplinary action.

- I understand if I'm approached by a State Licensing Inspector I must present my Allied Universal ID badge and state license if asked to do so.

_____
Employee signature

TUE MA A/H m f)
Employee's printed name

12-15-21
Date

APPENDIX 000052

AUS 00665

# Ahmed Declaration Exhibit J

# picture of correct Allied Elite Security Officer uniform



AhmedAllied000584

# Ahmed Declaration Exhibit K

# picture of Ahmed at target qualification training



APPENDIX 000056

AUS 001804

# Ahmed Declaration Exhibit L

# January 31, 2022 texts

**+12817337190**

Thursday, January 20, 2022

Hi how are you? I came by to the office the other day I didn't see you at the office I really like to know why I'm having serious issues why I'm not getting paid I have not even got paid today too I really like to know what's going on please get back with me on that thank you

Read
5:45 PM

Thursday, April 21, 2022

Hi Catherine can you give me a call at your earliest convenience

Read
3:49 PM

AhmedAllied000566

# Ahmed Declaration Exhibit M

# texts about working Houston Allied account with Ms. Travis



‹  +12815621274    📞  🔍  ⋮

Friday, February 18, 2022

2:19 PM    Twana Ahmed 9352791

I'm call you later today
I got you set up ms
Travis is going to call
you.                          2:28 PM

Okay sounds good thank
you I appreciate it
2:30 PM

Tuesday, March 15, 2022

Ok I just sent your info
to the account manager
with city of Houston
Mrs. Travis.                  3:44 PM

Alright sounds good
thank you so much I really
appreciate it
4:15 PM

AhmedAllied000565

# Ahmed Declaration Exhibit N

# police records including picture of two men arrested due to conduct at H-E-B on March 19, 2022

Apr 21 16:16 2022                                                          Page 1


EVENT HISTORY RECORDS
    Event #: P036089122-H                    Priority: 2
    Time: 19-Mar-2022/15:46:14               Type: 2104
    Response Level: 0
    Src: 9                                   Loc: 5895 SAN FELIPE ST ,HO ^77057 (HEB
    Info: HEB                                Caller: MARIDETH RODRIGUEZ
    Phone: (832)533-1717
    Address: 1800 BERING DR - SW
    Contact:
    Business:

EVENT REMARKS                    3:44 PM HE2 13 ]Call
19-Mar-2022/15:46:14150598 3:44 PM HEC053
    Incident location is a Public location

    TWO INTOXICATED MALE . ONE MALE IS PASSED OUT . AND ONE MALE IS ARGUING WITH
    SECURITY

19-Mar-2022/15:46:35150598      HEC053
    THEY ARE LOCATED AT THE ENTRANCE OF THE BUSN

19-Mar-2022/15:47:20150598      HEC053
    WAS ADVISED ONE OF THE MALES ATTEMPTED TO TAKE ALCOHOL FROM BUSN

19-Mar-2022/15:48:18150598      HEC053
    1) H/M WRG RED TEXAS A&M SWEATSHIRT AND JEANS ; BANDAGED HAND 2) H/M WRG BLK
    COAT, BLK SHIRT WITH SMILY FACE AND A BLUE JEANS

19-Mar-2022/16:30:21151721      TAC7
    MAAM HAVE US ENROUTE TO MEMORIAL CITY MED CENTER

19-Mar-2022/19:23:22165539      NWDISP
    MAAM HAVE US ENROUTE TO 5085 WESTHEIMER ON MEET THE FIREFIGHT URGENT PER SGT
    ALMASRI

EVENT SUMMARY
    Status     Status Date          By         At
    ------     ---------------      --------   --------
    WAI        19-Mar-2022/15:46:14  150598    HEC053
    DSP        19-Mar-2022/15:47:07  165539    NWDISP
    ENR        19-Mar-2022/15:47:07  165539    NWDISP
    ONS        19-Mar-2022/15:51:41  167665    MD6560
    CLS        20-Mar-2022/00:00:11  167665    MD6560

EVENT CHRONOLOGY
    Date/Time            Segment Name   Workstation   Description
    -----------------    ------------   -----------   -----------------------
    2022-03-19/15:44:58  LOCVER         HEC053


APPENDIX 000062                                   AhmedAllied000494

Apr 21 16:16 2022                                                      Page 2

| | | | |
|---|---|---|---|
| 2022-03-19/15:45:59 | SPI | HEC053 | (Start) |
| 2022-03-19/15:45:59 | SPI | HEC053 | (Stmnt) Awake Now? |
| 2022-03-19/15:46:01 | SPI | HEC053 | (Select) No {FEALP2A} |
| 2022-03-19/15:46:01 | SPI | HEC053 | (Stmnt) Breathing Normally? |
| 2022-03-19/15:46:02 | SPI | HEC053 | (Select) Yes {FEALAF} |
| 2022-03-19/15:46:02 | SPI | HEC053 | (Stmnt) Click "Accept" add any pertinent Fire/EMS info.(remarks),Click "Add Event" "EAK/OK", then "Continue" |
| 2022-03-19/15:46:07 | SPI | HEC053 | (Accept) FEALAI |
| 2022-03-19/15:46:08 | SPI | HEC053 | (Add Event) FEALAI |
| 2022-03-19/15:46:10 | SPI | HEC053 | (Select) -- -- -- {FEALHPDQ1B} |
| 2022-03-19/15:46:10 | SPI | HEC053 | (Stmnt) Incident location? |
| 2022-03-19/15:46:11 | SPI | HEC053 | (Select) Incident location is a Public location {FEALAP} |
| 2022-03-19/15:46:12 | SPI | HEC053 | (Stmnt) Click "Accept" add any pertinent Police info.(remarks),Click "Add Event" "EAK/OK", then "Continue" |
| 2022-03-19/15:46:13 | SPI | HEC053 | (Accept) 2104 |
| 2022-03-19/15:46:14 | ENTRY | HEC053 | |
| 2022-03-19/15:46:14 | XREF | HEC053 | #F2203190629 |
| 2022-03-19/15:46:14 | SPI | HEC053 | (Add Event) 2104 |
| 2022-03-19/15:46:15 | SPI | HEC053 | (Select) -- -- -- {FEALPRE} |
| 2022-03-19/15:46:16 | SPI | HEC053 | (Stmnt) For vehicle, suspect, or other information use Action Code "DP", then TRANSMIT CALL |
| 2022-03-19/15:46:31 | MISC | NWDISP | GBD (command: M) |
| 2022-03-19/15:46:35 | SUPP | HEC053 | |
| 2022-03-19/15:47:07 | DE | NWDISP | 18F44I (P) |
| 2022-03-19/15:47:07 | PRIUNIT | NWDISP | 18F44I |
| 2022-03-19/15:47:20 | SUPP | HEC053 | |
| 2022-03-19/15:48:18 | SUPP | HEC053 | |
| 2022-03-19/15:48:34 | SPI | HEC053 | (End) |
| 2022-03-19/15:51:41 | ONS | MD6560 | 18F44I |
| 2022-03-19/15:56:44 | MISC | NWDISP | REQ CHK BY MORE THAN 2 GUYS (command: M) |
| 2022-03-19/15:56:48 | DE | NWDISP | 18F20E (P) |
| 2022-03-19/15:56:57 | MISC | NWDISP | C3 (command: M) |

| | | | |
|---|---|---|---|
| 2022-03-19/15:59:11 | MISC | NWDISP | 18F44I,ONE DET (command: M) |
| 2022-03-19/16:02:23 | OK | NWDISP | 18F44I, TIMER CLEARED |
| 2022-03-19/16:04:51 | ONS | NWDISP | 18F20E |
| 2022-03-19/16:04:54 | MISC | NWDISP | 18F20E,3 DET (command: M) |
| 2022-03-19/16:05:14 | MISC | NWDISP | 18F44I,3 IN BACK 20E HAS ONE IN BACK (command: M) |
| 2022-03-19/16:15:54 | MISC | TAC7 | 1 REL 2 STILL DET (command: M) |
| 2022-03-19/16:25:28 | OK | TAC7 | 18F20E, TIMER CLEARED |
| 2022-03-19/16:30:19 | CLOENR | TAC7 | 18F20E[MEM CITY MED] |
| 2022-03-19/16:30:21 | APND | TAC7 | 18F20E,MsgId=149937166-MAAM HAVE US ENROUTE TO MEMORIAL CITY MED CENTER |
| 2022-03-19/16:51:07 | ONS | MD6257 | 18F20E |
| 2022-03-19/16:55:14 | MISC | NWDISP | 18F44I,REQ UNIT W/AFIS (command: M) |
| 2022-03-19/16:58:20 | ASSTER | NWDISP | 18F42E (P) [5895 SAN FELIPE ST ,HO ^77057 (HEB SAN FELIPE GROCERY)] |
| 2022-03-19/17:01:46 | OK | NWDISP | 18F20E, TIMER CLEARED |
| 2022-03-19/17:05:52 | ONS | MD7605 | 18F42E |
| 2022-03-19/17:16:58 | OK | NWDISP | 18F42E, TIMER CLEARED |
| 2022-03-19/17:27:32 | CLOCX | NWDISP | 18F20E[5895 SAN FELIPE ST ,HO ^77057 (HEB SAN FELIPE GROCERY)] |
| 2022-03-19/17:39:25 | CLOCOS | MD6257 | 18F20E[5800 SAN FELIPE] |
| 2022-03-19/17:46:11 | MISC | NWDISP | 18F44I,M OUT OF OUR SHOP INTO 20E SHOP (command: M) |
| 2022-03-19/17:46:25 | TRNS | NWDISP | 18F44I[JPC,1M] |
| 2022-03-19/17:48:58 | TRNS | NWDISP | 18F20E[SOBERING CENTER ,1] |
| 2022-03-19/18:05:14 | AUTPRE | NWDISP | 18F42E |
| 2022-03-19/18:10:51 | ONS | MD6560 | 18F44I |
| 2022-03-19/18:14:19 | ONS | MD6257 | 18F20E |
| 2022-03-19/18:25:14 | OK | NWDISP | 18F44I, TIMER CLEARED |
| 2022-03-19/18:26:07 | OK | NWDISP | 18F20E, TIMER CLEARED |
| 2022-03-19/18:58:43 | MISC | MD6560 | 18F44I,1 ARREST, 2 ORI, 2 2B WARRANTS - 18F08I NOTIFIED (command: M) |
| 2022-03-19/19:23:20 | CLOENR | NWDISP | 18F20E[5085 WESTHEIMER] |
| 2022-03-19/19:23:22 | APND | NWDISP | 18F20E,MsgId=149940210-MAAM HAVE US ENROUTE TO 5085 WESTHEIMER ON MEET THE FIREFIGHT URGENT |

AhmedAllied000496

Apr 21 16:16 2022                                                    Page 4

```
                                                              PER SGT ALMASRI
    2022-03-19/19:29:47    CLEAR       NWDISP     18F20E
    2022-03-19/23:41:05    CLOCOS      MD6560     18F44I[STATION, DEAD
                                                  BWC, SCANNING DOCS]
    2022-03-19/23:56:31    OK          NWDISP     18F44I, TIMER CLEARED
    2022-03-20/00:00:11    CLEAR       MD6560     18F44I  D/ARR  ,ORI X2,
                                                  CHARGES X3, TB WARRANT
                                                  X2
    2022-03-20/00:00:11    CLOSE       MD6560     D/ARR
```

UNIT SUMMARY

| Unit | Date/Time | Status |
|------|-----------|--------|
| 18F44I | 2022-03-19/15:47:07 | DSP |
| 18F44I | 2022-03-19/15:47:07 | ENR |
| 18F44I | 2022-03-19/15:51:41 | ONS |
| 18F44I | 2022-03-19/17:46:25 | TRN |
| 18F44I | 2022-03-19/18:10:51 | ONS |
| 18F44I | 2022-03-19/23:41:05 | ONS |
| 18F44I | 2022-03-20/00:00:11 | AV |
| 18F20E | 2022-03-19/15:56:48 | DSP |
| 18F20E | 2022-03-19/15:56:48 | ENR |
| 18F20E | 2022-03-19/16:04:51 | ONS |
| 18F20E | 2022-03-19/16:30:19 | ENR |
| 18F20E | 2022-03-19/16:51:07 | ONS |
| 18F20E | 2022-03-19/17:39:25 | ONS |
| 18F20E | 2022-03-19/17:48:58 | TRN |
| 18F20E | 2022-03-19/18:14:19 | ONS |
| 18F20E | 2022-03-19/19:23:20 | ENR |
| 18F20E | 2022-03-19/19:29:47 | AV |
| 18F42E | 2022-03-19/16:58:20 | DSP |
| 18F42E | 2022-03-19/16:58:20 | ENR |
| 18F42E | 2022-03-19/17:05:52 | ONS |
| 18F42E | 2022-03-19/18:05:14 | AV |

Apr 21 16:39 2022                                                    Page 1


EVENT HISTORY RECORDS
    Event #: F2203190629                    Priority: 7
    Time: 19-Mar-2022/15:46:08             Type: FEALA8
    Response Level: 0
    Src: 9                                  Loc: 5895 SAN FELIPE ST ,HO ^77057 (HEB
    Info: HEB                               Caller: MARIDETH RODRIGUEZ
    Phone: (832)533-1717
    Address: 1800 BERING DR - SW
    Contact:
    Business:

EVENT REMARKS

19-Mar-2022/15:46:08150598  ✓  HEC053
    TWO INTOXICATED MALE . ONE MALE IS PASSED OUT . AND ONE MALE IS ARGUING WITH
    SECURITY

19-Mar-2022/15:46:35150598  ✓  HEC053
    THEY ARE LOCATED AT THE ENTRANCE OF THE BUSN

19-Mar-2022/15:47:20150598  ✓ HEC053
    WAS ADVISED ONE OF THE MALES ATTEMPTED TO TAKE ALCOHOL FROM BUSN

19-Mar-2022/15:48:18150598  ✓  HEC053
    1) H/M WRG RED TEXAS A&M SWEATSHIRT AND JEANS ; BANDAGED HAND 2) H/M WRG BLK
    COAT, BLK SHIRT WITH SMILY FACE AND A BLUE JEANS

19-Mar-2022/15:59:04137244        HFD057
    L002 REQUESTS BLS

EVENT SUMMARY
    Status     Status Date            By        At
    ------     -----------------      --------  --------
    WAI        19-Mar-2022/15:46:08   150598    HEC053
    DSP        19-Mar-2022/15:46:15   119198    HFD059
    ENR        19-Mar-2022/15:47:36   FM1671    MD1671
    ONS        19-Mar-2022/15:52:53   FM1671    MD1671
    CLS        19-Mar-2022/17:19:42   FM1991    MD1991

EVENT CHRONOLOGY
    Date/Time              Segment Name   Workstation   Description
    -----------------      ------------   -----------   ------------------------
    2022-03-19/15:44:58    LOCVER         HEC053
    2022-03-19/15:45:59    SPI            HEC053        (Start)
    2022-03-19/15:45:59    SPI            HEC053        (Stmnt) Awake Now?
    2022-03-19/15:46:01    SPI            HEC053        (Select) No {FEALP2A}
    2022-03-19/15:46:01    SPI            HEC053        (Stmnt) Breathing
                                                        Normally?
    2022-03-19/15:46:02    SPI            HEC053        (Select) Yes {FEALAF}

| 2022-03-19/15:46:02 | SPI | HEC053 | (Stmnt) Click "Accept" add any pertinent Fire/EMS info.(remarks),Click "Add Event" "EAK/OK", then "Continue" |
| 2022-03-19/15:46:07 | SPI | HEC053 | (Accept) FEALAI |
| 2022-03-19/15:46:08 | ENTRY | HEC053 | |
| 2022-03-19/15:46:08 | SPI | HEC053 | (Add Event) FEALAI |
| 2022-03-19/15:46:10 | SPI | HEC053 | (Select) --  --  -- {FEALHPDQ1B} |
| 2022-03-19/15:46:10 | SPI | HEC053 | (Stmnt) Incident location? |
| 2022-03-19/15:46:11 | SPI | HEC053 | (Select) Incident location is a Public location {FEALAP} |
| 2022-03-19/15:46:12 | SPI | HEC053 | (Stmnt) Click "Accept" add any pertinent Police info.(remarks),Click "Add Event" "EAK/OK", then "Continue" |
| 2022-03-19/15:46:13 | SPI | HEC053 | (Accept) 2104 |
| 2022-03-19/15:46:14 | SUGDEF | HFD059 | |
| 2022-03-19/15:46:14 | SUGG | HFD059 | L002(L.*) |
| 2022-03-19/15:46:14 | XREF | HEC053 | #P036089122-H ✓ |
| 2022-03-19/15:46:14 | SPI | HEC053 | (Add Event) 2104 |
| 2022-03-19/15:46:15 | DSP | HFD059 | L002 (L) |
| 2022-03-19/15:46:15 | ALRTOK | | ALERT RESPONSE: Station 2, Source IP |
| 2022-03-19/15:46:15 | SPI | HEC053 | (Select) --  --  -- {FEALPRE} |
| 2022-03-19/15:46:16 | SPI | HEC053 | (Stmnt) For vehicle, suspect, or other information use Action Code "DP", then TRANSMIT CALL |
| 2022-03-19/15:46:35 | SUPP | HEC053 | |
| 2022-03-19/15:47:20 | SUPP | HEC053 | |
| 2022-03-19/15:47:36 | ENR | MD1671 | L002 |
| 2022-03-19/15:48:05 | NFYVIEW | HFD055 | HFD055 116262 |
| 2022-03-19/15:48:18 | SUPP | HEC053 | |
| 2022-03-19/15:48:26 | NFYVIEW | HFD055 | HFD055 116262 |
| 2022-03-19/15:48:34 | SPI | HEC053 | (End) |
| 2022-03-19/15:52:53 | ONS | MD1671 | L002 |
| 2022-03-19/15:58:46 | CHNG | HFD057 | Priority: 5 ==> 7;Type: FEALAI ==> FEALA8;TypeDescr: Alcohol Related Problem* ==> Alcohol |

Apr 21 16:39 2022                                                          Page 3

                                                    Related Problem;RespId:
                                                    BIGA ==> FEA8;

    2022-03-19/15:58:48      SUGDEF        HFD057
    2022-03-19/15:58:48      SUGG          HFD057    A002(A.*)
    2022-03-19/15:58:50      DSP           HFD057    A002 (A)
    2022-03-19/15:58:50      ALRTOK                  ALERT RESPONSE: Station
                                                     2, Source IP
    2022-03-19/15:59:04      CHNG          HFD057    Remarks Entered;
    2022-03-19/16:00:50      STATUSX                 Unit A002 Status timer
                                                     expired after 2 MIN
    2022-03-19/16:01:11      ENR           MD1991    A002
    2022-03-19/16:01:22      NFYVIEW       HFD055    HFD055 116262
    2022-03-19/16:05:17      ONS           MD1991    A002
    2022-03-19/16:16:18      AOR           MD1671    L002
    2022-03-19/16:23:56      TRNS          MD1991    A002[110,]
    2022-03-19/16:54:01      STATUSX                 Unit A002 Status timer
                                                     expired after 30 MIN
    2022-03-19/17:04:09      TARR          MD1991    A002
    2022-03-19/17:19:42      AIQ           MD1991    A002
    2022-03-19/17:19:42      CLOSE         MD1991

UNIT SUMMARY
    Unit          Date/Time              Status
    --------      ------------------     ------
    L002          2022-03-19/15:46:15    DSP
    L002          2022-03-19/15:47:36    ENR
    L002          2022-03-19/15:52:53    ONS
    L002          2022-03-19/16:16:18    AOR
    A002          2022-03-19/15:58:50    DSP
    A002          2022-03-19/16:01:11    ENR
    A002          2022-03-19/16:05:17    ONS
    A002          2022-03-19/16:23:56    TRN
    A002          2022-03-19/17:04:09    TAR
    A002          2022-03-19/17:19:42    AIQ

# Rodrigues,Meredith

████████████████████

I received a call from Allied Security stating that there was a person passed out on the sidewalk on the curbside side of the parking lot at 335pm. As I was walking outside to see about the man, ASM Jennifer and Service Admin Stephanie stopped me and stated that they stopped 2 guys from stealing beer and meat out of the main lobby door. They pointed the men out in the parking lot - one wearing a black t-shirt with a smiley face on it and black jacket, and the second with a maroon-colored A&M sweatshirt both looked to be older, Hispanic, and possibly homeless with facial hair/ beards.

The man in a sweatshirt stopped to relieve himself on a customer's car and I approached him to tell him he could not be doing that and that he needed to leave. Security (still on the phone with me) rushed over to assist me, and I told him to detain the man with the smiley face t-shirt as today was the second day in a row we have caught him stealing from the store. As security walked away to detain him, the man in the sweater collapsed to the ground and Matt (ASD) told me to call to the police and ambulance. I requested Matt to see if he could find the 3rd male who was passed out by Curbside. Matt walked over there but came back and said he could not find the man and thought he probably had left.

When police showed up, Curbside partners began to call me that there was a drunk person on the ground in the parking lot by the pick-up area. Officer Chen with HPD and I went to the area and found a third older, Hispanic male, also very intoxicated on the ground - this one I recognized from the attempted theft on 3/18/22. Police arrested all three and provided Incident numbers. They attempted to steal $342.19 of beer, wine, and meat today. Two of the three men were recognized by ASM Tykee, ASM Jennifer, and myself as having attempted to steal over $200 of Beer and Meat from the store on 3/18/22.

Police are requesting copies of the video from today (3/19) and yesterday (3/18) so that they can pass on to the DA. Officer Chen stated that all three are being charged on multiple counts including organized crime theft, a felony theft, public intoxication, and have been trespassed.

POLICE INCIDENT #'s:
0361246-22&0360891-22
Both for Theft
Unit #: 18F44I

AhmedAllied000501



AhmedAllied000502

```
 1  VICTORIA 6PK BOTTLES     T    9.98
***TRAINING USE ONLY***
 2  HCF SHRED CO-JACK
        2 Ea. @  1/   5.19 F   10.38
***TRAINING USE ONLY***
 3  HEB NAT ANDOUILLE SMK CHK
        2 Ea. @  1/   5.49 F   10.98
***TRAINING USE ONLY***
 4  HEB CARB SENSE WHEAT FLOU F    2.98
***TRAINING USE ONLY***
 5  HEB BEEF VALUE PACK SMKD
        2 Ea. @  1/  13.99 F   27.98
***TRAINING USE ONLY***
 6  HEB RSRVE CRCKD PEPR TRKY
        2 Ea. @  1/   8.99 F   17.98
***TRAINING USE ONLY***
 7  SIL OAK CAB ALEX          T   79.99
***TRAINING USE ONLY***
 8  AVALON NAPA CABERNET LTD  T   19.98
***TRAINING USE ONLY***
 9  OBERON CABERNET           T   18.99
***TRAINING USE ONLY***
10  THE PRISONER              T   38.99
***TRAINING USE ONLY***
11  BUDWEISER CN
        2 Ea. @  1/  12.98 T   25.96
***TRAINING USE ONLY***
12  MODELO ESPECIAL           T   27.98
***TRAINING USE ONLY***
13  BUDWEISER STGS CN         T   19.98
***TRAINING USE ONLY***
14  PRK FNGER RIBS VP         F   10.09
***TRAINING USE ONLY***
*********** Sale Subtotal*** 322.24
        Sales Tax     19.95
*************** Total Sale*** 342.19
    *** CASH              342.19

    ITEMS PURCHASED: 19
```

Tell us how we are doing and you could
WIN 1 OF 60 $100 HEB GIFT CARDS/MONTH
No purchase necessary.
See rules and take survey at
www.heb.com/survey
or call 1-866-583-5024
or text SURVEY to 40879
Message and data rates may apply.
Odds depend on entries received.
Must be 18. Ends 5/12/22.

Para Espanol, visitenos por Internet a
www.heb.com/survey
O llame al 1-866-583-5024
O envie un mensaje de texto con
la palabra SURVEY al 40879
Pueden aplicarse tarifas
de mensajes y datos.
Las probabilidades de ganar dependen
de cuantas inscripciones recibamos.
Tener 18 anos o mas.
El sorteo se acaba 05/12/22.

CERTIFICATE CODE
   **6870319228877 376214**
************************************

          RECEIPT EXPIRES ON 06-17-22
*********TRAINING USE ONLY!!********

HEB Food-Drugs #36/687
5885 San Felipe, Houston, TX 77057
Phone:         (713) 278-8450
Pharmacy:      (713) 278-8474
Store Hours:   6 A.M. to 11 P.M.
  Your Cashier:LPS Only Training ID
   877376 03-19-22  3:46P 989/02/00687

APPENDIX 000070

# HOUSTON POLICE DEPARTMENT

**36089122**

**Suppl No: ORIG**



**Houston Police Department**
1200 Travis Street
Houston, Texas 77002
713-884-3131  Emergency Dial 9-1-1

Reported Date
03/19/2022

Offense Report Title
Theft - Shoplifting

Officer Name
COSPER, B R

## Administrative Information

| Agency | Incident # | Suppl. No. | Reported Date | Reported Time |
|---|---|---|---|---|
| HOUSTON POLICE DEPARTMENT | 360891-22 | ORIG | 03/19/2022 | 15:46 |

| Status | Offense Report Title |
|---|---|
| Report Written or to Follow | Theft - Shoplifting |

| CAD Call Type | Special Event Code |
|---|---|
| 2104 | |

| Address | | Offense County | City | Zip Code |
|---|---|---|---|---|
| 5895 SAN FELIPE ST | | HARRIS | HOUSTON | 77057 |

| Dist/Beat | Station | District | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|
| 18F30 | MIDW | 18 | 03/19/2022 | 15:46 | | | 18F44I |

| Officer Name/Employee # | Division |
|---|---|
| COSPER, B R / 167665 | Midwest - Evenings - Patrol |

| Second Officer Name/Employee # | Division |
|---|---|
| CHEN, R / 166139 | Midwest - Evenings - Patrol |

| Report Entered By/Employee # | Division |
|---|---|
| COSPER, B R / 167665 | Midwest - Evenings - Patrol |

| RMS Transfer | Property | Property Trans Stat | Weather |
|---|---|---|---|
| Successful | No | Successful | CLEAR |

| Esimated Loss Value | |
|---|---|
| $100 to $749 | (Class B Misdemeanor) |

| Language Translator | Gang Crime | Hate Crime | Family Violence | Foster Care Fac. | Mental Illness | Metal Theft |
|---|---|---|---|---|---|---|
| NONE | NO | NO | NO | NO | NO | NO |

| Approval Officer/Employee # | | Approval date | Approval Time |
|---|---|---|---|
| COSPER, B R / 167665 | | 03/20/2022 | 00:19 |

| Offense # | Offense | | Offense Description | Complaint Type |
|---|---|---|---|---|
| 1 | 060 | D | Theft - Shoplifting | |

APPENDIX 000071

AhmedAllied000503

# HOUSTON POLICE DEPARTMENT                    36089122

## PERSON SUMMARY

| Invl | Invl # | Type | Name | MNI | PRN | Race | Sex | DOB |
|------|--------|------|------|-----|-----|------|-----|-----|
| ARR | 1 | I | HERNANDEZ,ROBERTO | 4928959 | 6277614 | W | M | |
| CAB | 1 | B | H.E.B | 3483879 | 6277619 | | | |
| COM | 1 | I | RODRIGUEZ,MEREDITH | 1508232 | 6277620 | F | | |
| SUS | 1 | I | CASTRO,EDWARD | 1755528 | 6277615 | W | M | |
| SUS | 2 | I | PEREZ,ELMER | 3940450 | 6277616 | W | M | |
| WIT | 2 | I | GUEVERA,JENIFER CAROLINA | 4096231 | 6277618 | W | F | |
| WIT | 1 | I | JONES,TYKEE ACORIA | 1511271 | 6277617 | B | F | |

## Property Summary

| Involvement | Description |
|-------------|-------------|
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER VICTORIA 6PK BOTTLES |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER SIL OAK CAB |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER OBERON CABERNET |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER AVALON NAPA CABERNET |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER THE PRISONER |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER 2X BUDWEISER CN |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER MODELO ESPECIAL |
| Stolen – Recovered and Returned to Owner | A: Y LIQUOR  OTHER BUDWEISER STCS CN |
| Involvement | Description |

Report Officer
167665 / COSPER, B R

Printed At
10/30/2023 12:30

Page 2 of 17

APPENDIX 000072                                        AhmedAllied000504

# HOUSTON POLICE DEPARTMENT                              36089122

| Involvement | Description |
| --- | --- |
| Stolen - Recovered and Returned to Owner | A: Y OTHER   OTHER 2X HCF SHRED CO-JACK |
| Involvement Stolen - Recovered and Returned to Owner | Description<br>A: Y OTHER   OTHER 2X HEB BEEF VALUE PACK SMKD |
| Involvement Stolen - Recovered and Returned to Owner | Description<br>A: Y OTHER   OTHER 2X HEB RSRVE CRCKD PEPR TRKY |
| Involvement Stolen - Recovered and Returned to Owner | Description<br>A: Y OTHER   OTHER PRK FNGER RIBS VP |
| Involvement Stolen - Recovered and Returned to Owner | Description<br>A: Y OTHER   OTHER HEB NAT ANDOUILLE SMK CHK |
| Involvement Stolen - Recovered and Returned to Owner | Description<br>A: Y OTHER   OTHER HEB CARB SENSE WHEAT FLOU |

## Arrested Person 1: HERNANDEZ,ROBERTO

| Involvement | | Invl No | Type | Reported Date |
| --- | --- | --- | --- | --- |
| Arrested Person | | 1 | Individual | 03/19/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
| --- | --- | --- | --- |
| HERNANDEZ,ROBERTO | 4928959 | White or White Hispanic | Male |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
| --- | --- | --- | --- | --- | --- | --- |
| ▬▬▬ | 55 | Hispanic or Latino | (Y) | No | 5'06" | 210# |

| Hair Color | Eye Color | Complexion | Build |
| --- | --- | --- | --- |
| Brown | Brown | Olive | Heavy |

| Glasses | Extent of Injury |
| --- | --- |
| No Glasses Worn | |

| General Appearance | Hair Description |
| --- | --- |
| Dirty | Bald |

| Facial Features | | |
| --- | --- | --- |
| Facial - No Facial Hair | | |

| Mark Type | Mark Code | MarkDescription |
| --- | --- | --- |
| NONE | | |

| Clothing |
| --- |
| Black Shirt Unspecified |

| DWI Involved? | Marital Status | Citizen of | Nationality |
| --- | --- | --- | --- |
| | Singled | United States - American Citizen | American Nationality (United States) |

| Address Type | Address | Date |
| --- | --- | --- |
| Home | HOMELESS | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
| --- | --- | --- | --- |
| | | | |

| Report Officer | Printed At | Page |
| --- | --- | --- |
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 3 of 17 |

# HOUSTON POLICE DEPARTMENT

**36089122**

HOUSTON                                    TX

| Phone Type | Phone Number | Date |
|---|---|---|
| Cell - Mobile | (000)000-0000 | 03/19/2022 |

| E-Mail Type | Email |
|---|---|
| Other | none |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ███████ | Texas |
| FBI Number | ████████ | |
| State Criminal Identification Number (SID) | ██████ | |
| Harris County (SPN #) | 001404208 | |
| Harris County Sheriff's Office # (SO#) | 0671874 | |
| State Criminal Identification Number (SID) | ██████ | |
| Harris County Sheriff's Office # (SO#) | 1644254 | |

| Relationship | Name (Last, First MI) |
|---|---|
| Unknown | UNKNOWN |

| DOB | Race | Sex | Phone Type | Phone No |
|---|---|---|---|---|
| | | | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Employer/School | Occupation |
|---|---|
| UNKNOWN | |

| Contact | Employed From | Employed To |
|---|---|---|
| | | |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

| Vic/Off Age | Residence Status | Domestiv Violence | OFN_INVL | Sexual Assault | Sexual Assault Injury |
|---|---|---|---|---|---|
| 55 | Resident | | 2 | N | |

| Involvement | Arrest Type | Arrest Date | Arrest Time | Booking No | Status |
|---|---|---|---|---|---|
| Arrested | On-View Arrest / Dispatch Arrest | 03/19/2022 | 15:59 | 22-0009589 | Booked |

| Disposition | Arrest Location | City | Reporting District | Beat |
|---|---|---|---|---|
| Misdemeanor | 5895 SAN FELIPE ST | HOUSTON | 18F30 | 18 |

| Armed With | Transported Unit - Transported By |
|---|---|
| Unarmed | 18F44I - 167665 / COSPER, B R |

| Physical Condition |
|---|
| Intoxicated |

| Place of Birth | City of Birth | Multiple Charges | Multiple Arrests |
|---|---|---|---|
| El Salvador | OTHER | | N |

| BAC | Time | BAC2 | Time | BAC3 | Time | Attitude | Balance | Eyes | Odor | Speech |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| Report Officer | Printed At | |
|---|---|---|
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 4 of 17 |

APPENDIX 000074

AhmedAllied000506

# HOUSTON POLICE DEPARTMENT

**36089122**

| Physical Condition | Breath | Walking | Turning |
|---|---|---|---|
| INTOX | | | |

| Charge Code | Charge | Level | Attempt | Counts |
|---|---|---|---|---|
| THEFT - MISDEMEANOR | Theft - Misdemeanor | M | | |

| Authorized By | Hold Dvision | Other Booking No |
|---|---|---|
| 000000   UNASSIGNED, U | | |

Arrest Details
ADA IBANEZ TOOK CLASS B THEFT - SHOPLIFTING

| Charge Code | Charge | Level | Attempt | Counts |
|---|---|---|---|---|
| -PROCESS- BURG & THEFT | Process For Burglary And Theft | HO | | |

| Authorized By | Hold Dvision | Other Booking No |
|---|---|---|
| 000000   UNASSIGNED, U | BT | |

Arrest Details
ADA IBANEZ TOOK CLASS B THEFT - SHOPLIFTING

## Complainant - Business / Government 1: H.E.B

| Involvement | Invl No | Type | Reported Date |
|---|---|---|---|
| Complainant - Business / Government | 1 | Business | 03/19/2022 |

| Name | MNI |
|---|---|
| H.E.B | 3483879 |

| Address Type | Address | Date |
|---|---|---|
| Work / Business | 5895 SAN FELIPE ST | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77057 | |

| E-Mail Type | Email |
|---|---|
| Other | NONE |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

### IBRS Info

| Victim Invl No | Aggravated Homicide | Justifiable Homicide |
|---|---|---|
| 1 | | |

Related Offenses
Shoplifting

Type of Injury

## Complainant 1: RODRIGUEZ,MEREDITH

| Involvement | Invl No | Type | Reported Date |
|---|---|---|---|
| Complainant | 1 | Individual | 03/19/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| RODRIGUEZ,MEREDITH | 1508232 | White or White Hispanic | Female |

| DOB | Age | Hispanic | Juvenile | Height | Weight |
|---|---|---|---|---|---|
| ███████ | 40 | Hispanic or Latino | (Y) No | 5'01" | 155# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Brown | Brown | | |

| Glasses | Extent of Injury |
|---|---|
| | |

# HOUSTON POLICE DEPARTMENT

**36089122**

| DWI Involved? | Marital Status | Citizen of | | Nationality |
|---|---|---|---|---|

| Address Type | Address | | | Date |
|---|---|---|---|---|
| Work / Business | 5895 SAN FELIPE ST | | | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77057 | |

| Phone Type | Phone Number | | Date |
|---|---|---|---|
| Cell - Mobile | (832)533-1717 | | 03/19/2022 |

| E-Mail Type | Email |
|---|---|
| Other | none |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ▓▓▓▓ | Texas |

| ID Type | Number | Issued By |
|---|---|---|
| Social Security Number | ▓▓▓▓ | |

| ID Type | Number | Issued By |
|---|---|---|
| Package Number | 1002057 | |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|

| Vic/Off Age | Residence Status | Domestiv Violence | OFN_INVL | Sexual Assault | Sexual Assault Injury |
|---|---|---|---|---|---|
| 40 | Resident | | | N | |

**IBRS Info**

| Victim Invl No | Aggravated Homicide | Justifiable Homicide |
|---|---|---|
| 1 | | |

| Related Offenses |
|---|
| Shoplifting |

| Type of Injury |
|---|

| Vicitm Relationship to Suspect | Suspect Invl No | Suspect Involvement |
|---|---|---|
| Relationship unknown | | 1 Suspect |

| Suspect Name | Suspect DOB |
|---|---|
| CASTRO,EDWARD | ▓▓▓▓ |

| Sex | Race |
|---|---|
| Male | White or White Hispanic |

| Vicitm Relationship to Suspect | Suspect Invl No | Suspect Involvement |
|---|---|---|
| Relationship unknown | | 1 Arrested Person |

| Suspect Name | Suspect DOB |
|---|---|
| HERNANDEZ,ROBERTO | ▓▓▓▓ |

| Sex | Race |
|---|---|
| Male | White or White Hispanic |

| Vicitm Relationship to Suspect | Suspect Invl No | Suspect Involvement |
|---|---|---|
| Relationship unknown | | 2 Suspect |

| Suspect Name | Suspect DOB |
|---|---|
| PEREZ,ELMER | ▓▓▓▓ |

| Sex | Race |
|---|---|
| Male | White or White Hispanic |

| Report Officer | Printed At | |
|---|---|---|
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 6 of 17 |

# HOUSTON POLICE DEPARTMENT

**36089122**

## Suspect 1: CASTRO,EDWARD

| Involvement | | Invl No | Type | | Reported Date |
|---|---|---|---|---|---|
| Suspect | | 1 | Individual | | 03/19/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| CASTRO,EDWARD | 1755528 | White or White Hispanic | Male |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ▉ | 49 | Hispanic or Latino | (Y) | No | 5'10" | 170# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Black | Black | | |

| Glasses | Extent of Injury |
|---|---|
| | |

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|
| | | | |

| Address Type | Address | | Date |
|---|---|---|---|
| Home | HOMELESS | | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | | |

| E-Mail Type | Email |
|---|---|
| Other | NONE |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ▉ | Texas |
| Social Security Number | ▉ | |
| FBI Number | ▉ | |
| State Criminal Identification Number (SID) | ▉ | |
| HPD Number | 031000660719 | |
| Harris County (SPN #) | 001302167 | |
| Harris County Sheriff's Office # (SO#) | 0651076 | |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

| Vic/Off Age | Residence Status | Domestiv Violence | OFN_INVL | Sexual Assault | Sexual Assault Injury |
|---|---|---|---|---|---|
| 49 | Resident | | 1 | N | |

## Suspect 2: PEREZ,ELMER

| Involvement | | Invl No | Type | | Reported Date |
|---|---|---|---|---|---|
| Suspect | | 2 | Individual | | 03/19/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| PEREZ,ELMER | 3940450 | White or White Hispanic | Male |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ▉ | 58 | Hispanic or Latino | (Y) | No | 5'05" | 190# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| | | | |

| Report Officer | Printed At | |
|---|---|---|
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 7 of 17 |

# HOUSTON POLICE DEPARTMENT

**36089122**

| | | | | |
|---|---|---|---|---|
| Black | | Brown | | |

| Glasses | Extent of Injury |
|---|---|
| | |

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|
| | | | |

| Address Type | Address | Date |
|---|---|---|
| Home | HOMELESS | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | | |

| Phone Type | Phone Number | Date |
|---|---|---|
| Cell - Mobile | (000)000-0000 | 03/19/2022 |

| E-Mail Type | Email |
|---|---|
| Other | none |

| ID Type | Number | Issued By |
|---|---|---|
| Passport Number | ███████ | |
| Harris County (SPN #) | 003021549 | |
| Harris County Sheriff's Office # (SO#) | 0881467 | |
| FBI Number | ███████ | |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

| Vic/Off Age | Residence Status | Domestiv Violence | OFN_INVL | Sexual Assault | Sexual Assault Injury |
|---|---|---|---|---|---|
| 58 | Resident | | 3 | N | |

## Witness 1: JONES,TYKEE ACORIA

| Involvement | | Invl No | Type | Reported Date |
|---|---|---|---|---|
| Witness | | 1 | Individual | 03/19/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| JONES,TYKEE ACORIA | 1511271 | Black, Black Hispanic or African American | Female |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ███████ | 30 | Not Hispanic/Latino | (N) | No | 5'08" | 200# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Brown | Brown | | |

| Glasses | Extent of Injury |
|---|---|
| | |

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|
| | | | |

| Address Type | Address | Date |
|---|---|---|
| Home | 2410 S KIRKWOOD RD #431 | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77077 | |

| Address Type | Address | Date |
|---|---|---|
| | | |

# HOUSTON POLICE DEPARTMENT

**36089122**

03/19/2022

Work / Business  5895 SAN FELIPE ST

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77057 | -95.485605/29.749892 |

| Phone Type | Phone Number | Date |
|---|---|---|
| Cell - Mobile | (281)738-0700 | 03/19/2022 |

| E-Mail Type | Email |
|---|---|
| Other | unknown |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ██████ | Texas |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|

## Witness 2: GUEVERA,JENIFER CAROLINA

| Involvement | Invl No | Type | Reported Date |
|---|---|---|---|
| Witness | 2 | Individual | 03/19/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| GUEVERA,JENIFER CAROLINA | 4096231 | White or White Hispanic | Female |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ██████ | 25 | Hispanic or Latino | (Y) | No | 5'00" | 160# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Brown | Brown | | |

| Glasses | Extent of Injury |
|---|---|

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|

| Address Type | Address | Date |
|---|---|---|
| Home | 8113 SUNNYHILL ST | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77088 | |

| Address Type | Address | Date |
|---|---|---|
| Work / Business | 5895 SAN FELIPE ST | 03/19/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77057 | -95.485605/29.749892 |

| Phone Type | Phone Number | Date |
|---|---|---|
| Cell - Mobile | (832)692-7890 | 03/19/2022 |

| E-Mail Type | Email |
|---|---|
| Other | unknown |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ██████ | Texas |
| State Issued Drivers License / ID Card # | ██████ | Texas |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|

| Report Officer | Printed At | Page 8 of 17 |
|---|---|---|
| 167665 / COSPER, B R | 10/30/2023 12:30 | |

APPENDIX 000079

AhmedAllied000511

# HOUSTON POLICE DEPARTMENT                    36089122

## Property

| Prop# | Involvement | | | Invl No | Invl Date | Security | Tagged | Tag No | | Item No |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Stolen - Recovered and Returned to Owner | | | 8001 | 03/19/2022 | N | N | | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| Liquor/Beer/Alcohol | Alcohol |

| Description | # Pieces | Value |
|---|---|---|
| SIL OAK CAB | | $79.99 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:23 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| Other - Not In List | |

| Link | Invl | Invl No | Name | DOB | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | | W | F |

| Prop# | Involvement | | | Invl No | Invl Date | Security | Tagged | Tag No | | Item No |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Stolen - Recovered and Returned to Owner | | | 8002 | 03/19/2022 | N | N | | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| Liquor/Beer/Alcohol | Alcohol |

| Description | # Pieces | Value |
|---|---|---|
| OBERON CABERNET | | $18.99 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:23 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| Other - Not In List | |

| Link | Invl | Invl No | Name | DOB | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | | W | F |

| Prop# | Involvement | | | Invl No | Invl Date | Security | Tagged | Tag No | | Item No |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | Stolen - Recovered and Returned to Owner | | | 8003 | 03/19/2022 | N | N | | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| Liquor/Beer/Alcohol | Alcohol |

| Description | # Pieces | Value |
|---|---|---|
| AVALON NAPA CABERNET | | $19.99 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:25 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| Other - Not In List | |

| Link | Invl | Invl No | Name | DOB | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | | W | F |

| Prop# | Involvement | | | Invl No | Invl Date | Security | Tagged | Tag No | | Item No |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | Stolen - Recovered and Returned to Owner | | | 8004 | 03/19/2022 | N | N | | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| | |

| Report Officer | Printed At | |
|---|---|---|
| 167665 / COSPER  B R | 10/30/2023 12:30 | Page 10 of 17 |

# HOUSTON POLICE DEPARTMENT

**36089122**

Liquor/Beer/Alcohol                                                        Alcohol

| Description | | | | # Pieces | Value |
|---|---|---|---|---|---|
| THE PRISONER | | | | | $38.99 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:26 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| Other - Not In List | |

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|---|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | | ▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|---|
| 5 | Stolen - Recovered and Returned to Owner | | 8005 | 03/19/2022 | N | N | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| Liquor/Beer/Alcohol | Alcohol |

| Description | | | | # Pieces | Value |
|---|---|---|---|---|---|
| 2X BUDWEISER CN | | | | | $25.96 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:26 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| Other - Not In List | |

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|---|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | | ▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|---|
| 6 | Stolen - Recovered and Returned to Owner | | 8006 | 03/19/2022 | N | N | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| Liquor/Beer/Alcohol | Alcohol |

| Description | | | | # Pieces | Value |
|---|---|---|---|---|---|
| MODELO ESPECIAL | | | | | $27.98 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:27 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| Other - Not In List | |

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|---|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | | ▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|---|
| 7 | Stolen - Recovered and Returned to Owner | | 8007 | 03/19/2022 | N | N | | |

| Type | Category |
|---|---|
| Article | Other/Items Not Listed in the Article Name |

| Article | IBRS Type |
|---|---|
| Liquor/Beer/Alcohol | Alcohol |

| Description | | | | # Pieces | Value |
|---|---|---|---|---|---|
| BUDWEISER STCS CN | | | | | $19.98 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 03/19/2022 | 19:28 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|---|---|
| | |

| Report Officer | Printed At | |
|---|---|---|
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 11 of 17 |

APPENDIX 000081                                              AhmedAllied000513

# HOUSTON POLICE DEPARTMENT                    36089122

Other - Not In List

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|------|------|---------|------|---|-----|------|-----|
| OWN | COM | | 1 RODRIGUEZ,MEREDITH | | ▮▮▮▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|-------|-------------|--|---------|-----------|----------|--------|--------|---------|
| 8 | Stolen - Recovered and Returned to Owner | | 8008 | 03/19/2022 | N | N | | |

| Type | Category | |
|------|----------|--|
| Article | Other/Items Not Listed in the Article Name | |

| Article | IBRS Type |
|---------|-----------|
| Liquor/Beer/Alcohol | Alcohol |

| Description | | # Pieces | Value |
|-------------|--|----------|-------|
| VICTORIA 6PK BOTTLES | | | $9.98 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|--------------|--------------|--------------|---------|--|---------------|
| 03/19/2022 | 19:12 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|-------|-------|
| Other - Not In List | |

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|------|------|---------|------|---|-----|------|-----|
| OWN | COM | | 1 RODRIGUEZ,MEREDITH | | ▮▮▮▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|-------|-------------|--|---------|-----------|----------|--------|--------|---------|
| 9 | Stolen - Recovered and Returned to Owner | | 8009 | 03/19/2022 | N | N | | |

| Type | Category | |
|------|----------|--|
| Article | Other/Items Not Listed in the Article Name | |

| Article | IBRS Type |
|---------|-----------|
| Other Item Not Listed | Other |

| Description | | # Pieces | Value |
|-------------|--|----------|-------|
| 2X HCF SHRED CO-JACK | | | $10.38 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|--------------|--------------|--------------|---------|--|---------------|
| 03/19/2022 | 19:21 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|-------|-------|
| Other - Not In List | |

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|------|------|---------|------|---|-----|------|-----|
| OWN | COM | | 1 RODRIGUEZ,MEREDITH | | ▮▮▮▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|-------|-------------|--|---------|-----------|----------|--------|--------|---------|
| 10 | Stolen - Recovered and Returned to Owner | | 8010 | 03/19/2022 | N | N | | |

| Type | Category | |
|------|----------|--|
| Article | Other/Items Not Listed in the Article Name | |

| Article | IBRS Type |
|---------|-----------|
| Other Item Not Listed | Other |

| Description | | # Pieces | Value |
|-------------|--|----------|-------|
| 2X HEB BEEF VALUE PACK SMKD | | | $27.98 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|--------------|--------------|--------------|---------|--|---------------|
| 03/19/2022 | 19:21 | S | 154507 | 0323221909 | 03/19/2022 |

| Brand | Model |
|-------|-------|
| Other - Not In List | |

| Link | Invl | Invl No | Name | | DOB | Race | Sex |
|------|------|---------|------|---|-----|------|-----|
| OWN | COM | | 1 RODRIGUEZ,MEREDITH | | ▮▮▮▮ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|-------|-------------|--|---------|-----------|----------|--------|--------|---------|
| 11 | Stolen - Recovered and Returned to Owner | | 8011 | 03/19/2022 | N | N | | |

| Type | Category |
|------|----------|

| Report Officer | Printed At | |
|----------------|-----------|--|
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 12 of 17 |

# HOUSTON POLICE DEPARTMENT                    36089122

| Article | | | Other/Items Not Listed in the Article Name | | | |
|---|---|---|---|---|---|---|

| Article | | | IBRS Type | | | |
|---|---|---|---|---|---|---|
| Other Item Not Listed | | | Other | | | |

| Description | | | | # Pieces | Value | |
|---|---|---|---|---|---|---|
| 2X HEB RSRVE CRCKD PEPR TRKY | | | | | $17.98 | |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date | |
|---|---|---|---|---|---|---|
| 03/19/2022 | 19:22 | S | 154507    0323221909 | | 03/19/2022 | |

| Brand | | | Model | | | |
|---|---|---|---|---|---|---|
| Other - Not In List | | | | | | |

| Link | Invl | Invl No | Name | DOB | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | ████ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|---|
| 12 | Stolen - Recovered and Returned to Owner | | 8012 | 03/19/2022 | N | N | | |

| Type | | Category | | | | |
|---|---|---|---|---|---|---|
| Article | | Other/Items Not Listed in the Article Name | | | | |

| Article | | | IBRS Type | | | |
|---|---|---|---|---|---|---|
| Other Item Not Listed | | | Other | | | |

| Description | | | | # Pieces | Value | |
|---|---|---|---|---|---|---|
| PRK FNGER RIBS VP | | | | | $10.09 | |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date | |
|---|---|---|---|---|---|---|
| 03/19/2022 | 19:28 | S | 154507    0323221909 | | 03/19/2022 | |

| Brand | | | Model | | | |
|---|---|---|---|---|---|---|
| Other - Not In List | | | | | | |

| Link | Invl | Invl No | Name | DOB | Race | Sex |
|---|---|---|---|---|---|---|
| OWN | COM | 1 | RODRIGUEZ,MEREDITH | ████ | W | F |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|---|
| 13 | Stolen - Recovered and Returned to Owner | | 8013 | 03/19/2022 | N | N | | |

| Type | | Category | | | | |
|---|---|---|---|---|---|---|
| Article | | Other/Items Not Listed in the Article Name | | | | |

| Article | | | IBRS Type | | | |
|---|---|---|---|---|---|---|
| Other Item Not Listed | | | Other | | | |

| Description | | | | # Pieces | Value | |
|---|---|---|---|---|---|---|
| HEB NAT ANDOUILLE SMK CHK | | | | | $10.38 | |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date | |
|---|---|---|---|---|---|---|
| 03/19/2022 | 21:28 | S | 154507    0323221909 | | 03/19/2022 | |

| Brand | | | Model | | | |
|---|---|---|---|---|---|---|
| Other - Not In List | | | | | | |

| Prop# | Involvement | | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|---|
| 14 | Stolen - Recovered and Returned to Owner | | 8014 | 03/19/2022 | N | N | | |

| Type | | Category | | | | |
|---|---|---|---|---|---|---|
| Article | | Other/Items Not Listed in the Article Name | | | | |

| Article | | | IBRS Type | | | |
|---|---|---|---|---|---|---|
| Other Item Not Listed | | | Other | | | |

| Description | | | | # Pieces | Value | |
|---|---|---|---|---|---|---|
| HEB CARB SENSE WHEAT FLOU | | | | | $2.98 | |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date | |
|---|---|---|---|---|---|---|
| 03/19/2022 | 21:29 | S | 154507    0323221909 | | 03/19/2022 | |

| Report Officer | | Printed At | | | |
|---|---|---|---|---|---|
| 167665 / COSPER, B R | | 10/30/2023 12:30 | | | Page 13 of 17 |

APPENDIX 000083                                    AhmedAllied000515

# HOUSTON POLICE DEPARTMENT

**36089122**

Brand
Other - Not In List

Model

## All Property Notes

## Modus Operandi

| Gang Act | Gang Name | | Victim's Sex | Victim's Race |
|---|---|---|---|---|
| N | | | | |

Property Targetd

Theft Type
Shoplifting

| Entry Location | | Arson Inhabited | Alarm | Oddity |
|---|---|---|---|---|

Premise Type
Grocery Store or Supermarket

| Hate Crime Date | Cargo Theft | Body Worn Video | | Victim's Age Group |
|---|---|---|---|---|
| | N | Body Video Not Reviewed | | |

## Brief Incident Summary

Dispatched to a Person Down
Theft - Shoplifting
3 Suspects/1 Arrest - 1 TO-BE Warrant
1 Suspect transported to Sobering Center
ORI Generated

## Incident Narrative

ALL BWCs ON SCENE:
==================
B COSPER 167665 - 18F44I
R CHEN 166139 - 18F44I

S COUGHLIN 168141 - 18F20E
A GONZALEZ 154578 - 18F20E

W DIAZ 164489 - 18F42E

INTRODUCTION:
=============
I, Officer Cosper, riding with Officer Chen as 18F44I on 03/19/2022 was dispatched to a
call for service reporting a Person Down at 5895 SAN FELIPE ST. Officers were dispatched
at 1547hrs and arrived on scene at 1551hrs.

Body Worn Cameras were recording and were not reviewed. Report generated from memory.

COMPLAINANT STATEMENTS:
=======================
H.E.B Store 36

RODRIGUEZ,MEREDITH

Ms. Rodriguez is the store manager. She was informed by her staff that the suspects who
stole around $200 worth of items had returned to the store today. She met with the
suspects outside in the parking lot, and observed Suspect #2 approaching parked vehicles
and attempting to urinate on them. She stopped Suspect #2, who proceeded to pass out on

Report Officer
167665 / COSPER, B R

Printed At
10/30/2023 12:30

Page 14 of 17

APPENDIX 000084

AhmedAllied000516

# HOUSTON POLICE DEPARTMENT                    **36089122**

the ground. Ms. Rodriguez recognizes the suspects by their clothing, particularly the smiley face on Suspect #1's t-shirt. Ms. Rodriguez wants to press charges against the suspects and give them a criminal trespass warning.

```
WITNESS STATEMENTS:
===================
```

WITNESS #1: JONES,TYKEE ACORIA

Ms. Jones stated that she was standing near the entrance of the store and recognized the suspect as the same guy from yesterday from his elderly and intoxicated appearance and walked with the same gait. She approached the suspect to take his cart of items away at the entrance.

WITNESS #2: GUEVERA,JENIFER CAROLINA

Ms. Guevera stated she saw the suspect wandering around the general hall carrying high value items, and recognized him by his maroon colored jacket and general features since she had approached the suspect yesterday to take away his basket at the front entrance.

```
REPORTEE STATEMENT:
===================
SAME AS COMPL
```

```
OFFICER'S PARAGRAPH/SCENE DESCRIPTION:
=====================================
```
5895 SAN FELIPE ST a HEB Grocery store located on the south side of the road.

Officers observed Suspect 1 (HERNANDEZ,ROBERTO) to be visibly intoxicated near a customer's vehicle around the center of the parking lot. While detained on scene the suspect fell asleep due to his intoxication.

Suspect 2 (CASTRO,EDWARD) was observed laying on his back next to a customer's vehicle in the same aisle as Suspect 1, closer to the entrance of the grocery store. He was observed to be highly intoxicated and unable to respond to questions, and had to be transported by HFD to the hospital for his intoxication and prior injury to his hand.

Suspect 3 (PEREZ,ELMER) was observed sitting on the floor leaning against the metal bar inside a shopping cart return, who appeared to be highly intoxicated and was unable to provide any identification. Suspect 3 was initially non-compliant but no use of force was utilized while detaining him. While detained on scene, the suspect urinated in the back seat of the patrol vehicle and proceeded to fall asleep due to his intoxication.

From the security footage for today's incident, Officer R. Chen observed Suspect 1 and 2 enter the store around 1530 hours. From another camera angle, Suspect 1, who was identified by his black jacket and black shirt with a large yellow smiley face, was observed walking down the wine aisle and loading his cart with several bottles of wine. Suspect 2, who is identified by his red hoodie, was observed putting meats and beer into the cart. Around 1541 hours, Suspect 1 was observed leaving the store while Suspect 2 pushed the cart past the registers and was approached by the witnesses. Suspect 2 leaves the cart with the witnesses and was observed walking into the parking lot.

In the security footage for yesterday's incident, I observed Suspect 1 wearing his black shirt with large yellow smiley face and a black hat inside the store with Suspect 3, who was wearing a red long sleeved shirt and blue pants. Suspect 3 was observed pushing the cart past the point of sale and attempting to push the cart out of the store, which had locked up due to its anti-theft mechanism, before being approached by the witnesses who

# HOUSTON POLICE DEPARTMENT                                 36089122

pull the cart away from him. Suspect 3 leaves the store and meets with Suspect 1 in the
parking lot, where they proceed to leave the parking lot in a silver sedan. The sedan was
parked in the same area as where Suspect 3 was found laying outside today, but the
vehicle was not observed on scene during today's incident. None of the Suspects today had
car keys in their possession.

```
OFFICER'S ACTIONS:
==================
```
Officers arrived on scene and were led by the Complainant to the two initial Suspects in
the parking lot. While we were with the Suspects, the Complainant advised a third Suspect
was also on scene and was involved in yesterday's theft. We requested for another unit to
assist, and Officer A. Gonzalez and Officer S. Coughlin riding Unit 18F20E arrived to
the scene. Two Suspects were detained while one suspect was transported to Memorial
Herman Memorial City by Ambulance 02 with Unit 18F20E following up at the hospital.

Officers were advised that two of the men detained had stolen merchandise from the store
the day before (03/18/2022). Officer Chen reviewed security footage after speaking with
the complainant and witnesses. Officer W. Diaz riding Unit 18F42E later arrived on scene
to assist with identifying Suspect #2. After reviewing security footage and gathering
statements, Officer Chen called DA Intake and spoke to ADA Ibanez who, hearing the facts
of the case approved the filling of a to-be warrant on PEREZ,ELMER due to the offense
occurring over 24 hours in the past, a to-be warrant on CASTRO,EDWARD due to his
hospitalization and non-violent felony, and a Class B theft for HERNANDEZ,ROBERTO.

Unit 18F20E transported PEREZ,ELMER to the Sobering Center after being released on scene.
Officers provided the complainant with a case number and verbal instructions to call the
HPD Non-Emergency Number when they are able to download security footage of the theft. We
transported HERNANDEZ, ROBERTO to the Joint Processing Center for his charge, and
completed this ORI and a to-be warrant for CASTRO, EDWARD and PEREZ,ELMER.

JPC Sgt Pect reviewed charges.

```
DISPOSITION:
============
```
Dispatched to a Person Down
Theft - Shoplifting
3 Suspects/1 Arrest - 1 TO-BE Warrant
1 Suspect transported to Sobering Center
ORI Generated
SB111 Completed
Itemized receipt scanned into Intellinetics

CASTRO, EDWARD
hospitalized at Memorial Hermann Memorial City Hospital.
Room 8
Charge nurse: Victoria
Primary doctor: Dr. Calderon

```
SUSPECT STATEMENTS:
===================
```
SUS #1: HERNANDEZ,ROBERTO - ARRESTED, THEFT CLASS B


-NO STATEMENT

SUS #2: CASTRO,EDWARD - TRANSPORTED TO MEMORIAL HERMAN MEMORIAL CITY, TO BE WARRANT
FILED, THEFT 2+ CONVICTIONS

- NO STATEMENT

APPENDIX 000086

# HOUSTON POLICE DEPARTMENT                36089122

SUS #3: PEREZ,ELMER - TRANSPORTED TO SOBERING CENTER

-NO STATEMENT

PROPERTY/EVIDENCE FOUND OR RECOVERED:
=====================================
PROPERTY RECOVERED:

```
VICTORIA 6PK BOTTLES - 9.98
2X HCF SHRED CO-JACK - 10.38
2X HEB BEEF VALUE PACK SMKD - 27.98
HEB CARB SENSE WHEAT FLOU - 2.98
HEB NAT ANDOUILLE SMK CHK - 10.98
2X HEB RSRVE CRCKD PEPR TRKY - 17.98
SIL OAK CAB - 79.99
OBERON CABERNET - 18.99
AVALON NAPA CABERNET - 19.98
THE PRISONER - 38.99
2X BUDWEISER CN - 25.96
MODELO ESPECIAL - 27.98
BUDWEISER STCS CN - 19.98
PRK FNGER RIBS VP - 10.09


TOTAL - 322.24
```

Report Officer
167665 / COSPER, B R

Printed At
10/30/2023 12:30

Page 17 of 17

APPENDIX 000087                                AhmedAllied000519

# HOUSTON POLICE DEPARTMENT

**36089122**

**Suppl No: 0001**



Houston Police Department
1200 Travis Street
Houston, Texas 77002
713-884-3131  Emergency Dial 9-1-1

Reported Date
03/19/2022

Offense Report Title
Theft - Shoplifting

Officer Name
GONZALEZ, A

## Administrative Information

| Agency | Incident # | Suppl. No. | Reported Date | Reported Time |
|---|---|---|---|---|
| HOUSTON POLICE DEPARTMENT | 360891-22 | 0001 | 03/19/2022 | 19:10 |

| Status | Offense Report Title |
|---|---|
| Report Written or to Follow | Theft - Shoplifting |

| CAD Call Type | Special Event Code |
|---|---|
| 2104 | |

| Address | Offense County | City | Zip Code |
|---|---|---|---|
| 5895 SAN FELIPE ST | | HOUSTON | 77057 |

| Dist/Beat | Station | District | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|
| 18F30 | MIDW | 18 | 03/19/2022 | 15:46 | | | |

| Officer Name/Employee # | Division |
|---|---|
| GONZALEZ, A / 154578 | Midwest |

| Second Officer Name/Employee # | Division |
|---|---|
| COUGHLIN, S J / 168141 | Midwest |

| Report Entered By/Employee # | Division |
|---|---|
| GONZALEZ, A / 154578 | Midwest |

| RMS Transfer | Property | Property Trans Stat | Weather |
|---|---|---|---|
| Successful | No | Successful | |

| Esimated Loss Value |
|---|
| |

| Language Translator | Gang Crime | Hate Crime | Family Violence | Foster Care Fac. | Mental Illness | Metal Theft |
|---|---|---|---|---|---|---|
| | | | | | | |

| Approval Officer/Employee # | Approval date | Approval Time |
|---|---|---|
| GONZALEZ, A / 154578 | 03/19/2022 | 19:24 |

## Modus Operandi

| Gang Act | Gang Name | | Victim's Sex | Victim's Race |
|---|---|---|---|---|
| N | | | | |

| Entry Location | Arson Inhabited | Alarm | Oddity |
|---|---|---|---|
| | | | |

| Hate Crime Date | Cargo Theft | Body Worn Video | | Victim's Age Group |
|---|---|---|---|---|
| | | Body Video Not Reviewed | | |

## Brief Incident Summary

See narrative

## Incident Narrative

| Report Officer | Printed At | |
|---|---|---|
| 167665 / COSPER, B R | 10/30/2023 12:30 | Page 1 of 2 |

AhmedAllied000520

# HOUSTON POLICE DEPARTMENT                                    36089122

I Officer Coughlin and Officer Gonzalez wrote this supplement from memory and did not review our BWC footage while writing this report.

BWC ON SCENE:
=============
S. Coughlin 168141
A. Gonzalez 154578
B. Cosper 167665
R. Chen 166139
W. Diaz 164489

I Officer Coughlin and Officer Gonzalez riding marked unit #18F20E on 03/19/2022 at 1556 hours were dispatched to assist Primary unit #18F44I on a Person Down call located at 5895 San Felipe at the HEB. We arrived on scene at 1604 hours. Primary unit #18F44I had two males detained at the moment and we made contact with a third suspect/individual Edward Castro ████████████.

The suspect Edward Castro was observed laying on the ground being treated by HFD. The suspect was intoxicated and HFD A002 began transport to Memorial City Memorial Hermann Hospital. Officer Coughlin and Gonzalez went to the hospital to determine the Doctor and hospital bed the suspect was staying in. The primary unit determined that filing a 2B Warrant was sufficient and that we did not need to sit on the suspect for Felony Theft Charges.

We then left the scene and met back with Primary Unit #18F44I and Officer Diaz 18F42E at the scene location 5895 San Felipe Street. We took custody of another suspect Elmer Perez and transported him to the Sobering Center located at 150 N Chenevert in Houston TX 77002 at 1748 hours and arrived at 1814 hours. 2B Warrant will be filed for this suspect at a later date by 18F44I.

End of supplement

# Ahmed Declaration Exhibit O

# texts including picture of man about whom H-E-B manager is claiming theft and other problems on April 4, 2022 — one of the same two arrested due to conduct at H-E-B on March 19, 2022



AhmedAllied000594



AhmedAllied000595

# Ahmed Declaration Exhibit P

**pictures of two men about whom H-E-B manager is claiming theft and other problems on April 4, 2022 — the same two arrested due to conduct at H-E-B on March 19, 2022**



AhmedAllied000588

# Ahmed Declaration Exhibit Q

# phone notes about April 4, 2022 incident

# April 4, 2022 Store number 738

HEB MIC
Kevin
I texted me on my post side phone
about couple guys they are attempted to steal
merchandise from the store
he said he  already kicked them out of the store they
might come back again he called me back few minutes
later he said they are back in the store
Can you come inside the store to keep your eyes on
them
I went back inside the store they had a basket of full of
alcohol in beer
They went around the cashier not payingI recognize
the suspects from other HEB store with organized
theft which is they been arrested multiple times for the
same issue and they are not allowed to come back to
H-E-B property at all after when he went around the
kiss year and did not want to pay for the merchandise
I observe a knife on his site he was very drunk
intoxicated after when I approached him I handcuffed
him for safety issue he might harm somebody so
he can get away Hermie customer or employee the
suspect has been violent before and different store
so I recognized him very well after that the police
department came and they arrested them and took
him off the property

Last modified: Apr 4, 2022

AhmedAllied 000661

# Ahmed Declaration Exhibit R

# screen shot of April 5, 2022 [next day] text from Patrick Freeney



+17625241023

Arriving at the property
4:30(1_22_2022)

4:12 PM

Off the property

11:31 PM

Wednesday, January 26, 2022

Hi Alex how are you this is
Twana  please let me know
when did you told me that
I have to go to work today I
did not get no text messages
from you I didn't get one
phone call from you one of
the supervisors texting me
telling me I missed a shift of
work and they said you told
me that and I was aware

View all

MMS 10:52 AM

Tuesday, April 5, 2022

Twana I'll be out to get
you shortly.  I've been
sucked into a meeting
and will be finished
shortly.

10:17 AM

Okay no problem take your
time thank you

10:17 AM

APPENDIX 000098

AhmedAllied000569

# Ahmed Declaration Exhibit S

# April 11, 2022 email produced from Allied without date

----- Forwarded Message -----
**From:** "Barnes,Catherine" <Catherine.Barnes@aus.com>
**To:** "twana_202020@yahoo.com" <twana_202020@yahoo.com>
**Cc:** "Freeney, Patrick" <Patrick.Freeney@aus.com>
**Sent:** Mon, Apr 11, 2022 at 6:00 PM
**Subject:** Allied Universal Security License

Good evening Ahmed,

We are emailing you due to missing documents needed for your security license affiliation, please complete the attachment by completing the applicant information section, acknowledgments, sign and date and return asap.

Best regards,

**Catherine Barnes**

Human Resources Coordinator

**Allied Universal**

11811 North Freeway | Suite #810 | Houston, TX 77060

W: 832-786-3911  | **catherine.barnes@aus.com**
License # C15802



This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. Any and all rights to confidentiality and privilege are not waived, and are hereby

specifically preserved. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, retention, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by return email or by telephone at the above number and delete the original message and its attachments from your system.

AhmedAllied000446

| | |
|---|---|
| **From:** | Barnes,Catherine |
| **To:** | twana_202020@yahoo.com |
| **Cc:** | Freeney, Patrick |
| **Subject:** | Allied Universal Security License |
| **Attachments:** | image001.png |
| | EIU App.pdf |
| **Importance:** | High |

Good evening Ahmed,

We are emailing you due to missing documents needed for your security license affiliation, please complete the attachment by completing the applicant information section, acknowledgments, sign and date and return asap.

Best regards,

**Catherine Barnes**
Human Resources Coordinator
**Allied Universal**
11811 North Freeway | Suite #810 | Houston, TX 77060
W: 832-786-3911 | **catherine.barnes@aus.com**
License # C15802



AUS 01547

**Texas Department of Public Safety**
**Regulatory Services Division**
www.dps.texas.gov

**PRIVATE SECURITY**

## EMPLOYEE INFORMATION UPDATE

### APPLICATION INFORMATION

Submission of an employee information update form (PSP-14) affiliates the individual with the new employer, it does not generate a new pocket card or renew the individual license.

⌐ THE ABOVE SPACE IS RESERVED FOR OFFICE USE ONLY ⌐

### APPLICANT INFORMATION (EMPLOYEE INFORMATON)

| Applicant Last Name | Applicant First Name | Middle Initial |
|---|---|---|
| Applicant Social Security Number | Applicant Email Address | |
| Date Of Birth | Country Of Birth | State |

| ☐ State Issued DL  ☐ USA Passport | DL/ID Issuing State | DL/ID, Passport Or Military ID Number |
|---|---|---|
| ☐ State Issued ID  ☐ Military ID | | |

| Home Address | County |
|---|---|
| City | State (2-Letter Code) | Zip | Home Phone |
| Mailing Address | County |
| City | State (2-Letter Code) | Zip |

| I am licensed as: (Select all that apply) | ☐ Alarm System Installer  ☐ Continuing Education Instructor  ☐ Non-Commission Security Officer | ☐ Alarm System Monitor  ☐ Electronic Access Control Device Installer  ☐ Personal Protection Officer | ☐ Commission Security Officer  ☐ Locksmith  ☐ Private Investigator |
|---|---|---|---|

### EMPLOYER INFORMATION (UPDATING TO)

| Company Name  Allied Universal Security Services | Company License Number  C15802 |
|---|---|
| Date of Employment with Employer | Expiration Date of Pocket Card  PENDING |
| Owner or Company Representative First Name  BILL | Owner or Company Representative Last Name  KING |

| The individual is employed as: (Select all that apply) | ☐ Alarm System Installer  ☐ Continuing Education Instructor  ☐ Non-Commission Security Officer | ☐ Alarm System Monitor  ☐ Electronic Access Control Device Installer  ☐ Personal Protection Officer | ☐ Commission Security Officer  ☐ Locksmith  ☐ Private Investigator |
|---|---|---|---|

### PAYMENT INFORMATION

☐ Employee Information Update Fee: $15 update fee + $2 subscription fee = $17 total

### ACKNOWLEDGEMENTS

☐ I understand that all fees submitted to DPS are non-refundable, are not transferable and that, in accordance with Administrative Rule 35.23, I will have 90 days from the date of notice of a deficiency to turn in all required documentation, supplemental information and/or fees OR this application will be abandoned and I will be required to reapply. (required)

☐ I verify that the information provided is true and correct, and I understand that this is an official Government record and that any false statement made on this document or any other supplement provided to DPS may result in criminal prosecution. (required)

Applicant Signature _____ Date _____

Owner or Company Representative Signature _____ Date _____

Bill King

Page 1 of 2

PSP-14

APPENDIX 000103

AUS 01548

# Ahmed Declaration Exhibit T

## April 21, 2022 text requesting call with human resources

**+12817337190**

Thursday, January 20, 2022

Hi how are you? I came by to the office the other day I didn't see you at the office I really like to know why I'm having serious issues why I'm not getting paid I have not even got paid today too I really like to know what's going on please get back with me on that thank you

Read
5:45 PM

Thursday, April 21, 2022

Hi Catherine can you give me a call at your earliest convenience

Read
3:49 PM

AhmedAllied000566

# Ahmed Declaration Exhibit U

## April 25, 2022 email reporting discrimination

| | |
|---|---|
| **From:** | Twana Kaka on behalf of Twana Kaka <twana_202020@yahoo.com> |
| **To:** | Catherine.Barnes@aus.com |
| **Subject:** | Re: Allied Universal Security License |
| **Date:** | Monday, April 25, 2022 2:55:51 PM |
| **Attachments:** | image001.png |

Hello Katherine this is Officer Ahmed I'm replying to your message in regards to this form I have completed this form 3 times previously I've filled it two times with you personally and once at the event at the hotel when I got hired. I wanted to let you know because I feel as though I am being discriminated against and I have been on suspension for over 2 week. I performed my duties to the best of my ability I did nothing wrong and have been under suspension for two weeks now.

I have been targeted by the account manager he has been rude to me he has stated to me Racial slurs and threatened me I have been silent under the risk of losing my job. He has pulled me into office doors closing the door behind them and threaten me on the property he said he will (fry) me and to go back to my country and that there is a certain way things go in this country not where I'm from he said. I am not aware if he has had problems with other Muslim employees but he has made it clear to me that he has a problem with me.

He made me shave my beard even after I told him I have to keep it for religious purposes and most recently he stated to me that he was going to make sure I get my license taken away from me and I'll never be able to work security for the rest of my life why he is threatening me like that I really don't know.
I've never missed a day I've never called in sick I have been a good employee and have considered the interests of the property and this company.  I can't even get another job because I don't know if I'll lose this one. I do not want to leave this company it has treated me well other than patricks racism I wish to continue working for this company.

Please Catherine give me call back at your earliest convenience thank you.


On Mon, Apr 11, 2022 at 6:00 PM, Barnes,Catherine <Catherine.Barnes@aus.com> wrote:

> Good evening Ahmed,
>
>
> We are emailing you due to missing documents needed for your security license affiliation, please complete the attachment by completing the applicant information section, acknowledgments, sign and date and return asap.
>
>
>
> Best regards,

APPENDIX 000107

AUS 01543

# Ahmed Declaration Exhibit V

## Early May 2022 emails with human resources

**Allied Universal**

11811 North Freeway | Suite #810 | Houston, TX 77060

W: 832-786-3911  | **catherine.barnes@aus.com**
License # C15802



This e mail transmission and any documents  files or previous e mail messages attached to it  are confidential and are protected by the attorney client privilege and/or work product doctrine  Any and all rights to confidentiality and privilege are not waived  and are hereby specifically preserved   f you are not the intended recipient  or a person responsible for delivering it to the intended recipient you are hereby notified that any review  disclosure  retention  copying  dissemination  distribution or use of any of the information contained in  or attached to this e mail transmission is STR CTLY PROH B TED   f you have received this transmission in error please immediately notify me by return email or by telephone at the above number and delete the original message and its attachments from your system

**From:** Twana Kaka <twana_202020@yahoo.com>
**Sent:** Friday, May 6, 2022 6:08 PM
**To:** Barnes,Catherine <catherine.barnes@aus.com>
**Subject:**


Email from: twana_202020@yahoo.com

DO NOT click links or open attachments unless you recognize the sender AND know the content is safe. If you suspect this is phishing, please forward to phish@aus.com and then delete.


Hi Catherine I've sent you a few emails and text messages could you please respond your the only one that can solve my issue as hr. But your not communicating with me it's been 2 weeks

**Allied Universal**

11811 North Freeway | Suite #810 | Houston, TX 77060

W: 832-786-3911 | **catherine.barnes@aus.com**
License # C15802



This e mail transmission and any documents  files or previous e mail messages attached to it  are confidential and are protected by the attorney client privilege and/or work product doctrine  Any and all rights to confidentiality and privilege are not waived  and are hereby specifically preserved   f you are not the intended recipient  or a person responsible for delivering it to the intended recipient you are hereby notified that any review  disclosure  retention  copying  dissemination  distribution or use of any of the information contained in  or attached to this e mail transmission is STR CTLY PROH B TED   f you have received this transmission in error please immediately notify me by return email or by telephone at the above number and delete the original message and its attachments from your system

**From:** Twana Kaka <twana_202020@yahoo.com>
**Sent:** Friday, May 6, 2022 6:08 PM
**To:** Barnes,Catherine <catherine.barnes@aus.com>
**Subject:**


Email from: twana_202020@yahoo.com

DO NOT click links or open attachments unless you recognize the sender AND know the content is safe. If you suspect this is phishing, please forward to phish@aus.com and then delete.


Hi Catherine I've sent you a few emails and text messages could you please respond your the only one that can solve my issue as hr. But your not communicating with me it's been 2 weeks

**From:** "Twana Kaka" <twana_202020@yahoo.com>
**To:** "Catherine.Barnes@aus.com" <Catherine.Barnes@aus.com>
**Sent:** Mon, May 16, 2022 at 2:52 PM
**Subject:** RE: RE:

I would like to know what's my employer status am I still been employed by Ally universal or am I being fired or am I being suspended I would just like to know what's going on nobody is answering that question can you please check for me and find out

On Thu, May 12, 2022 at 8:11 AM, Barnes,Catherine
<Catherine.Barnes@aus.com> wrote:

> Good morning,
>
> No I do not.
>
>
> Best regards,
> **Catherine Barnes**
> Human Resources Coordinator
> **Allied Universal**
> 11811 North Freeway | Suite #810 | Houston, TX 77060
> W: 832-786-3911 | **catherine.barnes@aus.com**
> License # C15802
>
> 
>
>
> **From:** Twana Kaka <twana_202020@yahoo.com>
> **Sent:** Wednesday, May 11, 2022 7:47 PM
> **To:** Barnes,Catherine <Catherine.Barnes@aus.com>
> **Subject:** RE: RE:
>
> Thank you for your response but why cant I receive information from don't you handle employee affairs and take complaints?

This e-mail transmission and any documents  files or previous e-mail messages attached to it  are confidential and are protected by the attorney-client privilege and/or work product doctrine  Any and all rights to confidentiality and privilege are not waived  and are hereby specifically preserved   f you are not the intended recipient  or a person responsible for delivering it to the intended recipient  you are hereby notified that any review  disclosure  retention copying  dissemination  distribution or use of any of the information contained in  or attached to this e-mail transmission is STR CTLY PROH B TED   f you have received this transmission in error  please immediately notify me by return email or by telephone at the above number and delete the original message

# Ahmed Declaration Exhibit W

# May 16, 2022 email to human resources about status

**From:** Twana Kaka
**To:** Barnes,Catherine
**Subject:** RE: RE:
**Date:** Monday, May 16, 2022 2:52:34 PM
**Attachments:** image001.png

I would like to know what's my employer status am I still been employed by Ally universal or am I being fired or am I being suspended I would just like to know what's going on nobody is answering that question can you please check for me and find out

On Thu, May 12, 2022 at 8:11 AM, Barnes,Catherine <Catherine.Barnes@aus.com> wrote:

Good morning,

No I do not.

Best regards,

**Catherine Barnes**

Human Resources Coordinator

**Allied Universal**

11811 North Freeway | Suite #810 | Houston, TX 77060

W: 832-786-3911 | **catherine.barnes@aus.com**
License # C15802



**From:** Twana Kaka <twana_202020@yahoo.com>
**Sent:** Wednesday, May 11, 2022 7:47 PM
**To:** Barnes,Catherine <Catherine.Barnes@aus.com>
**Subject:** RE: RE:

Thank you for your response but why cant I receive information from don't you handle employee affairs and take complaints?

On Tue, May 10, 2022 at 8:01 AM, Barnes,Catherine <Catherine.Barnes@aus.com> wrote:

Good morning Twana,

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney/client privilege and/or work product doctrine. Any and all rights to confidentiality and privilege are not waived, and are hereby specifically preserved. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by return email or by telephone at the above number and delete the original message and its attachments from your system.

APPENDIX 000113

# Ahmed Declaration
# Exhibit X

## May 25, 2022 text
## saying ineligible for rehire
## and so revealing termination

7:56

**2819080665**

Wednesday, May 25, 2022

Hey Muhammad

I got notification and was told that you are non rehirable

If you need to inquire further you will have to connect with HR

10:52 AM

So are you going to talk to HR or what am I supposed to do

Read
2:17 PM

I can't talk to HR I only relay what I am told

You can reach out to.the hotline as informed or reach back out to Katherine.alyea@aus.com

2:19 PM

AhmedAllied000572

# Ahmed Declaration Exhibit Y

# May 25, 2022-June 2022 human resources communications and hotline summary

content is safe. If you suspect this is phishing, please forward to phish@aus.com and then delete.

Hello Catherine how are you?
My name is Twana
I am an ally universal employee
And I would like to talk to you over the phone but I do not have your phone number
And I've been told you are an HR
please get back with me as soon as possible because I'm having a serious problem

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Thursday, May 26, 2022 12:54 PM
**To:** twana_202020@yahoo.com
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE:

Good afternoon Twana,

Do you have a number you can be reached at?

Thanks,

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Thursday, May 26, 2022 12:45 PM
**To:** twana_202020@yahoo.com
**Cc:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Subject:** RE:

Hello Twana,
I am tied up today, so I am asking Wayne, the HR Representative to give you a call.
I will follow up with him later today.
Thanks,

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Twana Kaka <twana_202020@yahoo.com>
**Sent:** Wednesday, May 25, 2022 6:05 PM
**To:** Alyea, Katherine <Katherine.alyea@aus.com>
**Subject:**

Email from: twana_202020@yahoo.com

DO NOT click links or open attachments unless you recognize the sender AND know the

APPENDIX 000118

AUS 01261

**Case: 36184 - Hotline Phone CE**
**Issue Involving Employee Relations and HR : Dispute with Manager/ Supervisor : Wrongful Termination/ Removal/ Transfer**

## Case Snapshot

**Opened:** 05/25/2022 5:18 PM
**Days open:** Less than 24 hours
**Last modified:** 05/26/2022 8:01 AM
**Intake method:** Hotline Phone
**Status:** In Process
**Alert:** Green

## Case Details Show Original Case Details

**Reported tier information**
**Case type:**
Allegation
**Intake method:**
Hotline Phone

**Location**
**Organization/Building name:**
Allied Universal
**Branch number:**
WE572174
**Location name:**
CE (TX) HOUSTON (Commercial)
**Location/Address:**
CE (TX) HOUSTON (Commercial
**Country/Territory:**
United States

**Reporter contact information**
**Reporter anonymous:**
No
**Reporter first name:**
Cwana
**Reporter last name:**
Amed
**Phone number:**
832-896-9276
**Email address:**
cwana_202020@yahoo.com
**Contact availability:**
Anytime

**Case Information**
**What is your relationship to Allied Universal ?**
Employee
**HRID#:**
9352791

APPENDIX 000119                                          AUS 01257

**Please identify the person(s) engaged in this behavior:**
Patrick (phonetic spelling) Frainey (phonetic spelling) - account manager
(first name unknown) (last name unknown) - general supervisor
**Do you suspect or know that a supervisor or management is involved?**
Yes
**If yes, then who?**
Patrick (phonetic spelling) Frainey (phonetic spelling) account manager
**Is management aware of this problem?**
Yes
**What is the general nature of this matter?**
Racism and Threats
**Where did this incident or violation occur?**
Allied Universal account manager office
**Please provide the specific or approximate time this incident occurred:**
In the month of April
**How long do you think this problem has been going on?**
More than a year
**How did you become aware of this violation?**
It happened to me
**Details:**
When Patrick was hired as the account manager and had his first encounter with Cwana, Patrick had interrogated Cwana by asking him about his origin due to Cwana's language barrier and foreign last name. Since then, Cwana suggested that Patrick had something against him due to his race and religion being Middle Eastern or Muslim.

There had been an incident recently regarding Cwana being addressed by the general supervisor that he would need to cut his beard, even though it had been between the period of Ramadan, which is a very significant and spiritual period for Muslim's to keep their culture and heritage strong. The general supervisor and Patrick had enforced the rule on Cwana to shave his beard, which eventually was done due to the constant reminders. To Cwana's surprise, he had noticed that there had been employees (names and job titles withheld) that had longer beards than him at the facility, which suggested that he had been targeted and dealt with unfairly but ignored the fact of racism due to simply being humble.

Another incident involved a misunderstanding when Cwana had been scheduled to work. Cwana had been called to the office by Patrick and had been addressed about the scheduling. Cwana had made it clear to Patrick that he was not scheduled to work and requested verification from the general supervisor. Patrick became irate and started to threaten Cwana by saying, "I'm going to destroy your life and fry you like a fucking chicken. You don't know who your fucking talking to." After the threats, Patrick also told Cwana to get out of his office and if Cwana was lying, Patrick would fire Cwana. It had seemed that Patrick found out that Cwana was not lying due to the general supervisor being written up for the misinformation. Patrick had neither acknowledged that Cwana was right, nor apologized for the threats made.

There had been another issue involving Cwana apprehending 3 persons that had been stealing from an Allied Universal linked site. In the state of Texas, a commission officer is liable to detain and apprehend someone by right during the process of a crime. After apprehending 3 persons (names and job titles unknown) that had been caught stealing, Cwana had been called to the office by Patrick. Patrick had started to threaten Cwana, and whenever Cwana wanted to state the reason as to why he was not wrong, Patrick would tell him to "shut up." Patrick stated that Cwana was in America, and that there are different ways to handle a burglary situation rather than being a "lose cannon." Patrick also mentioned that Cwana should have let go of the culprit and suspended Cwana until further notice.

After these events, Cwana was not called back immediately and had realized that he had been terminated. Cwana had then decided to return the equipment, including his firearm and other belongings, that had been the property of the business. Patrick had also passed a remark that if Cwana had not returned the items, Patrick would destroy him and revoke his security license. Patrick had also stated that even if the company does not fire Cwana, that he would find a way to fire Cwana, which Patrick has no right to do, and Cwana considers this unprofessional and unethical.
**Location Description:**
0

**Location2:**
CE
**Location3:**
Security

AUS 01259



+12817297121

Add to contacts    Block number

Monday, June 6, 2022

Wayne.Oliver@aus.com

Thank you  3:59 PM

4:58 PM  All right I got it thank you

Tuesday, June 7, 2022

Good morning Twana did you send me your statement?
10:12 AM

Do you want the statement for for that pacific incident
10:26 AM

Yes and your hotline complaint
10:28 AM

The hotline complaint is the

APPENDIX 000122

AhmedAllied000579

**+12817297121**

Do you want the statement for for that pacific incident

10:26 AM

Yes and your hotline complaint

10:28 AM

The hotline complaint is the same complaint and it's the same thing I told you everything we talked about on the phone is the same thing

4:37 PM

Thursday, June 9, 2022

Hello please let me know if you already received my email

7:11 PM

Monday, June 13, 2022

Please I would like to know what day I was fired exactly and what kind of action are you guys taking against the

AhmedAllied000578

| | |
|---|---|
| **From:** | Twana Kaka on behalf of Twana Kaka <twana_202020@yahoo.com> |
| **To:** | Wayne.Oliver@aus.com |
| **Date:** | Wednesday, June 8, 2022 7:23:13 PM |

After the incident happened at one of the property I was working at one of the supervisors told me I have to go to the office the account manager will like to speak to me at the office and explain to him what's going on after when I got to the office the next day which is I was scheduled to work and I got told not to go to work because I have to go to the office to meet the account manager so I did the next day go to the office and speak to the account manager the account manager didn't want to listen to me completely he had a statement right in front of him he told me to sign this statement he read the statement to me and I told him this is not what exactly happened at the property he said to me that's one of the HEB managers shit to me and I told him you have to take my statement and listen to what I say he didn't want to listen to me because he was telling me to shut up and shut my mouth and listen to him he was very aggressive towards me after that he took a pen out and told me to sign it and I told him I don't agree with this he said I will recommend the company to fire you if you don't get fired I'm going to make sure you going to get fired because I don't want a loose cannon working that company and I told him I'm not a loose Cannon and I'm not going to sign this document because I don't agree with this I did not sign this report and I did not do this report you told me I'm being suspended he will be contacting me very soon and he told me to turn in all my equipments the next day and I told him that's fine I will do that he told me he will make sure he will suspend my license and he will call the states on me to take my license away from me which is he doesn't have any authority to do that it does not have the authority to take my license he does not have the authority to suspend my license and he said to me I will make sure you will go to jail and I will charges on you and I told them for what exactly and what exactly did I do wrong and he said this conversation is over leave the office and I told him the way Ally universal gave me those equipments and trusted me with them those are not my property those are Ally universal property I will return them back but you don't have to threaten me like that and to suspect me like that and being aggressive towards me like because I didn't do anything wrong and I told him you are being very aggressive towards me and you are accusing me of theft and stealing the next day I went back to the office to turn it in all my equipments which Ally universal gave me to conduct my duty I kept that promise to turn in all the equipment to the company the way they gave it to me

One of the first incident I had with the account manager it was over scheduling to work one of the supervisor contacted me through a text message and gave me a schedule to work and I did agree to work and I accepted that schedule after 2 days later I went to the post I was scheduled to work as like the text message said I drove 50 minutes
To the post I was scheduled to work when I got there I didn't see no patrol car at the property so I contacted the supervisor who scheduled me to work at that site he told me I was not supposed to be there and I told him this is what the text message says I'm supposed to be here because you scheduled me to be here he says no go ahead and go home and I'm going to make sure you going to get paid for driving all the way over there gas money
And I was like okay
So I contacted the account manager to explain to him what's going on and what happened I talked to the account manager and explain everything to him he said he will speak to the supervisor and he will contact me back the account manager told me to go ahead and go home and they will give me a new schedule
Few days later I got contacted by the supervisor saying they want me at the office so I went to the office and sat down with the account manager Patrick it was very pissed off at me and he

was very angry at me and very aggressive and very disrespectful towards me telling me why did I miss a day of work and I told him exactly what is he talking about I have no idea and I have no clue he said to me supervisor Alex gave you a schedule and you did not go to work I told him no sir that's completely wrong I did go to work I did want to that site and I contacted the supervisor Alex and I contacted you and you guys told me I'm not scheduled to be there this is a big misunderstanding and I did not miss any schedule and that's when he start telling me to shut my mouth

I'm in the hot water just to listen to him and I start talking that's when he told me to shut my fucking mouth he got up and close the office door and there was nobody around it was just me and him at the office that's when he start cussing me out and yelling at me after when he closed the office door so nobody can listen and I told him this is wrong I did not

I did not miss any day of scheduling I always want to work I told him he needs to investigate it more and I told him he needs to bring the supervisor at the office to make this clear you cannot listen to one side of the story you have to always listen to the second side of the story so you can compare both stories together so you can find out which one is lying

He did not want to listen to that he continued to tell me to shut my mouth

I told him I don't agree to this you need to bring the supervisor down to the office today or tomorrow or later on so you can confront me with a supervisor so we can get this fixed and he said to me he will look into it further but if I was lying he will fry me like a fucking chicken and he will destroy my fucking life that's what exactly he said to me

And he said I'll be contacting you very soon

After that incident the account manager never contacted me never called me to talk about that incident

he find out and he realized he was wrong it was not my fault it was the supervisor fault because I had text messages prove I want to decide and I clocked in on I show them the proof I clocked in and I went to the side according to the schedule

I did follow the procedure and I did follow my schedule which is the supervisor gave me

And it was a big mistake by the company and by the supervisor

the account manager never called me or apologize or said anything to me about what happened about cussing me out and disrespecting me and threatened me

When I was at the office talking to the account manager he told me this is America we get things done different over here that was very racist things to say to me it's not like what I lived or I came from

After when I got told that I didn't say anything I was just stunned and I had nowhere to say because I didn't want to lose my job I was afraid if I say anything I will lose my job and I did not want to lose my job because I liked working for Ally universal it was a good company and I got treated very well by the company except the account manager and being targeted by him personally

After I return back to work I received my schedule I start being targeted about my facial hair my beard every time the supervisor will show up to the post to do inspection he was continuing to tell me every time to shave my beard and I told him this is part of the religion I believe in I'm not supposed to shave my beard I have to keep my beard for religious purposes he didn't want to listen to that he told me that's company policy you need to follow company policy so I went and shaved my whole entire beard the next day because I got very annoyed by the supervisor to tell me every single time you come to the post to get rid of my beard the supervisor himself he had a beard I didn't say anything I did not ask any question after when I got rid of my beard I seen other employees of Ally universal who works with me at the same program I was in they had their beard really long four times longer in my beard I went and talked to one of them just try to find out why they have their beard have they been told by any supervisor to get rid of their beard because of company policy

AUS 01333

They said no know I was being targeted
I didn't say anything I did what I was told and I continue with my schedule to go to work
always on time always arriving to the property 30 minutes earlier never being late never
missed one day of schedule I never been right up by anybody for doing anything wrong when
I was conducting my duty

I think I suspended for conducting my job and doing my duty and follow what the manager of
the post told me to do I was never been told I was fired I got told I was suspended and I'll be
contacted by the account manager and to tell me about the investigation he's going to conduct
I find out my own and myself and I was fired I was not reliable by Ally universal that will
prove Patrick point he will make sure I was fired because the account manager told me he will
make sure I was fired
Even if I lie universal will never fire me he will make sure I was fired
It's just like walking with a big Target in your back by the account manager for some reason I
have no idea why
Is he a racist to me because I'm a that's how I felt and he already proven that to me
I did ask the account manager to speak to anybody above him a manager or a supervisor his
boss I would like to have this conversation with him I told the account manager face-to-face in
his office he refused what I asked for he told me nobody wants to talk to me nobody wants to
see me that felt very weird after that one happen I start knocking on doors to find out what's
going on and why am I being treated like that

After that I start communicating with HR
Through an email
And try to explain to her what's going on and what happened the HR responded back to me
Saying she doesn't get involved and employees affair

Please respond back to my email with confirmations I want to make sure you received my
email thank you

And let me know if you want the incident report or you have any more question please give
me a call

3:55   87%

< +12817297121

The hotline complaint is the same complaint and it's the same thing I told you everything we talked about on the phone is the same thing

4:37 PM

Thursday, June 9, 2022

Hello please let me know if you already received my email

7:11 PM

Monday, June 13, 2022

Please I would like to know what day I was fired exactly and what kind of action are you guys taking against the account manager because of the discriminations and the racism he had towards me I would like to know that and I would like to know when am I going to be able to reapply

    

AhmedAllied000577

# Ahmed Declaration
# Exhibit Z

# police report about a different
# Allied security guard's
# use of force

# Houston Police Department

**0885575-22**

Production



Houston Police Department
1200 Travis Street
Houston, Texas 77002
713-884-3131 Emergency Dial 9-1-1

Reported Date/Time
07/04/2022 22:47
Offense Report Title
Criminal Mischief (Reckless Damage) <$2500
Officer Name
THOMAS, D R

## Administrative Information

| Address | | | | City | | Zip |
|---|---|---|---|---|---|---|
| 10251 KEMPWOOD DR | | | | HOUSTON | | 77043 |

| Dist/Beat | Station | District | From Date/Time | To Date/Time | Primary Unit |
|---|---|---|---|---|---|
| 4F20 | NW | 04 | (07/04/2022 22:47) | | 4F21N |

| Officer 1 Name | Division |
|---|---|
| THOMAS, D R | Northwest - Nights - Patrol |

| Officer 2 Name | Division |
|---|---|
| | |

| Weather | Offense County | | | Est. Loss Value | |
|---|---|---|---|---|---|
| CLEAR | Harris County | | | $2,500 to $29,999   (State Jail Felony) | |

| Hate Crime | Family Violence | Metal Theft | Gang Crime | |
|---|---|---|---|---|
| No | No | No | No | |

### ARR: DENNIS,TERRY JEROME

| Race | Sex | Ethnicity | | Height | Weight | Age |
|---|---|---|---|---|---|---|
| Black, Black Hispanic or African American | Male | Not Hispanic/Latino | (N) | 5'08" | 220# | 47 |

| Address | City | State | Zip Code |
|---|---|---|---|
| 9393 TIDWELL RD #812 | HOUSTON | TX | 77078 |

### CAB: HEB

| Address | City | State | Zip Code |
|---|---|---|---|
| 10251 KEMPWOOD DR | HOUSTON | TX | 77043 |

**Phone(s):** CE
(713)996-0009

### COM: CARMONA,CHRISTIAN DANIEL

| Race | Sex | Ethnicity | | Height | Weight | Age |
|---|---|---|---|---|---|---|
| White or White Hispanic | Male | Hispanic or Latino | (Y) | 5'06" | 140# | 29 |

| Address | City | State | Zip Code |
|---|---|---|---|
| 3503 DEEDS RD | HOUSTON | TX | 77084 |

**Phone(s):** CE
(281)723-2493

## PROPERTY SECTION

| Damaged/Destroyed/Vandalized | Brand/Make | Model | Qty | Serial No. | Value |
|---|---|---|---|---|---|
| Window | NO BRA | | | | 4000.00 |
| Description | | | | | |
| Convenience store glass | | | | | |
| | | Owner | | | |
| | | HEB | | | |

| Report Officer | Printed At | | |
|---|---|---|---|
| THOMAS, D R | 11/26/2024 03:29 | | Page: 1 of 2 |

APPENDIX 000129                    AhmedAllied 000757

# Houston Police Department

**0885575-22**

Production

**Summary**

SUSPECT WAS ARRESTED FOR CRIMINAL MISCHIEF, HE BROKE THE WINDOW OF A CONVENIENCE STORE.

| Report Officer | Printed At | |
|---|---|---|
| THOMAS, D R | 11/26/2024 03:29 | Page: 2 of 2 |

APPENDIX 000130

AhmedAllied 000758

# Ahmed Declaration Exhibit AA

## 911 call about different Allied security guard's use of force

Jul 07 14:10 2022                                                    Page 1


EVENT HISTORY RECORDS
    Event #: P088526022-I               Priority: 4
    Time: 04-Jul-2022/21:41:25          Type: 4089
    Response Level: 0
    Src: 9                              Loc: 10251 KEMPWOOD DR ,HO ^77080
    Info:                               Caller: RAYMOND RODRIGUEZ/SECURITY OFFIC
    Phone: 832 513 0699
    Address: 10154 NEUENS RD - N
    Contact:
    Business: HEB

EVENT REMARKS

04-Jul-2022/21:41:25167291        HEC077
    (Click Continue)
    UNKNOWN SUSPICIOUS EVENT REPORT.

    ANI 346 633 9128...CLLR REPORTING THAT THERE IS A B/M HEAVY BUILT 30 YOA
    WRNG BLU SHIRT BLU JNS BLU SNEAKERS W/A PROSTHETIC LEG REQ PD AT THE P LOT
    FOR A FAMILY DISPUTE...HE IS ALONE AT THE LOC, NO DISTURBANCE GOING
    ON...NOI/NOD

EVENT SUMMARY
    Status    Status Date          By          At
    ------    ------------------   --------    --------
    WAI       04-Jul-2022/21:41:25 167291      HEC077
    CLS       04-Jul-2022/23:50:15 161587      TAC2

EVENT CHRONOLOGY
    Date/Time                Segment Name    Workstation    Description
    ------------------       ------------    -----------    -----------------------
    2022-07-04/21:37:50      LOCVER          HEC077
    2022-07-04/21:38:38      SPI             HEC077         (Start)
    2022-07-04/21:38:38      SPI             HEC077         (Stmnt) SUSPICIOUS SINS
    2022-07-04/21:38:38      SPI             HEC077         (Select) (Click
                                                            Continue) {PSUS}
    2022-07-04/21:38:38      SPI             HEC077         (Stmnt) WHAT SUSPICIOUS
                                                            ACTIVITY IS BEING
                                                            REPORTED?
    2022-07-04/21:38:39      SPI             HEC077         (Select) UNKNOWN
                                                            SUSPICIOUS EVENT
                                                            REPORT. {PACSUS2}
    2022-07-04/21:38:39      SPI             HEC077         (Stmnt) CLICK "ACCEPT"
                                                            TO OBTAIN POLICE
                                                            RESPONSE CALL CODE,
                                                            THEN CLICK "CONTINUE"
                                                            FOR FURTHER
                                                            INSTRUCTIONS.
    2022-07-04/21:38:39      SPI             HEC077         (Select) - - - - - - -


APPENDIX 000132                          AhmedAllied 000768

| 2022-07-04/21:38:39 | SPI | HEC077 | (Stmnt) ASK THE FOLLOWING QUESTIONS THAT ARE APPROPRIATE AND DOCUMENT IN THE REMARKS SECTION. |
| 2022-07-04/21:38:40 | SPI | HEC077 | (Accept) 4089 |
| 2022-07-04/21:38:42 | SPI | HEC077 | (Back) Back To Sin Id {PACSUS2} |
| 2022-07-04/21:38:42 | SPI | HEC077 | (Stmnt) CLICK "ACCEPT" TO OBTAIN POLICE RESPONSE CALL CODE, THEN CLICK "CONTINUE" FOR FURTHER INSTRUCTIONS. |
| 2022-07-04/21:38:43 | SPI | HEC077 | (Back) Back To Sin Id {PSUS} |
| 2022-07-04/21:38:43 | SPI | HEC077 | (Stmnt) WHAT SUSPICIOUS ACTIVITY IS BEING REPORTED? |
| 2022-07-04/21:38:44 | SPI | HEC077 | (Select) SUSPICIOUS PERSON REPORT. {SUSP-4} |
| 2022-07-04/21:38:44 | SPI | HEC077 | (Stmnt) ARE YOU AWARE OF OR DO THEY APPEAR TO HAVE MENTAL ISSUES? |
| 2022-07-04/21:38:53 | SPI | HEC077 | (Back) Back To Sin Id {PSUS} |
| 2022-07-04/21:38:53 | SPI | HEC077 | (Stmnt) WHAT SUSPICIOUS ACTIVITY IS BEING REPORTED? |
| 2022-07-04/21:38:53 | SPI | HEC077 | (Select) UNKNOWN SUSPICIOUS EVENT REPORT. {PACSUS2} |
| 2022-07-04/21:38:53 | SPI | HEC077 | (Stmnt) CLICK "ACCEPT" TO OBTAIN POLICE RESPONSE CALL CODE, THEN CLICK "CONTINUE" FOR FURTHER INSTRUCTIONS. |
| 2022-07-04/21:38:54 | SPI | HEC077 | (Accept) 4089 |
| 2022-07-04/21:38:55 | SPI | HEC077 | (Select) - - - - - - - - {PSUS9} |
| 2022-07-04/21:38:55 | SPI | HEC077 | (Stmnt) ASK THE FOLLOWING QUESTIONS THAT ARE APPROPRIATE AND DOCUMENT IN THE REMARKS SECTION. |
| 2022-07-04/21:38:55 | SPI | HEC077 | (End) |
| 2022-07-04/21:41:25 | ENTRY | HEC077 | |
| 2022-07-04/22:04:26 | EXPIRE | | Pending event expired |

Jul 07 14:10 2022                                                                    Page 3

```
    2022-07-04/23:50:15    XREF         TAC2              #P088557522-L, DUO
    2022-07-04/23:50:15    DUP          TAC2              DUO
```

# Ahmed Declaration Exhibit BB

# police records about different Allied security guard's use of force — taser and handcuffs on double amputee

# 911audio produced in native .wav format

CARMONA,CHRISTIAN DANIEL Phone Number: 2817232493

Has never seen this D before. Was not there on scene when it happened, W, security was.

Said window had not been fixed yet but measured.

No exact amount at this time but will email after they fix today. Said just measured yesterday.

Has surveillance of the incident.

AhmedAllied 000759

Jul 07 14:10 2022                                                        Page 1


EVENT HISTORY RECORDS
    Event #: P088557522-L                    Priority: 3
    Time: 04-Jul-2022/22:47:10               Type: 3041
    Response Level: 0
    Src: T                                   Loc: 10251 KEMPWOOD DR ,HO ^77080
    Info: GAS STATION                        Caller: BRIAN- HEB CENTRAL STATION
    Phone: 210 938 8500
    Address:
    Contact:
    Business: HEB GROCERY

EVENT REMARKS

04-Jul-2022/22:47:10173179        HEC032
    (Click Continue)
    THIS IS A BURGLARY.
    BUSINESS (BUSINESS, GARAGE, SHED).
    IN PROGRESS (Suspects can be seen or heard).

04-Jul-2022/22:47:49173179        HEC032
    CLLR STATED THAT HE IS CALLING FROM THE CENTRAL STATION IN SAN ANTONIO FOR
    HEB...

04-Jul-2022/22:48:29173179        HEC032
    CALLER IS OUTSIDE THE LOCATION.
    1 SUSPECT.
    UNKNOWN / NO WEAPONS INVOLVED.

    CLLR STATED THAT THE POI IS AT THE GAS STATION TRYING TO BREAK THE WINDOW TO
    GET IN...

04-Jul-2022/22:48:58173179        HEC032
    CLLR STATED THAT THE POI IS THREATENING SECURITY ONSITE WITH A PROSTHETIC
    LEG...

04-Jul-2022/22:51:04173179        HEC032
    SUSPECTS CAME ON FOOT.
    NO - THE CALLER IS NOT THE OWNER OF THE PROPERTY.

    POI: BM LATE 30-EARLY 40'SYOA 4'8 MED BUILT BALD HEAD WEARING BLU SHIRT,
    ORANGE IN FRONT NO PANTS IN CHECKERED BOXERS... POI TOOK HIS PANTS OFF..

04-Jul-2022/22:51:31173179        HEC032
    CLLR STATED THAT PER VIDEO POI IS WALKING TOWARDS THE PUMPS...

04-Jul-2022/22:52:44173179        HEC032
    POI HAS WALKED BACK TOWARDS THE STORE.. SECURITY IS NOT ENGAGING... POI IS
    SITTING DOWN IN FRONT OF THE GAS STATION KEYOSK...


APPENDIX 000137                        AhmedAllied 000760

Jul 07 14:10 2022                                                      Page 2


NO - THE REPORTEE IS NOT THE OWNER OF THE PROPERTY.

1  SUSPECT.

BUSINESS DAMAGED

UNKNOWN - IF THIS INVOLVES SOMEONE WITH MENTAL ISSUES.

CRIMINAL MISCHIEF IN PROGRESS  (Suspects can be seen or heard).

(Click Continue)

POI HAS GOTTEN BACK UP, ALMOST ATTACKED THE SECURITY OFFICER...

04-Jul-2022/22:54:49173179       HEC032
    CLLR STATED THAT HE IS UNSURE IF THE POI IS ARMED, EVERYONE AT THE LOC IS
    BACKING AWAY FROM HIM...

04-Jul-2022/22:55:32173179       HEC032
    POI IS NOT ATTEMPTING TO BREAK IN BUT HE IS CONSISTENTLY BREAKING THE GLASS
    W/ HIS PROSTHETIC LEGS...

04-Jul-2022/22:56:53173179       HEC032
    NOI.NOD

04-Jul-2022/23:50:35161587       TAC2
    ALL 3 OF THOSE 4F20 CALLS ARE DUPED. 5575 IS THE RIGHT CALL TO DUPE THE
    OTHERS TO, THX

EVENT SUMMARY
    Status      Status Date         By          At
    ------      ------------------  --------    --------
    WAI         04-Jul-2022/22:47:10  173179    HEC032
    DSP         04-Jul-2022/23:52:10  161587    TAC2
    ENR         04-Jul-2022/23:52:10  161587    TAC2
    WAI         04-Jul-2022/23:53:38  161587    TAC2
    DSP         04-Jul-2022/23:55:13  161587    TAC2
    ENR         04-Jul-2022/23:55:19  171555    MD5499
    ONS         04-Jul-2022/23:57:11  107853    MD7201
    CLS         05-Jul-2022/04:25:07  171555    MD5499

EVENT CHRONOLOGY
    Date/Time              Segment Name    Workstation    Description
    ------------------     ------------    -----------    ----------------------
    2022-07-04/22:46:26    LOCVER          HEC032
    2022-07-04/22:46:47    SPI             HEC032         (Start)
    2022-07-04/22:46:47    SPI             HEC032         (Stmnt) BURGLARY SINS
    2022-07-04/22:46:48    SPI             HEC032         (Select) (Click
                                                          Continue) {BURGLARY}


APPENDIX 000138                           AhmedAllied 000761

Jul 07 14:10 2022                                                    Page 3

|                        |       |        |                                                          |
|------------------------|-------|--------|----------------------------------------------------------|
|                        |       |        | DOOR/WINDOW OR BURGLARY?                                  |
| 2022-07-04/22:46:49    | SPI   | HEC032 | (Select) THIS IS A BURGLARY. {BURG-1}                     |
| 2022-07-04/22:46:49    | SPI   | HEC032 | (Stmnt) WHAT IS BEING BURGLARIZED?                        |
| 2022-07-04/22:46:50    | SPI   | HEC032 | (Select) BUSINESS (BUSINESS, GARAGE, SHED). {BURG-1A}     |
| 2022-07-04/22:46:50    | SPI   | HEC032 | (Stmnt) WHEN DID THIS OCCUR?                              |
| 2022-07-04/22:46:52    | SPI   | HEC032 | (Select) IN PROGRESS (Suspects can be seen or heard). {BURG-1201} |
| 2022-07-04/22:46:52    | SPI   | HEC032 | (Stmnt) CLICK "ACCEPT" TO OBTAIN POLICE RESPONSE CALL CODE, THEN CLICK "CONTINUE" FOR FURTHER INSTRUCTIONS. |
| 2022-07-04/22:47:10    | ENTRY | HEC032 |                                                          |
| 2022-07-04/22:47:10    | DTFLW | HEC032 | DETAILS TO FOLLOW                                        |
| 2022-07-04/22:47:12    | SPI   | HEC032 | (Accept) 1201                                            |
| 2022-07-04/22:47:13    | SPI   | HEC032 | (Select) ======================== ======= {BURG-1A1}    |
| 2022-07-04/22:47:13    | SPI   | HEC032 | (Stmnt) ARE YOU CALLING FROM OUTSIDE OR INSIDE THE LOCATION? |
| 2022-07-04/22:47:49    | DTFLW | HEC032 | DETAILS TO FOLLOW                                        |
| 2022-07-04/22:47:49    | CHNG  | HEC032 | Remarks Entered;Priority: 3 ==> 1;Type: BURGL ==> 1201;TypeDescr: BURGLARY TYPE OF CALLS ==> BURGLARY/BUSINESS/IN PROG;RespId: <empty> ==> BRG2;RespLvl: <empty> ==> 0;SpecialInstruc: BURGL-SIN ==> <empty>; |
| 2022-07-04/22:47:52    | SPI   | HEC032 | (Select) CALLER IS OUTSIDE THE LOCATION. {BURG-1A2}      |
| 2022-07-04/22:47:52    | SPI   | HEC032 | (Stmnt) How many suspects are involved? (Add in Remarks: Race/Sex/Age/Clothing/O |

APPENDIX 000139                          AhmedAllied 000762

| | | | |
|---|---|---|---|
| | | | Vehicle/Direction) |
| 2022-07-04/22:47:56 | SPI | HEC032 | (Select) 1 SUSPECT. {BURG-1A3} |
| 2022-07-04/22:47:56 | SPI | HEC032 | (Stmnt) ARE WEAPONS INVOLVED? (Document who has the weapon and their description) |
| 2022-07-04/22:48:00 | SPI | HEC032 | (Select) UNKNOWN / NO WEAPONS INVOLVED. {BURG-1A4} |
| 2022-07-04/22:48:00 | SPI | HEC032 | (Stmnt) DO YOU KNOW IF THE SUSPECT(S) CAME IN A VEHICLE OR ON FOOT? |
| 2022-07-04/22:48:29 | DTFLW | HEC032 | DETAILS TO FOLLOW |
| 2022-07-04/22:48:29 | CHNG | HEC032 | Remarks Entered; |
| 2022-07-04/22:48:58 | DTFLW | HEC032 | DETAILS TO FOLLOW |
| 2022-07-04/22:48:58 | CHNG | HEC032 | Remarks Entered; |
| 2022-07-04/22:49:09 | SPI | HEC032 | (Select) SUSPECTS CAME ON FOOT. {BURG-1A5} |
| 2022-07-04/22:49:09 | SPI | HEC032 | (Stmnt) ARE YOU THE OWNER OF THE PROPERTY? |
| 2022-07-04/22:49:12 | SPI | HEC032 | (Select) NO -- THE CALLER IS NOT THE OWNER OF THE PROPERTY. {POIVOI} |
| 2022-07-04/22:49:12 | SPI | HEC032 | (Stmnt) |
| 2022-07-04/22:49:36 | MISC | NWDISP | GBD (command: M) |
| 2022-07-04/22:51:04 | DTFLW | HEC032 | DETAILS TO FOLLOW |
| 2022-07-04/22:51:04 | CHNG | HEC032 | Remarks Entered; |
| 2022-07-04/22:51:31 | DTFLW | HEC032 | DETAILS TO FOLLOW |
| 2022-07-04/22:51:31 | CHNG | HEC032 | Remarks Entered; |
| 2022-07-04/22:52:03 | MISC | NWDISP | EVE SHIFT WAS HELD OVER FOR FREEDOM OVER TX CELEBRATION. THEY WERE JUST RELEASED AND ARE IN THE PROCESS OF GETTING KEYS IN SO NIGHT SHIFT CAN SO. (command: M) |
| 2022-07-04/22:52:44 | DTFLW | HEC032 | DETAILS TO FOLLOW |
| 2022-07-04/22:52:44 | CHNG | HEC032 | Remarks Entered; |
| 2022-07-04/22:53:07 | CHNG | NWDISP | Priority: 1 ==> 3;Type: 1201 ==> 3041;TypeDescr: BURGLARY/BUSINESS/IN PROG ==> DISTURBANCE/CIT;RespId: BRG2 ==> CIT2; |
| 2022-07-04/22:53:16 | DTFLW | HEC032 | DETAILS TO FOLLOW |

AhmedAllied 000763

|                       |      |         | Entered;Priority: 3 ==> 1;Type: 3041 ==> 1201;TypeDescr: DISTURBANCE/CIT ==> BURGLARY/BUSINESS/IN PROG;RespId: CIT2 ==> BRG2; |
|-----------------------|------|---------|---|
| 2022-07-04/22:53:27   | CHNG | NWDISP  | Priority: 1 ==> 3;Type: 1201 ==> 3041;TypeDescr: BURGLARY/BUSINESS/IN PROG ==> DISTURBANCE/CIT;RespId: BRG2 ==> CIT2; |
| 2022-07-04/22:54:00   | SPI  | HEC032  | (Delete) Discard SPI Remarks |
| 2022-07-04/22:54:00   | SPI  | HEC032  | (End) |
| 2022-07-04/22:54:03   | SPI  | HEC032  | (Start) |
| 2022-07-04/22:54:03   | SPI  | HEC032  | (Stmnt) CRIMINAL MISCHIEF SINS |
| 2022-07-04/22:54:04   | SPI  | HEC032  | (Select) (Click Continue) {PCRM} |
| 2022-07-04/22:54:04   | SPI  | HEC032  | (Stmnt) WHEN DID THIS OCCUR? |
| 2022-07-04/22:54:05   | SPI  | HEC032  | (Select) CRIMINAL MISCHIEF IN PROGRESS (Suspects can be seen or heard). {PCRM1A} |
| 2022-07-04/22:54:05   | SPI  | HEC032  | (Stmnt) ARE YOU AWARE OF OR DO THEY APPEAR TO HAVE MENTAL ISSUES? |
| 2022-07-04/22:54:08   | SPI  | HEC032  | (Select) UNKNOWN - IF THIS INVOLVES SOMEONE WITH MENTAL ISSUES. {PCRM1} |
| 2022-07-04/22:54:08   | SPI  | HEC032  | (Stmnt) WHAT TYPE OF DAMAGE? (Describe damage in remarks section) |
| 2022-07-04/22:54:11   | SPI  | HEC032  | (Select) BUSINESS DAMAGED {PACCRM} |
| 2022-07-04/22:54:11   | SPI  | HEC032  | (Stmnt) CLICK "ACCEPT" TO OBTAIN POLICE RESPONSE CALL CODE, THEN CLICK "CONTINUE" FOR FURTHER INSTRUCTIONS. |
| 2022-07-04/22:54:12   | SPI  | HEC032  | (Accept) 2240 |
| 2022-07-04/22:54:13   | SPI  | HEC032  | (Select) |

                    AhmedAllied 000764

Case 4:23-cv-02823    Document 34-1    Filed on 01/22/25 in TXSD    Page 142 of 718

```
                                                  ----------------------
                                                  ----------------------
                                                  {PCRM3}
  2022-07-04/22:54:13    SPI          HEC032      (Stmnt) HOW MANY
                                                  SUSPECTS ARE INVOLVED?
                                                  (Add in Remarks:
                                                  Race/Age/Clothing/On
                                                  Foot/In
                                                  Vehicle/Direction)
  2022-07-04/22:54:14    SPI          HEC032      (Select) 1  SUSPECT.
                                                  {PCRM5}
  2022-07-04/22:54:15    SPI          HEC032      (Stmnt) IS THE REPORTEE
                                                  THE OWNER OF THE
                                                  PROPERTY?
  2022-07-04/22:54:17    SPI          HEC032      (Select) NO - THE
                                                  REPORTEE IS NOT THE
                                                  OWNER OF THE PROPERTY.
                                                  {POIVOI}
  2022-07-04/22:54:17    SPI          HEC032      (Stmnt)
  2022-07-04/22:54:49    DTFLW        HEC032      DETAILS TO FOLLOW
  2022-07-04/22:54:49    CHNG         HEC032      Remarks
                                                  Entered;Priority: 3 ==>
                                                  2;Type: 3041 ==>
                                                  2240;TypeDescr:
                                                  DISTURBANCE/CIT ==>
                                                  CRIM MISCHIEF/IN
                                                  PROG;RespId: CIT2 ==>
                                                  CD2;
  2022-07-04/22:55:32    DTFLW        HEC032      DETAILS TO FOLLOW
  2022-07-04/22:55:32    CHNG         HEC032      Remarks Entered;
  2022-07-04/22:55:51    CHNG         NWDISP      Priority: 2 ==> 3;Type:
                                                  2240 ==>
                                                  3041;TypeDescr: CRIM
                                                  MISCHIEF/IN PROG ==>
                                                  DISTURBANCE/CIT;RespId:
                                                  CD2 ==> CIT2;
  2022-07-04/22:56:53    DTFLW        HEC032      DETAILS TO FOLLOW
  2022-07-04/22:56:53    CHNG         HEC032      Remarks
                                                  Entered;Priority: 3 ==>
                                                  2;Type: 3041 ==>
                                                  2240;TypeDescr:
                                                  DISTURBANCE/CIT ==>
                                                  CRIM MISCHIEF/IN
                                                  PROG;RespId: CIT2 ==>
                                                  CD2;
  2022-07-04/22:59:08    CHNG         NWDISP      Priority: 2 ==> 3;Type:
                                                  2240 ==>
                                                  3041;TypeDescr: CRIM
                                                  MISCHIEF/IN PROG ==>
```

                    AhmedAllied 000765

|                       |          |         | CD2 ==> CIT2; |
| --------------------- | -------- | ------- | ---------------------------------- |
| 2022-07-04/23:50:15   | DUP      | TAC2    | #P088526022-I, DUO |
| 2022-07-04/23:50:17   | MISC     | TAC2    | DUP * (command: M) |
| 2022-07-04/23:50:27   | DUP      | TAC2    | #P088572522-F, DUP |
| 2022-07-04/23:50:35   | APND     | TAC2    | MsgId=152030849-ALL 3 |
|                       |          |         | OF THOSE 4F20 CALLS ARE |
|                       |          |         | DUPED. 5575 IS THE |
|                       |          |         | RIGHT CALL TO DUPE THE |
|                       |          |         | OTHERS TO, THX |
| 2022-07-04/23:52:10   | DE       | TAC2    | 4F21N (P) |
| 2022-07-04/23:52:10   | PRIUNIT  | TAC2    | 4F21N |
| 2022-07-04/23:52:13   | DSP      | TAC2    | 4F23N (P) |
| 2022-07-04/23:52:35   | ENR      | MD7201  | 4F23N,FROM 10092 ALFRED |
|                       |          |         | LN, HO |
| 2022-07-04/23:53:38   | AUTPRE   | TAC2    | 4F21N,C1 |
| 2022-07-04/23:53:38   | AUTPRE   | TAC2    | 4F23N,C1 |
| 2022-07-04/23:55:13   | DSP      | TAC2    | 4F21N (P) 4F23N (P) |
| 2022-07-04/23:55:13   | PRIUNIT  | TAC2    | 4F21N |
| 2022-07-04/23:55:19   | ENR      | MD5499  | 4F21N |
| 2022-07-04/23:55:29   | ENR      | MD7201  | 4F23N,FROM 5199 GESSNER |
|                       |          |         | RD, HO |
| 2022-07-04/23:57:11   | ONS      | MD7201  | 4F23N |
| 2022-07-05/00:04:27   | ONS      | MD5499  | 4F21N |
| 2022-07-05/00:22:33   | OK       | NWDISP  | 4F23N, TIMER CLEARED |
| 2022-07-05/00:24:39   | OK       | NWDISP  | 4F21N, TIMER CLEARED |
| 2022-07-05/00:30:50   | MISC     | MD5499  | 4F21N,1 MALE IN THE BCK |
|                       |          |         | OF MY SHOP (command: M) |
| 2022-07-05/00:41:22   | CLEAR    | MD7201  | 4F23N |
| 2022-07-05/00:41:54   | TRNS     | MD5499  | 4F21N[Joint Processing |
|                       |          |         | Center from 2781 |
|                       |          |         | GESSNER RD, HO] |
| 2022-07-05/01:15:39   | ONS      | MD5499  | 4F21N |
| 2022-07-05/01:36:04   | OK       | NWDISP  | 4F21N, TIMER CLEARED |
| 2022-07-05/03:52:40   | CLOCOS   | MD5499  | 4F21N[9700 KATY |
|                       |          |         | FREEWAY/CHARGES/ORI] |
| 2022-07-05/04:25:07   | CLEAR    | MD5499  | 4F21N  D/ARR |
| 2022-07-05/04:25:07   | CLOSE    | MD5499  | D/ARR |

UNIT SUMMARY

| Unit   | Date/Time             | Status |
| ------ | --------------------- | ------ |
| 4F21N  | 2022-07-04/23:52:10   | DSP    |
| 4F21N  | 2022-07-04/23:52:10   | ENR    |
| 4F21N  | 2022-07-04/23:53:38   | AV     |
| 4F23N  | 2022-07-04/23:52:13   | DSP    |
| 4F23N  | 2022-07-04/23:52:35   | ENR    |
| 4F23N  | 2022-07-04/23:53:38   | AV     |
| 4F21N  | 2022-07-04/23:55:13   | DSP    |
| 4F21N  | 2022-07-04/23:55:19   | ENR    |

```
4F21N        2022-07-05/00:41:54    TRN
4F21N        2022-07-05/01:15:39    ONS
4F21N        2022-07-05/03:52:40    ONS
4F21N        2022-07-05/04:25:07    AV
4F23N        2022-07-04/23:55:13    DSP
4F23N        2022-07-04/23:55:29    ENR
4F23N        2022-07-04/23:57:11    ONS
4F23N        2022-07-05/00:41:22    AV
```

Jul 07 14:10 2022                                                      Page 1


EVENT HISTORY RECORDS
    Event #: P088572522-F              Priority: 5
    Time: 04-Jul-2022/23:19:12         Type: 5303
    Response Level: 0
    Src: T                             Loc: 10198 KEMPWOOD DR + 2701 GESSNER RD
    Info:                              Caller: DAVID- SEAL SECURITY
    Phone: 713 422 2770
    Address:
    Contact:
    Business: HEB GAS STATION

EVENT REMARKS

04-Jul-2022/23:19:12173179        HEC032
    (Click Continue)
    DELAYED REPORT OF A CRIMINAL MISCHIEF.
    YES -  CALLER IS IN THE CITY LIMITS OF HOUSTON
    YES - SOMEONE WITNESSED THE CRIME
    NO - WEAPONS WERE NOT INVOLVED
    1 SUSPECT.
    ----------------------------------------------------------------------

    CLLR STATED THAT THERE WAS A MALE THAT ATTEMPTED TO BREAK IN THE LOC.. CLLR
    STATED THAT THE POI WAS TAZED BY ALLIED SECURITY... POI BROKE THE WINDOW TO
    THE LOC.. POI:BM 30-40'SYOA HEAVY BUILT WEARING BLU W/ORANGE SUN ON FRONT OF
    SHIRT BLU JNS LEANING ON SOMETHING..NOI.NOD

EVENT SUMMARY
    Status   Status Date           By          At
    ------   ------------------    --------    --------
    WAI      04-Jul-2022/23:19:12  173179      HEC032
    CLS      04-Jul-2022/23:50:27  161587      TAC2

EVENT CHRONOLOGY
    Date/Time            Segment Name    Workstation    Description
    ------------------   ------------    -----------    -----------------------
    2022-07-04/23:13:58  LOCVER          HEC032
    2022-07-04/23:15:49  SPI             HEC032         (Start)
    2022-07-04/23:15:49  SPI             HEC032         (Stmnt) CRIMINAL
                                                        MISCHIEF SINS
    2022-07-04/23:15:49  SPI             HEC032         (Select) (Click
                                                        Continue) {PCRM}
    2022-07-04/23:15:50  SPI             HEC032         (Stmnt) WHEN DID THIS
                                                        OCCUR?
    2022-07-04/23:15:51  SPI             HEC032         (Select) DELAYED REPORT
                                                        OF A CRIMINAL MISCHIEF.
                                                        {PCRM6}
    2022-07-04/23:15:51  SPI             HEC032         (Stmnt) ARE YOU IN THE
                                                        CITY LIMITS OF HOUSTON?


APPENDIX 000145                          AhmedAllied 000771

Jul 07 14:10 2022                                                    Page 2

|                         |        |        |                                                                      |
|-------------------------|--------|--------|----------------------------------------------------------------------|
|                         |        |        | IS IN THE CITY LIMITS OF HOUSTON {PCRM7}                             |
| 2022-07-04/23:15:53     | SPI    | HEC032 | (Stmnt) DID YOU OR SOMEONE ELSE WITNESS THE CRIME TAKING PLACE?      |
| 2022-07-04/23:15:54     | SPI    | HEC032 | (Select) YES - SOMEONE WITNESSED THE CRIME {PCRM8}                   |
| 2022-07-04/23:15:54     | SPI    | HEC032 | (Stmnt) WERE WEAPONS INVOLVED?                                       |
| 2022-07-04/23:18:52     | SPI    | HEC032 | (Select) NO - WEAPONS WERE NOT INVOLVED {PCRM9}                      |
| 2022-07-04/23:18:52     | SPI    | HEC032 | (Stmnt) HOW MANY SUSPECTS ARE INVOLVED? (Add in Remarks: Race/Sex/Age/Clothing/On Foot/In Vehicle/Direction) |
| 2022-07-04/23:18:54     | SPI    | HEC032 | (Select) 1 SUSPECT. {PACCRM5}                                        |
| 2022-07-04/23:18:55     | SPI    | HEC032 | (Stmnt) CLICK "ACCEPT" TO OBTAIN POLICE RESPONSE CALL CODE, THEN CLICK "CONTINUE" FOR FURTHER INSTRUCTIONS. |
| 2022-07-04/23:18:56     | SPI    | HEC032 | (Accept) 5303                                                        |
| 2022-07-04/23:18:56     | SPI    | HEC032 | (Select)                                                             |
|                         |        |        | ---------------------- ---------------------- -------------------- {POIVOI} |
| 2022-07-04/23:18:56     | SPI    | HEC032 | (Stmnt)                                                              |
| 2022-07-04/23:19:12     | ENTRY  | HEC032 |                                                                      |
| 2022-07-04/23:49:16     | EXPIRE |        | Pending event expired after 30 MIN                                  |
| 2022-07-04/23:50:27     | XREF   | TAC2   | #P088557522-L DUP                                                   |
| 2022-07-04/23:50:27     | DUP    | TAC2   | DUP                                                                  |

# HOUSTON POLICE DEPARTMENT

**88557522**

**Suppl No: ORIG**



Houston Police Department
1200 Travis Street
Houston, Texas 77002
713-884-3131 Emergency Dial 9-1-1

Reported Date
07/04/2022

Offense Report Title
Criminal Mischief (Reckless Damage) <$2500

Officer Name
THOMAS, D R

## Administrative Information

| Agency | Incident # | Suppl. No. | Reported Date | Reported Time |
|---|---|---|---|---|
| HOUSTON POLICE DEPARTMENT | 885575-22 | ORIG | 07/04/2022 | 22:47 |

| Status | Offense Report Title |
|---|---|
| Report Written or to Follow | Criminal Mischief (Reckless Damage) <$2500 |

| CAD Call Type | Special Event Code |
|---|---|
| BURG | |

| Address | Offense County | City | Zip Code |
|---|---|---|---|
| 10251 KEMPWOOD DR | HARRIS | HOUSTON | 77043 |

| Dist/Beat | Station | District | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|
| 4F20 | NW | 04 | 07/04/2022 | 22:47 | | | 4F21N |

| Officer Name/Employee # | Division |
|---|---|
| THOMAS, D R / 171555 | Northwest - Nights - Patrol |

| Report Entered By/Employee # | Division |
|---|---|
| THOMAS, D R / 171555 | Northwest - Nights - Patrol |

| RMS Transfer | Property | Property Trans Stat | Weather |
|---|---|---|---|
| Successful | Yes | Successful | CLEAR |

| Esimated Loss Value |
|---|
| $2,500 to $29,999 (State Jail Felony) |

| Language Translator | Gang Crime | Hate Crime | Family Violence | Foster Care Fac. | Mental Illness | Metal Theft |
|---|---|---|---|---|---|---|
| NONE | NO | NO | NO | NO | NO | NO |

| Approval Officer/Employee # | Approval date | Approval Time |
|---|---|---|
| THOMAS, D R / 171555 | 07/05/2022 | 04:25 |

| Offense # | Offense | Offense Description | Complaint Type |
|---|---|---|---|
| 1 | 14012 | Criminal Mischief (Reckless Damage) <$2500 | Dispatched |

## PERSON SUMMARY

| Invl | Invl # | Type | Name | MNI | PRN | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|---|
| ARR | 1 | I | DENNIS,TERRY JEROME | 1210850 | 6552618 | B | M | ▮ |
| CAB | 1 | B | HEB | 3125898 | 6552622 | | | |
| COM | 1 | I | CARMONA,CHRISTIAN DANIEL | 4895848 | 6552623 | W | M | ▮ |
| WIT | 1 | I | RODRIGUEZ,RAYMOND ARTHUR | 4730604 | 6552621 | W | M | ▮ |

## Property Summary

| Involvement | Description |
|---|---|
| Damaged/Destroyed/Vandalized | A: Y WINDOW U BRAN Convenience store glass |

## Arrested Person 1: DENNIS,TERRY JEROME

| Involvement | | Invl No | Type | | Reported Date |
|---|---|---|---|---|---|

| Report Officer | Printed At | |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | Page 1 of 8 |

APPENDIX 000147

AhmedAllied 000773

# HOUSTON POLICE DEPARTMENT

**88557522**

Arrested Person                              1    Individual                    07/04/2022

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| DENNIS,TERRY JEROME | 1210850 | Black, Black Hispanic or African American | Male |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ████ | 47 | Not Hispanic/Latino | (N) | No | 5'08" | 220# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Black | Brown | Dark Brown | Heavy |

| Glasses | Extent of Injury |
|---|---|
| No Glasses Worn | |

| General Appearance | Hair Description |
|---|---|
| Casual | Bald |

Facial Features
Face - Round

| Mark Type | Mark Code | MarkDescription |
|---|---|---|
| NONE | | |

Clothing
Blue Shirt T-Shirt  Blue Pants Jeans

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|
| | Singled | United States - American Citizen | American Nationality (United States) |

| Address Type | Address | | Date |
|---|---|---|---|
| Home | 9393 TIDWELL RD #812 | | 07/05/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77078 | -95.251909/29.850591 |

| Phone Type | Phone Number | Date |
|---|---|---|
| Home | (000)000-0000 | 07/04/2022 |

| E-Mail Type | Email |
|---|---|
| Other | 000 |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ████ | Texas |
| FBI Number | ████ | |
| State Criminal Identification Number (SID) | ████ | |
| FBI Number | ████ | |
| State Criminal Identification Number (SID) | ████ | |
| Juvenile Identification Number | ████ | |

| Relationship | Name (Last, First MI) |
|---|---|
| Unknown | NONE |

| DOB | Race | Sex | Phone Type | Phone No |
|---|---|---|---|---|
| | | | | |

| Address | City | State | Zip Code |
|---|---|---|---|
| | | | |

| Report Officer | Printed At | |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | Page 2 of 8 |

# HOUSTON POLICE DEPARTMENT

**88557522**

| Employer/School | | Occupation | |
|---|---|---|---|
| NONE | | | |

| Contact | | Employed From | Employed To |
|---|---|---|---|
| | | | |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

| Vic/Off Age | Residence Status | Domestiv Violence | OFN_INVL | Sexual Assault | Sexual Assault Injury |
|---|---|---|---|---|---|
| 00 | Resident | | | N | |

| Involvement | Arrest Type | Arrest Date | Arrest Time | Booking No | Status |
|---|---|---|---|---|---|
| Arrested | On-View Arrest / Dispatch Arrest | 07/05/2022 | 00:30 | 22-0023453 | Booked |

| Disposition | Arrest Location | City | Reporting District | Beat |
|---|---|---|---|---|
| Felony | 10251 KEMPWOOD DR | HOUSTON | 4F20 | 04 |

| Armed With | Transported Unit - Transported By |
|---|---|
| Unarmed | 4F21N - 171555 / THOMAS, D R |

| Physical Condition |
|---|
| Good Health/Claims Good/Ok |

| Place of Birth | City of Birth | Multiple Charges | Multiple Arrests |
|---|---|---|---|
| Texas | HOUSTON | | N |

| BAC | Time | BAC2 | Time | BAC3 | Time | Attitude | Balance | Eyes | Odor | Speech |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| Physical Condition | Breath | Walking | Turning |
|---|---|---|---|
| GOOD HLTH | | | |

| Charge Code | Charge | Level | Attempt | Counts |
|---|---|---|---|---|
| CRIM MISCHIEF FEL | Criminal Mischief - Felony | F | | |

| Authorized By | Hold Dvision | Other Booking No |
|---|---|---|
| 000000      UNASSIGNED, U | | |

| Arrest Details |
|---|
| SUSPECT BROKE GLASS ON CONVENIENCE STORE |

| Charge Code | Charge | Level | Attempt | Counts |
|---|---|---|---|---|
| -PROCESS- BURG & THEFT | Process For Burglary And Theft | HO | | |

| Authorized By | Hold Dvision | Other Booking No |
|---|---|---|
| 000000      UNASSIGNED, U | BT | |

| Arrest Details |
|---|
| SUSPECT BROKE GLASS ON CONVENIENCE STORE |

## Complainant - Business / Government 1: HEB

| Involvement | Invl No | Type | Reported Date |
|---|---|---|---|
| Complainant - Business / Government | 1 | Business | 07/04/2022 |

| Name | MNI |
|---|---|
| HEB | 3125898 |

| Address Type | Address | Date |
|---|---|---|
| Home | 10251 KEMPWOOD DR | 07/04/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77043 | |

| Report Officer | Printed At | Page 3 of 8 |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | |

AhmedAllied 000775

# HOUSTON POLICE DEPARTMENT

**88557522**

| Phone Type | Phone Number | | Date |
|---|---|---|---|
| Cell - Mobile | (713)996-0009 | | 07/04/2022 |

| E-Mail Type | Email |
|---|---|
| Other | 000 |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

## IBRS Info

| Victim Invl No | Aggravated Homicide | Justifiable Homicide |
|---|---|---|
| 1 | | |

| Related Offenses |
|---|
| Destruction, damage, vandalism |

| Type of Injury |
|---|
| |

## Complainant 1: CARMONA,CHRISTIAN DANIEL

| Involvement | | Invl No | Type | | Reported Date |
|---|---|---|---|---|---|
| Complainant | | 1 | Individual | | 07/04/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| CARMONA,CHRISTIAN DANIEL | 4895848 | White or White Hispanic | Male |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ▉ | 29 | Hispanic or Latino | (Y) | No | 5'06" | 140# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Brown | Brown | | |

| Glasses | Extent of Injury |
|---|---|
| | |

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|
| | | | |

| Address Type | Address | | | Date |
|---|---|---|---|---|
| Home | 3503 DEEDS RD | | | 07/05/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77084 | |

| Address Type | Address | | | Date |
|---|---|---|---|---|
| Mailing | 3503 DEEDS RD | | | 07/05/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| HOUSTON | TX | 77084 | |

| Phone Type | Phone Number | | Date |
|---|---|---|---|
| Cell - Mobile | (281)723-2493 | | 07/04/2022 |

| E-Mail Type | Email |
|---|---|
| Other | 000 |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ▉ | Texas |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ▉ | Texas |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

| Vic/Off Age | Residence Status | Domestiv Violence | OFN_INVL | Sexual Assault | Sexual Assault Injury |
|---|---|---|---|---|---|
| | | | | | |

| Report Officer | Printed At | |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | Page 4 of 8 |

# HOUSTON POLICE DEPARTMENT                88557522

| 00 | Resident | N |
|---|---|---|

## IBRS Info

| Victim Invl No | Aggravated Homicide | Justifiable Homicide |
|---|---|---|
| | 1 | |

| Related Offenses |
|---|
| Destruction, damage, vandalism |

| Type of Injury |
|---|
| |

## Witness 1: RODRIGUEZ,RAYMOND ARTHUR

| Involvement | Invl No | Type | Reported Date |
|---|---|---|---|
| Witness | 1 | Individual | 07/04/2022 |

| Name (Last, First, MI) | MNI | Race | Sex |
|---|---|---|---|
| RODRIGUEZ,RAYMOND ARTHUR | 4730604 | White or White Hispanic | Male |

| DOB | Age | Hispanic | | Juvenile | Height | Weight |
|---|---|---|---|---|---|---|
| ▓▓▓ | 28 | Hispanic or Latino | (Y) | No | 5'02" | 144# |

| Hair Color | Eye Color | Complexion | Build |
|---|---|---|---|
| Black | Brown | | |

| Glasses | Extent of Injury |
|---|---|
| | |

| DWI Involved? | Marital Status | Citizen of | Nationality |
|---|---|---|---|
| | | | |

| Address Type | Address | | Date |
|---|---|---|---|
| Home | 16402 ASHLYN TIMBERS LN | | 07/05/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| MAGNOLIA | TX | 77355 | |

| Address Type | Address | | Date |
|---|---|---|---|
| Mailing | 16402 ASHLYN TIMBERS LN | | 07/05/2022 |

| City | State | Zip Code | Map Coordinates |
|---|---|---|---|
| MAGNOLIA | TX | 77355 | |

| Phone Type | Phone Number | Date |
|---|---|---|
| Cell - Mobile | (832)513-0699 | 07/04/2022 |

| E-Mail Type | Email |
|---|---|
| Other | 000 |

| ID Type | Number | Issued By |
|---|---|---|
| State Issued Drivers License / ID Card # | ▓▓▓ | Texas |

| Saw Susp Oper Veh? | Susp/Pass Intox. | Susp In Acc?/Wit Saw Acc? | Dispo Of Pass |
|---|---|---|---|
| | | | |

## Property

| Prop# | Involvement | Invl No | Invl Date | Security | Tagged | Tag No | Item No |
|---|---|---|---|---|---|---|---|
| 1 | Damaged/Destroyed/Vandalized | 8001 | 07/04/2022 | N | N | | |

| Type | Category | Name |
|---|---|---|
| Article | Other/Items Not Listed in the Article | |

| Article | IBRS Type |
|---|---|
| Window | Other |

| Report Officer | Printed At | |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | Page 5 of 8 |

# HOUSTON POLICE DEPARTMENT                    88557522

| Description | | | | | | # Pieces | Value |
|---|---|---|---|---|---|---|---|
| Convenience store glass | | | | | | | $4,000.00 |

| Entered Date | Entered Time | RMS Transfer | Control | | Reported date |
|---|---|---|---|---|---|
| 07/05/2022 | 01:19 | S | 165897 | 0724222017 | 07/04/2022 |

| Brand | Model |
|---|---|
| Unknown Brand | |

| Link | Invl | Invl No | Name | DOB | Race | Sex |
|---|---|---|---|---|---|---|
| COM | COM | 1 | CARMONA,CHRISTIAN DANIEL | ███████ | W | M |
| WIT | WIT | 1 | RODRIGUEZ,RAYMOND ARTHUR | ███████ | W | M |
| SUS | ARR | 1 | DENNIS,TERRY JEROME | ███████ | B | M |
| OWN | CAB | 1 | HEB | | | |

## All Property Notes

## Modus Operandi

| Gang Act | Gang Name | | Victim's Sex | Victim's Race |
|---|---|---|---|---|
| N | | | | |

| Entry Location | | Arson Inhabited | Alarm | Oddity |
|---|---|---|---|---|
| | | | | |

| Premise Type |
|---|
| Convenience Store |

| Hate Crime Date | Cargo Theft | Body Worn Video | | Victim's Age Group |
|---|---|---|---|---|
| | | Body Video Not Reviewed | | |

## Brief Incident Summary

SUSPECT WAS ARRESTED FOR CRIMINAL MISCHIEF, HE BROKE THE WINDOW OF A CONVENIENCE STORE.

## Incident Narrative

ALL BWCs ON SCENE:
==================

171555 THOMAS
107853 MCGILL


INTRODUCTION:
=============
I, Officer Thomas, while riding 4F21N, on 07/04/2022, were dispatched to a
disturbance/cit call, which later turned out to be a criminal mischief call, at 10251
Kempwood Dr, Houston, Texas 77080 in Harris County, Texas.
I was dispatched at 2355 and arrived on scene at 0004hrs.


COMPLAINANT STATEMENTS:
=======================
HEB - 10251 Kempwood Dr - 713-996-0009

Christian Daniel Carmona - DL ███████ - Ph 281-723-2493 - Store Director
The complainant, Mr. Carmona, stated that he went to the HEB gas station with the
security guard, the witness, who said the defendant was banging on the gas station window
at HEB. He stated the defendant was saying that he wants the cops to be called so he can

| Report Officer | Printed At | |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | Page 6 of 8 |

APPENDIX 000152                                    AhmedAllied 000778

# HOUSTON POLICE DEPARTMENT

**88557522**

be picked up and go where he needs to go. The complainant stated he called the cops but the defendant was still angry and escalating. He stated the defendant said he wanted a cigarette so the complainant gave him a cigarette but he was still getting more angry. The complainant stated he left the location with the security guard for about 5 minutes and came back and the defendant was still by the glass and was still angry. He stated the defendant took off his prosthetic leg and started hitting the glass and smashing it. He stated that it will cost around $4,000.00 to replace the glass window. He stated that he tried his best to work with the defendant, but the defendant would not work with him. He stated that HEB wants to press charges.


WITNESS STATEMENTS:
===================
Raymond Arthur Rodriguez, the fourth - DL ████████ - Ph 832-513-0699 - Security guard for HEB
The witness, Mr. Rodriguez, stated that he on viewed the defendant banging on the glass. He stated that he watched the defendant take off his right prosthetic leg and start hitting the glass window and smashing it. He stated the defendant was escalated and started moving towards him but the witness drew his tazer and pointed it at him and the defendant stopped advancing towards him. He stated he placed the defendant in handcuffs while they waited for police.


REPORTEE STATEMENT:
===================
Same as complainant.


OFFICER'S PARAGRAPH/SCENE DESCRIPTION:
=====================================
The HEB is located on the south side of Kempwood Dr. The gas station is in the parking lot on the east side of the lot and is located on the corner of Kempwood Dr/ Gessner Rd. I observed the entire glass window of the gas station to be heavily cracked.


OFFICER'S ACTIONS:
==================
Upon my arrival, I met with the complainant, and witness. I collected their information and statements. I met with the suspect and collected his statement. Me and Officer P. Mcgill placed the defendant in the back of my patrol car. I collected the suspects name and called the DA's office. ADA Stephen Harris accepted charges for Criminal Mischief - State Jail Felony. I transported the defendant to JPC and booked him. I completed this ORI and charges. JPC SGT. Pruitt accepted and reviewed charges.


DISPOSITION:
============
I completed this ORI and charges.


SUSPECT STATEMENTS:
===================
Terry Jerome Dennis - ID


PROPERTY/EVIDENCE FOUND OR RECOVERED:
=====================================
None found or recovered.

Report Officer
171555 / THOMAS, D R

Printed At
01/03/2025 10:58

Page 7 of 8

APPENDIX 000153

AhmedAllied 000779

# HOUSTON POLICE DEPARTMENT

**88557522**

APPENDIX 000154

AhmedAllied 000780

# HOUSTON POLICE DEPARTMENT

**88557522**

**Suppl No: 0001**



**Houston Police Department**
1200 Travis Street
Houston, Texas 77002
713-884-3131  Emergency Dial 9-1-1

Reported Date
02/21/2023

Offense Report Title
Criminal Mischief (Reckless Damage) <$2500

Officer Name
ALCARAZ, L S

## Administrative Information

| Agency | Incident # | Suppl. No. | Reported Date | Reported Time |
|---|---|---|---|---|
| HOUSTON POLICE DEPARTMENT | 885575-22 | 0001 | 02/21/2023 | 12:48 |

| Status | Offense Report Title |
|---|---|
| Report Written or to Follow | Criminal Mischief (Reckless Damage) <$2500 |

| CAD Call Type | Special Event Code |
|---|---|
| BURG | |

| Address | Offense County | City | Zip Code |
|---|---|---|---|
| 10251 KEMPWOOD DR | | HOUSTON | 77043 |

| Dist/Beat | Station | District | From Date | From Time | To Date | To Time | Primary Unit |
|---|---|---|---|---|---|---|---|
| 4F20 | NW | 04 | 07/04/2022 | 22:47 | | | |

| Officer Name/Employee # | Division |
|---|---|
| ALCARAZ, L S / 162879 | Central - Night - Patrol |

| Report Entered By/Employee # | Division |
|---|---|
| ALCARAZ, L S / 162879 | Central - Night - Patrol |

| RMS Transfer | Property | Property Trans Stat | Weather |
|---|---|---|---|
| Successful | No | Successful | |

| Esimated Loss Value |
|---|
| |

| Language Translator | Gang Crime | Hate Crime | Family Violence | Foster Care Fac. | Mental Illness | Metal Theft |
|---|---|---|---|---|---|---|
| | | | | | | |

| Approval Officer/Empolyee # | Approval date | Approval Time |
|---|---|---|
| ALCARAZ, L S / 162879 | 02/21/2023 | 12:58 |

## Modus Operandi

| Gang Act | Gang Name | | Victim's Sex | Victim's Race |
|---|---|---|---|---|
| N | | | | |

| Entry Location | Arson Inhabited | Alarm | Oddity |
|---|---|---|---|
| | | | |

| Hate Crime Date | Cargo Theft | Body Worn Video | Victim's Age Group |
|---|---|---|---|
| | | Body Video Not Reviewed | |

## Brief Incident Summary

SUSPECT ARRESTED FOR WARRANT RELATING TO THIS CASE.

## Incident Narrative

| Report Officer | Printed At | |
|---|---|---|
| 171555 / THOMAS, D R | 01/03/2025 10:58 | Page 1 of 2 |

AhmedAllied 000781

# HOUSTON POLICE DEPARTMENT                                    88557522

INTRODUCTION AND ACTIONS:
-----------------------------------------------

On 02/21/2023 I, Officer L. Alcaraz, riding unit 2A54D was dispatched to a
CIT/Disturbance located at 2901 Airline Dr, Houston, Harris County, Texas, 77009. The
call was in regard of a crimnal mischief with Mr. Dennis as the suspect. As I was
conducting my investigation of the Crimnal Mischief, I ran Mr. Dennis through my MDT and
found that he has an active warrant out for his arrest for this case number. I confirmed
the warrant with the Harris County warrant division.

After the investigation was completed, Mr. Dennis was charges with two felony offense and
booked in at the Joint Processing Center. Paper warrant was filled out and completed by
me at the Joint Processing Center.

See incident number: 256105-23.

APPENDIX 000156                                    AhmedAllied 000782

# Ahmed Declaration Exhibit CC

## news report about different Allied security guard's use of force — pepper spray and dragging female

Live    News    Weather    Morning News    Sports    Uploads    Tell 26    More ⋮

# Security guard at Kroger accused of racially profiling, assaulting Black women

By Gabby Hart  |  **Published** June 29, 2022 11:03pm CDT  |  Houston  |  FOX 26 Houston  |

**Security guard at Kroger accused of racial profiling**

FOX 26 Reporter Gabby Hart has more on the incident and has reaction from community activists.

**HOUSTON** - A security guard at Kroger is under fire for allegedly racially profiling three different Black women in separate interactions, assaulting one of them and yelling racially insensitive remarks at another.

All three encounters were captured on video. On June 21, Shelondra Peavy recorded her inside the Kroger on 249 and Antoine.

## MORE CRIME AND PUBLIC SAFETY

She says she couldn't carry anymore in her hands, so she dropped some of her items in a clear Kroger produce bag and continued shopping. That's when she says the Allied Universal Security guard seen in the video accused her of stealing. During their encounter, the guard can be heard admitting that he called her "Black and ugly."

Just two months prior on April 13, Stephanie Teel, a woman with special needs had an encounter with the same security guard.

Stephanie was with her cousin, Kamesha Sterling, when she opened a Kroger burger inside the store and started eating it. Sterling says she had every intention of paying for it when they got to the register. But the security guard approached them, an altercation ensued, and eventually, he pepper-sprayed and dragged Stephanie from the store.

**MORE HOUSTON NEWS**

One month later, Stephanie's cousin recorded another interaction with the same guard; he can be seen on video following her from the store and asking her if she had something in her bag.

"He should be terminated, and he also should be arrested," said community activist Quanell X.

Quanell and Doctor Candice Matthews got word of these incidents, and they went to Kroger to speak with the security guard.

"Baby, it's about to get ugly, because we're bringing the hammer of accountability all the way here to this Kroger, and you're going to lose your job," Dr. Matthews said.

**RELATED: Woman shot, killed during 'possible disturbance' in east Harris County: Sheriff**

None of the women involved were arrested or charged for shoplifting.

Kroger sent FOX 26 the following statement:

*"At Kroger, the safety of our associates and customers is one of our core values. We expect all third-party contractors to live up to those values, which also include respect, diversity, and inclusion. The Allied Universal Security Guard in question will no longer service Kroger stores. We will not tolerate this type of behavior from third-party providers that operate within our stores."*

**Houston    News    Crime and Public Safety**

This material may not be published, broadcast, rewritten, or redistributed. ©2025 FOX Television Stations

AhmedAllied 000681

News video available here:

https://www.fox26houston.com/news/caught-on-cam-kroger-security-guard-accused-of-racially-profiling-assaulting-black-women

And here [AhmedAllied 000791]:

https://vimeo.com/1048774780/72f9072630?ts=0&share=copy

# Ahmed Declaration Exhibit DD

# video — two different Allied security guard's use of force — beating male already on the ground

News video available here:

https://grizzyshoodnews.com/more-questions-than-answers-little-york-and-59/#

And here [AhmedAllied 000790]:

https://vimeo.com/manage/videos/1048774780/72f9072630

# Ahmed Declaration Exhibit EE

# fabricated discipline forms

ALLIEDUNIVERSAL

# COACHING – COUNSELING – DISCIPLINARY NOTICE
Security Professionals/Service Employees

| | | | |
|---|---|---|---|
| Employee Name | Twana Ahmed | Employee ID | 9352991 |
| Position Title | Security Professional | Branch/Department | Houston- Commercial |
| Client Site | HEB Houston | Supervisor | Patrick Freeney |
| Union ◯Yes ⦿No | Union Name/Local | Probationary Period | ☐ Currently ☐ Past Union |

**WORK HISTORY** – Prior coaching/counseling or disciplinary action

**Type of Action(s)**     **Date**    **Issued By**    **Description/Reason**

☐ Verbal Warning    2-14-22    P. Freeney

☒ Written Warning    #36 Failing to meet Company Appearance Standards

☐ Final Warning/Suspension

**CURRENT SITUATION – INFRACTION/PERFORMANCE ISSUE(S)** – List as applicable. Attach additional pages if necessary.

☒ Work Rule Violation    #36 Failing to meet Company Appearance Standards

☐ Performance

☐ Attendance

**FACTS** – Provide details of the situation (Who, What, Where, When, How). Attach additional pages if necessary.

On 2-14-2022, SP Twana Ahmed appeared on site in an unkept uniform (Dirty pants, dark gray shoes.)

**EXPECTATION** – Detail the future behavior that is expected. Attach additional pages if necessary.

Refer to AUS Employee Handbook.

**CORRECTIVE ACTION** – Determine next steps, follow-up and/or consequences. Attach additional pages if necessary.

Recommendation: First written warning → expectation is to have SP make the necessary corrections and not repeat uniform violation

**DOCUMENTATION OF CORRECTIVE ACTION**   Agree

☐ Verbal Warning    ☐ Written Warning    ☐ Final Warning    ☐ Termination    Effective Date

☐ Suspension*    Dates of Suspension   From     To    ◯Paid    ⦿Unpaid

*Unpaid disciplinary suspensions of greater than one day require review with Regional HR Manager or Director in advance

**ACKNOWLEDGEMENT**

I acknowledge that this Coaching-Counseling-Disciplinary Notice has been reviewed with me. By signing below, I acknowledge a copy has been given to me and that a copy will be placed in my personnel file. I understand that signing this document does not constitute agreement and I may provide a rebuttal statement which will also be placed in my personnel file. Any other performance deficiency and/or policy violations may result in further disciplinary action up to and including termination.

◯ Agree    ◯Disagree

| | |
|---|---|
| Employee Comments: | |

| | | | |
|---|---|---|---|
| Employee Name | Twana AHMED | Employee Signature *REFUSED | Date 2-15-2022 |
| Manager/Supervisor | Patrick G. Freeney | Manager/Supervisor Signature | Date 2-15-2022 |
| Witness Name | | Witness Signature | Date 2-15-22 |
| Original - Personnel File | Copy - Employee | Copy - Supervisor | Rev 17MAR2021 |

APPENDIX 000164

AUS 00779



# COACHING – COUNSELING – DISCIPLINARY NOTICE

Security Professionals/Service Employees

| | | |
|---|---|---|
| Employee Name | **TWANA AHMED** | |
| Position Title | Security Professional | |
| Client Site | HEB Houston | |
| Union ○ Yes ⦿ No | Union Name/Local | |

| | |
|---|---|
| Employee ID | **9352791** |
| Branch/Department | Houston- Commercial |
| Supervisor | Patrick Freeney |
| Probationary Period | ☐ Currently ☐ Past Union |

**WORK HISTORY** – Prior coaching/counseling or disciplinary action

| Type of Action(s) | Date | Issued By | Description/Reason |
|---|---|---|---|
| ☐ Verbal Warning | | | |
| ☐ Written Warning | | | |
| ☐ Final Warning/Suspension | | | |

**CURRENT SITUATION – INFRACTION/PERFORMANCE ISSUE(S)** – List as applicable. Attach additional pages if necessary.

☒ Work Rule Violation  04042022 - Abuse of Customer, Employee, visitor, or
☐ Performance  third party, including fighting, provoking a fight or other
☐ Attendance  disorderly, reckless conduct / including inappropriate use

**FACTS** – Provide details of the situation (Who, What, Where, When, How). Attach additional pages if necessary.

ON 4-4-2022, SP TWANA AHMED (EMPLOYEE# 9352791) WAS INVOLVED IN A USE
OF FORCE INCIDENT ON CLIENT PROPERTY THAT WAS EXECUTED OUTSIDE OF
ACCEPTABLE PERAMETERS BY "ARRESTING" A SUSPECTED SHOPLIFTER PRIOR
TO THE SUBJECT LEAVING THE BLDG.

**EXPECTATION** – Detail the future behavior that is expected. Attach additional pages if necessary.

Refer to AUS Employee Handbook.

**CORRECTIVE ACTION** – Determine next steps, follow-up and/or consequences. Attach additional pages if necessary.

Recommendation:

**DOCUMENTATION OF CORRECTIVE ACTION**  Agree

| | | | |
|---|---|---|---|
| ☐ Verbal Warning | ☐ Written Warning | ☐ Final Warning | ☒ Termination |
| ☐ Suspension* | Dates of Suspension  From | To | |

Effective Date
○ Paid  ⦿ Unpaid

*Unpaid disciplinary suspensions of greater than one day require review with Regional HR Manager or Director in advance

**ACKNOWLEDGEMENT**

I acknowledge that this Coaching-Counseling-Disciplinary Notice has been reviewed with me. By signing below, I acknowledge a copy has been given to me and that a copy will be placed in my personnel file. I understand that signing this document does not constitute agreement and I may provide a rebuttal statement which will also be placed in my personnel file. Any other performance deficiency and/or policy violations may result in further disciplinary action up to and including termination.

○ Agree  ○ Disagree

Employee Comments:

| | | | |
|---|---|---|---|
| Employee Name | | Employee Signature  REFUSED TO SIGN | Date 04052022 |
| Manager/Supervisor  Patrick G. Freeney | | Manager/Supervisor Signature | Date 04052022 |
| Witness Name | | Witness Signature | Date APRS.2022 |
| Original - Personnel File | Copy - Employee | Copy - Supervisor | Rev 17MAR2021 |

# APPENDIX 000165

AUS 00778

# Exhibit 2

# Declaration of Mauro Siboldi

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Twana Ahmed, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. 4:23-cv-02923 |
| | § | |
| vs. | § | Jury Demanded |
| | § | |
| Universal Protection Service, LP d/b/a | § | |
| Allied Universal, | § | |
| | § | |
| *Defendant*. | § | |

## DECLARATION OF MAURO SIBOLDI

1. My name is Mauro Siboldi. The facts and statements that I make in this declaration are true and accurate to the best of my recollection. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration. I was told that "personal knowledge" means that I personally witnessed or experienced something using one or more of my senses, like sight, hearing, smell, or touch. I was also told that "personal knowledge" includes how I feel.

2. I am a United States citizen and I am over 18 years old. I am a Hispanic male. I was born in Montevideo, Uruguay. I moved to the U.S. when I was about five years old. I am not Muslim and have never practiced the Muslim faith.

3. I have a lot of experience in the security industry. I am a military veteran. I previously worked for Brinks in a security position. I also used to work for the loss-prevention department at a hotel in the Galleria area in Houston, Texas.

4. I was first hired with Allied Universal around December 2021, at a hiring event in a hotel in Houston. The first time that I met Twana Ahmed was there at the Allied hiring event.

APPENDIX 000167

5.  The hiring process was a fairly quick process. They had some chairs set out in a hallway near a couple of ballrooms and they would call you up one by one and go over your resume. If they thought that you were a good fit then they would basically on the spot offer you a position.

6.  I remember at the hiring event there were several computers, and maybe six different people that each had a desk and a computer. When it was my turn, there was one person, a woman sitting at a computer and a desk. I sat down by her, but I never actually used the computer. The woman sitting at the desk went over my resume and filled out the application and entered some of my personal information into the computer. Occasionally the woman at the computer would show me things to confirm my personal information. After that I remember at some point filling something out online at home. I do not remember any discrimination or harassment training on the computer that day. I do not remember ever receiving any training with Allied about discrimination or harassment. I do not remember doing any kind of new employee orientation with Allied on that day or any day after that.

7.  I was hired by Allied for a special team, called the Elite team. For that team, Allied hires armed guards. That team was designated to work for H-E-B grocery stores.

8.  After I was offered the job on the spot, about a month later, in January 2022, I went in person to complete the Elite training, which was about a week long. The training was partly at a gun range, out near Fulshear, for about one or two days. Then the rest of the training was at the Allied office. The total training lasted about seven days. Twana Ahmed was in the same training class with me. Most of us in the class were from a military background, from a law-enforcement background, or both.

9.  I remember that when we were at the gun range, we were all in line together, side by side. I think Twana was right next to me. I remember that Twana had some issues with his gun not working. I remember that Monroe, the instructor had to lend Twana another gun in order for him to qualify for the gun range test.

10.  In the classroom for the Elite training, I remember a medium-sized room with some desks. They would show us some slides, over a variety of subjects. I remember that we took some tests and for at least one of the tests they gave us the answers to the test.

11.  I met Patrick Freeney during the classroom training. Patrick was the director of the Elite program. I think the extent of my contact with Patrick was basically in the

classroom trying to ask him questions. And most of the times he would avoid my questions. They had been telling us in the class, you guys can't make certain mistakes because then you can get sued or get fired. All of us were on edge, and we didn't want to make mistakes. So, we would constantly, all of us, be asking questions. For example, we would ask, "So, in this scenario, I would assume that you would need to take this route. What is your advice on that?" He would not answer and he would be rude about it when you are legitimately trying to figure out how to handle the situation. He was really aggressive and rude when you would try to talk to him. That is something that stuck out to me. A couple of times he would go, "dah dah dah dah dah" to try to cut people off and not let other people talk. He was very aggressive about not letting people talk. I know that at one point I got kind of frustrated, and I told him, in front of the class, "Hey, I understand that you are trying to answer everyone's questions, but you have to actually answer the questions, because we are not actually getting a solid answer for anything." So, for example, we would ask him something, and he would literally stray off and talk about something completely different. He wouldn't answer anyone's questions. We would ask, "In this situation, can we do this?" And he would literally stray off to something else and not answer the question. And every time you would remind him, "Hey you didn't answer the question," he would do exactly the same thing. That was something that didn't sit well with me.

12.   I observed Patrick Freeney to be very rude and pretty sarcastic. He had a really bad attitude. He was difficult to talk to. That's one of the reasons that I found myself getting very frustrated. I consider myself to be someone with a fair amount of patience. I have three kids. I have plenty of practice being patient by now. In security you want to be as thorough as possible when you go through your training, so you are well suited for anything that may occur in the field. So, all of us had a lot of questions. He was sarcastic most of the time. And he gave you the run around on almost every question that you asked him. I did catch many times that he was sarcastic and rude with his tone of voice and in the things that he said. I felt that feeling a lot. I remember on multiple occasions thinking, "is he really talking to the class like that?" We are asking legitimate questions. Is he really giving us these types of answers? I mean, he's not answering and he's being sarcastic. I felt like that was super unprofessional.

13.   At some point during the class in the office, I remember Twana told me that Patrick told him to shave his beard. I also remember that Twana asked a question during class about his religion, and I am pretty sure that it was regarding his beard. No one from Allied ever asked me to shave my beard.

14.   This is an accurate picture of me during our training:



15.   During the class, I remember Allied gave us some training for H-E-B, but I don't remember signing paperwork for it. Everything I thought was very minimal, nothing was really in-depth. So, we were constantly asking a lot of questions, because

we just didn't know. We asked for example, "What if this? What if that?" Most things were very unclear.

16.    I don't remember anything that we covered being thorough. We tried to finalize all of our questions with Patrick. We were supposed to be asking him all of our questions to get clarification on all of those protocols, but they didn't give us much clarity pertaining to anything. I've been in this industry for a while. I feel confident in my ability to deal with stressful situations. I have military experience as well.  If I did this training without that experience, I would not have felt very confident in going into that job.

17.    I remember that Allied went over their use of force policy in the training. We went over different types of use of force. They tried to explain that we could use a level above the force that was used. I remember being able to use force that was equal to, or one step above the force that was being used to try to neutralize the threat. And I remember that the highest level of force was deadly force. You were allowed to use some force if you were worried about your safety or the safety of others.

18.    As far as I remember from all of my experience as a security guard, if a security guard is threatened by someone, and if he felt like he was in danger and in fear for his life, or if he believed that the guy was going to hurt him or someone else on his way out, then that is 100% logical to neutralize the threat. I don't believe that Twana putting handcuffs on someone that threatened him with a knife and was stealing was a violation of the use of force policy that we were taught in the Elite program. If he felt like his life was in danger, or the life of anyone else was in danger, it would have been acceptable to put handcuffs on someone.

19.    Before I accepted the actual job offer with Allied, I told them I had a special situation with my kids and with my wife and her job. I made it real clear that I would need some leniency and that I couldn't just work one day here or two days her and there. I know that in these kind of jobs, they start people out with just one or two days on the schedule. But I told Allied before signing, I would love this position, but I have to start at 40 hours a week. I have to do it full time immediately because I need to put my kids in daycare, and that requires payment in advance. They agreed and told me "That's not going to be an issue."

20.    I went to the seven days of Elite training and then they didn't really give me anything for like another week or so. Then one of the supervisors called me and he said, "Hey, you're gonna start one day a week at this location." I said, "Wait, I spoke to somebody about this before I signed an offer letter and we agreed that I need to be assigned a full time position because I have to put my kids in childcare

in advance." So, the supervisor basically gave me a real smart aleck remark. And then I told him, "You know, I'm sorry. I don't mean to be rude, but I literally just can't do it. That's the whole purpose of me talking to you guys before I signed the offer. If you guys can find me a full time post, then absolutely, you know I'll drive all I have to drive, and I'll take care of that." He basically was just rude again and told me, "You know what? Patrick wants to see you. Come tomorrow to talk to him at the office." I told him, " I'm sorry, that's not how it works. I'm trying to communicate with you here, but you can't tell me, hey, you know what come here with one day's notice. You guys didn't even give me a post yet."

21.     Then I realized after talking to my wife, that if this job is so unorganized, and there is no communication now, I don't want to work there. I sent an email to Patrick and I tried to call him. He never answered me. I sent him a letter via email and I sent it to Human Resources. And then HR didn't respond so I called a couple days later. I said, "Hey, I wanted to see if you guys got my two weeks' notice." They basically told me, "You need to send it to Patrick." Since I can remember, if you put two weeks in at any company, you usually put it in to HR. That was another red flag for me. I told HR that I sent Patrick a copy as well and he never responded. The woman said, "You have to send it to him." And that was the extent of it. I couldn't get communication from HR, which I found extremely odd that for such a huge company I couldn't get any communication from HR.

**My name is Mauro Siboldi. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my rec-ollection. Executed on** Jan 14, 2025

Mauro Siboldi (Jan 14, 2025 10:28 CST)

Mauro Siboldi

# Exhibit 3

# excerpts from
# Allied Universal
# 30(b)(6) deposition

1              UNITED STATES DISTRICT COURT FOR THE

2         SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

3                              -  -  -
   TWANA AHMED,                  ) CIVIL DIVISION
4                                )
              Plaintiff,         ) NO. 4:23-cv-02823
5                                )
      -vs-                       )
6                                )
                                 )
7   UNIVERSAL PROTECTION         )
    SERVICE, LP, d/b/a ALLIED    )
8   UNIVERSAL SECURITY           )
    SYSTEMS,                     )
9                                )
              Defendant.         )
10
                               -  -  -
11

12              REMOTE VIDEOTAPED DEPOSITION OF ANNA

13       SOJA, PMK, located in Texas, commencing at 8:30

14       A.M. CST, 9:30 A.M. EST, on Friday, September

15       13, 2024, before ALYSSA A. REPSIK, Court

16       Reporter and Notary Public in and for the

17       Commonwealth of Pennsylvania.

18

19

20

21

22

23

24

25

APPENDIX 000174

```
 1   APPEARANCES VIA ZOOM:

 2   FOR THE PLAINTIFF:

 3   AH LAW, PLLC

 4   BY:  AMANDA C. HERNANDEZ, ESQ.

 5   5718 WESTHEIMER, SUITE 1000

 6   HOUSTON, TX 77057

 7   Amanda@ahfirm.com

 8

 9   FOR THE DEFENDANT:

10   MARTENSON, HASBROUCK & SIMON, LLP

11   BY:  NATHAN A. SHINE, ESQ.

12   500 DAVIS STREET, SUITE 1003

13   EVANSTON, IL 60201

14   Nshine@martensonlaw.com

15

16   OTHER APPEARANCES:

17   JENNIFER MUNTER STARK, ESQ.

18   LEGAL VIDEOGRAPHER - TIMOTHY COX

19

20                  ---o0o---

21

22

23

24

25
```

APPENDIX 000175

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

```
1                          INDEX

2                       ---oOo---
                                              PAGE
3      EXAMINATION:   ATTORNEY HERNANDEZ          6

4                       ---oOo---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

APPENDIX 000176

```
 1                P R O C E E D I N G S

 2               THE VIDEOGRAPHER:  Good

 3    morning.  We are now on the record at 8:36 a.m.

 4    Central Time on September 13, 2024, to begin

 5    the deposition of Anna Soja, Universal

 6    Protection Services, LP, doing business as

 7    Allied Universal Security Services, pursuant to

 8    Fed. R. Civ. P. 30(b)(6), in the matter of

 9    Twana Ahmed versus Universal Protection

10    Services, LP, d/b/a Allied Universal -- or

11    doing business as Allied Universal.

12               The venue for this case is in the

13    United States District Court for the Southern

14    District of Texas, Houston Division.  The case

15    number is 4:23-CV-02823.

16               This deposition is taking place via

17    Zoom video conference.  The legal videographer

18    is Timothy Cox, here on behalf of Steno, and

19    our court reporter is Sara Acklin [sic], also

20    here on behalf of Steno.

21               So would counsel please identify

22    yourselves and state who you represent.

23               ATTORNEY HERNANDEZ:  Amanda

24    Hernandez for plaintiff, Twana Ahmed.

25               ATTORNEY SHINE:  Nathan Shine,
```

APPENDIX 000177

```
 1   for Universal Protection Service, LP, doing

 2   business as Allied Universal Security Services.

 3                    THE VIDEOGRAPHER:  Thank you,

 4   Counsel.

 5                Would the reporter please swear in

 6   the witness.

 7                    ANNA SOJA, PMK, a witness

 8   herein, having been first duly sworn, was

 9   examined and testified as follows:

10                         EXAMINATION

11   BY ATTORNEY HERNANDEZ:

12        Q.     Thank you.

13               Do you agree that companies must

14   protect employees from discrimination in the

15   workplace?

16        A.     Yes, I do.

17        Q.     Is that important?

18        A.     Yes, it is.

19        Q.     On a scale of 1 to 10 where 1 is not

20   important at all, and 10 is the most important,

21   how important is it that companies protect

22   employees from discrimination in the workplace?

23        A.     10.

24        Q.     Why is that important?

25        A.     It is important for us to be able to
```

APPENDIX 000178

1    protect our employees from any discrimination

2    based on any race, religion, national origin,

3    or any protected classes as stated by the law.

4         Q.    Is there any other reason why it's

5    important besides the law?

6         A.    Yes.  It is good for us to foster a

7    safe and comfortable environment for all of our

8    employees, to foster an inclusive and diverse

9    environment for our employees.

10              So it is very important for us to be

11   able to have an environment where individuals

12   are able to come into work, feel comfortable

13   when they're in the work environment and the

14   individuals they are working with.

15        Q.    Do you agree that companies must

16   protect employees from retaliation when they

17   report discrimination?

18        A.    Yes, I do.

19        Q.    Is that important?

20        A.    Yes, it is.

21        Q.    On the same scale of 1 to 10, how

22   would you rate that?

23        A.    10.

24        Q.    And why is it important to protect

25   employees from retaliation?

1        A.    It is important for us to protect

2    employees from retaliation in order for them to

3    feel comfortable in the environment they are

4    working with and to protect them from any

5    lawful behaviors conducted by other

6    individuals.

7            And to make sure that they have an

8    environment that they could work in where they

9    don't fear that they will be retaliated against

10   if they brought any matters to our attention.

11       Q.    Do you agree that companies must

12   protect employees from retaliation when they

13   request religious accommodations?

14       A.    Yes, I do.

15       Q.    And on the same scale of 1 to 10,

16   how important is that?

17       A.    10.

18       Q.    And why is that important?

19       A.    It is important for us -- for our

20   companies -- or Allied Universal -- to ensure

21   that an individual is able to bring to our

22   attention a reasonable accommodation request

23   and for us to review the accommodation request

24   and be able to provide them with an interactive

25   conversation to protect their rights and for us

APPENDIX 000180

1    to be able to review all the information that

2    was provided to us to ensure that we are

3    protecting their rights and reviewing the

4    information they brought to us in regards to

5    any accommodations.

6        Q.    Do you agree that not protecting

7    employees from discrimination or retaliation

8    can be unsafe?

9        A.    I do.

10       Q.    Is it fine with you if I refer to

11   "Allied Universal" or "Universal Protection

12   Services, LP," as just "Allied"?

13       A.    Yes.  Yeah.

14       Q.    Thank you.

15             Are Allied's policies and procedures

16   mandatory?

17       A.    Yes, they are.

18       Q.    Allied has a zero-tolerance policy

19   for discrimination and harassment; correct?

20       A.    Yes, they do.

21       Q.    And Allied also has a zero-tolerance

22   policy for retaliation in the work place?

23       A.    That is correct, yes.

24       Q.    On a scale of 1 to 10, 1 being not

25   important at all and 10 being the most

APPENDIX 000181

1  important, how important is it to Allied that

2  it follow its policies and procedures?

3      A.    10.

4      Q.    Okay.  And on the same scale of 1 to

5  10, how important is it to Allied that there be

6  no discrimination in the workplace?

7      A.    10.

8      Q.    And same scale, that there be no

9  retaliation in the workplace?

10      A.    10.

11      Q.    And same scale, that there be no

12  harassment in the workplace?

13      A.    10.

14      Q.    How does Allied ensure that there is

15  no discrimination in the workplace?

16      A.    Well, Allied does provide several

17  trainings for all individuals for -- from every

18  level, from a security professional to senior

19  management, to ensure that they are well aware

20  of what is determined to be discrimination,

21  harassment, retaliation so they're well versed

22  and understand that.

23           And we also provide all of our

24  employees on every level a platform to report

25  any reports of discrimination, harassment,

 1   retaliation, hostile work environment,

 2   bullying, anything that they have felt was an

 3   inappropriate conduct in the workplace.

 4       Q.    You mentioned that Allied provides

 5   training to all levels of employees.  Does

 6   Allied provide different training to security

 7   professionals than it does to, say, supervisors

 8   or managers?

 9       A.    It does -- it does determine on the

10   role.  We do have standardized training that

11   everybody receives across the board that's the

12   same.  For example, like, new employee

13   orientation training is the same across the

14   board.

15            There are more significant levels of

16   training for higher leadership roles than maybe

17   a security professional would receive.  But

18   security professionals would receive training

19   that's specific to their specific roles, and

20   same goes for anything that's any levels above

21   that.

22       Q.    And just to clarify, so let's say

23   we're talking about a security professional.

24   What -- setting aside their training for their

25   specific role, what training does Allied

APPENDIX 000183

1    provide on antidiscrimination and

2    antiretaliation laws?

3         A.    Sure.    During new employee

4    orientation, all employees must come -- must

5    complete three modules followed by a final

6    exam.

7              The first module outlines the

8    antiharassment policy, which goes over

9    discrimination, harassment, the different types

10   of harassment there is, and ways of reporting

11   that harassment.

12             There's an addition -- could be some

13   additional training.    If it's State required,

14   then Allied Universal would also conduct that

15   training.

16             For example, in Illinois, it is

17   mandatory to provide annual training on, you

18   know, harassment or discrimination, but it is

19   sometimes state specific.

20        Q.    And then aside from that initial

21   training on the module, is there any other

22   training that Allied requires of security

23   professionals throughout their tenure with

24   Allied?

25        A.    Yes.    There's continuous training.

APPENDIX 000184

 1    It depends on how long they've been with the

 2    organization, but there is continuous training.

 3             We do have something that's called

 4    core training, that they have to complete as

 5    mandatory training, all paid.  There's several

 6    levels of the training.  It depends on their

 7    specific role.

 8             So for example, for security

 9    professionals, there's guidelines of what

10    training they are mandatory to complete.

11             There's also voluntary training

12    available for all of our security professionals

13    through an online platform.

14             There's also site-specific

15    client-requested training that security

16    professionals go through.

17             So it's continuous throughout their

18    employment.

19        Q.    And -- excuse me.

20             I probably asked the question

21    incorrectly.

22             But specific to training on

23    discrimination and retaliation, aside from the

24    new -- the new employee orientation module, are

25    employees required to take additional training

APPENDIX 000185

1    on discrimination and retaliation?

2        A.    Yes, if it's State mandated.

3        Q.    Okay.  So, for example, in Texas are

4    they required to?

5        A.    The State does not require it in

6    Texas.

7        Q.    Okay.  And so if so, Twana Ahmed who

8    was working at Allied, he would have completed

9    the module that you referred to when he was

10   initially hired?

11       A.    That is correct.

12       Q.    Okay.  And so would there be

13   evidence of that completion in the test that

14   was taken somewhere?

15       A.    So there is -- so there's a

16   compliance code that is entered into the

17   compliance tracker in their employee file, that

18   outlines that new employee orientation was

19   completed, and that means that it was

20   successfully completed because there is a final

21   exam at the end.

22            If an employee or new hire at new

23   employer orientation does not pass that exam,

24   we do not move forward with employment for

25   them.  So in Mr. Ahmed's situation, he would

APPENDIX 000186

1  have completed it and must have passed the exam

2  if we moved forward with his employment.

3      Q.    Okay.  Excuse me.

4          You have -- so the module -- how

5  long is the module that's for

6  antidiscrimination and antiretaliation laws?

7      A.    They are self-paced.  The time to

8  complete all three modules are back to back to

9  one another with questions in between, but it's

10  a three-hour course to complete all three

11  modules.

12          Again, it is self-paced, so it would

13  be up to the candidate for how long it took

14  them to complete any specific module.

15      Q.    Okay.  Thank you.

16          And so when supervisors are

17  initially hired or promoted, do supervisors

18  have any different training on discrimination

19  or harassment or retaliation at Allied?

20      A.    Supervisors will receive the same

21  training as the security professional on those

22  particular matters.

23      Q.    Okay.  And what about managers?

24      A.    Managers do receive -- if, for

25  example, if it's a new manager going and

```
 1   bringing -- from an external candidate coming

 2   into the organization or if it's a promotion,

 3   they are required to complete a new employee

 4   orientation for administrative employees which

 5   is -- differs from the security professional

 6   and supervisor modules.  It's a little more

 7   extensive.

 8       Q.     The specific part on discrimination

 9   and retaliation and harassment is more

10   extensive?

11       A.     The training is more extensive.  Our

12   policies and training in regards to harassment,

13   retaliation are the same across the board.

14       Q.    I see.  Can you give me an example

15   of how the training is more extensive?

16       A.    Well, they have more requirements as

17   far as, you know, investigating reports, making

18   sure that reports are submitted in a timely

19   fashion.

20            So for example, security

21   professional they are told, you know, "You are

22   -- you have to report, you know, these type of

23   incidents."

24            From a manager perspective, as soon

25   as they become aware of such incidents, they
```

APPENDIX 000188

1    should be conducting investigations.  They

2    should be reporting it.

3              So their training is to -- how to

4    properly react to a situation as soon as they

5    become aware of any type of discrimination,

6    harassment, retaliation occurring as opposed to

7    an SP reporting it out.

8         Q.    I see.  Okay.  And is that also just

9    given to them when they're initially promoted

10    or hired, and then that's it if it's not

11    required by the State?

12         A.    That is correct.

13         Q.    Okay.  Would there be written

14    materials that explain the training that

15    managers must follow when they're investigating

16    reports?

17         A.    Yes.  It is outlined in the

18    administrative handbook.

19         Q.    As far as you know, has the

20    administrative handbook been produced in this

21    case?

22         A.    I'm not -- I'm not sure.

23         Q.    Okay.  Is the administrative

24    handbook something that -- you might have said

25    this.

APPENDIX 000189

1             Is the administrative handbook

2   something that only the managers must follow or

3   do supervisors also need to follow the

4   administrative handbook?

5        A.     Supervisors and security

6   professionals follow the security professional

7   handbook.  Any managers and administrative

8   roles and above follow the admin handbook.

9        Q.    Okay.  Thank you.

10            Patrick Freeney, what was his title

11   at Allied in --

12        A.    He was an operations manager.

13        Q.    An operations manager.  So he would

14   have been following the administrative

15   handbook?

16        A.    That is correct.

17        Q.    Okay.  And can you tell me when

18   Patrick Freeney was first hired?

19        A.    I believe it was January of 2021,

20   from the best of my recollection.

21        Q.    Okay.  So he was hired in directly

22   as a manager?

23        A.    I do believe so, yes.

24        Q.    Okay.  And I'm sorry.  You said

25   January of 2021?

APPENDIX 000190

```
 1          A.     Correct.

 2          Q.     Okay.  And what level of education

 3   or experience did he have?

 4          A.     I do not recall.

 5          Q.     Do you know what level of experience

 6   he had?

 7          A.     From my recollection, he would have

 8   had previous leadership experience.  I just --

 9   I just do not recall at this time.

10          Q.     If you wanted to find out, how would

11   you do that?

12          A.     We have a platform that we're able

13   to look at his employment application, r sum

14   submitted, and anything he would disclose

15   during his onboarding process.

16                 So I would be able to verify, had

17   I -- I'm able to view that information.

18          Q.     Okay.  During the course of his

19   employment, was Patrick Freeney the subject of

20   any investigation at Allied?

21          A.     Yes, he was.

22          Q.     Was it just one investigation?

23          A.     Yes, it was.  I'm sorry.  There was

24   two incidents.  I apologize.

25          Q.     Okay.  What was the first incident?
```

APPENDIX 000191

1           A.     We received a concern regarding

2    him -- it was an anonymous complaint submitted

3    through or our NAVEX hotline regarding him

4    potentially requiring his supervisors to

5    complete schedules on his behalf.

6           Q.     Was that against Allied's policy?

7           A.     It is not.

8           Q.     Okay.  And what was the outcome of

9    that investigation?

10          A.     It was not substantiated.

11          Q.     Who conducted that investigation?

12          A.     I do not recall.

13          Q.     When did that investigation take

14   place?

15          A.     I want to say somewhere mid-2022.

16          Q.     And then what were the circumstances

17   surrounding the second incident?

18          A.     The second complaint that we

19   received through our employee hotline was

20   submitted by the plaintiff.

21          Q.     And what was the outcome of that

22   investigation?

23          A.     So it was a twofold piece.  So

24   the -- the allegations regarding Patrick

25   Freeney making inappropriate comments was

APPENDIX 000192

1    unsubstantiated.

2            The allegations in regard to

3    requesting the plaintiff to shave his beard

4    were unsubstantiated.

5            We reviewed the termination, because

6    that was included also in the complaint, and we

7    reviewed that the termination was justified.

8        Q.    Is -- you said there was a twofold

9    piece.  Was that the first part, or is there --

10   or were you explaining both parts?

11       A.    Both parts.  So the first part would

12   be that there was comment that -- there was

13   allegations that Patrick Freeney was making

14   inappropriate comments to the plaintiff.  And

15   the second piece that it was a wrongful

16   termination.

17       Q.    And Patrick Freeney no longer works

18   for Allied; correct?

19       A.    That's correct.

20       Q.    When was his last day?

21       A.    It was on or about June 2022.

22       Q.    And what -- why did he leave?

23       A.    He resigned for personal reasons.

24       Q.    Do you know where he's working now?

25       A.    I do not.

```
 1        Q.    Was Patrick Freeney disciplined in
 2   any way during his time at Allied?
 3        A.    He was not.
 4        Q.    Okay.  Do you agree that
 5   discrimination in the workplace is a
 6   foreseeable danger to employees?
 7        A.    Yes, it is.  It could be, yes.
 8        Q.    Okay.  Why is that?
 9        A.    Well, it depends.  If an
10   organization becomes aware of such instance and
11   doesn't act on it, it could escalate between
12   the individuals involved.  So it could pose a
13   danger if the company doesn't become involved
14   in the matter.
15        Q.    In developing Allied's policies and
16   procedures applicable to preventing
17   discrimination and retaliation in the
18   workplace, did Allied consider any statistics
19   related to, say, the percentage of employees
20   that experience discrimination?
21        A.    I do not know.
22        Q.    In your experience as an HR
23   professional, have you encountered any studies
24   showing percentages of employees that report
25   having experienced discrimination?
```

APPENDIX 000194

```
 1        A.     I do not.

 2                  ATTORNEY SHINE:  Objection to

 3    outside the scope, Amanda.

 4    BY ATTORNEY HERNANDEZ:

 5        Q.     In your education and training and

 6    experience, are you aware that oftentimes

 7    employees that experience discrimination often

 8    do not report it out of fear of retaliation?

 9                  ATTORNEY SHINE:  Again,

10    objection.  Outside the scope.

11    BY ATTORNEY HERNANDEZ:

12        Q.     You can still answer.

13                  ATTORNEY SHINE:  To the extent

14    she has any knowledge, she can answer.

15                  THE WITNESS:  And I'm sorry.

16    Can you rephrase the question?

17    BY ATTORNEY HERNANDEZ:

18        Q.     Sure.  At -- you are an HR

19    professional; correct?

20        A.     That is correct.

21        Q.     Okay.  How long have you been

22    working in HR?

23        A.     A little over 10 years.

24        Q.     And so in your experience as an HR

25    professional, are you aware that oftentimes
```

APPENDIX 000195

1    employees that experience discrimination will

2    not report it out of fear of retaliation?

3                    ATTORNEY SHINE:   My objection

4    stands.

5                    THE WITNESS:   Yes.

6                    ATTORNEY SHINE:   But she may

7    answer.

8                    THE WITNESS:   Yes.

9    BY ATTORNEY HERNANDEZ:

10       Q.    Okay.   Have you -- in your studies,

11   have you seen a report noted by the EEOC that

12   roughly 75 percent of employees that have

13   reported workplace conduct have experienced

14   retaliation?

15                   ATTORNEY SHINE:   Objection.

16   Outside the scope.

17           To the extent she has any personal

18   knowledge, she may answer.   However, this is

19   not the appropriate question for a 30(b)(6)

20   witness.

21   BY ATTORNEY HERNANDEZ:

22       Q.    You may answer.

23       A.    I do not.

24       Q.    How does Allied ensure the

25   discrimination and harassment is not occurring

APPENDIX 000196

1    in its workplace if employees do not self

2    report?

3         A.    Well, we do provide all of our

4    employees guidelines in the employee handbook

5    on how to report any type of discrimination

6    that they may be -- discrimination, harassment,

7    retaliation -- that they become aware of.

8              They are able to report these

9    matters anonymously through our hotline which

10    is available to them 24/7.

11             Also, during our trainings and new

12    employee orientation, we also outline the

13    individuals that observe somebody being

14    discriminated against, harassed, retaliated

15    against for them to also speak up and report

16    those matters to us.

17        Q.    Okay.  So if an employee is fearful

18    of retaliation and does not self-report, does

19    Allied do anything to ensure that

20    discrimination is not happening?

21             For example, does it monitor the

22    workplace in any way?

23        A.    Well, in our industry, it's a little

24    more difficult to do that because we are

25    contract security.  So we provide security

APPENDIX 000197

1    services through multiple clients throughout,

2    you know, throughout cities, throughout the

3    country, and it's very site-specific.

4            So we're not in one environment

5    together where we're able to do that.  It's all

6    very spread out.

7        Q.    Okay.  So just so I have a clear

8    answer, does Allied monitor the workplace to

9    ensure that discrimination is not happening?

10       A.    I would say, yes, we do monitor.  We

11   ensure that our managers are, you know, well

12   trained to observe these matters, but again,

13   depending on the location, some -- some sites

14   have just one security professional by

15   themselves in a guard shack, for example.

16   Right.  So it would be difficult for us to be

17   able to monitor in a situation like that.

18           In a larger location, yes, it would

19   probably be much easier for a manager to be

20   able to monitor that.

21       Q.    Is anyone monitoring the managers to

22   ensure that they are not engaging in

23   discriminatory or retaliatory behavior?

24       A.    I would say that yes.  I mean, we --

25   you know, there's definitely meetings occurring

APPENDIX 000198

1    with managers, conversations regarding what's

2    happening on-site with leadership, so you know,

3    they're actively involved.

4           It would be difficult to determine

5    whether a manager is, you know, conducting

6    themselves in a, you know, unprofessional

7    manner when reacting with their security

8    professionals unless we're, you know,

9    monitoring the site 24/7.

10          So it would be difficult to fully

11   monitor a site, but yes, I would say that we do

12   our best to do so.

13       Q.    And so how is that done?

14       A.    Well, they are -- for example, like,

15   in account meetings would have to meet with

16   their direct report; go over what's happening

17   at the site; discuss what's happening with

18   security professionals, interaction with

19   clients.  Are we doing a good job?  These

20   conversations are constantly occurring.

21          So it would be up to a leader to

22   determine if there's something that is raising

23   a red flag with them to further look into it.

24          But there are constant meetings

25   occurring with all of our staff --

APPENDIX 000199

1    administrative staff.

2        Q.    I'm sorry.  So that sounded like a

3    manager checking in with its security

4    professionals, but I believe you said that

5    Allied monitors its managers to ensure that

6    they are not engaging in discrimination.

7            How -- how does Allied monitor its

8    managers to ensure that they are not engaging

9    in discrimination?

10        A.    Well, we're just hosting meetings.

11    I mean, it would be very difficult for us to

12    determine whether a manager is behaving in a

13    discriminatory manner unless they fully display

14    that to us.

15            If there was a meeting held or a

16    site visit where a manager fully displayed that

17    they were discriminating against an employee,

18    making an inappropriate comment, it would be

19    addressed immediately.

20            Otherwise, if there's no signs that

21    a manager is, you know, being -- discriminating

22    against people or having -- or making

23    inappropriate comments that are not made to us

24    or being reported to us, it'd be difficult for

25    us to determine whether a manager is practicing

1    that without, you know, any reporting of it or

2    visible acts of it.

3         Q.    Okay.  So aside from, like, meetings

4    that the manager would have with their

5    superiors, there's no other way that Allied can

6    monitor the managers; true?

7         A.    That's correct.

8         Q.    Okay.  Do you agree that

9    discrimination in the workplace is preventable?

10        A.    I -- I mean, that's a difficult

11   question.  But, I mean, as much as we would

12   like for it to be prevented, no, I don't think

13   it's 100 percent preventable because we can't

14   control individuals.

15        Q.    Okay.  Why not?

16        A.    Well, you know, we can give all the

17   tools for a manager or individuals to be

18   successful and know, you know, the policies,

19   procedures, laws against preventing these type

20   of discriminatory acts, but as far as an

21   individual, what they -- when they do that,

22   it's hard for the organization to be able to

23   prevent that because we can't control an

24   individual's acts.

25             What we can do, from a company

APPENDIX 000201

 1   standpoint to control that, is to provide them

 2   the training and guidance, policies and

 3   procedures to follow as much as possible to --

 4   in order to prevent that from occurring.

 5        Q.    Okay.  Do you agree -- similar

 6   question.  Do you agree that retaliation for

 7   reporting discrimination in the workplace is

 8   preventable?

 9        A.    Well, again, it's providing them the

10   guidance, policies, and procedures to be aware

11   of what retaliation is to avoid it at all

12   costs.

13        Q.    Okay.  When Patrick was first hired,

14   was he immediately Twana Ahmed's manager?

15        A.    I do not know.

16        Q.    Okay.  How -- do you know how many

17   subordinates he had at the time?

18        A.    Patrick?

19        Q.    Yes.

20        A.    He had three.

21        Q.    Patrick Freeney?

22        A.    Sorry.  Patrick Freeney, he had

23   four.  I apologize.  Four.

24        Q.    And who were those subordinates?

25        A.    It was Patrick Parham, Mauricio

1    Zepeda, Alexander Bergeron, and Nathan

2    Hernandez.  I want to say it was a Nathan for

3    sure.  I just might be recalling the last name

4    incorrectly.

5        Q.    Were -- so you listed four people.

6    Were those four subordinates considered

7    supervisors of the security professionals?

8        A.    They are field supervisors that,

9    yes, they -- in the hierarchy, it would be

10    Patrick, the field supervisors, and then all

11    security professionals below them.

12        Q.    So is Patrick also -- so were the

13    security professionals also Patrick Freeney's

14    subordinates?

15        A.    Yes.  They were considered under

16    him.  Yes.

17        Q.    And who is Patrick Freeney's

18    immediate supervisor?

19        A.    It was Felicia Solis-Ramirez.

20        Q.    And what is Felicia's title?

21        A.    Branch manager.

22        Q.    When was Felicia hired by Allied?

23        A.    From my understanding, January 2018.

24        Q.    What's her level of education?

25        A.    I do not recall.  She had 10 years

1    of leadership experience prior to her hiring.

2         Q.    And 10 years of management

3    experience doing what?

4         A.    In the management roles.

5         Q.    Do you know where?

6         A.    I do not recall.

7         Q.    Did she have a security professional

8    background?

9         A.    I do not recall.

10        Q.    Was Felicia always the branch

11   manager from 2018 until the time she left?

12        A.    That is correct.

13        Q.    Would Felicia have been required to

14   follow the administrative handbook?

15        A.    Yes.

16        Q.    Would Felicia have been required to

17   do any additional training on discrimination,

18   retaliation, or harassment while at Allied?

19        A.    She would have completed training on

20   those topics.

21        Q.    Aside from the initial onboarding

22   training, would she have been required to

23   complete training -- like, yearly training or

24   more frequent training?

25        A.    I do not know.

```
 1        Q.    Was she based in Texas?

 2        A.    Yes, she was.

 3        Q.    And so if Texas didn't require it,

 4   would she have been required to undergo

 5   additional training on discrimination,

 6   harassment, or retaliation?

 7        A.    I do not know.

 8        Q.    And if she had completed that

 9   training, would Allied have a record of it?

10        A.    Yes, we would.

11        Q.    And when was Felicia's last day of

12   work with Allied?

13        A.    I believe -- gosh.  I believe

14   potentially May 2024.

15        Q.    And what were the circumstances of

16   her departure?

17        A.    She resigned.

18        Q.    Did she resign in lieu of

19   termination?

20        A.    I do not believe so, no.

21        Q.    Do you know why she resigned?

22        A.    I do not.

23        Q.    Do you know where she is working

24   now?

25        A.    I do not.
```

APPENDIX 000205

```
1        Q.    Did Patrick Freeney resign in lieu
2    of termination?
3        A.    I do not know, but I don't believe
4    so.
5        Q.    Is there somebody that would know?
6        A.    Yeah.   Most definitely there would
7    be somebody from the Texas group that would
8    definitely know that.
9        Q.    Who would know?
10       A.    We -- we could request that
11   information to be provided.  There would be
12   record of it.  The Texas branch leadership
13   would know that information.
14       Q.    And who is considered Texas branch
15   leadership?
16       A.    At this time, I believe Bill Keene.
17   No.  Sorry.  He's -- I don't think he's no
18   longer with the company.
19            Well, our HR manager would
20   definitely be able to look that information up,
21   which is Katherine Alyea.  Alyea.
22       Q.    Okay.  So Katherine -- I'm sorry.
23   How do you pronounce her last name?
24       A.    "Alyea," I believe.
25       Q.    Katherine Alyea is the HR manager
```

APPENDIX 000206

```
 1   for Texas?
 2        A.    For the Houston branch.
 3        Q.    Okay.  And you mentioned Bill Keene.
 4   You said he no longer works with Allied?
 5        A.    Yes.  At the time, he would have
 6   been Felicia's direct report, but he's no
 7   longer with Allied.
 8        Q.    What was his title?
 9        A.    He was regional vice president.
10        Q.    When did he leave?
11        A.    I do not know.
12        Q.    Do you know why he left?
13        A.    I do not.
14        Q.    You said Bill Keene would have been
15   Felicia's direct supervisor, I believe?
16        A.    At the time, yes.
17        Q.    At the time.  Did she have any other
18   supervisors?
19        A.    No.  Not in the hierarchy, no.
20        Q.    And in the hierarchy, who -- was
21   Felicia Patrick Freeney's only direct
22   supervisor?
23        A.    Yes.
24        Q.    Is there anyone else that Patrick
25   Freeney would have reported to?
```

```
 1        A.    No.  She would be his direct

 2   supervisor.

 3        Q.    Okay.  Could you briefly tell me

 4   what Patrick Freeney's general duties were as

 5   account manager?

 6              ATTORNEY SHINE:  I'm just

 7   objecting to misstating the testimony.

 8              ATTORNEY HERNANDEZ:  I'm

 9   sorry.

10   BY ATTORNEY HERNANDEZ:

11        Q.    What was his title?  What was

12   Patrick Freeney's title?

13        A.    Operations manager.

14        Q.    Thank you.  Can you let me know --

15   can you explain what his general duties were as

16   operations manager?

17        A.    The general duties of an operations

18   manager, it's scheduling, doing call-offs,

19   filling the schedules, dealing with day-to-day

20   concerns from employees, maintaining

21   compliance, ensuring training is occurring.

22              There are several criterias that

23   managers must meet.  A standard -- for example,

24   advanced scheduling, ensuring payroll is

25   adequately submitted.  They're responsible for
```

APPENDIX 000208

1    payroll records.  They're responsible for

2    managing that employees are calling in, calling

3    out.  Responsible for ensuring that employees

4    are following company guidelines as far as

5    utilizing our technology while they're on post.

6              And interacting with clients and the

7    general public to make sure that our security

8    professionals are meeting company standards and

9    client requirements.

10    Q.    Was Patrick Freeney considered the

11    Elite account manager?

12    A.    He -- I don't -- I wouldn't say that

13    he was the Elite account manager.  He oversaw

14    the AGB account, and the Elite program was

15    embedded into that account.

16    Q.    And did he oversee that for all of

17    Houston?

18    A.    I do not know.

19    Q.    Okay.  Do you know how many security

20    professionals he managed?

21    A.    I do not know.

22    Q.    Did Pat -- did Patrick have

23    authority to hire new members to his team?

24    A.    Yes, he did.

25    Q.    Did he have authority to discipline

APPENDIX 000209

1    members of his team?

2         A.    Yes, he did.

3         Q.    Did he have authority to approve

4    whether members of the team worked overtime?

5         A.    Yes, he did.

6         Q.    And I think you said this already,

7    but he had authority to set employee schedules

8    or alter employee schedules?

9         A.    Yes.

10        Q.    And did he have authority to fire

11   members of his team?

12        A.    Yes.

13        Q.    It was Patrick Freeney that

14   recommended Twana Ahmed be fired from Allied;

15   true?

16        A.    Yes.

17        Q.    What is your title with Allied?

18        A.    Human resources director, regional

19   for the Midwest.

20        Q.    And how long have you worked with

21   Allied?

22        A.    Eight years.

23        Q.    Have you always been the human

24   resources director?

25        A.    No.

```
 1    30(b)(6) witness.
 2              To the extent you have personal
 3    knowledge and would like to testify to that,
 4    you may answer.
 5              THE WITNESS:  Yes, I do.  I do
 6    believe that it is important.
 7    BY ATTORNEY HERNANDEZ:
 8        Q.    Does Allied require that
 9    investigations be conducted immediately when an
10    employee reports discrimination or harassment?
11        A.    Yes.
12        Q.    Okay.  Do you agree that it would be
13    wrong to ignore reports of discrimination or
14    harassment?
15        A.    Yes.
16              ATTORNEY SHINE:  Objection.
17    Outside the scope.
18              To the extent she has personal
19    knowledge, she may answer.
20              THE WITNESS:  Yes.
21    BY ATTORNEY HERNANDEZ:
22        Q.    Okay.  Would it be against Allied's
23    policies to ignore reports of discrimination or
24    harassment?
25        A.    Yes.
```

APPENDIX 000211

1    Q.    Do you agree that it would be -- do

2  you agree that it would be reckless to ignore

3  reports of discrimination or harassment?

4                ATTORNEY SHINE:  Objection.

5  Outside the scope.

6                To the extent she has personal

7  knowledge, she can answer.

8                THE WITNESS:  Yes.

9  BY ATTORNEY HERNANDEZ:

10    Q.    I cannot remember if you already

11  answered this, but does Allied have or use any

12  manuals on how to conduct investigations into

13  reports of discrimination?

14    A.    Yes.  There are guidelines provided

15  on how to conduct an investigation.

16    Q.    Okay.  Is that, like -- where is

17  that housed?  Is it housed in an actual manual

18  like a physical book, or is it something

19  online?

20    A.    We are predominantly digital, so it

21  is housed on a company platform under human

22  resources categories, and it outlines and it

23  has -- there's a file that contains all that

24  information.

25    Q.    And so is there -- so is there -- is

1    there an actual manual on how to conduct

2    investigations into reports of discrimination?

3         A.    It's not a manual.  There's

4    guidelines provided.

5         Q.    Okay.  And these guidelines that are

6    provided, are they provided to all the HR

7    professionals tasked with conducting

8    investigations?

9         A.    Yes.

10        Q.    Are they expected to follow the

11   guidelines?

12        A.    The guidelines are per -- provided

13   as a standard way of performing an

14   investigation.  More newer HR professionals

15   would use those guidelines, and all the

16   documentation attached to them more senior, and

17   depending on the region and the HR director at

18   their discretion how an investigation is to be

19   completed, but those guidelines do provide

20   exactly what the company expectation is -- is

21   following to properly and thoroughly conduct an

22   investigation.

23        Q.    Okay.  What do those guidelines

24   recommend happen to conduct a thorough and fair

25   investigation?  What are the steps?

APPENDIX 000213

1        A.    Well, there are several steps.  The

2    first one is to, you know, evaluate the

3    situation to determine the next steps, whether

4    or not somebody may have to be suspended, what

5    parties are involved, determining whether

6    there's potential camera footage, determining

7    what witnesses are -- are available or were

8    part of the -- the allegations.

9            Time recordkeeping, you know, any

10   records of when phone calls were made,

11   interviews are conducted.  What questions to

12   ask.  What information should we be seeking.

13   Who should be involved.

14            And then, you know, the final

15   evaluation of all the relevant evidence and

16   witness testimony is then further reviewed.

17   And we do have a disciplinary matrix that is

18   then reviewed to determine the final

19   determination on what next steps we will take.

20       Q.    You mentioned what questions to ask.

21   Can you give me an example of what you mean by

22   that?

23       A.    It would be standard questions

24   because in all investigations, there's

25   different question for an investigation

1    depending on the allegation.

2           It would be standard questions to

3    ask as in, you know, how long the employee has

4    been with us.  What is their title.  You know,

5    have they been at that particular location for

6    X amount of time depending on what level of

7    individual that we are interviewing.  Asking

8    what witnesses happened -- when did it happen.

9    Who may have been involved.  How did it happen.

10   Do we have a reason why we believe it happened.

11   Standard questions.

12          And obviously, there's going to be

13   other questions that are more in depth into the

14   actual allegations, but the standard questions

15   are to kind of get an outline of what happened.

16        Q.    Okay.  Whenever someone is tasked

17   with conducting an investigation, has Allied --

18   sorry.  Strike that question.

19          Does Allied provide training on how

20   to conduct investigations to all of the HR

21   professionals tasked with conducting

22   investigations?

23        A.    Yes.  There is training for that.

24   That's correct.

25        Q.    Okay.  Would anyone be conducting an

APPENDIX 000215

1   investigation that has not been trained?

2        A.    No.

3        Q.    If an employee reports

4   discrimination or harassment, what is one of

5   the first steps that the investigator should go

6   about -- how should the investigator go about

7   investigating that report?

8        A.    In the event that we get such a

9   report, the first thing that investigators

10  should be doing is talking to the reporter,

11  gathering as much information from the

12  reporting party as far as who the allegation is

13  against, if there was any witnesses to the

14  allegation -- to the incident that occurred.

15  Asking history if there's -- if this is an

16  ongoing issue.  If this was -- asking, if it

17  was previously reported, who it would have been

18  reported to.

19            Gathering that formal information at

20  first, and then based on what's collected, then

21  we determine what next steps we would take in

22  the investigation.

23       Q.    Okay.  So if I understand correctly,

24  they -- let's say they gathered the information

25  that the reporter provided, and they decide

APPENDIX 000216

1    that they need to talk -- they need to

2    investigate further.  What would be the next

3    step?

4         A.    The next step would be determine

5    whether -- what are we investigating.  Right?

6    So for example, if it's another security

7    professional claiming that they're, for

8    example, being bullied by another security

9    professional, our next step would be -- one,

10   we're always involving the security

11   professional's direct supervisor unless they're

12   somehow involved in the investigation.  We are

13   then questioning that individual based on

14   information we have collected from the

15   reporter.  We also are requesting to review any

16   potential camera footage if it's available.

17            And we determine, depending on the

18   allegation, whether or not suspension is

19   warranted, but that depends on the type of

20   allegation that is brought to our attention.

21        Q.    And if -- so if you're investigating

22   a manager and you determine -- if the manager

23   is the subject of the investigation, then

24   what's the next step?

25        A.    If a manager is the subject of the

APPENDIX 000217

1    investigation, then we involve their direct

2    supervisor.  Okay.  They are not -- they -- we

3    treat them just like any other individual

4    that's getting interviewed for a complaint,

5    except the only difference is that we escalate

6    it to one more level above them for their

7    involvement.

8         Q.    So when you -- when you say you

9    escalate to one level above them, does that

10   mean that you would be then interviewing the --

11   the manager's supervisor?

12        A.    No.  Not interviewing the manager's

13   supervisor, but involving them in the

14   investigation.

15        Q.    Okay.  How would they be involved?

16        A.    They would be assisting in

17   conducting the investigation.  For example,

18   sitting in the room as a witness or potentially

19   seeking information, as well.  Asking

20   questions, as well.  So we do partner with the

21   -- with our direct supervisors.

22             So there's a variety of reasons they

23   might be involved, but primarily to help with

24   the investigation, to gather information.

25        Q.    Okay.  And so if the -- if the

1    manager's direct supervisor is not involved in

2    the questioning, is that a red flag that maybe

3    the investigation is not being conducted

4    correctly?

5           A.    Can you rephrase the question?  I

6    don't understand.

7           Q.    Sure.  If the manager is the subject

8    of the investigation and their direct

9    supervisor is not involved in the

10   investigation -- as you mentioned, it should be

11   part of the procedure -- is that a red flag

12   that the investigation is not being conducted

13   per Allied's procedures?

14          A.    No.  It depends on the situation.

15   So it depends on the level of the complaint --

16   the severity of the complaint.

17                So in some instances, our supervisor

18   might be just providing a recommendation or a

19   secondary review.  If it's a severe allegation,

20   you know, we definitely have the supervisors

21   being involved from -- so they can be a part of

22   the situation.

23                But it really a case by case

24   depending on what kind of allegation it is and

25   the level of allegation.

APPENDIX 000219

1        Q.      Can you give me an example of a

2    severe allegation?

3        A.      Sexual harassment.

4        Q.      Would using racial slurs be

5    considered a severe allegation?

6        A.      Yes, it would.

7        Q.      Would threatening physical harm on

8    the employee be considered a severe allegation?

9        A.      Yes, it would.

10       Q.      You mentioned training in the

11   investigation.  In this training -- in how to

12   conduct investigations.

13              In this training, are the

14   investigators taught to look for signs of

15   discrimination or, like, red flags that

16   indicate that maybe this might be a sign of

17   discrimination or retaliation?

18       A.      Yes.  There -- they are trained to

19   look for patterns.  So we look at previous

20   history.  Has there been any previous reports

21   of any similar acts.  Have we ourselves maybe

22   noticed any red flags of that nature.

23              So they are trained to really look

24   at the big scope of things, but yes, we do look

25   for patterns and any previous complaints filed

 1    against that individual.
 2          Q.    Do you have experience spotting red
 3    flags of discrimination?
 4                ATTORNEY SHINE:  Objection.
 5    Outside the scope of the 30(b)(6) witness.
 6                To the extent she has personal
 7    knowledge, she may testify in an individual
 8    capacity.
 9                THE WITNESS:  I mean, I would
10    say, yes, I would look for patterns, and I
11    would look for if there's anything that sticks
12    out, that needs to be further looked at.  Yeah.
13    BY ATTORNEY HERNANDEZ:
14          Q.    Do any come to mind to you right
15    now?
16          A.    No.
17          Q.    Okay.  Could it be a red flag of
18    discrimination if, say, an employee's accent
19    was mocked?
20          A.    Yes, that could be.
21          Q.    Could it be a red flag of
22    discrimination if an employee was pressured to
23    shave his beard after indicating a religious
24    need to keep the beard?
25          A.    Yes.

1    Q.    Could it be a red flag of

2    discrimination if an employee was pressured to

3    shave his beard, but other employees were not

4    pressured to shave their beard?

5    A.    Yes.

6    Q.    Could it be a red flag of

7    discrimination if an employee was issued a

8    faulty weapon if others were issued working

9    weapons?

10    A.    I wouldn't say that was necessarily

11    discrimination.

12    Q.    Okay.  Could it be a red flag of

13    potential discrimination if an employee was not

14    issued equipment that other employees in the

15    same position were issued?

16    A.    Yes.

17    Q.    Could it be a red flag of

18    discrimination if an employee of a different

19    national origin was told to go back to his

20    country?

21    A.    Yes.

22    Q.    Could cussing at an employee be a

23    red flag of potential discrimination?

24    A.    Yes.

25    Q.    Could physical threats toward an

APPENDIX 000222

```
 1   employee be a red flag of potential
 2   discrimination?
 3        A.    Yes.
 4        Q.    Could racial slurs toward an
 5   employee be a red flag of discrimination?
 6        A.    Yes.
 7        Q.    Could a failure to follow policies
 8   be a red flag of discrimination?
 9        A.    I guess I would -- I think it would
10   need to be a little more specific as to what
11   policies they were failing to follow to see if
12   it's related to discrimination because there
13   are several policies that could not be
14   followed.
15             So I guess it would depend on what
16   policy is not being followed.
17        Q.    Okay.  In your understanding of
18   employment retaliation, can disciplinary
19   decisions ever be applied in a way that's
20   retaliatory?
21                 ATTORNEY SHINE:  Objection.
22   Outside the scope of a 30(b)(6) witness.
23             She may answer in an individual
24   capacity to the extent she has knowledge.
25                 THE WITNESS:  Can you ask the
```

1    question again?

2    BY ATTORNEY HERNANDEZ:

3         Q.    Sure.  In your understanding of

4    employment retaliation, can disciplinary

5    decisions ever be applied in a way that's

6    retaliatory?

7         A.    Yes.

8         Q.    And so under Allied's policies and

9    procedures and training in looking for signs of

10   retaliation, under their procedures, is it --

11   is something to look for close timing between a

12   protected activity and the disciplinary action?

13               ATTORNEY SHINE:  Objection.

14   Calls for a legal conclusion.

15               To the extent she has personal

16   knowledge, she can answer.

17               THE WITNESS:  Yeah.  I do not

18   know.

19   BY ATTORNEY HERNANDEZ:

20        Q.    Okay.  Do you know what "protected

21   activity" means?

22        A.    Yes.

23        Q.    Is that defined in Allied's

24   policies?

25        A.    Yes, it is.  It's also included in

APPENDIX 000224

1    the new employee orientation training.

2         Q.    Okay.  And how -- so what is

3    protected activity?  What's the definition of

4    that protected activity?

5                    ATTORNEY SHINE:  Objection.

6    Outside the scope.  Calls for a legal

7    conclusion.

8              To the extent she has personal

9    knowledge or if you would like to rephrase with

10   respect to Allied's definition of protected

11   activity, she may answer.

12   BY ATTORNEY HERNANDEZ:

13        Q.    What is Allied's definition of

14   protected activity provided in the training?

15        A.    Well, Allied -- Allied's definition

16   of it would be -- any protected activity would

17   be any individual that, you know, brings to our

18   attention any religious -- for example,

19   religious accommodation requests.  Anything in

20   regards to their sexual orientation, national

21   origin, any protected classes.

22              And it would be our, you know,

23   responsibility to ensure that we are protecting

24   those individuals and those classes when they

25   bring any matters to our attention of any type

APPENDIX 000225

1  of, you know, activity that is outside the

2  policy.

3      Q.    And under those policies, would

4  reporting discrimination be a protected

5  activity?

6      A.    Yes.

7      Q.    Under Allied's policies, would

8  opposing discrimination be a protected

9  activity?

10            THE REPORTER:  I'm sorry.

11  Ma'am --

12            ATTORNEY HERNANDEZ:  I'm

13  sorry.  Did you answer?

14            THE WITNESS:  Yes, yes.  I

15  apologize if you guys couldn't hear me.

16  BY ATTORNEY HERNANDEZ:

17      Q.    Excuse me.

18          In the training that's you've

19  received or provided, are you taught to look

20  for signs of potential retaliation?

21            ATTORNEY SHINE:  Objection.

22  Outside the scope of a 30(b)(6) notice.

23          If it's directed to her personally

24  or as a company.

25            ATTORNEY HERNANDEZ:  Let me

```
 1   rephrase.  I thought I mentioned Allied.
 2   BY ATTORNEY HERNANDEZ:
 3        Q.    In the training that Allied has
 4   provided or provides its investigators, are
 5   they taught to look for signs of potential
 6   retaliation?
 7        A.    Yes.
 8        Q.    Do any -- any come to mind right
 9   now?
10        A.    Retaliation, in certain
11   circumstances where maybe an individual filed a
12   complaint of harassment, for example, against
13   their supervisor, and as a result of that
14   investigation, that individual may have
15   potentially been demoted, or their rate of pay
16   was affected following a complaint that was
17   potentially substantiated, and then, you know,
18   there was repercussions against the reporter.
19        Q.    Anything else?
20        A.    I mean, there's several situations
21   where we could review what -- cases of
22   retaliation.
23             You know, if a reporter brings to
24   our attention a case that maybe it was the
25   circumstances of "He said.  She said," or "He
```

1    said.  He said", "she said.  She said," where

2    we weren't able to fully substantiate the

3    allegations due to a lack of evidence, and then

4    subsequently, maybe the reporter then gets

5    removed from a role that affects their pay or

6    their schedule.  That would be another example.

7        Q.    Okay.  Would close timing between

8    the protected activity and then the discipline

9    be a sign of retaliation?

10        A.    It would depend on what the

11   discipline would be.  Is it a warranted

12   discipline for a violation of policy, or if it

13   wasn't a warranted disciplinary action.  It

14   would have to be reviewed.

15        Q.    Sorry.  Let me rephrase.

16             Could it be a potential sign of

17   retaliation close timing between the protected

18   activity and then the discipline?

19        A.    It could be, but it would depend on

20   the circumstances of the discipline.

21        Q.    Okay.  Could ignoring reports of

22   discrimination be a sign of retaliation?

23        A.    Yes.

24        Q.    Could physical threats after a

25   protected activity be a sign of retaliation?

APPENDIX 000228

1          A.     Yes.

2          Q.     Could visible anger after protected

3    activity be a sign of retaliation?

4          A.     Yes.

5          Q.     Could threats to fire an employee

6    after protected activity be a sign of

7    retaliation?

8          A.     Yes.

9          Q.     Could threat to revoke an employee's

10   security license be a red flag of retaliation?

11         A.     Yes.

12         Q.     Could dispersant treatment be a sign

13   of retaliation?

14         A.     Yes.

15                ATTORNEY SHINE:   Objection.

16   Calls for a legal conclusion.

17   BY ATTORNEY HERNANDEZ:

18         Q.     For example, if someone was -- let's

19   say, if one employee was merely suspended for

20   violating a policy yet another employee that

21   engaged in protected activity was fired for

22   violating the same policy, could that be a

23   potential sign of retaliation?

24         A.     Can you rephrase the question,

25   please.

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

1     Q.    Sure.  If one employee was suspended

2    for violating Allied's policy and another

3    employee was fired for violating the same

4    policy but they had engaged in protected

5    activity, could that be a sign of retaliation?

6         A.    Yes.

7         Q.    Could it be a sign of retaliation if

8    an employee's disciplinary form is falsified?

9         A.    Yes.

10        Q.    And could it be a sign of

11   retaliation if a manager lies about having a

12   witness present in a disciplinary meeting?

13        A.    Yes.

14        Q.    Okay.  Thank you.

15             Do you agree that or -- does Allied

16   agree that all investigations into

17   discrimination or retaliation must be properly

18   documented?

19        A.    I'm sorry.  Can you ask the question

20   again?

21        Q.    Sure.  Does Allied agree that all

22   investigations into discrimination or

23   retaliation must be properly documented?

24        A.    Yes.

25        Q.    Okay.  And Allied has investigation

APPENDIX 000230

1    forms that it uses; correct?

2         A.    It does have investigation forms,

3    but they're not mandatory to be used.  They're

4    provided as a guideline.

5         Q.    Okay.  Are they considered the best

6    practice?

7         A.    Yes.

8         Q.    You mentioned earlier a scenario of

9    "He said.  She said" or "He said.  He said,"

10   what are investigators taught to do if an

11   employee reports one thing, but the manager

12   denies it?

13        A.    Well, those are the difficult ones.

14   Right.  But we do look for previous patterns.

15            So, for example, if we had a

16   situation where we -- it was brought to our

17   attention allegation of inappropriate

18   misconduct or inappropriate comments and we --

19   there was no witnesses, there's nothing that we

20   could substantiate that the conversation

21   even -- those conversations occurred,

22   unfortunately, we don't have enough to state

23   that, yes, this act occurred.

24            What we would do is look at any

25   previous -- if there was any previous complaint

1    of the same nature.  We would talk to potential

2    witnesses to see if anybody has heard any

3    comments like this previously, and we would

4    look for patterns.

5              But without that information, it's

6    very difficult to substantiate a case.

7         Q.    Okay.  And so without -- without any

8    previous history, is the manager's word taken

9    over the employee's word?

10        A.    Let's say it's -- I don't think that

11   we would say -- I mean, we obviously want to

12   have trust in our managers, but since there is

13   a lack of evidence to support it, we do keep it

14   on record to see if something like that happens

15   in the future and we have it on record.

16             But it's -- we document it as "This

17   is what the reporter said.  This is what the

18   subject of the complaint said.  We are unable

19   to confirm that either/or comment occurred."

20   And we would close out the investigation with

21   all the evidence collected, and it would be

22   kept on file.

23             But it would just -- with the lack

24   of evidence, it would be hard to determine.

25        Q.    Okay.  And so say in a situation

 1   where an employee is being harassed and they've
 2   reported this but there's no -- but it's a "He
 3   said.  He said" situation, there's no --
 4   there's no protection for the employee going
 5   forward; correct?
 6              ATTORNEY SHINE:  Objection.
 7   Outside the scope of a 30(b)(6) witness and
 8   notice.
 9              And to the extent she has personal
10   knowledge and you're asking for her independent
11   personal experience, she may testify.
12              THE WITNESS:  Is that what
13   you're asking for?
14   BY ATTORNEY HERNANDEZ:
15       Q.    Yes.
16       A.    Okay.  From my personal experience,
17   if the employee is submitting multiple
18   complaints against the manager, then we would
19   be able to review it differently because we got
20   multiple complaints.
21              But if it's one complaint and it's
22   "He said.  She said" and a lack of information,
23   it would unfortunately be unsubstantiated.
24              If there's multiple complaints
25   submitted, then that's -- that would be viewed

1    a little bit differently.

2         Q.    If there are multiple complaints

3    submitted and it still remains "He said.  She

4    said," what's -- what happens?

5                   ATTORNEY SHINE:  Again,

6    objection.  Outside the scope of the 30(b)(6)

7    witness and notice.

8              However, to the extent she has

9    personal knowledge, she may testify to that

10   independent knowledge.

11   BY ATTORNEY HERNANDEZ:

12        Q.    Let me rephrase.

13             Under Allied's policies and

14   procedures, if an employee is reporting

15   harassment more than once but it remains a "He

16   said.  He said" situation, what happens?

17        A.    Well, in those circumstances -- now

18   we see a little bit of different information

19   since it's a constant reporting.  Now it's --

20   now we have a little more information to work

21   off, but there's potentially something is

22   occurring, but there's this continuous

23   reporting.

24             So based on the allegation and the

25   circumstances, now it's a different view

1    because now there's more information because

2    it's not just one complaint.  These are

3    multiple complaints.  And we're able to review

4    it on a different level with viewing are they

5    similar, what is being said, and what pattern

6    we're seeing.

7              So it's a little bit different if

8    there's more complaints versus just one

9    complaint.

10        Q.    Okay.  I'm not sure that the

11   question was answered.

12             So under Allied's policy, what

13   should happen?

14        A.    It depends on the outcome and what

15   we are able to find.  Right.  So if we are able

16   to conclude that, yes, we do believe that

17   there's inappropriate comments or, you know,

18   discriminatory comments being made, then we

19   would take action based on our disciplinary

20   matrix.

21        Q.    How would Allied determine that,

22   yes, the comment was made if it's the

23   employee's word against the managers word?

24        A.    It depends on the information that

25   we're actually able to collect and information

1   that we find through the course of

2   investigation.  Right.

3           It's not really black and white when

4   these investigations are occurring.  The more

5   questions that we ask, the more patterns that

6   we are looking at, we are able to then possibly

7   determine what our next steps are.

8           So it really depends on each

9   situation.  There's not one -- there's no

10  situations that are all the same, so it really

11  would depend on what we are able to collect,

12  what we are able to find through the course of

13  these investigations.

14          So it's really difficult to say,

15  "Here's what the exact next step we would

16  take."  It would just depend on the information

17  we're able to collect.

18      Q.    Okay.  What is Allied's policy on

19  security professionals having beards?

20      A.    Our policy -- our standard policy is

21  they must be clean shaven.

22      Q.    Okay.  And if a security

23  professional must keep a beard for religious

24  purposes, is there an exception?

25      A.    Well, we do ask for a religious

APPENDIX 000236

1    accommodation to be completed so we have record

2    of it, but it would be the same thing.  They're

3    allowed to keep their beard.  It just has to be

4    clean shaven.

5         Q.    Can you define "clean shaven"?

6         A.    So I believe there's a standard

7    regarding, you know, them making sure it's

8    shaved correctly right above the collar line.

9         Q.    Okay.

10        A.    It's not, like, messy.  That it's,

11   you know, well groomed.

12        Q.    Okay.  So a beard is allowed as long

13   as it's above the collar line and not messy?

14        A.    Correct.

15        Q.    Okay.  Are supervisors and managers

16   trained that they should allow beards as long

17   as it's above the collar line and not messy?

18        A.    Yes.  It's provided in the grooming

19   standards.  Yes.

20        Q.    Okay.  If a security professional

21   tells his supervisor that he needs to keep his

22   beard for religious purposes, what should

23   happen?

24        A.    They could ask for a religious

25   accommodation, but it would have -- something

APPENDIX 000237

```
 1   to be reviewed depending on what they're

 2   requesting for their beard to be.  Are they

 3   saying that they can't shave, be clean shaven

 4   during this time, the kind of questions we

 5   would ask.

 6           But they would be allowed to have

 7   their beard.

 8       Q.   Okay.  That's probably -- I probably

 9   asked a bad question, but what should the

10   supervisor do if -- if the security

11   professional is indicating that they want to

12   keep their beard for religious purposes?

13       A.   They should be able to allow them as

14   it's not a violation of policy.

15       Q.   Okay.  So -- and it's -- it's

16   against policy for the supervisor to

17   continually pressure the employee to shave

18   after they've expressed that request to keep

19   the beard, right, for religious purposes?

20       A.   There wouldn't be an exact policy

21   saying that you can't continue to ask someone

22   that, but no, there would be -- there shouldn't

23   be a reason why a supervisor is pressuring

24   someone to do so.

25                   ATTORNEY HERNANDEZ:  Okay.  If
```

APPENDIX 000238

```
 1   it's okay, I'd like to take just a short

 2   10-minute break to run to the restroom and then

 3   come back on the record.

 4                 THE VIDEOGRAPHER:  Okay.  We

 5   are now off the record.  The time is 9:57 a.m.

 6   Central Time.

 7                 (A recess was taken.)

 8                 THE VIDEOGRAPHER:  We are now

 9   on the record.  The time is 10:09 a.m. Central

10   Time.

11   BY ATTORNEY HERNANDEZ:

12        Q.    You testified earlier that Allied

13   trains investigators to follow investigation

14   guidelines; correct?

15        A.    Correct.

16        Q.    Are the guidelines mandatory?

17        A.    They're not mandatory.  They're just

18   a guideline as a best practice provided to our

19   investigators as a way to kind of show how

20   investigations should be done, but no, they're

21   not mandatory.

22        Q.    Could an employee or an investigator

23   be disciplined for not doing a proper

24   investigation?

25        A.    Yes.
```

APPENDIX 000239

```
 1        Q.    In your history there at Allied, has
 2   anyone been disciplined for not doing a proper
 3   investigation?
 4                 ATTORNEY SHINE:  Objection.
 5   Outside the scope of the 30(b)(6) witness.
 6                 To the extent you're asking for her
 7   personal knowledge, she may testify.
 8                 THE WITNESS:  In my personal
 9   experience, yes, there -- there definitely have
10   been.  Again, we're -- it's region by region,
11   so it depends on the region how they would view
12   that.
13                 But, yes, there have been, in my
14   experience.
15   BY ATTORNEY HERNANDEZ:
16        Q.    What were the circumstances
17   surrounding what -- that discipline?
18                 ATTORNEY SHINE:  Again,
19   objection.  Outside the scope.
20                 To the extent she's answering from
21   her personal and information, she may testify.
22                 THE WITNESS:  If this is
23   something under my review -- we review, you
24   know, cases all the time.  Either if an
25   employee, you know, brings it to out attention
```

APPENDIX 000240

```
 1   that they felt that the investigation was
 2   inadequately completed or we did our own review
 3   and found the investigation was inadequately
 4   completed, we review what was done what was not
 5   done, and determine what level of discipline
 6   based on what was not properly conducted during
 7   that investigation.
 8            So it depends on kind of the
 9   circumstances surrounding it.
10   BY ATTORNEY HERNANDEZ:
11        Q.    Can you give me an example of
12   when -- of an improper investigation?
13                  ATTORNEY SHINE:  Objection.
14   Outside the scope.
15            To the extent she's answering from
16   her personal knowledge, she may testify.
17                  THE WITNESS:  Sure.  In one of
18   the experiences that I, you know, we've had, we
19   found that a manager didn't respond to a
20   complaint.  They received a text message of
21   concerns regarding their supervisors.  The
22   manager failed to even respond or act on it.
23            And then it was brought to our
24   attention later that the employee was leaving
25   the organization because they were not -- they
```

APPENDIX 000241

1    felt that we didn't do any actions to act on

2    their complaint.

3            And the manager was subsequently

4    placed on a final with additional training due

5    to failure to react to a complaint that was

6    brought to their attention.

7    BY ATTORNEY HERNANDEZ:

8        Q.    Okay.  But the manager was not

9    terminated?

10       A.    No, was not terminated.

11       Q.    So you mentioned -- what -- under

12   Allied's policies, what are managers supposed

13   to do when somebody reports discrimination?

14       A.    Managers are supposed to intake a

15   statement immediately from the reporting party.

16   They're also required to ask all the relevant

17   questions; who was involved, when did it occur,

18   has it happened previously, was this previously

19   reported, are there any witnesses.  Asking for,

20   you know, potential areas of where it was.  If

21   there's potential camera footage, they may go

22   review it.  It just depends if there is or

23   isn't.

24            They are to report it to HR

25   immediately.  And we partner with the managers

1    to conduct the investigation really depending

2    on what type of allegation it is.

3         Q.    Okay.  Is Allied's use of force

4    policy mandatory?

5         A.    Yes, it is.

6         Q.    Okay.  And so the use of force

7    policy allows security professionals to use

8    some force if they fear for their own safety or

9    the safety of others; true?

10        A.    No.  It has to be in a very extreme

11   level.  So it's not just if they feel that

12   there's harm, there has to be deadly threat

13   towards them or others in order for them to

14   engage into any physical activity with someone.

15   But it would have to be a threat of fatality.

16             So it's kind of hard to say yes if

17   that's the, you know, case.  It has to be an

18   extreme measure.

19        Q.    For any -- are you saying there has

20   to be a threat of deadly force for any level of

21   the continuum in the use of force policy?

22        A.    No.  That would be the final one.

23   There's several levels of the use of force

24   policy.  Our security professionals are trained

25   that they should never engage or physically

APPENDIX 000243

1    touch another individual unless their life

2    is -- their life or somebody else's life is

3    being threatened or harmed.

4         Q.    Okay.  So Allied issues guns to

5    armed security professionals; true?

6         A.    Yes.

7         Q.    Okay.  Allied issues guns to armed

8    security professionals in anticipation that

9    there may be some circumstances in which the

10   officer may have to use deadly force; right?

11        A.    It's a deterrent.

12        Q.    So are the guns -- is a security

13   professional ever justified in using their gun

14   under the use of force policy?

15        A.    As a final, final measure after all

16   other options were exhausted and there's a

17   threat of harm to themselves or another

18   individual, then yes.  But it's the final

19   circumstance when all other options were

20   exhausted.

21        Q.    Okay.  But they are allowed to

22   use -- so security professionals are allowed to

23   use deadly force if all other avenues were

24   exhausted; right?

25        A.    And there's a threat of immediate

1    harm, yes.

2        Q.    And there's a threat of immediate

3    harm.  Okay.

4            Would the use of force policy allow

5    a security professional to use deadly force if

6    they were fearful that immediate deadly force

7    would be used on them?

8        A.    Yes.

9        Q.    Okay.

10       A.    There would have to be a

11   circumstance that shows whether there was a

12   weapon displayed -- or predominantly just that

13   there was a weapon displayed and that the

14   individual was, you know, walking towards them

15   to attack them or another individual.

16       Q.    Okay.  And Allied also issues tasers

17   to officers in anticipation that there may be

18   some circumstances where the officer has to use

19   the TASER; right?

20       A.    Yes, but again, that would be the

21   last and final solution to -- to a scenario.

22       Q.    So using a TASER would be -- would

23   be -- so let me back up.

24            On the use of force continuum, using

25   deadly force is the final step; right?

APPENDIX 000245

1    A.    Correct.

2    Q.    And that's considered Level 6 force;

3  right?

4    A.    Correct.

5    Q.    Okay.  Using a TASER under the

6  policy, is that considered on the same level as

7  deadly force?

8    A.    It would be right above that level.

9  Again, there would have to be a display of some

10  type of weapon or aggression that would --

11  that's going to harm someone or themselves for

12  them to be utilizing it.

13    Q.    Okay.  And so -- so based on that --

14  on the policy, that would be considered Level 6

15  force; right?

16    A.    That would be --

17    Q.    I'm sorry.  Level 5 force.

18    A.    Yes.

19    Q.    Okay.  6 is the highest; correct?

20            THE REPORTER:  I'm sorry,

21  ma'am.  Was that a "yes" or a "no"?  You just

22  nodded your head.

23            THE WITNESS:  It was a "yes."

24  BY ATTORNEY HERNANDEZ:

25    Q.    So based on the policy, I think you

APPENDIX 000246

1    said using a TASER is allowed if the

2    professional fears for his safety or the safety

3    of others and there's been a display of

4    aggression?

5         A.    Aggression or a weapon.

6         Q.    Or a weapon.  Okay.  Then the next

7    level below Level 5 is Level 4; right?

8         A.    Correct.

9         Q.    And so that can involve if the --

10   that can involve the use of pepper spray;

11   right?

12        A.    I believe so, or detaining at that

13   point, if I'm not mistaken.

14        Q.    Detaining?  Let me see.

15        A.    I would have to refer to the policy

16   to be exact, but I believe --

17        Q.    Okay.

18        A.    -- it would be right above that.

19        Q.    Let me see if I can share my screen.

20              Are you able to see --

21        A.    Yes, I can.

22        Q.    It says "Level 4," and this is Bates

23   marked AUS_00115.

24              Do you recognize this as Level 4 of

25   the use of force continuum?

APPENDIX 000247

1        A.     Yes, yes.

2        Q.     Okay.  So in looking at this, is

3   Level 4 allowing the use of pepper spray when

4   the officer has a fear for their own safety or

5   the safety of others?

6        A.     Yes.

7        Q.     Okay.  And so does Allied issue

8   pepper spray to its security professionals in

9   anticipation that there may be some

10  circumstances in which they would need to use

11  the pepper spray for their own safety or the

12  safety of others?

13       A.     Yes.  Extreme measures, yes.

14       Q.     Then the next level below that would

15  be Level 3; correct?

16       A.     Yes.

17       Q.     And so I think this is what you were

18  referring to before where there's -- it says,

19  "Use of hands, control hold, and restraints";

20  right?

21       A.     Yes.

22       Q.     And so Allied issues its security

23  professionals handcuffs in anticipation that

24  there may be some circumstances in which they

25  need to use the handcuffs; right?

1    A.    Yes.

2    Q.    And under the policy, are security

3  professionals allowed to use handcuffs if they

4  fear for their own safety or the safety of

5  others?

6    A.    Yes, but again, I would have to

7  be -- that has to be somebody posing a real

8  threat to them.

9           But, yes, that's what they would

10  need.

11    Q.    Okay.  And so under -- and then

12  below that is Level 2, which is just verbal

13  communication; right?

14    A.    Yes.  I wouldn't say "just."  This

15  is the key one.  This is what our security

16  professionals are predominantly trained on as

17  their best efforts is to verbally attempt to

18  de-escalate the situation.

19           They truly -- at this point, if

20  they're being unsuccessful with de-escalating a

21  situation with an individual, the police should

22  be involved in this matter.

23           All levels higher than this, these

24  are just extreme in a situation where there

25  is -- there's a threat of harm that poses a

APPENDIX 000249

```
 1   true harm towards individuals.  Our security
 2   professionals are really trained on one and
 3   two.  Verbal commands are the ones that they
 4   really are trained to help de-escalate a
 5   situation, causing a space in between
 6   themselves and the individuals they're speaking
 7   with.
 8             And if that's not working, they
 9   should really be getting the police involved at
10   that point.
11        Q.   So are you saying that the security
12   professionals are not trained on Levels 3
13   through 6?
14        A.   No.  That is not what I'm saying.
15   They're 100 percent trained on all these
16   matters, Level 3, 4, and 6.  3 -- sorry.  3, 4,
17   5, and 6 are the worst-case scenarios.
18        Q.   Okay.
19        A.   Where you would need to get involved
20   and de-escalate it to these sections if
21   there's, again, threats that pose harm to
22   themselves or others.
23             We do not only want to train
24   individuals that they don't have to get to that
25   level by attempting to de-escalate the
```

```
 1   situation by providing verbal commands to the
 2   individuals and involving the police, as it
 3   should be a police matter.  If that doesn't
 4   work and the police maybe don't arrive in time
 5   and the situation is escalating, then they move
 6   on to the next levels.
 7        Q.    Okay.  Excuse me.  I lost my train
 8   of thought for a second.
 9             These -- these levels allow for some
10   discretion on the part of the professional;
11   correct?
12        A.    Yes.
13        Q.    I'm going to stop sharing my screen.
14             Can you give me an example of when
15   it would be okay for the security professional
16   to use their TASER?
17        A.    If an individual displayed a weapon
18   such as a gun or a knife and attempted -- was
19   maybe, like, walking towards them or another
20   individual.
21        Q.    Can you give me an example of when a
22   security professional would be allowed to use
23   pepper spray?
24        A.    If an individual was potentially
25   charging at them in an aggressive manner or
```

APPENDIX 000251

1  towards somebody else in an aggressive manner.

2      Q.    Okay.  And can you give me an

3  example of when the security professional is

4  allowed to use handcuffs?

5      A.    If the individual is charging at

6  themselves or another individual in an

7  aggressive manner.

8      Q.   So is that -- that was the same

9  example as Level 4; correct?

10      A.   Correct.  And that -- all armed

11  security officers have all means available to

12  them.  Some just might have a firearm and

13  handcuffs.  Some might just have TASERs and

14  handcuffs.  Some might just have OC spray and

15  handcuffs.  It depends on the contract.  It

16  depends on what the post orders and

17  requirements are.

18          So it's difficult to say that in

19  each scenario, they should use first their

20  handcuffs, then their OC spray, TASER, deadly

21  force, when not all of our armed security

22  officers may have all of those items available

23  to them per the contract requirement.

24      Q.   Okay.  So assuming they have all of

25  those items available, can you give me an

APPENDIX 000252

 1    example of when it would be okay to use the

 2    handcuffs and not the pepper spray?

 3                Because pepper spray is a level

 4    above the handcuffs; correct?

 5         A.    Correct.  So for an example, if we

 6    had an individual that -- handcuffs would be a

 7    good situation if there's an individual

 8    attacking another person or attempting to harm

 9    another person where our security professionals

10    were able to intervene and grab their arms and

11    handcuff them securely.

12                If they have a circumstance where

13    they're unable to do that, they could probably

14    escalate to the next level.  But this would be

15    a circumstance where an individual is

16    getting -- attacking another individual, our

17    security professional is able to intervene and

18    potentially grab the individual's arms and

19    restrain them.

20         Q.    Okay.  If the individual is

21    attacking property, not anyone else, is it --

22    would the security professional be justified in

23    using a TASER?

24         A.    Not necessarily, no.

25         Q.    You said, "not necessarily."  So

APPENDIX 000253

1    there may be some circumstances where they

2    would be allowed to use the TASER?

3        A.    If the property damage was resulting

4    in somebody getting injured, then yes.  But if

5    it's just property damage -- for example,

6    somebody is just in a room and breaking

7    things -- then that's a police matter, and our

8    employees would have to refrain from, you know,

9    interacting with that individual.

10            If it was -- if the property damage

11    was causing harm -- potential harm to another

12    person, then we would see potential use for the

13    OC spray.

14        Q.    I'm sorry.  The question was

15    regarding a TASER, not the spray.

16        A.    I'm sorry.  A TASER.  Then they

17    could potentially use a TASER, yes.

18        Q.    Okay.  But if the property damage

19    was not harming an individual, would they be

20    justified in using the TASER?

21        A.    No, they would not.

22        Q.    And if they did use the TASER

23    because of property damage, would that security

24    professional be fired?

25        A.    We would have to do a review whether

APPENDIX 000254

1    the use of force was justified or unjustified.

2    If there was no immediate harm to any persons

3    involved in the matter, then there wouldn't

4    really be a reason why to use the TASER.

5        Q.    Okay.  Do all violations of the use

6    of force policy result in termination?

7        A.    If they are justified.  I mean, I'm

8    sorry.  If it's an unjustified use of force.

9        Q.    Then if -- if it's an unjustified

10   use of force, then every security professional

11   is terminated --

12       A.    Correct.

13       Q.    -- at that point?  Okay.

14             Do all use -- do all -- excuse me.

15             Do all uses of force result in a

16   root cause analysis?

17       A.    No.

18       Q.    Okay.  When is a root cause analysis

19   used?

20       A.    First, the situation is evaluated.

21   In situations like a verbal or physical

22   altercation between, for example, two security

23   professionals, a root cause analysis would not

24   be used, but it is considered a use of force.

25             When there is an individual that is

APPENDIX 000255

1    engaging with maybe a customer or, for example,

2    engaging with, you know, an unruly -- a

3    customer and there has been made -- physical

4    contact to achieve a desired outcome, then a

5    root cause analysis would be conducted.

6        Q.    Okay.  And does Allied have written

7    policies and procedures on how to conduct a

8    root cause analysis?

9        A.    Yes.

10       Q.    Are those mandatory?

11       A.    Yes.

12       Q.    What is the purpose of the root

13   cause analysis?

14       A.    The purpose of the root cause

15   analysis is to review the circumstances of what

16   transpired in the incident to determine whether

17   or not the use of force was justified or

18   unjustified.

19       Q.    Okay.  And so if, during the root

20   cause analysis, it's determined that the use of

21   force was justified, then that would -- that

22   would not result in a termination; correct?

23       A.    After review, it would -- it depends

24   on the circumstances.  But if it was considered

25   a justified use of force and if we fully

1  evaluated the situation that it was determined

2  that there was no other option for that

3  security professional, then, no, it would not

4  result in termination.

5        Q.    Okay.  Who is supposed to be

6  conducting the use of force analysis -- I mean,

7  sorry -- the root cause analysis?

8        A.    The manager.

9        Q.    The manager conducts the root cause

10  analysis?

11        A.    Correct.

12        Q.    Okay.  Is the security professional

13  supposed to participate in that process of the

14  root cause analysis?

15        A.    The security professional that is

16  involved in the incident?

17        Q.    Yes.

18        A.    No.  They provide us a statement in

19  regards to what transpired and why they

20  conducted themselves in that manner, and that

21  information is then used as part of the root

22  cause analysis.

23              But they are not involved in

24  completing it.

25        Q.    Okay.  When you say that the manager

1    should be conducting the root cause analysis,

2    which manager are you referring to?

3         A.    It would be the security

4    professional's direct manager.

5         Q.    Okay.

6         A.    Or direct supervisor.

7         Q.    Okay.  So under your policy, you

8    mentioned that you need to get the security

9    professional's statement when they're -- a root

10   cause analysis is conducted; correct?

11        A.    Yes.

12        Q.    And so if the security

13   professional's statement is not gathered, would

14   that mean that it's an inaccurate root cause

15   analysis?

16        A.    If a statement is not gathered

17   from -- well, basically, the security

18   professional did not complete an incident

19   report, that's one part of the root cause

20   analysis.

21             We also review potential witnesses,

22   camera footage, any other information that we

23   could gather to review the situation.

24             So if there's a situation where

25   we're lacking a statement or an incident report

APPENDIX 000258

```
1   from the security professional that was

2   involved, that doesn't just stop there.  We

3   have to do a full investigation into what

4   transpired.

5        Q.    Was there any video footage reviewed

6   when Allied conducted Twana Ahmed's root cause

7   analysis?

8        A.    From our understanding and review,

9   there was camera footage reviewed on property

10  following the incident.

11       Q.    Who reviewed that camera footage?

12       A.    Alex Bergeron.

13       Q.    Okay.  Skipping back to reports of

14  discrimination, who does Allied hold

15  accountable if HR ignores a report of

16  discrimination?

17       A.    Yes.

18       Q.    The question was:  Who does Allied

19  hold accountable if HR ignores a report of

20  discrimination?

21       A.    The individual that the report was

22  submitted to.

23       Q.    Okay.  And so how are they held

24  accountable?

25       A.    In determining the facts, then they
```

1    would determine which level of discipline is

2    warranted for that individual and additional

3    training.

4         Q.    Okay.  But that would not be a

5    termination?

6         A.    It's a case-by-case basis.  It would

7    determine, you know, how egregious was the

8    complaint, you know, how it was mishandled.

9    You know, is there a history of this.

10              It really depends, you know, if it's

11   a new employee that maybe just didn't know what

12   to do.  You know, we put that into perspective.

13   If it's a tenured employee that should have

14   known better, that would play into

15   circumstances.

16              So it would depend on the

17   circumstances surrounding that.

18        Q.    Can you clarify what you mean by if

19   it's an egregious complaint?

20              Does that mean that HR is allowed to

21   ignore complaints that are not considered as

22   egregious?

23        A.    No.

24        Q.    Okay.  Should any report of

25   discrimination ever be ignored?

APPENDIX 000260

1    A.    No.

2    Q.    Okay.  What date was Twana Ahmed

3  suspended?

4    A.    I believe it was April 4, 2022.

5    Q.    And when was he terminated?

6    A.    The termination date that we have on

7  file is April 4, 2022.

8    Q.    What does that mean, "the

9  termination date that we have on file"?  Is

10  that the actual termination date?

11    A.    It's the -- it would be his last day

12  worked.  I don't know the exact date of when --

13  it was maybe processed.

14        But the termination date we have on

15  file for Twana is April 4th.

16    Q.    So if Twana's root cause analysis --

17  if the root cause analysis was performed for

18  Twana after April 4th, how could he have been

19  terminated before the analysis was performed?

20    A.    I do not know.

21    Q.    Is it normal procedure for Allied to

22  first conduct the root cause analysis and get

23  approval for that termination before the

24  employee is terminated?

25    A.    Yes.

APPENDIX 000261

1    Q.    Okay.  Who has to approve the

2    termination once a root cause analysis is

3    performed?

4    A.    Once a root cause analysis is

5    performed, it is the 10-7 document that's

6    completed at the direction of our general

7    counsel, David Buckman.

8         We -- then it is reviewed by a panel

9    of individuals.  The manager overseeing that

10   security professional is the ultimate

11   decision-maker, but it is reviewed to determine

12   whether or not the use of force was justified

13   or unjustified.

14         Based on the determination of the

15   panel review, then the manager makes the final

16   decision on whether termination is warranted

17   based on our findings.

18   Q.    The manager makes the final

19   decision.  So in this situation -- in this

20   circumstance would be Patrick Freeney?

21   A.    Correct.

22   Q.    Under Allied policies, if an

23   employee is suspended for more than one day,

24   then an HR professional must be involved;

25   correct?

APPENDIX 000262

```
 1        A.    No.

 2        Q.    Let me pull up -- give me a second

 3   so I can share screen again.

 4              Are you able to see what I believe

 5   to be the Allied's -- part of Allied's

 6   disciplinary matrix?

 7        A.    Yes.

 8        Q.    This is Bates labeled AUS_00746.

 9              At the bottom here, do you see where

10   it says, "Suspensions without pay of greater

11   than one day require review with regional HR

12   manager or regional HR director in advance"?

13              Did I read that correctly?

14        A.    Yes.

15        Q.    Is that a requirement, then, that if

16   an employee is suspended for greater than one

17   day without pay, that either the HR manager or

18   the HR director needs to be involved?

19        A.    It's a guideline.  Depending on the

20   investigation type -- like, for example, use of

21   force incidents, they are predominantly handled

22   by management, and you know, determining the

23   outcome would be based on the root cause

24   analysis.

25              So this is a guideline of the
```

APPENDIX 000263

1    expectation, but it doesn't necessarily mean

2    that a manager would need to be involved -- an

3    HR manager, HR director would have to be

4    notified of every suspension in this policy.

5         Q.    Okay.  So despite the word

6    "required," you're saying this is not

7    mandatory?

8         A.    It's a guideline.

9         Q.    Okay.  Who completed -- let me stop

10    sharing.

11              Who completed Twana's root cause

12    analysis?

13         A.    It would have been Patrick Freeney.

14    And the second reviewer was Felicia

15    Solis-Ramirez.  And Bill Keene was also

16    involved in the review.  The completion was

17    done by Patrick Freeney.

18         Q.    Okay.  And you're saying that's

19    normal procedure?

20         A.    Correct.

21         Q.    Was Patrick Freeney trained in how

22    to conduct root cause analysis -- analysis?

23         A.    He had to work in support of his

24    direct manager Felicia because that was his

25    first incident of a use of force incident.

APPENDIX 000264

1    Q.    Okay.  So the question was:  Was

2    Patrick Freeney trained in how to conduct root

3    cause analysis?

4        A.    I'm sorry.  I do not know.

5        Q.    Okay.  I want to ask about the --

6    just in general general background on some of

7    the supervisors for Twana.

8            I believe you mentioned Alex

9    Bergeron.  I -- is that how you pronounce his

10   last name?

11       A.    I believe so, yes.

12       Q.    Alex Bergeron, when was he first

13   hired with Allied?

14       A.    I do not recall the exact dates.  We

15   have records I can refer back to.  I can get

16   exact dates, but I do not recall at this time.

17       Q.    Would you be able to refer to it

18   right now?

19       A.    I would have to log into our systems

20   to review it, yeah.

21       Q.    Okay.  Does Alex Bergeron still work

22   for Allied?

23       A.    Yes, he does.

24       Q.    What is his title?

25       A.    His current title is an armed

APPENDIX 000265

1    security professional.

2         Q.    What was his title -- when -- so was

3    he demoted to armed security professional?

4         A.    Yes, he was.

5         Q.    Okay.  When was he demoted?

6         A.    I don't recall the exact dates, but

7    it was somewhere in the middle of 2022.

8         Q.    And why was he demoted?

9         A.    I do not recall the exact reason.

10        Q.    Was it a result of -- of the

11   incident that happened with Twana Ahmed?

12        A.    I do believe there was that.  He may

13   not have instructed Twana properly to complete

14   an incident report immediately, but I'm not

15   certain that that was the exact reason for the

16   demotion.

17        Q.    Who demoted him?

18        A.    It would have been his immediate

19   supervisor, which would have been Patrick

20   Freeney.

21        Q.    Has Alex Bergeron ever been the

22   subject of an investigation at Allied?

23        A.    I do not know.

24        Q.    Would you be able to find out?

25        A.    I believe so, yes.

```
 1   named Wayne Oliver?

 2        A.    Yes, Wayne Oliver.

 3        Q.    Okay.  And what is his title?

 4        A.    Human resources representative.

 5        Q.    And how long has he been an HR rep?

 6        A.    He joined Allied on or about

 7   February 2022.

 8        Q.    What is his level of education?

 9        A.    He has a degree in HR and had 10

10   years of HR experience prior to joining Allied.

11        Q.    Has he been trained -- was he

12   trained in how to conduct investigations while

13   at Allied?

14        A.    I do not know.

15        Q.    Does he still work for Allied?

16        A.    Yes, he does.

17        Q.    Is his title still HR rep?

18        A.    Yes, it is.

19        Q.    At Allied, are the HR reps primarily

20   the people responsible for conducting

21   investigations?

22        A.    They're heavily involved in it.  It

23   depends on if they're assigned a case.

24             So once we get presented a case,

25   it's at the discretion of the HR directors and
```

APPENDIX 000267

1    exact number of individuals she would have --

2    she would have directly been involved with, but

3    it would have been the branch staff.  We could

4    definitely find that information out, as well,

5    though.

6         Q.    Did Patrick Freeney submit the

7    hotline report?

8         A.    No.

9         Q.    Who submitted the report?

10         A.    It was another individual in the

11   branch.  I believe her name was Savannah.

12         Q.    Okay.  What was the date of that

13   investigation?

14         A.    I do not recall.

15         Q.    Okay.  I'm not sure if I asked this

16   before, but was Catherine Barnes the subject of

17   an investigation while during -- has she been

18   the subject of an investigation while at

19   Allied?

20         A.    I do not believe so, no.

21         Q.    Has she been issued any discipline?

22         A.    I do not know.

23         Q.    Was Catherine Barnes disciplined in

24   any way when she ignored Twana Ahmed's report

25   of discrimination?

1        A.      I do not know.

2        Q.      Would you be able to find out?

3        A.      Yes.

4        Q.      Could you find out right now?

5        A.      I would have to get in contact with

6    the Houston branch to do that.

7        Q.      Okay.  When a report of

8    discrimination is ignored, what could happen to

9    the employee?

10        A.      I believe we covered this a little

11    bit earlier, but it really depends on the

12    circumstances, what transpired, and you know,

13    it depends on the tenure of the individual as

14    well.

15                But there should be either a

16    coaching session or guidance provided,

17    retraining to an individual that has ignored

18    it.  It really would depend on the manager's

19    decision on that, but there should be some

20    level of coaching and above to an individual

21    that ignored a complaint.

22        Q.      So let me rephrase the question.  I

23    did not ask it in a great way.

24                When a report of discrimination is

25    ignored, what could happen to the employee

APPENDIX 000269

1   that's reporting?

2                   ATTORNEY SHINE:  Objection.

3   Calls for speculation.  Outside the scope of

4   the 30(b)(6).

5                   To the extent she has personal

6   knowledge, she may answer.

7                   THE WITNESS:  I guess I don't

8   understand the question, and I guess I don't

9   know.

10  BY ATTORNEY HERNANDEZ:

11      Q.    What's the danger in ignoring

12  reports of discrimination to the employees that

13  are reporting?

14                  ATTORNEY SHINE:  Same

15  objection.

16                  THE WITNESS:  You know, in my

17  experience, you know, obviously, there -- there

18  is a concern if there's -- obviously, if

19  there's not action taken immediately to

20  investigate, because it is our standard to

21  immediately investigate concerns as they're

22  brought to our attention.  If somebody does

23  fail to act or escalate a concern that was

24  brought their attention, it is our -- you know,

25  from my experience, it is to either coach or

APPENDIX 000270

```
 1   discipline, depending, you know, case by case,

 2   determining what level is warranted in that

 3   situation.

 4   BY ATTORNEY HERNANDEZ:

 5        Q.    Could it create an unsafe working

 6   condition for the employee -- for the

 7   reporter --

 8                    ATTORNEY SHINE:  Same

 9   objection.

10   BY ATTORNEY HERNANDEZ:

11        Q.    -- if the report is ignored?

12        A.    Okay.  Can you rephrase the

13   beginning of that question?

14        Q.    Sure.  Could ignoring the report of

15   discrimination create an unsafe working

16   environment for the reporter?

17                    ATTORNEY SHINE:  Same

18   objection.

19                    THE WITNESS:  I mean, in my

20   experience, it could.

21   BY ATTORNEY HERNANDEZ:

22        Q.    Could it lead to continued

23   harassment?

24                    ATTORNEY SHINE:  Same

25   objection.
```

APPENDIX 000271

```
 1              THE WITNESS:  In my
 2   experience, it could.
 3   BY ATTORNEY HERNANDEZ:
 4       Q.   Could it lead to unfair discipline?
 5              ATTORNEY SHINE:  Same
 6   objection.
 7              THE WITNESS:  In my
 8   experience, it could.
 9   BY ATTORNEY HERNANDEZ:
10       Q.   Do you understand what I mean when I
11   say the "N word"?
12       A.   Yes, I do.
13       Q.   Do you agree that the N word is a
14   racial slur?
15              ATTORNEY SHINE:  Objection.
16   Calls for a legal conclusion.  Outside the
17   scope of the 30(b)(6) witness.
18              To the extent she has any personal
19   knowledge, she may testify.
20              THE WITNESS:  Yes, I do.
21   BY ATTORNEY HERNANDEZ:
22       Q.   Under Allied's policies, is the N
23   word considered a racial slur?
24       A.   Yes, it is.
25       Q.   Is it against Allied's policies to
```

APPENDIX 000272

1   use the N word in the workplace?

2        A.    Yes, it is.

3        Q.    Is it against Allied's policies for

4   managers to call workers a "sand N word"?

5        A.    Yes, it is.

6        Q.    On a scale of 1 to 10, with 1 being

7   not harmful at all and 10 being extremely

8   harmful, how harmful is it to call someone a

9   sand N word?

10                ATTORNEY SHINE:  Objection.

11   Outside the scope of the 30(b)(6) notice.

12                To the extent she has personal

13   knowledge or experience, she may testify.

14                THE WITNESS:  In my

15   experience, yes.  I mean, sorry.  I apologize.

16                ATTORNEY HERNANDEZ:  Thank

17   you.  I'm just going to take a couple minutes

18   to look over my notes, but I think I'm about

19   ready to wrap up.

20                Take five minutes.

21                THE VIDEOGRAPHER:  We are now

22   off the record.  The time is 11:21 a.m. Central

23   Time.

24                (A recess was taken.)

25                THE VIDEOGRAPHER:  We are now

APPENDIX 000273

1  on the record.  The time is 11:24 a.m. Central

2  Time.

3  BY ATTORNEY HERNANDEZ:

4      Q.    Okay.  Just a few follow-up

5  questions on records.

6          How does Allied ensure that employee

7  notices of counseling are not backdated?

8      A.    I would not know.

9      Q.    Are is there any policy that

10  requires that the notices of counseling be

11  logged into a system somewhere or digitally

12  prepared?

13      A.    They are -- they could be digitally

14  prepared or handwritten.  There is no direction

15  in which they should do it in.

16          Once a disciplinary record is

17  completed, we should be logging it into our

18  NAVEX system for recordkeeping.

19      Q.    Okay.

20              THE REPORTER:  I'm sorry.

21  What's that system called?

22              THE WITNESS:  NAVEX.

23              THE REPORTER:  Thank you.

24  BY ATTORNEY HERNANDEZ:

25      Q.    So once a -- once a disciplinary

APPENDIX 000274

1    form is issued, it should be logged in that

2    same day that it's given?

3         A.    It doesn't necessarily need to be

4    logged in that same day, but it should be

5    logged in as quickly as possible.

6         Q.    Okay.  So then there's no -- there's

7    no way that Allied can ensure that the notices

8    are not backdated; true?

9         A.    We would trust that our managers are

10   putting the correct dates on there.

11        Q.    Okay.  But I don't think that

12   answered the question.  There's no way that

13   Allied can ensure that the notices of

14   counseling are not backdated; true?

15        A.    True.

16        Q.    Okay.  How does Allied ensure that

17   an employee is actually given the counseling?

18        A.    On the bottom portion of the -- of

19   the disciplinary notice, there's a section for

20   signatures where it requires the employee to

21   sign or the individual receiving the

22   discipline.

23            If they refuse to sign it, we would

24   write on the line that they refused to sign.

25        Q.    And so if the manager wrote down,

APPENDIX 000275

1    "Refused to sign," there's no way for Allied to

2    know that the employee actually received the

3    notice; correct?

4         A.    It would be based on the information

5    located at the bottom of the disciplinary

6    notice.  That's how we would be confirming it.

7         Q.    I'm sorry.  I don't think that

8    answered the question.

9              But if -- if the manager is the one

10   that writes down "Refused to sign" but doesn't

11   actually give the employee the notice, there's

12   no way for Allied to know whether the employee

13   actually got the notice; true?

14        A.    Correct.

15        Q.    Does Allied, as part of its

16   policies, require there to be a witness when an

17   employee is counseled?

18        A.    Yes.

19        Q.    Okay.  So is a witness to the

20   counseling one way that Allied can ensure that

21   the counseling actually happened?

22        A.    Yes.

23        Q.    Okay.  And so if -- if there's -- if

24   there isn't a witness, is that against Allied's

25   policies?

APPENDIX 000276

1        A.    No, not necessarily.  No.

2        Q.    Okay.  So sorry.  Going back, I

3    believe you just testified that it -- that a

4    witness is required when an employee is given a

5    notice of counseling.

6        A.    Yes.  On the bottom of the form, we

7    do have space that -- to provide where the

8    employee that's receiving the disciplinary, the

9    manager that's issuing, and then a witness

10   that's part of the -- that's in the room

11   witnessing the counseling or termination

12   transpiring should sign it, as well.

13       Q.    Okay.  Thank you.

14             If it's determined that a witness's

15   signature was falsified, is that a potential

16   red flag of retaliation?

17       A.    If a witness signature is falsified?

18       Q.    Yes.

19       A.    No, no.

20       Q.    Would that be a red flag at all to

21   you --

22       A.    It would be a red flag, yes.

23       Q.    What would it be a red flag of?

24       A.    Improper recordkeeping.

25       Q.    So if a manager wanted to retaliate

APPENDIX 000277

1    against -- retaliate against an employee by

2    creating a paper trail of concerns and forging

3    witness signatures, would that be a red flag to

4    you of potential retaliation?

5                    ATTORNEY SHINE:  Objection.

6    Outside the scope of the 30(b)(6) witness.

7              To the extent you're asking for her

8    personal knowledge or opinion, she can answer.

9                    THE WITNESS:  Yeah.  And in my

10   personal opinion, yes, that would.

11   BY ATTORNEY HERNANDEZ:

12        Q.    Okay.  Is it against Allied's

13   policies for somebody to fake signatures on

14   counseling forms?

15        A.    I'm sorry.  Can you reask the

16   question?

17        Q.    Is it against Allied's policy for a

18   manager to fake signatures of witnesses on

19   counseling forms?

20        A.    Yes.

21        Q.    Is it against Allied's policies for

22   a manager to backdate counseling forms?

23        A.    I guess I would have to understand

24   what the backdate would be.  Is it backdating

25   to not the date of the actual meeting?  I would

APPENDIX 000278

1   just need to get clarity on that question.

2       Q.    Right.  Fair enough.  Is it

3   against's Allied's policy to -- for managers to

4   create counseling forms that were never

5   actually given?

6       A.    Yes.

7                   ATTORNEY HERNANDEZ:  Okay.

8   Pass the witness.

9                   ATTORNEY SHINE:  I have no

10  questions.

11                  THE VIDEOGRAPHER:  Okay.

12  Ms. Repsik, would you like to confirm

13  transcript orders first?

14                  THE REPORTER:  Yes.

15           Mr. Shine, do you need a copy of the

16  transcript?

17                  ATTORNEY SHINE:  Yes, please.

18                  THE REPORTER:  Does anyone

19  need a rough draft?

20                  ATTORNEY SHINE:  No.

21                  ATTORNEY HERNANDEZ:  No

22  thanks.

23                  THE REPORTER:  All right.

24  Thank you.

25                  THE VIDEOGRAPHER:  Okay.  And

```
 1   COMMONWEALTH OF PENNSYLVANIA        )
                                         ) SS
 2   COUNTY OF BERKS                     )

 3                  CERTIFICATE

 4     I, Alyssa A. Repsik, a notary public in and
     for the Commonwealth of Pennsylvania, do hereby
 5   certify that the witness, ANNA SOJA, PMK, was
     by me first duly sworn to testify the truth,
 6   the whole truth, and nothing but the truth;
     that the foregoing deposition was taken at the
 7   time and place stated herein; and that the said
     deposition was recorded stenographically by me
 8   and then reduced to typewriting under my
     direction and constitutes a true record of the
 9   testimony given by said witness.

10     I further certify that I am not a relative,
     employee, or attorney of any of the parties or
11   a relative or employee of either counsel and
     that I am in no way interested directly or
12   indirectly in this action.

13     IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this 24th
14   day of September 2024.

15

16

17          _____
            Alyssa A.  Repsik, Notary Public
18          Court Reporter
            Notary Public
19          Berks County
            My Commission Expires March 12, 2028
20          Commission Number 1296614

21

22

23

24

25
```

APPENDIX 000280

# Exhibit 4

# excerpts from
# Twana Ahmed deposition

1

```
 1                UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   TWANA AHMED,                    :
                                     :
 4           Plaintiff,              :
                                     :
 5   VS.                             :   C.A. NO.  4:23-cv-02823
                                     :
 6   UNIVERSAL PROTECTION            :
     SERVICE, LP d/b/a               :
 7   ALLIED UNIVERSAL                :
     SECURITY SERVICES,              :
 8                                   :
             Defendant.              :
 9
        ************************************************
10
                ORAL AND VIDEOTAPED DEPOSITION OF
11                        TWANA AHMED

12                     SEPTEMBER 19, 2024

13      ************************************************

14

15              THE ORAL AND VIDEOTAPED DEPOSITION OF

16   TWANA AHMED, produced as a witness at the instance of

17   the Defendant, and duly sworn, was taken in the

18   above-styled and numbered cause on the 19th day of

19   September, 2024, from 9:45 a.m. to 6:58 p.m., before

20   Andrea L. Desormeaux, CSR in and for the State of

21   Texas, reported by machine shorthand, at the offices of

22   Vorys, Sater Seymour & Pease, 909 Fannin, Suite 2700,

23   Houston, Texas, pursuant to the Federal Rules of Civil

24   Procedure and the provisions stated on the record or

25   attached hereto.
```

APPENDIX 000282

Twana Ahmed - September 19, 2024                13

| | | |
|---|---|---|
| 09:53:09 | 1 | A.    I don't remember that, no. |
| 09:53:17 | 2 | Q.    Twana, I just want to go through a couple of |
| 09:53:27 | 3 | background questions with you.  Can you please state |
| 09:53:30 | 4 | your full legal name for the record. |
| 09:53:33 | 5 | A.    Twana, first name.  Last name is Ahmed. |
| 09:53:37 | 6 | Q.    Do you have a middle name? |
| 09:53:38 | 7 | A.    Don't use one.  Don't have one. |
| 09:53:40 | 8 | Q.    And it's my understanding that you speak |
| 09:53:42 | 9 | multiple languages; is that correct? |
| 09:53:43 | 10 | A.    That's correct. |
| 09:53:44 | 11 | Q.    How many languages do you speak? |
| 09:53:47 | 12 | A.    Kurdish, Arabic, English. |
| 09:53:47 | 13 | THE REPORTER:  Can you speak up for me? |
| 09:53:48 | 14 | A.    Like four languages.  Four or three languages. |
| 09:53:52 | 15 | Q.    And what languages are those? |
| 09:53:54 | 16 | A.    English, Kurdish, and Arabic. |
| 09:54:00 | 17 | Q.    I'm sorry.  English and what was the middle |
| 09:54:02 | 18 | one? |
| 09:54:02 | 19 | A.    Kurdish and Arabic. |
| 09:54:03 | 20 | Q.    Okay.  And what's your fluency level with |
| 09:54:06 | 21 | English? |
| 09:54:07 | 22 | A.    I speak English well but it's not my mother |
| 09:54:10 | 23 | language. |
| 09:54:10 | 24 | Q.    Okay. |
| 09:54:12 | 25 | A.    There's things I might understand and there's |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000283

Twana Ahmed - September 19, 2024                    20

10:03:00  1        A.    This one?  Yes.

10:03:01  2        Q.    And did you review this document before it was

10:03:03  3    filed on your behalf?

10:03:04  4        A.    Yes.

10:03:05  5        Q.    And do you know where your lawsuit was

10:03:08  6    originally filed?

10:03:09  7        A.    In Houston.

10:03:10  8        Q.    Do you know if it was in state or federal

10:03:14  9    court?

10:03:16 10        A.    Federal court.

10:03:17 11        Q.    Would it surprise you to learn that Allied

10:03:22 12    Universal moved the case to federal court?

10:03:28 13        A.    I don't know.  Would it surprise me?  I'm not

10:03:31 14    too sure if it would surprise me or not.  I don't know

10:03:34 15    what's the difference between the courts very well.

10:03:36 16        Q.    When were you first hired with Allied

10:03:38 17    Universal?

10:03:38 18        A.    In the year of 2021.  In the ending of the

10:04:42 19    year, during the holiday time.

10:03:45 20        Q.    And what type of hiring process did you have

10:03:52 21    to go through?

10:03:53 22        A.    It was a hiring event at a hotel off of

10:03:56 23    Westheimer Street.  I walked in and I met a recruiter,

10:04:09 24    a female recruiter.  And she interviewed me, short

10:04:17 25    interview, because I had a permit for security, like a

APPENDIX 000284

| | | |
|---|---|---|
| 10:04:22 | 1 | license, and they were looking for people with actual |
| 10:04:26 | 2 | license handy.  And they were very short of staff, and |
| 10:04:31 | 3 | they wanted people with experience.  And I started the |
| 10:04:35 | 4 | process from that day.  Anyone -- it was a very short |
| 10:04:41 | 5 | process because, like, they wanted people very fast. |
| 10:04:44 | 6 | They wanted just to get you in to fill up their needs |
| 10:04:48 | 7 | and their spots. |
| 10:04:49 | 8 | Q.   Okay.  Do you know when you went to that |
| 10:04:53 | 9 | hiring event? |
| 10:04:54 | 10 | A.   When?  It was close to the holiday in 2021.  I |
| 10:04:59 | 11 | don't exact remember a date. |
| 10:05:15 | 12 | (Exhibit No. 2 marked.) |
| 10:05:15 | 13 | Q.   (By Mr. Shine)  Twana, you're being handed a |
| 10:05:17 | 14 | copy of an email that you provided in discovery.  It's |
| 10:05:20 | 15 | labeled AhmedAllied 479. |
| 10:05:30 | 16 | What's the date of this email? |
| 10:05:35 | 17 | A.   10/21. |
| 10:05:40 | 18 | Q.   I'm sorry.  Is that December 10th of 2021? |
| 10:05:45 | 19 | A.   Yes. |
| 10:05:45 | 20 | Q.   And what email address was it sent to? |
| 10:05:49 | 21 | A.   Allied Universal.  It's right here. |
| 10:05:53 | 22 | Q.   What email address was it sent to? |
| 10:05:55 | 23 | A.   It's from my email. |
| 10:05:58 | 24 | Q.   And what is your email address? |
| 10:06:00 | 25 | A.   Twana_202020@yahoo.com. |

10:09:55  1      Q.   Can you describe what she looked like?

10:09:57  2      A.   It was multiple persons, not one.  One of

10:10:02  3  them, she was an Asian, a little brown skin.  The

10:10:11  4  second one, an older lady with gray hair, an African

10:10:19  5  American.

10:10:20  6      Q.   Was it just those two people?

10:10:22  7      A.   I believe there was a third one.  The third

10:10:24  8  one was not an interview, just reviewing paperwork.

10:10:29  9      Q.   And was that a male or a female?

10:10:32 10      A.   It was a female too.

10:10:34 11      Q.   And what did she look like?

10:10:36 12      A.   Tall, younger black lady.

10:10:39 13      Q.   After your interview, what happened next?

10:10:48 14      A.   My -- after my interview -- my interview was

10:10:50 15  really quick.  Just reviewing my -- reviewing

10:10:55 16  documents.  And they wanted me to make copies of my

10:11:02 17  documents and fill up the form, application, and start

10:11:09 18  the process of employment with them.

10:11:10 19      Q.   Did you receive an offer letter?

10:11:12 20      A.   Receive an offer letter?  It doesn't ring any

10:11:19 21  bell.  I don't think so.

10:11:32 22                (Exhibit No. 4 marked.)

10:11:32 23      Q.   (By Mr. Shine)  Twana, you've been handed a

10:11:34 24  copy of an email that you provided in discovery,

10:11:38 25  labelled AhmedAllied 477.  What is the date of this

Twana Ahmed - September 19, 2024                    27

| | | |
|---|---|---|
| 10:12:52 | 1 | 18, for example. Do you see where I'm referring to? |
| 10:12:54 | 2 | A.    Yeah. |
| 10:12:55 | 3 | Q.    Can you turn to page 8. And do you see how |
| 10:13:15 | 4 | your paragraphs are numbered? For example, on page 8 |
| 10:13:18 | 5 | it says 41, 42, 43. Do you see where I'm referring? |
| 10:13:21 | 6 | A.    Yes. |
| 10:13:22 | 7 | Q.    Specifically looking at paragraph 41, can you |
| 10:13:24 | 8 | please read that paragraph to yourself and look up when |
| 10:13:27 | 9 | you're finished. |
| 10:13:28 | 10 | A.    "In December of 2021" -- |
| 10:13:30 | 11 | Q.    I'm sorry. You can read it quietly to |
| 10:13:33 | 12 | yourself and then look up when you're finished. |
| 10:13:35 | 13 | A.    Oh, okay. |
| 10:14:20 | 14 |         Some of it's blurry. I cannot see it |
| 10:14:24 | 15 | very well. But some of it, I can see it. |
| 10:14:29 | 16 | Q.    Does that indicate you are finished reading? |
| 10:14:31 | 17 | A.    Yeah. |
| 10:14:31 | 18 | Q.    Based on what you just read, is it fair to say |
| 10:14:38 | 19 | that this paragraph states that Allied does not train |
| 10:14:42 | 20 | its new security guards at the time of hiring? |
| 10:14:47 | 21 | A.    No, they don't train at this -- at the hiring |
| 10:14:53 | 22 | program, no. |
| 10:14:55 | 23 | Q.    Okay. So when did you first get trained? |
| 10:14:57 | 24 | A.    I got -- I got -- I got trained after when I |
| 10:15:02 | 25 | was already working in the field. |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000287

Twana Ahmed - September 19, 2024                    28

10:15:05  1        Q.    About how long after?

10:15:09  2        A.    Month or two, if not more.

10:15:20  3        Q.    Did you complete a new employee orientation?

10:15:26  4        A.    A new employee orientation?  I believe so.

10:15:31  5        Q.    Did you complete any other trainings?

10:15:36  6        A.    Yes.  The Elite training.

10:15:39  7        Q.    And it is your testimony you weren't trained

10:15:42  8    until a couple of months after starting?

10:15:46  9        A.    Yes.

10:16:07 10                (Exhibit No. 5 marked.)

10:16:07 11        Q.    (By Mr. Shine)  Twana, you've been handed a

10:16:08 12    training certificate for your New Employee Orientation.

10:16:15 13    Have you seen this document before?

10:16:16 14        A.    I've seen it in the computer.

10:16:18 15        Q.    And is that your name in the middle?

10:16:20 16        A.    Yes.

10:16:20 17        Q.    Is that your handwriting?

10:16:21 18        A.    Yes.

10:16:22 19        Q.    And what date did you complete New Employee

10:16:25 20    Orientation?

10:16:25 21        A.    That was on the 15 -- on 10, 11 -- 12/15/2021.

10:16:31 22        Q.    And when did you start your employment?

10:16:32 23        A.    A couple days or a week.  A week,

10:16:38 24    approximately.  I don't remember.  I was already in the

10:16:40 25    field after when I got my equipment.

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000288

10:16:43  1        Q.    Okay.  At the time that you completed New

10:16:47  2   Employee Orientation on December 15th of 2021, you had

10:16:52  3   just started.  Is that fair to say?

10:16:57  4        A.    Started working, basically?

10:17:00  5        Q.    Correct.

10:17:08  6        A.    No.  Because I didn't receive any uniform or

10:17:14  7   anything like that.  How will I be working?

10:17:17  8        Q.    Twana, if you can look at what's been marked

10:17:20  9   as No. 4, which is your offer letter received from

10:17:24 10   Allied Universal.  It's going to be one of the

10:17:30 11   documents on the side with a little yellow sticker that

10:17:33 12   says Number 4.

10:17:35 13        A.    Oh, I see it.

10:17:35 14        Q.    There should be one that says Number 4.

10:17:38 15        A.    This one?

10:17:39 16        Q.    Yes.

10:17:40 17        A.    Okay.

10:17:40 18        Q.    What is the date of that offer letter?

10:17:42 19        A.    It's the 14th.

10:17:45 20        Q.    And the date of your New Employee Orientation?

10:17:48 21        A.    It's the -- right here on the 15th.

10:17:50 22        Q.    So you were trained through New Employee

10:17:54 23   Orientation the day after you received your offer

10:17:56 24   letter, correct?

10:17:56 25              MS. HERNANDEZ:  Objection; misstates

Twana Ahmed - September 19, 2024                    30

10:17:58  1    testimony.

10:18:03  2         A.    That's the 14th.  That's the 15th.  There was

10:18:07  3    no actual training.  Let's just go through it, go

10:18:10  4    through it, go through it so you can be in the field

10:18:12  5    working.

10:18:13  6         Q.    (By Mr. Shine)  Was there an exam or a test

10:18:16  7    that you had to complete during new employee

10:18:20  8    orientation?

10:18:20  9         A.    I believe so.  But they would give you answer

10:18:29 10    at the same time of the test.  So basically when you

10:18:31 11    take a test, they give you the answer because they just

10:18:35 12    wanted me to be in the field.  So was it a test?  Was

10:18:38 13    it not a test?  Don't know what exactly was -- was

10:18:41 14    done.  It was on the computer.

10:18:43 15         Q.    But you received New Employee Orientation as

10:18:46 16    of December 15th, correct?

10:18:47 17         A.    According to this, yes.

10:19:13 18              (Exhibit No. 6 marked.)

10:19:13 19         Q.    (By Mr. Shine)  Twana, you've been handed a

10:19:17 20    second training certificate for a course on Preventing

10:19:20 21    Unlawful Discrimination & Harassment.  Have you seen

10:19:25 22    this document before?

10:19:26 23         A.    I don't remember.

10:19:26 24         Q.    At the bottom of the page, is that your

10:19:33 25    handwriting?

APPENDIX 000290

Twana Ahmed - September 19, 2024                    31

| | | |
|---|---|---|
| 10:19:33 | 1 | A.    That is, yes. |
| 10:19:34 | 2 | Q.    And does that spell your name? |
| 10:19:38 | 3 | A.    Yes. |
| 10:19:38 | 4 | Q.    And what date does it say you completed this |
| 10:19:41 | 5 | training? |
| 10:19:42 | 6 | A.    12/15/21. |
| 10:19:47 | 7 | Q.    Other than the two training certificates that |
| 10:19:52 | 8 | we just discussed, did you complete any additional |
| 10:19:54 | 9 | training at the time you were hired? |
| 10:19:56 | 10 | A.    I don't remember. |
| 10:19:57 | 11 | Q.    I want to go back to your complaint.  It's |
| 10:20:03 | 12 | that first document that we started talking about. |
| 10:20:07 | 13 | A.    This one? |
| 10:20:07 | 14 | Q.    It's been marked as Number 1. |
| 10:20:09 | 15 | A.    Okay. |
| 10:20:09 | 16 | Q.    Still on page 8, starting on paragraph 42.  Do |
| 10:20:16 | 17 | you see where I'm referring to? |
| 10:20:17 | 18 | A.    Yeah. |
| 10:20:17 | 19 | Q.    Please read paragraph 42 to yourself and look |
| 10:20:20 | 20 | up when you are finished. |
| 10:20:45 | 21 | A.    Okay. |
| 10:20:45 | 22 | Q.    Is it fair to say that you completed something |
| 10:20:50 | 23 | known as Elite training? |
| 10:20:51 | 24 | A.    Elite training, that's correct. |
| 10:20:53 | 25 | Q.    And what is your understanding of the |

Twana Ahmed - September 19, 2024                32

10:20:56  1    requirements to become an Elite security guard with

10:21:01  2    Allied?

10:21:02  3        A.    Well, it is a qualification course to qualify

10:21:05  4    for your firearm and Taser and how to use them.

10:21:15  5        Q.    And when did you take that course?

10:21:20  6        A.    After when I was already working in the field.

10:21:24  7        Q.    How long after?

10:21:25  8        A.    I don't remember how long after but probably a

10:21:30  9    month or two.  I'm not too sure.

10:21:32 10        Q.    One to two months?

10:21:36 11        A.    Maybe.

10:21:41 12        Q.    Where were you working prior -- in the field

10:21:47 13    prior to completing that training?

10:21:49 14        A.    Before the Elite training, I was working at --

10:21:54 15    excuse me -- different sites, H-E-B sites, different

10:22:03 16    ones.

10:22:03 17        Q.    You said H-E-B sites?

10:22:05 18        A.    Yes.

10:22:05 19        Q.    And what do you understand H-E-B to be?

10:22:08 20        A.    It's a grocery store.

10:22:10 21        Q.    Did you work only at H-E-B?

10:22:11 22        A.    No.  They have different stores under their

10:22:15 23    logo with different names.

10:22:16 24        Q.    Okay.  When you said you were working at sites

10:22:19 25    before the Elite training --

Twana Ahmed - September 19, 2024                    33

| | | |
|---|---|---|
| 10:22:20 | 1 | A.    Yeah. |
| 10:22:21 | 2 | Q.    -- where specifically did you work? |
| 10:22:26 | 3 | A.    Specific store addresses? |
| 10:22:27 | 4 | Q.    Yes. |
| 10:22:28 | 5 | A.    I worked at a -- one in downtown, close by |
| 10:22:34 | 6 | here.  I worked in... close to San Felipe, I believe |
| 10:22:53 | 7 | so, that they had a store over there too still.  And |
| 10:22:57 | 8 | more.  I don't remember the actual street names. |
| 10:23:00 | 9 | Q.    Did you work at any location other than an |
| 10:23:03 | 10 | H-E-B store? |
| 10:23:05 | 11 | A.    No.  The only one I worked, it was under H-E-B |
| 10:23:10 | 12 | with different company names.  The same H-E-B but |
| 10:23:15 | 13 | different names.  They don't call it H-E-B. |
| 10:23:17 | 14 | Q.    How long was the Elite training program? |
| 10:23:20 | 15 | A.    A week. |
| 10:23:20 | 16 | Q.    Where was it held? |
| 10:23:23 | 17 | A.    It was two -- it was -- there was a field and |
| 10:23:29 | 18 | there was office training. |
| 10:23:31 | 19 | Q.    So in the office, where was it held? |
| 10:23:34 | 20 | A.    On 45. |
| 10:23:36 | 21 | Q.    I don't know what that means. |
| 10:23:37 | 22 | A.    45 South, the Allied office. |
| 10:23:41 | 23 | Q.    And in the field, where was it held? |
| 10:23:43 | 24 | A.    It was somewhere an hour and 45 minutes away |
| 10:23:48 | 25 | from the office, middle of nowhere. |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

Twana Ahmed - September 19, 2024                    34

10:23:51  1        Q.   And when you say "field," what type of field
10:23:53  2   was it?
10:23:54  3        A.   It was a big -- I don't know how many hundreds
10:23:59  4   of acre of land.  It was -- they had a range.  We had
10:24:02  5   to qualify over there.
10:24:03  6        Q.   When you say a range, what do you mean by
10:24:04  7   that?
10:24:04  8        A.   Fire range.
10:24:06  9        Q.   What are the topics that you covered during
10:24:08 10   the Elite training?
10:24:11 11        A.   Sorry?
10:24:13 12        Q.   What did you learn about during the Elite
10:24:16 13   training?
10:24:16 14        A.   They -- one of the trainings, for example, it
10:24:24 15   was about qualifying for the firearm.  One of them was
10:24:29 16   for when to use the Taser, when to not use it.  Like
10:24:36 17   basically if you pepper spray somebody, do not use the
10:24:40 18   Taser because that could become fire, it burns a
10:24:46 19   person.  When not to shoot it, which area; for example,
10:24:50 20   not in the face or anything like that.
10:24:54 21        Q.   Besides the firearm and the Taser, did you
10:24:58 22   learn about anything else?
10:24:58 23        A.   The baton, where -- if you have to use it,
10:25:03 24   there's areas that you don't want to use.  The
10:25:12 25   handcuff, how to handcuff somebody in the proper --

APPENDIX 000294

10:25:17  1   proper way.

10:25:18  2        Q.   Did you learn about any of Allied's policies?

10:25:27  3        A.   I think so but I don't remember at this time.

10:25:36  4        Q.   Did you learn about Allied's Use of Force

10:25:42  5   Policy?

10:25:42  6        A.   Yes.

10:25:42  7        Q.   And you said the training was approximately

10:25:48  8   one week?

10:25:49  9        A.   It was one week, approximately, yeah.

10:25:54 10        Q.   And how do you define one week?  Is that five

10:25:57 11   days or seven days?

10:25:59 12        A.   It was seven days because it was -- it was

10:26:01 13   even on the weekend, Saturday, Sunday.  I remember

10:26:05 14   that.

10:26:05 15        Q.   How many people were in that Elite training

10:26:12 16   class?

10:26:12 17        A.   Ten, if not more.

10:26:16 18        Q.   Do you remember any of the names of the people

10:26:20 19   that you went to training with?

10:26:21 20        A.   Yes.

10:26:22 21        Q.   Who do you remember?

10:26:24 22        A.   One person.  Siboldi.

10:26:35 23        Q.   Siboldi.

10:26:39 24        A.   Siboldi, Sibolde, something like that.

10:26:43 25   Siboldi, Sibolde.

Twana Ahmed - September 19, 2024          36

10:26:43  1    Q.   Was that a first or a last name?

10:26:44  2    A.   I believe that's his last name.

10:26:52  3    Q.   Who was your training instructor?

10:26:53  4    A.   Ramos.   Ramo, Ramos.   Something like that.

10:27:02  5    Q.   Do you know someone by the name of Monroe?

10:27:06  6    A.   Yes, yeah.

10:27:06  7    Q.   Is that who you're referring to?

10:27:07  8    A.   Yes, yeah.

10:27:08  9    Q.   As your training instructor?

10:27:09 10    A.   Yes.   It was the firearm instructor.

10:27:15 11    Q.   Was Monroe your only instructor?

10:27:23 12    A.   It was -- we had -- yeah, it was the

10:27:25 13    instructor, yeah.

10:27:25 14    Q.   And turning back to your complaint which is

10:27:37 15    the document --

10:27:38 16    A.   Yes.

10:27:38 17    Q.   -- before you, starting at paragraph 43, can

10:27:42 18    you please read that paragraph to yourself and look up

10:27:48 19    when you are finished.

10:27:58 20    A.   Yes.

10:27:58 21    Q.   Was Patrick Freeney part of your Elite

10:28:06 22    training program?

10:28:06 23    A.   Patrick trainee -- Patrick Freeney?   What do

10:28:11 24    you mean by part of the Elite training program?   Was he

10:28:15 25    in the class with me?   Is that what you mean?

Twana Ahmed - September 19, 2024                    37

10:28:17  1      Q.    Was he in the class with you?

10:28:17  2      A.    No.  He was just going back and forth, in and

10:28:21  3  out, in and out.  He was not sitting in the class.

10:28:26  4      Q.    Okay.  So in paragraph 43 when it says,

10:28:28  5  "During this training, one of Allied Universal's

10:28:30  6  managers named Patrick Freeney repeatedly makes fun of

10:28:34  7  a Hispanic guard's accent" --

10:28:36  8      A.    Yes.

10:28:36  9      Q.    -- is that accurate for what is stated in

10:28:38 10  paragraph 43?

10:28:39 11      A.    Yes.  But he was not in the class.  He comes,

10:28:44 12  say a couple of things and leave, come back and say a

10:28:47 13  couple of things and go and come.  Not constantly like

10:28:51 14  us in the classroom.

10:28:52 15      Q.    Okay.  Who is Patrick Freeney?

10:28:54 16      A.    I believe he was the account manager at the

10:28:58 17  time of the account I was working.

10:28:58 18      Q.    Was he your direct supervisor?

10:29:01 19      A.    He was the supervisor.

10:29:04 20      Q.    Was that the first time you met Patrick?

10:29:09 21      A.    That was the first time in the class.

10:29:11 22      Q.    What day of training was it when you first met

10:29:16 23  him?

10:29:16 24      A.    I don't remember.

10:29:16 25      Q.    And who is the Hispanic guard that you're

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000297

10:29:23  1    referring to in paragraph 43?

10:29:25  2        A.    I don't remember.  But he was in the class

10:29:28  3    with us.

10:29:29  4        Q.    Can you describe what he looked like?

10:29:30  5        A.    It was a -- short, my height, gray -- a little

10:29:41  6    bit gray hair with an accent on him.

10:29:46  7        Q.    Male?

10:29:50  8        A.    A gentleman.

10:29:55  9        Q.    And when you say short, my height,

10:29:59 10    approximately how tall are you?

10:30:01 11        A.    5'6".

10:30:04 12        Q.    And what specifically did Patrick Freeney say

10:30:07 13    to him?

10:30:08 14        A.    When somebody talks like, blah, blah, blah,

10:30:12 15    blah, blah, make noises and things like that when

10:30:16 16    somebody speaks.

10:30:16 17        Q.    And Patrick did this in the training?

10:30:20 18        A.    Yes.

10:30:20 19        Q.    Were other people present at the time?

10:30:25 20        A.    Yes.

10:30:27 21        Q.    And is this something that you directly

10:30:30 22    observed or just heard from someone else?

10:30:31 23        A.    I was there.

10:30:33 24        Q.    Was the instructor Monroe present?

10:30:39 25        A.    At the time, I don't believe so.

Twana Ahmed - September 19, 2024                39

| | | |
|---|---|---|
| 10:30:42 | 1 | Q.   How many times did he allegedly make fun of |
| 10:30:52 | 2 | the -- |
| 10:30:52 | 3 | A.   One. |
| 10:30:53 | 4 | Q.   -- Hispanic guard? |
| 10:30:53 | 5 | A.   One time. |
| 10:30:54 | 6 | Q.   When did this Hispanic guard quit? |
| 10:31:03 | 7 | A.   Don't remember. |
| 10:31:06 | 8 | Q.   Was it during training? |
| 10:31:08 | 9 | A.   I don't remember. |
| 10:31:09 | 10 | Q.   You testified that you personally observed |
| 10:31:21 | 11 | Patrick make fun of this guard, correct? |
| 10:31:24 | 12 | A.   Correct. |
| 10:31:25 | 13 | Q.   So why didn't you report it to someone at that |
| 10:31:31 | 14 | time? |
| 10:31:31 | 15 | A.   Because I didn't want to be involved in |
| 10:31:33 | 16 | anything. |
| 10:31:33 | 17 | Q.   Did you tell Monroe when he came back in the |
| 10:31:44 | 18 | room? |
| 10:31:44 | 19 | A.   No, I did not. |
| 10:31:45 | 20 | Q.   Did anyone tell Monroe when he came back in |
| 10:31:48 | 21 | the room? |
| 10:31:48 | 22 | A.   I don't -- I don't know. |
| 10:31:48 | 23 | Q.   If you could turn back to your complaint, |
| 10:31:59 | 24 | which is still before you, and look at paragraph 44. |
| 10:32:04 | 25 | Can you please read that paragraph to yourself and look |

APPENDIX 000299

10:32:17  1    up when you're finished.

10:32:17  2        A.    Okay.

10:32:18  3        Q.    Is it fair to say that the first sentence of

10:32:23  4    paragraph 44 says, "Patrick Freeney then tells the new

10:32:28  5    Kurdish guard that he must shave his beard"?

10:32:32  6        A.    Kurdish guard?  I'm the Kurdish guard.  Yes.

10:32:35  7        Q.    But is that a fair and accurate reading of

10:32:37  8    what is stated in the first sentence of paragraph 44?

10:32:40  9        A.    He told me that.  He didn't tell the Kurdish

10:32:44  10   guard.  He told me that.

10:32:45  11       Q.    What specifically did he say to you?

10:32:50  12       A.    He says, You need to shave your beard.

10:32:52  13       Q.    Was this in the training classroom?

10:32:58  14       A.    He pulled me to the side areas where we were

10:33:02  15   sitting.  He pointed at my beard and he said, You need

10:33:05  16   to shave it.

10:33:06  17       Q.    When he pulled you to the side area, was it

10:33:09  18   still in the training classroom?

10:33:12  19       A.    Close to the door.

10:33:13  20       Q.    But still withinside the training classroom?

10:33:18  21       A.    Yes.

10:33:19  22       Q.    And others were still in the room?

10:33:21  23       A.    It was a -- it was kind of like in a break.

10:33:23  24   Some of them were out, some of them were in, talking to

10:33:28  25   each other.

| | | |
|---|---|---|
| 10:33:28 | 1 | Q.    Was Monroe present? |
| 10:33:29 | 2 | A.    I don't remember. |
| 10:33:29 | 3 | Q.    And Patrick said you need to shave your beard? |
| 10:33:42 | 4 | A.    That's correct. |
| 10:33:42 | 5 | Q.    Was that the first time he said this to you? |
| 10:33:47 | 6 | A.    That is the first time. |
| 10:33:49 | 7 | Q.    And what day of training did this happen? |
| 10:33:51 | 8 | A.    I don't remember. |
| 10:33:52 | 9 | Q.    What did you understand him to mean when he |
| 10:33:59 | 10 | asked you to shave your beard? |
| 10:34:00 | 11 | A.    I don't understand your question. |
| 10:34:05 | 12 | Q.    Let me try to rephrase for you. |
| 10:34:07 | 13 | A.    Okay. |
| 10:34:08 | 14 | Q.    When Patrick said you need to shave, how did |
| 10:34:12 | 15 | you understand you need to shave? |
| 10:34:13 | 16 | A.    Get rid of it. |
| 10:34:15 | 17 | Q.    And when you say "get rid of it," does that |
| 10:34:18 | 18 | mean like to your skin, or does that mean trimmed?  How |
| 10:34:22 | 19 | do you define "get rid of it"? |
| 10:34:25 | 20 | A.    Get rid of it means shave it all because it |
| 10:34:29 | 21 | was already trim and clean and looked professional. |
| 10:34:32 | 22 | Q.    Did you ask Patrick to clarify what he meant |
| 10:34:35 | 23 | by asking you to shave? |
| 10:34:36 | 24 | A.    It was clear as the sun.  Shave it.  Get rid |
| 10:34:41 | 25 | of it.  That's it. |

10:34:42 1        Q.    Did Patrick have a beard?

10:34:44 2        A.    I think he had a goatee.  I think so.  I'm not

10:34:49 3   too sure.

10:34:50 4        Q.    And what did you say in response to him?

10:34:55 5        A.    I have it for religious purposes, my beliefs.

10:35:03 6   That's why I have my beard.

10:35:05 7        Q.    And to clarify "religious purposes," what

10:35:09 8   religion do you practice?

10:35:10 9        A.    Islam.

10:35:11 10       Q.    How many other people were in the classroom at

10:35:16 11  that time?  Do you remember?

10:35:18 12       A.    I don't remember, no.

10:35:18 13       Q.    You testified previously that there were maybe

10:35:23 14  ten or more people in your training class, right?

10:35:26 15       A.    Approximately.  But it was during a break, so

10:35:29 16  people were in and out.  Don't remember how many

10:35:32 17  actually that were sitting because it was long hours of

10:35:35 18  class, people wanted to use restroom, people wanted to

10:35:38 19  call family, or somebody wanted to smoke or something.

10:35:41 20  So how many in the room at the time?  Don't remember.

10:35:43 21       Q.    Do you remember how many men were in that

10:35:46 22  training class?

10:35:47 23       A.    Except -- everybody was men except one girl.

10:35:52 24       Q.    And of the men, how many other people had a --

10:36:01 25  had a beard?

Twana Ahmed - September 19, 2024                    43

| | | |
|---|---|---|
| 10:36:01 | 1 | A.    A couple. |
| 10:36:04 | 2 | Q.    Do you remember their names? |
| 10:36:05 | 3 | A.    Siboldi was one of them. |
| 10:36:10 | 4 | Q.    Anyone else? |
| 10:36:12 | 5 | A.    A couple of other guys.  Don't remember their |
| 10:36:14 | 6 | name. |
| 10:36:15 | 7 | Q.    When you say "couple," is that two, three |
| 10:36:24 | 8 | people or more? |
| 10:36:24 | 9 | A.    Probably two to three, yeah. |
| 10:36:26 | 10 | Q.    Any more than three? |
| 10:36:28 | 11 | A.    Maybe. |
| 10:36:29 | 12 | Q.    Any more than four? |
| 10:36:31 | 13 | A.    Not too sure. |
| 10:36:36 | 14 | Q.    Are you aware if they had any accommodation on |
| 10:36:39 | 15 | file? |
| 10:36:39 | 16 | A.    Accommodation for what? |
| 10:36:42 | 17 | Q.    To wear their beard. |
| 10:36:43 | 18 | A.    I don't think they had any accommodation or |
| 10:36:46 | 19 | anything like that. |
| 10:36:47 | 20 | Q.    Did you ever talk to them about their beards? |
| 10:36:50 | 21 | A.    I talked to them:  Have you guys been told to |
| 10:36:54 | 22 | shave your beard?  That's the only one. |
| 10:36:57 | 23 | Q.    And who did you talk to about that? |
| 10:36:58 | 24 | A.    Siboldi. |
| 10:37:11 | 25 | Q.    At that time were you familiar with Allied's |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000303

10:37:18  1    Religious Accommodation Policy?

10:37:21  2         A.    No.

10:37:21  3         Q.    Did you report Patrick's comments at that

10:37:32  4    time?

10:37:32  5         A.    Regarding of the beard?

10:37:34  6         Q.    Yes.

10:37:35  7         A.    Don't remember.  I don't think so.

10:37:35  8         Q.    Why not?

10:37:36  9         A.    Because I wanted to get back to class and

10:37:44 10    graduate and go back to real work.

10:37:54 11              MR. SHINE:  We've been testifying for

10:37:57 12    about an hour-ish.  Do you need a break?

10:38:01 13              THE WITNESS:  If you want one.

10:38:02 14              MR. SHINE:  I'm asking you if you need a

10:38:03 15    break.

10:38:04 16              THE WITNESS:  We can take one.

10:38:05 17              MR. SHINE:  Can we go off the record?

10:38:07 18              THE VIDEOGRAPHER:  Off record at 10:37.

10:38:16 19              (Off the record 10:37 a.m. to 10:48 a.m.)

10:48:27 20              THE VIDEOGRAPHER:  Back on the record at

10:48:34 21    10:48.

10:48:37 22         Q.    (By Mr. Shine) Twana, I want to back up a

10:48:40 23    little bit to go over a few things that you may have

10:48:43 24    completed at the start of your employment with Allied.

10:48:46 25              After being hired or sometime during that

Twana Ahmed – September 19, 2024                    46

10:50:14  1      Q.    Could you turn to the next page which is

10:50:18  2    AUS 37.

10:50:19  3      A.    I see it, yes.

10:50:20  4      Q.    Is it fair to say at the top of the page it

10:50:23  5    reads "Use of Force Policy Acknowledgment"?  Did I read

10:50:31  6    that accurately?

10:50:31  7      A.    (No response).

10:50:32  8      Q.    At the very top of the page.  I believe you're

10:50:34  9    looking at the wrong one.

10:50:35 10      A.    Oh.  This one?  Okay.  This page right here?

10:50:40 11    Yeah.

10:50:41 12      Q.    So again, just for clarity of the record, it

10:50:44 13    says Use of Force Policy Acknowledgment; is that

10:50:47 14    correct?

10:50:47 15      A.    Yeah.

10:50:48 16      Q.    And in the middle of the page, would you agree

10:50:51 17    that it outlines Allied Universal's Use of Force

10:50:55 18    Policy?

10:50:55 19      A.    As it says here, it's their Use of Force

10:51:03 20    Policy.

10:51:03 21      Q.    And inside the black box at the very bottom,

10:51:05 22    there's a red checkmark and the word "signature."  Do

10:51:09 23    you see where I'm referring?

10:51:10 24      A.    Yeah, I see that.

10:51:11 25      Q.    What does it say under the checked box?

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000305

Twana Ahmed - September 19, 2024                    47

10:51:13  1       A.    It says my name and the month and the date and
10:51:17  2    the year and time.
10:51:19  3       Q.    Okay.  And what date and time is represented
10:51:21  4    there?
10:51:21  5       A.    12/15/2021, 3:04 p.m.
10:51:31  6       Q.    And what does it say underneath your name and
10:51:33  7    the date and time?
10:51:34  8       A.    The checked box?  It's like signature checked
10:51:46  9    box mark.
10:51:46 10       Q.    So specifically underneath your name, is there
10:51:49 11    additional text?
10:51:50 12       A.    What do you mean "additional text"?
10:51:54 13       Q.    Underneath your name, is it fair to say that
10:51:56 14    it reads, "Checking the checked box above is equivalent
10:52:00 15    to a handwritten signature"?  Did I read that
10:52:04 16    correctly?
10:52:04 17       A.    Yeah, I see that, yeah.  Like if you check, it
10:52:06 18    means you agree to it.
10:52:07 19       Q.    And is it fair to say that you completed this
10:52:09 20    form?
10:52:10 21       A.    Well, we were not -- we were not gone through
10:52:14 22    the form.  They just told us:  Go through it, check.
10:52:20 23    Next check, next check, next check.  Don't worry about
10:52:24 24    reading anything or anything like that.
10:52:26 25       Q.    And so you just went along with it and checked

Twana Ahmed - September 19, 2024                    48

| | | |
|---|---|---|
| 10:52:28 | 1 | off forms without reading them? |
| 10:52:29 | 2 | A.   That's what they -- that's what they told us |
| 10:52:31 | 3 | and that's what we did. |
| 10:52:32 | 4 | Q.   I'm asking you personally.  You just went |
| 10:52:36 | 5 | along and checked off boxes without reading the |
| 10:52:38 | 6 | information? |
| 10:52:39 | 7 | A.   Yes. |
| 10:52:41 | 8 | Q.   Okay.  Looking at those numbers on the bottom |
| 10:52:49 | 9 | corner again -- |
| 10:52:50 | 10 | A.   Yes. |
| 10:52:51 | 11 | Q.   -- can you flip to AUS 40? |
| 10:52:54 | 12 | A.   Do you mean Number 40? |
| 10:53:00 | 13 | Q.   Correct. |
| 10:53:01 | 14 | A.   I see -- yeah, I'm on page 40. |
| 10:53:05 | 15 | Q.   And there's a black box around text.  Is that |
| 10:53:10 | 16 | also fair to say? |
| 10:53:11 | 17 | A.   Do you mean all the way on the bottom, like |
| 10:53:14 | 18 | same as the other one? |
| 10:53:15 | 19 | Q.   Uh-huh. |
| 10:53:16 | 20 | A.   My name, yeah, I see that. |
| 10:53:18 | 21 | Q.   Okay.  And is there a red checkmark next to |
| 10:53:22 | 22 | your name? |
| 10:53:22 | 23 | A.   Yes.  Same as the other page. |
| 10:53:24 | 24 | Q.   And what does it say next to the red |
| 10:53:27 | 25 | checkmark? |

APPENDIX 000307

Twana Ahmed - September 19, 2024                52

| | | |
|---|---|---|
| 10:58:39 | 1 | AUS 47. |
| 10:58:41 | 2 | A.   47?  Okay. |
| 10:58:48 | 3 | Q.   At the top of the page it says, "Employee's |
| 10:58:53 | 4 | Withholding Certificate."  Did I read that correctly? |
| 10:58:57 | 5 | A.   Yes. |
| 10:58:57 | 6 | Q.   What do you understand this form to be? |
| 10:58:59 | 7 | A.   This is a tax, I believe for -- I think this |
| 10:59:04 | 8 | is a tax form or something like that. |
| 10:59:06 | 9 | Q.   Is this a form that you also completed? |
| 10:59:08 | 10 | A.   The tax form?  I completed something like |
| 10:59:11 | 11 | this, yes, tax form. |
| 10:59:12 | 12 | Q.   Is there a date and time also identified for |
| 10:59:16 | 13 | when you completed this form? |
| 10:59:18 | 14 | A.   Yes.  It's all of the way in the bottom. |
| 10:59:22 | 15 | Q.   And what date and time are listed? |
| 10:59:24 | 16 | A.   12/15/21, 2:17. |
| 10:59:35 | 17 | Q.   If you could turn to page AUS 53. |
| 10:59:46 | 18 | A.   Okay. |
| 10:59:47 | 19 | Q.   At the top of the page, it says, "Employee |
| 10:59:51 | 20 | Handbook Receipt and Acknowledgment (SP)."  Did I read |
| 10:59:55 | 21 | that correctly? |
| 11:00:04 | 22 | A.   Yes.  But I don't know what that means.  51, |
| 11:00:06 | 23 | correct. |
| 11:00:06 | 24 | Q.   53. |
| 11:00:08 | 25 | A.   53?  This one, yeah. |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

Twana Ahmed - September 19, 2024                    53

11:00:17  1        Q.   At the top of the page it says, "Employee

11:00:19  2   Handbook Receipt and Acknowledgment."  Did I read that

11:00:22  3   correctly?

11:00:22  4        A.   "SP" in the last?

11:00:25  5        Q.   Uh-huh.

11:00:25  6        A.   Yeah.

11:00:26  7        Q.   What do you understand this form to mean?

11:00:32  8        A.   I don't understand it, like, what to be

11:00:36  9   exactly.

11:00:36 10        Q.   At the -- do you see the black box that goes

11:00:40 11   around the text?

11:00:41 12        A.   I do.

11:00:41 13        Q.   The very first sentence says, "I certify and

11:00:46 14   acknowledge the following."

11:00:49 15             Do you see where I'm referring to?

11:00:50 16        A.   Right here?  Yeah.

11:00:52 17        Q.   Okay.  And would you agree with me that there

11:00:55 18   are four bullet points inside of that --

11:00:58 19        A.   Box?  There's four black dots.

11:01:00 20        Q.   Bullet points.

11:01:02 21        A.   Dots, yeah.

11:01:03 22        Q.   And the fourth one, it says, "I also

11:01:07 23   acknowledge that I am expected to read, understand, and

11:01:10 24   comply with the employee handbook and all company

11:01:12 25   policies and procedures."

Twana Ahmed - September 19, 2024                    59

```
11:10:00  1      Q.    (By Mr. Shine)  I'm handing you a copy of
11:10:02  2   Allied's policy for detention and legal arrest as it's
11:10:07  3   contained within its employee handbook.  Have you seen
11:10:12  4   this or read this policy before?
11:10:14  5      A.    I might but don't remember exactly.
11:10:20  6      Q.    Twana, why would you sign and acknowledge that
11:10:27  7   you had received the handbook if you didn't intend to
11:10:30  8   read it?
11:10:31  9      A.    Because when they give us something, they
11:10:36 10   don't give us the opportunity to review the form
11:10:38 11   because they want us to be done with it fast as we
11:10:41 12   could.  Like basically just check, check, hit next,
11:10:50 13   check, hit next, check, hit next, check, hit next.
11:10:53 14      Q.    But would you agree with me that you testified
11:10:56 15   you had to enter information like your checking
11:10:59 16   account, your emergency contact information, your tax
11:11:05 17   withholding information?  So you did actually have to
11:11:07 18   do some additional work, right?
11:11:09 19      A.    The -- when it comes to that, yeah.  We had to
11:11:12 20   fill up the bank account informations because that's
11:11:19 21   how I get my pay.
11:11:20 22      Q.    So is it -- do you think that the policies
11:11:29 23   don't apply to you because you didn't read them?
11:11:31 24      A.    No.  The policy applies to everybody when you
11:11:35 25   are employed by the company.
```

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000310

11:11:39 1        Q.   So based on the policy that's before you, can

11:11:47 2    you read the first sentence of the policy?  Can you

11:11:58 3    read it out loud?  It starts with "Security

11:12:08 4    professionals."

11:12:08 5        A.   This one?  "Security professionals, as..."

11:12:10 6    This one?

11:12:10 7        Q.   Uh-huh, the very first sentence.

11:12:19 8        A.   I need to translate these words.  I don't

11:12:22 9    understand them, these right here.

11:12:23 10       Q.   I will read it aloud, and please tell me if I

11:12:27 11   read it correctly.

11:12:28 12       A.   Okay.

11:12:28 13       Q.   "Security professionals, as a result of their

11:12:32 14   position, have no elevated legal duty or authority to

11:12:37 15   arrest a subject."

11:12:44 16            Did I read that correctly?

11:12:46 17       A.   What do you mean by "subject"?  A person?

11:12:51 18       Q.   I'm just asking if I read the words correctly

11:12:54 19   off the policy.

11:12:55 20       A.   Yeah.

11:12:55 21       Q.   And based on your understanding as a security

11:13:06 22   guard for Allied, you weren't a police officer,

11:13:09 23   correct?

11:13:09 24       A.   That is correct.

11:13:11 25       Q.   Were you considered what they sometimes refer

11:17:43  1      A.    Yeah.

11:17:44  2      Q.    And there are two bullet points underneath

11:17:46  3  that, correct?

11:17:51  4      A.    Two dots, yes.

11:17:53  5      Q.    The last bullet point says, "Where mustaches

11:17:58  6  and/or beards may be permitted under customer

11:18:03  7  standards, such facial hair must be neatly trimmed and

11:18:08  8  conform to the contours of the face."

11:18:12  9            Did I read that correctly?

11:18:13 10      A.    Yes.

11:18:13 11      Q.    It further says, "Exceptions may be made for

11:18:19 12  medical or religious reasons as a reasonable

11:18:24 13  accommodation."

11:18:25 14            Did I also read that correctly?

11:18:25 15      A.    Yes.

11:18:26 16      Q.    Based on this policy, would you agree with me

11:18:30 17  that Allied allows employees to have facial hair,

11:18:33 18  including a beard?

11:18:34 19      A.    That's not what I was told, though.

11:18:36 20      Q.    The question is:  Based on this policy, would

11:18:40 21  you agree with me that Allied allows its employees to

11:18:43 22  have facial hair, including beards?

11:18:46 23      A.    Based of what I see here, that's a yes.

11:19:24 24            (Exhibit No. 10 marked.)

11:19:24 25      Q.    (By Mr. Shine)  Twana, I'm handing you a copy

| | | |
|---|---|---|
| 11:20:54 | 1 | issued"? |
| 11:20:56 | 2 | A. Yes. |
| 11:20:56 | 3 | Q. In the center of the policy there are four |
| 11:21:00 | 4 | bullet points. Do you see where I am referring to? |
| 11:21:02 | 5 | A. Yes, the one with the little dots, correct. |
| 11:21:04 | 6 | Q. The very first dot says, "ID cards, if |
| 11:21:08 | 7 | assigned, must be carried at all times while working." |
| 11:21:11 | 8 | Did I read that correctly? |
| 11:21:12 | 9 | A. That is correct. |
| 11:21:13 | 10 | Q. Would you agree with me that it says "if |
| 11:21:15 | 11 | issued"? |
| 11:21:19 | 12 | A. Yes. And the -- what's it called? The |
| 11:21:24 | 13 | position I was in, it was within their policy to have |
| 11:21:29 | 14 | one. |
| 11:21:30 | 15 | Q. Okay. I'm speaking about this particular |
| 11:21:33 | 16 | policy. Would you agree that the first bullet point |
| 11:21:38 | 17 | says, "ID cards, if issued, must be carried at all |
| 11:21:45 | 18 | times while working"? |
| 11:21:48 | 19 | A. Yeah. Yes, yes, of course. |
| 11:21:51 | 20 | Q. Were you issued an ID badge? |
| 11:21:53 | 21 | A. No, I was not. |
| 11:22:09 | 22 | (Exhibit No. 11 marked.) |
| 11:22:09 | 23 | Q. (By Mr. Shine) Twana, I'm handing you a copy |
| 11:22:12 | 24 | of a signed acknowledgment that you agreed that you |
| 11:22:14 | 25 | received an ID badge, which is labeled as AUS 665. At |

Twana Ahmed - September 19, 2024                    67

11:22:24  1    the bottom of the page there's a signature and printed

11:22:27  2    name.  Is that your handwriting?

11:22:29  3         A.   That is.

11:22:29  4         Q.   Is there a date attached to that form?

11:22:31  5         A.   12/15/21.

11:22:34  6         Q.   And it's fair to say that you completed

11:22:41  7    this -- this form?

11:22:41  8         A.   I signed it and dated it.

11:22:43  9         Q.   And the first bullet point says, "I was issued

11:22:49 10    an ID badge by the local Allied Universal branch

11:22:53 11    office"; is that correct?

11:22:55 12         A.   That's correct.

11:22:56 13         Q.   And so were you issued an ID badge?

11:22:58 14         A.   No, I was not.

11:23:00 15         Q.   But you signed a form saying that you did?

11:23:05 16         A.   They told us to sign it.

11:23:07 17         Q.   And so your testimony is that you just signed

11:23:09 18    a document because somebody told you to sign it?

11:23:12 19              MS. HERNANDEZ:  Objection; argumentative.

11:23:15 20              You can answer.

11:23:16 21         A.   They told us to sign it, the person in the

11:23:19 22    class.

11:23:20 23         Q.   (By Mr. Shine)  And who was that person?

11:23:24 24         A.   He was in the class walking through us --

11:23:29 25    walking us through the paperwork.

APPENDIX 000314

Twana Ahmed - September 19, 2024                68

| | | |
|---|---|---|
| 11:23:31 | 1 | Q.   And who was that person? |
| 11:23:32 | 2 | A.   It was a couple of people.  I remember just |
| 11:23:38 | 3 | one of them.  It was a tall, black lady, light skin |
| 11:23:46 | 4 | with short hair. |
| 11:23:47 | 5 | Q.   Is this the same person that you were |
| 11:23:49 | 6 | referring to with the -- excuse me -- the forms |
| 11:23:53 | 7 | earlier? |
| 11:23:53 | 8 | A.   Same person. |
| 11:23:54 | 9 | Q.   Did you ever bring to Allied's attention that |
| 11:24:04 | 10 | you didn't receive an ID badge? |
| 11:24:06 | 11 | A.   Yes. |
| 11:24:07 | 12 | Q.   Who did you tell? |
| 11:24:07 | 13 | A.   The account manager. |
| 11:24:10 | 14 | Q.   And who is that? |
| 11:24:14 | 15 | A.   Mr. Freeney. |
| 11:24:14 | 16 | THE REPORTER:  Say it again. |
| 11:24:14 | 17 | A.   Mr. Freeney. |
| 11:24:17 | 18 | Q.   (By Mr. Shine)  When you say "Mr. Freeney," is |
| 11:24:19 | 19 | that Patrick Freeney? |
| 11:24:21 | 20 | A.   That's correct. |
| 11:24:21 | 21 | Q.   When did you tell him? |
| 11:24:23 | 22 | A.   Multiple -- a couple of times.  Two, three |
| 11:24:31 | 23 | times. |
| 11:24:31 | 24 | Q.   When was the first time? |
| 11:24:32 | 25 | A.   When I was in the office, I talked to him |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000315

11:24:41  1    about it because I was missing a lot of equipments and

11:24:48  2    never got issued one.

11:24:49  3         Q.   So what date was that?

11:24:52  4         A.   Don't remember the exact date.

11:24:54  5         Q.   And you said when you were in the office.

11:25:02  6    What office are you talking about?

11:25:04  7         A.   Allied Universal office.

11:25:08  8         Q.   And you said you told Patrick Freeney two to

11:25:17  9    three times that you didn't have an ID badge, right?

11:25:20 10         A.   Correct.

11:25:22 11         Q.   When was the second time you told him?

11:25:24 12         A.   Not too long after that.  And I told one of

11:25:30 13    the supervisors too in the field.

11:25:33 14         Q.   When you say not too long after that,

11:25:36 15    approximately when was that?

11:25:41 16         A.   Maybe two, three -- two weeks.  Two weeks.

11:25:49 17    Close to that.

11:25:50 18         Q.   Two weeks after what?  Training?  Hired?

11:25:55 19         A.   Training.

11:25:57 20         Q.   And by "training," do you mean the Elite

11:26:03 21    training?

11:26:03 22         A.   Yes.

11:26:03 23         Q.   When was the third time that you told Patrick

11:26:10 24    Freeney that you didn't have an ID badge?

11:26:13 25         A.   Can't recall that, exact when.  It was

Twana Ahmed - September 19, 2024                70

| | | |
|---|---|---|
| 11:26:30 | 1 | after -- let's see if I can try to remember. I don't |
| 11:26:41 | 2 | remember after how long. |
| 11:26:42 | 3 | Q. You also testified that you told a supervisor. |
| 11:26:47 | 4 | Who did you tell? |
| 11:26:49 | 5 | A. The supervisor who came to the scene to issue |
| 11:26:57 | 6 | my Taser. They came to the property I was working in, |
| 11:27:01 | 7 | and I told them I don't have an ID card the same as the |
| 11:27:06 | 8 | one you have on, I never got issued one. And there was |
| 11:27:16 | 9 | basically no response regarding of that. Like you will |
| 11:27:22 | 10 | get one or something like that. |
| 11:27:23 | 11 | Q. What was that supervisor's name? |
| 11:27:25 | 12 | A. Morris -- I don't know how to say his name |
| 11:27:43 | 13 | very well. Morris, Maurice, or something like that. |
| 11:27:47 | 14 | Q. Is that a male? |
| 11:27:49 | 15 | A. Yes. Hispanic male. |
| 11:27:53 | 16 | Q. Was Maurice his first or last name? |
| 11:27:57 | 17 | A. I don't know. |
| 11:28:02 | 18 | Q. And when did you tell him you didn't have an |
| 11:28:05 | 19 | ID badge? |
| 11:28:05 | 20 | A. When he came to the scene of the -- me |
| 11:28:08 | 21 | working. |
| 11:28:08 | 22 | Q. And when was that? |
| 11:28:09 | 23 | A. I don't remember the exact time but -- I don't |
| 11:28:15 | 24 | remember the exact date or the month, but I remember it |
| 11:28:17 | 25 | was during winter. Approximately the time was between |

11:28:23  1    7:00 to 8:30 at night.

11:28:26  2        Q.   And when you say he came to the field, where

11:28:31  3    were you?

11:28:32  4        A.   I was at H-E-B.

11:28:33  5        Q.   Which store?

11:28:33  6        A.   San Felipe, by the drive-through, by the

11:28:39  7    pharmacy area.  I was -- I remember I was parked in a

11:28:47  8    fire lane too, like an area he wants -- he said to meet

11:28:50  9    me there, and I met him there.

11:28:52 10        Q.   Was anyone else working with you at that time?

11:28:55 11        A.   It was just me.

11:29:15 12                 (Exhibit No. 12 marked.)

11:29:15 13        Q.   (By Mr. Shine)  And returning to the employee

11:29:22 14    handbook policies and procedures just briefly, Twana.

11:29:22 15        A.   Yes.

11:29:25 16        Q.   I'm handing you a copy of Allied's Religious

11:29:27 17    Accommodations policy as it's contained in the employee

11:29:31 18    handbook.  Are you familiar with this policy?

11:29:34 19        A.   I can't recall this policy.

11:29:41 20        Q.   Again, why would you sign and acknowledge an

11:29:43 21    agreement to read and understand the handbook policies

11:29:46 22    if you didn't read it?

11:29:47 23        A.   They told us to just check next, check next,

11:29:53 24    check next.

11:29:53 25        Q.   Does that mean the policy doesn't apply to

Twana Ahmed - September 19, 2024                72

| | | |
|---|---|---|
| 11:29:55 | 1 | you? |
| 11:29:56 | 2 | A.   They told us to do what we were supposed to |
| 11:30:01 | 3 | do, and I did what I was supposed to do or what I was |
| 11:30:04 | 4 | told to do. |
| 11:30:05 | 5 | Q.   Would you agree that this policy was |
| 11:30:08 | 6 | applicable to you? |
| 11:30:09 | 7 | A.   What do you mean by "applicable"? |
| 11:30:11 | 8 | Q.   That it was an available policy for you to |
| 11:30:13 | 9 | use. |
| 11:30:13 | 10 | A.   I was not aware of this policy or anything |
| 11:30:15 | 11 | like that because they told us hit the checkmark, go to |
| 11:30:21 | 12 | the next, hit the checkmark, to the next.  There was |
| 11:30:26 | 13 | never opportunity to review any documents. |
| 11:30:43 | 14 | Q.   If you could go back to what was marked as |
| 11:30:45 | 15 | Exhibit No. 7, which is the big printed policy |
| 11:30:47 | 16 | document. |
| 11:30:47 | 17 | A.   Okay. |
| 11:30:47 | 18 | Q.   And turn to page AUS 53.  Are you there on |
| 11:31:11 | 19 | page 53? |
| 11:31:12 | 20 | A.   I am on page 53. |
| 11:31:15 | 21 | Q.   Again, this is the employee handbook Receipt |
| 11:31:19 | 22 | and Acknowledgment form, correct? |
| 11:31:21 | 23 | A.   Yes.  SP?  That one? |
| 11:31:26 | 24 | Q.   Correct. |
| 11:31:27 | 25 | A.   This one? |

Twana Ahmed - September 19, 2024                    74

11:32:37  1              Did I read that correctly?

11:32:38  2         A.    Yes.

11:32:38  3         Q.    So would you agree with me that by signing

11:32:42  4    this form, you agreed to review and read the employee

11:32:45  5    handbook?

11:32:46  6         A.    They told us to sign it and go through it.

11:32:51  7         Q.    Do you see the link above the signature box

11:32:57  8    that says, "Please use this link to view the employee

11:33:01  9    handbook"?

11:33:05 10         A.    Yes, I see that, the one with the blue

11:33:07 11    writing, correct.

11:33:08 12         Q.    Did you ever click on that?

11:33:09 13         A.    I don't remember.

11:33:10 14         Q.    During your employment with Allied, did you

11:33:16 15    ever click on that?

11:33:16 16         A.    I can't recall that.

11:33:19 17         Q.    Turning back to the Religious Accommodation

11:33:29 18    policy, which was identified as Number 12 and labeled

11:33:32 19    as AUS 172.  Based on this policy, Twana, would you

11:33:44 20    agree that Allied Universal allows religious

11:33:48 21    accommodations?

11:33:49 22         A.    According to this, what I see, yes.  But we

11:33:52 23    never got told that.

11:33:55 24         Q.    Again, because it was in a handbook you never

11:33:58 25    read?

APPENDIX 000320

Twana Ahmed - September 19, 2024                    75

11:33:59  1              MS. HERNANDEZ:  Objection; argumentative.

11:34:03  2         You can answer.

11:34:05  3      A.   They never gave us the opportunity to read it.

11:34:11  4      Q.   (By Mr. Shine)  And you never asked any

11:34:16  5  questions about it?

11:34:17  6      A.   At that time of the class, no -- of hiring

11:34:28  7  event.  Sorry.

11:34:40  8      Q.   You previously testified, Twana, that you

11:34:43  9  practice the Muslim religion; is that correct?

11:34:47 10      A.   That is correct, yeah.

11:34:48 11      Q.   And as part of your practice, are you required

11:34:50 12  to wear or maintain a beard?

11:34:52 13      A.   Yes.

11:34:52 14      Q.   Are there any times that you might shave or

11:34:56 15  otherwise grow it longer?

11:34:58 16      A.   Have a beard, that's the requirement.

11:35:07 17      Q.   Okay.

11:35:08 18      A.   Shave -- shaving, it's not -- it's part of the

11:35:15 19  religion to have a beard.

11:35:20 20      Q.   When you first told Patrick Freeney that you

11:35:27 21  kept a beard for religious purposes, was this around

11:35:35 22  Ramadan or some other observed holiday in your

11:35:38 23  religion?

11:35:39 24      A.   Don't remember but Ramadan is -- it's a -- has

11:35:47 25  nothing to do with a beard.  It's a month of fast --

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000321

11:35:57  1    fasten -- fasting.

11:35:58  2         Q.    Fasting?

11:36:00  3         A.    Fasting.

11:36:01  4         Q.    Okay.  Can you explain what the religion

11:36:12  5    requires for a beard?

11:36:14  6         A.    The religion require -- like, required for a

11:36:22  7    beard, to grow your beard.  And doesn't -- doesn't --

11:36:30  8    how should I try to say?  Doesn't bother -- or it's not

11:36:36  9    bother.  Like, go down too much on your mouth, cover

11:36:41 10    your mouth, and things like that.  Like, I don't want

11:36:47 11    to -- it's not bother.  I don't know how to say it

11:36:50 12    right.  It's like being involved with the food you eat,

11:36:55 13    like touch the food that you eat, like disturb the food

11:36:58 14    that you eat or something like that.

11:37:00 15         Q.    And you're saying it's not supposed to?

11:37:02 16         A.    It's not supposed to.  Like, keep it not like

11:37:06 17    to bother the food or something.  Like, keep it clean.

11:37:13 18         Q.    Okay.  How long was your beard whenever

11:37:16 19    Patrick asked you to shave it?

11:37:17 20         A.    It was this -- like this (indicating).  It was

11:37:26 21    not like here or here.  It was like here.

11:37:33 22         Q.    So by the way you're gesturing, is it a little

11:37:36 23    longer than what you have now?

11:37:37 24         A.    It could be, yeah.

11:37:40 25         Q.    Was it shorter than what you're wearing right

11:39:27  1    to do this and do that because the time difference and

11:39:32  2    things like that.

11:39:32  3         Q.    Okay.  Do you know when Ramadan was in 2022?

11:39:39  4         A.    Don't remember when exactly.

11:39:42  5         Q.    How long have you been a practicing Muslim?

11:39:48  6         A.    Since I was born.  That's my -- that's my --

11:39:53  7    that's my religious, yeah.

11:39:58  8         Q.    Okay.  And other than keeping a beard, do you

11:40:03  9    observe other practices of the Muslim religion?

11:40:07 10         A.    Can you explain the question more?

11:40:13 11         Q.    Sure.  Let me try to rephrase.

11:40:15 12         A.    Okay.

11:40:16 13         Q.    So besides wearing a beard, do you do anything

11:40:18 14    else to practice your religion?

11:40:21 15         A.    Of course.  There's a lot of stuff you have to

11:40:26 16    practice.  And some of them, it's like helping -- part

11:40:33 17    of your religion to help people in need.  Pray.

11:40:43 18         Q.    What do you specifically do to practice your

11:40:46 19    religion, besides wearing a beard?

11:40:49 20         A.    Listen to Quran.  I don't know if you know

11:40:57 21    that.  Like, Quran, listen to it.

11:40:59 22         Q.    That's your religious text, correct?

11:41:02 23         A.    What does it mean by "text"?

11:41:04 24         Q.    Like a -- like a book?

11:41:05 25         A.    It's like in Christianity, they call it Bible.

| | | |
|---|---|---|
| 11:41:12 | 1 | Q.   Okay. |
| 11:41:12 | 2 | A.   In Islam they call it Quran.  And Jewish |
| 11:41:17 | 3 | religion it's Torah. |
| 11:41:18 | 4 | Q.   So you listen to the Quran? |
| 11:41:22 | 5 | A.   Yes. |
| 11:41:22 | 6 | Q.   What else do you do to practice your religion? |
| 11:41:25 | 7 | A.   Help people in need when I'm able to.  It |
| 11:41:34 | 8 | doesn't matter -- it doesn't have to be financial need. |
| 11:41:38 | 9 | It could be somebody who could be sick, that needed |
| 11:41:44 | 10 | help.  If you are able to help them, you can help them |
| 11:41:48 | 11 | with anything that you are capable of. |
| 11:41:50 | 12 | Q.   Do you also participate in the prayer? |
| 11:41:58 | 13 | A.   Yes.  But I don't go to masjid or -- or mosque |
| 11:42:09 | 14 | or anything like that. |
| 11:42:10 | 15 | Q.   And why not? |
| 11:42:11 | 16 | A.   I just -- it's like basically if you pray at |
| 11:42:13 | 17 | home, it's the same as mosque; it's you and your God. |
| 11:42:18 | 18 | If you pray here, it's the same as mosque; it's you and |
| 11:42:24 | 19 | your God.  It's like between you and your God.  God |
| 11:42:26 | 20 | will accept it at the house, He accept it at the |
| 11:42:30 | 21 | mosque.  If He accept it at the mosque, accept it at |
| 11:42:34 | 22 | the house.  It's the same thing. |
| 11:42:35 | 23 | Q.   Okay. |
| 11:42:36 | 24 | A.   The mosques are different here than from |
| 11:42:38 | 25 | overseas.  Overseas, they have imam.  Here they have |

11:42:41  1   imam, but over there it will be -- they read the Quran

11:42:43  2   to you, they interpret the Quran to you in Arabic.

11:42:49  3   It's an Arabic Quran, but they interpret it to you the

11:42:52  4   way it is.

11:42:54  5            Over here it's -- the Quran, is in

11:42:56  6   Arabic, but some copies in English.  When they

11:42:59  7   translate it, let's say, from Arabic to English, it's

11:43:02  8   not the same way it sounds in Arabic.  So when I listen

11:43:06  9   to it in Arabic, let's say, somebody, like, in the

11:43:13 10   Internets reads it and I listen to it, I understand it

11:43:19 11   more clearly and will feel more comfortable and relaxed

11:43:24 12   and relieves me when I hear -- when I hear it.

11:43:29 13       Q.   Okay.  In looking further at your complaint,

11:43:38 14   Twana --

11:43:39 15       A.   Yes.

11:43:40 16       Q.   -- after Patrick asked to you shave your

11:43:45 17   beard --

11:43:46 18       A.   Yes.

11:43:46 19       Q.   -- your complaint said a few weeks later that

11:43:50 20   a supervisor also asked you to shave; is that right?

11:43:53 21       A.   Yes.

11:43:53 22       Q.   What do you mean by "a few weeks"?

11:43:59 23       A.   When I was at the field, after that, they have

11:44:06 24   to issue equipments to me because I was missing

11:44:09 25   equipments because I was just carrying the firearm that

Twana Ahmed - September 19, 2024                81

| | | |
|---|---|---|
| 11:44:13 | 1 | was issued to me.  That's all.  One of their -- part of |
| 11:44:16 | 2 | their equipments was the Taser.  I was not issued one. |
| 11:44:22 | 3 | The supervisor came to the scene and issued me a |
| 11:44:25 | 4 | nonoperational Taser. |
| 11:44:27 | 5 | Q.    What date was that? |
| 11:44:28 | 6 | A.    I don't remember.  But I remember it was |
| 11:44:32 | 7 | during winter because it was cold.  I didn't have -- |
| 11:44:35 | 8 | the reason I remember it was winter because I was cold |
| 11:44:38 | 9 | and freezing and never got issued Allied uniform |
| 11:44:44 | 10 | jackets.  And I asked for one from the supervisor, and |
| 11:44:47 | 11 | the supervisor told me they don't have any.  And when |
| 11:44:55 | 12 | he opened his trunk to give me the Taser, I clearly saw |
| 11:45:03 | 13 | in front of me jackets.  I don't know, they call them |
| 11:45:06 | 14 | beanies. |
| 11:45:06 | 15 | Q.    Okay. |
| 11:45:06 | 16 | A.    The one for winter, the black one that says |
| 11:45:09 | 17 | "Allied," he had some of those and they never issued me |
| 11:45:13 | 18 | one. |
| 11:45:13 | 19 | Q.    When you say it was winter and cold -- I'm |
| 11:45:15 | 20 | from Chicago so I don't know what it gets like here -- |
| 11:45:19 | 21 | what type of temperature are we talking about? |
| 11:45:21 | 22 | A.    Houston gets cold. |
| 11:45:22 | 23 | Q.    Sure.  So what do you recall on this date? |
| 11:45:29 | 24 | A.    All I know it's winter and cold. |
| 11:45:31 | 25 | Q.    What was the supervisor's name? |

APPENDIX 000326

Twana Ahmed - September 19, 2024                        82

| | | |
|---|---|---|
| 11:45:34 | 1 | A.    Mauroso, Mauricio, something like that. |
| 11:45:39 | 2 | Mauricio.  I don't remember his name exactly. |
| 11:45:40 | 3 | Q.    Is this the same Hispanic supervisor -- |
| 11:45:43 | 4 | A.    That's correct. |
| 11:45:43 | 5 | Q.    -- you talked about earlier? |
| 11:45:44 | 6 | A.    That's correct. |
| 11:45:45 | 7 | Q.    And he met you in the field? |
| 11:45:52 | 8 | A.    That is correct. |
| 11:45:53 | 9 | Q.    And remind me where he met you. |
| 11:45:56 | 10 | A.    H-E-B site on San Felipe Street.  It was |
| 11:46:09 | 11 | approximately, time-wise, from 6:30 to 7:00 to 8:00. |
| 11:46:14 | 12 | Somewhere between those couple of hours, three hours. |
| 11:46:21 | 13 | It was nighttime because I remember the sun was not out |
| 11:46:24 | 14 | and -- the sun was, like, gone, I think, and it was |
| 11:46:28 | 15 | cold. |
| 11:46:28 | 16 | Q.    Did the supervisor also have a beard? |
| 11:46:40 | 17 | A.    He did have one, yes. |
| 11:46:42 | 18 | Q.    How long was his beard? |
| 11:46:43 | 19 | A.    I don't remember. |
| 11:46:43 | 20 | Q.    Was it shorter or longer than yours? |
| 11:46:49 | 21 | A.    I think a little bit shorter.  I'm not sure. |
| 11:47:06 | 22 | Q.    Do you know if he -- if he had a religious |
| 11:47:11 | 23 | accommodation? |
| 11:47:11 | 24 | A.    Oh, I never asked him that.  I don't think |
| 11:47:16 | 25 | so I asked him that. |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000327

11:47:16  1      Q.   Do you know if he had any accommodation for

11:47:18  2  wearing his beard?

11:47:19  3      A.   I never asked him that.

11:47:20  4      Q.   But you claim he asked you to shave your

11:47:27  5  beard?

11:47:27  6      A.   Yes.

11:47:27  7      Q.   How did you understand what he meant by shave

11:47:37  8  your beard?

11:47:38  9      A.   He -- he told me twice to shave my beard.

11:47:41 10  Shave it.  Like shave it off.

11:47:43 11      Q.   He didn't ask you to shave it like his, just

11:47:48 12  trim it down?

11:47:49 13      A.   No.   Trim it down is trim it and all that.

11:47:54 14  And my beard was completely trimmed and clean, lined

11:47:59 15  up, clean, everything clean, looking perfect, sharp.

11:48:02 16      Q.   And so your testimony is that you shaved down

11:48:06 17  to the skin?  You had no facial hair?

11:48:09 18      A.   I shaved.  Down to the skin, I don't remember.

11:48:19 19  But I did shave.  I had to shave.

11:48:21 20      Q.   And when did you do that?

11:48:25 21      A.   Not -- not long after that.

11:48:30 22      Q.   What does "not long" mean?  An hour?

11:48:34 23      A.   No.

11:48:34 24      Q.   A day?

11:48:35 25      A.   Less than a week or a week.  And I started,

Twana Ahmed - September 19, 2024                          84

11:48:49  1    like, wearing the face mask.

11:49:03  2         Q.    When the supervisor asked you to shave, how

11:49:07  3    did you respond?

11:49:08  4         A.    I told him I had a beard for a long time and

11:49:13  5    it's part of my belief to have one.  He goes, like, but

11:49:20  6    that's policy of the company.  You're not -- they don't

11:49:24  7    want you to have beard.

11:49:26  8                   I did not argue.  I did not say anything.

11:49:29  9    I was like, okay, I understand.

11:49:31 10         Q.    At that time, Twana, if it was part of your

11:49:40 11    religion, why didn't you refuse to shave?

11:49:43 12         A.    Sorry?

11:49:45 13         Q.    At that time, as you say it was part of your

11:49:50 14    religion, why did you not refuse to shave?

11:49:53 15         A.    I needed the job to take care of my family,

11:49:57 16    and I needed the money to take care of my family and

11:50:00 17    myself.  I had to do what I had to do to keep my family

11:50:05 18    fed and myself.

11:50:06 19         Q.    And did you report the supervisor asking you

11:50:13 20    to shave your beard to anyone?

11:50:15 21         A.    I couldn't report it to anyone because if I

11:50:19 22    report it to the account manager -- I'm pretty sure it

11:50:24 23    came from the account manager.  So I couldn't report it

11:50:27 24    to anyone.

11:50:30 25         Q.    Do you remember when we were talking about the

11:50:32  1    company's harassment and discrimination policy?

11:50:35  2        A.    Yes, you talked about it.

11:50:37  3        Q.    And you agreed with me at that time that an

11:50:41  4    employee has multiple ways it can report harassment and

11:50:46  5    discrimination, right?

11:50:46  6        A.    You said that, yes.

11:50:48  7        Q.    But you still chose not to report it to

11:50:50  8    anyone?

11:50:50  9        A.    Well, just like I said, they didn't give us

11:50:56 10    the opportunity to view the documents or go through the

11:50:59 11    documents, or they gave us, let's say, a specific card

11:51:03 12    that said, hey, if something goes wrong with you in the

11:51:06 13    company, contact this number or anything like that.

11:51:10 14              Everything they give us:  Hit checkmark,

11:51:14 15    hit next, hit checkmark, hit next, hit checkmark and go

11:51:17 16    hit next.  Basically like go through it -- like, run

11:51:22 17    through it fast as we could -- fast as you can because

11:51:24 18    we don't have enough time.

11:51:27 19        Q.    But that doesn't mean that the policies don't

11:51:30 20    apply to you, right?

11:51:31 21        A.    The policy applies to everyone.

11:51:38 22        Q.    So you would agree that whether you read it or

11:51:41 23    not, the policy applies to you at that time?

11:51:44 24        A.    I was not aware of the policy.  So I had to do

11:51:51 25    whatever they told me to do because I was employed by

Twana Ahmed - September 19, 2024                    86

| | | |
|---|---|---|
| 11:51:53 | 1 | them at the time and I have to listen to what the |
| 11:51:57 | 2 | supervisor says because the supervisor is above me. |
| 11:52:00 | 3 | And whatever he says, the supervisor, I will do because |
| 11:52:05 | 4 | how would I know if the supervisor just made that up? |
| 11:52:08 | 5 | I'm pretty sure I have to listen to him. |
| 11:52:13 | 6 | Q.   If you would have read the policy, you would |
| 11:52:16 | 7 | have known if he had made it up, right? |
| 11:52:19 | 8 | A.   Well, they don't let us read the policy. |
| 11:52:57 | 9 | (Exhibit No. 13 marked.) |
| 11:52:57 | 10 | Q.   (By Mr. Shine)  Twana, you're being handed a |
| 11:52:59 | 11 | photo that you provided in discovery.  It's labeled |
| 11:53:04 | 12 | AhmedAllied 590.  Have you seen this photo before? |
| 11:53:09 | 13 | A.   Yes, of course. |
| 11:53:09 | 14 | Q.   Who is in this photo? |
| 11:53:11 | 15 | A.   It's me. |
| 11:53:11 | 16 | Q.   And who is next to you? |
| 11:53:13 | 17 | A.   The instructor. |
| 11:53:14 | 18 | Q.   Do you recall his name? |
| 11:53:17 | 19 | A.   Mauro -- Monroe.  Mauro.  Monroe. |
| 11:53:22 | 20 | Q.   Monroe? |
| 11:53:24 | 21 | A.   Monroe. |
| 11:53:25 | 22 | Q.   Okay.  And you said he was your instructor? |
| 11:53:27 | 23 | A.   He was the firearm instructor, Taser |
| 11:53:31 | 24 | instructor, baton instructor.  Like the instructor for |
| 11:53:34 | 25 | the company. |

Twana Ahmed - September 19, 2024                    87

```
11:53:35  1        Q.    When was this photo taken?
11:53:38  2        A.    During the training, the -- I believe the last
11:53:44  3   day -- the last days of the training.  It could be the
11:53:49  4   last -- one of the last, last day or one day before the
11:53:53  5   last day.
11:53:53  6        Q.    Okay.  Where was this photograph taken?
11:53:56  7        A.    At the office.
11:53:57  8        Q.    When you say "the office," which office are
11:54:00  9   you referring to?
11:54:01 10        A.    On 45.
11:54:02 11        Q.    That's the Allied office?
11:54:05 12        A.    Correct.
11:54:06 13        Q.    Do you know who took this photo?
11:54:11 14        A.    I'm not too sure but I think, if I'm not --
11:54:27 15   Siboldi -- Siboldi.  I think so.  I'm not too sure.
11:54:33 16        Q.    Does this photo represent what your beard
11:54:40 17   looked like at the time you were in training?
11:54:42 18        A.    I didn't understand your question.  Like
11:54:49 19   what --
11:54:49 20        Q.    Sure.  Let me try to rephrase.
11:54:51 21        A.    Okay.  Thank you.
11:54:52 22        Q.    In this picture it's fair to say you have a
11:54:55 23   beard, right?
11:54:56 24        A.    Correct, yeah.
11:54:56 25        Q.    And you said this was during training?
```

APPENDIX 000332

Twana Ahmed - September 19, 2024                    88

| | | |
|---|---|---|
| 11:54:58 | 1 | A.    Yes. |
| 11:54:58 | 2 | Q.    Did your beard ever get shorter or longer than |
| 11:55:02 | 3 | this? |
| 11:55:02 | 4 | A.    It never got longer -- longer than that. |
| 11:55:08 | 5 | Q.    Okay. |
| 11:55:22 | 6 | (Exhibit No. 14 marked.) |
| 11:55:22 | 7 | Q.    (By Mr. Shine)  Twana, you're being handed |
| 11:55:24 | 8 | another photograph labeled AUS 1804.  Have you seen |
| 11:55:31 | 9 | this photo before? |
| 11:55:32 | 10 | A.    I don't think so. |
| 11:55:33 | 11 | Q.    Do you recognize who's in the photograph? |
| 11:55:36 | 12 | A.    It's me. |
| 11:55:37 | 13 | Q.    Do you recognize where the photo was taken? |
| 11:55:42 | 14 | A.    Yes. |
| 11:55:44 | 15 | Q.    And where was that? |
| 11:55:45 | 16 | A.    That's the field -- the field training area |
| 11:55:49 | 17 | that I told you earlier. |
| 11:55:49 | 18 | Q.    Okay.  And again, that's you in the |
| 11:55:53 | 19 | photograph? |
| 11:55:54 | 20 | A.    That is correct. |
| 11:55:55 | 21 | Q.    Fair to say that you also have a beard in that |
| 11:55:58 | 22 | picture? |
| 11:55:58 | 23 | A.    Yes.  That was during training, yes. |
| 11:56:01 | 24 | Q.    You said this was during training.  Is that |
| 11:56:06 | 25 | the Elite training that you referred to? |

APPENDIX 000333

| | |
|---|---|
| 11:56:08 | 1 |

11:56:08  1        A.    That is correct, yeah.

11:56:10  2        Q.    And at the time that you were hired with

11:56:13  3   Allied, was your beard ever longer than that?

11:56:17  4        A.    Don't remember.

11:56:21  5        Q.    At the time that you were hired, was your

11:56:24  6   beard shorter than that?

11:56:30  7        A.    Don't remember exactly.

11:56:34  8        Q.    Is this what your beard looked like when

11:56:39  9   Patrick Freeney told you that you needed to shave?

11:56:44 10        A.    Yes.

11:56:44 11        Q.    And is this what your beard looked like when

11:56:46 12   you allege the supervisor also told you you needed to

11:56:50 13   shave?

11:56:50 14        A.    Yes, but more clean.

11:56:52 15        Q.    What do you mean by "more clean"?

11:56:55 16        A.    Like basically, if you see the dread lines --

11:56:59 17   the -- I don't know if you call them dread lines or

11:57:01 18   what.  Like, more clean, more fresh.  Like if you see

11:57:06 19   in the first picture right here, it's more clean than

11:57:09 20   over here (indicating).  I don't know if the picture's

11:57:14 21   like a little bit different, the camera edge, because

11:57:16 22   this is far away and this is closer.  It probably makes

11:57:20 23   a little bit of difference.

11:57:21 24        Q.    Okay.  Other than sort of more clean, did your

11:57:28 25   beard look any different when the supervisor asked you

| | | |
|---|---|---|
| 11:57:30 | 1 | to shave? |
| 11:57:32 | 2 | A.    No. |
| 11:57:33 | 3 | Q.    When you were -- you were placed at H-E-B |
| 11:57:44 | 4 | store locations, right?  Like, you worked -- |
| 11:57:48 | 5 | A.    H-E-B. |
| 11:57:48 | 6 | Q.    -- at H-E-B? |
| 11:57:50 | 7 | A.    Yes.  Not just H-E-B.  H-E-B owns different |
| 11:57:57 | 8 | names. |
| 11:57:58 | 9 | Q.    Okay. |
| 11:58:00 | 10 | A.    I worked -- I worked for whatever H-E-B |
| 11:58:04 | 11 | company name.  What I mean by "company name," let's |
| 11:58:11 | 12 | say, for example, they own a -- it's a grocery store |
| 11:58:18 | 13 | that's owned by H-E-B Corporation but it's a different |
| 11:58:20 | 14 | name. |
| 11:58:21 | 15 | Q.    Okay.  So -- so the H-E-B name -- |
| 11:58:25 | 16 | A.    Yes. |
| 11:58:25 | 17 | Q.    -- is a couple of different stores? |
| 11:58:28 | 18 | A.    They have a main store.  It's the H-E-B, |
| 11:58:32 | 19 | H-E-B.  And they have the most one -- let's say, for |
| 11:58:37 | 20 | example, it's for high, wealthy areas, but they don't |
| 11:58:42 | 21 | call them H-E-B.  They call them different names. |
| 11:58:44 | 22 | Q.    Do you know what they call them? |
| 11:58:46 | 23 | A.    One of them called Central Market. |
| 11:58:48 | 24 | Q.    And you said that these are for high, wealthy |
| 11:58:52 | 25 | areas? |

Twana Ahmed - September 19, 2024                    93

12:01:49  1   of an Inspection Report that was completed on you

12:01:51  2   during employment with Allied.  Have you seen this

12:01:56  3   document before?

12:02:01  4        A.   I -- I've seen this one.

12:02:03  5              MR. SHINE:  And for the record, it's

12:02:04  6   labeled AUS 731 to 732.

12:02:17  7        Q.   (By Mr. Shine)  On the first page, Twana, does

12:02:19  8   it give a date for when this was completed?

12:02:22  9        A.   Yes.

12:02:22 10        Q.   And what date is listed?

12:02:29 11        A.   The 26th of 2022, 6:15 a.m.

12:02:38 12        Q.   Sure.  And you said the 26th of 2022.  Is

12:02:43 13   there a month identified?

12:02:44 14        A.   Yes.

12:02:45 15        Q.   What month?

12:02:46 16        A.   By number, I don't know it by number.  I don't

12:02:54 17   know how to say it by number.

12:02:55 18        Q.   Okay.  Would you agree with me that it says 26

12:03:00 19   MAR 2022?

12:03:01 20        A.   Yes, MAR, yes.

12:03:02 21        Q.   And would you agree with me that MAR is short

12:03:07 22   for March?

12:03:08 23        A.   By number it will be more understandable to

12:03:11 24   me.

12:03:11 25        Q.   March is the third month of --

APPENDIX 000336

12:03:14  1        A.    Yeah, yeah, yeah.  3/26/2022, 6:15.

12:03:20  2        Q.    Okay.  And you were the officer being

12:03:23  3    reviewed, correct?

12:03:23  4        A.    Yes.

12:03:24  5        Q.    Okay.  If you turn to the second page, which

12:03:28  6    is AUS 732, there's two photographs, right?

12:03:36  7        A.    Yes.

12:03:37  8        Q.    And is that a photograph of you?

12:03:41  9        A.    That is me, yes.

12:03:42 10        Q.    Do you have a beard in this photo?

12:03:46 11        A.    Yes.

12:03:49 12        Q.    In March of 2022, is this before or after the

12:04:01 13    supervisor asked you to shave?

12:04:02 14        A.    I don't remember.

12:04:10 15        Q.    The picture as it's represented on AUS 732, is

12:04:15 16    this beard shorter or longer than the other pictures we

12:04:21 17    looked at today?

12:04:22 18        A.    It's not clear enough.

12:04:24 19        Q.    And did you shave or trim your beard in this

12:04:31 20    picture?

12:04:32 21        A.    Lined it up.

12:04:32 22        Q.    You lined it up?

12:04:34 23        A.    Yes.

12:04:34 24        Q.    Okay.

12:04:35 25        A.    You can call that trimming to keep it clean.

12:04:39 1      Q.   And were there any issues with your beard at

12:04:46 2   this point in March of 2022?

12:04:50 3      A.   At the site?  Nobody had an issue with it at

12:04:54 4   H-E-B at all.

12:04:58 5      Q.   What about with Allied?  Did anyone complain

12:05:06 6   about your beard at this point?

12:05:08 7      A.   They didn't want the beard but -- Patrick

12:05:12 8   Freeney didn't want the beard.  He told me about it.

12:05:17 9      Q.   In March of 2022?

12:05:18 10     A.   I don't remember the exact date or March or

12:05:20 11  anything like that.  Before that, during the training,

12:05:27 12  he told me about it.  After that and that specific

12:05:31 13  date, I don't remember.

12:05:32 14     Q.   And again, was this before or after you

12:05:37 15  shaved?

12:05:38 16     A.   That's -- I remember I trimmed it out.

12:05:55 17  Trimmed.  Maybe lowered it.  I don't remember.

12:05:59 18     Q.   So when you testified earlier that you

12:06:02 19  shaved --

12:06:02 20     A.   Yes.

12:06:02 21     Q.   -- is this how it looked after you were done?

12:06:05 22     A.   Lower.

12:06:07 23     Q.   In your complaint, Twana, you also claim that

12:06:19 24  there were other security professionals with beards,

12:06:21 25  some that were longer than yours, right?

APPENDIX 000338

12:06:25  1      A.    That's correct.

12:06:26  2      Q.    Who did you specifically see with a beard that

12:06:28  3  was longer than yours?

12:06:29  4      A.    The gentleman, he was working at a site that I

12:06:33  5  came from a place.  The time was 4:30 because that's

12:06:37  6  when I was scheduled.  It was a heavyset Hispanic male

12:06:41  7  tatted up on both arms.  His beard was like this long

12:06:46  8  (indicating).

12:06:47  9      Q.    When you say "this long," approximately, what,

12:06:49  10  a foot?

12:06:50  11      A.    You can say that.  And I have asked him, did

12:06:58  12  anybody came up to you and ask you to shave your beard?

12:07:01  13  He says no.  I was like, Well, they're telling me to

12:07:04  14  shave my beard.  He laughed and no comment.

12:07:08  15      Q.    Do you remember his name?

12:07:09  16      A.    No.

12:07:17  17      Q.    Did you ask him if he had an accommodation?

12:07:21  18      A.    No, I did not ask him.

12:07:22  19      Q.    Do you know if he had an accommodation?

12:07:30  20      A.    No, I don't know.

12:07:32  21      Q.    Besides this heavier set Hispanic male, is

12:07:36  22  there anyone else that you identified as having a beard

12:07:39  23  longer than yours?

12:07:41  24      A.    I don't remember exactly, like, if somebody

12:07:48  25  had it longer.

Twana Ahmed - September 19, 2024                    97

12:07:50　1　　　Q.　Anyone else, Twana, that you can identify that

12:07:59　2　had a beard like yours, meaning the same length as

12:08:04　3　yours?

12:08:04　4　　　A.　Like, trimmed and cleaned?  No.  But Siboldi

12:08:12　5　had a beard.  It was my -- you can say my classmate

12:08:17　6　because he was in a class with me.  He had a beard.  A

12:08:24　7　couple of other guys, they had a beard.  Was it trimmed

12:08:28　8　out or anything like that?  I don't think so.  I was

12:08:30　9　the -- one of the guys who had my beard clean and

12:08:33　10　trimmed and looked professional.

12:08:35　11　　　Q.　And again, do you know if Siboldi had an

12:08:48　12　accommodation?

12:08:48　13　　　A.　I don't think he had accommodation.  I don't

12:08:53　14　think so.  But did I ever ask him?  I don't remember,

12:08:58　15　honestly.

12:08:58　16　　　Q.　Another thing that you allege in your

12:09:02　17　complaint, Twana, is that you were not issued a

12:09:09　18　body-worn camera but others were.

12:09:12　19　　　A.　That is correct.

12:09:12　20　　　Q.　Is that right?

12:09:14　21　　　A.　Yes, sir.

12:09:15　22　　　Q.　Were others in your training program issued

12:09:18　23　body-worn cameras?

12:09:19　24　　　A.　Everybody was issued body cameras, badges --

12:09:32　25　metal badges -- probable -- probable uniform.

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000340

12:09:48  1      Q.   So speaking specifically about the body-worn

12:09:53  2   cameras, you said everyone.  So all ten people or so

12:09:55  3   that were in your Elite training class received

12:09:58  4   body-worn cameras?

12:09:59  5      A.   Yes.  Siboldi had a body camera when he was in

12:10:03  6   the class.  Had it in a vest.  It's part of your policy

12:10:12  7   to have the body camera.

12:10:16  8      Q.   And what policy is that?

12:10:17  9      A.   They told us it's part of their policy to have

12:10:20 10   the proper uniform, equipments and everything.  Like,

12:10:25 11   have the badge and camera, metal badge, identification.

12:10:30 12   So the metal badge goes here, the identification card

12:10:33 13   goes here; shows your pictures, identify who you are.

12:10:39 14   The firearm, Taser, baton, one pair of handcuffs.  I

12:10:45 15   didn't have --

12:10:46 16      Q.   And whose policy was this?

12:10:48 17      A.   The company.  Like, they told us that's -- you

12:10:51 18   have to have these.  It's part of their Elite policy.

12:10:56 19   You have to be complete.

12:10:57 20      Q.   Who specifically issued the equipment during

12:11:03 21   training?

12:11:04 22      A.   The instructor.

12:11:14 23      Q.   Monroe?

12:11:15 24      A.   That is correct.  But the body camera, it

12:11:22 25   really didn't matter.  Anybody, like, from the

APPENDIX 000341

| | | |
|---|---|---|
| 12:11:25 | 1 | office -- with the Elite program, they could have |
| 12:11:30 | 2 | issued it to you, you know. |
| 12:11:42 | 3 | Q.   Did you report not getting a body-worn camera |
| 12:11:46 | 4 | to anyone? |
| 12:11:46 | 5 | A.   Yes. |
| 12:11:47 | 6 | Q.   Who did you report it to? |
| 12:11:48 | 7 | A.   I talked to the supervisor. |
| 12:11:49 | 8 | Q.   Who is the supervisor? |
| 12:11:50 | 9 | A.   Mauroso -- Mauricio.  He came to the field.  I |
| 12:11:59 | 10 | told him, Hey, I don't have this, I don't have that.  I |
| 12:12:02 | 11 | don't have a body camera.  I don't have this.  And he |
| 12:12:05 | 12 | was like, Don't worry about it. |
| 12:12:29 | 13 | (Exhibit No. 16 marked.) |
| 12:12:29 | 14 | Q.   (By Mr. Shine)  Twana, I'm handing you a |
| 12:12:31 | 15 | packet of photos that you provided in discovery.  These |
| 12:12:35 | 16 | are consecutively labeled AhmedAllied 584 through 587. |
| 12:12:46 | 17 | Starting with the first page which is |
| 12:12:49 | 18 | 548, who is the security guard? |
| 12:12:50 | 19 | A.   He's Allied employed with the Elite program. |
| 12:12:54 | 20 | Q.   And what's his name? |
| 12:12:55 | 21 | A.   Don't know his name. |
| 12:12:56 | 22 | Q.   And was he in your training program? |
| 12:12:59 | 23 | A.   I can't recall him, no. |
| 12:13:02 | 24 | Q.   When was he hired by Allied? |
| 12:13:05 | 25 | A.   Not aware of that. |

Twana Ahmed - September 19, 2024                    100

| | | |
|---|---|---|
| 12:13:07 1 | Q. | When did he complete Elite officer training? |
| 12:13:09 2 | A. | Not aware of that. |
| 12:13:11 3 | Q. | He wasn't in your training class? |
| 12:13:15 4 | A. | He was not. |
| 12:13:16 5 | Q. | Do you know if he attended training before |
| 12:13:18 6 | you? | |
| 12:13:18 7 | A. | I don't know. |
| 12:13:24 8 | Q. | Do you know if he attended training after you? |
| 12:13:27 9 | A. | Don't know that. |
| 12:13:29 10 | Q. | Who took the photo? |
| 12:13:32 11 | A. | I did. |
| 12:13:32 12 | Q. | When did you take the photo? |
| 12:13:34 13 | A. | Don't remember when. |
| 12:13:38 14 | Q. | Where was this photo taken? |
| 12:13:43 15 | A. | One of the posts that I worked at. |
| 12:13:47 16 | Q. | Do you know where specifically this was taken? |
| 12:13:51 17 | A. | Don't remember the address but it was one of |
| 12:13:59 18 | the H-E-B stores. | |
| 12:14:03 19 | Q. | And you testified you don't know what date it |
| 12:14:05 20 | was taken. Was this before or after your training | |
| 12:14:08 21 | program? | |
| 12:14:08 22 | A. | This is way -- that's after my training. |
| 12:14:11 23 | Q. | How long after? |
| 12:14:12 24 | A. | A little bit while. |
| 12:14:17 25 | Q. | When you say "a little bit while," is that one |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000343

Twana Ahmed - September 19, 2024          102

12:15:21 1          A.    Allied Universal employees, the same program

12:15:26 2      that I was in, the Elite program.

12:15:30 3          Q.    And what's her name?

12:15:32 4          A.    I don't remember her name.  Don't know his --

12:15:34 5      sorry.  Do not know her name.

12:15:36 6          Q.    And what's his name?

12:15:37 7          A.    Don't -- don't know his name either.

12:15:41 8          Q.    Do you know when this female officer was

12:15:44 9      hired?

12:15:45 10         A.    No, I do not.

12:15:47 11         Q.    Is she an Elite officer?

12:15:49 12         A.    Yes.

12:15:50 13         Q.    How do you know that?

12:15:52 14         A.    The shirt, the badge, the camera, the holster

12:15:57 15     of the firearm, the vest, the Taser.

12:16:08 16         Q.    Do officers not in the Elite program get

12:16:14 17     issued the same stuff?

12:16:16 18         A.    No, no.

12:16:16 19         Q.    And how do you know that?

12:16:19 20         A.    You don't -- like, you don't get issued a

12:16:25 21     firearm like this with a holster.  That's what I'm

12:16:28 22     aware -- like, know of.  Like, they don't issue, like,

12:16:32 23     so much equipments like this, expensive equipments,

12:16:35 24     like a Taser.  The Taser is approximately $3,500 Taser,

12:16:42 25     you know.  I have not seen anybody work for Allied that

| | | |
|---|---|---|
| 12:16:46 | 1 | I had come encounter with that have those equipments. |
| 12:16:52 | 2 | Q.   Still looking at the female officer, did she |
| 12:16:57 | 3 | attend Elite training with you? |
| 12:16:58 | 4 | A.   No, she did not.  I don't -- I never seen her |
| 12:17:00 | 5 | in my training class. |
| 12:17:02 | 6 | Q.   Do you know when she was -- when she completed |
| 12:17:05 | 7 | training? |
| 12:17:05 | 8 | A.   I have no idea. |
| 12:17:07 | 9 | Q.   Who took this photo? |
| 12:17:09 | 10 | A.   I did. |
| 12:17:10 | 11 | Q.   And where was the photo taken? |
| 12:17:11 | 12 | A.   That was at H-E-B store. |
| 12:17:13 | 13 | Q.   Which location? |
| 12:17:14 | 14 | A.   I believe West Houston.  I don't know if it's |
| 12:17:24 | 15 | West or South.  I think West Houston. |
| 12:17:28 | 16 | Q.   And what date was this photo taken? |
| 12:17:30 | 17 | A.   Do not remember the date exactly. |
| 12:17:36 | 18 | Q.   Do you know who issued her the body-worn? |
| 12:17:39 | 19 | A.   No, I do not. |
| 12:17:42 | 20 | Q.   Do you know when she was issued the body-worn? |
| 12:17:45 | 21 | A.   No, I was -- I do not. |
| 12:17:51 | 22 | Q.   Was this photograph taken around the same time |
| 12:17:54 | 23 | of the other officer that we talked about, the guy -- |
| 12:17:56 | 24 | A.   The first one? |
| 12:17:57 | 25 | Q.   Yeah, on 584 and 585. |

Twana Ahmed - September 19, 2024                104

| | | |
|---|---|---|
| 12:18:00 | 1 | A.   Approximately but not same date or -- probably |
| 12:18:04 | 2 | not same week but close by, you can say that. |
| 12:18:07 | 3 | Q.   And what about the male officer?  Do you know |
| 12:18:13 | 4 | when he was hired? |
| 12:18:14 | 5 | A.   No, I do not. |
| 12:18:15 | 6 | Q.   Did he attend training with you? |
| 12:18:17 | 7 | A.   No, he didn't -- no, I didn't have -- I don't |
| 12:18:19 | 8 | recall him in my class. |
| 12:18:20 | 9 | Q.   Is this the Hispanic male that you were |
| 12:18:25 | 10 | referring to previously? |
| 12:18:26 | 11 | A.   No.  But he give -- he give the familiarity of |
| 12:18:42 | 12 | him like -- a little bit closer like him, but the other |
| 12:18:45 | 13 | gentleman a little bit heavyset and tattoo on arm, and |
| 12:18:50 | 14 | his beard was longer than that beard. |
| 12:18:53 | 15 | Q.   Again, do you know what his name is? |
| 12:18:56 | 16 | A.   No, I do not. |
| 12:18:58 | 17 | Q.   Do you know if he took the Elite training |
| 12:19:01 | 18 | before you? |
| 12:19:02 | 19 | A.   I do not. |
| 12:19:06 | 20 | Q.   Do you know if he took Elite training after |
| 12:19:08 | 21 | you? |
| 12:19:09 | 22 | A.   I'm not aware of that. |
| 12:19:10 | 23 | Q.   And who -- it's fair to say you took this |
| 12:19:12 | 24 | photo because he's in a -- |
| 12:19:14 | 25 | A.   That is correct, yeah. |

12:19:15  1          Q.    Do you know when he was issued a body-worn

12:19:19  2     camera?

12:19:19  3          A.    I am not -- I'm not aware of that.

12:19:21  4          Q.    And do you know who issued the body-worn

12:19:25  5     camera to him?

12:19:25  6          A.    I am not aware of that.

12:19:27  7          Q.    If you turn to the last page in here, which is

12:19:30  8     AhmedAllied 587, is it fair to say that that's --

12:19:34  9          A.    The same photo.

12:19:37 10          Q.    -- the same individuals?

12:19:38 11          A.    Yes, you can say that, yeah.

12:19:39 12          Q.    And sort of briefly returning to our

12:19:42 13     discussion that we've had, Twana, about your beard --

12:19:45 14          A.    Yeah.

12:19:45 15          Q.    -- in looking at this officer's beard, is his

12:19:48 16     beard the same length as yours was before you shaved?

12:19:53 17          A.    That's longer.

12:19:54 18          Q.    It's longer.  Okay.  Do you know if he was

12:19:59 19     given an accommodation?

12:20:00 20          A.    Not aware of that.

12:20:01 21          Q.    Did you ever ask him if he was given --

12:20:05 22          A.    No, I did not.

12:20:03 23          Q.    -- an accommodation?

12:20:05 24          A.    No.

12:20:09 25          Q.    After you took these photographs, did you show

Twana Ahmed - September 19, 2024          106

| | | |
|---|---|---|
| 12:20:13 | 1 | them to anyone at Allied Universal? |
| 12:20:20 | 2 | A.   At Allied?  No. |
| 12:20:22 | 3 | Q.   Why did you take these photographs? |
| 12:20:25 | 4 | A.   To see the difference between what I got and |
| 12:20:34 | 5 | they got.  To see the difference the way they were |
| 12:20:38 | 6 | getting the equipments and I was -- I got my |
| 12:20:41 | 7 | equipments.  The treatment -- the treatment of -- they |
| 12:20:47 | 8 | received and the treatment I received. |
| 12:20:50 | 9 | Q.   Did you ever take a photo of yourself in full |
| 12:20:54 | 10 | uniform? |
| 12:20:55 | 11 | A.   I don't remember. |
| 12:20:57 | 12 | Q.   Did you ever talk to any of these officers in |
| 12:21:07 | 13 | these photos that we just talked about? |
| 12:21:09 | 14 | A.   These two, no.  And the other one, I don't |
| 12:21:13 | 15 | remember ever spoken to him before. |
| 12:21:14 | 16 | Q.   And when you told the supervisor that you |
| 12:21:32 | 17 | weren't issued a body-worn -- |
| 12:21:34 | 18 | A.   Yes. |
| 12:21:34 | 19 | Q.   -- how did he respond?  Like, what did he -- |
| 12:21:44 | 20 | what did he say back to you? |
| 12:21:46 | 21 | A.   Every time I asked for something:  Don't worry |
| 12:21:50 | 22 | about it or we don't have any available or don't worry |
| 12:21:55 | 23 | about it, it's all good.  And I told him, I'm like, |
| 12:22:00 | 24 | hey, I needed it.  I'm missing a lot of equipments.  I |
| 12:22:04 | 25 | get the same response from them.  Every time I asked |

APPENDIX 000348

| | | |
|---|---|---|
| 12:22:07 | 1 | for anything, I get the same response. |
| 12:22:12 | 2 | Let's say for the uniform, the Elite |
| 12:22:15 | 3 | you're supposed to have -- that's not black.  Navy |
| 12:22:22 | 4 | blue.  Like, full set because you worn a set -- you |
| 12:22:28 | 5 | worn a vest that's navy blue.  The shirts -- I got one |
| 12:22:34 | 6 | shirt.  It was four times bigger than my size.  And |
| 12:22:38 | 7 | they told me we don't have any, just put that on and go |
| 12:22:41 | 8 | work.  I had no choice.  I had to wear it and go to |
| 12:22:46 | 9 | work. |
| 12:22:46 | 10 | Q.   You started your employment with Allied in |
| 12:22:50 | 11 | December of 2021, right? |
| 12:22:51 | 12 | A.   Correct. |
| 12:22:51 | 13 | Q.   Would you agree with me that the COVID |
| 12:22:56 | 14 | pandemic was happening at that point? |
| 12:22:58 | 15 | A.   It was during COVID.  I am aware of that, |
| 12:23:01 | 16 | yeah. |
| 12:23:01 | 17 | Q.   And do you remember going to, say, a grocery |
| 12:23:05 | 18 | store and there being things out of stock or something |
| 12:23:11 | 19 | not available? |
| 12:23:12 | 20 | A.   I was not aware of that, no. |
| 12:23:14 | 21 | Q.   Do you -- do you ever watch the news or listen |
| 12:23:21 | 22 | to the news? |
| 12:23:22 | 23 | A.   Yeah. |
| 12:23:23 | 24 | Q.   Do you remember the shortage of, say, paper |
| 12:23:27 | 25 | towels, toilet paper, things like that? |

APPENDIX 000349

Twana Ahmed - September 19, 2024          108

12:23:29  1      A.    People were going crazy over that, yes.

12:23:33  2      Q.    Right.  So when Allied told you that they

12:23:36  3  didn't have something, you somehow say that's

12:23:40  4  discriminatory?

12:23:41  5      A.    The reason is because when I asked them, they

12:23:45  6  said to me, We don't have any.  But the supervisor say

12:23:53  7  we took the last ones and they already had some, the

12:23:57  8  proper uniform.  Why would you take the last ones if

12:24:01  9  you know you have officers are missing the -- missing

12:24:03  10  the correct ones -- the -- missing proper uniform and

12:24:08  11  you just take it for yourself.  Or we have another

12:24:12  12  officers got issued shirts who came -- graduated with

12:24:15  13  me.  They issued the blue one.  I was the one who got

12:24:19  14  issued a different color.

12:24:32  15            MR. SHINE:  I think we're are at a good

12:24:34  16  spot to take a break.

12:24:37  17            MS. HERNANDEZ:  Okay.

12:24:37  18            THE VIDEOGRAPHER:  Off the record at

12:24:39  19  12:24.

12:24:40  20            (Off the record 12:24 p.m. to 12:37 p.m.)

12:37:12  21            THE VIDEOGRAPHER:  Back on the record at

12:37:38  22  12:37.

12:37:40  23      Q.    (By Mr. Shine) Twana, I'd like to turn back to

12:37:44  24  talk a little bit further about your -- your complaint

12:37:46  25  and some of the specific allegations that you've made.

| | | |
|---|---|---|
| 12:37:48 | 1 | So I know you have a bunch of documents in front of |
| 12:37:52 | 2 | you. |
| 12:37:52 | 3 | A.   Yes. |
| 12:37:52 | 4 | Q.   But if you could find the one that we talked |
| 12:37:55 | 5 | about first which has a number, sticker Number 1, on |
| 12:37:58 | 6 | it.  It's the complaint that you filed against Allied. |
| 12:38:04 | 7 | It looks like it might be at the very bottom of all of |
| 12:38:09 | 8 | those pages in front of you. |
| 12:38:14 | 9 | A.   Is this the one you are referring to? |
| 12:38:15 | 10 | Q.   Yes.  Does the sticker say Number 1 on it? |
| 12:38:19 | 11 | A.   It does. |
| 12:38:19 | 12 | Q.   Okay.  If you could turn to page 9.  And do |
| 12:38:30 | 13 | you see where the paragraphs continue:  47, 48, 49, 50? |
| 12:38:37 | 14 | A.   Yeah, I see that. |
| 12:38:38 | 15 | Q.   Okay.  Can you, starting with paragraph 50, |
| 12:38:41 | 16 | just read that paragraph to yourself and look up |
| 12:38:48 | 17 | whenever you're finished. |
| 12:38:48 | 18 | A.   Just the 47? |
| 12:38:50 | 19 | Q.   Number 50. |
| 12:38:53 | 20 | A.   Number 50.  Okay. |
| 12:39:13 | 21 | Q.   Is it -- is it fair to say that Patrick got |
| 12:39:18 | 22 | mad at you about allegedly missing a day of work?  Is |
| 12:39:23 | 23 | that -- is that what you're -- you're talking about in |
| 12:39:26 | 24 | this paragraph? |
| 12:39:26 | 25 | A.   Yes.  But I never missed any day of work. |

Twana Ahmed - September 19, 2024                110

12:39:29  1    Q.    Right.    But the -- the -- what you say is that

12:39:32  2    Patrick got mad because he claims you missed a day of

12:39:35  3    work, right?

12:39:35  4    A.    That's correct, yes.    That is correct.

12:39:37  5    Q.    When was this?    Like, what specific day was

12:39:40  6    this?

12:39:40  7    A.    Don't remember the specific date.

12:39:47  8    Q.    Was this before or after training?

12:39:49  9    A.    That was after training.

12:39:55 10    Q.    And was this before or after he asked you to

12:39:59 11    shave your beard?

12:40:00 12    A.    That's after.

12:40:07 13    Q.    And was this before or after the supervisor

12:40:09 14    asked you to shave your beard?

12:40:13 15    A.    That's after.

12:40:14 16    Q.    Okay.    Where were you when this conversation

12:40:21 17    took place?

12:40:22 18    A.    At the office.

12:40:24 19    Q.    When you say "the office," what office are you

12:40:27 20    referring to?

12:40:27 21    A.    45.

12:40:28 22    Q.    And you previously testified 45 means the

12:40:33 23    Allied branch office; is that right?

12:40:34 24    A.    Yes, yes.

12:40:35 25    Q.    Where in the office did this conversation --

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000352

12:40:39  1        A.    In his office.

12:40:40  2        Q.    When you say "his," is that Patrick Freeney's?

12:40:43  3        A.    Yes.

12:40:43  4        Q.    Who else was present with you?

12:40:45  5        A.    Nobody.

12:40:46  6        Q.    What does Patrick Freeney's office look like?

12:40:52  7   Like, how was it set up?

12:40:54  8        A.    You walk into the office.  A lot of stuff

12:41:00  9   behind him; chargers, battery chargers.

12:41:06 10        Q.    Okay.

12:41:07 11        A.    Let's say -- let's say this is the chargers

12:41:10 12   behind you and a desk, two computers to the left side

12:41:17 13   that kind of facing him but you can see a little bit,

12:41:20 14   and the computer in front of him.

12:41:22 15        Q.    Okay.

12:41:23 16        A.    And two chairs.  Two chairs front of him and a

12:41:29 17   door and a lot of -- a lot of equipments right next to

12:41:32 18   him.

12:41:32 19        Q.    Okay.  And it was just him in the office?

12:41:36 20        A.    It was just him in the office, yes.

12:41:38 21        Q.    And where was he at in the office when you

12:41:41 22   first got there?

12:41:42 23        A.    He was in his office.

12:41:45 24        Q.    Sure.  Was he sitting?  Standing?  Walking

12:41:49 25   around?

APPENDIX 000353

12:41:50  1    A.    No.  Sitting.

12:41:51  2    Q.    Was he at his desk or one of the chairs you

12:41:54  3  talked about?

12:41:54  4    A.    No.  He's at desk.

12:41:56  5    Q.    And what made you go to his office that day?

12:41:59  6    A.    He called me to come to the office.

12:42:01  7    Q.    Was that a day that you were scheduled to

12:42:03  8  work?

12:42:03  9    A.    I do not remember if I was scheduled to work.

12:42:17 10  But he called me to the office and he said you need to

12:42:19 11  come into the office.

12:42:20 12    Q.    Okay.  Do you remember being in uniform at

12:42:22 13  that point?

12:42:22 14    A.    I do not remember if I was in uniform.

12:42:31 15    Q.    Where was Patrick's office sort of compared to

12:42:36 16  others?  Are there -- let me rephrase.

12:42:39 17          Are there offices sort of on each side of

12:42:41 18  his office, or is it just sort of a standalone by

12:42:44 19  itself?

12:42:45 20    A.    So front of his office -- this is his door.

12:42:52 21  This is his door.  Front of him, a couple of feet down

12:42:56 22  is the restroom.  Right next to his office, it's a -- I

12:43:00 23  believe it's a longer office, longer than this, I think

12:43:04 24  so.  Right next to him, a small office.  Right next to

12:43:09 25  him, a corner office, and then right next to that an

12:43:13  1    office, a longer office.

12:43:14  2         Q.   Okay.  Were those offices occupied at the time

12:43:18  3    too?

12:43:20  4         A.   I didn't pay attention to the office right

12:43:23  5    next to him, are they occupied or not.

12:43:25  6         Q.   When you first got to the office that day, did

12:43:30  7    you talk to anyone before you talked to Patrick?

12:43:32  8         A.   No, I don't remember that because my main goal

12:43:38  9    was to see Patrick at that time.

12:43:39 10         Q.   And when you get to the branch office, did you

12:43:43 11    have to go, you know, through -- I don't want to say

12:43:47 12    security.  But did you have to sort of -- sort of buzz

12:43:49 13    in in any way or do you --

12:43:51 14         A.   No.  The door is open.  You walk in and the

12:43:54 15    clerk -- you know, it's not a -- the front desk knows

12:43:57 16    who you are; you work for the company.  You let her

12:44:00 17    know who you are and who you are here to see.  And

12:44:06 18    they -- they -- sometimes Patrick come gets you, or

12:44:12 19    sometimes you walk in.  But majority of the time

12:44:16 20    somebody will come get you.

12:44:17 21         Q.   And on this day, did you talk to that front

12:44:25 22    reception or --

12:44:26 23         A.   Yeah.  Yeah, yeah, yeah.

12:44:27 24         Q.   And was it a male or a female?

12:44:28 25         A.   It was a female.

12:44:30  1         Q.    What does she look like?

12:44:31  2         A.    African American, a little bit heavyset,

12:44:42  3    longer hair.

12:44:43  4         Q.    Do you remember her name?

12:44:44  5         A.    No, I do not.

12:44:45  6         Q.    And what did you tell her when you first got

12:44:47  7    there?

12:44:48  8         A.    "I'm here to see Patrick."  And she recognized

12:44:51  9    me, that I work for the company and I've been in and

12:44:57 10    out for the class and all that.

12:44:58 11         Q.    Okay.  Did you say you were there to see

12:45:00 12    Patrick or Patrick Freeney or --

12:45:02 13         A.    Patrick.  Patrick Freeney.

12:45:04 14         Q.    And how did she respond?

12:45:08 15         A.    "Okay.  I will notify him."

12:45:12 16         Q.    Then what happened after that?  Did you get

12:45:19 17    buzzed in or did Patrick come and get you?

12:45:22 18         A.    He come and get me.

12:45:24 19         Q.    What did he first say to you when he came to

12:45:27 20    get you?

12:45:27 21         A.    "Come on in."  I walked in.

12:45:34 22         Q.    And after walking in, how far is the walk from

12:45:38 23    sort of walking into Patrick's office?

12:45:41 24         A.    So you walk in.  There's an office in the

12:45:49 25    shape of classrooms to your left.  It's a short walkway

```
12:45:56  1   from here to there.  You make a right.  You go a little
12:46:00  2   bit further down.  Patrick's office will be on the
12:46:04  3   left.
12:46:04  4        Q.   Did you have any other conversations with
12:46:06  5   Patrick while you were walking to his office?
12:46:12  6        A.   No.
12:46:13  7        Q.   And when you get to his office, he went behind
12:46:18  8   his desk?
12:46:19  9        A.   Yes.
12:46:19 10        Q.   And where did you go?
12:46:29 11        A.   In the office.
12:46:30 12        Q.   Sure.  So were you standing?  Were you
12:46:32 13   sitting?
12:46:32 14        A.   At the first time I was standing because I
12:46:38 15   can't just sit down.  I want to ask for permission, Can
12:46:42 16   I sit down or anything like that.  So I sit down.  Have
12:46:46 17   a seat.  I sit down.
12:46:48 18        Q.   Okay.  So after you had a seat, it was in one
12:46:50 19   of the chairs in front of his desk, right?
12:46:52 20        A.   That's correct, yeah.
12:46:53 21        Q.   And so after you sat down, Patrick sat down at
12:46:56 22   his desk?
12:46:57 23        A.   He sat down at his desk, yeah.
12:46:59 24        Q.   And what specifically did he say to you at
12:47:01 25   that point?
```

12:47:02  1      A.   "You were scheduled to work.  You missed a day

12:47:10  2  of work."

12:47:12  3           I was very shocked when he said that,

12:47:14  4  that I missed a day of work.  I was -- I never missed a

12:47:18  5  day.  I don't know what he's talking about.  I always

12:47:21  6  showed up to work.

12:47:25  7      Q.   What day did he say you missed?

12:47:27  8      A.   I don't remember the day.  But it was a day in

12:47:32  9  the schedule, so -- according to him, that I missed to

12:47:34 10  work, that I did not show up.

12:47:36 11      Q.   Was this in December of 2021?

12:47:40 12      A.   Do not remember that.

12:47:43 13      Q.   Was this in January of 2022?

12:47:48 14      A.   Somewhere around 2022.  Don't remember the

12:47:50 15  month, honestly.

12:47:51 16      Q.   Was this in February of 2022?

12:47:53 17      A.   Don't remember that.

12:47:55 18      Q.   And how did you respond to Patrick?

12:48:06 19      A.   I told him I never listen to -- I never -- I

12:48:11 20  never missed a day of work or anything like that.

12:48:16 21           He said, You were sent a schedule to

12:48:20 22  work, you agree to it.

12:48:22 23           I was like, I was never sent a schedule.

12:48:24 24           And he start yelling at me and telling

12:48:26 25  me, If you are lying, I'm gonna grill you or -- grill

12:48:35  1    you like an F-ing chicken.

12:48:39  2                And I was kind of scared.  And I told

12:48:44  3    him, You are yelling at me.  And all that stuff.  But

12:48:48  4    you are not listening.  You are -- you have one side of

12:48:53  5    the story.  You need to listen to -- you need to listen

12:48:58  6    to both side of story.  I showed up to the worksite.

12:49:04  7    According to what I have in here, in my phone, the

12:49:07  8    schedule, I went there.  I called you and I told you I

12:49:11  9    went to the site to work and I was not scheduled to

12:49:15 10    work.  I called Alex.  The first time Alex says I'm --

12:49:21 11    he's the supervisor at the time who sent me the text

12:49:24 12    message told me to go to this post.

12:49:26 13                So I get to the post.  It was an hour --

12:49:28 14    an hour away from where I was.  So I get there.  And

12:49:36 15    they -- there was no patrol car, there was no security,

12:49:40 16    there was nobody.  So I went around -- I told him I

12:49:43 17    went around -- I went around the premises of the

12:49:44 18    property to look for a patrol car.  I went in the store

12:49:48 19    and there was no security, so it was kind of weird.  So

12:49:51 20    I went to H-E-B and asked for, Hey, if there's any

12:49:54 21    patrol car here or anything like that.

12:49:56 22                So I called Alex.  I said, Alex, I'm at

12:49:59 23    this post that you told me to be here at this time,

12:50:03 24    this date, and this month -- time over here.  But there

12:50:08 25    is nothing going on.

Twana Ahmed - September 19, 2024                118

| | | |
|---|---|---|
| 12:50:10 | 1 | He says, I think that -- I'm with family |
| 12:50:16 | 2 | right now.  It's my day off.  But don't worry about it. |
| 12:50:20 | 3 | You can go home.  We will -- you will get paid for |
| 12:50:29 | 4 | driving over there and driving back. |
| 12:50:33 | 5 | So I told him it's not about the pay and |
| 12:50:35 | 6 | all that.  But you scheduled me to be here.  It's |
| 12:50:39 | 7 | supposed to be overtime.  Because I asked for |
| 12:50:43 | 8 | overtime -- like, to work overtime; I needed extra |
| 12:50:47 | 9 | hours, extra money.  And I went back home after that. |
| 12:50:51 | 10 | A couple of days later, I get the phone |
| 12:50:53 | 11 | call from Patrick.  And it was regarding of missing a |
| 12:51:02 | 12 | day.  And I told Patrick, I never missed a day.  This |
| 12:51:05 | 13 | is my text message.  This is the proof.  I called you |
| 12:51:07 | 14 | and I told you this is what happened.  You told me |
| 12:51:11 | 15 | don't worry about it.  Go home.  I'll take care of it. |
| 12:51:15 | 16 | And you never called me back or gave me an update.  And |
| 12:51:18 | 17 | now you're telling me I'm missing a date?  You're |
| 12:51:21 | 18 | talking about this date that I missed but I went there. |
| 12:51:24 | 19 | I have text messages.  You need to bring Alex to the |
| 12:51:27 | 20 | office.  Because you need to bring him, sit him down in |
| 12:51:31 | 21 | front of me to -- face-to-face so you can have both |
| 12:51:35 | 22 | sides of the story.  You cannot listen to one side of |
| 12:51:39 | 23 | the story because that's not fair. |
| 12:51:41 | 24 | He said to me, If you are lying to me, |
| 12:51:46 | 25 | I'm gonna fire you like an F-ing chicken.  This is |

APPENDIX 000360

Twana Ahmed - September 19, 2024                    119

```
12:51:49   1   America.  We run things different over here.  It's not
12:51:53   2   like where you come from.  Things doesn't -- things
12:51:58   3   doesn't get run like that over here.
12:51:59   4                   I was shocked when -- and at the same
12:52:03   5   time I was scared.  I couldn't say anything.  And every
12:52:07   6   time I tried, like, a word they don't understand or try
12:52:13   7   to ask him, he'd be, buh, buh, buh, buh, buh, buh.
12:52:17   8   Keep talking.  Keep talking.  Shut your fucking mouth.
12:52:22   9                   And I was just scared and shocked and
12:52:24  10   didn't know what to do because at the same time I was
12:52:28  11   in need of money, in a really bad spot because I had
12:52:33  12   family member who I had --
12:52:33  13       Q.   I'm going to pause you right there --
12:52:35  14       A.   Yes.
12:52:35  15       Q.   -- so we can talk about what you just
12:52:38  16   testified to a little bit.
12:52:41  17       A.   Okay.
12:52:41  18       Q.   This sort of text message and telling Patrick
12:52:47  19   he needs to talk to Alex.  You said Alex was a
12:52:52  20   supervisor.  What was Alex's last name?
12:52:54  21       A.   I do not know his last name.
12:52:55  22       Q.   When you say he was a supervisor, what kind of
12:52:58  23   supervisor was he?
12:52:58  24       A.   A supervisor.  What kind of supervisor?  It
12:53:02  25   was supervisor.  I know him as supervisor.
```

APPENDIX 000361

| | | |
|---|---|---|
| 12:53:05 | 1 | Q.    Okay.  And -- |
| 12:53:08 | 2 | A.    He was -- he was below Patrick. |
| 12:53:18 | 3 | Q.    And you showed Patrick the text messages? |
| 12:53:20 | 4 | A.    I did.  Yes, I did.  He says, I don't want to |
| 12:53:25 | 5 | see anything. |
| 12:53:29 | 6 | And I said, You need to bring him to the |
| 12:53:31 | 7 | office and sit in front of me and -- to listen to both |
| 12:53:39 | 8 | story at the same time to understanding what's going on |
| 12:53:45 | 9 | because -- |
| 12:53:45 | 10 | Q.    I'm going to pause you right there. |
| 12:53:47 | 11 | A.    Yes. |
| 12:53:47 | 12 | Q.    Did Alex ever come to the office while you |
| 12:53:50 | 13 | were talking to Patrick? |
| 12:53:51 | 14 | A.    No, he did not. |
| 12:53:52 | 15 | Q.    Did Patrick ever try to call Alex to come to |
| 12:53:56 | 16 | the office while you were talking to him? |
| 12:53:58 | 17 | A.    No, he did not try to call. |
| 12:54:00 | 18 | Q.    Do you know if he sent him a message or a text |
| 12:54:02 | 19 | or other -- |
| 12:54:02 | 20 | A.    I do not -- |
| 12:54:03 | 21 | Q.    -- communication? |
| 12:54:04 | 22 | A.    I don't remember that, no. |
| 12:54:05 | 23 | Q.    And when you were having this conversation or |
| 12:54:10 | 24 | interaction with Patrick -- |
| 12:54:11 | 25 | A.    Yes. |

Twana Ahmed - September 19, 2024                    121

```
12:54:12  1        Q.   -- was he at his desk the whole time?

12:54:14  2        A.   He was at his desk the whole time.

12:54:16  3        Q.   Was he seated the whole time?

12:54:17  4        A.   He was seated the whole time.

12:54:22  5        Q.   And when you were sitting in the chair in

12:54:24  6   front of his desk and he's sitting at his desk, about

12:54:27  7   how far away is that from each other?  Is it greater

12:54:30  8   than what we're sitting apart today?

12:54:33  9        A.   A little bit closer.

12:54:34 10        Q.   A little closer?

12:54:35 11        A.   Yes.

12:54:35 12        Q.   Is it more like you and the court reporter?

12:54:37 13        A.   Approximately.  It's a wider, round desk.

12:54:45 14        Q.   Sure.  Oh, it's a round desk?

12:54:47 15        A.   It's like a -- like, it's not like this.  It's

12:54:49 16   like this, like a round desk (indicating).

12:54:52 17        Q.   Okay.  So looking at your distance to the

12:54:56 18   court reporter, maybe 4 feet?

12:54:58 19        A.   Yeah.  You can say that.

12:55:04 20        Q.   I know he says -- or at least you testified

12:55:14 21   that he said a lot of things to you.

12:55:16 22        A.   Right.

12:55:16 23        Q.   What sort of tone of voice was he using?  Was

12:55:21 24   he --

12:55:21 25        A.   Yelling at me.
```

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000363

Twana Ahmed - September 19, 2024          122

12:55:22  1      Q.    Okay.  When you say "yelling," is it just the

12:55:26  2  language, or was he using like an elevated voice?

12:55:29  3      A.    Elevated voice.

12:55:30  4      Q.    Okay.

12:55:30  5      A.    Like -- it's not like me and you speaking.

12:55:34  6      Q.    Okay.

12:55:34  7      A.    He was using a tone like:  Shut up.  Like,

12:55:38  8  very loud.  Shut your F-ing mouth.  Don't --

12:55:44  9      Q.    And was the office door open at that point?

12:55:47 10      A.    It was closed.

12:55:48 11      Q.    It was closed.  When did the office door get

12:55:53 12  closed?

12:55:53 13      A.    He closed it.

12:55:54 14      Q.    When?

12:55:55 15      A.    When I went into the office.

12:56:00 16      Q.    So after you went into the office and sat

12:56:02 17  down, Patrick closed the door?

12:56:03 18      A.    Closed the office.

12:56:04 19      Q.    When you were walking into the office, did you

12:56:07 20  see anyone else in any of the other offices around you?

12:56:10 21      A.    I did not pay attention.  But there was

12:56:12 22  people, in the beginning, further down in the

12:56:16 23  classroom.

12:56:16 24      Q.    Okay.  No one specifically right around

12:56:20 25  Patrick's office?

```
12:56:21  1        A.    I didn't pay attention to anything like that
12:56:25  2   because I was there for Patrick, yeah.
12:56:28  3        Q.    Sure.
12:56:29  4        A.    To see him.
12:56:36  5        Q.    Okay.  So how did this conversation or
12:56:38  6   interaction end with Patrick?
12:56:40  7        A.    He -- the way it ended with him at that
12:56:46  8   particular time is I'm gonna talk to -- after when I
12:56:54  9   said you need to bring him in, it's not okay, it's not
12:56:59 10   fair you to listen to one side of story.  I missed a
12:57:05 11   day of work.  I never missed a day.  I always wanted to
12:57:10 12   work.  I always asked for overtime.  I always asked for
12:57:13 13   longer hours.  I wanted to work.  You need to bring him
12:57:16 14   into the office.  He said, I will talk to him but you
12:57:19 15   will be hearing from me soon.
12:57:24 16              I guess since I never heard back from
12:57:26 17   him, he realized I was correct and Alex was right
12:57:34 18   that -- I guess he realized I was correct and Alex was
12:57:38 19   wrong.  He never called me or texted me or apologized
12:57:43 20   to me regarding of the -- what he did to me in the
12:57:47 21   office or any apology or any phone call, say, hey,
12:57:52 22   look, things got fixed.  Sorry about what I said to you
12:57:55 23   and things like that.  It just, like, never happened.
12:57:55 24        Q.    Okay.
12:57:59 25        A.    And I was scared --
```

| | | |
|---|---|---|
| 12:58:00 | 1 | Q.   I'm going to pause you for a second. |
| 12:58:02 | 2 | A.   Yes, yes. |
| 12:58:02 | 3 | Q.   How long did your conversation with Patrick |
| 12:58:04 | 4 | last? |
| 12:58:08 | 5 | A.   I don't remember exactly how long. |
| 12:58:09 | 6 | Q.   Was it more than two minutes? |
| 12:58:12 | 7 | A.   No.  Way more than that. |
| 12:58:13 | 8 | Q.   More than 10 minutes? |
| 12:58:15 | 9 | A.   More than that. |
| 12:58:16 | 10 | Q.   More than 30 minutes? |
| 12:58:17 | 11 | A.   Approximately 30 minutes if not more. |
| 12:58:26 | 12 | Q.   You testified that you weren't aware if he was |
| 12:58:28 | 13 | texting or messaging with Alex.  Were you texting or |
| 12:58:31 | 14 | messaging with Alex at that time? |
| 12:58:33 | 15 | A.   No, no, no.  Out of respect I didn't be on the |
| 12:58:36 | 16 | phone in front of him or anything like that.  I put the |
| 12:58:38 | 17 | phone away because I was there for work purposes. |
| 12:58:42 | 18 | Didn't want to be distracted by my phone. |
| 12:58:45 | 19 | Q.   When the conversation ended -- |
| 12:58:51 | 20 | A.   Yeah. |
| 12:58:52 | 21 | Q.   -- what did -- what did you do at that point? |
| 12:58:54 | 22 | A.   I was walking -- as I was walking out, I left. |
| 12:59:09 | 23 | I got pulled in -- I believe was an HR lady.  She |
| 12:59:15 | 24 | wanted me to...  It was a missing document, I think. |
| 12:59:27 | 25 | It was the same day there was a missing document, I |

12:59:30  1  believe.  Wanted me to sign or something like that.  So

12:59:39  2  I went to the office and I told her I did sign that

12:59:47  3  document at the event.  And she said, Yeah, we're

12:59:54  4  missing that document.  I was like, I have signed it

12:59:57  5  and filled it out the proper way.

12:59:59  6       Q.    Okay.  Who was this person?

01:00:01  7       A.    It was a black lady at the office.

01:00:08  8       Q.    And when you say "a black lady at the office,"

01:00:11  9  I mean, who was she?

01:00:13 10       A.    I believe she was from HR.  Something to do

01:00:15 11  with HR or licensing -- licensing for the security.

01:00:25 12       Q.    Okay.  So this is the same day that Patrick

01:00:28 13  and you had this interaction?

01:00:32 14       A.    Yes.

01:00:33 15       Q.    And it was for something with your licensing?

01:00:35 16       A.    Something with the license.  Something with a

01:00:38 17  paper to sign and date.

01:00:39 18       Q.    Okay.  And --

01:00:39 19       A.    Which is --

01:00:45 20       Q.    -- what is the name of this person?

01:00:47 21       A.    I don't remember her name on top of my head.

01:00:53 22       Q.    Had you met her before that day?

01:00:54 23       A.    Yeah, I met her at the event.

01:00:56 24       Q.    Where did you first meet her?

01:00:57 25       A.    I met at the event.

01:00:59  1        Q.   So is this the same tall, black, short-haired
01:01:02  2   woman --
01:01:02  3        A.   Yeah, yeah.
01:01:03  4        Q.   -- that you were talking about previously?
01:01:04  5        A.   Yeah, yeah.  There were a couple -- couple of
01:01:10  6   lady, they looked a little bit the same.
01:01:21  7        Q.   Okay.  So you left Patrick's office and she
01:01:26  8   came and got you?  Or how did -- or you went and found
01:01:30  9   her?
01:01:31 10        A.   I was walking out.  I believe she was passing
01:01:35 11   through or something like that or -- I don't remember
01:01:43 12   how she contacted me or she -- but I remember I ended
01:01:49 13   up in her office.  And she pulled out the paper and
01:01:54 14   she still -- she told me to fill it out.  And I did it
01:01:59 15   and all that stuff.  And I told her, I did this paper
01:02:02 16   twice.  This is the third time I did it.
01:02:02 17        Q.   Okay.
01:02:05 18        A.   And then I filled it up and gave it to her,
01:02:08 19   and I kind of mentioned to her a couple of things.
01:02:10 20        Q.   Okay.  So I'm going to pause you right there.
01:02:12 21        A.   Okay.
01:02:13 22        Q.   You said you went to her office?
01:02:14 23        A.   Yes.
01:02:14 24        Q.   And her office is -- is -- where was it
01:02:18 25   located, like, in proximity to Patrick's?

Twana Ahmed - September 19, 2024                    127

01:02:21 1      A.    Two offices -- two, three offices down.

01:02:26 2      Q.    And sort of how was her office set up?

01:02:33 3      A.    Her office was a bigger office.  You walk in

01:02:40 4 to the door.  You see a desk in front of you, but in

01:02:46 5 the end you, like, kind of turn right.  Her office is

01:02:49 6 at the end.

01:02:49 7      Q.    Okay.

01:02:50 8      A.    Like, her desk is at the end.

01:02:52 9      Q.    Okay.

01:02:53 10     A.    And she have a board.

01:02:55 11     Q.    And so she asked you to go back to her office?

01:02:58 12     A.    Come to her office and have a seat.

01:03:02 13     Q.    And then that's when she told you there was a

01:03:06 14 missing form for your licensing?

01:03:08 15     A.    Correct, correct.  Something has to do with

01:03:11 16 licensing, something to do with registration or

01:03:17 17 something like that.

01:03:17 18     Q.    And when you say "licensing," is that your

01:03:21 19 state licensing to carry a firearm?

01:03:27 20     A.    I believe so, yeah.

01:03:28 21     Q.    Okay.

01:03:29 22     A.    Because that's the only license that you are

01:03:31 23 required to -- very required to have on you during

01:03:38 24 duty.

01:03:38 25     Q.    Okay.  So you go to her office.  She says

APPENDIX 000369

| | | |
|---|---|---|
| 01:03:44 | 1 | there's a form you need to complete.  You tell her |
| 01:03:48 | 2 | you've already done this a couple of times. |
| 01:03:49 | 3 | A.   Yes. |
| 01:03:50 | 4 | Q.   Did you complete it again? |
| 01:03:51 | 5 | A.   I did complete it again. |
| 01:03:52 | 6 | Q.   And again, this was the exact same day that |
| 01:03:55 | 7 | you talked to Patrick and he made those comments to you |
| 01:03:58 | 8 | about frying you like a chicken and... |
| 01:04:01 | 9 | A.   Yes, yes. |
| 01:04:03 | 10 | Q.   You started to say something that I |
| 01:04:10 | 11 | interrupted.  You said you told her things.  What |
| 01:04:14 | 12 | did -- what did you tell her? |
| 01:04:14 | 13 | A.   So I mentioned to her a couple of things.  One |
| 01:04:20 | 14 | of them about the overtime.  And I told her I'm asking |
| 01:04:27 | 15 | for overtime and asking her for more hours; I'm in a |
| 01:04:33 | 16 | bad spot for money.  And I really to know -- I really |
| 01:04:37 | 17 | need to work and I don't mind anywhere, if you can help |
| 01:04:43 | 18 | me with that.  And I told her I think -- I wanted to, |
| 01:04:50 | 19 | like, say I'm being discriminated against by my account |
| 01:04:56 | 20 | manager, the way he's talking to me and things like |
| 01:05:07 | 21 | that, and taking hours away from me and losing a lot of |
| 01:05:10 | 22 | overtime because in the beginning when I started with |
| 01:05:13 | 23 | you guys, I was getting all overtime and everything I |
| 01:05:16 | 24 | wanted.  But since become account manager, things has |
| 01:05:22 | 25 | changed around me.  And there was no comment over |

APPENDIX 000370

01:05:31  1    anything.  Just sign and things like that.  And then I

01:05:36  2    had a feeling -- go ahead.

01:05:38  3        Q.   How long was your conversation with this

01:05:41  4    woman?

01:05:43  5        A.   Ten minutes, 15, maybe more.

01:05:49  6        Q.   And do you know what her title was or is?

01:05:55  7        A.   I think she was in HR.

01:05:58  8        Q.   And so you signed the paperwork, you gave her

01:06:14  9    some of this information.  And then did you just get up

01:06:17 10    and leave?

01:06:18 11        A.   I signed the probable -- probable documents

01:06:27 12    and told her what exactly happened.  And I go ahead and

01:06:35 13    left.  I -- yes, I think I left her office.

01:06:42 14        Q.   Okay.  After you left her office, where did

01:06:49 15    you go?

01:06:50 16        A.   I think home.  I think so.

01:06:58 17        Q.   Other than talking to Patrick and talking to

01:07:06 18    this woman that you think was in HR, did you talk to

01:07:10 19    anyone else when you were at the branch office that

01:07:13 20    day?

01:07:14 21        A.   Don't remember.

01:07:16 22        Q.   Did you report any of your conversation with

01:07:24 23    Patrick to Allied's hotline number at that point?

01:07:33 24        A.   No.

01:07:34 25        Q.   Why not?

Twana Ahmed - September 19, 2024                130

01:07:34  1        A.    I was afraid -- I was afraid of losing my jobs

01:07:38  2    because I was in the really bad spot and I needed that

01:07:42  3    job.  I didn't want him -- I didn't want anybody to

01:07:45  4    retaliate against me.  If I say something, he's way

01:07:49  5    higher than me and way powerful than me.  I'm just a

01:07:52  6    lower man.  I might lose my job.  And not listen to me,

01:07:57  7    just like what Patrick did to me.  If I say something,

01:08:01  8    they're gonna listen to him because he's way above me.

01:08:06  9    So I had to deal with everything just to make my living

01:08:09 10    to feed my family and feed myself.

01:08:11 11        Q.    Okay.  Did you say anything to anyone outside

01:08:24 12    of Allied Universal about that conversation that day?

01:08:26 13        A.    That particular day?  I don't remember if I

01:08:36 14    spoke to anybody that particular day.

01:08:39 15        Q.    What about a few days after or a week after;

01:08:43 16    someone outside of Allied, did you talk to anyone about

01:08:48 17    that day?

01:08:49 18        A.    I do not remember if I spoke to anyone

01:08:56 19    regarding that.

01:08:57 20        Q.    Did you write down your interactions in any

01:09:02 21    way?  Like, did you make a note or diary for yourself?

01:09:05 22        A.    Right in front of him?  No, I did not.

01:09:08 23        Q.    What about after the fact?  Did you make a

01:09:10 24    note or a diary for yourself?

01:09:13 25        A.    No, I don't -- I don't remember I did anything

APPENDIX 000372

01:14:12  1    labeled AUS 1036 consecutively through 1042.

01:14:21  2        Q.   (By Mr. Shine)  Have you seen this document

01:14:23  3    before?

01:14:23  4        A.   I do not remember.

01:14:24  5        Q.   On the first page there's a heading that says

01:14:31  6    "Security Objective."  It's the top heading on the

01:14:34  7    upper right-hand side.  Do you -- or I'm sorry -- the

01:14:37  8    upper left side.  Do you see where I'm referring to?

01:14:39  9        A.   Yeah.

01:14:42 10        Q.   And in reading that first paragraph it

01:14:45 11    identifies that these are post orders for working at an

01:14:48 12    H-E-B property.  Is that fair to say?

01:14:50 13        A.   According to the paper, yes.

01:14:52 14        Q.   In the bottom left-hand corner of the page,

01:14:55 15    there's a date after the word "revision."

01:15:02 16             Do you see where I'm referring to?

01:15:03 17        A.   The date, 11/26/2021.

01:15:06 18        Q.   Okay.  Would you agree with me that 11/26 of

01:15:09 19    2021 was prior to your start date with the company?

01:15:19 20        A.   That's before my employment?

01:15:20 21        Q.   Correct.

01:15:21 22        A.   Yeah, yeah.

01:15:21 23        Q.   If you could turn to the third page, which is

01:15:30 24    AUS 1038 or 1,038.

01:15:37 25        A.   Okay.

01:16:52  1        A.    Right.

01:16:56  2        Q.    -- would you agree that Allied set clear

01:16:58  3   expectations for how a security guard was expected to

01:17:07  4   react or interact with a shoplifter?

01:17:09  5        A.    According to the paper, yes.

01:17:14  6        Q.    Okay.  At the bottom of the -- or still in the

01:17:17  7   Shoplifter subheading --

01:17:20  8        A.    Yes.

01:17:20  9        Q.    -- it's highlighted in yellow.  It starts with

01:17:23 10   "Officer will in no way detain or handcuff..."

01:17:27 11             Do you see where I'm referring?

01:17:28 12        A.    I do see that.

01:17:29 13        Q.    And it reads, "Officer will in no way detain

01:17:32 14   or handcuff unless a customer or partner is being

01:17:36 15   physically assaulted by a suspect."

01:17:40 16             Did I read that accurately?

01:17:45 17        A.    Yes, you did.

01:17:46 18        Q.    Did anyone go over these post orders with you

01:17:49 19   before you started at the H-E-B stores?

01:17:56 20        A.    Do not remember but this is the policy

01:18:02 21   according to the paper.  But the -- the incidents, when

01:18:08 22   it happened, the gentleman made a threat to me and I

01:18:13 23   acted according to the threat.

01:18:15 24        Q.    We'll get to the incident that you're -- I

01:18:18 25   think you're referring to.

Twana Ahmed - September 19, 2024                    138

01:18:18  1    A.    Yes.

01:18:19  2    Q.    I'm just asking specifically if these post

01:18:22  3  orders were reviewed with you prior to you working at

01:18:26  4  the H-E-B account.

01:18:27  5    A.    Do not remember.

01:18:28  6    Q.    If you could flip to what is labeled as

01:18:37  7  AUS 1041.  At the top of the page, it says,

01:18:42  8  "Unacceptable Behaviors."  Do you see what I'm

01:18:44  9  referring to?

01:18:45 10    A.    You said 41?

01:18:51 11    Q.    Yes.

01:18:52 12    A.    Yes, I see that.

01:18:53 13    Q.    And then on the following page, it says --

01:18:56 14  which is AUS 1042, it starts with "failure to meet

01:19:00 15  grooming standards."

01:19:02 16          Do you see what I'm referring to?

01:19:03 17    A.    This page, yes.

01:19:05 18    Q.    Underneath "failure to meet grooming

01:19:10 19  standards," it reads:  "Unarmed, regular armed and

01:19:13 20  Elite officers, beards must be neatly trimmed, clean

01:19:18 21  necklines and close cropped.  No long beards."

01:19:23 22          Did I read that correctly?

01:19:30 23    A.    Yes, you did.

01:19:31 24    Q.    So again, based on the post orders, an Elite

01:19:33 25  officer was allowed to have a beard, correct?

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000375

01:19:36  1          A.    According to this.

01:19:41  2          Q.    Do you know when you were first assigned to

01:19:42  3     work at one of the H-E-B accounts?

01:19:45  4          A.    After when I finished my processing, I was --

01:19:49  5     immediately started working at H-E-B.

01:19:51  6          Q.    Okay.  And you don't recall if you reviewed

01:19:55  7     these post orders with anyone?

01:19:57  8          A.    Don't recall it.

01:20:00  9          Q.    Did you receive any training on the post

01:20:04 10     orders?

01:20:04 11          A.    Do not remember.

01:20:18 12                    (Exhibit No. 18 marked.)

01:20:18 13          Q.    (By Mr. Shine)  Twana, I'm handing you a copy

01:20:27 14     of an on-the-job checklist that was completed for you

01:20:30 15     at the time that you started at the H-E-B site

01:20:32 16     locations.  This is --

01:20:33 17                    MS. HERNANDEZ:  Objection; misstates

01:20:35 18     testimony.

01:20:37 19          Q.    (By Mr. Shine)  It's consecutively labeled

01:20:40 20     AUS 644 to 652.  Have you seen this document before?

01:20:53 21          A.    It looks familiar to me.

01:20:55 22          Q.    On the first page which is 644, is that your

01:21:00 23     name listed at the top?

01:21:03 24          A.    Yeah, that is.

01:21:04 25          Q.    And is that your handwriting?

01:22:24  1       A.    Martin Hernandez?  I think he's a supervisor.

01:22:33  2       Q.    Okay.  And when you're looking at this

01:22:41  3   document, Twana, throughout it it requires signatures.

01:22:47  4       A.    Yes.

01:22:47  5       Q.    Are those your signatures?

01:22:50  6       A.    Not all of them.

01:23:25  7       Q.    When you say "not all of them," can you give

01:23:29  8   me an example of a signature that is not yours?

01:23:32  9       A.    For example, this one, page 51, that's not my

01:23:44 10   signature.  Page 52, that is not my signature.  Like

01:23:51 11   this one is not my signature.  That's not my signature.

01:24:03 12       Q.    I'll back you up and we'll start from the very

01:24:05 13   beginning.

01:24:06 14       A.    Okay.

01:24:06 15       Q.    Please start with 644.

01:24:08 16       A.    644?  Okay.

01:24:08 17       Q.    The very first page.

01:24:08 18       A.    Yes.

01:24:10 19       Q.    At the top it says, "Training Name:  Twana

01:24:13 20   Ahmed."  That is your handwriting?

01:24:15 21       A.    Yes.

01:24:15 22       Q.    In the middle of the page there's a heading

01:24:18 23   titled "Equipment and Uniform" and after it, it's -- at

01:24:20 24   the very bottom of that heading it says, "Officer

01:24:22 25   understands uniform requirements" with a signature.  Is

01:24:25  1   that your signature?

01:24:40  2        A.   No, it's not my signature.

01:24:43  3        Q.   In the middle of the page, where it says "SP

01:24:46  4   Signature," you're claiming that's not your signature?

01:24:48  5        A.   I don't -- I don't signed like that.  Not kind

01:24:51  6   of like that, no.

01:24:52  7        Q.   Is that your initials?

01:24:55  8        A.   These are not my initial.

01:24:57  9        Q.   I am not referring to trainer initials.  I'm

01:25:00 10   referring to specifically in the middle of the page

01:25:02 11   where it says "SP Signature."

01:25:13 12        A.   Are you talking about this one (indicating)?

01:25:19 13        Q.   Yes.

01:25:22 14        A.   I don't -- I don't think that's my signature.

01:25:28 15   I don't really sign like that.

01:25:35 16        Q.   Looking at page 645, again, there are multiple

01:25:42 17   times where it asks for "Officer Signature" or "SP

01:25:47 18   Signature."  Do you see where I'm referring to under

01:25:50 19   each heading?

01:25:51 20        A.   Yes.

01:25:51 21        Q.   Are those your signatures?

01:25:54 22        A.   That is my signature.  It looks like it.

01:26:09 23              The second row and the third row, they

01:26:16 24   don't look like -- and the fourth row, they don't look

01:26:20 25   like my signature.

Twana Ahmed - September 19, 2024                143

01:26:23   1        Q.   So are you testifying today that these are not

01:26:25   2   your signature?

01:26:26   3        A.   It doesn't look like my signature.

01:26:28   4        Q.   That's not the question, Twana.

01:26:30   5        A.   Yes, I understand.

01:26:31   6        Q.   Something may not look like it, but do you

01:26:34   7   recall going through an on-the-job training list and

01:26:37   8   signing off on each of these requirements?

01:26:40   9        A.   Even if I signed them or I didn't sign them --

01:26:43  10   for example, when we were handed out our documents,

01:26:48  11   there was never given us the opportunity to read them

01:26:51  12   and review them.  Just fill it out, sign it and give it

01:26:56  13   to us.

01:26:56  14        Q.   Twana, if you could turn back to page 644,

01:27:00  15   please.

01:27:00  16        A.   Yes, I am.  Is it the first page?

01:27:08  17        Q.   Yes.

01:27:09  18        A.   Okay.

01:27:09  19        Q.   Your testimony today is that you were just

01:27:11  20   handed a document and asked to sign it without

01:27:13  21   reviewing it?

01:27:13  22        A.   That's correct.

01:27:14  23        Q.   Without going over any of these things with

01:27:16  24   your supervisor?

01:27:17  25        A.   That's correct.

01:27:17  1       Q.   So you never reviewed how your shirt was

01:27:24  2   supposed to be presented?  You never reviewed how your

01:27:27  3   pants were supposed to be presented?

01:27:29  4       A.   Well --

01:27:30  5       Q.   You never reviewed your shoes and socks needed

01:27:32  6   to be all black?

01:27:33  7       A.   I know that it needs to be all black as the

01:27:38  8   uniform they gave you.  If, for example, they gave you

01:27:41  9   a black uniform, you're not gonna go buy a pink uniform

01:27:46 10   to wear it.  You're supposed to have the proper uniform

01:27:49 11   the company did issue.  For example, if they issue you

01:27:50 12   boots, you're not gonna go buy sport boots and have on

01:27:54 13   site.  That's unprofessional and it's not part of your

01:27:58 14   uniform.

01:27:59 15       Q.   Turning to page 2, which is AUS 645, in the

01:28:06 16   middle of the page it says "Store Manager Check-In

01:28:09 17   Sheet."  You're claiming that's not your signature

01:28:11 18   under "SP Signature"?

01:28:12 19       A.   It don't look familiar to me.

01:28:14 20       Q.   So you didn't review how you're supposed to

01:28:16 21   sign in and out on a sheet?

01:28:17 22       A.   Just sign and check, sign, check, sign, check.

01:28:22 23       Q.   You didn't review that you're supposed to

01:28:24 24   contact the MIC prior to starting your shift?

01:28:27 25       A.   I contacted the MIC every time.

01:28:32  1        Q.   Because you were trained on it, right?

01:28:35  2        A.   No.  I do it automatically by myself.  I go

01:28:40  3   introduce myself and -- because you have to meet the

01:28:43  4   store manager because --

01:28:44  5        Q.   I'm going to stop you because there's no

01:28:46  6   question before you right now.

01:28:48  7        A.   What do you mean?

01:28:48  8        Q.   I didn't ask a question.

01:28:51  9        A.   Okay.

01:28:52 10        Q.   I'm stopping your narrative.

01:28:54 11        A.   Okay.

01:28:55 12        Q.   On page 645 at the bottom, it says

01:28:59 13   "Patrolling."  The first box says, "As soon as you're

01:29:02 14   logged in and inspected your mobility devise or

01:29:05 15   equipment, you must conduct an initial patrol."

01:29:08 16             Again, you're claiming you never got

01:29:10 17   trained on that?

01:29:11 18        A.   We got told to patrol, that's correct.

01:29:13 19        Q.   And you're stating that's not your signature

01:29:15 20   under SP Signature?

01:29:16 21        A.   Never reviewed it.  Never had the opportunity

01:29:18 22   to review the documents.

01:29:22 23        Q.   Twana, why would you sign a document if you

01:29:24 24   didn't review it?

01:29:24 25        A.   Well, if they give us something and say just

01:29:26  1   sign and give it to us, sign and give it to us, we're

01:29:30  2   gonna do it.  That's the problem with the company.  If

01:29:32  3   the company give us all these documents -- for example,

01:29:35  4   says, Hey, just sign over here, sign over here, date it

01:29:38  5   and give it to us don't go over it, if I'm reading it

01:29:41  6   one by one, they're gonna say, I told you to sign it

01:29:43  7   and give it to us.  So I'm gonna follow whatever the

01:29:46  8   person told me at the company -- employee or supervisor

01:29:51  9   or manager -- whatever he said to do at the time, I'm

01:29:55 10   gonna do it.  So...

01:29:57 11        Q.   So if I go to Martin Hernandez and say, Did

01:30:00 12   you go over this document line by line with Twana, he's

01:30:03 13   going to tell me no?

01:30:04 14        A.   Absolutely.

01:30:06 15        Q.   And if I go to Martin Hernandez and get an

01:30:10 16   affidavit from him that says, I went through everything

01:30:13 17   and I personally observed him sign every document,

01:30:16 18   you're still going to sit here and tell me you didn't

01:30:19 19   sign it today?

01:30:19 20        A.   I have never read these documents and had the

01:30:22 21   opportunity to read these documents like this and sign

01:30:25 22   them.

01:30:27 23        Q.   On the last page, Twana, on page 652 --

01:30:35 24        A.   Yes.

01:30:35 25        Q.   -- in the middle, is that your name, "Twana

01:30:39  1    Ahmed"?

01:30:39  2         A.    That's correct.

01:30:40  3         Q.    Is that your handwriting?

01:30:41  4         A.    Yes, that is.

01:30:42  5         Q.    Is that your signature after "I, security

01:30:45  6    professional"?

01:30:46  7         A.    Are you referring to this one or that one

01:30:50  8    (indicating)?

01:30:52  9         Q.    After "I, security professional, attest that I

01:30:54 10    have been adequately trained in all of the

01:30:57 11    expectations, procedures, and policies as indicated

01:30:59 12    above," is that your signature?

01:31:00 13         A.    It doesn't match my signature.  I can't recall

01:31:07 14    that, if it's my signature.  The bottom one, that is my

01:31:11 15    signature because I sign like this.

01:31:13 16         Q.    And how are those two signatures different?

01:31:15 17         A.    It's different because you can see the shape.

01:31:17 18    It's going up and all that.  It is my signature?  I

01:31:22 19    can't remember if it's my signature or not.

01:31:23 20         Q.    Do you sign your name exactly the same every

01:31:28 21    time you write it?

01:31:28 22         A.    Like, write it or sign it?  What do you mean?

01:31:31 23    Like, if I sign it -- if I write it, maybe or I'd say

01:31:37 24    maybe not.  It depends.  If somebody's rushing you, you

01:31:41 25    might be under pressure or rushed, you might sign it

01:33:45 1      A.    Maybe yes, maybe no.

01:33:46 2      Q.    On page 647, which is the next page, the first

01:33:51 3  category is "Shoplifter."  Did you sign that?

01:33:56 4      A.    Maybe yes, maybe no.

01:34:13 5      Q.    The next category says, "Homeless

01:34:19 6  Person/Loitering/Suspicious Person or Panhandler."  Did

01:34:24 7  you sign that?

01:34:37 8      A.    Maybe yes, maybe no.

01:34:39 9      Q.    The next topic is "Lost Child or Adult."  Did

01:34:43 10  you sign that?

01:34:49 11     A.    Maybe yes, maybe no.  Don't remember on top of

01:34:52 12  my head if I signed it or not.

01:34:55 13     Q.    The next category says, "Child Alone in Car,"

01:34:59 14  which carries over onto the next page which is AUS 648,

01:35:04 15  and there's a signature at the top of the page.  Did

01:35:07 16  you sign that?

01:35:11 17     A.    Probably yes, probably not.

01:35:13 18     Q.    Which one is it?

01:35:14 19     A.    Maybe yes, maybe no.  I don't -- I don't

01:35:17 20  remember.

01:35:17 21     Q.    Is that your signature?

01:35:20 22     A.    The signatures, all of them look different so

01:35:32 23  it's making me, like...  Maybe yes, maybe no.  Not too

01:35:46 24  sure, honestly.

01:35:47 25     Q.    The next category on 648 says, "Unattended

| | | |
|---|---|---|
| 01:35:59 | 1 | Animal in Vehicle."  Did you sign that? |
| 01:36:06 | 2 | A.    Maybe yes.  I don't remember if I signed that. |
| 01:36:17 | 3 | I can't recall on top of my head. |
| 01:36:19 | 4 | Q.    Is that your signature? |
| 01:36:22 | 5 | A.    It could be, yes, my signature. |
| 01:36:29 | 6 | Q.    The next category is "Whom to Contact for |
| 01:36:37 | 7 | Emergencies."  Did you sign that? |
| 01:36:45 | 8 | A.    I think so.  Not too sure but I think. |
| 01:36:56 | 9 | Q.    Is that your signature? |
| 01:36:57 | 10 | A.    Not too sure.  Maybe yes, maybe no.  Not too |
| 01:37:39 | 11 | sure. |
| 01:37:39 | 12 | Q.    On page 650, the first bullet point says |
| 01:38:00 | 13 | "Practices, take-offs slow down -- I'm sorry. |
| 01:38:04 | 14 | Practices take-offs slow to quick, |
| 01:38:06 | 15 | straight and with wheel turned at 45-degree angle" and |
| 01:38:10 | 16 | there's a signature.  Is that your signature? |
| 01:38:14 | 17 | A.    Are you referring to page 50? |
| 01:38:17 | 18 | Q.    650, the very first signature on the page. |
| 01:38:27 | 19 | A.    You're referring to this one right here |
| 01:38:29 | 20 | (indicating)? |
| 01:38:31 | 21 | Q.    Yes. |
| 01:38:32 | 22 | A.    No, that's not mine. |
| 01:38:33 | 23 | Q.    The next signature that's in the middle of the |
| 01:38:38 | 24 | page where it says, "Practices backing out using body |
| 01:38:43 | 25 | motion and brakes," is that your signature? |

Twana Ahmed - September 19, 2024                    152

01:40:29  1    that.

01:40:31  2        Q.   You said no, I don't know, and I don't

01:40:35  3    remember.

01:40:35  4        A.   Yeah.  Like, basically, I don't sign like

01:40:39  5    this, so I don't remember me signing anything like

01:40:42  6    this.  It doesn't ring a bell.

01:40:47  7        Q.   On page 652, I know we've talked briefly about

01:40:51  8    it.  After your name, Twana Ahmed, that's printed,

01:40:56  9    there's a first signature.  Is that your signature on

01:41:03 10    the very last page, 652?

01:41:07 11        A.   Oh, 652?

01:41:11 12        Q.   The first signature after your printed name,

01:41:14 13    Twana Ahmed, is that your signature?

01:41:16 14        A.   This one?

01:41:17 15        Q.   No.  The one --

01:41:18 16        A.   That one?

01:41:19 17        Q.   Yeah.

01:41:24 18        A.   Don't -- don't know.

01:41:24 19        Q.   The one below that where it says, "Officer in

01:41:28 20    Training Signature," is that your signature?

01:41:29 21        A.   That looks like kind of my signature.

01:41:32 22        Q.   So, again, if I get an affidavit from Martin

01:41:54 23    Hernandez that says that he personally went through

01:41:57 24    this with you and observed and watched you sign each of

01:42:03 25    these signatures, is your testimony today still that

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000386

01:42:07  1    you don't know or that it wasn't you?

01:42:09  2        A.   I didn't say it wasn't me.  I said I don't

01:42:12  3    remember me, like, signing these documents like this.

01:42:17  4    I said that is my signature right here, it looks like

01:42:20  5    my signature.  But these -- like this one specifically,

01:42:24  6    it doesn't ring a bell at all.  For example, this one,

01:42:30  7    absolutely not.  The difference between this and this,

01:42:50  8    it's a big difference.  So that one, absolutely not.

01:42:58  9        Q.   Would it be odd to you to have a document that

01:43:02 10    you signed in some spots but not others, Twana?

01:43:05 11        A.   I don't know.  I could -- maybe I forgot to

01:43:08 12    sign this.  Let's say, for example, I signed that, I

01:43:11 13    signed this, I had signed this.  Let's say he gave me

01:43:15 14    the documents.  I give you this documents.  Just hit

01:43:20 15    check, check, check, check, check, check.  Sign here,

01:43:22 16    sign here, sign here.  Maybe I forgot a couple of

01:43:26 17    boxes.  He went back to the office -- it was not an

01:43:30 18    office.  He went back to the office to review the

01:43:32 19    documents.  Oh, okay, you're missing a signature?  Let

01:43:35 20    me sign instead of him instead of me going back in the

01:43:38 21    field, if I done this in the field.

01:43:41 22        Q.   You're speculating, right?

01:43:43 23        A.   What do you mean speculating?  What do you

01:43:44 24    mean by speculating?

01:43:45 25        Q.   You have no idea whether or not someone signed

01:43:48  1    your name on your behalf, right?

01:43:50  2         A.   It'd be a possibility.  Why not?

01:43:51  3         Q.   But you have no personal knowledge of anyone

01:43:55  4    signing your name on this document?

01:43:57  5         A.   I'm not saying I don't have a personal

01:43:59  6    knowledge.

01:44:00  7         Q.   So what personal knowledge do you have, Twana?

01:44:03  8    Who signed your name that wasn't you?

01:44:05  9         A.   I didn't say sign name.  I said it could be or

01:44:08 10    maybe there was a box left open.  I forgot to sign it

01:44:12 11    when they -- let's say if it happens in the field, I

01:44:15 12    filled out this paper, I forgot a box open.  They

01:44:19 13    scratched it like this instead of coming back in the

01:44:21 14    field and having me sign it.  That's a possibility it

01:44:24 15    can happen too.  If they don't want you to read the

01:44:27 16    documents, to review the documents and go over the

01:44:31 17    documents, what makes you not think they can sign it?

01:44:35 18    Absolutely.  If they give you all these documents --

01:44:40 19         Q.   I'm just going to cut you off.  There's no

01:44:42 20    question before you right now.

01:44:43 21         A.   No, but --

01:44:44 22         Q.   I'm asking you to stop talking.  There's no

01:44:47 23    question presented.  You do not need to give a

01:44:49 24    narrative response right now.

01:44:50 25              MS. HERNANDEZ:  He was -- he's allowed to

01:47:04  1        Q.    This paragraph alleges a shoplifting in April

01:47:09  2   of 2022 at the H-E-B store, correct?

01:47:12  3        A.    Yes.

01:47:16  4        Q.    What specific date did this alleged

01:47:23  5   shoplifting happen?

01:47:30  6        A.    Which store are you talking about

01:47:32  7   specifically?

01:47:32  8        Q.    I'm asking you.  Your complaint says:  Not

01:47:36  9   long afterward in April of 2022, the Kurdish guard is

01:47:42 10   stationed at an H-E-B grocery store on duty.  The H-E-B

01:47:44 11   store manager sends the guard a text message with some

01:47:47 12   pictures of the man in -- of a man in the store.

01:47:50 13        A.    Are you talking about the --

01:47:51 14        Q.    What date did this happen?

01:47:53 15        A.    Don't remember the specific date.  It happened

01:47:56 16   on a city -- it happened on Bellaire.  The city of

01:48:02 17   Bellaire, at the H-E-B I was working over there.  I

01:48:06 18   don't remember the exact date.

01:48:08 19        Q.    This paragraph also identifies a store manager

01:48:12 20   sending you a text message.  Who was the store manager?

01:48:16 21        A.    Sent me a text message and a phone call.

01:48:18 22        Q.    And what was the store manager's name?

01:48:20 23        A.    Keevin.  Kevin.  Something like that.

01:48:27 24        Q.    What's Kevin's last name?

01:48:30 25        A.    I do not know his last name.

APPENDIX 000389

Twana Ahmed - September 19, 2024                    158

01:48:32  1        Q.    What does Kevin look like?

01:48:33  2        A.    White male, black hair.

01:48:44  3        Q.    How tall?

01:48:45  4        A.    5'7" approximately.

01:48:51  5        Q.    And how old?

01:48:53  6        A.    Early 40s, if not less.

01:49:02  7        Q.    Did he have any facial hair?

01:49:05  8        A.    I don't think he had facial -- I don't

01:49:10  9    remember.

01:49:10 10        Q.    And you said he texted you and he called you?

01:49:14 11        A.    Yes.

01:49:15 12        Q.    Which did he do first?

01:49:17 13        A.    I think the text messages.

01:49:22 14        Q.    And what time did you receive the first text

01:49:26 15    message?

01:49:26 16        A.    Don't remember the time.

01:49:28 17        Q.    What time did you start your shift?

01:49:32 18        A.    I don't remember what time was my shift that

01:49:48 19    day.

01:49:48 20        Q.    Did you work a set schedule?

01:49:50 21        A.    No.  Sometimes -- some posts 11:00 in the

01:49:54 22    morning.  Sometimes 10:00.  Sometimes 4:30.  It depends

01:49:58 23    on the post.  Sometimes 12-hour shift, sometimes 8-hour

01:50:04 24    shift.  It depends on the post.

01:50:13 25        Q.    You said he called you?

Twana Ahmed - September 19, 2024                    159

01:50:15  1        A.    Yes, he did call me.

01:50:16  2        Q.    What time did he call you?

01:50:21  3        A.    At around the same time that he texted me.

01:50:29  4        Q.    And what store were you working at?

01:50:35  5        A.    The one in Bellaire.

01:50:37  6        Q.    Do you know the address?

01:50:38  7        A.    No.

01:50:38  8        Q.    Is there more than one H-E-B store in

01:50:42  9  Bellaire?

01:50:42 10        A.    I think -- I don't know.  I think maybe one.

01:50:46 11  I'm not sure.  Maybe two.  Not sure.  That's the one

01:50:49 12  I'm aware of that I worked in.

01:50:51 13        Q.    At the time you were working, were you the

01:50:55 14  only Allied security guard assigned at that location?

01:51:02 15        A.    On that particular day, I was the only one

01:51:05 16  scheduled to be there.  Was it in a morning shift?  I

01:51:10 17  don't know.  But I was the only one, at the incident

01:51:12 18  time, that was there.

01:51:32 19               (Exhibit No. 19 marked.)

01:51:32 20        Q.    (By Mr. Shine)  Twana, I'm handing you a copy

01:51:34 21  of a text message that you provided in discovery which

01:51:37 22  is labeled AhmedAllied 594 and AhmedAllied 595.

01:51:44 23               At the top of the text message it says

01:51:46 24  "MIC Kevin."  Do you see where I'm referring to?

01:51:49 25        A.    Yes, yes.

Twana Ahmed - September 19, 2024          160

01:51:50  1      Q.    What does MIC Kevin mean to you?

01:51:53  2      A.    Kevin is the manager.  MIC, I think a manager,

01:51:57  3  store manager.  Don't know what exactly MIC stands for

01:52:02  4  but I think it's something with a manager.

01:52:04  5      Q.    Is this the Kevin that you were referring

01:52:07  6  to --

01:52:07  7      A.    Yeah.

01:52:07  8      Q.    -- that we just talked about?

01:52:09  9      A.    Yes, I am.

01:52:10 10      Q.    Do you see there's a little, sort of, M in an

01:52:21 11  orange circle and it says, "If on property, he needs to

01:52:24 12  leave."  Do you see where I'm referring to?

01:52:26 13      A.    Yes.

01:52:26 14      Q.    Is that Kevin texting you?

01:52:28 15      A.    Yes.

01:52:28 16      Q.    And on page 595, at the bottom there's the

01:52:36 17  text "Attempted beer theft."  Do you see where I'm

01:52:39 18  referring to?

01:52:40 19      A.    Yeah, I am.

01:52:40 20      Q.    And there's a time stamp.  What time stamp is

01:52:45 21  listed?

01:52:45 22      A.    4:50 p.m.

01:52:48 23      Q.    Is 4:50 p.m. the time that he texted you about

01:52:54 24  this particular alleged shoplifting?

01:52:56 25      A.    Yes, according to the paper, of course.

Twana Ahmed - September 19, 2024                161

01:52:59  1        Q.    What time did he call you?

01:53:01  2        A.    He called me probably after the incident --

01:53:06  3    sorry.  Not after the incident.  After sending these

01:53:09  4    pictures.

01:53:11  5        Q.    Okay.  Are there more text messages that you

01:53:17  6    received from Kevin that day?

01:53:18  7        A.    Don't remember.  Most of the -- after this,

01:53:33  8    most of it was done like on the phone as he's back on

01:53:39  9    the property and things like that.

01:53:39 10        Q.    Sure.  On this day when he sent you -- to your

01:53:43 11    knowledge, these are the only texts that he sent you?

01:53:45 12        A.    I think so.  Not too sure.  It could be

01:53:48 13    there's more.  Not too sure.

01:53:49 14        Q.    So would you agree with me that he never asked

01:53:52 15    you to stop and detain this individual?

01:53:54 16        A.    Excuse me?  Say -- repeat your question again.

01:53:57 17        Q.    Would you agree with me that these text

01:54:01 18    messages do not say stop and detain this gentleman,

01:54:04 19    correct?

01:54:05 20        A.    The text messages, according over here, it

01:54:09 21    doesn't say that.  But it doesn't mean --

01:54:11 22        Q.    The text message does not say push him against

01:54:14 23    a wall, right?

01:54:15 24        A.    The text message doesn't say that.

01:54:17 25        Q.    The text message doesn't say put your hands on

01:54:19  1   him, right?

01:54:20  2        A.    The text message didn't say that.  I don't

01:54:23  3   see --

01:54:23  4        Q.    The text message doesn't say to handcuff him,

01:54:26  5   right?

01:54:26  6        A.    I don't see that.

01:54:27  7        Q.    Where were you when you received these text

01:54:29  8   messages?

01:54:29  9        A.    I was patrolling the property in the patrol

01:54:32 10   car.

01:54:33 11        Q.    Where specifically were you located on the

01:54:35 12   property?

01:54:35 13        A.    I think below the second floor of the

01:54:38 14   property, patrolling the premises of the project.  The

01:54:43 15   garage and parking lot.

01:54:46 16        Q.    And you were in a patrol car, you say?

01:54:48 17        A.    I was in a patrol car, yes.

01:54:51 18        Q.    When you say "patrol car," is that the Allied

01:54:58 19   Universal car that you spoke of earlier?

01:54:59 20        A.    That is correct.

01:54:59 21        Q.    After you received these text messages, what

01:55:02 22   did you do?

01:55:03 23        A.    He called me.  He says they are -- we kicked

01:55:05 24   them out of the store.  They are back with a couple

01:55:11 25   guys -- a couple, two or three.  They are shoplifting.

APPENDIX 000394

01:55:17  1    They are stealing beer and merchandise from the store.

01:55:21  2    Can you come inside the store?

01:55:24  3         Q.   So looking at the text messages, on page 594

01:55:31  4    and 595, would you agree that that's a picture of the

01:55:39  5    same person in all four pictures?

01:55:42  6         A.   Yeah, yeah, they are.

01:55:43  7         Q.   And you said that Kevin told you there were

01:55:45  8    more guys than just one?

01:55:46  9         A.   Yes.

01:55:48  10        Q.   And you said two or three.  Was it two?

01:55:51  11        A.   Two or three.  Because this group -- they're

01:55:58  12   usually a group of three.

01:55:59  13        Q.   And you testified that he asked you to come

01:56:00  14   into the store?

01:56:04  15        A.   Yes.  Why would he text me this if he doesn't

01:56:07  16   want me inside the store?

01:56:08  17        Q.   I have no clue, Twana.

01:56:10  18        A.   Yeah.  He texted me.

01:56:12  19        Q.   Did you enter the store?

01:56:13  20        A.   I did, of course.

01:56:14  21        Q.   Where did you enter the store?

01:56:15  22        A.   I went -- I went around in the patrol car.

01:56:19  23   Went to the second floor.  I parked on the second floor

01:56:23  24   by the second -- second gate and I went to the store.

01:56:29  25   He pointed them out to me.

Twana Ahmed - September 19, 2024                              164

01:56:31   1        Q.   And where were they when you first made an

01:56:33   2   observation of them?

01:56:34   3        A.   They were loading beer, cases of alcohol, in

01:56:41   4   the carts.

01:56:41   5        Q.   How many carts were there?

01:56:42   6        A.   One.

01:56:43   7        Q.   And how many guys did you see?

01:56:47   8        A.   The guy was loading, he was one person.

01:56:50   9        Q.   Was there anyone else around him?

01:56:53  10        A.   Around this guy?  No, there was not.  Don't

01:56:58  11   remember if there was somebody else around him at the

01:57:00  12   time.

01:57:00  13        Q.   How many cases of beer did you see him load

01:57:03  14   into a cart?

01:57:04  15        A.   I don't remember how many.

01:57:05  16        Q.   More than one?

01:57:07  17        A.   Yes.

01:57:08  18        Q.   More than three?

01:57:09  19        A.   It could be.

01:57:11  20        Q.   And by "case," how many beers were in the

01:57:15  21   case?

01:57:15  22        A.   Don't remember.

01:57:16  23        Q.   Was it a six-pack?

01:57:20  24        A.   Don't remember.

01:57:25  25        Q.   Was it a 12-pack?

APPENDIX 000396

01:57:29  1       A.    Don't remember how many.  I didn't pay

01:57:31  2  attention to the merchandise of the -- too much

01:57:34  3  attention to the merchandise in the carts.

01:57:35  4       Q.    But you saw this gentleman in the photo of 594

01:57:39  5  loading beer into a cart?

01:57:41  6       A.    Yes, opening the fridge and putting alcohol,

01:57:46  7  wine, liquor, or beer in the carts.

01:57:49  8       Q.    Did you take a picture of the cart?

01:57:53  9       A.    I believe so.

01:58:20 10             (Exhibit No. 20 marked.)

01:58:20 11       Q.    (By Mr. Shine)  Twana, I'm handing you a

01:58:22 12  document that -- or a photo that you provided in

01:58:25 13  discovery labeled AhmedAllied 588.

01:58:29 14             Is this the cart that you saw the

01:58:31 15  gentleman putting stuff into?

01:58:32 16       A.    Yes.

01:58:33 17       Q.    And where are the cases of beer you saw him

01:58:37 18  putting into the cart?

01:58:38 19       A.    After, when opened the fridge, he loaded it in

01:58:44 20  the cart.  Wine, beer, whatever you want to call them.

01:58:52 21  But it was alcohol.

01:58:52 22       Q.    So which -- which cart was he loading?  The

01:58:55 23  one in front?

01:58:56 24       A.    The one by his hand.

01:58:57 25       Q.    Oh, the one back here next to the other

Twana Ahmed - September 19, 2024                166

01:58:59  1    gentleman?

01:59:00  2          A.    That's him.   That's the same person.

01:59:04  3          Q.    Right.   So I see the gentleman in the freezer.

01:59:08  4          A.    Yes.

01:59:08  5          Q.    That's who you're referring to, right?

01:59:10  6          A.    Are you talking about this guy?

01:59:11  7          Q.    Yeah.

01:59:12  8          A.    Yeah, that's him, yeah.

01:59:13  9          Q.    If you look at page 594 and 588 together, the

01:59:23 10    gentleman in page 594 is wearing a plaid coat, correct?

01:59:28 11          A.    Which plaid coat?   A jacket, you mean?

01:59:33 12          Q.    Yes.

01:59:34 13          A.    Yes.

01:59:34 14          Q.    In 588 the person that's reaching into the

01:59:38 15    freezer is wearing the plaid coat, correct?

01:59:41 16          A.    This guy is what you mean?   Yes.

01:59:43 17          Q.    The guy reaching into the freezer?

01:59:45 18          A.    It's the same guy in this picture.

01:59:47 19          Q.    Okay.   And so which cart is he loading up with

01:59:50 20    cases of beer?

01:59:51 21          A.    The one he was pushing in his hand.

01:59:54 22          Q.    He's not pushing a cart.   His hands are in the

01:59:58 23    freezer, Twana.

01:59:59 24          A.    Well, whatever he's grabbing on, that's what I

02:00:02 25    can see.

APPENDIX 000398

02:00:02  1        Q.    So what cart was his?

02:00:03  2        A.    I believe the cart, it was in his hand.

02:00:08  3    Whatever he's grabbing on, that's his cart.

02:00:11  4        Q.    On page 588, would you agree with me that

02:00:18  5    there are two people in the middle of the photograph?

02:00:21  6    There's a person bending over in the freezer or

02:00:24  7    refrigerator --

02:00:24  8        A.    Oh.

02:00:25  9        Q.    -- and there's a person standing with a cart.

02:00:27 10        A.    Oh, sorry.  I did not see the other person.

02:00:30 11    When you said bend over -- bending over, now I --

02:00:33 12    that's the second person.  I did not know that's a

02:00:35 13    person.  I thought it was -- I thought it was that

02:00:39 14    boxes.

02:00:39 15              Yes, he's bending -- sorry.  He's bending

02:00:43 16    over to load the carts, and the other guy is pushing

02:00:46 17    the carts; that is correct.

02:00:47 18        Q.    So this cart that's in the front, that has

02:00:50 19    maybe a six-pack and a couple of bottles of wine,

02:00:53 20    that's not the guy's cart?

02:00:57 21        A.    I don't remember if that's his cart or not,

02:00:59 22    but they were working together.

02:01:00 23        Q.    And how many cases of beer are in that cart in

02:01:04 24    the back where the guy is bending over?  How many cases

02:01:07 25    of beer do you see in there?

02:01:08  1      A.    I don't remember.  I can't -- I can't tell.

02:01:09  2      Q.    But you testified that you saw him loading the

02:01:11  3  cart up with cases of beer.

02:01:13  4      A.    Yeah.  Loading it -- when I mean loading it,

02:01:16  5  not to the top, like, loading, putting beer.  That's

02:01:20  6  loading.

02:01:20  7      Q.    So in that back cart, look really closely and

02:01:24  8  tell me how many cases of beer you see.

02:01:27  9      A.    I can't tell.  It's kind of dark.

02:01:28 10      Q.    And you're saying that these two people were

02:01:38 11  working together?

02:01:39 12      A.    Yes.

02:02:31 13      Q.    So when you got to this aisle where the guys

02:02:35 14  were, what did you do?

02:02:37 15      A.    Continue to watching them and see what they

02:02:40 16  do.

02:02:40 17      Q.    How old, do you know approximately, they were?

02:02:44 18      A.    How old?  Kind of old.

02:02:50 19      Q.    What's "kind of old" mean to you?

02:02:55 20      A.    Over -- over 55.

02:03:03 21      Q.    Okay.

02:03:04 22      A.    50.  You can say not too old but kind of old,

02:03:11 23  getting old.

02:03:11 24      Q.    And did you talk to these guys at that point?

02:03:17 25      A.    No, I did not approach them.

02:03:19  1        Q.    You didn't say anything to them?

02:03:22  2        A.    At that time, specific time, no, I did not.

02:03:27  3        Q.    So then what did you do?

02:03:28  4        A.    I just observed them.  Because they already

02:03:34  5    been told to leave the store.  And they were in back.

02:03:38  6    Just waiting for them.  They maybe have -- they're

02:03:41  7    gonna pay.  Maybe they brought money, they left and

02:03:44  8    brought money and they pay and they're gonna be normal

02:03:49  9    customers.  You never know.  So I just waited.

02:03:51 10        Q.    So did you take this photograph, which is 588,

02:03:56 11    at the first time you observed them?

02:03:58 12        A.    Yeah, I believe so, yeah.

02:04:00 13        Q.    So you observed them -- for how long did you

02:04:06 14    observe them?

02:04:06 15        A.    Don't -- I don't remember for how long.  But I

02:04:11 16    did observe them, keep my eyes on them.

02:04:13 17        Q.    After that observation -- I mean, was it more

02:04:19 18    than five minutes?

02:04:20 19        A.    I don't know.

02:04:22 20        Q.    Was it more than ten minutes?

02:04:26 21        A.    Maybe.  Maybe ten minutes, maybe more, maybe

02:04:34 22    less.  Not more than 20.

02:04:35 23        Q.    Did they say anything to you at that point?

02:04:39 24        A.    At that particular time, no.

02:04:41 25        Q.    Do you know if they saw you?

Twana Ahmed - September 19, 2024          170

02:04:45  1        A.   I don't know.  I think they saw me.

02:04:56  2        Q.   So after they left this aisle, where did they

02:04:59  3   go?

02:04:59  4        A.   I don't remember where exactly they went.  I

02:05:16  5   think they were leaving the -- leaving the store.  I

02:05:24  6   think.  Not too sure.

02:05:26  7        Q.   Did you keep eyes on them the whole time?

02:05:31  8        A.   I don't remember if I kept eyes on them the

02:05:48  9   whole time.

02:05:48 10        Q.   So when did you first interact with them?

02:05:58 11        A.   I interacted with one, not both.

02:06:01 12        Q.   So which one did you interact with?

02:06:06 13        A.   The guy with the hat.

02:06:09 14        Q.   In looking at 588, both gentlemen are wearing

02:06:18 15   a hat.  Which one are you referring to?

02:06:21 16        A.   The -- both -- 588?  They both not wearing

02:06:28 17   hats.  One of -- this is the only person who's wearing

02:06:30 18   a hat.  I don't remember --

02:06:32 19        Q.   So looking at page 594, this is the gentleman

02:06:36 20   that you said you interacted with?

02:06:38 21        A.   This one (indicating).

02:06:40 22        Q.   And where did you interact with him?

02:06:42 23        A.   By the door.  When he went over -- when he

02:06:44 24   went -- when he went around the counter.

02:06:46 25        Q.   Okay.  I have not been to this location.  So

02:06:50  1  where is the door located?

02:06:52  2          A.    They have multiple doors.

02:06:53  3          Q.    So which door did he go to?

02:06:56  4          A.    Second floor by the electrical stairs.

02:07:05  5          Q.    Okay.  You said he went around the counter.

02:07:08  6  What counter are you talking about?

02:07:09  7          A.    Paying -- paying counter.  Cashier.  You can--

02:07:11  8  that's what they refer to.

02:07:12  9          Q.    Was he pushing a cart at that point?

02:07:15 10          A.    Yes.

02:07:15 11          Q.    Which cart was he pushing?

02:07:17 12          A.    The one he took the stuff.

02:07:19 13          Q.    Is that cart represented in the picture

02:07:22 14  labeled 588?

02:07:23 15          A.    Yeah, that cart, yeah.

02:07:25 16          Q.    Which cart?

02:07:26 17          A.    The cart they have in their hands.

02:07:28 18          Q.    The one in the back, in the middle of the

02:07:33 19  picture, right?

02:07:34 20          A.    Are you referring to this or that one

02:07:37 21  (indicating)?

02:07:38 22          Q.    That's what I'm asking for you to clarify.

02:07:40 23          A.    This one.  I'm talking about this one.

02:07:42 24          Q.    Okay.  So the one that --

02:07:43 25          A.    I don't know --

02:07:44  1      Q.    -- is closer to the two gentleman, right?

02:07:45  2      A.    Yes.  I don't -- I don't know if that's their

02:07:47  3  cart or not.  I don't remember that.  It could be

02:07:49  4  theirs.  It could be not.  I don't know that.  But

02:07:51  5  that's the cart they holding, so that is the cart they

02:07:54  6  have.

02:07:54  7      Q.    And you saw the gentleman with the hat, in the

02:07:58  8  blue checkered jacket, walk around the register?

02:08:04  9      A.    Yes.

02:08:04 10      Q.    Pushing a cart?

02:08:05 11      A.    Yes.

02:08:06 12      Q.    At that point how many -- what was in his

02:08:10 13  cart?

02:08:11 14      A.    Drinks, alcohol, food.  That's what I

02:08:20 15  remember.  How much they were worth, I'm not too sure.

02:08:22 16  I didn't price it up.  I didn't check the price.

02:08:24 17      Q.    Did you watch him walk around the corner -- or

02:08:28 18  walk around the counter?

02:08:29 19      A.    Yeah, yeah.  These are the register,

02:08:36 20  self-checkouts, a box, Register 1, 2, 3, 4, whatever.

02:08:40 21  10, 15, they've got cashiers.  He comes and goes around

02:08:43 22  all these cashiers and tried to exit without paying.

02:08:48 23      Q.    And you watched him the full way?

02:08:50 24      A.    Yes, because I was by the door watching him.

02:08:53 25      Q.    Where was the other guy?

02:08:54 1        A.    The other guy left the store because the other

02:08:57 2    guy's a lookout.

02:09:03 3        Q.    You testified earlier that there might have

02:09:04 4    been three people.  Where's the third guy?

02:09:06 5        A.    There are usually three, for my last

02:09:08 6    experience with them before this one.

02:09:10 7        Q.    Okay.  But at this time, was there two or

02:09:12 8    three?

02:09:12 9        A.    Two, but the third one I did not observe.  It

02:09:16 10   could be somewhere in the property.

02:09:17 11       Q.    But you have no idea?

02:09:19 12       A.    Huh?

02:09:20 13       Q.    You have no idea?

02:09:21 14       A.    I didn't observe him, the third person; but

02:09:25 15   there are usually three.  But what I saw that day, two.

02:09:29 16       Q.    So how did you first approach him?

02:09:36 17       A.    I was by the door.  I was, like, Hey, you need

02:09:41 18   to pay.  You need to go back to the lane.  You need to

02:09:46 19   pay.  He was in the carts, he was -- you can smell the

02:09:49 20   odor of alcohol coming out of his mouth.  Completely

02:09:53 21   intoxicated.  Made a verbal threat towards me and I

02:09:57 22   acted on that threat.

02:09:58 23            Well, before that, the manager told me

02:10:01 24   not to let them leave.

02:10:03 25       Q.    How did the manager tell you that?

Twana Ahmed - September 19, 2024                 174

```
02:10:05  1        A.    Don't let them leave the property with the
02:10:08  2   item.
02:10:08  3        Q.    And how did he -- how did he communicate that
02:10:13  4   to you?
02:10:13  5        A.    Physically, like, face-to-face.
02:10:15  6        Q.    Was the manager with you during this
02:10:19  7   observation?
02:10:19  8        A.    He stand behind the register on the other
02:10:24  9   side.  I was the only one in the -- in the front.
02:10:27 10   Before -- before -- before I go up there and all that,
02:10:31 11   like, before they get close, he pointed and was like,
02:10:35 12   Don't let them leave.  Don't let them leave.  I was
02:10:38 13   like, Okay.
02:10:39 14        Q.    So he told you orally don't let them leave, or
02:10:42 15   he just pointed at you and you --
02:10:42 16        A.    He said --
02:10:44 17        Q.    -- interpreted that as don't let them leave?
02:10:46 18        A.    No, No.  It's not I interpreted that.  The
02:10:49 19   length of distance between me and him, it was not that
02:10:53 20   far.
02:10:53 21        Q.    Great.  How far was it?
02:10:54 22        A.    5 feet.  It could be 5 feet or it could be
02:10:57 23   less.  He said to me, He's coming around.  If they
02:11:03 24   attempted to leave, don't let them leave; don't let
02:11:06 25   them take the merchandise.
```

Twana Ahmed - September 19, 2024          175

| | |
|---|---|
| 02:11:07 1 | I was like, okay. So I gave them -- they |
| 02:11:09 2 | came up -- he came up to me, one of them. I didn't see |
| 02:11:12 3 | the second one. The second one left. |
| 02:11:14 4 | Q. Right. You said the guy with the hat, the guy |
| 02:11:17 5 | in the blue jacket, right? |
| 02:11:18 6 | A. Correct, correct. |
| 02:11:19 7 | Q. Okay. So when he came up to you and you said, |
| 02:11:21 8 | You need to pay for that, what did he say? |
| 02:11:23 9 | A. He refused to pay for it. He goes like, Move |
| 02:11:27 10 | out of -- move. He came towards me with the carts. He |
| 02:11:30 11 | said, I will cut you up. So I took it as a threat to |
| 02:11:37 12 | cut you up. He has a knife or something on him, so -- |
| 02:11:40 13 | Q. Did he say he had a knife on him? |
| 02:11:42 14 | A. He said, I will cut you up. |
| 02:11:45 15 | Q. Okay. But did he specifically say, I have a |
| 02:11:47 16 | knife? |
| 02:11:47 17 | A. Would you mind if I finish the whole thing |
| 02:11:50 18 | so -- |
| 02:11:50 19 | Q. Did he specifically say, I have a knife? |
| 02:11:52 20 | A. Yes, he said that. Let me finish, please. |
| 02:11:55 21 | Q. Did he show you said knife? |
| 02:11:56 22 | A. He did not pull out a knife. |
| 02:11:58 23 | Q. Where were his hands during the interaction, |
| 02:12:01 24 | Twana? |
| 02:12:01 25 | A. One of them was in the carts. |

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000407

02:12:03  1        Q.    Where was the other one?

02:12:04  2        A.    I believe on the side area.  I don't believe

02:12:05  3    both of --

02:12:06  4        Q.    Side area of what?

02:12:07  5        A.    His jacket or something.

02:12:09  6        Q.    But you were observing him the whole time,

02:12:11  7    right?

02:12:11  8        A.    I was observing him, yes.

02:12:12  9        Q.    Okay.

02:12:13 10        A.    I was watching him eye to eye.  And he was

02:12:17 11    completely intoxicated.  And he says, I will cut you up

02:12:21 12    if you don't move out of my way.

02:12:23 13              That's when I acted for a safety reason

02:12:25 14    to protect myself and protect the employees and

02:12:29 15    management and the customers of H-E-B at that time.

02:12:34 16        Q.    Sure.  So did he physically attack you?

02:12:37 17        A.    He came up to me with the carts in an

02:12:40 18    aggressive way.

02:12:41 19        Q.    What do you mean by "aggressive"?

02:12:42 20        A.    When somebody's, like, aggressive, like comes

02:12:44 21    towards you with the carts.  Before I interacted with

02:12:47 22    him, he saw me by the door.  He knows I'm gonna

02:12:49 23    approach him and talk to him.

02:12:51 24        Q.    How do you know that?

02:12:51 25        A.    What?

Twana Ahmed - September 19, 2024                177

02:12:52  1          Q.    How do you know he knows --

02:12:52  2          A.    Because --

02:12:53  3          Q.    -- that you're going to approach him?

02:12:55  4          A.    Because I dealt with him before and they got

02:12:57  5     arrested because of me before in a different property.

02:13:00  6          Q.    Okay.

02:13:00  7          A.    The same group.  So they know me very well.

02:13:04  8     And they know I --

02:13:05  9          Q.    But that day, you're saying he knew you were

02:13:08 10     going to talk to him?

02:13:09 11          A.    Because he saw me by the door and he looked at

02:13:12 12     me.  He saw me clearly by the door, the glass door.  He

02:13:15 13     saw me very well.

02:13:16 14          Q.    And when you say he came up to you

02:13:17 15     aggressively, what does that mean?

02:13:19 16          A.    Aggressively, like when you see somebody just

02:13:22 17     come up to them with the carts, attempted to hit them

02:13:25 18     in the carts.

02:13:25 19          Q.    Did he touch you with the cart?

02:13:28 20          A.    I don't remember if he touched me -- touched

02:13:32 21     me with the carts, but he came towards me with the

02:13:35 22     carts.

02:13:35 23          Q.    Okay.  And so when he aggressively came

02:13:42 24     towards you, did he do any other gestures towards you?

02:13:47 25          A.    When he made the threat, I realized he was

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000409

02:13:52  1   completely intoxicated.  He's not in his full mindset.

02:13:56  2   You never know what this person's capable -- capable

02:14:00  3   of.  So I used the proper force to detain him according

02:14:11  4   to Allied Universal guidelines and instructions and

02:14:15  5   policy.

02:14:16  6        Q.   Are you a corporate representative for Allied?

02:14:20  7        A.   I'm not a corporate representative for --

02:14:23  8        Q.   So do you know what Allied's policy --

02:14:25  9        A.   The policy says it's -- the policy says if

02:14:28 10   somebody makes a threat towards you or anything like

02:14:31 11   that, use the probable -- probable force.  So the

02:14:36 12   person is -- for example, if that person left the

02:14:39 13   property and he has -- I took the item away and he's

02:14:46 14   not in full his mindset, I don't know if he's walking

02:14:48 15   out and there's an 80-years-old -- older woman, he's

02:14:52 16   gonna grab a knife and stab her and take her car.  And

02:14:56 17   they're gonna be like, Where were you?  Why didn't you

02:14:59 18   do something?  That's one.

02:15:02 19             Two, if he goes back, grab a gun -- he's

02:15:06 20   so pissed off that I took his liquor away.  He's gonna

02:15:11 21   come back and I'm patrolling or the manager is inside,

02:15:11 22   he's gonna come and shoot somebody in the head and kill

02:15:14 23   somebody.  And that's when I'm gonna be in trouble in

02:15:16 24   both ways.

02:15:17 25             So the proper way is contact -- have him

Twana Ahmed - September 19, 2024                179

02:15:20  1    here, stand over here, call the proper authority.  The

02:15:24  2    proper authority will come and deal with him in the

02:15:27  3    legal matter.  So it's not gonna be under my

02:15:30  4    responsibility.  Why did you not did this or why did

02:15:32  5    you do this.  And both ways, I did not acted alone,

02:15:36  6    like, by myself.  I was told what to do by the property

02:15:39  7    manager.  If I didn't do what the property manager told

02:15:42  8    me to do, I'd be in trouble too.  Like, why did you

02:15:47  9    didn't listen to him.

02:15:48  10        Q.   Do you work for H-E-B?

02:15:49  11        A.   I'm hired by Allied Universal to --

02:15:54  12        Q.   Correct.  So Allied Universal was your

02:15:56  13    employer, right?

02:15:57  14        A.   Correct.

02:15:57  15        Q.   So Allied Universal's policies and procedures

02:16:01  16    controlled your employment, right?

02:16:02  17        A.   Correct.

02:16:03  18        Q.   And we just went through the post orders

02:16:05  19    together, right?

02:16:06  20        A.   Right.

02:16:06  21        Q.   And it says do not touch a shoplifter,

02:16:09  22    correct?

02:16:10  23        A.   Does H-E-B has those post orders and

02:16:14  24    management's aware of that?  Absolutely looks like not.

02:16:18  25    Why did they contact me?  Why would he contact me and

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000411

Twana Ahmed - September 19, 2024                    181

02:17:30  1        A.    I am -- I am aware of the law very clearly in

02:17:31  2    the State of Texas.

02:17:31  3        Q.    Great.  What's the Texas penal code that

02:17:33  4    you're referring to?

02:17:34  5        A.    I'm gonna -- I don't know the penal code

02:17:36  6    exactly by my head.

02:17:37  7        Q.    So how are you trained in the penal code,

02:17:39  8    Twana?

02:17:39  9        A.    I have been in the security business for --

02:17:41 10    for a period of time.  There are things you learn

02:17:43 11    within your experience.  For example, when I'm wearing

02:17:46 12    a uniform, the State of Texas says I'm a public

02:17:51 13    servant.  If you assault me, it means you assaulted a

02:17:53 14    police officer, you'll be charged as a -- charged a

02:17:58 15    police officer.  That's in the State of Texas law.

02:18:00 16    What's the law code?  I have no idea.

02:18:02 17        Q.    So you're saying anytime a security guard that

02:18:04 18    works for a private company is assaulted, the police

02:18:07 19    are going to charge them as assaulting a police

02:18:10 20    officer?

02:18:10 21        A.    Yes.  That's what the law is.  That's in the

02:18:14 22    State of Texas.

02:18:15 23        Q.    I'm glad you're so confident, Twana.

02:18:17 24        A.    That is the law.  It's a --

02:18:23 25        Q.    So going back to the relevant issue here, did

02:18:25  1   this man physically touch you in any way?

02:18:27  2        A.    He came up to me aggressively.

02:18:30  3        Q.    Did he physically touch you in any way?

02:18:32  4        A.    He made a threat towards me.

02:18:34  5        Q.    Did he physically touch you in any way?

02:18:36  6        A.    He made a threat towards me.

02:18:38  7              MR. SHINE:  Counsel, please advise your

02:18:40  8   client to answer the question.  He's clearly being

02:18:42  9   evasive.

02:18:43 10              THE WITNESS:  I'm not.

02:18:44 11        Q.    (By Mr. Shine)  The question is:  Did he

02:18:45 12   physically touch you?  Yes or no?

02:18:47 13        A.    He came up to me with the carts, the pushing

02:18:49 14   carts.  Attempted to assault me with the pushing cart,

02:18:52 15   so I act on it.  It was -- it was a threat.

02:18:58 16              MR. SHINE:  Your client is not answering

02:18:59 17   the question.  And if he's going to continue to be

02:19:02 18   evasive --

02:19:03 19              MS. HERNANDEZ:  He's trying to answer --

02:19:03 20              MR. SHINE:  -- we'll go to the Court.

02:19:05 21              MS. HERNANDEZ:  -- to the best of his

02:19:06 22   ability.

02:19:06 23              MR. SHINE:  It's not.  It's a simple yes

02:19:08 24   or no, Counsel.  If he's refusing or continuing to be

02:19:11 25   evasive, I will go to Judge Rosenthal.

02:19:11   1                    MS. HERNANDEZ:  Are you refusing to

02:19:13   2    answer?

02:19:14   3                    THE WITNESS:  I'm answering all his

02:19:15   4    questions.

02:19:16   5        Q.   (By Mr. Shine)  The question simply is:  Did

02:19:18   6    he physically touch you?

02:19:20   7        A.   You cannot -- some questions you cannot ask

02:19:21   8    them -- answer them by yes or no.  It's impossible to

02:19:26   9    ask somebody yes or no, some stuff.

02:19:27  10                    MS. HERNANDEZ:  Do you understand what he

02:19:28  11    means by "physically"?

02:19:29  12                    THE WITNESS:  No.

02:19:31  13                    MR. SHINE:  We're going to stop.  We're

02:19:33  14    going to take a break.  Go off the record, please.

02:19:36  15                    THE VIDEOGRAPHER:  Off the record at

02:19:38  16    2:19.

03:07:52  17                    (Off the record 2:19 p.m. to 3:07 p.m.)

03:08:14  18                    THE VIDEOGRAPHER:  Back on the record at

03:08:19  19    3:07.

03:08:22  20        Q.   (By Mr. Shine) Twana, before we took a break,

03:08:26  21    there was a question that was posed to you with respect

03:08:28  22    to this guy that was allegedly shoplifting, right?  And

03:08:33  23    the question was:  Did he touch you or physically touch

03:08:38  24    you in any way?  So I'm going to ask the same question.

03:08:42  25    Did he touch you that day?

03:08:43   1        A.    I do not remember.

03:08:44   2        Q.    You stopped him, right, from leaving the

03:08:58   3   store?

03:08:58   4        A.    I was told to stop him and I asked the -- I

03:09:10   5   asked him when he was leaving the store to -- I gave

03:09:17   6   him the opportunity to pay for the items or leave the

03:09:21   7   items and leave the premises of the property and the

03:09:26   8   store.

03:09:26   9        Q.    Okay.  But you stopped him at some point,

03:09:31  10   right?

03:09:31  11        A.    Correct.

03:09:34  12        Q.    And when you stopped him, he was still inside

03:09:37  13   the store, right?

03:09:38  14        A.    What do you mean, "inside the store"?  Like,

03:09:53  15   inside the store or in the property?  What exactly,

03:09:56  16   like --

03:09:56  17        Q.    Inside the store.

03:09:57  18        A.    I think so.  By the exit.

03:10:08  19        Q.    Okay.  But he hadn't -- he had not exited the

03:10:13  20   store at that point, right?

03:10:14  21        A.    I don't remember exactly if he was outside --

03:10:36  22   outside of the store.  He was in the store area.

03:10:39  23        Q.    Okay.  So where were you?  Were you inside the

03:10:45  24   store or outside the store?

03:10:46  25        A.    I was by the gate, by the door, the entrance

03:10:51  1    or the exits of the store.

03:10:52  2         Q.   Right.  So you testified previously that you

03:10:53  3    had entered the store when the manager asked you to

03:10:56  4    come inside, right?

03:10:58  5         A.   Yes.

03:10:58  6         Q.   And then you observed these gentlemen and

03:11:00  7    followed him as he went towards the registers, right?

03:11:04  8         A.   I went towards the door after that.

03:11:06  9         Q.   Right.  And you stood inside the store at that

03:11:10  10   point, right?

03:11:10  11        A.   I was not inside the store, like, physically

03:11:12  12   inside the store.  I was by the gate.  Because there's

03:11:17  13   a metal barrier, glass.  I was by the metal barrier or

03:11:20  14   the glass.

03:11:21  15        Q.   Okay.  And you said he approached you with a

03:11:27  16   shopping cart, right?

03:11:29  17        A.   Yeah, that's correct.

03:11:29  18        Q.   And you said he approached you aggressively.

03:11:33  19   Your words, right?

03:11:34  20        A.   Yes.

03:11:34  21        Q.   Can you again describe what you mean by

03:11:37  22   "aggressively"?

03:11:37  23        A.   Coming towards me with the carts after I asked

03:11:41  24   him to -- like, approached him, went up to him or after

03:11:44  25   he saw me.

Twana Ahmed - September 19, 2024                186

03:11:46   1          Q.    And when he didn't follow your directions,
03:11:48   2    what did you do?
03:11:49   3          A.    He made the threat, and I acted on the threat.
03:11:56   4          Q.    When you say "he made the threat," what are
03:11:58   5    you talking about?
03:11:59   6          A.    "I'm gonna cut you up.  Move out of my way."
03:12:02   7          Q.    Okay.  And again, he never showed you a knife,
03:12:06   8    right?
03:12:06   9          A.    He didn't pull anything out, like, physically
03:12:09  10    show me or anything like that, no.
03:12:11  11          Q.    Okay.  And when -- again, he refused to stop
03:12:17  12    on your directions.  You said you acted, right?  What
03:12:20  13    did you do?
03:12:26  14          A.    Detained him.
03:12:29  15          Q.    And what do you mean by "detained him"?
03:12:35  16          A.    Put in handcuffs, attempt to put handcuffs on
03:12:39  17    him.
03:12:39  18          Q.    So putting him in handcuffs or attempting to
03:12:42  19    put him in handcuffs, to me, means two different
03:12:46  20    things.  What did you do?
03:12:48  21          A.    Because I -- I didn't complete the handcuffs
03:12:50  22    hundred percent when law enforcement showed up.  Like,
03:12:54  23    he was -- I'm putting handcuffs on him, the police
03:12:58  24    showed up behind me exactly.  They were there very fast
03:13:01  25    to respond back.  Faster than I ever thought about.

03:13:04  1      Q.    Were you the one that called the police?

03:13:07  2      A.    No, I did not.

03:13:08  3      Q.    Do you know who called the police?

03:13:10  4      A.    The manager.

03:13:11  5      Q.    When you say "the manager," is that Kevin you

03:13:15  6  were talking about earlier?

03:13:17  7      A.    I believe so.  There were multiple managers.

03:13:19  8  Which one called 9-1-1?  Not too sure.

03:13:22  9      Q.    Okay.  And what police department arrived?

03:13:26 10      A.    Local police department.

03:13:29 11      Q.    I'm not sure what local means.  I'm not from

03:13:31 12  the area.  Can you tell me what local means to you?

03:13:33 13      A.    Whatever jurisdiction of police department

03:13:36 14  that area in, that particular agency showed up.

03:13:39 15  Whatever agency will patrol that area.

03:13:41 16      Q.    Okay.  So in your experience, what agency

03:13:44 17  paroles that area?

03:13:45 18      A.    Well, since it's a different city, it's not

03:13:47 19  HPD, it's -- it's a B police department.  So, Bellaire

03:13:52 20  Police Department, I believe they showed up.

03:13:54 21      Q.    And when you said you were attempting to place

03:13:57 22  him in handcuffs when the police arrived, what do you

03:14:01 23  mean by "attempting"?

03:14:02 24      A.    Because I was putting handcuffs on him and --

03:14:08 25  on one of the hand, and he was, like, resisting.  You

APPENDIX 000418

03:14:11  1     know, not cooperative.  And I had to attempt to put the

03:14:18  2     other one handcuffs on.  The police showed up not

03:14:24  3     completely on, and police took him away immediately.

03:14:27  4          Q.   How many police officers showed up?

03:14:35  5          A.   On top of my head, I don't have a knowledge

03:14:38  6     of -- don't remember exactly.  Maybe three, maybe two.

03:14:46  7          Q.   After this incident occurred, Twana, did you

03:14:51  8     complete an incident report?

03:14:52  9          A.   I was never given the opportunity to do a

03:14:58 10     police -- sorry -- incident report.

03:15:20 11               (Exhibit No. 21 marked.)

03:15:20 12          Q.   Twana, I'm handing you a copy of an incident

03:15:23 13     report that you completed after this incident.  Would

03:15:25 14     you agree --

03:15:25 15               MR. SHINE:  This is, for the record,

03:15:28 16     AUS 671 through AUS 674.

03:15:34 17          Q.   (By Mr. Shine)  On the first page, 671, do you

03:15:37 18     see in the middle where it says "Name"?

03:15:38 19          A.   Yes.

03:15:39 20          Q.   That is your name?

03:15:40 21          A.   Yes.

03:15:40 22          Q.   Is that your handwriting?

03:15:41 23          A.   Yes.

03:15:42 24          Q.   Is that your phone number?

03:15:43 25          A.   Yes.

APPENDIX 000419

03:15:43  1        Q.    Above your name, does it say date of incident

03:15:46  2   of April 4th, 2022?

03:15:47  3        A.    Yes.

03:15:47  4        Q.    Does it say date of incident reported

03:15:51  5   April 4th of 2022?

03:15:52  6        A.    4/4/22, yes.

03:15:55  7        Q.    Again, is it your testimony today that you

03:15:57  8   were never given an opportunity to complete an incident

03:15:59  9   report?

03:15:59 10        A.    Not this incident report I'm talking about.

03:16:01 11   I'm talking about a complete incident report.

03:16:03 12        Q.    I'm asking if you completed an incident

03:16:06 13   report.  And your testimony today was, no, you were

03:16:09 14   never given the opportunity; is that correct?

03:16:10 15        A.    Which incident report that you're talking

03:16:13 16   about specifically?  Because there was supposed to be

03:16:16 17   two or three incident reports.

03:16:18 18        Q.    Okay.

03:16:18 19        A.    This is, I believe, one of them.

03:16:20 20        Q.    At the bottom of page 671, does it identify an

03:16:24 21   address of where the incident took place?

03:16:30 22        A.    Are you talking about 5106?

03:16:32 23        Q.    Yes.  What is the complete address?

03:16:34 24        A.    B-I-S-S-O-N-N-G-T Street.

03:16:42 25        Q.    If I said 5106 Bissonnet Street, does that

03:16:46  1    make sense to you?

03:16:47  2        A.   Bissonnet does rig a bell.  Bissonnet Street,

03:16:50  3    yes.

03:16:50  4        Q.   Okay.  And again, this is your handwriting,

03:16:59  5    correct?

03:16:59  6        A.   Best of my -- yeah, that is.

03:17:01  7        Q.   If you could turn your page to the next page,

03:17:06  8    672.  Again, it's a Use of Force Incident Report.  Is

03:17:14  9    that your handwriting?

03:17:15 10        A.   Yeah, it is.

03:17:15 11        Q.   So again, your testimony today was that you

03:17:20 12    were never given an opportunity to complete an incident

03:17:22 13    report.  Is that still true?

03:17:23 14        A.   A report of exactly what happened, I didn't do

03:17:26 15    a report like that, explain my situation.  I was never

03:17:30 16    given the opportunity to do an actual detailed report.

03:17:33 17    This is just saying fill this out.  It doesn't say what

03:17:38 18    happened, what's going on, why did you do it, why did

03:17:41 19    you not do it.

03:17:41 20        Q.   Great.  If you could turn to page 674, which

03:17:45 21    is the last page, Twana.  This again says "Employee

03:17:48 22    Statement."  Is there a date attached to this

03:17:51 23    statement?

03:17:52 24        A.   Yes.

03:17:52 25        Q.   What date is attached?

Twana Ahmed - September 19, 2024                    191

| | | |
|---|---|---|
| 03:17:53  1 | A. | Are you talking about the last page? |
| 03:17:59  2 | Q. | Yes. |
| 03:17:59  3 | A. | 4/4/22. |
| 03:18:01  4 | Q. | And is that your handwriting? |
| 03:18:02  5 | A. | That is my handwriting. |
| 03:18:03  6 | Q. | And where it says employee information, does |

03:18:06  7  that say "Twana Ahmed"?

| | | |
|---|---|---|
| 03:18:08  8 | A. | Right here? |
| 03:18:09  9 | Q. | Yes. |
| 03:18:10 10 | A. | Yes. |
| 03:18:10 11 | Q. | Is that your phone number? |
| 03:18:14 12 | A. | Yes. |
| 03:18:14 13 | Q. | And again, there's a handwritten portion in |

03:18:16 14  the middle of that page, right?

| | | |
|---|---|---|
| 03:18:17 15 | A. | Yes.  That's when it says H-E-B? |
| 03:18:19 16 | Q. | Yes. |
| 03:18:19 17 | A. | Yes. |
| 03:18:20 18 | Q. | Great.  Please read that for me. |
| 03:18:22 19 | A. | I can't see it clearly. |
| 03:18:24 20 | Q. | But you would agree that's your handwriting, |

03:18:27 21  right?

| | | |
|---|---|---|
| 03:18:27 22 | A. | That is my handwriting, yes. |
| 03:18:29 23 | Q. | So I'm going to ask that you try to read it |

03:18:32 24  for me.

| | | |
|---|---|---|
| 03:18:32 25 | A. | I can't -- I cannot see it clearly what it |

APPENDIX 000422

03:18:35  1    says.  Too blurry.

03:18:38  2         Q.   Then please read along while I read it aloud

03:18:44  3    for you.

03:18:45  4         A.   Okay.  All I --

03:18:45  5         Q.   It says:  "H-E-B MIC Kevin" -- there's an I --

03:18:51  6    "texted me on my post side phone about couple guys.

03:18:58  7    They are attempted to S-T-A-I merchandise from the

03:19:07  8    store.  He said already kicked store.  The might come

03:19:19  9    back again.  He called me back few minutes later."  Its

03:19:35 10    illegible.  "He" -- again illegible -- "come inside the

03:19:40 11    store.  Keep your eyes on them" -- illegible -- "back

03:19:49 12    inside the store.  They have a basket full of alcohol

03:19:59 13    and beer."

03:20:01 14              Is that a fair and accurate reading of

03:20:03 15    what it says?

03:20:04 16         A.   That's accurate.

03:20:05 17         Q.   Okay.  And you completed this -- this

03:20:07 18    statement on April 4th of 2022, right?

03:20:10 19         A.   I did not complete the report.  I did write

03:20:19 20    this, you are correct; but I did not give --

03:20:21 21         Q.   You completed this statement, Twana, on

03:20:23 22    April 4th of 2022, correct?

03:20:24 23         A.   Yeah, correct.

03:20:25 24         Q.   And nowhere in this statement does it say

03:20:28 25    anything about the guys allegedly having a knife,

03:20:30   1    right?

03:20:30   2         A.   I was never given the opportunity to finish

03:20:33   3    the report.

03:20:34   4         Q.   Of course.  Nowhere in the report does it say

03:20:42   5    that one of the guys allegedly tried to cut you, right?

03:20:46   6         A.   I was -- it doesn't say in here because I was

03:20:48   7    never given the opportunity to finish it.

03:20:50   8         Q.   Who didn't give you the opportunity to finish

03:20:52   9    it.

03:20:52  10         A.   Alex.

03:20:53  11         Q.   And why didn't he give you the opportunity --

03:20:55  12         A.   He was rushing me because he was just:  Do

03:20:57  13    this, do this.  You need to be in the office tomorrow.

03:21:00  14    You've been taken off schedule.  You need to come to

03:21:03  15    meet the account manager.

03:21:04  16         Q.   Everything during your employment with Allied

03:21:06  17    was a rush?  You never took the time to slow down and

03:21:09  18    actually do what you were supposed to do?

03:21:11  19         A.   If they rush you, they rush you --

03:21:13  20              MS. HERNANDEZ:  Objection; argumentative.

03:21:17  21         Q.   (By Mr. Shine)  Did you ever attempt to

03:21:18  22    supplement this document?

03:21:19  23         A.   What do you mean by "supplement"?

03:21:20  24         Q.   Write an additional statement.

03:21:22  25         A.   I tried.

03:21:23  1        Q.    When?

03:21:23  2        A.    The same day.

03:21:25  3        Q.    With who?

03:21:25  4        A.    With Alex.

03:21:27  5        Q.    And even if Alex said, No, you can't do it,

03:21:30  6    why didn't you write it yourself?

03:21:31  7        A.    I didn't have the paper.  He took the paper.

03:21:34  8        Q.    Did you not have paper available at home?

03:21:36  9        A.    No, I did not.

03:21:37 10        Q.    Did you have a cell phone?

03:21:38 11        A.    A personal cell phone?

03:21:40 12        Q.    Yes.

03:21:40 13        A.    I do have a personal cell phone.

03:21:42 14        Q.    Can you send text messages on a personal cell

03:21:45 15    phone?

03:21:45 16        A.    Yes.

03:21:45 17        Q.    Can you write emails on a personal cell phone?

03:21:48 18        A.    Yes.

03:21:48 19        Q.    Can you write notes on your personal cell

03:21:50 20    phone?

03:21:50 21        A.    Yes.

03:21:50 22        Q.    So you could have written yourself another

03:21:52 23    statement, right?

03:21:53 24        A.    Yes.

03:21:53 25        Q.    But you chose not to, right?

APPENDIX 000425

Twana Ahmed - September 19, 2024                    195

03:21:55  1      A.    It's not I chose not to.  What different would

03:21:58  2  it make if I wrote one and given to Allied?  No

03:22:01  3  different because the decision's already made.

03:22:02  4      Q.    On this document you never identified that any

03:22:06  5  of these guys attacked anyone, right?

03:22:08  6      A.    I didn't say attacked, no.

03:22:09  7      Q.    On this statement you never identified that

03:22:14  8  anyone threatened anyone, right?

03:22:16  9      A.    At this particular document?  No.

03:22:18 10      Q.    The document you wrote after the incident

03:22:20 11  occurred, correct?

03:22:20 12      A.    This one, yes.

03:22:23 13      Q.    You said you think Bellaire PD showed up,

03:22:31 14  right?

03:22:31 15      A.    Yes.

03:22:32 16      Q.    And are you aware if Bellaire PD also wrote a

03:22:37 17  report?

03:22:37 18      A.    I believe so.  Of course.

03:22:55 19           (Exhibit No. 22 marked.)

03:22:55 20      Q.    (By Mr. Shine)  Twana, I'm handing you a copy

03:22:58 21  of the Bellaire PD report that you provided in

03:23:01 22  discovery which is consecutively labeled AhmedAllied

03:23:07 23  526 through 540.

03:23:10 24           Have you seen this document before?

03:23:12 25      A.    I think so.

| | | |
|---|---|---|
| 03:23:12 | 1 | Q.    If you could turn to page 529 for me. |
| 03:23:26 | 2 | A.    529?  Yes, it's on 529. |
| 03:23:30 | 3 | Q.    And at the top of the page there's a heading |
| 03:23:33 | 4 | that says "Narrative."  Do you see where I'm referring |
| 03:23:36 | 5 | to? |
| 03:23:36 | 6 | A.    You're talking about right here?  528? |
| 03:23:43 | 7 | Q.    529. |
| 03:23:45 | 8 | A.    529.  Narrative?  Okay. |
| 03:23:52 | 9 | Q.    Do you see where it says "Narrative" at the |
| 03:23:57 | 10 | top of the page? |
| 03:23:58 | 11 | A.    Yeah. |
| 03:23:58 | 12 | Q.    Can you please read that narrative to yourself |
| 03:24:00 | 13 | and look up when you're finished. |
| 03:24:29 | 14 | A.    Okay. |
| 03:24:29 | 15 | Q.    Based on your review of that narrative, is it |
| 03:24:33 | 16 | fair to say that the men were stopped before they |
| 03:24:40 | 17 | exited the store? |
| 03:24:41 | 18 | A.    According to this, yes. |
| 03:24:43 | 19 | Q.    Also in reference to the narrative that you've |
| 03:24:50 | 20 | reviewed, it says that both were charged with public |
| 03:24:53 | 21 | intoxication, right? |
| 03:24:54 | 22 | A.    That's correct. |
| 03:24:54 | 23 | Q.    If you can turn to page 540, which is the last |
| 03:25:00 | 24 | page.  There's a narrative that starts at the top of |
| 03:25:25 | 25 | the page.  It says, "Suspect and his companion..."  Do |

03:25:27  1    you see where I'm referring to?

03:25:28  2        A.    Yes.

03:25:29  3        Q.    It reads:  "Suspect and his companion were

03:25:32  4    known shoplifters by H-E-B management and security.

03:25:36  5    H-E-B called police to wait for suspects to leave

03:25:40  6    store.  An over zealous security officer jumped the gun

03:25:43  7    and did not wait for suspects to pass final point of

03:25:48  8    payment before confronting suspects."

03:25:50  9              Is this a fair and accurate reading of

03:25:52 10    what is listed in that narrative?

03:25:53 11        A.    No.

03:25:54 12        Q.    What did I misstate?

03:25:55 13        A.    They didn't -- they went over the counter and

03:25:58 14    I was told to stop them.

03:25:59 15        Q.    The question was:  Did I read it accurately

03:26:01 16    from the page?

03:26:02 17        A.    Oh.  Yeah, you did, yeah.

03:26:04 18        Q.    If you could turn back to page 527, please.

03:26:29 19    In the middle of the page there's a heading that says

03:26:32 20    "Offense Information."  Do you see where I'm referring

03:26:34 21    to?

03:26:34 22        A.    Yeah, I see that.

03:26:42 23        Q.    And what were these individuals charged with

03:26:44 24    based on the police report?

03:26:45 25        A.    Drunk, like, public intoxication because --

03:26:52  1      Q.   Fair to say they were not charged with

03:26:56  2  shoplifting?

03:26:56  3      A.   Because H-E-B refused to press charges on

03:27:00  4  them.  The officer asked the manager, and the manager

03:27:04  5  didn't want to press charges.  They said, Okay, we're

03:27:04  6  gonna take him on public intoxication if you don't want

03:27:10  7  to charge him for that, since we're already here.

03:27:10  8      Q.   But the question was:  What were they charged

03:27:12  9  with?  And you responded, "public intoxication,"

03:27:14 10  correct?

03:27:15 11      A.   That is correct, yeah.

03:27:17 12      Q.   Fair to say they were not charged with

03:27:20 13  shoplifting?

03:27:21 14      A.   That is correct.

03:27:21 15      Q.   If you need to review the police report in its

03:27:24 16  entirety, please do so.  But is it fair to say that

03:27:28 17  nowhere in the police report does it identify that a

03:27:30 18  weapon was recovered?

03:27:31 19      A.   It doesn't say that.

03:27:32 20      Q.   And nowhere does the police report identify

03:27:35 21  that a knife was recovered, right?

03:27:37 22      A.   Right.

03:27:37 23      Q.   And did you have an opportunity to talk to the

03:27:43 24  Bellaire PD?

03:27:44 25      A.   I don't remember.

APPENDIX 000429

Twana Ahmed - September 19, 2024                    199

03:27:49  1        Q.    After Bellaire PD took the guys into custody

03:27:57  2    for public intoxication, what did you do next?

03:28:01  3        A.    When they put them in the car, they stayed to

03:28:09  4    price the item and try to see how much is it.  It's up

03:28:18  5    to the manager.  Told them, Can you ring these items up

03:28:22  6    and tell us the total amount they were stealing?  And

03:28:26  7    the manager came back with a receipt of the item.  And

03:28:29  8    he went up to him and says, Do you want to press

03:28:32  9    charges on them?  And the manager says, No.  The

03:28:35 10    officer says, Okay.  Are you sure?  He responded Yes,

03:28:41 11    we don't want to press charges.  He says, Okay.  We're

03:28:44 12    gonna take them anyway for public intoxication.  They

03:28:47 13    are drunk.  They put them in the car and charged them

03:28:51 14    with public intoxication and took them.

03:28:52 15        Q.    I appreciate you giving me a narrative of what

03:28:55 16    Bellaire PD did.  I'm asking what you did.

03:29:03 17                  After Bellaire PD placed the individuals

03:29:06 18    in custody --

03:29:07 19        A.    Right.

03:29:07 20        Q.    -- what did you do?

03:29:09 21        A.    I went back to my -- I can't recall exactly.

03:29:13 22    I went back to my official duties.

03:29:18 23        Q.    Did you call anyone within Allied Universal?

03:29:22 24        A.    I can't recall.  I don't remember.

03:29:24 25        Q.    Did you text anyone within Allied Universal?

| | | |
|---|---|---|
| 03:29:26 | 1 | A.    I do not remember. |
| 03:29:33 | 2 | Q.    At some point did Alex show up? |
| 03:29:36 | 3 | A.    Yes. |
| 03:29:36 | 4 | Q.    What time did he show up? |
| 03:29:38 | 5 | A.    After the incident.  When exactly, not too |
| 03:29:45 | 6 | sure. |
| 03:29:45 | 7 | Q.    Was it as they were being arrested? |
| 03:29:48 | 8 | A.    No.  After. |
| 03:29:48 | 9 | Q.    Was it five minutes after? |
| 03:29:51 | 10 | A.    Longer. |
| 03:29:55 | 11 | Q.    Ten minutes after? |
| 03:29:57 | 12 | A.    Longer.  Maybe an hour, two hours but not too |
| 03:30:01 | 13 | sure when exactly, a specific time.  Maybe an hour and |
| 03:30:06 | 14 | a half or two hours.  But it was before my shift.  I |
| 03:30:08 | 15 | was still on the clock and I was still patrolling.  But |
| 03:30:12 | 16 | when exactly, not too sure.  I cannot give you a |
| 03:30:14 | 17 | specific time. |
| 03:30:14 | 18 | Q.    Did you talk to Patrick Freeney that night? |
| 03:30:18 | 19 | A.    I don't think so.  No. |
| 03:30:21 | 20 | Q.    Did you talk to Alex that night? |
| 03:30:23 | 21 | A.    Yes, I did talk to Alex. |
| 03:30:28 | 22 | Q.    Okay. |
| 03:30:28 | 23 | A.    I tried -- I tried to explain things to Alex. |
| 03:30:31 | 24 | They don't want to listen.  It looks like the decision |
| 03:30:36 | 25 | already had been made in the office.  So come up to the |

APPENDIX 000431

03:30:39 1   office.  You're not on schedule.  And they will talk to

03:30:45 2   you at the office.  That's all.

03:30:45 3       Q.   So when Alex showed up, the first thing he

03:30:48 4   said to you was you're off the schedule, go to the

03:30:50 5   office?

03:30:51 6       A.   He says you are off the schedule.  You need to

03:30:53 7   go to the office tomorrow, early as you can.  They want

03:30:57 8   to -- account manager would like to speak -- wants to

03:31:01 9   talk to you.

03:31:04 10              And that's what exactly happened.  I went

03:31:06 11  to the next -- they took me off schedule.  I was

03:31:09 12  supposed to work the next day.  I was not on schedule,

03:31:11 13  and I went to the office.

03:31:15 14      Q.   And Alex had you fill out those forms that

03:31:19 15  night, right?

03:31:20 16      A.   Whatever he gave me, I did fill it up, yeah.

03:31:34 17              THE REPORTER:  I'm sorry.  I'm having a

03:31:36 18  hard time hearing you.

03:31:37 19      A.   Whatever he gave me, I filled out and -- tried

03:31:39 20  to fill out and complete it.

03:31:41 21      Q.   (By Mr. Shine)  Did you talk to anyone else

03:31:43 22  from Allied that night?

03:31:44 23      A.   I don't remember exactly.

03:31:47 24      Q.   Why did Alex show up at the site?

03:31:49 25      A.   I think Patrick told him to.  I think.  Not

APPENDIX 000432

03:31:55  1    too sure.  Or the company send them whatever, the

03:32:00  2    reason he was there for.

03:32:02  3         Q.    Why would the company send him to the site?

03:32:04  4         A.    I have no idea.

03:32:05  5         Q.    Why would Patrick Freeney send him to the

03:32:08  6    site?

03:32:08  7         A.    Maybe because of the incident, to figure out

03:32:11  8    what's going on and what happened.  But they didn't

03:32:13  9    want to listen to what happened because they already --

03:32:17  10   the decision had been made by them.

03:32:19  11        Q.    How did -- how did Allied know that there was

03:32:21  12   an incident?

03:32:21  13        A.    How would they know it was an incident?  I

03:32:26  14   don't know.

03:32:27  15        Q.    You were the only officer on -- only Allied

03:32:30  16   officer at the site at that time, right?

03:32:32  17        A.    Correct.

03:32:32  18        Q.    So how would Allied know that an incident

03:32:36  19   occurred?

03:32:36  20        A.    Maybe management called them.  H-E-B

03:32:39  21   management.

03:32:39  22        Q.    Do you know if H-E-B management called them?

03:32:41  23        A.    Not too sure.

03:32:42  24        Q.    Did you ever talk to Kevin after the incident?

03:32:45  25        A.    No, not really.  Don't remember.

03:32:48  1      Q.    So you said that Alex told you you were off

03:32:55  2  the schedule.  Did he say that you were suspended?

03:32:58  3      A.    No, he did not say that.  He said, You're off

03:33:00  4  the schedule.  You are scheduled to work tomorrow.  You

03:33:03  5  don't have to go to work.  It's already been taken care

03:33:05  6  of.  You're off the schedule.  Come to the office.

03:33:08  7      Q.    And so did you go to the office that night or

03:33:12  8  the next day?

03:33:13  9      A.    Oh, the next day.

03:33:14 10      Q.    What time did you get to the office?

03:33:17 11      A.    Morning.  Don't know the time.  11:00, 10:00

03:33:23 12  in the morning.  Somewhere around there.  Could be

03:33:26 13  later.  Not too sure, like, what time exactly, but it

03:33:28 14  was the next day.  Absolutely, like, a hundred percent

03:33:32 15  the next day.

03:33:33 16      Q.    Were you in uniform?

03:33:34 17      A.    No, I was not.  I was -- I believe I was in

03:33:37 18  civilian clothes because I was off the schedule.  Was I

03:33:42 19  in uniform, not too sure; but I think I was in civilian

03:33:46 20  clothes.

03:33:46 21      Q.    When you use the term "civilian," what do you

03:33:49 22  mean by that?

03:33:50 23      A.    Like regular clothes, not uniform.  Like

03:33:52 24  casual clothes like you and me, something like that.

03:33:55 25      Q.    Okay.

03:33:56  1        A.    Not like shorts.  Not like actual professional

03:34:02  2   clothes.

03:34:03  3        Q.    So you show up at maybe 10:00, maybe 11:00?

03:34:06  4        A.    Somewhere around there, yes.

03:34:10  5        Q.    Who did you talk to first?

03:34:12  6        A.    I walked into the office.

03:34:15  7        Q.    And after you walked in, what did you do?

03:34:19  8        A.    I talked to the front desk lady.  Who are you

03:34:22  9   here to see?  Patrick.  Patrick came, grabbed me.

03:34:29 10   Like, grabbed me and took me to the office.  He walked

03:34:32 11   in first.  I walked in behind him.

03:34:35 12        Q.    Okay.  When you say that he grabbed you, did

03:34:38 13   he touch you?

03:34:39 14        A.    No.  Grabbed, like, Hey, come on in.  Like,

03:34:41 15   grab, you know.

03:34:42 16        Q.    So he never touched you?

03:34:44 17        A.    No, I didn't say grab, like, grab you, no.

03:34:46 18   Like, Hey, let's go.  Come on in.  Like, that's how I

03:34:49 19   mean by grabbing.

03:34:50 20        Q.    And the front person that was, you know, the

03:34:53 21   administrator or the receptionist, was it the same

03:34:57 22   woman that you talked about earlier?

03:34:58 23        A.    I think so.  She was the same, yeah.

03:35:00 24        Q.    And so Patrick got you, and you went to his

03:35:03 25   office again?

03:35:04  1       A.    Yes.

03:35:04  2       Q.    And when you went to his office, did he go in

03:35:06  3  first?

03:35:06  4       A.    He went in first.

03:35:09  5       Q.    And where did he go after he entered his

03:35:12  6  office?

03:35:12  7       A.    He went behind the desk.

03:35:14  8       Q.    And where did you go?

03:35:16  9       A.    At the -- sit in the desk or the table or

03:35:20 10  chair.  The chair you sitting in.

03:35:22 11       Q.    So sort of opposite from him, right?

03:35:25 12       A.    Yes.  This is Patrick.  Assume there's a table

03:35:27 13  and this is me (indicating).

03:35:28 14       Q.    Was anyone else around at that time?

03:35:34 15       A.    I don't remember if it -- it was just -- I

03:35:37 16  don't remember if anyone else was over there.

03:35:40 17       Q.    Do you remember what day of the week this was?

03:35:42 18       A.    No.

03:35:42 19       Q.    And after you got into the office, what does

03:35:51 20  Patrick say?

03:35:51 21       A.    He has a form ready.  He said to me:  Sign it,

03:36:03 22  date it, and give it to me.  I was trying to go over

03:36:09 23  it.  He goes, like, there's no time to go over it.

03:36:11 24  Sign it and give it to me.

03:36:12 25             I was like, What is this?

Twana Ahmed - September 19, 2024                206

03:36:14  1              He goes, like, the incident report.

03:36:15  2              I was like, I did not wrote this and this

03:36:17  3    is not what happened and this isn't -- this is not what

03:36:22  4    exactly going on.  This is not what I wrote.  This is

03:36:24  5    not my side of story.

03:36:26  6              He says, I don't care.  Sign it, initial

03:36:34  7    it, date it, and give it to me.  Loud voice.

03:36:37  8    Aggressive voice.  Disrespectful voice.

03:36:41  9        Q.   Sure, I understand that's how you're

03:36:44 10    classifying it.  Was he sitting at his desk?

03:36:46 11        A.   Yes.

03:36:46 12        Q.   Did he ever stand up?

03:36:50 13        A.   I don't remember if he stand up or not.

03:36:52 14        Q.   Were you sitting down at this time too?

03:36:55 15        A.   I was sitting down, yes.

03:36:56 16        Q.   Did you ever stand up?

03:36:58 17        A.   I don't remember I standed up, no.

03:37:00 18        Q.   Okay.

03:37:01 19        A.   During the conversation?  No, I was sitting

03:37:03 20    down.

03:37:03 21        Q.   After you refused to sign this form, what

03:37:07 22    happened?

03:37:07 23        A.   He start threatening me.

03:37:13 24        Q.   When you say he started threatening you, what

03:37:16 25    do you mean by that?

03:37:17  1      A.    Threat.   Threat of taking my license away,

03:37:22  2   threatening to suspend my license.   Threatening calling

03:37:29  3   law enforcement on me, force charges on me, that I'm a

03:37:34  4   loose cannon in the company.   I was just trying to

03:37:38  5   explain my situation, I was explaining my side of

03:37:41  6   story.   He was telling me, I don't give a fuck what

03:37:44  7   happened or what you have to say.   What are you gonna

03:37:48  8   say?   This is the paper that you're gonna sign and

03:37:52  9   that's it.   You are suspended.   It's not -- you are

03:37:59 10   suspended.   You need -- if you refuse to sign, you

03:38:03 11   refuse to sign.   You need to come back early as

03:38:08 12   tomorrow, turn in your equipments until the outcome of

03:38:12 13   the investigation.

03:38:14 14      Q.    Okay.   Did you sign the form?

03:38:16 15      A.    I did not sign the form, no.   I refused to

03:38:20 16   sign it because it was not my testimony and not my

03:38:22 17   report.   And I told Patrick, You were not there.   Alex

03:38:25 18   was not there.   I was there.   I am a witness of what

03:38:32 19   happened.   I need to giving the actual opportunity to

03:38:36 20   fill up the actual report of what happened, exactly

03:38:39 21   what happened.   He refused to do that.   He refused to

03:38:44 22   give me the opportunity to do any reports or anything

03:38:47 23   like that.   He said --

03:38:49 24      Q.    I'm going to pause you for a second.

03:38:51 25      A.    Yes.

APPENDIX 000438

03:38:51  1    Q.    But you did have the opportunity on April 4th

03:38:54  2  with Alex.

03:38:55  3    A.    That was not the full opportunity to complete

03:38:57  4  the form.

03:38:57  5    Q.    Right.  And what prevented you from writing

03:38:59  6  your own statement, Twana?

03:39:01  7    A.    I needed the official documents from Allied

03:39:04  8  Universal for the incident.  They never provided to me.

03:39:10  9  Like incident report says "incident report."  They

03:39:12 10  never --

03:39:12 11    Q.    You couldn't just write it on a piece of

03:39:15 12  paper?

03:39:15 13    A.    Will they accept it?  I don't know.  But if

03:39:18 14  they gave me --

03:39:19 15    Q.    Did you try?

03:39:20 16    A.    I asked for incident reports.

03:39:21 17    Q.    Did you try to write it on a piece of paper?

03:39:23 18    A.    I didn't try and write it on a piece of paper

03:39:31 19  but --

03:39:31 20    Q.    Did you try to offer them a statement?

03:39:34 21    A.    Yes, of course, of course, absolutely, without

03:39:36 22  a reasonable doubt I asked for -- to fill out paper.  I

03:39:40 23  asked for actual paper to fill it out.  I told them,

03:39:42 24  give me a paper to fill it out.  They said, No.

03:39:45 25  Decision has been made.  You are suspended.  You're not

```
03:39:46  1   gonna do any paper.  You're not gonna fill up anything.
03:39:47  2   You sign this or you don't sign it.  If you don't sign
03:39:50  3   it, I'm gonna put "refused to sign."
03:39:52  4              I said, Okay.  I'm not signing anything.
03:39:54  5   This is not what happened with me.  I want to -- I want
03:39:56  6   to give the -- I want to be given the opportunity to
03:39:59  7   sign to -- sorry -- to fill out my own statement and do
03:40:04  8   my own statement.  And that's when he become really
03:40:07  9   pissed off and aggressive toward me.
03:40:10 10       Q.   Okay.  And again, I appreciate that
03:40:13 11   characterization.
03:40:14 12       A.   Thank you.
03:40:14 13       Q.   But the question two you, Twana --
03:40:19 14       A.   Yes.
03:40:19 15       Q.   -- was if Allied allegedly did not give you a
03:40:23 16   form to fill out --
03:40:24 17       A.   Right.
03:40:25 18       Q.   -- what stopped you from writing your own
03:40:27 19   statement on your own paper?
03:40:29 20       A.   I didn't know if they're gonna take it
03:40:38 21   because --
03:40:38 22       Q.   Did you try?
03:40:39 23       A.   Huh?
03:40:41 24       Q.   Did you try?
03:40:41 25       A.   I asked them.
```

03:40:42  1        Q.   Did you try to submit a document that was not

03:40:44  2   accepted?

03:40:45  3        A.   I asked them, Do you guys need it, my report?

03:40:48  4   They said, No, we don't need nothing from you.

03:40:51  5        Q.   Twana, the question is:  Did you try to submit

03:40:54  6   a statement that was not accepted by Allied?

03:40:57  7        A.   I gave them the opportunity to fill up my

03:41:00  8   report, but they didn't want my report.  It's not -- I

03:41:04  9   tried to give them my reports and fill up a paper.

03:41:07 10   They didn't want it.  They didn't want it.

03:41:10 11        Q.   I will ask a third time.

03:41:12 12        A.   Yes.

03:41:13 13        Q.   The question was:  Did you try to write a

03:41:17 14   statement and provide it to Allied, on your own paper,

03:41:23 15   that was not accepted?

03:41:24 16        A.   Yes.  They don't want it.  They don't want

03:41:27 17   nothing.

03:41:27 18        Q.   Where is the piece of paper that you tried to

03:41:29 19   write a statement on?

03:41:30 20        A.   I didn't fill it up because they didn't want

03:41:32 21   to take it, take nothing from me.  I told them, Can I

03:41:35 22   do my own report?  They said, No.

03:41:37 23        Q.   So Patrick told you you were suspended, right?

03:41:44 24        A.   Correct.

03:41:44 25        Q.   Did he tell you you were fired at that point?

| | | |
|---|---|---|
| 03:41:46 | 1 | A.    No. |
| 03:41:47 | 2 | Q.    You testified that he asked you to come back |
| 03:41:50 | 3 | the next day to turn in your -- your equipment, right? |
| 03:41:52 | 4 | A.    Correct, yes. |
| 03:41:53 | 5 | Q.    Did you turn in your equipment the next day? |
| 03:41:55 | 6 | A.    Hundred percent, yes. |
| 03:41:56 | 7 | Q.    And what did you turn in? |
| 03:41:57 | 8 | A.    Firearm, the rounds that you -- like, rounds, |
| 03:42:10 | 9 | bullets, the actual issue numbers, Taser and equipments |
| 03:42:14 | 10 | they -- whatever equipments they issued to me.  Main |
| 03:42:18 | 11 | equipments they wanted back from me was the firearm and |
| 03:42:27 | 12 | the Taser. |
| 03:42:43 | 13 | (Exhibit No. 23 marked.) |
| 03:42:43 | 14 | Q.    (By Mr. Shine)  Twana, you're being handed a |
| 03:42:45 | 15 | document that's your weapon return for what appears to |
| 03:42:48 | 16 | be your firearm, which is dated -- I'm sorry -- labeled |
| 03:42:52 | 17 | AhmedAllied 449. |
| 03:42:54 | 18 | Have you seen this document before? |
| 03:42:55 | 19 | A.    Yes, I have. |
| 03:42:56 | 20 | MS. HERNANDEZ:  Objection; misstates the |
| 03:42:58 | 21 | Bates number. |
| 03:42:59 | 22 | MR. SHINE:  449? |
| 03:43:00 | 23 | MS. HERNANDEZ:  The one you handed me is |
| 03:43:01 | 24 | 448. |
| 03:43:08 | 25 | MR. SHINE:  I apologize. |

03:43:08  1                    THE WITNESS:  This one is 448 too.

03:43:08  2                    MR. SHINE:  I apologize.  That's my

03:43:08  3   mess-up.

03:43:08  4                    MS. HERNANDEZ:  That's okay.

03:43:15  5        Q.   (By Mr. Shine)  Can I clarify what's been

03:43:16  6   marked 448?

03:43:16  7        A.   That's 23.

03:43:25  8        Q.   I apologize.  So what has been marked as 23 is

03:43:29  9   AhmedAllied 448.

03:43:34 10        A.   I believe this is for the Taser.

03:43:35 11        Q.   Correct.  So this is for your Taser, right?

03:43:37 12        A.   Correct, yeah.

03:43:37 13        Q.   And is --

03:43:38 14        A.   Because it has X3 on it.  That's a Taser.

03:43:42 15        Q.   And is that your signature at the bottom?

03:43:44 16        A.   Yeah, I'm aware of this document, yeah.  I

03:43:49 17   signed this document for returning my documents --

03:43:51 18   sorry -- returning my equipments.

03:43:54 19        Q.   Okay.

03:44:08 20                    (Exhibit No. 24 marked.)

03:44:08 21        Q.   (By Mr. Shine)  Twana, you're being handed a

03:44:11 22   second document, which is a weapon return for --

03:44:14 23   properly -- for your firearm, which is labeled

03:44:19 24   AhmedAllied 449.

03:44:21 25                    Again, is this your signature on this

03:44:22  1  form?

03:44:22  2       A.   Yeah.  I'm aware of this document.  I've seen

03:44:24  3  it before.

03:44:25  4       Q.   Okay.  Who did you turn your weapons in to?

03:44:26  5       A.   Patrick.

03:44:27  6       Q.   And where was Patrick at the time you turned

03:44:31  7  your weapons in?

03:44:32  8       A.   He was in the office.

03:44:33  9       Q.   And what time did you get to the branch

03:44:35 10  office?

03:44:35 11       A.   12:00, 1:00.

03:44:39 12       Q.   And where in the office was Patrick at that

03:44:45 13  time?

03:44:45 14       A.   In his room, in his office.

03:44:47 15       Q.   Okay.  Was anyone else present --

03:44:47 16       A.   No.

03:44:49 17       Q.   -- at the time?

03:44:49 18       A.   No.

03:44:50 19       Q.   When you first got to the office, who did you

03:44:54 20  talk to first?

03:44:54 21       A.   Do you mean the main office or his office?

03:44:59 22       Q.   The main office, when you first arrived at

03:45:02 23  Allied.

03:45:03 24       A.   The clerk or registrar, the receptionist.

03:45:13 25       Q.   Did Patrick come and get you again?

03:45:15  1        A.    Yes.

03:45:16  2        Q.    He did?

03:45:17  3        A.    Yes.

03:45:17  4        Q.    So he came -- were you sitting in like a

03:45:21  5    reception?

03:45:21  6        A.    Yes.

03:45:22  7        Q.    Again, I haven't been to the office.

03:45:24  8        A.    Yes.  So when you're going in, there's a glass

03:45:26  9    door.  You walk in.  The receptionist is to the left --

03:45:29 10    to the right.  In front of you, you have a door.  A

03:45:32 11    couple of chairs, you sit down.  I was sitting down.  I

03:45:37 12    went in:  Hey.  Hi.  I'm here to see Patrick.

03:45:39 13              She goes, like, I'll notify him to come

03:45:41 14    grab you.  And then...

03:45:42 15        Q.    And then Patrick came to get you?

03:45:45 16        A.    Patrick came.

03:45:47 17        Q.    And again, I know you used the word grabbed.

03:45:50 18    I just want to clarify:  He never touched you, right?

03:45:52 19        A.    No, no.  Just, I mean, like grabbed, like,

03:45:54 20    let's go, come on.  Like, get me.  Something like that.

03:45:56 21        Q.    Okay.  So you followed Patrick back to his

03:45:58 22    office?

03:45:58 23        A.    Yes.

03:45:59 24        Q.    And when you get to his office, what happens?

03:46:00 25    Like, where does he go?

03:46:01  1      A.   Sit behind his chair.

03:46:03  2      Q.   And where do you go?

03:46:04  3      A.   Sit on the chair.

03:46:06  4      Q.   Again, as you've testified earlier, sort of

03:46:08  5  across from each other, right?

03:46:13  6      A.   Correct.

03:46:13  7      Q.   What happens at that point?

03:46:16  8      A.   I had a -- it's not a suitcase.  It's a small

03:46:19  9  shoulder bag that I placed the equipments inside for a

03:46:24 10  secured reason.  Because it's a firearm and all that

03:46:27 11  stuff, they don't want to, like, have it in a case.

03:46:30 12  And for just safety reason, I had them secured.

03:46:33 13           So I went in there.  I opened it.  I told

03:46:38 14  him, This is the gun in the case.  These are two

03:46:42 15  magazines.  These are bullets.  These are the Taser.

03:46:47 16  He looked at the Taser.  Looked at the bottom of it.

03:46:51 17  Matched the serial number of the one that got issued to

03:46:54 18  me.  Gave it to me -- sorry, not gave it -- gave it to

03:47:00 19  me like before by Allied.  He looked at it.  He put it

03:47:05 20  back in the holster, put it inside.

03:47:08 21           He grabbed the gun.  I was sitting in

03:47:10 22  front of him.  He didn't attempt to clear the gun or

03:47:13 23  anything like that for safety reason.  Which the gun

03:47:15 24  was empty; it was not loaded or anything like that.

03:47:22 25           I'm sitting in front of him.  He points

Twana Ahmed - September 19, 2024                216

03:47:23  1    the barrel towards me like this.  I'm sitting like

03:47:25  2    this.  He turned the barrel towards me.  When he turned

03:47:26  3    the barrel towards me, I moved the chair this way.  I

03:47:28  4    moved it back.  I didn't -- I know the gun was clear;

03:47:31  5    there was nothing inside.  But when he pointed it

03:47:36  6    towards me, he flipped the other side, finger really

03:47:40  7    close to the trigger.  He looked at the serial number,

03:47:42  8    wrote the serial number, just throw it back on the

03:47:46  9    desk.  And I was shocked when he did that.

03:47:53 10             And he looked at -- grabbed the

03:47:55 11    magazines, looked at how many rounds.  I believe 17

03:47:58 12    rounds or 15 rounds, whatever that number was, was

03:48:04 13    issued, because there was no bullets -- missing

03:48:09 14    bullets.

03:48:09 15             He got up before filling these up hundred

03:48:13 16    percent or signing -- or I signed.  He got up, went

03:48:17 17    somewhere.  He came back after five, ten minutes later.

03:48:21 18    I was sitting in the office.  He stopped talking.  And

03:48:25 19    then I told him, Can I use the restroom?  He said, Yes.

03:48:30 20    So I went to use the restroom.  Took like five minutes.

03:48:34 21    I came back and left the door open, didn't close the

03:48:37 22    door.

03:48:37 23        Q.    Okay.  I'm going to stop you for a minute.

03:48:40 24        A.    Yes.

03:48:41 25        Q.    You said that he pointed the barrel of a gun

03:48:46  1    at you?

03:48:46  2         A.    Yes, he did.

03:48:47  3         Q.    And that it was --

03:48:48  4         A.    Not loaded.

03:48:49  5         Q.    Correct, unloaded.  But -- and what did you

03:48:55  6    say that made you feel?

03:48:57  7         A.    Very uncomfortable and freaked me out.

03:49:02  8         Q.    So why didn't you include that fact in your

03:49:07  9    complaint?

03:49:07 10         A.    I didn't include it in the complaint.

03:49:10 11         Q.    But that's a pretty important fact that you

03:49:13 12    would have included, right, if it actually happened?

03:49:16 13         A.    It did happen.

03:49:18 14         Q.    Okay.  So you come back from the bathroom and

03:49:20 15    you leave the door open?

03:49:21 16         A.    Yes, I did.

03:49:22 17         Q.    And is Patrick still in his office at that

03:49:24 18    point?

03:49:24 19         A.    He -- he came back, and then I told him,

03:49:28 20    Excuse me; I need to use the restroom.

03:49:28 21         Q.    Okay.

03:49:29 22         A.    He goes, like, help yourself up.

03:49:32 23               And I went to the restroom a few minutes.

03:49:36 24    Came back.  He was in the chair.  I left the door open

03:49:43 25    about this much, approximately.

03:49:44  1    Q.    When you say "this much," was that 2, 3 feet?

03:49:47  2    A.    Approximately 3 feet, yeah.

03:49:49  3    Q.    Okay.  Why did you leave the door open?

03:49:51  4    A.    I left it open because I want to talk to him.

03:50:01  5  And if he's gonna be aggressive with me or anything

03:50:12  6  like that, hopefully somebody can hear something

03:50:15  7  because he has done it before.

03:50:17  8    Q.    Okay.  Why did you want to talk to him?

03:50:18  9    A.    I wanted to talk to him about why this was

03:50:22 10  happening to me.  And I follow every guideline of

03:50:28 11  the -- guideline of the company.  I did what I was

03:50:30 12  supposed to do.  And I -- I did what I was supposed to

03:50:34 13  do and whatever they told me to do.

03:50:36 14    Q.    And did he talk to you?

03:50:37 15    A.    Yes, he did.

03:50:38 16    Q.    How long did you talk?

03:50:39 17    A.    Don't remember the exact time, how long.

03:50:43 18  20 minutes, 30 minutes.  Don't remember.  But we talked

03:50:46 19  about it.

03:50:46 20    Q.    Okay.

03:50:47 21    A.    He -- he didn't want to listen to me.  And

03:50:51 22  that's when he -- he repeated same -- multiple same

03:50:55 23  words that he repeated before in the past that he ever

03:50:58 24  told -- that he told me before:  This is not what you

03:51:01 25  come from -- sorry.  When I -- let me go back.

Twana Ahmed - September 19, 2024                    219

03:51:08  1              When he grabbed me and went to the

03:51:12  2     office, he was on the phone; he had headphones on.  Who

03:51:16  3     exactly he was speaking to, I was not -- I don't know

03:51:20  4     who he was speaking to.  But as soon as I sit down, he

03:51:24  5     told the person on the phone, I'm dealing with a sand

03:51:27  6     nigger.  I've got to call you back.

03:51:30  7              I didn't know what "sand nigger" mean.  I

03:51:33  8     didn't know what it come from.  I didn't know what he

03:51:37  9     translated it to.  But I found out later on what it

03:51:40 10     means.  He meant me, since I'm from Middle East and we

03:51:43 11     have a lot of deserts, we worship deserts.  That's what

03:51:48 12     he meant.

03:51:48 13          Q.   Do you know what he meant?

03:51:50 14          A.   Exactly.  Sand nigger.

03:51:52 15          Q.   Do you -- are you Patrick Freeney?

03:51:54 16          A.   What?

03:51:55 17          Q.   Are you Patrick Freeney?

03:51:56 18          A.   There is no way to translate that phrase in a

03:52:00 19     different language.

03:52:01 20          Q.   I'm simply asking:  Are you Patrick Freeney?

03:52:03 21          A.   Absolutely not.

03:52:04 22          Q.   So do you actually know what he meant?

03:52:06 23          A.   Of course.

03:52:06 24          Q.   Because you can read his mind, right?

03:52:10 25          A.   No.  I'm not a psychiatrist, but you can

03:52:14  1    understand those words when it comes out of somebody's

03:52:18  2    mouth, trust me.  When you call somebody "sand nigger"

03:52:21  3    and especially he's a Muslim and he's an immigrant from

03:52:24  4    Middle East.

03:52:25  5        Q.    Right.  So the first time you went through

03:52:27  6    this story, Twana, you said that he came out and got

03:52:30  7    you.  He sat behind the desk.  You had a conversation.

03:52:30  8        A.    Right.

03:52:33  9        Q.    Now you're going back and saying --

03:52:34 10        A.    No, no, no.  You --

03:52:34 11        Q.    Please don't interrupt me.

03:52:35 12        A.    Correct.

03:52:35 13        Q.    Now you're going back and saying he was

03:52:37 14    actually on the phone.  So which one is it?

03:52:39 15        A.    He was on the phone.  I forgot about that

03:52:42 16    phrase right there.  The phone.  I remember when I came

03:52:45 17    back from the restroom, I was like, Oh, yeah, he was on

03:52:48 18    the phone the first time.  He was on the phone.  He

03:52:50 19    hang up the phone, and that's when -- before he hang up

03:52:53 20    the phone, he says, I've got to call you back, I'm

03:52:55 21    dealing with this.

03:52:56 22              There was nobody else to deal with except

03:52:58 23    me.  I was the only one in his office.  I was the only

03:53:01 24    one there for a reason.  And that's what he meant.  Me.

03:53:04 25    He didn't mean somebody else.  He didn't mean the

03:53:06  1    person on the phone.  He meant me.

03:53:08  2        Q.   Sure.  So who was he talking to?

03:53:10  3        A.   I don't know.

03:53:10  4        Q.   And you say he was on --

03:53:13  5        A.   On his phone.

03:53:14  6        Q.   -- headphones?

03:53:16  7        A.   He was on the phone, and he had a small black

03:53:19  8    device in his ears.

03:53:20  9        Q.   When you say "small black device," what do you

03:53:24  10   mean?

03:53:24  11       A.   Headphones.  Small headphones in his ears.  He

03:53:27  12   was talking.  And then he grabbed the phone.  I

03:53:30  13   remember the phone was a black phone.  I believe it was

03:53:35  14   android or something like that.  He hang up the phone

03:53:39  15   and put the phone down.

03:53:40  16       Q.   Okay.  So again, after you talked to him for,

03:53:51  17   again, 20 to 30 minutes --

03:53:53  18       A.   Yes.

03:53:53  19       Q.   -- after you used the bathroom --

03:53:55  20       A.   Yes.

03:53:55  21       Q.   -- what did you do at that point?

03:53:57  22       A.   I was talking to him while I -- I told him I

03:54:00  23   need to be given the opportunity to explain my

03:54:02  24   situation.  I need an opportunity to do the reports and

03:54:08  25   do what I'm supposed to do.

APPENDIX 000452

| | | |
|---|---|---|
| 03:54:10 | 1 | He said to me:  You are suspended until |
| 03:54:17 | 2 | outcome of the investigation.  You are a loose fucking |
| 03:54:22 | 3 | cannon in this company.  Even if you are not -- even if |
| 03:54:27 | 4 | you are not fired in the outcome of the investigation, |
| 03:54:30 | 5 | I'm gonna make sure you are fired and you are -- and |
| 03:54:34 | 6 | hire -- and unhirable.  I don't know why a dumb ass |
| 03:54:41 | 7 | person like -- I don't know how a dumb ass person like |
| 03:54:46 | 8 | you served with the military and worked with the |
| 03:54:50 | 9 | military.  That's what he said. |
| 03:54:54 | 10 | And I was -- he goes, like, clearly you |
| 03:54:57 | 11 | don't understand how things run this -- in this |
| 03:55:00 | 12 | country.  You think it's like where you come from.  If |
| 03:55:03 | 13 | you don't know how to -- if you -- if you don't know |
| 03:55:08 | 14 | how to, like -- if you don't know how to work over here |
| 03:55:16 | 15 | or survive over here -- something like that -- you need |
| 03:55:19 | 16 | to go back to wherever you came from.  Absolutely you |
| 03:55:23 | 17 | do not belong in here. |
| 03:55:25 | 18 | Q.   And you know that verbatim? |
| 03:55:27 | 19 | A.   What do you mean "batim"? |
| 03:55:29 | 20 | Q.   Verbatim.  You repeated to us just now exactly |
| 03:55:32 | 21 | what Patrick said to you that day? |
| 03:55:34 | 22 | A.   That's what happened.  That's what he said to |
| 03:55:36 | 23 | me, yes. |
| 03:55:36 | 24 | Q.   Are those his exact words? |
| 03:55:38 | 25 | A.   That's exact his words, yes. |

03:55:39  1      Q.    So you remember his exact words --

03:55:47  2      A.    I remember what he -- because --

03:55:48  3      Q.    -- from --

03:55:48  4      A.    Because --

03:55:49  5      Q.    -- two years ago?

03:55:50  6      A.    Because when somebody is racist against your

03:55:53  7  belief, against where you come from, against your

03:55:56  8  origins, you never forget that.  That will be scars in

03:55:59  9  me.

03:56:00 10      Q.    So why wasn't all of that included in your

03:56:03 11  complaint?

03:56:03 12      A.    I left it open for the complaint.  I talked to

03:56:10 13  HR about it.  I brought it up to HR about it.  Some of

03:56:16 14  it --

03:56:16 15      Q.    So again, why -- why did you use the restroom

03:56:18 16  and go back to talk to him?  Because you wanted to --

03:56:18 17      A.    Because --

03:56:20 18      Q.    -- have a conversation about the incident,

03:56:22 19  right?

03:56:22 20      A.    No.  Because he was not finished hundred

03:56:24 21  percent.  Because I told you when I gave him the gun

03:56:28 22  and everything, he filled it up but I didn't get a copy

03:56:35 23  for my records.  And I didn't sign it.  How am I know

03:56:39 24  I'm gonna turn in the equipments and they gonna say,

03:56:44 25  without my records or my copy, and they gonna say, Oh,

Twana Ahmed - September 19, 2024                        224

03:56:47  1    he never got any copy -- he never turned in the

03:56:49  2    equipments, and I can get blamed for those items.  So I

03:56:53  3    need a copy for my records.

03:56:55  4                    So when he came back, I went back and

03:56:58  5    asked -- excused to go to restroom.  And I did my thing

03:57:01  6    in the restroom, and then came whack in the office.

03:57:08  7        Q.    To sign the documents?

03:57:09  8        A.    Sign the documents and try to explain my

03:57:12  9    situation.

03:57:12 10        Q.    But you testified previously that you signed

03:57:15 11    the documents when you turned the equipment in before

03:57:17 12    you went to the bathroom.  So which one is it, Twana?

03:57:21 13                    MS. HERNANDEZ:  Objection; misstates

03:57:23 14    testimony.

03:57:24 15        A.    Signed the documents and get copies from them.

03:57:27 16    Because I would not leave without a copy.  I would have

03:57:30 17    took the stuff with me.  Because he already threatened

03:57:35 18    me to press charges on me.  He's already threatening me

03:57:40 19    to jail me.  He's already threatening me to suspend my

03:57:44 20    license.

03:57:44 21        Q.    (By Mr. Shine)  Twana, the question was:  Did

03:57:47 22    you sign the documents before or after you went to the

03:57:49 23    bathroom?

03:57:50 24                    MS. HERNANDEZ:  Objection; vague.

03:57:51 25        A.    Would you mind letting me finish completely,

APPENDIX 000455

03:57:54  1    please?  Please, I have to finish everything.

03:57:56  2         Q.   (By Mr. Shine) Twana --

03:57:57  3         A.   I understand your question.

03:57:58  4         Q.   Then answer the question.

03:57:59  5         A.   Let me finish my -- what I was trying to say.

03:58:02  6              MS. HERNANDEZ:  Twana, just let him --

03:58:04  7              MR. SHINE:  Can we go off the record?

03:58:07  8              Off the record.

03:58:08  9              THE VIDEOGRAPHER:  Off the record at

03:58:10 10    3:57.

03:59:11 11              (Off the record 3:58 p.m. to 4:07 p.m.)

04:07:59 12              THE VIDEOGRAPHER:  Back on the record at

04:08:03 13    4:07.

04:08:05 14         Q.   (By Mr. Shine) Twana, the question that was

04:08:07 15    asked before the break was:  The two weapon return

04:08:12 16    documents that you signed, did you sign those before or

04:08:16 17    after --

04:08:19 18         A.   It was not --

04:08:20 19         Q.   -- going to the bathroom?

04:08:22 20         A.   It was not complete, both of them.  It was

04:08:24 21    filled up.

04:08:25 22         Q.   When you say it was not complete, please help

04:08:29 23    me understand what you mean by that.

04:08:30 24         A.   Not complete.  Basically finish the first one,

04:08:33 25    the second one, and -- sign the first one, but the

04:08:39  1   second one I believe was not signed.  That's what I

04:08:42  2   mean by "complete" and ask for copies.

04:08:46  3        Q.   And again, on both documents labeled

04:08:52  4   AhmedAllied 448 and AhmedAllied 449, that is your

04:08:56  5   signature -- excuse me -- at the bottom of the form,

04:08:59  6   correct?

04:08:59  7        A.   Referring to this?

04:09:01  8        Q.   Yes.

04:09:01  9        A.   Yes, that is.

04:09:02 10        Q.   And on the other document, that is your

04:09:05 11   signature as well, correct?

04:09:05 12        A.   Yes, it is.

04:09:10 13        Q.   Okay.  You testified that you talked to

04:09:14 14   Patrick Freeney for an additional 20 to 30 minutes,

04:09:16 15   right?

04:09:16 16        A.   Maybe more.

04:09:16 17        Q.   Okay.  After that 20 to 30 minutes, what did

04:09:22 18   you do next?

04:09:23 19        A.   After the initial conversation and everything,

04:09:29 20   I asked to see his boss.

04:09:31 21        Q.   Who did you understand his boss to be?

04:09:34 22        A.   Whatever was above him.

04:09:36 23        Q.   I'm asking you:  Who do you understand his

04:09:39 24   boss to be?

04:09:40 25        A.   It was a couple of offices down.  Two offices

Twana Ahmed - September 19, 2024                    227

| | |
|---|---|
| 04:09:43 1 | down.  I knew he was a higher-up in the company. |
| 04:09:46 2 | Q.   When you say "higher-up," what was that |
| 04:09:49 3 | person's title? |
| 04:09:50 4 | A.   Not too sure but he was higher up in the |
| 04:09:56 5 | company. |
| 04:09:57 6 | Q.   Okay.  And it was a guy? |
| 04:09:58 7 | A.   It was a gentleman, yes. |
| 04:10:00 8 | Q.   What did he look like? |
| 04:10:02 9 | A.   I can't remember exactly what he looked like. |
| 04:10:08 10 | I -- all I know is he had dark hair.  Maybe Hispanic or |
| 04:10:12 11 | maybe white. |
| 04:10:14 12 | Q.   Was he at the office that day? |
| 04:10:17 13 | A.   I can't remember exactly if he was in the |
| 04:10:22 14 | office or not.  But I -- I asked to see him.  He said |
| 04:10:28 15 | to me -- |
| 04:10:29 16 | Q.   Who is the "he" you're talking about? |
| 04:10:31 17 | A.   Patrick. |
| 04:10:33 18 | Q.   Okay. |
| 04:10:33 19 | A.   He said nobody wants to see -- nobody wants to |
| 04:10:37 20 | see your dumb ass. |
| 04:10:40 21 | Q.   Okay.  After he said that, then what happened? |
| 04:10:44 22 | A.   And I was just trying to explain to him what's |
| 04:10:56 23 | going on.  He didn't want to listen to me whatsoever. |
| 04:10:59 24 | Q.   At some point did that conversation end? |
| 04:11:01 25 | A.   At some point, yes, of course. |

Twana Ahmed - September 19, 2024                    228

04:11:09  1        Q.   And when that conversation ended, where did

04:11:14  2   you go or what did you do?

04:11:17  3        A.   I can't recall at this time exactly what I

04:11:23  4   did.

04:11:23  5        Q.   Did you leave the branch office?

04:11:24  6        A.   I can't recall that.  Did I left the branch

04:11:29  7   office or went somewhere else, I don't know.  I think I

04:11:31  8   went somewhere else.  I'm not too sure.  Like, I cannot

04:11:35  9   remember at this time, right now, at this moment.

04:11:37 10        Q.   But at some point you left the branch office,

04:11:42 11   right?

04:11:42 12        A.   Of course.  Of course, at some point I left

04:11:45 13   the branch office.  I'm not gonna --

04:11:45 14        Q.   So after your conversation with Patrick ended,

04:11:49 15   about how long after that conversation did you leave

04:11:52 16   the branch office?

04:11:53 17        A.   I don't remember.

04:11:53 18        Q.   Was it five minutes?

04:11:55 19        A.   I don't remember.  20, 30.  I have no idea.  I

04:12:00 20   just don't remember when exactly I left the office.

04:12:03 21        Q.   And after you left Patrick's office, what did

04:12:08 22   you do?

04:12:08 23        A.   Not too sure what I did because I was shocked

04:12:30 24   at what happened.

04:12:34 25        Q.   But you left the branch office at some point,

04:12:42  1    right?

04:12:42  2        A.    Sometime, of course.

04:12:43  3        Q.    Did you talk to anyone else that day?

04:12:43  4        A.    (No response).

04:12:55  5        Q.    I guess I should rephrase.  Did you talk to

04:12:57  6    anyone else from Allied that day?

04:13:05  7        A.    Can't remember at this time exactly.  I think

04:13:17  8    so.  I don't know.  But I don't think for sure I left

04:13:25  9    the office immediately.  I don't know if I spoke to

04:13:28 10    somebody or not.

04:13:29 11        Q.    In your complaint you also identify that you

04:13:41 12    wrote a written report to Allied Universal, right?

04:13:48 13        A.    The one you showed me?

04:13:52 14        Q.    No.  About the interaction with Patrick.

04:14:02 15        A.    What do you mean by "report"?  Like exact

04:14:05 16    report, what do you mean?  Can you be more specific,

04:14:06 17    please?  Like, report like a hand paper?  Like an

04:14:09 18    email?  A text message?

04:14:11 19        Q.    Sure.  In your complaint it says that you made

04:14:14 20    a report to Allied Universal's HR in writing.  So my

04:14:20 21    question was:  At some point you made a -- some kind of

04:14:23 22    written document or something that you gave to HR in

04:14:26 23    writing, right?

04:14:27 24        A.    I believe so, but I don't remember when or

04:14:29 25    where or when.  I did talk to HR.  HR emailed me and --

APPENDIX 000460

04:14:37   1   because after when I was suspended or fired, whatever

04:14:41   2   they said, HR was not aware of anything.  They send me

04:14:45   3   an email.  They said you have missing documents; you

04:14:48   4   need to come to the office and fill them up or do them.

04:14:51   5        Q.   Uh-huh.

04:14:51   6        A.   And I --

04:14:52   7        Q.   And that's -- we talked about that earlier,

04:14:54   8   right?

04:14:54   9        A.   No.  That's a completely different one.

04:14:57  10        Q.   I guess I'm confused because you said the

04:15:02  11   day -- you testified earlier --

04:15:02  12        A.   Uh-huh.

04:15:04  13        Q.   -- that after talking to Patrick --

04:15:12  14        A.   Yes.

04:15:13  15        Q.   -- you went and talked to HR about a form that

04:15:18  16   you were asked to complete two to three times.

04:15:19  17        A.   That was the first time.  And then the

04:15:21  18   second -- and then HR contacted me again about the same

04:15:24  19   form they want me to fill up because they lost the

04:15:26  20   other one.  It's the same form that I filled up at the

04:15:31  21   office.  It's the same form that I filled up in the

04:15:35  22   event, and it's the same form they want me to fill up

04:15:39  23   again.  And I was kind of lost.  Why you keep wanting

04:15:42  24   me to fill the same form up?  It makes no sense, you

04:15:46  25   know.  And I told HR, Are you aware of what's going on?

04:15:50  1      Q.    When did you talk to HR?

04:15:52  2      A.    When -- when I was suspended.

04:15:58  3      Q.    Okay.  So when did you first talk to HR after

04:16:03  4  you were suspended?

04:16:05  5      A.    Don't remember exact when.  But I talked to

04:16:08  6  her after my suspension because I was not fired, I was

04:16:12  7  suspended.  According to what I was told by Patrick, I

04:16:15  8  was never fired, I was suspended until the outcome of

04:16:18  9  the investigation.

04:16:18 10      Q.    And who in HR did you talk with -- talk to?

04:16:22 11      A.    The tall black lady.

04:16:25 12      Q.    And you don't know when you talked to her?

04:16:33 13      A.    Don't -- don't remember a specific date or a

04:16:38 14  month or anything like that.

04:16:40 15      Q.    But you said it was after you were suspended?

04:16:43 16      A.    After when I was suspended, correct.

04:16:46 17      Q.    Do you think it was like the next day?

04:16:48 18      A.    No.  But close.  Like -- I don't mean like the

04:16:54 19  same day close but, like, not too -- not too far, not

04:16:58 20  too short.  Like, not -- like, what I mean, not long

04:17:02 21  time after, no.

04:17:04 22      Q.    Okay.  And what did you tell her?

04:17:10 23      A.    I told her I'm suspended.  And she said you

04:17:18 24  need to fill this paper out.  It's a registration

04:17:23 25  document.  And I told her I -- I believe I told her --

04:17:29  1    I can't recall a hundred percent what I said to her.

04:17:32  2    What -- I told her I filled it up multiple times.  This

04:17:35  3    is my third time or fourth time filling up this

04:17:38  4    document.  And I explained to her what's going on and

04:17:41  5    what happened to me and my situation.  And her response

04:17:47  6    was you need to contact the hotline.  Something like

04:17:58  7    that.

04:17:58  8         Q.   Okay.  So she asked you to call the, like,

04:18:01  9    Allied Universal hotline?

04:18:03 10         A.   I believe so.  Whatever number she -- whatever

04:18:06 11    hotline she was talking about.

04:18:07 12         Q.   Okay.  And from your understanding, what is

04:18:12 13    the hotline?

04:18:12 14         A.   I don't know what's the hotline.  I didn't --

04:18:16 15    I never heard about anything hotline or something.

04:18:18 16    Hotline means emergency line, to me, I phrase it,

04:18:23 17    that's how.  But I didn't know what's the hotline and

04:18:24 18    what is it for, what does it do.  But she kind of,

04:18:28 19    like, told me what's the hotline for, I believe.

04:18:30 20         Q.   And so did she give you a phone number?

04:18:35 21         A.   Not too sure.  Can't remember.  I think so.  I

04:18:41 22    don't know, like, specifically.  I think she did.  I

04:18:43 23    think so.

04:18:43 24         Q.   And at some point did you -- did you call the

04:18:49 25    hotline?

Twana Ahmed - September 19, 2024                    233

04:18:49  1        A.    Yes, I did.

04:18:50  2        Q.    So you were given a phone number to the

04:18:52  3   hotline, right?

04:18:53  4        A.    Yes.

04:18:53  5        Q.    When did you call the hotline?

04:19:02  6        A.    Don't remember exact month or date, but I did

04:19:08  7   call the hotline.

04:19:10  8        Q.    Okay.

04:19:14  9        A.    Called them multiple times.  More than once.

04:19:17 10        Q.    And...

04:19:33 11              (Exhibit No. 25 marked.)

04:19:33 12        Q.    (By Mr. Shine)  Twana, I'm handing you a copy

04:19:35 13   of the hotline complaint that you filed which is

04:19:37 14   labeled AUS 1257 to 1259.  Is this a fair and accurate

04:19:45 15   copy of the hotline complaint that you made?

04:19:49 16        A.    I made it over the phone, not paper.

04:19:51 17        Q.    Okay.  So if you're looking at page -- the

04:19:55 18   first page which is AUS 1257 or 1,257 --

04:20:00 19        A.    I see that number, correct.

04:20:02 20        Q.    Right under the heading that says "Case

04:20:06 21   Snapshot," it's the first text that appears in orange.

04:20:09 22   Do you see what I'm referring to?

04:20:11 23        A.    This one?  The first one?

04:20:13 24        Q.    Correct.

04:20:14 25        A.    Yes, I see that.

04:20:15  1       Q.   There's an open date.  What date is listed

04:20:18  2   there?

04:20:18  3       A.   5/25/2022 at 10:05.  Is that what you're

04:20:25  4   talking about.

04:20:26  5       Q.   Yes.  It's 5/25/2022, correct?

04:20:29  6       A.   Yes.

04:20:29  7       Q.   Is there a time stamp?

04:20:32  8       A.   What do you mean "time stamp"?

04:20:33  9       Q.   Is there a time listed after the date?

04:20:38 10       A.   5/26/2022, 8:01 a.m.

04:20:43 11       Q.   Let me back you up just slightly.

04:20:50 12       A.   Okay.

04:20:50 13       Q.   Do you see where it says "Opened 5/25/2022"?

04:20:57 14       A.   5/25/2022, opened, yeah, I see that.

04:21:01 15       Q.   And there is a time stamp of 5:18 p.m.  Did I

04:21:04 16   read that accurately?

04:21:06 17       A.   5/26/22, 8:01 a.m.  Is that what you mean?

04:21:12 18   Yes.

04:21:12 19       Q.   Twana, a little further down in the orange

04:21:31 20   print, it says "case details."  Do you see where I'm

04:21:35 21   referring to?

04:21:35 22       A.   Yeah, I see that.

04:21:36 23       Q.   And then it says "Intake method:  Hotline

04:21:41 24   phone."  Do you see where I'm referring to there?

04:21:43 25       A.   Yeah.

04:21:43  1      Q.   You testified earlier that you called in

04:21:46  2   through the hotline, right?

04:21:47  3      A.   Yeah, I did.

04:21:48  4      Q.   If you go a little further down, it says

04:21:52  5   "reporter contact information" and it lists a first and

04:21:55  6   last name with a phone number and email address.  I

04:21:59  7   recognize that it's typed C-W-A-N-A for the first name,

04:22:05  8   but is that your phone number?

04:22:08  9      A.   C-W -- are you saying...  There is no phone

04:22:25 10   number here.

04:22:28 11      Q.   Do you see where your last name is listed?

04:22:30 12      A.   Oh.  You're talking about right here.  That is

04:22:32 13   my phone number.

04:22:33 14      Q.   Okay.  Is it fair to say, Twana, that you

04:22:36 15   didn't type up this document, right?

04:22:38 16      A.   Oh, no, I did not.

04:22:40 17      Q.   So if someone got the spelling of your first

04:22:43 18   name wrong, that could just be an error?

04:22:47 19      A.   Yeah.  Now I know what you mean.  I see the

04:22:52 20   C-W-T -- C-W-A-N-A.  I know what you're talking about.

04:23:01 21   I didn't even know that's my name.  Yeah, that's wrong

04:23:04 22   and the last name is wrong too.

04:23:06 23      Q.   Correct.  But that is your phone number, the

04:23:10 24   832 number?

04:23:10 25      A.   Yeah, that is my number, yeah.

04:23:13  1        Q.   And again, is it fair to say that you didn't

04:23:15  2   type this.  You were talking to someone on the other

04:23:18  3   line of a phone, right?

04:23:19  4        A.   Yeah, I did not write anything.

04:23:20  5        Q.   Okay.

04:23:22  6        A.   Even my email is wrong, I think.

04:23:26  7        Q.   On the next page, on AUS 1258, do you see

04:23:42  8   where there is some -- some text, like a narrative

04:23:45  9   that's written out under the heading "Details"?

04:23:53 10        A.   I see it, yeah.  I see that.

04:23:55 11        Q.   Okay.  In the second paragraph under "Details"

04:24:01 12   where it starts, "There had been an incident recently

04:24:05 13   regarding" -- what should be Twana -- "being addressed

04:24:08 14   by the general supervisor."

04:24:11 15             Do you see what I'm talking about?

04:24:12 16        A.   Yeah.

04:24:13 17        Q.   Who were you referring to as the general

04:24:15 18   supervisor?

04:24:15 19        A.   General -- general supervisor?  I did not say

04:24:27 20   that word.  Never mentioned general supervisor.  They

04:24:35 21   might understand it wrong.

04:24:37 22        Q.   Okay.  The sentence continues:  "Being

04:24:47 23   addressed by the general supervisor that he would need

04:24:49 24   to cut his beard even though it had been between the

04:24:53 25   period of Ramadan, which is a very significant and

04:24:57  1  spiritual period for Muslims to keep their culture and

04:25:01  2  heritage strong."

04:25:02  3            Did I read that right?

04:25:03  4      A.    Yes.

04:25:03  5      Q.    What do you mean by "had been between the

04:25:06  6  period of Ramadan"?

04:25:08  7      A.    It means close to Ramadan or the end of

04:25:21  8  Ramadan.

04:25:21  9      Q.    Okay.  And I know I asked you previously but

04:25:25 10  do you recall when Ramadan was in 2021?

04:25:27 11      A.    I don't remember.

04:25:28 12      Q.    And what about in 2022?

04:25:32 13      A.    I can't recall the month exactly.

04:25:43 14      Q.    The next sentence continues with:  "The

04:25:46 15  general supervisor and Patrick had enforced the rule on

04:25:50 16  Twana to shave his beard."

04:25:54 17            Did I read that correctly?

04:25:55 18      A.    Yes.  But the phrase of -- you read it

04:25:57 19  correctly, yes.  But the general supervisor, I don't

04:26:00 20  know where that came from.

04:26:01 21      Q.    Okay.  So if it's talking about the general

04:26:04 22  supervisor and Patrick, would you have identified

04:26:08 23  someone else?

04:26:09 24      A.    Supervisor but not the word of general.

04:26:16 25      Q.    Okay.  This paragraph continues:  "To Twana's

04:26:31  1    surprise, he had noticed that there had been

04:26:36  2    employees (names and job titles withheld) that had

04:26:39  3    longer beards than him at the facility."

04:26:42  4             Did I read that correctly?

04:26:43  5        A.   Yes, you did.

04:26:44  6        Q.   Why didn't you give names and job titles at

04:26:49  7    that time?

04:26:49  8        A.   Because I did not know their names

04:26:52  9    specifically.  Their -- the gentleman's name, the

04:26:56 10    Hispanic gentleman, the one with the tattoo.  And it

04:26:59 11    was very hard for me to say some names because of the

04:27:02 12    accent and things like that.  I don't -- I don't

04:27:07 13    remanize names, like remanize the -- memorize name.

04:27:12 14    I'm very bad at that.  Kind of like it's hard to say

04:27:19 15    sometimes.

04:27:20 16        Q.   In your review of this document, is this the

04:27:32 17    full complaint that you made on the phone that day?

04:27:34 18        A.   Yes.  But the person that I talked to over the

04:27:37 19    phone, they said to me -- excuse me -- we're gonna take

04:27:45 20    down but we have to breakdown the most important stuff.

04:27:49 21    You can tell me what's going on, what happened, but I

04:27:54 22    have to break it down.  By breaking down, basically

04:27:56 23    whatever you're saying, we're gonna written down the

04:27:59 24    most important parts, not the whole complete story of

04:28:01 25    what's going on and what happened.  That's the person

APPENDIX 000469

04:28:05  1    said over -- that's what the person said to me over the

04:28:07  2    phone.

04:28:07  3        Q.    Why didn't you include that in your complaint

04:28:15  4    against the company?

04:28:17  5                MS. HERNANDEZ:  Objection; vague.

04:28:20  6        A.    That was -- I believe that was their policy.

04:28:31  7    And if somebody told you something over the phone, I'm

04:28:35  8    gonna do it.

04:28:48  9        Q.    (By Mr. Shine)  After you filed the hotline

04:28:51  10   complaint, when were you next contacted by someone from

04:28:53  11   Allied regarding your complaint?

04:28:56  12       A.    I don't believe I ever was contacted.  I don't

04:29:01  13   recall somebody contacting me.  I don't remember on top

04:29:03  14   of my head.  I had to call them back myself, I think.

04:29:14  15       Q.    And again, looking at page AUS 1257, the

04:29:26  16   hotline complaint was opened on 5/25/2022, right?

04:29:31  17       A.    It was opened on the 25th, yes.

04:29:35  18       Q.    Okay.  And your testimony is that you were

04:29:40  19   never contacted about this?

04:29:41  20       A.    I don't remember somebody contacting me

04:29:44  21   regarding my phone call.  I don't remember that.

04:29:57  22                (Exhibit No. 26 marked.)

04:29:57  23       Q.    (By Mr. Shine)  Twana, I'm handing you an

04:30:02  24   email conversation which is labeled AUS 1265 to

04:30:15  25   AUS 1266.  At the very bottom of 1265, is that your

Twana Ahmed - September 19, 2024                    240

04:30:19   1   email address?

04:30:20   2        A.    Yes, that is.

04:30:20   3        Q.    And what date is listed underneath your email

04:30:23   4   address?

04:30:23   5        A.    The 25th, 2022, 6:00 p. -- 6:00 a. -- 6:00

04:30:27   6   p.m.

04:30:27   7        Q.    And who was the email addressed to?

04:30:31   8        A.    To me.

04:30:37   9        Q.    Who did you send the email to?

04:30:39  10        A.    To whatever this person is.

04:30:41  11        Q.    Okay.  And just above that, did you receive a

04:30:44  12   response from this Catherine Alyea, A-L-Y-E-A?

04:30:47  13        A.    This lady?

04:30:48  14        Q.    Yes.

04:30:50  15        A.    Through email?  I believe so, I did.

04:30:53  16        Q.    Okay.  And in the middle of the page on 1256,

04:30:56  17   is there a date listed when an email was sent to you in

04:31:03  18   response to your email on the 25th?

04:31:05  19        A.    Repeat your question, please.

04:31:08  20        Q.    Sure.  In the middle of 1265, it says from

04:31:15  21   Catherine Alyea to twana_score202020@yahoo.com.  Do you

04:31:24  22   see where I'm referring to?

04:31:26  23        A.    Yes.

04:31:26  24        Q.    And there's a date when that email was sent to

04:31:30  25   you, which says Thursday May 26, 2022, correct?

Twana Ahmed - September 19, 2024                    241

04:31:35  1    A.    This one?  12:45?

04:31:38  2    Q.    Yes, but the date prior to that --

04:31:40  3    A.    Yeah.

04:31:40  4    Q.    -- says Thursday, May 26, 2022, correct?

04:31:43  5    A.    Yes, yes.

04:31:44  6    Q.    And it says -- the body of the message says:

04:31:48  7  "Hello, Twana.  I'm tied up today so I am asking Wayne,

04:31:52  8  the HR representative, to give you a call.  I will

04:31:55  9  follow up with him later today.  Thanks."

04:31:58 10             Did I read that correctly?

04:31:59 11    A.    Yes, you did.

04:32:00 12    Q.    Immediately above that, at the very top of the

04:32:02 13  page, there's an email from a Wayne Oliver to you,

04:32:08 14  correct?

04:32:09 15    A.    Yes.

04:32:11 16    Q.    And the date on that says Thursday, May 26,

04:32:15 17  2022, correct?

04:32:15 18    A.    Yes, on the 26th.

04:32:17 19    Q.    "Good afternoon, Twana.  Do you have a number

04:32:19 20  that you can be reached at?  Thanks."

04:32:21 21             Did I read that correctly?

04:32:22 22    A.    Yes.

04:32:22 23    Q.    And so again, is your testimony that you never

04:32:25 24  received a follow-up to your complaint that you made?

04:32:28 25    A.    A follow-up by the hotline people, not the HR.

APPENDIX 000472

04:32:31  1        Q.    At some point did you talk to Wayne Oliver

04:32:45  2   about your complaint?

04:32:46  3        A.    Yes.

04:32:46  4        Q.    And at some point did you have discussions

04:32:47  5   with Wayne Oliver about your complaint?

04:32:50  6        A.    I have spoke to him, yes.

04:32:52  7        Q.    How did you communicate with Wayne?

04:32:55  8        A.    Over the phone.

04:32:56  9        Q.    Did you ever talk to him in an email?

04:32:58 10        A.    Maybe -- maybe yes, maybe not.  Can't

04:33:03 11   remember.  But I think a little bit of email and phone

04:33:10 12   calls.

04:33:10 13        Q.    Okay.  And did Wayne tell you that he was

04:33:18 14   investigating your hotline complaint?

04:33:20 15        A.    I think so.

04:33:30 16        Q.    And at some point did Wayne ask you for more

04:33:39 17   information about your complaint?

04:33:40 18        A.    Yes.  To go over with him what happened and

04:33:44 19   explain what's going on.

04:33:46 20        Q.    And did you provide him with that more

04:33:49 21   information that he requested?

04:33:50 22        A.    Yes, over the phone.

04:33:51 23        Q.    Was it only over the phone?

04:33:58 24        A.    I don't -- I don't remember if it was just

04:34:00 25   over the phone.  I think by email.  And I think

Twana Ahmed - September 19, 2024                    243

04:34:03  1    majority of it was over the phone because we spent a

04:34:08  2    portion of the time, I remember, over the phone.  It

04:34:13  3    was -- it was in the afternoon area and I was on the

04:34:18  4    phone with him to try to explain to him what's going on

04:34:20  5    and what happened.  Maybe some of it during email

04:34:25  6    address.  I can't remember exactly.  But I think over

04:34:28  7    email too.

04:34:49  8                  (Exhibit No. 27 marked.)

04:34:49  9        Q.   (By Mr. Shine)  Twana, I'm handing you a copy

04:34:51 10    of an email that you sent to Wayne Oliver which is

04:34:54 11    labelled AUS 1332 to 1334.

04:34:59 12        A.   Right.

04:34:59 13        Q.   When did you send this email to Wayne?

04:35:05 14        A.   8/22/2022, 7:23:13 p.m.

04:35:20 15        Q.   And I apologize.  You said 8/2022?

04:35:25 16        A.   Yeah, the date 8.

04:35:27 17        Q.   Please follow along as I read the date that's

04:35:30 18    on here.

04:35:30 19        A.   Okay.

04:35:31 20        Q.   Wednesday, June 8, 2022.  Did I read that date

04:35:34 21    correctly?

04:35:34 22        A.   Yes.  June, yeah.  June 8, yeah.

04:35:37 23        Q.   And so why did you send this email to Wayne?

04:35:50 24        A.   Explaining, I think, my situation and what's

04:35:52 25    going on and what happened.

Twana Ahmed - September 19, 2024                    244

04:35:54  1      Q.    Okay.  And at this point in June of 2022 is it
04:36:05  2   your understanding that Wayne was still investigating
04:36:07  3   your hotline complaint?
04:36:09  4      A.    I believe so.
04:36:11  5      Q.    After you filed your hotline complaint and
04:36:17  6   started working with Wayne, did you ever have any
04:36:21  7   further conversation with Patrick Freeney?
04:36:24  8      A.    Can't recall that.
04:36:29  9      Q.    Did Wayne ever provide you with a conclusion
04:36:37 10   of your investigation?
04:36:38 11      A.    Can't recall that.  What do you mean by
04:36:43 12   "conclusion"?  A decision, you mean?
04:36:45 13      Q.    Did Wayne ever communicate a decision to you
04:36:49 14   about your complaint?
04:36:52 15      A.    I think he said the decision has been made
04:36:56 16   already from way above me and there's nothing I can do.
04:37:05 17   I believe what you saying did happen, but there's
04:37:10 18   nothing I can do about it.  The decision already have
04:37:14 19   came down.  When he said that, he did not say it over
04:37:18 20   email.  He said it over the phone.
04:37:20 21      Q.    And you're saying that Wayne said he believed
04:37:24 22   you and --
04:37:25 23      A.    He did say that, yes.
04:37:28 24      Q.    So would it surprise you if I were able to
04:37:31 25   produce an affidavit from Wayne saying that he never

APPENDIX 000475

04:37:33  1    said that to you?

04:37:34  2         A.   You can do that.  But that's not what he --

04:37:37  3    that's what he said to me.  He says I'm not arguing

04:37:41  4    what you're saying.  I'm not saying this has not

04:37:43  5    happened.  I believe what you're saying.  But the

04:37:48  6    decision has been made already about you and there's

04:37:53  7    not much I can do.

04:37:54  8         Q.   And you said this was over the phone?

04:38:02  9         A.   Over the phone, correct.

04:38:03 10         Q.   Okay.  What date did he call you?

04:38:05 11         A.   I don't remember.

04:38:06 12         Q.   Was it before or after you sent this email

04:38:10 13    that we've been talking about?

04:38:11 14         A.   I don't remember exactly.

04:38:13 15         Q.   What time did he call you?

04:38:18 16         A.   From 12:00 to 3:00.  Approximately around that

04:38:26 17    time.  Because it was a hot summer and I was outside in

04:38:33 18    the sun talking to him so I can have enough

04:38:37 19    understanding and clearance of what he says, not to be

04:38:42 20    disturbed around my surrounding.  So I went outside and

04:38:46 21    talked to him.

04:38:46 22         Q.   Where were you when you got this phone call?

04:38:49 23         A.   I was at my friend's house.

04:38:54 24         Q.   Which friend?

04:38:55 25         A.   A family friend.

04:52:26   1        A.    I don't recall that, if I did or did not.

04:52:29   2   Maybe I did, maybe not.  Not too sure.

04:52:32   3        Q.    Twana, during your time with Allied Universal

04:52:38   4   did you receive any discipline?

04:52:39   5        A.    No, I did not.

04:53:01   6                  (Exhibit No. 30 marked.)

04:53:01   7        Q.    (By Mr. Shine)  Twana, I'm handing you a copy

04:53:03   8   of a discipline notice that was issued on February 14th

04:53:07   9   of 2022, labeled AUS 34.  Have you seen this document

04:53:11  10   before?

04:53:11  11        A.    No, I have not seen this document.

04:53:15  12        Q.    At the top of the page, would you agree that

04:53:17  13   it says "Twana Ahmed"?

04:53:19  14        A.    That is correct.

04:53:20  15        Q.    Do you remember what your employee ID number

04:53:23  16   was at the time that you were employed by Allied?

04:53:26  17        A.    No, I do not remember.  Like, on my head right

04:53:29  18   now, I do not remember it.  I can't recall this

04:53:32  19   document, like, seeing it.  I can't recall it.

04:53:35  20        Q.    So your testimony today is that you've never

04:53:38  21   seen this document?

04:53:39  22        A.    I'm not saying I've never seen it but I don't

04:53:42  23   remember.  This is not my handwriting.  This is not my

04:53:45  24   handwriting.  This is not my handwriting.

04:53:47  25        Q.    Well, of course.  If you look at the bottom,

Twana Ahmed - September 19, 2024                    257

04:55:26  1    document that's identified as a disciplinary notice

04:55:29  2    that was issued to you on April 5th of 2022.  Have you

04:55:35  3    seen this document before?

04:55:36  4         A.    No.

04:55:36  5         Q.    Would you agree with me at the top it

04:55:39  6    identifies employee name with your name, Twana Ahmed,

04:55:41  7    listed?

04:55:42  8         A.    That is my name.

04:55:43  9         Q.    Specifically this form references the

04:55:50 10    April 4th, 2022, incident at the H-E-B store.  Did you

04:55:55 11    ever receive a document writing you up for that?

04:55:58 12         A.    Which incident?

04:55:59 13         Q.    The April 4th, 2022, incident.

04:56:14 14         A.    Is this the one you are talking about came

04:56:18 15    from Patrick Freeney or given to me on the scene?

04:56:20 16    Which one is it exactly so I can remember.

04:56:22 17         Q.    I'm asking you:  Did Patrick Freeney give you

04:56:25 18    this document?

04:56:25 19         A.    Patrick Freeney gave me statements, wrote them

04:56:30 20    to me.  And I refused to sign it.  It could be this

04:56:34 21    one, it could be not.  I can't remember.

04:56:36 22         Q.    Okay.  Just a few final questions, Twana.

04:56:50 23         A.    Yes.

04:56:50 24         Q.    Are you currently married?

04:56:52 25         A.    No, I'm not.

Twana Ahmed - September 19, 2024                    263

05:09:34  1        A.    Thank you.

05:09:34  2        Q.    Other than high school, have you pursued any

05:09:37  3    further education?  Like, did you go to college or get

05:09:44  4    any other degree?

05:09:45  5        A.    I got a degree, certification, if you call

05:09:47  6    them degrees.  Like, for example, the security

05:09:50  7    certifications for the commissioned officer, like, be

05:09:54  8    armed.  And certification for noncommissioned officer,

05:09:57  9    that's the unarmed license for -- certified license for

05:10:06 10    forklift, if you want to call that a certification.

05:10:08 11        Q.    Okay.

05:10:09 12        A.    I'm licensed at CPR.  Would you call that a

05:10:20 13    license?

05:10:20 14        Q.    Sure.

05:10:20 15        A.    I have that too, CPR license.

05:10:23 16        Q.    Okay.  Any other additional schooling, like at

05:10:28 17    a university or a college that you attended?

05:10:31 18        A.    I can't recall, no.

05:10:36 19        Q.    And it's my understanding that you may have

05:10:41 20    served in the US military; is that correct?

05:10:44 21        A.    I have some experience, yes.  Some

05:10:52 22    affiliation -- affiliation to the military, yes.

05:10:54 23        Q.    When you say "affiliation to the military," is

05:10:57 24    it the US military?

05:10:59 25        A.    Yes.

APPENDIX 000479

Twana Ahmed - September 19, 2024                    264

05:10:59  1      Q.    And which branch?

05:11:00  2      A.    Multiple different branches.

05:11:03  3      Q.    Okay.  Including which branches?

05:11:05  4      A.    Army and Marine Corps.

05:11:13  5      Q.    What did you do in the Army?

05:11:15  6      A.    Did for the Army?  I did linguistic and things

05:11:25  7  like that.

05:11:26  8      Q.    And what did you do with the Marine Corps?

05:11:28  9      A.    Same thing.

05:11:29 10      Q.    Were you assigned -- were you considered sort

05:11:31 11  of active duty in those roles?

05:11:34 12      A.    I don't know if you want to call them active

05:11:36 13  duty or not.  It was translation job.  I don't know

05:11:42 14  what you mean by, like, active duty.

05:11:43 15      Q.    Sure.  Did you work as a civilian translator

05:11:47 16  for the Army and the Marine Corps, or were you an

05:11:52 17  enlisted member?

05:11:53 18      A.    I was -- with both of them at the time was --

05:11:58 19  I had a uniform but it was civilian, I believe.

05:12:02 20      Q.    Okay.  And when did you work for the Army?

05:12:07 21      A.    A long time ago.  And the Marine Corps was a

05:12:12 22  long time ago.

05:12:13 23      Q.    When you say "a long time ago," was that five

05:12:16 24  years ago?

05:12:17 25      A.    Oh, more than that.

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000480

05:37:46  1       A.    I don't have the funds.

05:37:48  2       Q.    Have you looked into any, you know, free

05:37:51  3  clinics that might be available in Houston?

05:37:53  4       A.    No, I did not because a lot of those doctors,

05:37:58  5  they want health insurance and money and I don't have

05:38:00  6  the funds for them.

05:38:10  7       Q.    Are you currently taking any medications?

05:38:12  8       A.    Right now?  No.  At this moment, no.

05:38:17  9       Q.    So you claim that you've suffered emotional

05:38:24 10  distress because of how Allied treated you.  What are

05:38:27 11  your symptoms of emotional distress?

05:38:29 12       A.    The -- the emotional distress that happened to

05:38:33 13  me:  Loss of hair, the losing ability to sleep, growing

05:38:45 14  gray hair very fast, giving me the -- the -- to pull my

05:38:58 15  hair -- my hairs out of my face.  Being in a situation,

05:39:09 16  being in corner by myself and crying.  And sometimes I

05:39:13 17  wake up in the middle of the night.  I done it -- went

05:39:19 18  to the church in the middle of the night, sit outside

05:39:21 19  of the church and just cried and cried and cried.

05:39:24 20       Q.    When you say "the church," my understanding,

05:39:26 21  based on the Muslim religion --

05:39:26 22       A.    Yes.

05:39:28 23       Q.    -- is that it's a mosque?

05:39:30 24       A.    No.  Christian -- a Christian church.

05:39:37 25       Q.    Okay.  And you just went outside the church?

APPENDIX 000481

05:39:44  1          A.    Yes.  Sit outside, yeah.

05:39:46  2          Q.    Was it because it was closed?

05:39:47  3          A.    Yes.

05:39:48  4          Q.    Did anyone at the church ever see you there?

05:39:51  5          A.    No.

05:39:52  6          Q.    Did you ever go back during times when it was

05:39:56  7    open to talk to anyone?

05:39:57  8          A.    No.  I just needed time by myself.

05:39:59  9          Q.    And as we sit here today, Twana, are you still

05:40:08  10   experiencing all of that?

05:40:10  11         A.    Yes.

05:40:11  12         Q.    So you still have difficulty sleeping?

05:40:17  13         A.    Yes.

05:40:17  14         Q.    And you still go sit at the church and cry?

05:40:20  15         A.    I do that sometimes, I sit outside of the

05:40:24  16   church.

05:40:24  17         Q.    When's the last time you went to the church?

05:40:27  18         A.    A couple of weeks ago.

05:40:32  19         Q.    Which church do you go to?

05:40:37  20         A.    It's the one on Sam Houston and Briar Forest

05:40:42  21   area.  And there is another one I go sit over there,

05:40:46  22   it's off of Memorial City area.  It's a big megachurch

05:40:54  23   that I go sit in the parking lot or sometimes in the

05:40:59  24   stair of the church, just sit outside the door.

05:41:02  25         Q.    Do you find this litigation process to be

05:41:04  1    stressful, Twana?

05:41:06  2        A.    Can you be more, like --

05:41:13  3        Q.    Sure.  Let me try to rephrase it for you.

05:41:15  4              We've been talking about a lawsuit that

05:41:18  5    you filed --

05:41:18  6        A.    Correct.

05:41:19  7        Q.    -- against Allied, right?

05:41:21  8        A.    Correct.

05:41:21  9        Q.    And you filed this lawsuit back in 2023.

05:41:25 10        A.    Right.

05:41:25 11        Q.    Here we are September of 2024.

05:41:28 12        A.    Correct.

05:41:29 13        Q.    Has this process, getting to today or even

05:41:33 14    today, been stressful for you?

05:41:35 15        A.    It's a process and I have to follow the

05:41:37 16    process.

05:41:37 17        Q.    Sure.  I appreciate that you're following the

05:41:40 18    process.  But the question is:  Was it -- has this been

05:41:43 19    stressful for you?

05:41:44 20        A.    Yes.

05:41:53 21        Q.    Is being away from your family been stressful

05:41:57 22    for you?

05:42:03 23        A.    Yes.

05:42:03 24        Q.    Do you get the opportunity to talk to them on

05:42:05 25    a regular basis?

Twana Ahmed - September 19, 2024                287

| | | |
|---|---|---|
| 05:42:05 | 1 | A.    On the phone, correct. |
| 05:42:08 | 2 | Q.    When's the last time you talked with your mom? |
| 05:42:16 | 3 | A.    Last week. |
| 05:42:19 | 4 | Q.    What about your dad? |
| 05:42:21 | 5 | A.    Last week. |
| 05:42:23 | 6 | Q.    Do you talk to your siblings? |
| 05:42:25 | 7 | A.    Yeah. |
| 05:42:26 | 8 | Q.    When's the last time you talked to your |
| 05:42:28 | 9 | brother? |
| 05:42:28 | 10 | A.    When I was talking to my mom. |
| 05:42:30 | 11 | Q.    And what about your three sisters? |
| 05:42:32 | 12 | A.    They were next to my mom. |
| 05:42:34 | 13 | Q.    Okay.  Would you say it's hard to be away from |
| 05:42:40 | 14 | your family? |
| 05:42:40 | 15 | A.    It's very hard. |
| 05:42:41 | 16 | Q.    And then understanding that you aren't really |
| 05:42:50 | 17 | working and money has been hard for you, would you say |
| 05:42:54 | 18 | that not having money has also been very challenging |
| 05:42:57 | 19 | for you? |
| 05:42:58 | 20 | A.    Yeah. |
| 05:42:58 | 21 | Q.    Do you have any other major stressors in your |
| 05:43:05 | 22 | life, Twana? |
| 05:43:07 | 23 | A.    Sorry.  What do you mean? |
| 05:43:08 | 24 | Q.    Are there anything -- is there anything else |
| 05:43:10 | 25 | in your life that's causing a lot of stress for you |

APPENDIX 000484

05:43:14  1    right now?

05:43:14  2        A.    Except what I'm going through.

05:43:17  3        Q.    So if we look at a scale of sort of your

05:43:29  4    emotional stress of a hundred percent -- do you

05:43:35  5    understand what a hundred percent is?

05:43:36  6        A.    Yeah.

05:43:37  7        Q.    What percentage of that 100 percent do you

05:43:42  8    attribute to Allied Universal?

05:43:43  9        A.    If -- if -- I'm going to try to answer it the

05:43:54 10    way -- if Allied wouldn't -- if Allied didn't done that

05:44:01 11    to me, I wouldn't be in these shoes right now I'm in.

05:44:07 12    So I do blame Allied Universal for what had been done

05:44:14 13    to me.

05:44:15 14              Back to your question.  The percentages,

05:44:18 15    there is no number you can put on it.

05:44:22 16        Q.    But as we sit here, Twana, you testified about

05:44:25 17    other things that have been hard.

05:44:27 18        A.    Right.

05:44:27 19        Q.    Like being away from your family.

05:44:29 20        A.    Right.

05:44:30 21        Q.    Not having money right now.

05:44:32 22        A.    Right.

05:44:32 23        Q.    Those are creating a percentage as well.

05:44:38 24        A.    Right.

05:44:39 25        Q.    And so if you had to identify a percentage

05:44:42  1    that you would assign to Allied Universal, what

05:44:45  2    percentage would that be?

05:44:47  3        A.   Just being away from the family does bring

05:44:55  4    stress, correct, you are correct.  But when you have

05:44:59  5    the funds coming in and you send it home, you put a

05:45:02  6    smile on your parents' face and your mom's and dad.

05:45:06  7    That will reduce the stress on you, especially when

05:45:10  8    they ask you for something in the time of need and you

05:45:14  9    turn around and say I cannot do anything about it.  So

05:45:18 10    that will elevate the stress, if you understand what I

05:45:26 11    said.

05:45:26 12                 A number?  I cannot put a number on it,

05:45:29 13    honestly.

05:45:29 14        Q.   Is it more than 10 percent?

05:45:31 15        A.   Oh, way more than that.

05:45:32 16        Q.   Is it 15 percent?

05:45:34 17        A.   More than 70 percent.

05:45:35 18        Q.   Twana, when you're not working for DoorDash,

05:45:51 19    what do you normally do during the day?

05:45:53 20        A.   I just sit and keep it to myself.

05:46:03 21        Q.   Do you play any sports?

05:46:04 22        A.   No.

05:46:05 23        Q.   Do you have any hobbies?  Like, do you go

05:46:08 24    hiking or go to the mall?  I don't know.  Do you have

05:46:12 25    any hobbies?

05:46:12  1      A.    If you go to the mall and there's something

05:46:15  2  that you want to buy, you don't have the funds for it

05:46:18  3  so it's kind of hard, so I stay away from those areas.

05:46:21  4      Q.    Okay.

05:46:22  5      A.    Hobbies, like you said, hiking, there's no

05:46:25  6  places to go to hike in Houston.  You know, walk around

05:46:31  7  a park somewhere, just walk around the park and sit by

05:46:34  8  yourself and just, like, think -- think things through.

05:46:40  9  Things like that, you know.  Or most things makes me

05:46:45 10  feel better, listening to the Quran will relax me.  I

05:46:53 11  feel -- after that, it just releases everything out of

05:46:55 12  my body, like, and I go to sleep.

05:46:57 13      Q.    I know we briefly touched on some of the

05:47:02 14  religious practices that you actually practice.

05:47:05 15      A.    Yes.

05:47:06 16      Q.    Do you belong to a mosque or any other, I

05:47:11 17  guess, sort of -- I don't want to say, like, building;

05:47:14 18  but is there -- is there a place that you go

05:47:16 19  religiously on a weekly or a monthly basis?

05:47:19 20      A.    Here?  No, I don't.  Because like you said --

05:47:26 21  I said earlier, over here the mosques are completely

05:47:31 22  different from the way they operate over there.  It's a

05:47:38 23  completely different thing, so that's why I don't go.

05:47:41 24  It's not like over there.  Here it's in English, so

05:47:47 25  when they translate things, I don't understand it

05:47:50  1    clearly.  So I'd rather listen to it on the phone, in

05:47:52  2    my own language, it would be more clear to me.

05:47:58  3        Q.   Okay.  Are there any community groups that you

05:48:01  4    belong to?

05:48:01  5        A.   What's community groups?

05:48:03  6        Q.   Sure.  It could be anything from like a Boys

05:48:05  7    and Girls Club, where you might go and volunteer.

05:48:09  8        A.   No.

05:48:10  9        Q.   No?

05:48:11 10        A.   No.

05:48:11 11        Q.   Have you ever lost a really close relative?

05:48:14 12        A.   What do you mean by a relative?

05:48:18 13        Q.   So when you were talking earlier about blood

05:48:21 14    family, for example.

05:48:22 15        A.   Yes.

05:48:23 16        Q.   Have you ever lost a close family member?  And

05:48:26 17    by "lost," I mean has anyone ever passed away in your

05:48:30 18    lifetime?

05:48:30 19        A.   No.

05:48:36 20        Q.   You've never lost a family member?

05:48:38 21        A.   Thank God, no.

05:48:39 22        Q.   Okay.  What about a close friend?  Have you

05:48:43 23    ever lost a close friend?

05:48:44 24        A.   Yes.

05:48:44 25        Q.   And thinking about how you felt when your

05:48:49  1    friend passed away --

05:48:50  2         A.    Yes.

05:48:51  3         Q.    -- how would you say being terminated from

05:48:59  4    Allied compares to losing a close friend?  Which one is

05:49:03  5    worse?

05:49:03  6         A.    Losing a friend, it's a very bad thing,

05:49:08  7    especially when the person was there before

05:49:12  8    30 minutes -- 30 minutes before what happened to him,

05:49:15  9    you were last person or the last couple of persons to

05:49:18 10    see him.  That's what happened to him.  That brings a

05:49:23 11    toll on me, yes.  But when time comes, people move on.

05:49:32 12    People move on in life and they start new chapters in

05:49:35 13    their life.  So it's a completely different thing from

05:49:43 14    what I'm going through.

05:49:47 15         Q.    Okay.  Are you aware that Allied Universal has

05:49:53 16    expressed an interest in trying to see if there was a

05:49:57 17    way to resolve your lawsuit?

05:49:58 18         A.    I did not understand the way of your question.

05:50:01 19         Q.    Sure.  Let me try to rephrase.

05:50:03 20         A.    Okay.

05:50:03 21         Q.    Are you aware that Allied Universal has asked

05:50:05 22    if there was an opportunity to resolve your lawsuit?

05:50:10 23         A.    If there is, my attorney will -- or my counsel

05:50:14 24    will be aware of that.

05:50:15 25         Q.    Sure.  I'm not asking what your counsel is

05:50:17  1    aware of or not.

05:50:18  2        A.   Oh.

05:50:19  3        Q.   I'm asking if you're aware.

05:50:21  4        A.   No.  Like, aware of that, no.

05:50:23  5        Q.   Have you personally thought about what

05:50:26  6    resolution you would like to see in this case?

05:50:33  7        A.   Yes.

05:50:34  8        Q.   And what -- what -- what would be the -- what

05:50:40  9    would be your resolution if you got to control

05:50:43 10    everything, Twana?

05:50:44 11        A.   It's not me controlling everything.  I want

05:50:48 12    Allied to realize they treated me unfairly.  They

05:50:53 13    realize the process that they put me through, it's

05:50:58 14    unfairly, to admit what they -- what they -- to admit

05:51:02 15    what they did to me was wrong.  I shouldn't been

05:51:06 16    treated that way.  And the process they done towards me

05:51:09 17    was completely wrong, to bear responsibility of what

05:51:12 18    happened to me and what I'm going through.

05:51:14 19        Q.   Okay.  And so for them to be able to do that,

05:51:19 20    is it -- you want them to, like, give you a document

05:51:23 21    that says that?  Or what are you sort of hoping might

05:51:26 22    be a resolution for this case?

05:51:31 23        A.   It depends on the company.  I cannot make the

05:51:35 24    company give me something.  It's all up to their --

05:51:40 25    people in the company to make that decisions and to --

06:00:29  1          Q.    Just in general, if you had an opportunity to

06:00:31  2     go back to Allied, would you -- would you consider

06:00:32  3     going back?

06:00:33  4          A.    Yes.

06:00:33  5          Q.    And that's notwithstanding your prior

06:00:38  6     involvement with Patrick Freeney?

06:00:40  7          A.    Nothing to do with Mr. Freeney or anything

06:00:44  8     like that.  To be treated fairly, respectfully, and

06:00:47  9     dignity.  And treat me with those things I said and

06:00:54 10     treat other employees, no matter their religions, their

06:00:58 11     belief, their race, where they come from, with dignity

06:01:07 12     and respect.

06:01:09 13                     MR. SHINE:  That wraps up my questioning.

06:01:09 14                     MS. HERNANDEZ:  Okay.

06:01:13 15                     MR. SHINE:  Did you want to take a break

06:01:14 16     or are you good to go?

06:01:16 17                     MS. HERNANDEZ:  Maybe just like five

06:01:18 18     minutes.

06:01:18 19                     MR. SHINE:  Can we go off the record?

06:01:20 20                     THE VIDEOGRAPHER:  Off the record at

06:01:21 21     6:00 p.m.

06:01:24 22                     (Off the record 6:01 p.m. to 6:06 p.m.)

06:06:49 23                     THE VIDEOGRAPHER:  Back on the record at

06:06:56 24     6:06.

06:06:56 25

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 06:06:56 | 1  | EXAMINATION                                                            |
| 06:06:57 | 2  | BY MS. HERNANDEZ:                                                      |
| 06:06:57 | 3  | Q.   Twana, I just want to clarify a couple of                         |
| 06:07:03 | 4  | things in your testimony today to make sure that we                    |
| 06:07:05 | 5  | have an accurate understanding.                                        |
| 06:07:09 | 6  | Earlier on I believe Nathan asked you                                  |
| 06:07:16 | 7  | when you first started thinking about filing a lawsuit                 |
| 06:07:22 | 8  | against Allied.  Do you remember that question?                        |
| 06:07:25 | 9  | A.   Nathan?                                                            |
| 06:07:30 | 10 | Q.   I'm sorry.  His name is Nathan.  Opposing                         |
| 06:07:34 | 11 | counsel's name is Nathan.                                              |
| 06:07:34 | 12 | A.   Oh.                                                               |
| 06:07:38 | 13 | Q.   So he asked you -- do you remember that he                        |
| 06:07:39 | 14 | asked you a question, something along the lines of when                |
| 06:07:42 | 15 | did you first start thinking about filing a lawsuit                    |
| 06:07:44 | 16 | against Allied?                                                        |
| 06:07:45 | 17 | A.   Yes.                                                              |
| 06:07:45 | 18 | Q.   Okay.                                                             |
| 06:07:46 | 19 | A.   I got confused.  Sorry I cut you off.  I got                      |
| 06:07:49 | 20 | confused with another Nathan that he brought up the                    |
| 06:07:53 | 21 | name.  I was like, No.                                                 |
| 06:07:55 | 22 | Q.   Right.  And so if I remember correctly, I                         |
| 06:07:58 | 23 | heard a couple of different answers.  Is it your                       |
| 06:08:05 | 24 | testimony that you first started thinking about filing                 |
| 06:08:07 | 25 | a lawsuit against Allied after your interaction with                   |

APPENDIX 000492

06:08:12  1    Patrick?

06:08:13  2         A.    Yes.

06:08:13  3         Q.    Okay.  Would that have been in December of

06:08:19  4    2021?

06:08:20  5         A.    Somewhere around there.

06:08:22  6         Q.    You were first hired in December of 2021,

06:08:26  7    correct?

06:08:26  8         A.    Yes.

06:08:27  9         Q.    And I believe you testified it was about a

06:08:31 10    month or two months after that that you went through

06:08:34 11    the Elite training, correct?

06:08:36 12         A.    That's correct.

06:08:36 13         Q.    So that would have been either January or

06:08:40 14    February of 2022, right?

06:08:43 15         A.    Yes.

06:08:43 16         Q.    And when did you first meet Patrick?

06:08:47 17         A.    The first time I ever met Patrick, it was

06:08:50 18    during the Elite training.

06:08:50 19         Q.    Okay.

06:08:52 20         A.    That's the first time I ever met him.

06:08:54 21         Q.    So that would have been either in January of

06:08:57 22    2022 or February of 2022, correct?

06:09:00 23         A.    Correct.

06:09:01 24         Q.    So is it accurate to say that you did not

06:09:06 25    first start thinking about filing a lawsuit against

06:09:08  1    Allied until after or during that Elite training?

06:09:14  2        A.   Of course, because I had no issue with Allied

06:09:19  3    whatsoever before the Elite.  Absolutely not.

06:09:21  4        Q.   Okay.  So that would not have been in December

06:09:23  5    of 2021, right?

06:09:25  6        A.   Yes.

06:09:26  7        Q.   Okay.  While I'm looking, at the beginning,

06:09:50  8    Nathan -- opposing counsel, the counsel for Allied,

06:09:54  9    Nathan Shine --

06:09:56 10        A.   Yes.

06:09:56 11        Q.   -- handed you some documents that I'm looking

06:09:59 12    for, but I believe one of them was like a certificate

06:10:03 13    of new orientation training.  Do you remember that?

06:10:09 14        A.   The documents?  Could you show me?  I don't

06:10:12 15    remember that.

06:10:18 16        Q.   Let me see if I can find it.

06:10:20 17        A.   I think it was right below the paper on the

06:10:23 18    bottom.

06:10:37 19        Q.   Well, my question is -- oh, here it is.

06:10:41 20    Sorry.  Okay.  I'm sorry.  Let me -- it's this document

06:10:57 21    that's Bates labeled AUS 00663.

06:11:01 22        A.   Yes.

06:11:01 23        Q.   And it says New Employee -- Employee

06:11:07 24    Orientation; is that right?

06:11:09 25        A.   Correct.

Twana Ahmed - September 19, 2024                    304

06:11:09  1        Q.    Did you have any new employee training on this
06:11:18  2    day that's listed on the certificate?
06:11:24  3        A.    At that specific date?  Don't recall if I -- I
06:11:29  4    don't remember if I had any training.  I might do, I
06:11:33  5    might not.  Not too sure.
06:11:35  6        Q.    So before you went through the Elite training,
06:11:36  7    do you remember any other training that Allied gave
06:11:38  8    you?
06:11:45  9        A.    Before?  No.  They didn't -- their main
06:11:49 10    training was the Elite training, the qualification for
06:11:52 11    the firearm and Taser.  That was their main goal to get
06:11:56 12    us that.  And during the Elite, they had another
06:11:59 13    training class, the TMO.  But before -- after the Elite
06:12:08 14    or anything like that, there was not any training that
06:12:11 15    I received.
06:12:11 16        Q.    Before Elite training, did you receive any
06:12:14 17    other training from Allied?
06:12:16 18        A.    No.
06:12:22 19        Q.    Okay.  And then I'm showing you -- I don't
06:12:27 20    know what exhibit number it is, but it's labeled
06:12:32 21    AUS 664, and at the top it says "Training Certificate
06:12:38 22    Preventing Unlawful Discrimination and Harassment."
06:12:42 23              Did I read that correctly?
06:12:43 24        A.    Yes, you did.
06:12:45 25        Q.    Were you trained on preventing unlawful

APPENDIX 000495

06:12:49  1    discrimination and harassment --

06:12:49  2        A.    No.

06:12:50  3        Q.    -- ever?

06:12:51  4        A.    No.  They just make us sign the documents and

06:12:55  5    then they take it away.

06:12:57  6        Q.    Do you remember, on this day or maybe the day

06:13:00  7    before, anybody going, like, over any slides with you

06:13:04  8    about discrimination or harassment?

06:13:06  9        A.    No, no.

06:13:15 10        Q.    Going back to something you said earlier --

06:13:20 11    and I think you just mentioned it right now.  During

06:13:22 12    the Elite training, you mentioned that Monroe was the

06:13:25 13    field instructor, correct?

06:13:27 14        A.    Correct.

06:13:27 15        Q.    And you -- I believe opposing counsel asked

06:13:37 16    you if he was the only instructor.  Do you remember

06:13:39 17    that?

06:13:39 18        A.    The main instructor for the class, for the

06:13:43 19    firearm and Taser, CPR, it was Monroe.  He was the main

06:13:50 20    instructor.

06:13:51 21        Q.    Okay.  And I think just a minute ago, you said

06:13:53 22    there was another instruction from TMO?

06:13:58 23        A.    TMO.

06:13:59 24        Q.    What --

06:14:00 25        A.    That's something called TMO.  I don't know

06:14:04  1    what TMO is, but it's something from Allied.  I think

06:14:09  2    it's a third-party company, train the -- hired by

06:14:16  3    H-E-B, not by Allied.  They came in -- I think they

06:14:24  4    came in and the instructors left.  TMO came, gave us a

06:14:32  5    class.  It was during the Elite program.  I believe the

06:14:36  6    last days or the last two days of the Elite program,

06:14:40  7    they came in and they had a big screen showing us how

06:14:45  8    to observe people, how to follow people around, what to

06:14:51  9    do when things -- people try to break in and things

06:14:56  10   like that.  But after when the class over, Allied

06:15:03  11   Universal instructors came inside and all that.  They

06:15:05  12   said, Don't listen to whatever what they said.

06:15:07  13       Q.   Okay.  So the TMO instructors were not Monroe?

06:15:11  14       A.   It was not Monroe, no, ma'am.

06:15:14  15       Q.   Okay.  And to your understanding, they were

06:15:18  16   not Allied employees?

06:15:21  17       A.   No, they were not.  They were a third-party

06:15:24  18   company.

06:15:25  19       Q.   When you asked -- or strike that.

06:15:30  20            When you told your supervisor that you

06:15:37  21   wanted to keep your beard for religious purposes, did

06:15:42  22   the supervisor let you know you could request a

06:15:45  23   religious accommodation?

06:15:46  24       A.   No, he did not say regarding of that.

06:15:50  25       Q.   When you let Patrick Freeney know that you

06:15:52  1    wanted to keep your beard for religious purposes, did

06:15:55  2    Patrick Freeney let you know you could request a

06:15:57  3    religious accommodation?

06:15:58  4         A.    No.

06:16:00  5         Q.    Going back, there's -- you mentioned that one

06:16:15  6    day you went to the office and you talked to Patrick

06:16:18  7    Freeney in his office involving the allegation that you

06:16:27  8    missed a day of work.

06:16:29  9         A.    Yes.

06:16:30  10        Q.    Do you remember that?  And you mentioned that

06:16:33  11   when you were walking out, you also met with someone

06:16:36  12   that you believed to be in HR.

06:16:37  13        A.    Correct.

06:16:38  14        Q.    Was that person's name Catherine Barnes?

06:16:43  15        A.    I believe it was Catherine, the name.

06:16:46  16        Q.    Okay.  And this was all before you were

06:16:56  17   suspended; is that right?

06:16:58  18        A.    Yes, those are before -- way before I was

06:17:01  19   suspended.

06:17:01  20        Q.    Okay.

06:17:15  21        A.    And I spoke to her regarding overtime too at

06:17:19  22   the same time.  And they mentioned something to me

06:17:24  23   to -- if I wanted -- if I wanted -- they had mentioned

06:17:26  24   to me if I wanted to work overtime, there is different

06:17:31  25   accounts I can go work over there.  For example, if

06:17:39  1   this person is account manager and this person is

06:17:43  2   account manager, I can go to them, ask to -- if they

06:17:46  3   need a security officer to work for them.  The

06:17:50  4   instructor told me that too.  She told me that too.

06:17:57  5             After that, I met some -- like, I had a

06:18:03  6   phone number of somebody; I don't recall her name.  She

06:18:06  7   was account manager for one of the accounts.  She said,

06:18:10  8   I am willing to give you overtime, time to work with

06:18:16  9   me, and I can give you the difference by the overtime.

06:18:21 10   I can pay you in overtime.  I need you to work with me,

06:18:25 11   but you don't have to use your firearm -- like, the

06:18:30 12   Elite firearm equipments.  Do you have your own stuff?

06:18:33 13             I'm was like, Yes, I do.

06:18:35 14             She said, You need the permission of

06:18:37 15   Patrick Freeney for the overtime to -- you need the

06:18:42 16   permission to work with me from Patrick because you

06:18:46 17   work with him, that's his account -- that is your boss.

06:18:52 18   I never got the -- they refused me down to working that

06:18:58 19   account.

06:18:58 20        Q.   Who refused to let --

06:19:01 21        A.   Patrick.

06:19:02 22        Q.   Okay.  Did you tell Catherine Barnes this at

06:19:06 23   that time?

06:19:06 24        A.   At that time about the accounts?  No.  She

06:19:14 25   gave me the path to take and it didn't work.

06:19:20  1       Q.    What do you mean she gave you the path to

06:19:22  2   take?

06:19:22  3       A.    Like, basically she gave me -- I can go to

06:19:25  4   these accounts and ask for people --

06:19:28  5       Q.    I see.

06:19:29  6       A.    -- ask for -- she gave me, like, heads-up to

06:19:33  7   go to these accounts to get -- ask for extra hours.

06:19:37  8              And even Monroe, he -- he talked to the

06:19:40  9   lady and he said she expecting a text from you or a

06:19:45 10   phone call and you can call her, introduce yourself to

06:19:52 11   her and she's -- she will help you.  She have contracts

06:19:53 12   with the City of Houston, downtown area, I belief,

06:20:00 13   12-hour shifts.  I don't know how long.

06:20:02 14              So I contacted her.  I introduced myself,

06:20:06 15   talked to her.  I said, I'm willing to work.

06:20:09 16              She said, I have 12-hour shift.  Can you

06:20:12 17   take 12 hours?

06:20:13 18              I was like, Yes, for sure.  I can take

06:20:16 19   many hours you got.  I have no problem.

06:20:17 20              She said, You need permission from your

06:20:19 21   account manager.  And the permission was never granted,

06:20:21 22   so I was not able to work overtime.  But at the same

06:20:25 23   time, after that happened, I met other officers, they

06:20:28 24   were working with me.  They were working for different

06:20:34 25   accounts and doing different overtime with different

06:20:37  1    accounts, but I was the only one who was not granted

06:20:40  2    that opportunity.  And that was very -- like, very

06:20:43  3    something different, something weird.  Why am I not

06:20:47  4    granted the opportunity as the other guys?  Why these

06:20:50  5    guys get an opportunity to work somewhere else with

06:20:52  6    different accounts, not me?

06:20:54  7              But there was nobody to go to to do

06:20:57  8    something about it because Patrick, he's the one who

06:21:02  9    makes the decision.  He's the one who pull the trigger

06:21:05 10    on you, basically.  There was nobody to go to complain.

06:21:09 11    If you go to HR, HR is not helping you.  They said that

06:21:14 12    basically talk to your account manager or we not -- we

06:21:20 13    don't deal with things like that or -- like, for

06:21:24 14    example, overtime.  We don't deal with discrimination,

06:21:26 15    we don't deal with this.  So there was no -- there was

06:21:29 16    no other path to take.  There was nowhere to go.

06:21:32 17              If there was a different path to take or

06:21:35 18    a different place to go, I absolutely would have went.

06:21:37 19    I asked for the opportunity to talk to Patrick's boss.

06:21:42 20    I wanted to sit down with him to listen to me, to side

06:21:46 21    of my story.  They turned me down.  They said, Nobody

06:21:48 22    wants to listen to your dumb ass.  Nobody wants to see

06:21:53 23    you.

06:21:53 24              So there was no other path to take.

06:21:55 25    There is no other solution to take.

Twana Ahmed - September 19, 2024                    311

06:22:01 1        Q.    I'm going to show you what was marked as

06:22:06 2   AUS 037.

06:22:07 3        A.    Okay.

06:22:07 4        Q.    At the top it says "Use of Force Policy

06:22:16 5   Acknowledgment."

06:22:17 6        A.    Yes.

06:22:17 7        Q.    Is that right?

06:22:18 8        A.    Yes.

06:22:18 9        Q.    And the very first paragraph, I'm going to

06:22:24 10  read it --

06:22:24 11       A.    Okay.

06:22:24 12       Q.    -- and you tell me if what I'm reading is

06:22:28 13  correct.

06:22:29 14       A.    If I understand, okay.

06:22:30 15       Q.    It says, "Less than deadly force."

06:22:30 16       A.    Okay.

06:22:33 17       Q.    "It is Allied Universal's policy that

06:22:36 18  employees shall not use physical force against persons

06:22:40 19  unless the employee reasonably believes that such force

06:22:48 20  to be necessary" -- sorry.  It's hard to read

06:22:50 21  upsidedown.  "Reasonably believes that such force to be

06:22:54 22  necessary to protect the employee or another individual

06:22:58 23  from imminent bodily harm."

06:23:02 24            Did I read that correctly?

06:23:04 25       A.    Yes.

06:23:04  1        Q.    "The extent of force employed must not exceed

06:23:07  2    the minimum amount of force necessary to counter the

06:23:10  3    threat and may be employed only for as long as the

06:23:14  4    threat persists."

06:23:17  5                    Did I read that correctly?

06:23:18  6        A.    Correct.

06:23:19  7        Q.    As you understand this policy and as you were

06:23:29  8    trained during your Elite training or any other

06:23:33  9    training that Allied gave to you, was it your

06:23:36 10    understanding that you were allowed to use restraints

06:23:41 11    if you felt someone was a threat to your --

06:23:44 12        A.    Yes.

06:23:44 13        Q.    -- safety or the safety of others?

06:23:46 14        A.    Yes.

06:23:46 15        Q.    Were you trained during the Elite training

06:23:52 16    about the Use of Force Policy?

06:23:54 17        A.    I don't think so.  I can't recall that.

06:24:18 18        Q.    Okay.  But at some point while you were at

06:24:22 19    Allied, you -- you were told that you could use

06:24:32 20    handcuffs if someone was a threat to your safety or the

06:24:35 21    safety of others?

06:24:36 22        A.    Yes.  And they taught us how to place the

06:24:42 23    handcuff.  For example, I remember the instructor said

06:24:44 24    there's a bone over here.  Do not slap -- cuff the

06:24:50 25    person.  You might end up hurting him.  Try to do it

Twana Ahmed - September 19, 2024                    313

06:24:55  1    gentle as you can.  You put the handcuffs and just,

06:24:57  2    like, push it down and handcuffing him.

06:25:00  3                And we did dummy training.  So basically,

06:25:03  4    we handcuffed each other.  Like, the other employee

06:25:07  5    handcuffing each other on how to do it.  You turn

06:25:11  6    around and handcuffing them behind their head.  Don't

06:25:14  7    do this, don't do that.  How to do proper restraints

06:25:18  8    and make sure the person is not hurt.  Make sure it's

06:25:21  9    not tight.  They showed us the key has a double lock.

06:25:25 10    You can put the -- the upside key to double lock it to

06:25:29 11    make sure it doesn't tight, it can't hurt his wrist or

06:25:34 12    anything like that.  That was part of the training.

06:25:36 13        Q.   Okay.  After the incident at H-E-B on

06:25:46 14    April 4th, 2022, when Alex showed up to the H-E-B, did

06:25:55 15    you tell Alex that the man threatened to cut you up?

06:26:01 16        A.   Yes.

06:26:02 17        Q.   Okay.  Did Alex tell you that he would

06:26:06 18    complete the incident report for you in Helius?

06:26:16 19        A.   He said, Don't worry about anything.  The most

06:26:24 20    important thing is you need to come to the office

06:26:26 21    tomorrow.  When I was filling up the paper he gave me,

06:26:29 22    he goes, like, Don't worry about it.  Don't worry about

06:26:32 23    it.  You don't have to do this either.  Come to the --

06:26:36 24    come to the office tomorrow.

06:26:38 25                Did he mention Helius?  I believe so, he

06:26:44  1  mentioned Helius.  If it's gonna do it or not, I can't

06:26:48  2  recall that specifically.  But he did not let me

06:26:52  3  complete the form, the one I got provided today, he

06:26:56  4  didn't let me complete that.

06:26:57  5       Q.   Okay.

06:26:58  6       A.   He said, I don't have time.  I don't have time

06:27:01  7  for this.  I have to go.  It's just -- it's taking a

06:27:05  8  while to fill it up.  It's too much.

06:27:09  9       Q.   Okay.  Do you remember telling me before that

06:27:12 10  Alex told you he would complete the incident report for

06:27:15 11  you in Helius?

06:27:18 12       A.   Can't recall that.

06:27:32 13       Q.   Okay.  When you met with Patrick Freeney in

06:27:40 14  the office after the H-E-B incident, did you tell him

06:27:45 15  that he was discriminating against you?

06:27:47 16       A.   Yes, I did.

06:27:49 17       Q.   Okay.  And what did he say?

06:27:52 18       A.   I told him, You are discriminate against me.

06:27:58 19  And that's when he start yelling at me, raising his

06:28:06 20  voice, his tone of voice.  Very aggressively told --

06:28:15 21  raised his voice of tone towards me.  And I was trying

06:28:19 22  to complete the sentences of what exactly he's saying

06:28:22 23  to me, like trying to say, Why are you discriminate

06:28:25 24  against me?  I'm being treated not fairly.  He didn't

06:28:30 25  want to listen to what I was trying to tell him at all.

Twana Ahmed - September 19, 2024                    315

06:28:32  1    He was cussing me out, yelling at me, saying very

06:28:38  2    provocative word towards me, calling me dumb ass, loose

06:28:43  3    cannon.  I'm gonna threaten you with arrest.

06:28:49  4    Threatening me with all kinds of stuff.  And I was

06:28:52  5    really scared and afraid of him.

06:28:54  6        Q.    Okay.  I'm looking for the...  I'm looking for

06:29:42  7    the counseling.  Notices of counseling.  Do you have

06:29:49  8    those handy with you?  I think I see it at the very

06:29:53  9    bottom.  The coaching.

06:29:54  10       A.    This one (indicating)?

06:29:56  11       Q.    Yes.  And then there's one other one.

06:30:57  12             Sorry.  I think it's marked Exhibit 31,

06:31:01  13   but I can't seem to find it in my stack.

06:31:06  14       A.    31?

06:31:07  15       Q.    I think so.

06:31:12  16       A.    Is it this one (indicating)?

06:31:14  17       Q.    Yes.  So looking again at Exhibit 30, which is

06:31:22  18   Bates No. AUS 34, while you were working at Allied --

06:31:33  19       A.    Yes.

06:31:33  20       Q.    -- did Patrick give you this Counseling

06:31:37  21   Disciplinary Notice?

06:31:38  22       A.    No.

06:31:39  23       Q.    Okay.  Did Patrick ask you to sign this?

06:31:47  24       A.    No.

06:31:47  25       Q.    Did Patrick ever tell you that you had a dirty

Twana Ahmed - September 19, 2024                    316

06:31:51  1    uniform?

06:31:51  2         A.    Never.

06:31:52  3         Q.    Did Patrick ever tell you you had dirty pants?

06:31:55  4         A.    Never.

06:31:55  5         Q.    Okay.  So when you testified that you might

06:31:56  6    have seen this before, were you referring to reviewing

06:31:59  7    it in the documents that were provided to us after you

06:32:02  8    filed the lawsuit?

06:32:03  9         A.    Yes.

06:32:06  10        Q.    Okay.  Looking back at -- now looking at

06:32:13  11   Exhibit 31.  When you met with Patrick on April 6th,

06:32:24  12   which would have been -- I'm sorry.  Strike that.

06:32:26  13             When you met with Patrick on April 5th,

06:32:31  14   which would have been the day after the incident at

06:32:35  15   H-E-B, did Patrick hand you this document?

06:32:40  16        A.    I seen documents like that, but -- but I did

06:32:51  17   not sign.

06:32:52  18        Q.    Do you remember telling me before that the

06:32:55  19   document that Patrick handed you was typed -- typed up,

06:33:00  20   not handwritten?

06:33:01  21        A.    It was computerized.  It was the same one but

06:33:04  22   it was computerized.

06:33:07  23        Q.    So this -- is this document typed up,

06:33:13  24   computerized?

06:33:14  25        A.    No.

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000507

| | | |
|---|---|---|
| 06:33:16 | 1 | Q.   So as -- |
| 06:33:18 | 2 | A.   By I -- sorry to cut you off.  By I mean |
| 06:33:22 | 3 | computerized, the writing was computerized, not the -- |
| 06:33:26 | 4 | this is what's computerized.  It was typed up in the |
| 06:33:29 | 5 | computer. |
| 06:33:29 | 6 | Q.   You mean the -- underneath where it says |
| 06:33:31 | 7 | "facts" -- |
| 06:33:32 | 8 | A.   All of it. |
| 06:33:33 | 9 | Q.   -- it was not handwritten? |
| 06:33:35 | 10 | A.   No.  All this not handwritten, no. |
| 06:33:38 | 11 | Q.   Okay.  So then I'm asking you again:  Did he |
| 06:33:42 | 12 | hand you a document that was -- that was typed up, like |
| 06:33:46 | 13 | computer font, and hand you this document? |
| 06:33:48 | 14 | A.   No.  It was just computer typed. |
| 06:33:50 | 15 | Q.   Okay.  So then sitting here now, does that |
| 06:34:00 | 16 | refresh your memory:  Did you receive this document the |
| 06:34:03 | 17 | day you met with Patrick after the incident? |
| 06:34:06 | 18 | A.   Not that specific document, no. |
| 06:34:08 | 19 | Q.   Okay.  Do you remember what the typed-up |
| 06:34:09 | 20 | version said? |
| 06:34:10 | 21 | A.   It was a report of -- I remember saying I |
| 06:34:18 | 22 | acted alone to detain a customer of H-E-B.  That's one |
| 06:34:22 | 23 | of the phrases.  That's when I did not agree with it |
| 06:34:26 | 24 | because I not -- I did not acted alone, and they were |
| 06:34:32 | 25 | not -- they were not customer of H-E-B.  They were |

06:34:34  1    trespass.  I tried to explain they were trespass from

06:34:38  2    every single H-E-B property.  It didn't matter.  It

06:34:42  3    could be Central Market, H-E-B, City -- City Fiesta or

06:34:50  4    anything.

06:34:50  5              He was not -- he didn't want to listen.

06:34:53  6    And this is not the one.  This has been wrote by him in

06:34:57  7    a couple of -- there's a couple of different inks.

06:35:01  8    There's blue inks, there's black ink.  The one they

06:35:06  9    provided to me, it was wrote by a -- like example, like

06:35:09 10    a computer.  I said, I'm not gonna refuse -- I'm not

06:35:12 11    gonna sign it.  I refuse to sign it.  And he got very,

06:35:15 12    very pissed when I refused to sign that.  And he cussed

06:35:20 13    me out.

06:35:21 14        Q.   Okay.  You testified also that after --

06:35:31 15    sometime after your last meeting with Patrick in April,

06:35:39 16    someone from HR emailed you asking for you to fill out

06:35:44 17    a form again.  Do you recall that testimony?

06:35:48 18        A.   Yes, yes.  Yes, I do.

06:35:50 19        Q.   Okay.  Was that person Catherine Barnes?

06:35:54 20        A.   I believe so, yes.

06:35:57 21        Q.   Okay.  And I believe you testified that you

06:36:02 22    responded to her.  When you said that, do you mean that

06:36:05 23    you responded to her via email?

06:36:07 24        A.   Yes, I responded back to her.

06:36:10 25        Q.   Okay.  And when you responded back to her, did

Twana Ahmed - September 19, 2024                    319

06:36:16  1   you, in the email, tell here that you felt you were

06:36:27  2   being discriminated against?

06:36:30  3        A.   Yes.

06:36:30  4        Q.   Did she respond to that email?

06:36:32  5        A.   I think she did.  She said that's -- I don't

06:36:35  6   remember the exact word.  One of her response was

06:36:39  7   that's not her line of work or she doesn't get involved

06:36:42  8   in things like that.

06:36:56  9        Q.   Do you recall if she immediately responded to

06:36:58 10   your email?

06:37:05 11             Strike that.  Let me rephrase.

06:37:07 12             If she would have responded to that

06:37:11 13   initial email, would you have a record of it?

06:37:14 14        A.   If she responded to that email?  I think so.

06:37:20 15        Q.   You would have a record of it?

06:37:22 16        A.   Probably.

06:37:23 17        Q.   You would have given it to me for the lawsuit;

06:37:27 18   is that right?

06:37:27 19        A.   Yes.

06:37:30 20        Q.   Okay.  So if the email -- if the email chains

06:37:36 21   show that she did not respond to that email, would that

06:37:38 22   be accurate?

06:37:41 23        A.   Sorry.  Can you ask the question again?

06:37:45 24        Q.   Yeah.  If the email chain showed that she did

06:37:48 25   not respond to that email, would that be accurate?

06:37:54  1    A.    If the email showed she didn't respond?  That

06:37:57  2  would be accurate, like, she didn't respond.  But I

06:37:59  3  believe -- I think she responded.  It was the same

06:38:04  4  Catherine Barnes or something.  I don't know.  But

06:38:07  5  somebody responded back to me about the -- that's not

06:38:12  6  their business.  They not -- they don't get in

06:38:16  7  employees' affair.

06:38:19  8    Q.    And if I represented to you that she -- she

06:38:22  9  did not initially respond in the email chain, do you

06:38:25 10  have reason to doubt me?

06:38:26 11    A.    No.

06:38:29 12    Q.    Okay.  And if I represented to you that you

06:38:32 13  had to email her a second time asking what's going on

06:38:37 14  and then that's when she responded --

06:38:39 15    A.    She responded.  Correct.

06:38:44 16    Q.    Okay.  Does that refresh your recollection?

06:38:47 17    A.    Yes.

06:38:48 18    Q.    Okay.  There were some questions today about

06:39:31 19  when you received a phone call from Wayne Oliver after

06:39:36 20  the -- or about the investigation --

06:39:42 21    A.    Yes.

06:39:43 22    Q.    -- surrounding your hotline complaint.  Do you

06:39:46 23  remember that?

06:39:46 24    A.    Yes, I remember that.

06:39:47 25    Q.    Okay.  So if -- I think there was some

06:39:57  1    confusion about when you received that phone call.

06:40:03  2              If the email -- if your emails to Wayne

06:40:07  3    Oliver about the investigation were in June of 2022,

06:40:13  4    about how long after that did he tell you that he

06:40:19  5    believed you?

06:40:19  6        A.    When I talked to him, after me talking to him,

06:40:29  7    I believe he called me back or the same time.  He said

06:40:34  8    to me I -- I believe what you're saying but there is

06:40:41  9    nothing that I can do.  The decision has became down

06:40:45 10    from above.  There's nothing in my power I can do for

06:40:48 11    you.  And I can tell that you have been treated not

06:40:55 12    fairly but there's not much I can do.

06:40:57 13        Q.    Would it have been around the same month that

06:41:01 14    you sent him that email?

06:41:03 15        A.    I believe so.

06:41:04 16        Q.    Okay.  So sometime around June of 2022 or --

06:41:08 17        A.    Maybe.

06:41:09 18        Q.    -- a month after?

06:41:10 19        A.    Maybe.

06:41:11 20        Q.    Okay.  You were asked some questions about

06:41:28 21    providing your own statement or trying to provide your

06:41:34 22    own statement about the incident on April 4th of 2022;

06:41:41 23    is that right?  You were asked some of those questions;

06:41:47 24    is that right?

06:41:47 25        A.    Today?

06:41:48  1        Q.    Yes.

06:41:48  2        A.    Yes.

06:41:54  3        Q.    Did you ever prepare a statement about that on

06:42:03  4   your phone or anywhere else?

06:42:09  5        A.    Like, did I prepare it from today?

06:42:19  6        Q.    No.   That day.

06:42:21  7        A.    Of the incident?

06:42:22  8        Q.    Uh-huh.

06:42:23  9        A.    Yeah.   Like, I have my own statement but

06:42:28 10   nobody took it from me.   Like, nobody accepted

06:42:31 11   anything.   I tried to provide it to the supervisor.

06:42:35 12   They didn't want to accept it.   I tried to provide it

06:42:38 13   to Patrick.   They didn't want to listen to what I have

06:42:42 14   to say or what I have to write or what I have to tell

06:42:45 15   them.   They didn't want to listen to me.

06:42:47 16        Q.    Okay.   Are you the one that wrote the lawsuit

06:42:56 17   petition that's marked as Exhibit 1?

06:42:59 18        A.    Is it this one (indicating)?

06:43:06 19        Q.    Yes.   Did you write that?

06:43:13 20        A.    Like, me typing all these?

06:43:16 21        Q.    Right.

06:43:17 22        A.    No, not these.   I didn't write those.   So I

06:43:19 23   don't know --

06:43:19 24        Q.    Did you write anything in that document?

06:43:23 25        A.    What happened to me.

Twana Ahmed - September 19, 2024                    323

06:43:26  1        Q.   You wrote it?

06:43:27  2        A.   What happened to me.  Like, statements of me.

06:43:31  3   Like, not like these Allied versus -- no, I didn't

06:43:35  4   wrote those.  Like, I didn't know how to write these

06:43:38  5   words.

06:43:38  6        Q.   Do you understand what I mean by -- I guess

06:43:41  7   let me try to clarify.

06:43:43  8             Did you type any of that document?

06:43:51  9        A.   Like, type them or --

06:43:52 10        Q.   That actual document, did you type any of

06:43:54 11   that?

06:43:54 12        A.   This one?  No.

06:43:55 13        Q.   Okay.  Did you -- are you an attorney?

06:43:59 14        A.   I am not an attorney.

06:44:01 15        Q.   Okay.  Do you know what is required to be in a

06:44:04 16   lawsuit petition?

06:44:05 17        A.   No.

06:44:06 18        Q.   Would you have any idea of what's legally

06:44:12 19   required to be in a legal complaint or a legal

06:44:14 20   petition?

06:44:15 21        A.   No.

06:44:15 22        Q.   Okay.  In looking at the facts that are in the

06:44:24 23   complaint -- or I'm sorry -- in the petition, is it

06:44:29 24   complete?

06:44:29 25        A.   No.

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000514

06:44:29 1      Q.    Okay.   There's some stuff that you remembered

06:44:38 2   after we filed the complaint; is that right?

06:44:40 3      A.    Of course.

06:44:41 4      Q.    There's some stuff that you might have told me

06:44:44 5   that I did not put in the complaint; is that correct?

06:44:49 6      A.    That is correct.

06:44:50 7      Q.    And I'm sorry.   I keep calling it a complaint,

06:44:53 8   but it's actually a petition.   At the bottom of the --

06:44:56 9   or at the top of the page, do you see where it says

06:44:58 10  "Original Petition"?

06:44:59 11     A.    Yes.

06:45:00 12     Q.    Okay.   You were asked some questions about the

06:45:10 13  emotional distress that you suffered as a result of

06:45:15 14  what Allied did.   Has what Allied did affected you in

06:45:29 15  any of your relationships with your friends?

06:45:31 16     A.    It did, yes.

06:45:32 17     Q.    How?

06:45:32 18     A.    I had to borrow money from friends and I

06:45:36 19  couldn't pay them back.   And we -- things went very bad

06:45:43 20  and we stopped talking, some of my friends.   I had to

06:45:48 21  borrow money to pay my phone bill, my -- for food, for

06:45:57 22  groceries, for car maintenance because doing the

06:45:59 23  delivery was not paying off.   Making like 20 bucks, $30

06:46:04 24  a day, it doesn't pay off -- it was not paying off, so

06:46:07 25  I had to borrow money from friends.   And unfortunately,

06:46:12  1    I couldn't pay them back.  And I made the promise to

06:46:14  2    pay them back, and I will pay them back when I have the

06:46:18  3    funds.  But it did destroy relationship with friends.

06:46:23  4        Q.    Was there a time that you had to sleep in your

06:46:27  5    car?

06:46:27  6        A.    Yes.  Because I had -- I had nowhere to go.

06:46:37  7    The only place I had was my car that I own, that's paid

06:46:41  8    off.  And that's the only property that I legally own.

06:46:46  9    And nobody can take it away.  And that's the only -- I

06:46:49 10    had to sleep in my car because I couldn't pay the rent

06:46:56 11    and the bills where I was living at the time.  And they

06:47:01 12    mentioned it to me, so out of dignity and respect, I

06:47:09 13    just picked my stuff up and left because I did not want

06:47:12 14    to be in that shoes.

06:47:15 15        Q.    And you were asked some questions about what

06:47:21 16    it would take to resolve the -- the lawsuit.  Are you

06:47:32 17    also asking for money to punish Allied for what they

06:47:37 18    did?

06:47:37 19        A.    Yes.  And to admit what they did to me was

06:47:47 20    wrong.  They should never do it -- not just to me, to

06:47:52 21    anybody else.  No matter what they believe or no matter

06:47:56 22    what's the skin color or where they come from, they

06:47:59 23    should treat everybody with dignity and respect equally

06:48:04 24    and listen to their employees because their employees,

06:48:07 25    in the end of the day, they are human.  And that's the

06:48:10  1   way Allied Universal makes their money, towards

06:48:14  2   employees who works for them and fill up their

06:48:18  3   positions and the sites.

06:48:20  4        Q.   Can I see your Exhibit 1, quickly?

06:48:42  5        A.   (Tendering).

06:49:14  6        Q.   Okay.  I'm on page 16 of the original petition

06:49:19  7   which was marked as Exhibit 1.

06:49:23  8             Do you see where it says "remedies

06:49:27  9   requested"?

06:49:29 10        A.   Yes, I see that.

06:49:30 11        Q.   Okay.  Going down to Part C, under paragraph

06:49:39 12   88 -- I'm sorry.  Under 88 it says, "Twana respectfully

06:49:46 13   requests the following remedies."

06:49:48 14             Did I read that correctly?

06:49:50 15        A.   Yes.

06:49:51 16        Q.   Part C says, "The following additional

06:49:55 17   equitable relief:  No. 1, requiring defendant to adopt

06:50:00 18   and implement procedures and policies better designed

06:50:03 19   to ensure that race, ancestry, religion, or national

06:50:09 20   origin play no role in its work environment or

06:50:13 21   employment decisions."

06:50:16 22             Did I read that correctly?

06:50:18 23        A.   Yes.

06:50:18 24        Q.   Are you asking that Allied implement policies

06:50:24 25   to make sure they're not using an employee's race or

| | | |
|---|---|---|
| 06:50:29 | 1 | religion or national origin when it makes decisions? |
| 06:50:32 | 2 | A.    Of course. |
| 06:50:34 | 3 | Q.    Okay.  "No. 2:  Requiring defendant to provide |
| 06:50:37 | 4 | training to all employees in the United States on |
| 06:50:40 | 5 | discrimination prevention and related compliance with |
| 06:50:45 | 6 | the civil rights laws violated, with the training |
| 06:50:51 | 7 | specifics to be tailored later." |
| 06:50:54 | 8 | Are you asking that Allied ensure that |
| 06:50:57 | 9 | all employees are trained on discrimination laws? |
| 06:51:01 | 10 | A.    Yes. |
| 06:51:02 | 11 | Q.    Okay.  If Allied does not have to pay the full |
| 06:51:23 | 12 | value of what they did -- or to repay for what |
| 06:51:29 | 13 | they've -- how they harmed you, what would happen? |
| 06:51:33 | 14 | MR. SHINE:  Objection; calls for |
| 06:51:36 | 15 | speculation. |
| 06:51:39 | 16 | Q.    (By Ms. Hernandez) You can answer. |
| 06:51:42 | 17 | A.    Can you ask the question again? |
| 06:51:44 | 18 | Q.    Yeah.  Sorry.  It was not phrased very well. |
| 06:51:48 | 19 | If Allied is not made to pay for the full |
| 06:51:52 | 20 | harm that they've caused, what do you think would |
| 06:51:54 | 21 | happen? |
| 06:51:55 | 22 | A.    They will get -- they will get away with it |
| 06:51:57 | 23 | and they will do it again to other people.  They will |
| 06:52:01 | 24 | continue that path.  Because if somebody do something |
| 06:52:05 | 25 | wrong and they don't get punished for it, they're gonna |

06:52:10  1    think, oh, it's completely fine and they're gonna

06:52:13  2    continue do that, which is -- that's wrong.  If anybody

06:52:15  3    do something to somebody, they should be punished for

06:52:18  4    it to not do that again, to realize in the future

06:52:23  5    that's wrong, we got punished for it, we should not do

06:52:27  6    it.  Let's take a different path, a better path.

06:52:30  7        Q.   And under your understanding, at a trial who

06:52:40  8    would decide what the right amount would be?

06:52:43  9        A.   The jury.

06:52:48 10        Q.   Okay.

06:52:51 11               MS. HERNANDEZ:  Pass the witness.

06:52:59 12               MR. SHINE:  I think I have two questions,

06:52:59 13    Twana.

06:53:02 14               THE WITNESS:  Yes, go ahead.

06:53:02 15                        EXAMINATION

06:53:03 16    BY MR. SHINE:

06:53:03 17        Q.   In your lawsuit you're not alleging any

06:53:06 18    overtime violations against Allied, correct?

06:53:09 19        A.   They was giving me overtime, but like if I

06:53:19 20    worked hour and a half -- sorry -- if I worked over 40,

06:53:22 21    they will give me the overtime, but they refused to

06:53:26 22    give me overtime after that.

06:53:27 23        Q.   Right.  So my question is:  In this lawsuit,

06:53:31 24    you're not saying that Allied failed to pay you

06:53:35 25    properly, right?

Twana Ahmed - September 19, 2024          329

06:53:35  1        A.    I can't recall that.

06:53:40  2        Q.    So as we sit here today, is it your

06:53:44  3    understanding that Allied paid you for all of your time

06:53:47  4    that you worked?

06:53:47  5        A.    There's times that I worked, they didn't pay

06:53:51  6    me for.  For example, when I went to that post and I

06:53:53  7    turned back, they told me to go home, they didn't pay

06:53:58  8    me for that.  It's an hour to go and an hour to come

06:54:03  9    back, they not pay me for that.

06:54:06  10       Q.    In your complaint or your petition, the

06:54:09  11   lawsuit that has been filed, is it fair to say that

06:54:13  12   you've raised no issues with overtime?

06:54:16  13       A.    That is correct.

06:54:25  14       Q.    Okay.  You testified that you remembered facts

06:54:37  15   that were not contained in your complaint, correct?

06:54:44  16              MS. HERNANDEZ:  Objection; misstates

06:54:45  17   testimony.

06:54:50  18       A.    Correct.

06:54:51  19       Q.    (By Mr. Shine)  Did you ever try to amend your

06:54:56  20   complaint?

06:54:56  21       A.    Sorry?

06:54:57  22       Q.    Did you -- the lawsuit that you filed, did you

06:54:59  23   ever try to amend your lawsuit?

06:55:01  24       A.    What do you mean by "amend"?

06:55:03  25       Q.    To change the facts that were presented.  Did

CONTINENTAL COURT REPORTERS, INC.- HOUSTON
(713) 522-5080

APPENDIX 000520

06:55:10  1    you ever try to add more facts to your lawsuit?

06:55:13  2         A.    If I knew.  I don't know how to do it.

06:55:18  3         Q.    Is it your understanding that your attorney

06:55:20  4    tried to amend your complaint?

06:55:22  5         A.    I will leave it up to her to amend the

06:55:25  6    complaint.  I don't know how to do it.

06:55:27  7         Q.    So is it fair to say --

06:55:29  8         A.    There's stuff -- sorry I cut you off.  There's

06:55:32  9    stuff are missing in the complaint, yes.  It's not like

06:55:37 10    hundred percent complete, yes, that is -- that is

06:55:39 11    correct.  But do I know how to add it?  I don't know

06:55:41 12    how to add it.

06:55:42 13         Q.    Did you ever try to add it?

06:55:48 14         A.    At the moment, no.

06:55:55 15         Q.    And then finally, when your attorney was

06:56:03 16    asking you if Catherine Barnes ever responded to your

06:56:09 17    email and you testified that she did but it may have

06:56:14 18    been a couple of emails, do you remember talking about

06:56:19 19    that with your attorney?

06:56:20 20         A.    Yeah, I do remember that, yeah.

06:56:22 21         Q.    When Catherine eventually responded to you to

06:56:26 22    say that she doesn't get involved in employee

06:56:31 23    complaints, do you remember her responding to you about

06:56:34 24    that?

06:56:35 25         A.    She don't get in like -- that's not part of

APPENDIX 000521

06:56:38  1    her duty or --

06:56:40  2          Q.    Okay.

06:56:41  3          A.    -- or not part of her job.  She don't get in

06:56:44  4    the affair.  Something like that, in that category.

06:56:47  5          Q.    So if she had responded immediately with --

06:56:49  6    with that same statement or a week later with that same

06:56:53  7    statement, it doesn't change the fact that she didn't

06:56:55  8    get involved, right?

06:56:56  9          A.    It does gonna change the fact.

06:56:59 10          Q.    How does it change?

06:57:00 11          A.    If she were to provide me what to do and where

06:57:03 12    to go, I would have done it sooner.  If she would have

06:57:08 13    called me to the office and sat down with me and tried

06:57:11 14    to listen to me and give me an advice what to do, that

06:57:14 15    would have changed a lot.  If she would have told me,

06:57:18 16    Hey, call this person, come on into the office, I want

06:57:20 17    to talk to you personally about what's going on, that

06:57:22 18    would have changed a lot.  But none of those happened.

06:57:27 19          Q.    But at the end of the day, she still didn't

06:57:29 20    get involved with that type of complaint, right?

06:57:31 21          A.    She did not help.  That's basically the

06:57:35 22    answer.

06:57:35 23          Q.    Because her answer was that it's not her job,

06:57:38 24    right?

06:57:38 25          A.    Technically.  And I -- as I know what HR is,

06:57:43   1    they are there for the employee.  You know, you go to

06:57:46   2    them to help you out if something going on.  I didn't

06:57:51   3    know HR will turn you around like that and not help

06:57:55   4    you.

06:57:57   5                  MR. SHINE:  No further questions.

06:58:00   6                  MS. HERNANDEZ:  We'll reserve the rest of

06:58:01   7    our questions for trial.

06:58:03   8                  THE VIDEOGRAPHER:  Off record at 6:57.

           9                  (Deposition concluded at 6:58 p.m.)

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

# Exhibit 5

# excerpts from
# Allied Human Resources
# Manager Katherine Alyea
# deposition

# Deposition Transcript

Case Number: 4:23-cv-02823

Date: September 13, 2024

In the matter of:

# TWANA AHMED v UNIVERSAL PROTECTION SERVICE, LP, et al.

# Katherine Marie Alyea



Reported by:
Alyssa A. Repsik

**Steno**
**Official Reporters**

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

APPENDIX 000525

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2          SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

 3                         -   -   -
    TWANA AHMED,              ) CIVIL DIVISION
 4                           )
              Plaintiff,      ) NO. 4:23-cv-02823
 5                           )
        -vs-                  )
 6                           )
                             )
 7  UNIVERSAL PROTECTION      )
    SERVICE, d/b/a ALLIED     )
 8  UNIVERSAL SECURITY        )
    SYSTEMS,                  )
 9                           )
              Defendant.      )
10
                         -   -   -
11

12              REMOTE VIDEOTAPED DEPOSITION OF

13      KATHERINE MARIE ALYEA, located in Texas,

14      commencing at 1:33 P.M. CST, 2:33 P.M. EST, on

15      Friday, September 13, 2024, before ALYSSA A.

16      REPSIK, Court Reporter and Notary Public in and

17      for the Commonwealth of Pennsylvania.

18

19

20

21

22

23

24

25
```

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 2

```
1   APPEARANCES VIA ZOOM:
2   FOR THE PLAINTIFF:
3   AH LAW, PLLC
4   BY:  AMANDA C. HERNANDEZ, ESQ.
5   5718 WESTHEIMER, SUITE 1000
6   HOUSTON, TX 77057
7   Amanda@ahfirm.com
8
9   FOR THE DEFENDANT:
10  MARTENSON, HASBROUCK & SIMON, LLP
11  BY:  NATHAN A. SHINE, ESQ.
12  500 DAVIS STREET, SUITE 1003
13  EVANSTON, IL 60201
14  Nshine@martensonlaw.com
15
16  OTHER APPEARANCES:
17  JENNIFER MUNTER STARK, ESQ.
18  LEGAL VIDEOGRAPHER - TIMOTHY COX
19
20              ---o0o---
21
22
23
24
25
```

Page 3

```
1                INDEX
2               ---o0o---
                                        PAGE
3   EXAMINATION:  ATTORNEY HERNANDEZ       6
4
                ---o0o---
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Good
3   afternoon.  We are on the record at 1:33 p.m.
4   Central Time on September 13, 2024, to begin
5   the deposition of Katherine Marie Alyea in the
6   matter of Twana Ahmed versus Universal
7   Protection Services, LP, doing business as
8   Allied Universal.
9         The venue for this case is in the
10  United States District Court for the Southern
11  District of Texas, Houston Division.  The case
12  number is 4:23-CV-02823.
13         This deposition is taking place via
14  Zoom video conference.  The legal videographer
15  is Timothy Cox, here on behalf of Steno, and
16  the court reporter is Sara Acklin [sic], also
17  here on behalf of Steno.
18         So would counsel please identify
19  yourselves and state whom you represent.
20            ATTORNEY HERNANDEZ:  Amanda
21  Hernandez for the plaintiff, Twana Ahmed.
22            ATTORNEY SHINE:  Nathan Shine
23  for defendant, Universal Protection Service,
24  LP, doing business as Allied Universal Security
25  Services.
```

Page 5

```
1         THE VIDEOGRAPHER:  Thank you,
2   Counsel.
3         Would the reporter please swear in
4   the witness.
5            KATHERINE MARIE ALYEA, a
6   witness herein, having been first duly sworn,
7   was examined and testified as follows:
8                EXAMINATION
9   BY ATTORNEY HERNANDEZ:
10     Q.   Ms. Alyea, do you agree that
11  companies must protect employees from
12  discrimination in the workplace?
13     A.   Yes.
14     Q.   Is that important?
15     A.   Yes, it is.
16     Q.   On a scale of 1 to 10 where 1 is not
17  important at all and 10 is the most important,
18  how important is it that companies protect
19  employees from discrimination in the workplace?
20     A.   Well, I would say a 10, in my
21  perspective.
22     Q.   And why is it so important?
23     A.   Because I think it's -- well, in my
24  opinion, you always want to provide a safe work
25  environment for all your employees.
```

APPENDIX 000527

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 6

1    Q.    Why is that?
2    A.    Why?  Because I think that that's
3    the responsibility of the employer, in my
4    opinion.
5    Q.    Do you agree that companies must
6    protect employees from retaliation when they
7    report discrimination?
8    A.    Yes.
9    Q.    And on the same scale of 1 to 10,
10   how important is it that companies protect
11   employees from retaliation when they report
12   discrimination?
13   A.    10.
14   Q.    Do you agree that companies must
15   protect employees from retaliation when they
16   request religious accommodations?
17   A.    Yes.
18   Q.    And on the same scale of 1 to 10,
19   how important is it that companies protect
20   employees from retaliation when they request
21   religious accommodations?
22   A.    10.
23   Q.    And is it fine with you if I refer
24   to "Allied Universal" as just "Allied"?
25   A.    Yes.

Page 7

1    Q.    Okay.  Are Allied's policies and
2    procedures mandatory?
3          ATTORNEY SHINE:  Objection.
4    This witness is not a 30(b)(6) witness.
5          But to the extent she has personal
6    knowledge, she can answer.
7          THE WITNESS:  What was the
8    question, again?  I'm sorry.
9    BY ATTORNEY HERNANDEZ:
10   Q.    Are Allied's policies and procedures
11   mandatory?
12   A.    In my opinion, I would say yes.
13   We're obligated to follow them.
14   Q.    Okay.  And Allied has a
15   zero-tolerance policy for discrimination and
16   harassment; correct?
17   A.    That's correct.
18   Q.    And also, Allied has a
19   zero-tolerance policy for retaliation in the
20   workplace; correct?
21   A.    That's correct.
22   Q.    Would you agree that discrimination
23   in the workplace is a foreseeable danger to
24   employees?
25   A.    No.

Page 8

1    Q.    And why not?
2    A.    Well, in my opinion, I think that if
3    we're doing what we're supposed to be doing,
4    they shouldn't experience those things if we're
5    following the policies.
6    Q.    So would that mean that you believe
7    that discrimination and retaliation in the
8    workplace are preventable?
9    A.    I would think so, yes, in my
10   opinion.
11   Q.    And in your experience, what does
12   Allied do to ensure that there is no
13   discrimination or retaliation in the workplace?
14   A.    Well, I would believe that our
15   training would help accommodate some of those
16   things or educate people on what's -- what your
17   behavior should be in the workplace.
18   Q.    Okay.  Anything else besides
19   training?
20   A.    Well, training, policy.  All of
21   those things.
22   Q.    Okay.  Anything else besides
23   training and the policy?
24   A.    Well, I would think that the
25   managers are -- like I said, would uphold the

Page 9

1    company standards.
2    Q.    How does Allied ensure that the
3    managers uphold the company standards?
4    A.    Well, we have reporting procedures
5    if they're not holding the standards.  We have
6    training, like I said.  Remedial training.
7    It's ongoing.
8    Q.    Okay.  How long have you been with
9    Allied?
10   A.    10 years.
11   Q.    And what is your title?
12   A.    It's senior regional HR manager.
13   Human resources manager.
14   Q.    Have you always held that title?
15   A.    No.
16   Q.    Okay.  When you were first hired,
17   what was your title?
18   A.    My first title was with Allied
19   Barton, and I was the district support manager.
20   Q.    Was that an HR role?
21   A.    Yes, it was an HR function.
22   Q.    Was that in Houston?
23   A.    Correct, in Houston.
24   Q.    So you said 10 years, so would that
25   have been in 2014?

APPENDIX 000528

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 10

1    A.    That's correct.
2    Q.    Okay.  And when you were hired into
3    that district support manager role, what was
4    your relevant experience?
5    A.    As far as HR?  Is that what you
6    mean?
7    Q.    Yes.
8    A.    Well, I had experience as a
9    frontline manager when I came in here, but I
10   had also done my SHRM training and all that and
11   was being trained by the regional HR manager at
12   Allied Barton.
13   Q.    Do you still hold the SHRM
14   certification?
15   A.    I do.
16   Q.    You do.  So you've maintained
17   that -- when did you first become SHRM
18   certified?
19   A.    Well, I was PHR certified first, and
20   then when PH -- well, the HRCI and SHRM split.
21   Then I also got the SHRM.  Then I had let my
22   PHR go.
23   Q.    What does PHR stand for?
24   A.    It was Professional Human Resource.
25   It was the HRCI.

Page 11

1    Q.    And what does HRCI stand for?
2    A.    It's been a while since I actually
3    knew what the acronym was.  Human Resource
4    Institute -- something like that.  I don't
5    remember.  It's been so long.
6    Q.    That's okay.  It's okay.
7    A.    Sorry.
8    Q.    You're fine.  Do you have a college
9    degree?
10   A.    Yes, I do.
11   Q.    What is your degree in?
12   A.    Anthropology.
13   Q.    And when did you get that degree?
14   A.    1994.
15   Q.    I don't remember if you said this,
16   but when did you first become SHRM certified or
17   PHR certified?
18   A.    I believe it was -- I don't know the
19   exact date.  It was around the end of 2020 --
20   I'm sorry.  2013 or possibly 2014.
21   Q.    Okay.  So would it have been when
22   you were at Allied or before you were --
23   A.    No.  Prior.
24   Q.    Okay.  So did you have experience in
25   HR before you -- were -- did you have

Page 12

1    experience working as an HR professional before
2    you started working for Allied Barton?
3    A.    I was not an HR professional.  I was
4    a frontline manager.  I did do HR functions on
5    some level.
6    Q.    What were your duties as a frontline
7    manager?
8    A.    Well, I was the managing partner for
9    a restaurant, and so therefore, I onboarded my
10   employees.  I was responsible for session
11   planning.  Investigations as far as if -- as
12   long as they weren't HR investigations, more,
13   like, operational-type things, theft, things of
14   those nature, so I had to investigate those
15   type of things.
16   Q.    Okay.  But no investigations into
17   reports of discrimination or harassment?
18   A.    No.  I would have turned that over
19   to the HR people then.
20   Q.    Okay.  So then once you became
21   district support manager, did you receive
22   training on how to conduct investigations while
23   at Allied?
24   A.    Yes, I did.
25   Q.    Okay.  And as a district support

Page 13

1    manager, were you responsible for conducting
2    investigations?
3    A.    Yes, I was.
4    Q.    And did that include investigations
5    into reports of discrimination or harassment?
6    A.    Yes.
7    Q.    Okay.  I don't think I asked this,
8    but what were your duties as district support
9    manager?
10   A.    I managed the recruiting team, the
11   human recourse coordinator, the licensing
12   coordinator, as well as the training person and
13   the receptionist.
14   Q.    And then how long were you district
15   support manager?
16   A.    I was the district support manager
17   until the merger between Allied Barton and
18   Universal, and then my title changed to
19   regional HR manager, which I believe was, like,
20   the end of 2016, beginning of 2017.
21   Q.    And did you say you're -- is that
22   the same title you hold now, regional HR
23   manager?
24   A.    Yes, it's regional HR manager,
25   senior HR manager.

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 14

1    Q.    Are they interchangeable?
2    A.    Yes.
3    Q.    Okay.  What are your general duties
4  as regional HR manager?
5    A.    Well, I am in charge of -- I have a
6  team of two, and then I have -- I'm responsible
7  for the offer letters, adjudications,
8  investigations.  I'm usually the one that
9  partners with legal if there's questions.
10   Q.    Who's on your team of two?
11   A.    Wayne Oliver and Jose Luna.
12   Q.    Were you responsible for training
13 Wayne Oliver and Jose Luna on a thousand
14 conduct investigations?
15   A.    I did train them a little bit, but
16 we also have company training for
17 investigations.
18   Q.    Is that ongoing training or is that
19 something that you undergo when you are first
20 hired?
21   A.    It's for when you're first hired,
22 and it's also part of the NAVEX access is to
23 take the investigation training.
24   Q.    So just to clarify, so the
25 investigation training to get into NAVEX, is

Page 15

1  that different from the investigation training
2  that you received when you were first hired?
3    A.    With Allied Barton?
4    Q.    Yes.
5    A.    It was similar to it.  It was
6  conducted by the legal team.
7    Q.    Okay.  Do you remember who conducted
8  that training?
9    A.    No, I do not.  I'm sorry.
10   Q.    The investigation training that
11 Wayne Oliver and Jose Luna received, is that
12 the same -- when they were first hired, is that
13 the same as the NAVEX investigation training
14 you were referring to?
15   A.    No.  There's two separate trainings.
16 You get NAVEX training, and then you get the
17 investigation training.
18   Q.    Okay.  The investigation training
19 that Wayne Oliver and Jose would have received
20 when they were first hired, how long does that
21 training last?
22   A.    I'm not sure.  It might -- I don't
23 want to say.  I don't know.
24   Q.    What does it consist of it?
25   A.    It's presented by our legal team, so

Page 16

1  I'm not -- I don't know that that's the one I
2  took.  So I don't want to say.  I didn't take
3  that one.
4    Q.    Okay.  But you did take the NAVEX
5  training; correct?
6    A.    Correct.
7    Q.    And how long is the NAVEX training?
8    A.    About an hour.
9    Q.    Is it conducted online?
10   A.    No.  It's facilitated.
11   Q.    Were there materials given to you
12 through that training?
13   A.    No.  It's a -- it takes you through
14 on how to work the NAVEX system.
15   Q.    Okay.  So it's not specific to just
16 investigations; correct?
17   A.    No.
18   Q.    How long is the investigation
19 portion of that training?
20   A.    That's not specific to
21 investigation.  It just shows you basically how
22 to enter -- or enter your materials into NAVEX
23 and, like I said, to navigate the system.
24   Q.    Oh.  I see.  I may have
25 misunderstood.  I thought earlier you testified

Page 17

1  that there was specific investigation training
2  for entering into NAVEX?
3    A.    You have to take the investigation
4  training before you're allowed to enter NAVEX
5    Q.    I see.  And then the investigation
6  training you're referring to is the one that's
7  conducted by legal; is that right?
8    A.    Yes.  Sorry if I wasn't clear.
9    Q.    No, no.  It was my misunderstanding.
10        So is that a one-time training
11 that's given?
12   A.    Correct.
13   Q.    Okay.
14   A.    But I do have -- yes, it is.  I'm
15 sorry.
16   Q.    Okay.  No problem.  Let's see.
17        Have you ever had to testify in a
18 deposition before?
19   A.    Yes.
20   Q.    For a while you were working at
21 Allied?
22   A.    Yes.
23   Q.    Okay.  And when was that?
24   A.    I believe it was December of 2020
25 because it was also remote.  It was COVID.

APPENDIX 000530

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 18

1    Q.    Was this for a wrongful termination
2    case?
3    A.    No.
4    Q.    Okay.  Have you ever had to testify
5    as a corporate representative for Allied?
6    A.    Yes.
7    Q.    Would that have been also in
8    December of 2020?
9    A.    Yes.
10    Q.    When you were first hired with
11    Allied Barton, did you receive training on
12    discrimination and retaliation laws?
13    A.    Yes.
14    Q.    And how long was that training?
15    A.    I don't remember.  That was a long
16    time ago.
17    Q.    Okay.  Was that also a one-time
18    thing that you've not had to repeat?
19    A.    No.  I didn't repeat it.
20    Q.    Okay.  Do you agree that companies
21    must conduct immediate investigations when an
22    employee reports discrimination or harassment?
23    A.    Yes.
24    Q.    On a scale of 1 to 10, with 1 being
25    not important at all and 10 being extremely

Page 19

1    important, how important is that?
2    A.    10.
3    Q.    Do you agree that it would be wrong
4    to ignore reports of discrimination or
5    harassment?
6    A.    Yes, I believe it would be.
7    Q.    Do you agree that it would be
8    reckless to ignore reports of discrimination or
9    harassment?
10           ATTORNEY SHINE:  Objection.
11    Calls for a legal conclusion.
12           To the extent she has personal
13    knowledge and can answer, she may testify.
14           THE WITNESS:  I'm sorry.  What
15    was the question?
16    BY ATTORNEY HERNANDEZ:
17    Q.    Do you agree that it would be
18    reckless to ignore reports of discrimination or
19    harassment?
20    A.    Yeah.  I guess I would agree without
21    knowing the circumstances.
22    Q.    From your time starting with Allied
23    until today, how many discrimination or
24    retaliation reports do you think you've had to
25    investigate?

Page 20

1    A.    Like, a number?  Specific number?
2    Q.    Yes.
3    A.    Possibly 30 or 40.
4    Q.    Okay.  Would that include reports
5    of -- reports that your subordinates would have
6    investigated?
7    A.    Some, but I'm speaking specifically
8    about myself, though.
9    Q.    Okay.  Thank you.
10    A.    I can't give you a total of all my
11    complaints.
12    Q.    In your region as -- as the regional
13    HR manager, how many employees -- how many --
14    how many Allied employees are -- I guess,
15    reports are funneled to you?
16           Like, are you in charge of a certain
17    number of employees in that region?
18    A.    Yes.
19    Q.    How many are there?
20    A.    Approximately 8,500 or more.
21    Q.    And so for those 8,500, it's your
22    team of you and Wayne Oliver -- and I've
23    forgotten -- Jose Luna.
24    A.    Jose.
25    Q.    It's just you three?

Page 21

1    A.    Correct.
2    Q.    Okay.  Did Allied have any manuals
3    regarding how to conduct investigations that
4    you follow when you're conducting these
5    investigations into report of discrimination?
6    A.    We have templates that we can use if
7    we choose to use them.
8    Q.    Do you typically --
9    A.    And --
10    Q.    Sorry.  Go ahead.
11    A.    They're just forms.
12    Q.    Do you typically use those forms?
13    A.    Sometimes.  It just kind of depends
14    on the nature of the complaint.
15    Q.    Can you explain a little bit more?
16    When would you typically use the forms?
17    A.    Well, I use the questions that they
18    have, but then I tailor them to the specific
19    complaint.
20           So I don't write everything on the
21    form.  Then I may take the questions off, if
22    that makes sense.
23    Q.    Okay.  Would you agree that it's
24    important to document every aspect of an
25    investigation into discrimination?

APPENDIX 000531

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 22

1    A.    Yes.
2    Q.    Okay.  And then in your supervision
3 of Wayne and Jose, have you tasked them with
4 using these forms?
5    A.    They do have them to use.
6    Q.    Do they typically use the forms?
7    A.    Not in every case, no.
8    Q.    Okay.  Are they expected to use the
9 questions on the forms?
10    A.    It would depend on the case.  Yes.
11    Q.    Okay.  If it was a report of -- if
12 it was a report of discrimination, would they
13 typically be expected to use the questions on
14 the forms?
15    A.    Not necessarily.  Like I said,
16 they're a guide.  They're a template.
17    Q.    Okay.  In your training and
18 experience of investigating reports of
19 discrimination, have you been trained to look
20 for signs or red flags that might indicate
21 discrimination?
22    A.    Yes.
23    Q.    Do any come to mind to you right
24 now?
25    A.    What do you mean?  Like, examples of

Page 23

1 discrimination?
2    Q.    Right.  Signs or red flags of
3 potential discrimination?
4    A.    I don't have an example off the top
5 of my head.  I mean, typically, when I do
6 training, it's just basically treating somebody
7 differently than others.
8    Q.    Okay.  Could it -- in your
9 experience, could it be a red flag of
10 discrimination if an employee's accent was
11 mocked?
12    A.    Could be.
13    Q.    Could it be a sign or red flag of
14 discrimination if an employee was pressured to
15 shave his beard after indicating a religious
16 need to keep the beard?
17    A.    Yes.
18    Q.    Could it be a sign or red the flag
19 of discrimination if an employee was issued a
20 faulty weapon and other employees were issued
21 working weapons?
22    A.    I guess I would have to determine if
23 that was purposeful or not.
24    Q.    And so if it was purposeful, could
25 that be a sign of discrimination?

Page 24

1    A.    Yes.
2    Q.    Could it be a sign or red flag of
3 discrimination if an employee was not issued
4 equipment that other employees were issued?
5    A.    Yes.
6    Q.    Could it be a sign or a red flag of
7 discrimination if an employee of a different
8 national origin was told to go back to his
9 country?
10    A.    Yes.
11    Q.    Could it be -- could cussing at an
12 employee be a sign or red flag of
13 discrimination?
14    A.    I would say unprofessional, not
15 necessarily.  It would depend on the words.
16    Q.    Okay.  Could racial slurs toward an
17 employee be a red flag --
18    A.    Of course.
19    Q.    -- of discrimination?
20    A.    Yes.
21    Q.    And could a failure to follow
22 policies be a red flag of discrimination?
23    A.    Yes.
24    Q.    Do you agree with this statement:
25 "Our community has the right to expect that

Page 25

1 employers will care about following the law"?
2    A.    Reread it one more time.
3    Q.    Sure.  "Our community has the right
4 to expect that employers will care about
5 following the law."
6    A.    I would agree.
7    Q.    And then in your experience and
8 understanding of employment retaliation, can
9 discipline ever be applied in a way that's
10 retaliatory?
11    A.    Yes.
12    Q.    Can you give us some examples?
13    A.    Well, I mean, if somebody had filed
14 a complaint and somebody took action against
15 them after, then, yes, that would be
16 considered.
17    Q.    Okay.  In your experience and
18 training, have you been taught to look for
19 signs or red flags of retaliation in
20 investigations?
21    A.    Yes.
22    Q.    And do any of those come to mind
23 right now?
24    A.    I mean, not a specific example, no.
25    Q.    Okay.  Would close timing between a

APPENDIX 000532

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 26

1  report and the discipline be a potential sign
2  of retaliation?
3      A.    Yes.
4      Q.    Could ignoring reports of
5  discrimination be a sign of retaliation?
6      A.    Yes.
7      Q.    Could physical threats after a
8  protected activity be a sign of retaliation?
9                ATTORNEY SHINE:  Objection.
10  Calls for a legal conclusion.
11               ATTORNEY HERNANDEZ:  Let me
12  back up.
13  BY ATTORNEY HERNANDEZ:
14     Q.    In your experience and training, are
15  you familiar with what a protected activity is,
16  and how would you define "protected activity"?
17     A.    I would say it's something like --
18  are you -- well, it's just -- I don't know.
19  I'm trying to think of an example, but
20  typically, like, our social media or religious
21  beliefs, all those things are, to me, are
22  protected activities on some level.
23     Q.    Would a report of discrimination be
24  considered protected activity?
25     A.    Mm-hmm.

Page 27

1      Q.    Would opposing discrimination be
2  considered protected activity?
3      A.    Yes.
4      Q.    Would requesting an accommodation be
5  considered protected activity?
6      A.    Yes.
7      Q.    In your experience, could threats to
8  fire an employee after his protected activity
9  be a red -- potential red flag of retaliation?
10     A.    Yes.
11     Q.    Could physical threats after
12  protected activity be a potential red flag of
13  retaliation?
14     A.    Yes.
15     Q.    Could visible anger after protected
16  activity be a sign or red flag of retaliation?
17     A.    Yes.
18     Q.    Could threats to revoke the
19  employee's security license after protected
20  activity be a sign or a red flag of potential
21  retaliation?
22     A.    Yes.
23     Q.    And could failure to follow policies
24  be a potential sign of retaliation?
25     A.    Yes.

Page 28

1      Q.    What was your involvement with the
2  investigation into Twana Ahmed's report of
3  discrimination?
4      A.    I'm sorry?  What?
5      Q.    What was your involvement with the
6  investigation into Twana Ahmed's report of
7  discrimination?
8      A.    So typically, if one of my reports
9  has an investigation of that nature, I'll coach
10  them.  I'll ask them questions, where they are
11  along with it, where they are in the process
12  and any other suggestions that I may have, that
13  they'll bring any concerns to me, and then I'll
14  assist them.
15     Q.    Okay.  Maybe I didn't ask it in the
16  right way.  But were you involved with
17  investigating the report that Twana Ahmed made?
18     A.    No.  I mean typically, if they are
19  assigned the case, it's their case.  But I do
20  have -- like, we have weekly meetings where we
21  cover certain items, like, if they have
22  questions or -- I mean, I office with Wayne, so
23  if he has questions, you know, they can come
24  and talk to me as they go through the process.
25     Q.    I see.

Page 29

1      A.    I'm a resource for them.
2      Q.    I see.  Did you assign the
3  investigation to Wayne when it came in?
4      A.    I don't remember being the one that
5  assigned it to him.  I would say it was
6  probably my supervisor that assigned it to him.
7      Q.    And who is your supervisor at the
8  time?
9      A.    LaShonda Tenner.
10     Q.    Okay.  In Wayne's investigation into
11  Twana Ahmed's report of discrimination, did you
12  find it unusual that Patrick Freeney did not
13  type out his notices of counseling?
14     A.    I would not find that totally
15  unusual because sometimes those are issued in
16  the field, and they may not have their
17  computers.
18               I have other sites that, you know,
19  don't have a computer at all, so typically -- I
20  mean, I prefer them to be typed, but it's not
21  unusual.
22     Q.    Why do you prefer them to be typed?
23     A.    Because of handwriting or
24  penmanship, so to say.  It's easier to read
25  sometimes if they're typed.

APPENDIX 000533

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 30

1     Q.    Okay.  And in your -- so did you
2  kind of oversee this investigation that Wayne
3  did?
4     A.    I wouldn't say that I oversaw it.
5  Did I have knowledge of it?  Yes.
6     Q.    Okay.  Were you involved in any way
7  in the investigation?
8     A.    Like I said, I coached him, or if he
9  had questions, he came to me to ask me a
10  question.
11          But I did not -- I was not, like,
12  the person conducting the investigation.
13     Q.    Okay.  During the investigation, it
14  looks like you asked whether a member of HR had
15  approved Twana's termination.
16          Is that correct?
17     A.    Yes.  I typically ask that, who they
18  partnered with.
19     Q.    Okay.  Is it typical procedure that
20  a member of HR needs to be -- needs to approve
21  terminations?
22     A.    We like to have oversight on them so
23  that we can make sure that, you know, the
24  verbiage is there.  It's not always going to be
25  our decision.  The branch managers have that

Page 31

1  latitude to do that.  We do, like I said, like
2  to review things as they happen.
3     Q.    I see.  Is it nine times out of ten
4  typical that someone from HR would overview a
5  termination -- or oversee a termination?
6     A.    Usually, like I said, they'll come
7  to us for a recommendation.  Not always are we
8  the ones that are putting our stamp of
9  approval.  The branch has -- the branch
10  managers and such have that latitude.
11     Q.    Okay.  So if a manager wants to
12  terminate a security professional, they would
13  either partner with someone from HR or a branch
14  manager; is that correct?
15     A.    Yes.  Sometimes the branch manager
16  will --
17     Q.    Okay.
18     A.    -- take lead.
19     Q.    I'm sorry.  What was that last thing
20  you said?
21     A.    I said, sometimes the branch manager
22  is involved, or they take the lead.  Like I
23  said, we like to make the recommendations or
24  review the information, but we're not always
25  the final decision.

Page 32

1     Q.    Okay.  But somebody else is
2  partnered with the manager; correct?
3     A.    Yes.  Usually.
4     Q.    Okay.  So there's some instances
5  when --
6     A.    No.  I'm just saying that normally,
7  they're -- they're not going to make that
8  decision on their own --
9     Q.    I see.
10     A.    -- at certain levels because we have
11  -- it's the hierarchy in the management.
12     Q.    I see.  So then at Patrick Freeney's
13  level, would he need someone from HR or the
14  branch manager to approve the termination?
15     A.    I would assume, especially with --
16  it would depend on the nature of the
17  termination, that it would have been made in
18  conjunction with his manager.
19     Q.    Okay.  As a member of HR, are you
20  ever involved when root cause analyses are
21  conducted?
22     A.    No.
23     Q.    Okay.  Have you ever been involved
24  when a root --
25     A.    No.  I'm aware of them, but I don't

Page 33

1  do them.
2     Q.    Got you.  Okay.  During the
3  investigation -- backing up.
4          You asked if a member of HR approved
5  Twana's termination; correct?
6     A.    Yeah.  I wanted to know basically
7  which person would have been involved, who was
8  involved.
9     Q.    And what was the response that you
10  got?
11     A.    I don't remember what he said.  I
12  want to say it was no, but I don't know.  I
13  don't want to say the wrong thing, like, give
14  you the wrong information.
15     Q.    Sure.  It's no problem.
16          Does the name Don Massey ring a bell
17  to you?
18     A.    Yes.
19     Q.    Who is Don Massey?
20     A.    Don Massey was the general manager
21  for one of the Houston branches.
22     Q.    Okay.  Does he have an HR function?
23     A.    No.  He's the general manager of --
24  so the general managers have their own branch.
25  They -- a lot of the managers report to them,

APPENDIX 000534

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 34

1  so they do have some decision-making.
2      Q.    Would Felicia Solis have reported to
3  Don Massey?
4      A.    No.  They would have been equal.
5      Q.    Equal.  Okay.  So general manager
6  and branch manager are equal?
7      A.    One supervises more hours than the
8  other, but they're equal.
9      Q.    Okay.  I'm sorry.  You said one
10 supervises more hours?
11     A.    Yeah.  So in security, things are
12 divided by hours.  And so in my understanding,
13 I don't have direct knowledge of Felicia
14 because she's not in my area.  She's
15 specifically catered to the AGB account.
16     Q.    Okay.  I see.  During the
17 investigation, there was a question of whether
18 the report was a "He said.  He said" type of
19 situation; correct?
20     A.    Correct.
21          ATTORNEY SHINE:  Object to the
22 vagueness, Amanda.  If you can refer to what
23 investigation you're speaking about.
24          ATTORNEY HERNANDEZ:  Sure.
25 BY ATTORNEY HERNANDEZ:

Page 35

1      Q.    During the investigation into Twana
2  Ahmed's report of discrimination that Wayne
3  Oliver investigated, there was a question or a
4  comment made that -- that this was a "He said.
5  He said" type of situation; correct?
6      A.    Yes.
7      Q.    How does -- does -- in your
8  experience, does Allied place a higher value on
9  the manager's word over the employees word in a
10 "He said.  He said" type of situation?
11     A.    I wouldn't say necessarily.  I mean,
12 it's just based off the facts that you can --
13 or the trail that you can follow, so to speak.
14          But typically, I mean, the
15 supervisor's words do count, but again, we're
16 going to look into the complaint always,
17 especially if there are witnesses named or
18 something of that nature or text messages
19 provided, something that we can take action on.
20     Q.    And so if there are no witness and
21 no text messages, then what would happen?
22     A.    Well, typically, we're not going to
23 be able to substantiate the claim based on
24 there's no witnesses or no other information
25 provided.

Page 36

1      Q.    So in that situation, if the
2  employee is telling the truth, then the
3  discrimination would just go on unchecked;
4  right?
5      A.    Well, we're looking for -- I mean,
6  I've never -- I would have also looked at if I
7  had complaints prior around that person.
8          I mean, I take everything into
9  account in those types of situations, and
10 specifically to Twana's, there was no other
11 complaints.
12     Q.    Okay.  So if there are -- if there
13 were no other complaints, this is the first
14 time it's being reported and there are no
15 witnesses, then does that mean there are no
16 consequences if the manager actually did do the
17 thing but denies it?
18     A.    I don't understand the question.
19 Because if he -- why -- if I can't prove that
20 it happened, how would I take action on the
21 manager?
22          I mean, obviously, we would take
23 trainings and stuff like that, but I would have
24 to substantiate the claim.
25     Q.    Right.  So my question is:  If an

Page 37

1  employee is saying one thing and a manager is
2  saying another, right, there's no -- there's no
3  witness, there's no prior complaints -- assume
4  that -- I mean, there's no way for Allied to
5  know whether the employee is telling the truth;
6  right?
7      A.    Correct.
8      Q.    And so even if the employee was
9  telling the truth, there would be no
10 consequence to the manager; correct?
11     A.    We might issue training just to make
12 sure that they're aware that the behavior
13 that's reported is incorrect or inappropriate.
14     Q.    Was any training issued to Patrick
15 Freeney as a result of Twana's report?
16     A.    No.
17     Q.    Okay.
18     A.    Because he didn't work for us any
19 longer at that point.
20     Q.    I see.  Okay.  Would it have been
21 issued if he was still working?
22     A.    Yes.
23     Q.    It also looks like there was a
24 concern that -- let me see.
25          Did Patrick Freeney lie about who

APPENDIX 000535

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 38

1  signed Twana's notices of counseling?
2             ATTORNEY SHINE: Objection.
3  Calls for speculation.
4            To the extent you have any personal
5  knowledge, she can testify.
6               THE WITNESS: I don't know. I
7  wasn't able to investigate anything with that
8  because, like I stated, Patrick no longer
9  worked for us.
10 BY ATTORNEY HERNANDEZ:
11      Q.    Okay. Let me see if I can share my
12 screen.
13      A.    Okay.
14      Q.    Give me a second.
15           Are you able to see this E-mail
16 string?
17      A.    Yeah. I see mine. It says, "Okay.
18 I'll see you there tomorrow."
19      Q.    Okay. This is Bates-labeled
20 AUS_01297.
21           It looks like on June 15th you write
22 to Wayne Oliver --
23      A.    To Wayne.
24      Q.    I'm sorry?
25      A.    To Wayne, yes.

Page 39

1       Q.    Yes. You write to Wayne, and you
2  say, "That is true. That is a 'he said he
3  said.' What about the write-ups? Alex stated
4  that he did not sign or witness them. I'm
5  going to the north office to discuss with
6  Patrick tomorrow."
7            Did I read that correctly?
8       A.    Yes.
9       Q.    Okay. Did you go to the north
10 office to discuss this with Patrick?
11      A.    Yes, I did.
12      Q.    Okay. I thought you had just
13 testified that you weren't able to determine
14 what happened?
15      A.    I went to the office to talk to him,
16 but he had already quit.
17      Q.    Oh. I see. So when you went to the
18 office to discuss with him, he was no longer
19 there?
20      A.    Correct.
21      Q.    Okay. Understood.
22      A.    Sorry.
23      Q.    No, no. It's okay. It was my
24 misunderstanding.
25           So you have no way of knowing --

Page 40

1       A.    No.
2       Q.    -- what happened?
3       A.    Right. I didn't complete any
4  conversations with Patrick.
5       Q.    Okay. Did he give a reason for why
6  he quit?
7       A.    All I saw was a text message when I
8  processed his separation that it was personal
9  reasons.
10      Q.    Who did he text?
11      A.    I don't remember who the text was
12 to. That was just the resignation that I
13 received because I process the separations.
14      Q.    Okay. So then did he -- did he quit
15 that day that you were supposed to meet with
16 him?
17      A.    I don't remember the date on the
18 E-mail, but I think I went to the office on the
19 17th or -- I'm trying to remember. Because it
20 was the day after the conversation, and I went
21 to the north office, and he was no longer
22 there.
23      Q.    Okay. Did he know that you were
24 coming to talk to him?
25      A.    No, no.

Page 41

1       Q.    Okay. Excuse me.
2       A.    Bless you.
3       Q.    It's just a bad cough that I can't
4  get rid of for some reason.
5            During Wayne's investigation, did
6  you see that Patrick Freeney said Alex had
7  witnessed the counselings?
8       A.    Yes.
9       Q.    Okay. And in that investigation,
10 did you see that Alex said he did not witness
11 or sign them?
12      A.    Yes. That's what Wayne had brought
13 to my attention.
14      Q.    Okay. Isn't that an indication that
15 Patrick Freeney is not being truthful about the
16 counselings?
17             ATTORNEY SHINE: Objection.
18 Calls for speculation.
19           To the extent you have any personal
20 knowledge, you may answer.
21             THE WITNESS: I don't have any
22 personal knowledge. I didn't speak to Patrick.
23 I wouldn't draw a conclusion without speaking
24 to him.
25 BY ATTORNEY HERNANDEZ:

APPENDIX 000536

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 42

1    Q.    Okay.  Would it be a red flag to you
2  if somebody said -- if a manager said, "This
3  supervisor witnessed the counselings" when, in
4  fact, they did not?
5    A.    Yes.
6    Q.    Okay.  But that would -- so that
7  indication -- would that not be enough to
8  believe the employee over the manager's side of
9  the story?
10           ATTORNEY SHINE:  Objection.
11  Calls for speculation.
12           If you have any personal knowledge,
13  you can answer.
14           THE WITNESS:  I was just going
15  to say, I didn't have a conclusion.  I always
16  take all accounts or sides into the -- I didn't
17  hear his side or what was the actual situation.
18  BY ATTORNEY HERNANDEZ:
19    Q.    You didn't hear whose side?
20    A.    I didn't speak to Patrick.
21    Q.    Okay.
22    A.    Do I think -- yes.
23    Q.    But Wayne Oliver did speak to
24  Patrick; correct?
25    A.    Not to my knowledge about the

Page 43

1  signatures.  I don't know for -- I think he
2  said -- well, actually, I'm sorry.
3           I think he spoke to Patrick, and
4  Patrick said Alex was the witness.  And that
5  was my goal, to speak to Patrick.
6    Q.    Okay.  If you had spoken to Patrick
7  and that was a lie, would that have given you
8  reason to substantiate Twana's reports?
9    A.    Not necessarily.
10    Q.    So even if a manager is caught lying
11  about something, that does not tip the favor in
12  the employee's -- to the employee's side as far
13  as who to believe?
14    A.    Possibly.
15    Q.    It could?
16    A.    Possibly, yes.  I mean, I would take
17  everything into account.
18    Q.    I'm going to take a -- just a
19  10-minute break to grab some water.
20    A.    Okay.
21           THE VIDEOGRAPHER:  Okay.  We
22  are now off the record.  The time is 2:23 p.m.
23  Central Time.
24           (A recess was taken.)
25           THE VIDEOGRAPHER:  We are now

Page 44

1  on the record.  The time is 2:33 p.m. Central
2  Time.
3  BY ATTORNEY HERNANDEZ:
4    Q.    So it was your testimony that
5  Patrick Freeney quit via text prior to your
6  meeting with him; is that correct?
7    A.    I don't know when he provided the
8  text to his managers.  I just received that as
9  to process his separation.
10           So I --
11    Q.    Okay.  Sorry.  Go ahead.
12    A.    No.  I was just going to say, I
13  don't know -- like, I don't remember the date
14  on the text message.  I just know that I was
15  provided that.
16           I always ask for a resignation or
17  what they have to process the separation
18  because I attach that for future use, if
19  necessary, so that it's available to the
20  company.
21    Q.    Okay.  Either way, prior to your
22  meeting with him, he had already quit; correct?
23    A.    Right.  When I got there, he was no
24  longer an employee.
25    Q.    Okay.  Did anyone follow up with him

Page 45

1  to complete the investigation even though he
2  was no longer employed?
3    A.    I did not speak to him after that.
4  And I don't -- I didn't talk to him.  All I had
5  was his company number.
6    Q.    Okay.  You didn't have any other
7  phone number for him in his records?
8    A.    I don't remember if I called it or
9  not, to be quite honest.
10    Q.    Okay.  Because it's important in an
11  investigation of a reported discrimination to
12  talk to all the witnesses; correct?
13    A.    Yes.
14           ATTORNEY SHINE:  Objection.
15           THE WITNESS:  But it can --
16           ATTORNEY SHINE:  Calls for
17  speculation.
18           THE WITNESS:  Sorry.
19           ATTORNEY SHINE:  It's
20  objection.  Calls for speculation.  But to the
21  extent you have any personal knowledge that's
22  responsive, you can testify.
23           THE WITNESS:  I -- Wayne spoke
24  with him.  Wayne was conducting the
25  investigation.

APPENDIX 000537

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 46

1  BY ATTORNEY HERNANDEZ:
2      Q.   Okay.  If you had called him, would
3  it be documented in the file?
4      A.   Yes.  Probably.  Possibly.  But it
5  wasn't my case.  Like I said, I don't -- I
6  wouldn't have added to Wayne's case, so to
7  speak.
8      Q.   Mm-hmm.  Would it have been best
9  practices to follow up with Patrick after he
10 left?
11              ATTORNEY SHINE:  Objection.
12 Calls for speculation.
13              But to the extent you have personal
14 knowledge, you can testify.
15              THE WITNESS:  I'm not saying I
16 didn't.  I don't remember.  I mean, I don't
17 remember.
18 BY ATTORNEY HERNANDEZ:
19      Q.   Right.  I'm not asking if you
20 remember or not, but I'm asking, would it have
21 been best practice to follow up with Patrick
22 after the investigation -- after he left to
23 complete the investigation?
24              ATTORNEY SHINE:  Objection --
25 the same objection.  And, Amanda, can we please

Page 47

1  clarify which investigation you're referring
2  to.  Are we referring to Plaintiff's complaint,
3  or are we referring to Katherine looking into
4  the discipline documents?
5              I'm -- I'm personally confused.
6  BY ATTORNEY HERNANDEZ:
7      Q.   Well, you testified earlier that
8  during the course of Wayne Oliver's
9  investigation into Twana Ahmed's report of
10 discrimination, you had planned to go speak
11 with Patrick in person; correct?
12     A.   Yes.
13     Q.   Okay.  Was that part of the
14 investigation that Wayne Oliver was conducting?
15     A.   It was more to speak to the
16 disciplinary document provided, and who was
17 present for that is more or less what the
18 conversation would have been.
19     Q.   All right.  Is that -- was that an
20 important part of this -- the investigation
21 into Twana's report of discrimination?
22     A.   Well, I would want to determine who
23 was actually present and if there were any
24 additional witnesses that I had access to.
25     Q.   Right.  So that was part of the

Page 48

1  investigation into Twana's report of
2  discrimination; correct?
3      A.   Yes, I guess.
4      Q.   Okay.  So would it have been best
5  practice to follow up with Patrick even though
6  he was no longer employed to find out, you
7  know, the answers to your questions?
8              ATTORNEY SHINE:  Objection.
9  Calls for speculation.
10             You can answer.
11             THE WITNESS:  I'm not saying I
12 didn't.  I don't remember.
13 BY ATTORNEY HERNANDEZ:
14     Q.   Right.  No, I'm not saying that you
15 didn't either.  I'm just asking, as part of
16 your training and experience --
17     A.   Yes, I would have called him.
18     Q.   Okay.
19     A.   But I don't remember.  I can't say
20 for sure that I tried.  I don't remember.
21     Q.   Okay.  But the question was:  Would
22 it have been best practice to call him, whether
23 you did or not?
24     A.   Yes.
25     Q.   Okay.  And if you did try to call

Page 49

1  him, to the best of your recollection, you
2  never got a hold of him; correct?
3      A.   Correct.
4      Q.   Okay.  If you did try to call him,
5  would there have been a record of it in the
6  file somewhere?
7      A.   I don't think there is, no.
8      Q.   Right.  But the question was, if you
9  did would there have been a record?
10     A.   Not necessarily.  I would have had
11 to document it.
12     Q.   Should it have been documented if
13 you tried to call him?
14             ATTORNEY SHINE:  Objection.
15 Calls for speculation.
16             But you can answer.
17             THE WITNESS:  Yes, I guess, if
18 it was -- if I did.
19 BY ATTORNEY HERNANDEZ:
20     Q.   Okay.  Do you train people to
21 document anytime they call --
22     A.   Yes.
23     Q.   -- witnesses in the file?  Okay.
24     A.   Mm-hmm.
25     Q.   Excuse me.

APPENDIX 000538

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 50

1    Were you involved in -- in Alex
2    Bergeron's demotion?
3    A.    No.
4    Q.    Do you have knowledge of it?
5    A.    Only due to what I found out during
6    this -- the course of discovery and stuff like
7    that.
8    Q.    And what did you find out?
9    A.    That he stated he was demoted
10   because of -- from Patrick.
11   Q.    And was he, in fact, demoted?
12   A.    In our system, it shows that he was
13   possibly demoted, yes.
14   Q.    Do you know why he was demoted?
15   A.    I do not know that.
16   Q.    Okay.  When a manager demotes a
17   supervisor, does that need to get approval by
18   anyone?
19   A.    No.
20   Q.    Okay.  When managers or members of
21   HR receive reports of discrimination, what are
22   they supposed to do?
23         ATTORNEY SHINE:  Objection.
24   This is not a 30(b)(6) witness.
25         However, to the extent she has

Page 51

1    personal knowledge, she can testify.
2         THE WITNESS:  Can you say the
3    question again?
4    BY ATTORNEY HERNANDEZ:
5    Q.    Sure.  In your experience at Allied,
6    when managers receive reports of discrimination
7    or supervisors, what are they supposed to do?
8    A.    They are supposed to report it to
9    HR.
10   Q.    Okay.  Is it ever okay to ignore a
11   report of discrimination?
12   A.    No.  If you're in a supervise-- I
13   mean, I have -- no.  They should definitely
14   pass it along.
15   Q.    Okay.  Do you understand what I mean
16   when I say "N word"?
17   A.    I'm sorry?
18   Q.    Do you understand what I mean when I
19   say "N word"?
20   A.    I think so.  In a racial context?
21   Q.    Yes.
22   A.    Okay.  Yes.
23   Q.    Do you agree that the N word is a
24   racial slur?
25   A.    Absolutely.

Page 52

1    Q.    And is it against Allied's policies
2    to use the N word?
3         ATTORNEY SHINE:  Objection.
4    She is not a 30(b)(6) witness.
5         However, in her personal experience,
6    she can testify.
7         THE WITNESS:  What was the
8    question again?
9    BY ATTORNEY HERNANDEZ:
10   Q.    Is it against Allied's policies to
11   use the N word in the workplace?
12   A.    Yes.
13   Q.    And then would it be against policy
14   for managers to call workers a "sand N word"?
15         ATTORNEY SHINE:  Same
16   objection, but you can answer.
17         THE WITNESS:  I don't have any
18   knowledge of anybody using that phrase.
19   BY ATTORNEY HERNANDEZ:
20   Q.    Right.  That wasn't the question.
21         Is it against policy for managers to
22   call employees a "sand N word"?
23   A.    Yes.
24   Q.    On a scale of 1 to 10, with 1 being
25   not harmful at all and 10 being extremely

Page 53

1    harmful, how harmful is it to call someone a
2    "sand N word"?
3         ATTORNEY SHINE:  Objection.
4    Calls for speculation.
5         But to the extent she has a
6    responsive answer, she can testify.
7         THE WITNESS:  I would say it's
8    a 10.
9    BY ATTORNEY HERNANDEZ:
10   Q.    All right.  I think I'm almost done.
11   I'm just going to take a couple minutes to look
12   over my notes.
13         Give me five minutes, okay?
14   A.    Okay.
15   Q.    And we'll go off the record.
16         THE VIDEOGRAPHER:  We are now
17   off the record.  The time is 2:44 p.m. Central
18   Time.
19         (A recess was taken.)
20         THE VIDEOGRAPHER:  We are now
21   on the record.  The time is 2:49 p.m. Central
22   Time.
23         ATTORNEY HERNANDEZ:  I pass
24   the witness.
25         ATTORNEY SHINE:  I have no

APPENDIX 000539

KATHERINE MARIE ALYEA
SEPTEMBER 13, 2024

JOB NO. 1171183

Page 54

```
1   questions.
2                   THE VIDEOGRAPHER:  Okay.
3   Ms. Repsik, you want to confirm transcript
4   orders?
5                   THE REPORTER:  Mr. Shine, do
6   you need a copy of this transcript?
7                   ATTORNEY SHINE:  Yes, please.
8                   THE REPORTER:  Thank you.
9   Does anyone need a rough draft?
10                  ATTORNEY HERNANDEZ:  No.
11                  ATTORNEY SHINE:  No.
12                  THE VIDEOGRAPHER:  Okay.  And
13  then for the video orders, Ms. Hernandez, we
14  have your standard order.  Is that still good?
15                  ATTORNEY HERNANDEZ:  Yes.
16                  THE VIDEOGRAPHER:  And,
17  Mr. Shine, would you like a copy of the video
18  deposition?
19                  ATTORNEY SHINE:  No.  Thank
20  you.
21                  THE VIDEOGRAPHER:  Okay.  So
22  this concludes the deposition of Katherine
23  Marie Alyea in the matter of Twana Ahmed versus
24  Universal Protection Services, LP, doing
25  business as Allied Universal.
```

Page 55

```
1                   We are now off the record.  The time
2   is 2:50 p.m. Central Time.
3                   - - -
4                   (Thereupon, the deposition was
5   concluded at 2:50 p.m. CST, 3:50 p.m. EST.
6   Signature was not waived.)
7                   - - -
```

Page 56

```
1           C E R T I F I C A T E
2                   - - -
3   I, KATHERINE MARIE ALYEA, do hereby certify
4   that I have read the foregoing transcript and
5   it is a true and correct copy of my deposition,
6   except for the changes, if any, made by me on
7   the attached Deposition Correction Sheet.
8
9
10
        _____
11
        _____
12      Date
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 57

```
1   ERRATA SHEET       REASON FOR
    PAGE      LINE     CHANGE/CORRECTION
2   _____     _____    _____
3   _____     _____    _____
4   _____     _____    _____
5   _____     _____    _____
6   _____     _____    _____
7   _____     _____    _____
8   _____     _____    _____
9   _____     _____    _____
10  _____     _____    _____
11  _____     _____    _____
12  _____     _____    _____
13  _____     _____    _____
14  _____     _____    _____
15  _____     _____    _____
16  _____     _____    _____
17  _____     _____    _____
18  _____     _____    _____
19  _____     _____    _____
20  _____     _____    _____
21  _____     _____    _____
22  _____     _____    _____
23  _____     _____    _____
24
25
```

APPENDIX 000540

APPENDIX 000541

Page 58

1    COMMONWEALTH OF PENNSYLVANIA    )
2                                    ) SS
3    COUNTY OF BERKS                 )
4              CERTIFICATE
5         I, Alyssa A. Repsik, a notary public in and
6    for the Commonwealth of Pennsylvania, do hereby
7    certify that the witness, KATHERINE MARIE
8    ALYEA, was by me first duly sworn to testify
9    the truth, the whole truth, and nothing but the
10   truth; that the foregoing deposition was taken
11   at the time and place stated herein; and that
12   the said deposition was recorded
13   stenographically by me and then reduced to
14   typewriting under my direction and constitutes
15   a true record of the testimony given by said
16   witness.
17        I further certify that I am not a relative,
18   employee, or attorney of any of the parties or
19   a relative or employee of either counsel and
20   that I am in no way interested directly or
21   indirectly in this action.
22        IN WITNESS WHEREOF, I have hereunto set my
23   hand and affixed my seal of office this 24th
24   day of September, 2024.

          _____
          Alyssa A. Repsik, Notary Public
          Court Reporter
          Notary Public
          Berks County
          My Commission Expires March 12, 2028
          Commission Number 1296614

# Exhibit 6

# excerpts from
# Allied Code of Ethics

# CONDUCT IN THE WORKPLACE



## Diversity and Inclusion

Allied Universal® is an Equal Opportunity Employer and does not tolerate discrimination against any employee or applicant on the basis of any legally protected characteristic or status. This policy applies to all terms and conditions of employment, including continued employment, promotions, evaluations, or other aspects of career development.

## Anti-Harassment

Allied Universal is committed to ensuring that no employee is discriminated against or harassed by a supervisor, other employees, clients or their employees, or any other person in the workplace in violation of any and all applicable laws. All Company employees are responsible for maintaining a workplace free of harassing or discriminatory conduct, including but not limited to threatening conduct or comments based on any legally protected characteristics or status.

*A safe, respectful, and inclusive work environment is paramount at Allied Universal.*

## Fraternization

Allied Universal has fraternization rules for U.S.-based employees regarding an employee's personal or romantic relationships with other Company employees, vendors, Company clients, or an employee, tenant, or homeowner at the account to which an employee is assigned. Please contact your direct supervisor or Human Resources representative for additional information.

**Q** I saw a supervisor harassing a coworker? Should I report them?

**A** **Yes.** *If you see something, say something. Allied Universal is committed to preventing harassment in the workplace, and will take immediate corrective action if harassment occurs.*



APPENDIX 000543

AhmedAllied000238

# Exhibit 7

# excerpts from Allied anti-discrimination and harassment policies

**POLICY AGAINST HARASSMENT AND DISCRIMINATION**

**2019 - Annual Reminder of Our Policy Against Unlawful Harassment, Discrimination and Retaliation**

It is important to me that our employees find Allied Universal a pleasant and enjoyable place to work. I hope that the time you spend on your job is not only challenging, but is also personally rewarding. One of the important ways we strive to ensure this is by strictly enforcing our policies against unlawful harassment, discrimination and retaliation. This is a critical policy within our organization – one that we share with you at the time you are hired, and we publish in numerous and ongoing ways throughout our organization. It is so important that I want to take a moment here to reiterate my expectations regarding how we treat one another, and our commitment to following up on all complaints we receive.

All employees have the right to work in an environment that is free from discrimination or unlawful harassment because of race, color, national origin, religion, sex (including sexual orientation, gender, gender identity and gender expression), age, ancestry, physical disability (including AIDS and HIV), mental disability, medical condition, marital status, registered domestic partner status, genetic characteristics or genetic information, pregnancy or childbirth, political activities or affiliations, citizenship status, or military or veteran status, or any other category protected by law. Unlawful harassment and discrimination is prohibited whether it comes from or is directed towards other employees, supervisors, managers, customers, vendors or anyone else in the workplace.

As a reminder, harassment or discrimination of any kind – whether it be physical, verbal, written or electronic – is not tolerated at Allied Universal. It is not acceptable, even in a "joking" manner, to talk about, or engage others in discussions about intimate, sexual or disparaging/discriminating topics, to inappropriately touch or threaten another person, or to retaliate against any employee who complains about harassment or discrimination. You may refer to your Employee Handbook for specific details and further examples of unacceptable activities at work. Anyone found to be engaging in such behavior will receive discipline, up to and including termination of employment.

If you believe you have been harassed, discriminated against or retaliated against for any reason, or you are aware of a situation involving such treatment, we expect you to do **one or more of the following immediate**ly:

- If you feel comfortable doing so, you should discuss the matter directly with the person you feel is causing the problem and attempt to resolve the matter.  Often, advising the person that their comments or actions are unwelcome will put a stop to it.
- If you are unable to address the matter directly with the individual(s) involved, or you've attempted this and the problem remains, you may report your concerns verbally or in writing to any member of your branch management team, anyone on the Corporate Leadership staff, any member of your Regional Human Resources team, any member of the Corporate Human Resources or Corporate Legal teams, or directly to me at 1551 N. Tustin Ave., #650, Santa Ana, CA 92705.
- You may make a report to our "Allied Universal Employees First" complaint hotline by calling 1-800-461-9330 or going to http://ausvoice.aus.com. Hotline and website reports may be made 24/7 and can be made anonymously if you wish.

We take complaints about harassment, discrimination and retaliation seriously, we will promptly investigate any complaint that is brought to the Company's attention, and we will take appropriate action based on the results of the investigation.

AUS 00571

We all want to be proud of our Company. This policy has my full support, and I ask every Allied Universal employee to support it as well.

## POLICY

Allied Universal is committed to providing a work environment free from discrimination or harassment because of race, color, national origin, religion, sex (including sexual orientation, gender, gender identity and gender expression), age, ancestry, physical disability (including AIDS and HIV), mental disability, medical condition, marital status, registered domestic partner status, genetic characteristics or genetic information, pregnancy or childbirth, political activities or affiliations, citizenship status, or military or veteran status, or any other category protected by law . It is the policy of the Company to ensure that no employee or applicant for employment is discriminated against in recruitment, hiring, compensation, training/apprenticeship, promotion, upgrading, demotion, downgrading, transfer, layoff or termination because of any category protected by law. . All decisions regarding conditions of employment will be based on the individual's overall qualifications and his or her ability to meet the requirements of the position.

Employees with disabilities shall be provided with reasonable accommodation, except where such accommodation would cause the Company undue hardship. Allied Universal invites employees with disabilities who require accommodation to inform their manager or a member of the Human Resources team of such disability and any suggestions for possible accommodation. Further information about this process can be found in the Employee Handbook.

It is also the policy of Allied Universal to provide a workplace free of harassment of employees by other employees, supervisors, managers, customers, vendors or others doing business with or for the Company. Harassment is considered an act of misconduct and may subject an individual to disciplinary action, up to and including immediate termination. All supervisors and managers are responsible for implementing and monitoring compliance with this policy.

- Verbal harassment: (e.g., derogatory or vulgar comments or jokes regarding race, sex, religion, ancestry or national origin, age, physical appearance or other legally-protected characteristic; threats of physical harm; distribution of written or graphic material having such effects).

- Physical harassment: (e.g., hitting, pushing, touching or other physical contact, or threats of such action; blocking or impeding movement).

- Sexual harassment: (e.g., unwelcome or unsolicited sexual advances, demands for sexual favors, touching or other verbal or physical conduct of a sexual nature; display of offensive material; leering; making sexual gestures).

This list is by no means comprehensive. As a general matter, employees should not engage in any conduct or behavior that is offensive to others in the workplace, whether purposefully or otherwise, and is not in any way work-related. Employees can avoid such situations by showing courtesy and respect to all.

## REPORTING PROCEDURE

Employees who feel they may have been harassed should tell the person harassing them to stop and attempt to resolve the matter directly, if possible and if the employee feels comfortable doing so. In addition, it is the employee's responsibility to promptly report any discriminatory or harassing conduct directly to Allied Universal. There are **THREE WAYS** that harassment or discrimination complaints may be made to Allied Universal:

1. Call our Incident Reporting Hotline 24/7 at **800-461-9330**. Calls may be made anonymously if you prefer.

2. Visit our Incident Reporting Hotline website at http://employeesfirst.aus.com.

3. Report your concerns directly to any member of your branch management team or Corporate Leadership Team – Regional President, Regional Vice President, Branch or General Manager, Division or Client Manager, Operations Manager, Human Resources Coordinator, or your Regional Human Resources Director/Manager/Representative. Complaints may be made directly to any member of Corporate Human Resources or directly **in writing** to the CEO of the Company, Steve Jones, at 1551 N. Tustin Ave., #650, Santa Ana, CA 92705.

***Reporting incidents to any other person besides those listed above (such as a Field Supervisor or Account Manager) will not be considered adherence to this policy. You may be asked to put your specific complaints in writing.***

***Any*** supervisors (including Field Supervisors and Account Managers) who become aware of any discrimination or harassment, whether it involves employee-to-employee, supervisor-to-employee, or vendor/customer-to-employee conduct, must promptly report the matter to their Regional Human Resources Director or Corporate Human Resources staff. If supervisors observe such harassment, they must take immediate action to stop it, and then report it. Failure to do so may result in disciplinary action for the supervisor.

Allied Universal's trained human resources management and staff will conduct a prompt and thorough investigation of all instances of alleged discrimination and harassment, including complaints received through the above referenced reporting methods. To the extent possible, all complaints and related information will remain confidential except as to those individuals who need the information to investigate, evaluate or take action in response to the complaint. The Company will also take remedial or disciplinary action, as appropriate.

## PROHIBITION OF RETALIATION

There shall be no retaliation of any kind against a complainant who in good faith notifies the Company of any unlawful discrimination or harassment. It is also a violation of our policy for employees to discourage each other from complaining about harassment or discrimination. Any employee (including a manager or supervisor) who is found to have violated the Company's policy against retaliation will be subject to appropriate disciplinary action, including possible termination.

## ACKNOWLEDGEMENT OF HARASSMENT & DISCRIMINATION POLICY

- I hereby acknowledge that I have received a copy of the foregoing Allied Universal Policy Against Harassment and Discrimination and I agree to comply with all aspects of the policy including the reporting procedures.

- I will not create a hostile work environment, nor will I participate in any form of harassment or discrimination in the workplace. If I believe I have been harassed or discriminated against in the workplace or I have observed any harassment or discrimination in the workplace, I will immediately report the incident as listed above. If I am a supervisor or a manager, I understand that I am responsible for taking prompt and effective action as soon as I know or suspect harassment or discrimination is taking place, including reporting to my **Regional Human Resources Director, or any member of the Corporate Human Resources or Legal Team.**

- I understand that unlawful harassment and discrimination is not tolerated by the Company, is against the law, and that anyone who engages in such behavior may be subject to disciplinary action up to and including immediate termination of employment.

- I understand that nothing in this policy is intended to nor shall be interpreted as interfering with

employee activities protected by the National Labor Relations Act, including communication and protected concerted activities regarding wages, working conditions, and other terms and conditions of employment.

☑ **Signature** Twana Ahmed 12/15/2021 2:49 PM
(checking the checkbox above is equivalent to a handwritten signature)

Employee Name                                    Branch Name
Twana Ahmed                                       Houston

# Freedom From Discrimination, Harassment (Including Sexual Harassment) and Hostile Work Environment

It is the policy of Allied Universal® to provide a workplace free of harassment of employees by other employees, Supervisors, Managers, customers, visitors, vendors or others doing business with or for the company, including harassment based on race, religious creed, color, national origin, religion, sex (including gender, sexual orientation, gender identity and gender expression), age, ancestry, physical disability (including AIDS and HIV), mental disability, medical condition, marital status, registered domestic partner status, genetic characteristics or genetic information, pregnancy or childbirth, political activities or affiliations, citizenship status (except as may be required by law), or military or veteran status, or any other category protected by law. Allied Universal considers such harassment an act of misconduct and may subject an individual to disciplinary action, up to and including immediate termination. All Supervisors and Managers are responsible for implementing and monitoring compliance with this policy.

Harassment is defined as unwelcome or unsolicited verbal, physical or sexual advances or conduct where submission is an explicit or implicit condition of employment, where submission or rejection of such conduct is used as the basis for making employment decisions, or verbal or physical conduct that has the purpose or effect of substantially interfering with an employee's job performance, or that creates an intimidating, hostile or offensive working environment.

Some examples of behavior that may be considered as harassment, depending upon the facts and circumstances, include but are not limited to the following:

- Verbal harassment: (e.g., derogatory or vulgar comments or jokes regarding race, sex, religion, ancestry or national origin, age, physical appearance or other legally-protected characteristic; threats of physical harm; distribution of written or graphic material having such effects).

- Physical harassment: (e.g., hitting, pushing, touching or other physical contact, or threats of such action; blocking or impeding movement).

- Sexual harassment: (e.g., unwelcome or unsolicited sexual advances, demands for sexual favors, touching or other verbal or physical conduct of a sexual nature; display of offensive material; leering; making sexual gestures).

This list is by no means comprehensive. As a general matter, employees should not engage in any conduct or behavior while on duty that is not work-related or may be offensive to others, whether intentionally or otherwise. Employees can avoid such situations by showing courtesy and respect to all.

APPENDIX 000549

AUS 00160

# Reporting Harassment cont.



Employees should report harassment, discrimination and complaints and concerns via the following methods:

**1** Call our Allied Universal Ethics Hotline 24/7 at 1-888-260-5948. Calls may be made anonymously.

**2** Visit our website at http://aus.ethicspoint.com. Click on "new user" on the sign in screen and create a user name and password. After submission you will receive responses and updates.

**3** Report concerns directly to any member of the branch management team or Corporate Leadership Team – Regional Vice President, Branch or General Manager, Division or Client Manager, Operations Manager, Human Resources Coordinator or your Regional Human Resources Director/Manager/Representative.

Complaints may be made directly to any member of Corporate Human Resources or directly to the CEO of the Company, Steve Jones, at 1551 N. Tustin Ave., #650, Santa Ana, CA 92705.

AUS 001671

# Zero Tolerance Policy

**ALLIED UNIVERSAL**

Allied Universal is committed to providing a work environment free from discrimination or harassment of any kind.



Our policy is to provide all employees with a safe work environment that is free from harassment or discrimination of any kind.

We have a Zero Tolerance policy for any type of harassing, discriminating, intimidating or otherwise unlawful or disrespectful behavior from or toward any of our employees.

APPENDIX 000551

AUS 001662

# Exhibit 8

## *EEOC v. Allied Universal*
## 2018 Consent Decree Order

FILED

18 JAN 22 AM 8 21

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

1
2
3

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 4  **U.S. EQUAL EMPLOYMENT**<br>5  **OPPORTUNITY COMMISSION,** | Case No. 17CV2436 BEN NLS |
| 6  **Plaintiff,** | **CONSENT DECREE;** |
| 7 | **ORDER** |
| 8  **vs.** | |
| 9  **UNIVERSAL PROTECTION**<br>10  **SERVICE, LP d/b/a ALLIED**<br>11  **UNIVERSAL SECURITY**<br>**SERVICES,** | |
| 12 | |
| 13  **Defendant.** | |
| 14 | |

15
16                          **I.**

17                   **INTRODUCTION**

18      Plaintiff, the U.S. Equal Employment Opportunity Commission ("EEOC" or

19  the "Commission") and Defendant Universal Protection Service, LP d/b/a Allied

20  Universal Security Services ("Defendant") agree to the entry of this Consent

21  Decree to resolve the EEOC's Complaint in the above-styled Action, filed under

22  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. section 2000e et

23  seq. ("Title VII").

24      The EEOC's Complaint alleges that Defendant unlawfully discriminated

25  against Charging Party William Webb ("Webb") based on religion (Islam) in

26  violation of Sections 701 (j) and 703(a) Title VII. More specifically, the

27  Complaint alleges that Defendant failed to provide Webb a religious

28  accommodation and discharged him based on his religion, Islam. The Commission

                                    1

APPENDIX 000553                                    AhmedAllied 000697

also alleges that Defendant discharged Webb in retaliation for having engaged in

protected activity in violation of Section 704(a) of Title VII.

## II.

### PURPOSES AND SCOPE OF THE CONSENT DECREE

A. The Parties to this Consent Decree ("Decree") are the EEOC and

Defendant. Defendant stipulates that it is the entity responsible for (i) providing

the monetary relief set forth below to Webb, and (ii) implementing the non-

monetary relief described in this Consent Decree. This Decree shall be binding on

and enforceable against Defendant, its officers, directors, agents, successors, and

assigns, as specified herein.

B. The Parties have entered into the Decree for the following purposes:

  1. To provide monetary and injunctive relief;

  2. To provide a final and binding settlement upon the Parties as to all

   claims alleged in the EEOC's Complaint in this Action;

  3. To ensure that Defendant continues to implement appropriate

   measures to provide a work environment that is free from religious

   discrimination and retaliation;

  4. To ensure that Defendant continues to implement effective policies,

   complaint procedures and training with respect to federal laws

   prohibiting discrimination and harassment based on religion and

   retaliation;

  5. To ensure that Defendant continues to maintain effective policies,

   complaint procedures and training with respect to federal laws

   prohibiting religious discrimination and retaliation.

  6. To avoid expensive and protracted costs incident to this litigation.

2

   AhmedAllied 000698

C.     Defendant expressly denies each of the allegations contained in the EEOC's Complaint and in Charging Party's charge of discrimination. Further, Defendant's execution of this Decree is not an admission of liability.

### III.

### RELEASE OF CLAIMS

A.     This Decree fully and completely resolves between Defendant and the EEOC all claims that are raised by the EEOC against Defendant in the Complaint filed in the United States District Court, Southern District of California and captioned <u>U.S. Equal Employment Opportunity Commission v. Universal Protection Service, LP d/b/a Allied Universal Security Services</u>, Civil Case No. 17CV2436 BEN NLS .

B.     Nothing in this Decree shall be construed to preclude any party from bringing suit to enforce this Decree in the event that any party fails to perform the promises and representations contained here.

C.     Nothing in this Decree shall be construed to limit or reduce Defendant's obligation to comply fully with Title VII or any other federal employment statute.

D.     This Decree in no way affects the EEOC's right to bring, investigate or litigate other charges that may be in existence or may later arise against Defendant in accordance with standard EEOC procedures.

### IV.

### EFFECTIVE DATE AND DURATION OF DECREE

A.     The provisions and agreements contained herein are effective immediately upon the date which this Decree is entered by the Court ("the Effective Date").

B.     Except as otherwise provided here, the Decree shall remain in effect for three (3) years after the Effective Date.

3

AhmedAllied 000699

## V.

### MODIFICATION AND SEVERABILITY

A.      This Decree constitutes the complete understanding of the Parties with respect to the matters contained herein.  No waiver, modification, or amendment of any provision of this Decree will be effective unless made in writing and signed by an authorized representative of each of the Parties.

B.      If one or more provisions of the Decree are rendered unlawful or unenforceable, the Parties shall make good faith efforts to agree upon appropriate amendments to this Decree to effectuate the purposes of the Decree.  In any event, the remaining provisions will remain in full force and effect, unless the purposes of the Decree cannot be achieved despite the Parties' reasonable efforts.

C.      By mutual agreement of the Parties, this Decree may be amended or modified in writing in the interests of justice and fairness to effectuate the provisions of this Decree.

## VI.

### JURISDICTION

A.      This Court has jurisdiction over the Parties and the subject matter of this lawsuit.  The Complaint asserts claims that, if proven, would authorize the Court to grant the equitable relief set forth in this Decree.  The terms and provisions of this Decree are fair, reasonable, and just.  This Decree conforms with the Federal Rules of Civil Procedure and Title VII, and is not in derogation of the rights or privileges of any person.

B.      The Court shall retain jurisdiction of this Action during the duration of the Decree for the purposes of monitoring and entering all orders, judgments, and decrees that may be necessary to implement the relief provided here.

4

## VII.

## COMPLIANCE AND DISPUTE RESOLUTION

A.    The Parties agree that if the EEOC has reason to believe that Defendant has failed to comply with any provision of this Consent Decree, the EEOC may petition or may bring an action before this Court to enforce the Decree. Prior to initiating such petition or action, the EEOC will notify Defendant's legal counsel of record, in writing, of the nature of the dispute. This notice shall specify the particular provision(s) that the EEOC believes has / have been breached. Absent a showing by either party that the delay will cause irreparable harm, Defendant shall have forty-five (45) days from receipt of the EEOC's notice of the alleged breach to attempt to address, resolve or cure the alleged breach.

B.    The Parties agree to cooperate with each other and use their reasonable efforts to resolve any dispute referenced in the EEOC notice.

C.    Unless the Parties have mutually agreed to extend the period by which the Defendant can address, resolve or cure the alleged breach, after forty-five (45) days have passed with no resolution or agreement to extend the time further, the EEOC may petition or bring an action before this Court for compliance with this Decree. In such a petition or action, the EEOC may seek all available relief, including, but not limited to, an extension of the terms of the Decree for such period of time as the Defendant is shown to be in breach of the Decree.

## VIII.

## MONETARY RELIEF

A.    In settlement of this lawsuit, Defendant shall pay the gross sum of Ninety thousand dollars ($90,000.00) in total monetary relief to Charging Party William Webb of which $67,000.00 shall be designated as compensatory damages.

B.    A check in the gross amount of $67,000.00 shall be issued to Webb. This $67,000 in compensatory damages shall be designated as non-wage compensation,

5

        AhmedAllied 000701

and no tax withholding shall be made for such compensatory damages.

Defendant shall prepare and distribute Form 1099 or equivalent tax reporting forms to Webb and shall make the appropriate reports to the Internal Revenue Service and other tax authorities.

C.     A check in the gross amount of $23,000 shall be issued to Webb minus any applicable deductions, including for federal, state and/or local tax withholdings. This amount is intended to compensate Webb for alleged lost wages. Defendant shall pay the employer's portion of all federal, state, and local taxes, including but not limited to FICA and FUTA taxes, and such amounts shall not be deducted from this check.  As such, an Internal Revenue Service ("IRS") Form W-2 shall be issued in connection with this payment.

D.     Defendant shall forward the settlement check to Webb via U.S. Certified Mail within ten (10) business days of the Effective Date of this Decree, and receipt by Defendant's undersigned counsel of a Form W-4 and Form W-9 (revised December 2014) for Webb.

E.     Within three (3) business days of the issuance of the settlement checks, Defendant shall submit a copy of the checks and related correspondence to Anna Y. Park, Regional Attorney, U.S. Equal Employment Opportunity Commission, 255 East Temple Street, 4th Floor, Los Angeles, California, 90012.

## IX.
## INJUNCTIVE RELIEF

A.     <u>Non-Discrimination</u>

Defendant, its officers, agents, management (including all supervisory employees), successors, assigns, and all those in active concert or participation with them, or any of them are enjoined for the duration of the Decree from

6

AhmedAllied 000702

engaging in employment practices in violation of Title VII, as amended. These employment practices include:

1. Unlawfully failing to provide religious accommodation to job applicant(s) or employee(s);

2. Unlawfully denying equal employment opportunities to job applicant(s) or employee(s) based on religion;

3. Unlawfully subjecting job applicant(s) or employee(s) to any action, policy or practice that is intended or is known to them to have the effect of discriminating against or harassing any employee based on religion; and

4. Unlawfully discriminating against any job applicant(s) or employee(s) based on religion.

B.  Non-Retaliation

Defendant is enjoined from engaging in, implementing, or permitting any action, policy, or practice with the purpose of retaliating against any current or former employee or applicant of the Defendant because such employee or applicant has in the past, or during the term of this Decree:

1.  Opposed in good faith any practice made unlawful under Title VII;

2.  Filed a charge of discrimination in good faith alleging such practice;

3.  Testified or participated in good faith in any investigation—including, without limitation, any internal investigation undertaken by Defendant—or proceeding in connection with this case or relating to any claim of a Title VII violation;

4.  Been identified as a possible witness or claimant in this Action;

5.  Asserted any rights under this Decree; or

6.  Sought and/or received any relief in accordance with this Decree.

7

AhmedAllied 000703

C.    <u>Equal Employment Opportunity Monitor</u>

      Within thirty (30) days of the Effective Date of this Decree, Defendant shall designate an Equal Opportunity Monitor ("Monitor") that has been approved by the EEOC to implement and monitor its compliance with Title VII and the provisions of this Decree. Defendant shall bear all costs associated with the selection and retention of the Monitor and the performance of his/her/its duties. The Monitor's responsibilities shall include the following:

1.    Ensuring that Defendant maintains and implements nation-wide an anti-discrimination, religious accommodation, and anti-retaliation policy and reporting procedure that will effectively carry out its obligations under Title VII and this Decree;

2.    Ensuring that Defendant maintains effective training for its employees, including management and human resources employees in California, on their rights and responsibilities under Title VII and this Decree, as well as under Defendant's policies and procedures relating to harassment, discrimination, and retaliation;

3.    Ensuring that Defendant maintains nation-wide procedures for complaints of discrimination and/or retaliation, and requests for accommodation that comply with its obligations under Title VII and this Decree;

4.    Ensuring that Defendant maintains a system for monitoring any investigation of any complaint nation-wide of religious discrimination, failure to accommodate or retaliation;

5.    Ensuring that Defendant maintains proper communications with complainants regarding the accommodation process, the complaint procedure, status of the request for accommodation and/or complaint, status of any subsequent investigation, results of the investigation, and any remedial action taken;

8

AhmedAllied 000704

6. Ensuring that Defendant communicates to third-party clients in San Diego and Orange counties that they should forward any requests for reasonable accommodation to Defendant's Human Resources Department and appropriate managers; and

7. Ensuring compliance with the reporting requirements of this Decree.

D. **Policies and Procedures**

1. With the EEO Monitor's assistance, Defendant shall review and, if necessary, revise its policies and procedures against discrimination and retaliation prohibited by Title VII (the "Policy"). The revised nation-wide Policy shall include:

   a. A clear explanation regarding Defendant's obligation to provide religious accommodation to job applicants and employees under Title VII;

   b. A clear explanation of the procedures for requesting a religious accommodation;

   c. A clear explanation of prohibited conduct, including discriminating against job applicants and employees based on religion;

   d. A clear explanation of the procedures for filing a complaint of discrimination and/or retaliation;

   e. Assurances that employees who request a religious accommodation, make complaints of discrimination, or provide information related to such complaints are protected against retaliation; and

   f. Assurance that Defendant will take prompt and appropriate corrective action when it determines that discrimination and/or retaliation has occurred.

9

APPENDIX 000561

AhmedAllied 000705

2. This revised policy shall be accessible in English, and when requested by an employee, in Spanish.

3. Within sixty (60) days of the Effective Date, Defendant shall ensure that it has distributed the Policy nationwide, by either physical or electronic posting, to every employee, including managers and supervisory employees.

4. Defendant shall ensure that all employees understand Defendant's obligations and responsibilities under Title VII and Defendant's policies and procedures for requesting a religious accommodation.

E. Training

1. **Human Resources Personnel/Managers in California**

All of Defendant's regional vice-presidents, branch managers, operations managers, human resources personnel and managers who are assigned to its California facilities shall attend, at least once every two years during the course of the four (4) years following the Effective Date of this Decree, a training program that includes information about religious accommodations and religious discrimination. This training shall occur in connection with the Company's training pursuant to California AB 1825, and shall be, in total, at least two (2) hours in duration. All Human Resource employees and Managers who attend the training shall verify such attendance in writing or electronically. At a minimum, this anti-discrimination and anti-retaliation training for managerial employees shall include instruction regarding:

a. Defendant's responsibilities and requirements under Title VII;

b. Making objective hiring and employment decisions that are not based on religion or religious stereotype;

10

AhmedAllied 000706

c.     Proper procedures for making a request for reasonable accommodation;

d.     Proper handling of requests for reasonable accommodation and engaging in an adequate accommodation review process;

e.     Proper handling of discrimination complaints and conducting an adequate investigation in response; and

f.     A review of Defendant's revised equal employment policies and practices consistent with this Decree.

Defendant shall provide the EEOC with a copy of the materials used for this training.

**2.    Employees Assigned to Work Off-Site in San Diego, County**

All of Defendant's non-supervisory employees, security professionals, and any other personnel who are assigned to work off-site within San Diego County, California shall receive online training approved by the EEOC. This training shall occur within six (6) months of the Effective Date of this Decree and once annually thereafter for the duration of this Decree. These employees shall verify their attendance in writing or electronically. This online training shall direct employees to the appropriate Human Resources personnel regarding any questions. All new non-supervisor employees assigned to work off-site within San Diego, California shall receive the training within thirty (30) days of hire. This training shall, at a minimum, include:

a.     Defendant's responsibilities and requirements under Title VII;

b.     The proper process and procedures for making a request for reasonable religious accommodation pursuant to company policy;

11

AhmedAllied 000707

c.    Proper process and procedures for making complaints of discrimination and/or retaliation;

d.    A review of Defendant's revised equal employment policies and practices consistent with this Decree; and

e.    The name and contact information for a human resources manager to whom employees can speak if there are any concerns in this regard.

F.   Accountability

Defendant shall hold its managers and supervisors accountable for failing to comply with Defendant's anti-discrimination and anti-retaliation policies and procedures.

G.   Posting of Notice

Within ten (10) business days after the Effective Date, and throughout the term of this Decree, Defendant shall post at all of its Branch Offices in California, the Notice (attached as **Exhibit "A"**) of the terms of this Decree in a clearly visible location frequented by employees at that facility for a period of sixty (60) days.

# X.

## RECORD KEEPING AND REPORTING

A.   Document Preservation

For the duration of the Decree, Defendant shall maintain such records for its facilities in San Diego, Orange County, and Long Beach as are necessary to demonstrate its compliance with this Decree, including but not limited to the following:

1.    All documents generated in connection with any request for religious accommodation of which human resources becomes aware and resolution of such request for the duration of the Decree;

12

AhmedAllied 000708

2. All documents generated in connection with any religious discrimination and/or retaliation complaint of which human resources becomes aware, any investigation into such complaint, and resolution of such complaint for the duration of the Decree;

3. All documents demonstrating the posting and/or availability of the revised policy and complaint procedure against discrimination and retaliation;

4. A list of the dates of the training required under this Decree;

5. All documents showing the list of names and positions of all attendees at the training required under this Decree;

6. All equal employment policies and procedures as required under this Decree; and

7. All training materials in connection with the training required under this Decree.

B.    Initial Reports

1. Within thirty (30) days of the Effective Date, Defendant shall submit to the EEOC a statement confirming that the notice (Exhibit A) described in Section IX.G. has been posted.

2. Within sixty (60) days of the Effective Date of this Decree, Defendant shall provide to the EEOC a copy of the Policy described in Section IX.D.

3. Within sixty (60) days of the Effective Date, Defendant shall submit to the EEOC a statement confirming the development and implementation of the revised Policy described in Section IX.D.

4. Within thirty (30) days after hiring the EEO Monitor, Defendant shall submit to the EEOC the training materials required in Section IX.E.

13

AhmedAllied 000709

1    This includes a description of the training to be provided and an
2    outline of the curriculum developed for the trainees.
3  C.    Reports from the Monitor Regarding Audits
4        During the duration of this Decree, the EEO Monitor shall conduct annual
5  audits regarding Defendant's compliance with this Decree and its employment
6  practices.  The first audit shall occur no later than one-hundred and twenty (120)
7  days after the Effective Date of this Decree. These audits shall be conducted
8  without any prior notice to Defendant. The Monitor's audits shall verify the
9  following about Defendant's California facilities:
10       1.  Defendant's record-keeping practices are compliant with this Decree;
11       2.  Defendant's response to all requests for religious accommodation were
12           properly handled under Title VII and in compliance with this Decree;
13       3.  Defendant's response to all religious discrimination and retaliation
14           complaints were properly handled under Title VII and in compliance with
15           this Decree;
16
17       4.  A review of training materials, and assessment of the effectiveness of
18           training;
19       5.  A review of Defendant's equal employment opportunity policies and
20           procedures, and assessment of the effectiveness of such written policies.
21       Within thirty (30) days after each audit, the Monitor shall provide a written
22  report to the EEOC regarding its findings. This report shall include all information
23  and documents relating to Defendant's response to requests for religious
24  accommodation, complaints of religious discrimination, and complaints of
25  retaliation for its San Diego, Orange County, and Long Beach facilities. This
26  includes the identity and job title of the persons involved in the accommodation or
27  complaint process, the steps taken in response to the request for reasonable
28

14

                    AhmedAllied 000710

1   accommodation or complaint, the rationale for the ultimate decision, and all

2   documentary evidence pertaining to the request for religious accommodation,

3   religious discrimination complaint, or retaliation complaint.

4   D.    <u>Annual Reports</u>

5       For the entire duration of the Decree, Defendant shall provide the EEOC

6   with annual written reports no later than the anniversary date of the Effective Date

7   of this Decree.  The subsequent annual reports shall include verification of the

8   following regarding all of Defendant's California facilities:

9
10      1.    Defendant's equal employment and accommodation policies and

           practices comply with Title VII and this Decree;

11
12      2.    Defendant has refrained from engaging in practices which subject job

13            applicants and/or employees to religious discrimination and/or

14            retaliation in violation of Title VII and this Decree;

15      3.    All training sessions required under this Decree during the prior

16            twelve months have occurred;

17      4.    Defendant has undertaken its best efforts to assure that all employees

18            required to attend a training session under this Decree during the prior

19            twelve months received the required training;

20      5.    Confirmation that Defendant has undertaken its best efforts to assure

21            that the Policy and training was provided to all employees hired after

22            the entry of this Decree as set forth in this Decree; and

23      6.    A report of all religion or retaliation-related discrimination complaints

24            in the San Diego, Orange County, and Long Beach facilities of which

25            human resources became aware that were made since the submission

26            of the immediately preceding report. This report shall include the

27            names of the individuals alleging discrimination; the nature of the

28

15

AhmedAllied 000711

alleged discrimination; the identities of the alleged discriminating officials; the dates of the alleged discrimination or retaliation; a brief summary of how each complaint was resolved; the identity of the employee(s) who investigated and/or resolved each complaint; and a description of the resolution or findings. If no results have been reached as of the time of the report, the result shall be included in the next report.

## XI.

## COSTS OF ADMINISTRATION AND IMPLEMENTATION OF THE CONSENT DECREE

Defendant shall bear all costs associated with its administration and implementation of its obligations under this Decree.

## XII.

## COSTS AND ATTORNEYS' FEES

Each party shall bear its own costs of suit and attorneys' fees.

## XIII.

## MISCELLANEOUS PROVISIONS

A.     During the term of this Consent Decree, Defendant shall provide any potential successor-in-interest or prospective purchaser with a copy of this Consent Decree within a reasonable time of not less than thirty (30) days prior to the execution of any agreement for acquisition or assumption of control of any or all of Defendant's facilities, or any other material change in corporate structure, and shall simultaneously inform the EEOC of same.

APPENDIX 000568

AhmedAllied 000712

B.     During the term of this Consent Decree, Defendant and its successors shall assure that each of its affiliates, officers, managers and supervisors is aware of any term(s) of this Decree which may be related to his/her job duties.

C.     Unless otherwise stated, all notices, reports and correspondence required under this Decree shall be delivered to the attention of the Regional Attorney, Anna Y. Park, U.S. Equal Employment Opportunity Commission, Los Angeles District Office, 255 E. Temple St., 4th Fl., Los Angeles, CA. 90012.

D.     The Parties agree to entry of this Decree and judgment subject to final approval by this Court.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

17

AhmedAllied 000713

1    All Parties, through the undersigned, respectfully apply for and consent to

2  the entry of this Consent Decree Order.

3

4                         So stipulated,

5

6                         MARTENSON, HASBROUCK & SIMON
LLP

7

8

9  Dated: 12-1-17         By:

10                        Marty N. Martenson
                            E-Mail: mnmartenson@martensonlaw.com

11

12                        Attorney for Defendant
                        Universal Protection Service, LP

13

14

15  Dated: 12-1-17         By:
                        For and on behalf of Defendant Universal

16                        Protection Service, LP

17

18

19                        U.S. EQUAL EMPLOYMENT
                        OPPORTUNITY COMMISSION

20

21  Dated: 12/5/17         By:

22                        Anna Y. Park
                        Regional Attorney

23                        E-Mail: anna.park@eeoc.gov

24

25                        Sue J. Noh
                        Connie K. Liem

26

27                        Attorneys for Plaintiff EEOC

28

AhmedAllied 000714

1

## ORDER

2

3 **GOOD CAUSE APPEARING:**

4      The Court hereby finds that compliance with all provisions of the foregoing

5 Decree is fair and adequate. The Court hereby retains jurisdiction for the term of

6 the foregoing Consent Decree, and the provisions thereof are hereby approved.

7

8      **IT IS SO ORDERED.**

9

10

11 Dated: _1/18/2018_ _____

12                                    U.S. District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19

# Exhibit 9

# Allied article—
# Allied named to fastest growing
# company list



There for you.

Home (/)  /  Allied Universal Named to Inc. Magazine's Annual List of Fastest-Growing Private Companies for the 13th Time

Share Page

# Allied Universal Named to Inc. Magazine's Annual List of Fastest-Growing Private Companies for the 13th Time

SANTA ANA, Calif. — Aug. 18, 2022 – Inc. Magazine revealed that Allied Universal, a global security and facility services company with a workforce of more than 800,000 people worldwide and revenue of approximately $20 billion, was named to the prestigious annual Inc. 5000 list for the 13th time demonstrating the company's record of sustained growth.



The list represents a unique look at the most successful companies within the U.S. economy's most dynamic segment — its independent businesses. Moving up to No. 2,490 from No. 4,469 last year, Allied Universal is among the top 50 percent of all companies on this year's Inc. 5000 list.

"It is truly an honor to be named to the Inc. 5000 list for the 13th time," said Steve Jones, Global Chairman & CEO of Allied Universal. "This is a testament to our visionary leaders, dedicated employees and a proven business model of strategic organic growth as well as growth through acquisitions. I am so proud to lead this team of phenomenal employees."

Complete results of the Inc. 5000, including company profiles and an interactive database that can be sorted by industry, region and other criteria, can be found at www.inc.com/inc5000. The top 500 companies are featured in the September issue of Inc., which will be available on Aug. 23.

"The accomplishment of building one of the fastest-growing companies in the U.S., in light of recent economic roadblocks, cannot be overstated," says Scott Omelianuk, editor-in-chief of Inc. "Inc. is thrilled to honor the companies that have established themselves through innovation, hard work and rising to the challenges of today."

### More about Inc. and the Inc. 5000 Methodology

Companies on the 2022 Inc. 5000 are ranked according to percentage revenue growth from 2018 to 2021. To qualify, companies must have been founded and generating revenue by March 31, 2018. They must be U.S.-based, privately held, for-profit and independent — not subsidiaries or divisions of other companies — as of Dec. 31, 2021. (Since then, some on the list may have gone public or been acquired.) The minimum revenue required for 2018 is $100,000; the minimum for 2021 is $2 million. As always, Inc. reserves the right to decline applicants for subjective reasons. Growth rates used to determine company rankings were calculated to four decimal places. The top 500 companies on the Inc. 5000 are featured in Inc. magazine's September issue. The entire Inc. 5000 can be found at?http://www.inc.com/inc5000.

### About Inc.

The world's most trusted business-media brand, Inc. offers entrepreneurs the knowledge, tools, connections and community to build great companies. Its award-winning multiplatform content reaches more than 50 million people each month across a variety of channels, including websites, newsletters, social media, podcasts and print. Its prestigious Inc. 5000 list, produced every year since 1982, analyzes company data to recognize the fastest-growing privately held businesses in the United States. The global recognition that comes with inclusion in the 5000 gives the founders of the best businesses an opportunity to engage with an exclusive community of their peers and the credibility that helps them drive sales and recruit talent. The associated Inc. 5000 Conference & Gala is part of a highly acclaimed portfolio of bespoke events produced by Inc. For more information, visit www.inc.com.

### About Allied Universal

Allied Universal®, a leading security and facility services company, provides proactive security services and cutting-edge smart technology to deliver tailored, integrated security solutions that allow clients to focus on their core business. Through a global workforce of approximately 800,000 people, we leverage best practices in communities all over the world. With revenues at approximately $20 billion, we are supported by efficient processes and systems that can only come with scale to help deliver our promise locally: keeping people safe so our communities can thrive. We believe there is no greater purpose than serving and safeguarding customers, communities, and people in today's world. Allied Universal is There for you®. For more information, please visit www.aus.com.

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners.

Do Not Sell My Personal Information

Accept Cookies

Contact Us
(https://www.aus.com/contact-us)

Call Us
(https://www.aus.com/contact-us)

Find a Job
(https://ad.doubleclick.net/ddm/clk/435397650;274797
https://jobs.aus.com?
utm_source=aus.com&utm_campaign=national_cross

**Also of Interest**

Proactive Security Services and Smart Technology (https://www.aus.com/about-us/at-a-glance)

Allied Universal Ranks in the Top Five Systems... (https://www.aus.com/press-releases/allied-universal-ranks-top-five-systems-integrators-list-sdm-magazine-fourth-year)

Allied Universal CEO Steve Jones Provides... (https://www.aus.com/press-releases/allied-universal-ceo-steve-jones-provides-midyear-update-state-labor-market-private)

News/Media (https://ausnewsroom.aus.com/)

Careers (https://ad.doubleclick.net/ddm/clk/435397650;274797481;a?https://jobs.aus.com?
utm_source=aus.com&utm_campaign=national_cross_business&utm_medium=career_site&utm_content=&ss=paid)

Contact Us (https://www.aus.com/contact-us)      Privacy Policy (/privacy-policy)      Terms of Use (/terms-of-use)      Site Map (https://www.aus.com/sitemap)

Code of Ethics (https://www.aus.com/sites/default/files/2024-07/2024_AU_Global_Code.pdf)

Speak Out Hotline (https://secure.ethicspoint.com/domain/media/en/gui/63141/index.html)

Whistleblower Policy (https://www.aus.com/sites/default/files/2022-05/Whistleblower%20Policy%202019_updated.pdf)

North America Supplier Code of Conduct (https://www.aus.com/sites/default/files/2024-11/final_north_america_supplier_code_of_conduct_7-29-24_0.pdf)

Supplier Diversity Policy (https://www.aus.com/sites/default/files/2023-06/POL-1513%20NA%20Supplier%20Diversity%20Policy%2011142022.pdf)

Do Not Sell My Personal Information

Allied Universal UK (http://www.aus.uk.com)      Allied Universal Mexico (http://www.ausecurity.mx)      Allied Universal Canada
(http://www.ausecurity.ca)

©2025 Allied Universal, State Licenses: 1003458, 14417, 1025514, 0600, 1863B, 58361, 295263, ACO 7130, AC440528, C15802, C24060601, C24060801 *Licensed in some jurisdictions as Universal Protection Service, LP and Universal Protection Service, LLC.

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners.

APPENDIX 000574                                    AhmedAllied 000667

# Exhibit 10

## TIME article
### *The Problems Inside North America's Largest Security Firm — and Third-Biggest Employer*

# TIME

## The Problems Inside North America's Largest Security Firm—and Third-Biggest Employer



David Zalubowski—AP; Getty Images

BY **ALANA SEMUELS**

MAY 11, 2023 7:00 AM EDT

*This story is the third of three in* Insecure, *a series about the private security industry. Read part 1:* Private Security Guards Are Replacing Police Across America.*And part 2:* In the World of Private Security, There Aren't Many Rules or Regulations

APPENDIX 000576
AhmedAllied 000668
1/11

As housing costs spiked during the pandemic, San Diego's homelessness problem became a crisis, and Christopher Russell was overwhelmed. As a security guard employed by Allied Universal at the behest of the owners of a shopping plaza in a scruffy neighborhood of San Diego, Russell's duties were to ask the homeless people sleeping outside of the stores and parking garage to leave. They didn't have anywhere to go, and some would move politely, but others had mental health or drug abuse issues and would spit on him or scream at him, he says. His job duties included calling authorities for backup, but he says the calls were such low priority that police sometimes wouldn't come for hours.



"It gets violent over here," says Russell, 36. "You really have to watch your back." A police officer was recently shot in the face across the street. Russell says he tried to create a union of Allied workers but turnover was so high that it was hard to find anyone sticking along long enough to sign a union card. He's worked for Allied twice, but says he quit the first time because the company failed to pay him for weeks on end. (Allied did not reply to a request for comment on this specific allegation.) Allied workers at his San Diego site make $19 an hour, not much higher than San Diego's $16.30 minimum wage.

https://time.com/6278934/allied-universal-security-problems/

Allied Universal is America's biggest company you've never heard of. With 800,000 employees globally and 300,000 in the U.S., it is the third-largest private employer in North America, after Walmart and Amazon. Most Americans interact with Allied employees daily—at airports, on public transit, in supermarkets, pharmacies and gas stations. Yet Allied has not faced the scrutiny that Walmart or Amazon have in recent years, perhaps because it doesn't sell goods and services to consumers. This lack of public visibility has enabled the company to deploy underpaid and under trained guards in cities across America, where they put themselves and the general public at risk; Allied guards have allegedly killed civilians in the last year, some have also been killed themselves, including Christian LaCour, an Allied security guard killed at the mass shooting at Allen Premium Outlets in Texas on May 6, and Aaron Salter Jr., the Allied security guard killed at the mass shooting at a Buffalo supermarket in May 2022.

**More from TIME**

In a statement responding to LaCour's death, Steve Jones, global chairman and CEO of Allied Universal, said that in the last few months, Allied's guards have "administered life-saving medical aid, extinguished fires, foiled human trafficking, prevented suicides and removed firearms from public spaces." Jones criticized negative media stories about security guards that he said failed to report on guards' "heroic actions," and said he was putting out a call to "reexamine how society views and portrays the millions of men and women who work every day to make the world safer."

What he left out is that for many current and former employees, Allied itself is responsible for many of the negative experiences in the security industry. TIME interviewed 11 people across four states who currently work for Allied or who have worked for the company in the last two years. Their complaints include

APPENDIX 000578    AhmedAllied 000670    3/11

that they're put in dangerous situations without essential equipment or training, and that Allied keeps winning contracts but lacks the staff to fulfill them. Many complain that Allied has miscalculated how much it owes them and missed paychecks. (A federal class action lawsuit filed in 2022 alleges that Allied pays employees based on scheduled hours rather than actual hours worked. Allied has disputed these claims in court; in April, Allied agreed to enter into mediation with its 27,000 Illinois security guards.)

"They're worried about how many contracts they get, not about hiring good, quality people," says one Allied guard, who works on the campus of the University of Pennsylvania and who did not want his name used for fear of jeopardizing his job. Though he works in an area with a lot of crime, and has been pushed around by civilians, he says he has not received de-escalation training or self defense training. His division is frequently short-staffed and provided with faulty equipment like broken radios. "It's a broken system and people aren't being trained properly," he says.

Allied said, in a statement provided to TIME, that it has established procedures and protocols to serve and protect, "including training on enhanced situational awareness, de-escalation techniques, respect for cultural diversity and customer service," but did not specifically comment on the guard's claim.

**Read more:** In the World of Private Security, There Aren't Many Rules or Regulations

TIME also reviewed 30 civil lawsuits filed since 2020 in which Allied is a defendant, and which allege that the company repeatedly failed civilians. They include a complaint from Eduardo Fernandez, a 76-year-old man who says he was robbed and beaten by a fellow passenger while traveling on Miami's Metromover train in September 2020, suffering skull fractures and brain hemorrhaging. An Allied guard who entered the train "seconds" before the attack did not intervene, Fernandez argues. Recent court documents show that the Allied guard was Reinaldo Palenzuela III, who resigned from the Florida Dept. of Corrections in 2019 after being formally charged with one count of battery on a detainee. The lawsuit alleges that Allied failed to hire, retain, and

https://time.com/6278584/allied-universal-security-problems/

train its security personnel; Fernandez argues that two Allied executives said during court proceedings that Palenzuela was unqualified to be placed on the transit contract. The case is set to go on trial in August.

In another lawsuit filed in New York in December, Julie Trowers, an Allied employee, alleged that a male employee pulled out his penis and started masturbating as she trained him on a patrol route on the campus of New York University. The male employee allegedly boasted to Trowers that he had not been required to take a drug test, submit his fingerprint, or consent to a criminal background check before he was hired; he also said he was not required to undergo sexual harassment training, according to her complaint. The lawsuit, which was settled in April without any finding of liability, alleged that had Allied screened the male employee, it never would have hired him, and that the company is "similarly careless" with respect to the licensing status and potential criminal backgrounds of many of the guards it hires.

Allied said, in a statement, that all security professionals must pass "a rigorous pre-hire background screening process and training courses that frequently exceed government and industry standards."

## How Allied lags in training and supervising workers

Allied is so big in part because it buys up smaller security companies—it has acquired at least 15 firms since 2021, including G4S, a British company that had been the world's largest security company and that repeatedly came under scrutiny, including for having employed Omar Mateen, who killed 49 people at an Orlando nightclub in 2016. Allied's acquisitions of one-time public companies like G4S have made it difficult to determine what is going on behind the scenes: since the company is privately held, outsiders and analysts have little insight into its financials or business practices. "The industry is becoming more opaque than it has ever been before," says Michael Field, an analyst at Morningstar who covered the security industry until recently, changing his role in part because there are so few remaining public security companies.

https://time.com/6278584/allied-universal-security-problems/
AhmedAllied 000672

5/11

The complaints about Allied are important to assess as the security industry continues to grow, supplementing publicly-funded police departments that are accountable to the public. Allied is the biggest security firm in the world, which allows it to save money on back office operations, offer low rates, and attract more clients. But the company's size and rapid growth, experts say, may be contributing to the problems that are glaring issues with the security industry writ large. Global security revenues are forecast to increase 4.4% each year to 2026, when they will reach $295 billion, according to a report from the Freedonia Group. "When you have that kind of growth," says Rick McCann, the founder of Private Officer International, an association for security officers that tracks trends in the industry, "the quality goes down and not up."

**Read more:** Private Security Guards Are Replacing Police Across America

The best security companies have a strong record of training employees and supervising them on the job. Those that don't open themselves up to liability issues and lawsuits, says Joseph Jaksa, a professor of criminal justice at Saginaw Valley State University.

Cearrah Peterson noticed a problem with supervision at Allied right away. She started working for Allied at an Atlanta hospital in 2020 and says that she received almost no training for a job that was very physical; it included disarming people with guns and keeping mentally ill patients in their rooms. She was injured twice in those initial months, once when she was trying to keep a patient in his room but he overpowered her, and once when she was told to remove a man from the hospital who was holding a nurse in a room against her will. She heard nothing from Allied or from her supervisors at the time—she says she later found out that the team supervising the hospital workers had all quit.

"We were getting hurt on the job, nobody was backing us up, and we'd call the police and they wouldn't come," says Peterson, who worked for Allied in both Maryland and Georgia. "It was just so poorly managed." Peterson eventually got promoted to operations manager, responsible for supervising 200 security guards, and says there was no way to do the job without working around the

https://time.com/6278084/allied-universal-security-problems/

clock—although the company was still only paying for 40 hours a week of work. She quit the job after being denied a leave of absence to take care of her mental and physical health, she says.

Although the contract between G4S (which was acquired by Allied in April 2021) and the Florida Department of Juvenile Justice required two officers to be on duty for each shift—a male and a female—to ensure that male officers could intake male patients and female officers could intake females at a Palm Beach juvenile detention center, a G4S supervisor in July of 2021 allegedly allowed a night shift to be staffed by a single male worker, who then sexually assaulted a teen, according to a motion for summary judgment filed by the the teen in January. The G4S supervisor also said, in a deposition, that he knew the worker did not have the background in law enforcement or year experience working with delinquent youth required of security guards at the detention center, but still allowed him to work a shift, which became a problem when the other male scheduled to work never showed up. In the deposition, the supervisor admitted that in the last few months of the contract, which ended in August 2021, "there were multiple times where G4S was not able to provide the proper staff to fill each shift," and that he himself had skipped the shifts where he was supposed to show up at the detention center in person. The case was settled in February.

Other Allied employees say that supervisors encourage employees to cut corners to get all the necessary work done. "They have you so overloaded, there's no way to check all the sites you're supposed to be checking," says Jason Barnhouse, who worked for Allied in Palm Desert, Calif. and who says managers told him to ignore stop lights and exceed speed limits to check all the sites he was supposed to visit on patrol.

In the runup to a California music festival that Allied was supposed to staff, Barnhouse says that his branch could not find enough workers. "We said, 'Nobody wants to work for us at the wages you're offering,'" he says—around $16 an hour at the time. Instead, he alleges, an Allied manager said she would find people off the street to work the festival, even though doing so would violate California regulations as people working as security are required to

https://time.com/6278584/allied-universal-security-problems/

have completed training. Barnhouse does not know whether the manager carried through with that plan.

It's not unusual for people employed by another company to work on Allied contracts. In August 2021, Gregory Livingston, a white security guard, shot and killed Alvin Motley Jr., a black man, at a Kroger gas station in Memphis, Tenn., after an altercation over loud music. Although Kroger had contracted with Allied Universal for security services, Allied had hired a third-party security firm to staff the role. The guard had never qualified for certification as a security guard in Tennessee, according to reporting by *The Tennessean*. Kroger severed its relationship with Allied after the incident. Livingston's trial is set for October; his lawyer says he was acting in self defense.

The Walgreens security guard who allegedly shot and killed Banko Brown, a 24-year-old trans man, at a San Francisco store in April, was also employed by an Allied subcontractor, according to reporting from *The San Francisco Standard*; the San Francisco D.A. declined to press charges against the guard, saying he believed he was in "mortal danger" and acted in self defense.

Allied says "all subcontractors are required to adhere to Allied Universal standards and client requirements." It also said, in a statement, that it "does not tolerate aggressive or inappropriate behavior of any kind by our employees." The company's use of force policy and ongoing awareness campaigns train employees on de-escalation, the company said; these procedures are reinforced through initial training and "constant" re-training. The company also said that it investigates the causes of all incidents and takes action to limit the possibility that similar situations will reoccur. Management "acts promptly to ensure issues are resolved, our standards are upheld and employees are terminated, if warranted under our zero tolerance policy," the company said.

Of course, the services that Allied can offer are largely determined by what their clients agree to pay. Allied may charge a client a certain amount per hour for security services; it then takes a cut of the agreed-upon rate and uses the rest to pay its employees and cover other administrative expenses. But many

https://time.com/6278584/allied-universal-security-problems/

clients have not significantly increased their rates in a tight labor market, which leaves Allied little wiggle room to spend more on recruiting or training. With fewer police officers across the country, businesses are left to hire out of their own pockets, a proposition that can cut into their bottom line.

"This whole security industry is all based on what the client is willing to pay," says McCann, of Private Officer International.

An Allied executive, Charlie Bohnenberger, went before Charlotte's City Council in April to plead for wage increases for security staff contracted to patrol the regional transit system. "In order to address the police staffing shortages, we need wage adjustments," he said, as the city weighed whether to replace Allied. Allied has presented a 13-page report to Charlotte showing that it would need to pay $31.60 an hour to retain and recruit guards, he said; the company was offering $25 an hour at the time. Allied lost the Charlotte contract.

## The challenge of replacing private security

Allied has taken hits for its struggle to recruit and retain enough quality security guards. The Denver Post reported in 2022 that Allied could not fill 83 of the 290 jobs it was contracted to staff on the regional transit system, which meant that Denver fined Allied millions of dollars for not being able to execute its end of the deal. In Costa Mesa, Calif., Allied ran jail services until a year ago when the city terminated the contract because "mass resignation" of employees meant that only two trained jailers were left working at the facility, which has 32 beds.

And in Santa Monica, Calif., a property owner, John Alle, spent a year trying to convince the city to replace Allied with another company. The parking lots of downtown Santa Monica have been the scene of a murder, an attempted carjacking, and numerous drug deals since 2020, and Alle says the contract with Allied is partly to blame. "They're unarmed, they're scared, and they're young," says Alle, about the Allied guards he has encountered. "If they see vagrants or drugs or guns, they'll stay away for their own safety." In December, Santa

https://time.com/6278584/allied-universal-security-problems/

AhmedAllied 000676

9/11

Monica agreed to replace Allied with another firm. The city says that it has been "short on officers for several years" but that it is making strides in hiring police.

Those guards who can find work outside of Allied are doing so. Christopher Russell, who patrolled the San Diego shopping plaza, applied for a job at another security company, and after multiple rounds of interviews, got a job there making double what he had made at Allied.

Allied said, in a statement, that its high recruiting and safety standards had led to an "industry leading customer retention rate," and that the average tenure of its top clients is more than 10 years. It protects more than 400 of the FORTUNE 500 companies.

The company's sheer size is one reason that industry experts don't think Allied —or the larger private security industry—is going to disappear anytime soon. There's been so much consolidation in the industry that there aren't many choices for cities or businesses who want to hire private security. In Charlotte, one of the firms chosen to replace Allied on the security contract said that Allied has subcontracted them to provide security services on a New York transit system. "It's a revolving door, there's only so many companies serving that area," says McCann. "Eventually they're going to come back to you."

Indeed, in Santa Monica, John Alle says that the new firm hired by the city in December is not a whole lot better than Allied. Crime is getting worse, he says, with police responding to more crimes, including stabbings, carjackings, and overdoses. He's still advocating for more money to be spent on police, rather than on private security.

But similar efforts around the country to return to police have not been successful. Charlotte's Mayor Pro Tem Braxton Winston tried to convince Charlotte to stop using private security to patrol its transit system—instead, he said, he thought more money should be spent on police. The city had been getting many complaints and bad reviews from constituents who said that the Allied guards did not have experience dealing with unhoused people or those

https://time.com/6278384/allied-universal-security-problems/
AhmedAllied 000677

going through a mental crisis, he says, and district attorneys complained that guards would send arrest reports or citations that were not usable.

In April, the city ultimately decided to replace Allied with two firms. One firm will supply unarmed guards on the transit system, and the other will provide armed guards. Though Winston had advocated for more money for the local police so that they could expand into transit, he didn't convince his colleagues. Instead, they decided to double the amount they were spending—from $7 million to $14 million—and hire even more private security.

**CONTACT US AT** LETTERS@TIME.COM.

https://time.com/6278584/allied-universal-security-problems

APPENDIX 000586

AhmedAllied 000678

# Exhibit 11

# Allied's EEOC
# Position Statement

**ALLIEDUNIVERSAL**®

February 27, 2023

EEOC Houston District Office
1919 Smith Street, 6th Floor
Houston, TX 77002

Re:    Twana Ahmed v. Allied Universal
       Charge No. 460-2023-00103

Dear Sir/Madam:

Please allow this letter to serve as the complete Response of Universal Protection Service, LP d/b/a Allied Universal Security Services ("Allied Universal") regarding the above-referenced complaint and any questionnaires or requests for information. Allied Universal reserves the right to supplement or modify this Position Statement should additional information become available.

The Complainant, Twana Ahmed ("Mr. Ahmed"), alleges that he was unlawfully discriminated against on the basis of his national origin, race, and religion and retaliated against. Allied Universal categorically denies Mr. Ahmed's claims. At all times, Allied Universal and its agents have complied with Allied Universal's own legitimate policies and all local, state, and federal laws regarding fair employment practices.

## I. FACTS

Allied Universal provides security services to many clients at sites throughout the Houston area. At all relevant times, Mr. Ahmed worked as a security professional at one such site, an H-E-B grocery store.[1]

On or about December 15, 2021, Mr. Ahmed was hired. Upon hire, Mr. Ahmed received access to the employee handbook and acknowledged that he was expected to read and comply with all Company policies and procedures and understood that disciplinary action, up to and including termination, may result if he violated any Company policy or requirement, regardless whether such policy or requirement is specifically stated in the handbook.[2]

At that time, Mr. Ahmed also acknowledged that it is Allied Universal's policy that employees shall not use physical force against persons unless the employee reasonably believes such force to be necessary to protect the employee or another individual from imminent bodily harm. The extent of force employed must not exceed

---

[1] See Exhibit A
[2] See Exhibit B, pg. 18 – Personnel File

AhmedAllied000004

the minimum amount of force necessary to counter the threat, and may be employed only for as long as the threat persists. Allied Universal considers any time an employee physically touches another person to achieve a desired level of compliance to be a use of force. This includes any time an officer uses his hands, body, defensive tactics or equipment in the course of their duties which requires reporting and notification as outlined in the Use of Force and Reporting Policy.  Allied Universal security officers must be mindful that the purpose of force is to overcome aggression or threats and only to protect the lives of the officer or other persons. The application of force for any other purpose is not justified.[3]

Allied Universal has anti-discrimination, anti-harassment, and anti-retaliation policies.[4]  Employees are encouraged to report any issues to their supervisors, human resources representatives, or through Allied Universal's internal employee hotline.

In his present Charge, Mr. Ahmed falsely claims that Client Manager Patrick Freeney ("Mr. Freeney") (Black/African American) made fun of a Hispanic recruit's accent during a training in November 2021 and that this was the reason the recruit quit. Neither human resources nor management received any complaints regarding this alleged conduct by Mr. Freeney from Mr. Ahmed or any other employees. Additionally, Mr. Freeney only made one or two brief visits into the classroom during this training, which was led by Regional Trainer Monroe McClain (Black/African American). Site Supervisor Mauricio Zepeda ("Mr. Zepeda") (Hispanic or Latino) was also present at various times throughout the training, and Mr. Zepeda confirmed that he did not hear Mr. Freeney make any inappropriate comments. There were approximately six Hispanic or Latino males in this training session. Two of them ultimately resigned because they did not like the schedule that was offered to them.

Mr. Ahmed goes on to claim that during training, Mr. Freeney told him that he had to shave his beard and that Mr. Ahmed responded that he could not shave his bread due to his religion. In reality, Mr. Ahmed was never told that he had to shave his beard. He was advised that, pursuant to Company policy, he needed to have his beard neatly trimmed to conform to the contours of the face.[5] When Mr. Ahmed responded that he could not shave his beard due to his religious beliefs, Mr. Zepeda informed him that exceptions may be made for religious reasons as an accommodation and that Mr. Ahmed would need to speak to Mr. Freeney or human resources regarding an accommodation request. Mr. Zepeda also reiterated that he did not have to shave his beard completely and that it could look like his did, which was approximately one inch long. Mr. Ahmad's beard was approximately three inches long at that time. Mr. Ahmed agreed and did not voice any additional concerns.

---

[3] See Exhibit B, pg. 2
[4] See Exhibit C, pg. 80 – Employee Handbook
[5] See Exhibit C, pg. 61

AhmedAllied000005

A few weeks later, while Mr. Zepeda was performing uniform inspections, he noticed that Mr. Ahmed had not trimmed his beard. He reminded him of the requirements unless he had obtained an approved accommodation request. However, Mr. Ahmed did not contact human resources to request an accommodation. Shortly afterward, Mr. Ahmed trimmed his beard and did not make any complaints alleging that he was not being adequately accommodated.

In his Charge, Mr. Ahmed claims that he noticed other security professionals who had beards that were allegedly longer than his was. At that time, there was only one other security professional (Black/African American) who had a longer beard than Mr. Ahmed, and he was also asked to trim his beard in accordance with Company policy unless he requested a medical or religious accommodation, and this employee subsequently trimmed his beard as requested.

Mr. Ahmed also claims that he was not issued a body camera but several other security professionals were issued one. At that time, the Company did not have enough body cameras and batons for all of the security personnel at this site, so they could not be issued to everyone initially. Mr. Zepeda and Mr. Freeney explained this to Mr. Ahmed and informed him that he would be issued a body camera and baton as soon as they received more. Mr. Ahmed confirmed that he understood and did not complain about this. These items were eventually issued to him.

On February 15, 2022, Mr. Ahmed appeared for work out of proper uniform by wearing dark grey shoes instead of black shoes and dirty uniform pants. The following day, Mr. Freeney issued him a counseling notice[6] for this violation of policy.[7]

On April 4, 2022, Mr. Ahmed noticed a suspected shoplifter and disregarded his training and post orders when he forcefully pushed the individual against the wall and applied steel handcuffs to his wrists behind his back before he exited the store. At no time did Mr. Ahmed employ de-escalation techniques as required. This maneuver was outside the scope of his job duties and a violation of the Company's Use of Force policy. Mr. Ahmed's actions resulted in an H-E-B customer being improperly detained. Additionally, law enforcement could not charge this individual with shoplifting because Mr. Ahmed's actions prevented the individual from actually leaving the store with any merchandise that was not purchased.

As outlined in the employee handbook, abuse of a visitor or other third party (physical, vernal, or otherwise), including inappropriate use of force in violation of the Use of Force policy is a violation that may result in disciplinary action up to and including immediate termination of employment.[8]

---

[6] See Exhibit D – Counseling Notice 2/15/22
[7] See Exhibit C, pgs. 64 and 57
[8] See Exhibit C, pg. 52

AhmedAllied000006

Mr. Ahmed was well aware of the Company's Use of Force policy and procedures. In fact, as recently as February 14, 2022, all security professionals at this site and in the area received supplemental training regarding the Company's Use of Force policy as a refresher, including proper/appropriate use of force techniques, de-escalation practices, and security personnel's role in loss prevention/shoplifting.

Security professionals, as result of their position, have no elevated legal duty or authority to arrest a subject. A person is considered arrested or detained when he/she is not free to leave the scene, regardless of whether force or coercion has been used. Though state laws vary, a Citizen's Arrest generally can only be made if all three of these conditions have been met: (1) A felony has been committed in your presence; (2) The police would not be able to respond in time to prevent injury from imminent physical harm or death, (a justified use of reasonable) force, or the escape of the subject; and (3) Your site's contract and post orders permit you to make a citizen's arrest. Making a physical arrest should be an act of last resort.[9] Otherwise, if asked to stop a customer by a client employee, the security professional should politely refuse, citing that doing so is against Company security policy.

Immediately afterward, the client notified Field Supervisor Alexzander Bergeron ("Mr. Bergeron") (White/Not Hispanic) of the incident and was reportedly appalled by Mr. Ahmed's use of force. The client confirmed that Mr. Ahmed recognized the suspected shoplifter and brought it to the client's attention, who then immediately contacted law enforcement. Despite this, Mr. Ahmed chose to wait and hide behind a wall in the lobby for the individual to walk toward the exit of the store and then immediately handcuffed him. Mr. Bergeron instructed Mr. Ahmed to submit a Use of Force report. However, Mr. Ahmed failed to submit the report within 24 hours as required.

Following this, Mr. Ahmed was interviewed by Mr. Freeney to determine his motivation for taking the action he did. Mr. Ahmed claimed that the client came to him to request his assistance with a suspected shoplifter. Mr. Ahmed stated that he acknowledged the request and then waited behind the door for the shoplifter to try to exit the store. Mr. Ahmed never claimed that this individual made any threatening comments to him or that he was drunk, which Mr. Ahmed now includes in his present Charge. At that time, Mr. Ahmed refused to provide a written statement. Mr. Ahmed was notified that his employment was temporarily suspended pending further investigation.

Mr. Freeney discussed the incident with Mr. Bergeron, the site supervisors, and the shift supervisor to determine what corrective action was warranted. Given Mr. Ahmed's blatant disregard of policy and failure to take any steps to deescalate the situation, they agreed that termination of Mr. Ahmed's employment was appropriate.

---

[9] See Exhibit C, pg. 41

AhmedAllied000007

Accordingly, Mr. Freeney notified Mr. Ahmed of this decision on or about April 7th. Mr. Freeney asked Mr. Ahmed to sign a termination notice, but he refused.

On May 25, 2022, Mr. Ahmed made a complaint via the employee hotline against Mr. Freeney. Mr. Ahmed claimed that Mr. Freeney asked him to trim his beard during Ramadan and that he noticed other employees that had longer beards than him, which suggested to him that he had been targeted and dealt with unfairly by Mr. Freeney. Mr. Ahmed also claimed that Mr. Freeney cursed at him and threatened him regarding not appearing for work on a day that Mr. Ahmed claimed he was not scheduled to work. Finally, Mr. Ahmed complained that he was suspended until further notice after detaining someone during the process of a crime and stated that he assumed he was terminated because no one had called him back to notify him of his work status or issue any disciplinary notice.

Human Resources Representative Wayne Oliver ("Mr. Oliver") investigated Mr. Ahmed's complaint and contacted Mr. Freeney to discuss the allegations. Mr. Freeney confirmed that he did not have a conversation with Mr. Ahmed about his beard during Ramadan and that he never made any unprofessional or threatening comments to Mr. Ahmed or any other employee. Mr. Freeney confirmed that he informed Mr. Ahmed that his employment was terminated based on his violation of the Company's Use of Force policy after discussing the incident with the supervisors.

Mr. Oliver also spoke to Mr. Bergeron regarding the incident. Based on the evidence that Mr. Oliver gathered, he was unable to substantiate any of the allegations contained in Mr. Ahmed's complaint. On or about June 11, 2022, Mr. Oliver informed Mr. Ahmed that he was unable to substantiate his complaint and confirmed that the termination of his employment based on his violation of the Company's Use of Force policy stood.

## II. DISCUSSION

### A. Mr. Ahmed cannot state a claim for discrimination and his complaint must be dismissed.

Allied Universal denies that it discriminated against Mr. Ahmed. To state a claim for discrimination, an employee must show that he or she was treated less favorably than other similarly situated employees due to his or her membership in a protected class. As a preliminary matter, Mr. Ahmed's Charge is devoid of any factual allegations which support his claims that he was treated differently than similarly situated employees because of his religion, national origin, or race. Mr. Ahmed's complaints against Mr. Freeney claiming that he treated him differently or that he made inappropriate comments to him only came after Mr. Ahmed's employment was terminated and as such, were made in bad faith. Regardless, his complaint wa investigated and unsubstantiated.

AhmedAllied000008

Mr. Ahmed's employment was suspended and ultimately terminated based on his violation of the Company's Use of Force policy. This is a legitimate, non-discriminatory reason and violation of the Use of Force policy is an immediately terminable offense. Accordingly, Mr. Ahmed cannot state a claim for discrimination, and his complaint must be dismissed.

   B. *Mr. Ahmed cannot state a claim for retaliation and his complaint must be dismissed.*

Allied Universal denies that it retaliated against Mr. Ahmed. To state a claim for retaliation, an employee must show that he or she: (1) engaged in a protected employment activity by reporting discrimination and/or harassment and (2) subsequently experienced an adverse employment action. Here, Mr. Ahmed never engaged in protected activity during his employment and only made a complaint alleging discrimination after his employment was terminated. As such, he did not experience an adverse employment action as a result of his complaint, and his retaliation is fatally flawed.

Mr. Ahmed's employment was terminated due to his violation of the Company's Use of Force policy, which is a legitimate, non-retaliatory reason. Based on the foregoing, Mr. Ahmed was not retaliated against and his complaint must be dismissed.

III. CONCLUSION

In summary, Mr. Ahmed was not discriminated and/or retaliated against. Mr. Ahmed's employment was suspended and ultimately terminated based on his violation of the Company's Use of Force policy, which is a legitimate, non-discriminatory and non-retaliatory reason. Mr. Ahmed's subsequent complaint alleging discrimination was investigated and unsubstantiated. As Mr. Ahmed's claims lack merit, Allied Universal respectfully requests that you dismiss his complaint and enter a finding of no probable cause.

Thank you for your consideration of our position. Requests for additional information should be emailed to Audra.Caldwell@aus.com. If you need to speak with someone please contact Ms. Caldwell at 678-472-3202.

Sincerely,

Audra Caldwell
Legal Services Group

Allied Universal
161 Washington Street, Suite 600
Conshohocken, PA 19428

AhmedAllied000009

# Exhibit 12

# Allied's
# use of force policy

| Allied | **Allied Universal Security Services** |
|---|---|
| | **Policy Statement** |

## Legal – Use of Force and Reporting Policy

**DATE REVISED:**    **08/22/2021**
**SOURCE:**        **Legal Department**
**PREPARED BY:**    **James C. Grant, Director, Firearms & Use of Force**
     **Policy:**      **Y**
     **Procedure:**  **Y**

**Purpose:**
To articulate policy and procedures concerning the use of force.

**Person(s) Responsible:**
Division Presidents
Region Presidents
Region Vice Presidents
Branch Managers (or similar)
Account and Field Operations (or similar)

**Scope of Employees Covered:**
This policy applies to all employees of Allied Universal Security Services.

## I.     Use of Force

### Use of Force- General Principles

It is Allied Universal's policy that employees shall not use physical force against persons unless the employee reasonably believes that such force to be necessary to protect the employee or another individual from imminent bodily harm.  The extent of force employed must not exceed the minimum amount of force necessary to counter the threat, and may be employed only for as long as the threat persists, as described in more detail below.

In most circumstances, disengagement in favor of calling law enforcement authorities is preferable choice.  Further, a decision to use force in any situation shall consider the likelihood of success and the risks to the Security Professional.  Under no circumstances should a Security Professional engage in a physical altercation that is likely to result in physical injury to the Security Professional or that is unlikely to effectively counter the threat.

*Allied Universal Security Services Use of Force and Reporting Policy –February 2020*

AUS 00734

Allied Universal considers any time an employee physically touches another person to achieve a desired level of compliance to be a use of force.  A use of force includes:

- Use of hands, body, defensive tactics or equipment, less lethal weapons, or firearms in the course of duties;
- Pursuit of any kind;
- Display or brandishing of any weapon;
- Deployment of a working dog.

As an exception to this policy, routine therapeutic patient restraint procedures and routine handcuffing during police operations (i.e. Company Police, Special Officers) do not need to be reported to the Legal Services Group.  In these environments, the Corporate Use of Force Report only needs to be completed if they involve the use of weapons, injuries to our employees, the subject or a third party, if there is some other unusual or unexpected outcome, or if the subject of medically-ordered therapeutic restraint resisted the procedure.

**Possession of Weapons Prohibited**

No Allied Universal employee or agent may carry, possess, or store a firearm or other weapon, including less lethal weapons during the course and scope of their employment, except as permitted by this policy.  Except where state law prohibits such a restriction, this policy shall prohibit the carrying of a personal firearm to work, as well as having a personal firearm available in the passenger compartment or trunk of a Company vehicle or private vehicle being used for work purposes.  As stated in the employee handbook, employees who violate this policy will be subject to discipline up to, and including, termination.

**Use of Force Continuum**

The Use of Force Continuum shall be the standard model for the use of force by all Allied Universal Security Professionals.  The continuum is broken down into six broad levels.  Each is designed to have an *elastic factor* to accommodate evolving situations evoking different levels of force.  It is common for the level of force to move from level two, to level three, and back again in a matter of seconds.

Allied Universal Security Professionals should be mindful that so long as prudent under the circumstances, disengagement in favor of calling the police or other law enforcement authorities is always the preferred course of action as part of the force continuum.

Additionally, Security Professionals must remember that the Use of Force Continuum relates not only to the escalation of the Use of Force but also directs the de-escalation of techniques as the subject's threats diminish or stop.

The following diagram demonstrates the escalation and de-escalation of the use of force with 1 being the least force used and 6 being deadly force:



| | |
|---|---|
| 6 | Deadly Force |
| 5 | Temporary Incapacitation |
| 4 | Less Lethal Defensive Sprays |
| 3 | Control Holds / Restraints |
| 2 | Verbal Communication |
| 1 | Officer Presence |

**LEVEL ONE**

**Officer Presence**.  The mere presence of a highly visible uniformed Security Professional may stop a crime in progress or prevent future crime. Without saying a word, an alert Security Professional can deter crime or direct criminals away from a property by use of body language and gestures. At this level gestures should be non-threatening and professional.

**LEVEL TWO**

**Verbal Communication**.  Used in combination with a visible presence, the use of the voice can usually achieve the desired results. Words can be whispered, used normally, or shouted to be effective. The content of the message is as important as the Security Professionals demeanor. It's always best to start out calm but firm and *non-threatening*. Choice of words and intensity can be increased as necessary or used in short commands in serious situations. The right combination of words can de-escalate a tense situation and prevent the need for a physical altercation. Training and experience improves the ability of a security officer to communicate effectively with everyone, including the police.

_**NOTE: All uses of force above Level Two require the preparation and submission of a Use of Force Report**_

**LEVEL THREE**

*Allied Universal Security Services Use of Force and Reporting Policy –February 2020*

AUS 00736

**Use of Open Hands, Control Holds & Restraints**.  Certain situations may arise where words alone do not reduce the aggression.  Sometimes Security Professionals will need to get involved physically. At this level, minimal force would involve the use of bare hands to guide, hold, or restrain. This does not include offensive moves such as punching, tackling, or choking.  Pain compliance holds could apply here but only after ordinary holds fail to control an aggressive suspect.  A baton may only be used at this level as a self-defense mechanism to block blows or temporarily restrain a suspect.  Handcuffs can be used a restraint devise only if the officer has been trained to do so. Not every suspect needs to be handcuffed. Restraints should only be used on a person who exhibits aggression, poses a real threat.  Handcuffs should not be applied too tightly and should be double-locked when safe to do so.  Once a suspect is handcuffed, the officer is responsible for his or her safety.  To avoid the possibility of "positional asphyxiation," Allied Universal Security Professionals may not pile on top of a suspect, or place a handcuffed suspect face-down on the ground.  Hog-ties and hobbling (tying legs together) are prohibited.

**LEVEL FOUR**

**Less Lethal Defensive Spray (O.C.)**.  When a suspect is violent or threatening, more extreme but less lethal measures may be used in defense, to bring the suspect under control, or affect an arrest.  Before a Security Professional may moving to level four, it is assumed that he or she exercised other less physical measures or deemed them inappropriate.  When used by surprise, pepper spray is an excellent distraction, allowing the officer time to get away, call the police, or subdue the suspect.  Pepper spray may not be used to protect property or to enforce business rules.  It is a defensive weapon.  Pepper spray must be directed in the suspect's face for maximum result, and not sprayed wildly at groups of people.  Even though considered less lethal, pepper sprays can cause severe reaction and possible injury.  Also, pepper sprays have a blinding effect and care must be used that spray victims do not fall down stairs, wander into traffic, or operate a motor vehicle.

**LEVEL FIVE**

**Temporary Incapacitation**.  This level of force may only be employed when the situation is so extreme, violent, and immediate that it is necessary to temporarily incapacitate a suspect prior to the arrival of the police.  This includes the use of all methods of non-deadly force beginning with the empty hand up through and including impact tools, Taser's or working dogs.  At level five, properly used defensive and offensive moves (including take downs, knee, hand, and elbow and arm strikes) are allowed under the right circumstances.  Baton blows to soft tissue and certain joint areas are consistent with professional security training standards.  Kicking any part of a subject's body, and baton blows to the suspect's head or throat, however, can be deadly, and are inconsistent with professional training standards, and are strictly prohibited **unless the use of deadly force is justified**.  Any violation of this directive will be treated as a serious offense warranting discipline up to, and including, termination.

Temporary incapacitation is used to stop a suspect from injuring an officer or others, permitting the application of handcuffs or other restraints.  Electronic control devices( ("ECDs") also

*Allied Universal Security Services Use of Force and Reporting Policy –February 2020*

known as conducted electrical weapons, and "Tasers" are a recognized means of temporarily incapacitating an assailant, but may only be carried by an Allied Universal Security Professional with the express approval of the Chief Administrative Officer and General Counsel in consultation with the Legal Services Group.

## LEVEL SIX

**Deadly Force**.  Allied Universal Security Professionals are justified in threatening or using less lethal force against another when and to the extent that the officer reasonably believes that such threat or force is necessary to defend him/herself or a third party against another's imminent use of unlawful force.  Deadly force, however, may be used only when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person, and the use of lesser force is not possible or would not extinguish the threat.

By way of example, but not limitation:

      A.  Deadly force generally may not be used to prevent the escape of a fleeing suspect unless that individual poses an imminent threat to the safety of others.

      B.  Firearms may not be fired for the purpose of disabling moving vehicles.

      C.  Firearms may not be discharged at or from a moving vehicle.

      D.  Warning shots are not permitted.

If feasible and if to do so would not increase the danger to the Security Professional or others, a verbal warning to submit to the authority of the officer shall be given prior to the use of deadly force.

When the decision is made to use force, an Armed Security Professional may continue its application only until the subject surrenders or otherwise no longer poses an imminent danger to the Security Professional or to others.

When the application of deadly force is necessary, attempts to wound or otherwise cause minor injury are unrealistic and impractical, and can prove dangerous to the Security Professional and others because such attempts are unlikely to neutralize the imminent danger he or she confronts.

The brandishing of an un-holstered firearm in a public setting is strictly prohibited unless the situation warrants the use of deadly force as stated herein.  Even when deadly force is permissible, Armed Security Professionals should assess whether its use creates a danger to third parties that outweighs the likely benefits of its use.  Consideration must be given to innocent bystanders and Security Professionals shall not unreasonably endanger the safety or welfare of bystanders.

*Allied Universal Security Services Use of Force and Reporting Policy –February 2020*

                                    AUS 00738

**Additional Criteria for All Uses of Force**

Whether deadly or less lethal, when force is used against a person it must cease when the resistance or threat is overcome or ceases.  Allied Universal Security Professionals must be mindful that the purpose of force is to overcome aggression or threats and only to protect the lives of the officer or other persons.  The application of force for any other purpose is not justified.

Since the Use of Force Continuum requires the exercise of less lethal force before resorting to deadly force, no Allied Universal security officer will be authorized to carry a firearm unless and until that officer is trained in the use of, and equipped with, a less lethal weapon such as a baton, pepper O.C. (Oleoresin Capsicum) spray, or ECDs.

***NOTE:  Adoption or use of Client-specific use of force policies must be approved by the Legal Services Group.***

Allied Universal Security Professionals will exercise only that level of force necessary to de-escalate an incident and safely achieve control.  As indicated by the Use of Force Continuum, whenever feasible, verbal commands should be given before resort to physical compliance techniques or the use of O.C. spray, a baton, or stun device.  The level of force necessary to safely achieve control will logically be proportionate with the level of resistance confronted.


### Monitoring of the Subject and Medical Attention

Once a combative subject has been detained it is important to monitor them for any medical problems resulting for the use of defense tactics or equipment.  Medical professionals shall be summoned for any subject who has been exposed to prolonged fighting, OC spray, baton strike, ECD use, dog bite, gunshot wound or with any other obvious injury or medical difficulty.  In the case of OC spray, immediate post-exposure cleansing should begin as soon as it is tactically safe to do so.

### Pursuit

Pursuit is defined as travelling at a faster pace or speed than a suspect, with the objective to approach and detain a suspect who is attempting to flee the scene of a crime and/or to avoid arrest/detention.  Pursuit is **prohibited** except in situations where failure to detain the suspect could cause death or serious bodily injury.

Pursuit does not include following at a rate and manner to maintain surveillance of the fleeing suspect with the intent to relay information to responding Law Enforcement or to contact the suspect who ceases to flee.

### Vehicle Pursuits

*Allied Universal Security Services Use of Force and Reporting Policy –February 2020*

APPENDIX 000600

A pursuit using a vehicle is defined as using a vehicle to follow a suspect who is on foot or in a vehicle while travelling at a higher speed than normal for the environment or in a manner that would be considered unsafe for the environment.

Vehicle Pursuits are **prohibited**, no matter the circumstances or equipment provided on security vehicles

Following a suspect or a suspect vehicle shall not be done in a manner that is unsafe or violates any jurisdictional vehicle code (speed limits or traffic control laws) or private property rules.

### Detention and Legal Arrest

A Security Professional, as result of his/her position, has no elevated legal duty or authority to detain or arrest a subject.

A person is considered arrested or detained when he/she is not free to leave the scene, regardless of whether force or coercion has been used.

Generally, a Security Professional's ability to make a lawful arrest is governed by the same laws which govern arrests made by private citizens, commonly referred to as a "citizen's arrest". Therefore, a Security Professional should understand the law in the jurisdiction where they are working with respect to a private citizen's ability to perform a lawful arrest. What may be considered a lawful detention and arrest in one state may be unlawful in another state.

Security Professionals may only make a Citizen's Arrest under a set of very strict circumstances. Though state laws vary, a Citizen's Arrest generally can only be made if all three of these conditions have been met:
- A felony has been committed in your presence
- The police would not be able to respond in time to prevent injury from imminent physical harm or death (a justified use of reasonable) force or the escape of the subject
- Your site's contract and post orders permit you make a citizen's arrest

Making a physical arrest should be an act of last resort and local law enforcement must be immediately notified.

There is no legal obligation for a Security Professional to make an arrest. While it is recognized that there are situations wherein Security Professionals do make arrests, if the situation is unsafe, the decision to not arrest may be appropriate. In such a situation, notifying and waiting for Law Enforcement may be prudent.

### Moving an Arrestee

While awaiting the arrival of Law Enforcement, the Security Professional should keep the arrestee at the scene of the apprehension, unless doing so would be unsafe. The arrestee should be placed in a seated position, either on a chair or other elevated stable object. If no such object is available the arrestee may be seated on the ground.

Any handcuffed and compliant arrestee shall be seated or under direct physical control of a security professional.

As set forth above in Section I (Use of Force Level 3) at no time shall a restrained subject be left in a prone (face-down) position. Hog tying or hobbling of subjects is prohibited.

If it is prudent to move the arrestee due to tactical or procedural considerations, then the arrestee may be escorted to another location.

The arrestee shall be under the observation of Security Professionals at all times until placed in the custody of Law Enforcement. The constant observation of the arrestee is for the safety of all persons, to limit the attempt to escape, or to protect against the destruction of evidence.

### Exceptions to the Pursuit/Detention/Arrest Policy Statements

In some instances, Allied Universal Security Professionals' have different duties and legal authorities, such as "police type" operations (i.e. Company Police, Special Officers), certain retail environments, facilities impacting national security or critical infrastructure. In these instances, further policy instructions, in conjunction with local regulations regarding the limits of your authority, will be communicated at the job level.

## II.    Reporting Requirements and Response

### Required Reporting

In every incident involving the Use of Force, the employees(s) involved must complete a "Use of Force Incident Report" and this form is to be forwarded by the Account Manager or Field Operations Manager over the Security Professional involved in the event to the Legal Services Group (force@aus.com) with copies to the supervisor's management chain (i.e. BM, RVP, RPs) within 24 hours of the event. This report will provide detail about the incident including the identity of those involved, the level and type of force applied, and the reasons for its application. Injuries to either officers or others must be fully described, as must any resultant property damage.

Branch and Regional Office management are responsible for strict compliance with notification requirements specified by all relevant state, local, and county private security licensing and regulatory authorities.

Within 5 business days of the event, Branch Office management will review the incident, the Security Professional(s) immediate supervisor must make a recommendation regarding whether

*Allied Universal Security Services Use of Force and Reporting Policy –February 2020*

the use of force complied with company policy, contract deliverables, and local regulations or if any additional investigation is dictated by the facts and circumstances of the incident.

**Response**

In all incidents involving the Use of Force, the Security Professional's immediate supervisor will respond to the scene as soon as practicable to gather the facts and assist the officer in the preparation of Use of Force Incident Report.  He or she should notify the Account Manager and/or Branch Manager of the event as soon as practicable.

Absent aggravating circumstances, no further investigation is necessary beyond the submission of the Use of Force Incident Report to the Legal Services Group and relevant Regional President. In determining whether an investigation is necessary based upon aggravating circumstances, local management should consider the nature and level of force applied, the extent of any injuries, and the level of adherence to policy.  The Supervisor, Account Manager, Branch Manager, and, if appropriate, the Regional President should contact the Legal Services Group for guidance in such cases when formulating a recommendation for follow-up investigation.

# Exhibit 13

## excerpts from
## Calvin Brown deposition

2/2/2018 4:32:00 PM
Chris Daniel District Clerk
Harris County
Envelope No: 22268551
By: GUTIERREZ, JANEL E
Filed: 2/2/2018 4:32:00 PM

CAUSE NO. 2016-20704

ANKI JOHNSON (HEIR OF          )    IN THE DISTRICT COURT

ROBERT JOHNSON),               )

      Plaintiff,              )

VS.                            )    HARRIS COUNTY, TEXAS

HEB GROCERY COMPANY, LP,       )

      Defendant.              )    113TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

CALVIN BROWN

OCTOBER 11, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF CALVIN BROWN, produced as a witness

at the instance of the Plaintiff, and duly sworn, was taken

in the above-styled and numbered cause on October 11, 2017,

from 10:17 a.m. to 11:44 a.m., before Robin Potts, CSR in

and for the State of Texas, reported by machine shorthand,

at the offices of Lewis, Brisbois, Bisgaard & Smith, LLP,

24 Greenway Plaza, Suite 1400, Houston, Texas, pursuant to

the Texas Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

NMA
Compressed
Transcript

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Unofficial Copy Office of Marilyn Burgess District Clerk



Page 2

1    APPEARANCES
2
3    FOR THE PLAINTIFF:
4    Ms. Velda R. Faulkner
5    Law Office of Velda R. Faulkner
6    6575 West Loop South, Suite 500
7    Bellaire, TX 77401
8
9    FOR THE DEFENDANTS ALLIED UNIVERSAL AND CALVIN BROWN:
10   Mr. Matthew R. Begley
11   Lewis, Brisbois, Bisgaard & Smith, LLP
12   24 Greenway Plaza, Suite 1400
13   Houston, TX 77046
14
15   ALSO PRESENT:
16   Anki Johnson
17   Shawn Johnson
18
19
20
21
22
23
24
25

Page 3

1                    INDEX
2
3    Appearances ........................................... 2
4    Stipulations ............................................. 4
5    CALVIN BROWN
6       Examination by Ms. Faulkner ............... 4
7    Signature and Changes ........................... 101
8    Reporter's Certificate ............................. 103
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                  THE REPORTER: Put your stipulations on the
2    record, please.
3                  MS. FAULKNER: Thank you. Everything by the
4    Rules.
5                  MR. BEGLEY: Yes, sure.
6                  THE REPORTER: Do you want the witness to
7    read and sign the transcript?
8                  MR. BEGLEY: Yeah, let's do that.
9          **********
10                 CALVIN BROWN,
11   having been first duly sworn, testified as follows:
12                 EXAMINATION
13   BY MS. FAULKNER:
14       Q. Good morning, Mr. Brown. My name is Attorney Velda
15   Faulkner.
16       A. Yeah. How ya doing?
17       Q. I'm doing fine. How are you?
18       A. All right.
19       Q. I'm the attorney for Mr. Robert Johnson, who is now
20   being represented by his family -- Miss Anki Johnson, his
21   daughter, and his son, Shawn Johnson. Okay?
22       A. Okay.
23       Q. Would you state your name for the record, please?
24       A. My name is Calvin Brown.
25       Q. Okay.

Page 5

1            Before we get started, if you let me finish my
2    question and then you answer so she can take down everybody's
3    testimony. Okay?
4       A. All right.
5       Q. Okay. And if you don't understand anything I'm
6    saying to you, just tell me you don't understand or to
7    rephrase. Okay?
8       A. Okay.
9       Q. Okay. All right.
10           And what's your address, Mr. Johnson?
11      A. Mr. Brown.
12      Q. I'm sorry. Mr. Brown. I'm calling you my client.
13   Mr. Brown. I'm sorry.
14           What's your address, Mr. Brown?
15      A. ███████████ Sugar Land, Texas. ZIP
16   Code 77498.
17      Q. Okay. And what's your --
18                 MR. BEGLEY: Are you having trouble hearing
19   him?
20           Speak up a little bit, Calvin.
21                 THE REPORTER: I'm okay.
22                 THE WITNESS: Okay. I'm sorry.
23                 MR. BEGLEY: Speak up a little bit.
24                 THE WITNESS: Okay.
25   My address is 16326 Blossomwood Lane, Sugar Land,

2 (Pages 2 to 5)

APPENDIX 000606                    AhmedAllied 000719



Page 6

1  Texas. ZIP Code 77498.
2  Q. (BY MS. FAULKNER) Okay. All right.
3  And what's your date of birth?
4  A.            1961.
5  Q. Okay. And, so, that would make you fifty –
6  A. 55. Be 56 next month.
7  Q. Next month. Okay.
8  And what is your driver's license number?
9  A. I don't know it by heart. I've got it in my
10 pocket.
11 My driver's license number is 08993791. State of
12 Texas.
13 Q. Okay. And where were you born?
14 A. I was born in Brookshire, Texas, Waller County.
15 Q. Okay. And you have lived in Sugar Land how long?
16 A. Since 2000.
17 Q. Okay. And where did you live before that?
18 A. Houston, Texas.
19 Q. Okay. And you have lived in Sugar Land how long?
20 A. Since 2000, September.
21 Q. This year?
22 A. 2000.
23 Q. 2000?
24 A. Yeah, 2000.
25 Q. Okay. September 2000?

Page 7

1  A. Yeah.
2  Q. Okay. So, you've been in Sugar Land 17 years?
3  A. 17 years.
4  Q. At this address?
5  A. At this address.
6  Q. Okay. And are you married?
7  A. I'm married. Been married 22 years.
8  Q. Okay. Do you have any children?
9  A. Got no children.
10 Q. Okay. Any nieces, nephews?
11 A. I've got plenty of nieces and nephews.
12 Q. Okay. Does your wife have any children?
13 A. She got one daughter. She grown.
14 Q. Okay. All right.
15 And she doesn't live with you?
16 A. No, she don't live with us. She's married.
17 Q. Okay. She is married?
18 A. Yeah.
19 Q. Okay. All right.
20 And who is your employer now?
21 A. My employer, Allied Universal.
22 Q. Allied?
23 A. Yeah, Allied Universal.
24 Q. And that's the defendant in this case -- other
25 defendant in this case; is that right?

Page 8

1  A. Right.
2  Q. Okay. And you spell "Allied" A-l-l-i-e-d; is that
3  right?
4  A. Right.
5  Q. Okay. And you've been working for them how long?
6  A. Been three years and ten months.
7  Q. Been three years and ten months?
8  A. Right.
9  Q. Okay. And how are you employed there?
10 A. I'm a security guard there.
11 Q. Okay. And how long have you been a security guard
12 at Allied? Have you been anything else other than a security
13 guard with them?
14 A. Just a security guard.
15 Q. Okay. And what's your rate of pay?
16 A. $10 an hour.
17 Q. Okay. And when you started with Allied, did you
18 start out at $10 an hour?
19 A. I started out at $10 an hour.
20 Q. Okay. Do they supply you with any uniforms?
21 A. Yeah.
22 Q. Okay. And how many do you get?
23 A. I get five uniforms.
24 Q. When you first started, you got five uniforms?
25 A. Right.

Page 9

1  Q. Okay. And you're still working on using those
2  uniforms?
3  A. No. They give us some more.
4  Q. Oh, they change them out?
5  A. Yeah.
6  Q. Okay. Any other equipment that -- any equipment,
7  rather, that they give you?
8  A. I just have hats and uniforms. That's it.
9  Q. Hats?
10 A. Yeah. And uniforms. And a site phone.
11 Q. A site phone?
12 A. It's a site phone. Call it a site phone.
13 Q. How do you spell "site phone"?
14 A. Site phone, s-i-t-e, site phone.
15 Q. Oh, site phone?
16 A. Yeah.
17 Q. Okay. And that's their phone?
18 A. That's their phone.
19 Q. And you have to use that when you're on duty there?
20 A. I use that on duty.
21 Q. Okay. Do you use it for any personal business at
22 all?
23 A. No.
24 Q. What does your site phone do? Is it a regular
25 telephone or is it just --

3 (Pages 6 to 9)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Page 10

1   A.  It's a regular telephone. It reports things. I
2   always have to do daily reports.
3       Q.  Okay. And is it only for Allied's use, you as
4   an --
5       A.  It's --
6       Q.  Hold on. Let me finish my question.
7       A.  Okay.
8       Q.  Is it to be used only by you as an employee of
9   Allied?
10      A.  That's it, as an employee of Allied.
11      Q.  Okay. And does it make phone calls?
12      A.  It don't make phone calls.
13      Q.  Okay.
14      A.  Unless the supervisor call you. That's it.
15      Q.  On that site phone?
16      A.  Right.
17      Q.  Okay. And you can talk on that phone; right?
18      A.  I can talk on the phone.
19      Q.  Okay. And you can call your supervisor too?
20      A.  Call my supervisor.
21      Q.  Okay. And is your supervisor on site where you are
22  usually?
23      A.  No. He comes to see me.
24      Q.  Okay.
25      A.  He got other posts to go to.

Page 11

1       Q.  Okay. And he will come if he needs something from
2   you or if you called him?
3       A.  Right, he'll come.
4       Q.  Okay. And you were first -- do you remember the
5   date in which you were hired?
6       A.  Yeah. It was about April the 4th, 2014.
7       Q.  Okay. And you said you were hired as a security
8   guard at the time. And you're still at a security guard
9   level; is that correct?
10      A.  Right.
11      Q.  Okay. And what's the name of your current
12  supervisor?
13      A.  Supervisor Hardy.
14      Q.  Hardy?
15      A.  Yeah, H-a-r-d-y.
16      Q.  H-a-r-d-y?
17      A.  H-a-r-d-y.
18      Q.  Okay. H-a-r-d-y?
19      A.  Right.
20      Q.  And that's his first name or last name?
21      A.  That's his last name.
22      Q.  Do you know his first name?
23      A.  I just say Supervisor Hardy. He never gave the
24  first name.
25      Q.  Okay. And was he your supervisor -- how long has

Page 12

1   he been your supervisor?
2       A.  He's been my supervisor for a couple months.
3       Q.  Okay. Who was your --
4       A.  Since last year. Since last year he's been my
5   supervisor. Since last year September.
6       Q.  Okay. And prior to Mr. -- is it Mr.?
7       A.  Mr.
8       Q.  Who was your supervisor before then?
9       A.  Like, Supervisor Hall was one.
10      Q.  Hall?
11      A.  H-a-l-l.
12      Q.  Okay. And is that a male or a female?
13      A.  That's a male.
14      Q.  Okay. And how long was he your supervisor?
15      A.  He was my supervisor since 2015.
16      Q.  And what date in 2015?
17      A.  I can't remember. Maybe January 2015.
18      Q.  Okay. And do you know where Mr. Hall is now?
19      A.  I don't know where he is now. He's no longer a
20  supervisor.
21      Q.  He's no longer a supervisor?
22      A.  No, he's not. I don't know why he's not with the
23  company no more.
24      Q.  Oh, he's not with Allied anymore?
25      A.  No.

Page 13

1       Q.  Okay. Did you know Mr. Hall before you started
2   working for Allied?
3       A.  No. I just knew him when he became a supervisor.
4       Q.  Okay. All right.
5           And where did you work before you started working
6   with Allied?
7       A.  Okay. I worked -- Stewart & Stevenson/BAE, I
8   worked there 18 years.
9       Q.  Stewart & Stevenson?
10      A.  Stewart & Stevenson.
11      Q.  Okay.
12      A.  Then it went to BAE.
13      Q.  Okay. You went to BAE?
14      A.  No. The company switched to BAE.
15      Q.  Okay.
16      A.  Switched names.
17      Q.  Okay. And what did you do over there at
18  Stewart & --
19      A.  I worked on the assembly line.
20      Q.  Let me finish my question.
21      A.  Okay.
22          MR. BEGLEY:  Slow down. Let her finish the
23  question.
24          THE WITNESS:  All right.
25          MR. BEGLEY:  Take a beat, and then you can

4 (Pages 10 to 13)

Official Copy Office of Marilyn Burgess District Clerk

APPENDIX 000608                    AhmedAllied 000721

Page 14

1  answer the question.
2          MS. FAULKNER: Thanks.
3      Q. (BY MS. FAULKNER) Before you worked at Stewart &
4  Stevenson, where did you work before then?
5      A. I was at Houston West Auto Truck Stop.
6      Q. Okay. And what was your position at Stewart &
7  Stevenson?
8      A. I was on the assembly line.
9      Q. Okay. What did you do there?
10     A. We fixed Army trucks.
11     Q. Armored?
12     A. Army trucks. U.S. Army trucks.
13     Q. Oh, Army trucks. Okay.
14         And how long did you work there?
15     A. 18 years.
16     Q. And were you laid off?
17     A. Got laid off.
18     Q. Okay. And after Stewart & Stevenson/BAE, that's
19  when you were hired over at Allied Universal?
20     A. Allied. Been laid off.
21     Q. And was it Allied Universal –
22     A. It was Universal Protection.
23     Q. Hold on. Let me finish.
24     A. Okay.
25     Q. The name of the company, was it Allied Universal

Page 15

1  when you were first hired?
2      A. No.
3      Q. What was the name of the company?
4      A. Universal Protection.
5      Q. Universal?
6      A. Yeah, Universal Protection.
7      Q. Okay. And that's a security company too?
8      A. Security company.
9      Q. Okay. That's who you hired on under?
10     A. Right.
11     Q. Okay. And are you an employee there?
12     A. Huh?
13     Q. Are you an employee there?
14     A. Right.
15     Q. And you're not a contractor worker?
16     A. No contractor worker.
17     Q. They pay you a salary or by the hour?
18     A. By the hour.
19     Q. Okay. And they offer you benefits?
20     A. Yeah.
21     Q. Okay. All right.
22         And let's move forward to – do you recall
23  October 19th, 2015?
24     A. I recall it real well.
25     Q. Where were you working?

Page 16

1      A. I was working at H-E-B Kirkwood.
2      Q. Okay. H-E-B?
3      A. Yeah, H-E-B Kirkwood.
4      Q. Kirkwood. Okay.
5          Do you know the address there?
6      A. I can't remember the address.
7      Q. Okay. And what time did you report to work there?
8      A. 4:00 o'clock.
9      Q. And what time did you get off?
10     A. 12:00 o'clock midnight.
11     Q. Okay. And were you working -- how long did you
12  work that shift?
13     A. Still work that shift.
14     Q. You still work that shift?
15     A. Right.
16     Q. Okay. And, so when you were hired on with Allied
17  Protection [sic], which is now Allied Universal, did you
18  start out working at 4:00 p.m. to 12:00 midnight?
19     A. Different post.
20     Q. Different post?
21     A. Right.
22     Q. Different address you mean?
23     A. Yeah, different post.
24     Q. Okay. You called it a post, but it was a different
25  location?

Page 17

1      A. Different location.
2      Q. Okay. And how long had you been working the H-E-B
3  on Kirkwood?
4      A. I started at Kirkwood November – the week before
5  Thanksgiving, a Saturday, November the 14th.
6      Q. November 14?
7      A. November 14.
8      Q. And that was two thousand and –
9      A. 14.
10     Q. 2014. Okay.
11         And when you started there, you started there at
12  4:00 p.m. to 12:00 midnight?
13     A. Right.
14     Q. Okay. And you were given only the site phone as
15  your equipment?
16     A. Right.
17     Q. Okay. And does Allied – or did Allied give you
18  any handcuffs?
19     A. I'm not commissioned.
20     Q. Okay. Describe for the jury what is a commissioned
21  officer?
22     A. A commissioned officer, he carries a gun. He
23  carries handcuffs. That's a commissioned officer.
24     Q. Okay. And since you're not a commissioned officer,
25  you did not have a gun or handcuffs?

5 (Pages 14 to 17)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

AhmedAllied 000722

Page 18

1   A.   Right.
2   Q.   Did you have any, like, twist ties or anything?
3   A.   None of that.
4   Q.   Okay. You only had your site phone?
5   A.   Right.
6   Q.   Okay. Do you have any arrest authority?
7   A.   No.
8   Q.   Okay. Do you have any authority to detain anyone?
9   A.   No.
10  Q.   Okay. And when you arrived to work that day on the
11  19th, tell the jury who you reported to.
12  A.   I report to my MIC.
13  Q.   And tell the jury what's a MIC?
14  A.   A MIC is a manager at H-E-B.
15  Q.   Like, a manager in charge?
16  A.   Right.
17  Q.   Okay. Who was that?
18  A.   Okay. The manager in charge was Tammy, I think.
19  But I had to report to -- I always report to the supervisor
20  who close, Jesse. The Spanish guy, Jesse, close.
21  Q.   And do you know if he spells his name J-e-s-s-e?
22  A.   Right.
23  Q.   Do you know Jesse's last name?
24  A.   I don't know his last name.
25  Q.   Okay. And Tammy, T-a-m-m-i or T-a-m-m-y?

Page 19

1   A.   T-a-m-m-y.
2   Q.   Okay. And she's a lady?
3   A.   She's a lady. She's --
4   Q.   Hold on. Is she an employee of H-E-B or Allied?
5   A.   H-E-B.
6   Q.   Okay. And you reported to her --
7   A.   Right.
8   Q.   -- to tell her that you arrived to work?
9   A.   I reported to Jesse that day. I do report to the
10  MIC that's going to close.
11  Q.   Okay. So, Jesse was the --
12  A.   Closing MIC.
13  Q.   Closing MIC?
14  A.   Right.
15  Q.   And Tammy was what?
16  A.   She's the top manager, store director.
17  Q.   The store director. Okay.
18       So, did you report to her and let her know you
19  reported to work that day?
20  A.   I don't have to. Once I report to the one that
21  close, that's all I got to do.
22  Q.   And that was Jesse?
23  A.   Jesse.
24  Q.   Okay. Did you meet Tammy at all for any reason
25  when you went to work?

Page 20

1   A.   Yeah. I met Tammy that day when the incident
2   happened.
3   Q.   No, no, no, when you got to work.
4   A.   No.
5   Q.   Okay. So, you didn't see her anytime before --
6   A.   No.
7   Q.   -- the incident happened?
8   A.   No.
9   Q.   Okay. And did you see any other H-E-B employees
10  that were in management other than Jesse that day?
11  A.   It depend. Sometimes I don't see him all the time.
12  I go to the desk and I ask them who the manager. Then that's
13  it.
14  Q.   Okay. So, Jesse was the only manager you knew of
15  on that day, on the 19th?
16  A.   Right.
17  Q.   Okay. And you reported to him --
18  A.   Right.
19  Q.   -- because he was the one that was closing that
20  day?
21  A.   Right.
22  Q.   Okay.
23       MR. BEGLEY: Slow down.
24  Q.   (BY MS. FAULKNER) If I'm talking too fast, let me
25  know.

Page 21

1   A.   It's okay.
2   Q.   Okay. And Jesse was the manager in charge to
3   close; is that correct?
4   A.   Right.
5   Q.   Okay. And what did Jesse tell you to do on that
6   day?
7   A.   Well, another manager called me, Mike.
8   Q.   Mike?
9   A.   Yeah.
10  Q.   And what's Mike's last name?
11  A.   I can't think. He's a Spanish guy too, Mike.
12  Q.   He was a manager there at H-E-B?
13  A.   Manager.
14  Q.   Okay. And what did you tell Mike when you arrived
15  there?
16  A.   No. He called me.
17  Q.   Mike called you?
18  A.   Yeah.
19  Q.   Okay. He called you before this incident occurred?
20  A.   Yeah, he called me before the incident occurred.
21  He called me to tell me to get him off the premises.
22  Q.   Okay. What did he tell -- did he call you before
23  he had said anything other than -- before he spoke about
24  Mr. Johnson, did you talk to Mike that day?
25  A.   Mike called me. He always would call me, you know,

6 (Pages 18 to 21)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000610            AhmedAllied 000723

Page 22

```
 1   if he see somebody on the lot.
 2       Q.  Say it again.
 3       A.  He would call me if he see something wrong on the
 4   lot.
 5       Q.  Okay.  In the parking lot?
 6       A.  Right.
 7       Q.  Okay.  Did Mike call you for any other reason other
 8   than Mr. Johnson?
 9       A.  He just called me for Mr. Johnson.
10       Q.  Okay.  Do you know what time Mike called you?
11       A.  Maybe about 5:00 o'clock.
12       Q.  Okay.  In the afternoon?
13       A.  Right.
14       Q.  And what was the weather like that day?
15       A.  It was a nice-weather day.
16       Q.  Okay.  And was it rainy?
17       A.  No.
18       Q.  Okay.  All right.
19           And do you take any medication?
20       A.  I take high blood pressure medication.
21       Q.  Okay.  How long have you been on that?
22       A.  Been a while.  38 probably.  Since I've been 38.
23       Q.  Okay.  And you're 55 now?
24       A.  Yeah.
25       Q.  So, that would be, what, about 13 years, at least
```

Page 23

```
 1   13 years?
 2       A.  Right.
 3       Q.  Okay.  Did you take your medication that day?
 4       A.  I take it every day.
 5       Q.  Okay.  And do you know what the name of the
 6   medication is?
 7       A.  I can't remember the name of the medication.  They
 8   change, different kinds.
 9       Q.  Okay.  And the medication that you were on that
10   day, is it the same that you're on today?
11       A.  Right.
12       Q.  Okay.  And how often do you take that?
13       A.  One every day.
14       Q.  Once a day?
15       A.  Yeah.
16       Q.  Any other?
17       A.  No.
18       Q.  Were you on any other medication that day?
19       A.  No.
20       Q.  Okay.  And on the day -- at the time that you --
21   when you reported to work at 4:00 o'clock, did you see
22   Mr. Johnson?
23       A.  I saw him.
24       Q.  Okay.  And what was he doing when you saw him?
25       A.  He was just sitting down at the time.
```

Page 24

```
 1       Q.  Sitting on what, a chair?
 2       A.  Yeah.
 3       Q.  A chair where?
 4       A.  The front of the store.
 5       Q.  In front of the store?
 6       A.  Right.
 7       Q.  Okay.  Describe for the jury what the front of the
 8   store looks like.
 9       A.  The front of the store is like a display place.
10   They have chairs in front sometimes.  And those chairs would
11   be -- they're for customers, though.  They're not for people
12   to sit on.
13       Q.  Okay.  So, if he were a customer, could he sit in
14   the chair?
15       A.  Yeah.
16       Q.  Okay.
17       A.  If he buying it.  But if he ain't buying it, he
18   can't.
19       Q.  Only if you're a customer buying the chair?
20       A.  Right.
21       Q.  Okay.  So, customers are never -- is there a sign
22   posted?
23       A.  They got signs.  Don't get on them unless you --
24       Q.  Hold on.  Let me finish.  Was there a sign posted
25   at that time for Mr. Johnson to not sit in that chair?
```

Page 25

```
 1       A.  I can't remember.
 2       Q.  Okay.  Are there any other -- were there any other
 3   signs posted for Mr. Johnson or for anyone?
 4       A.  It's for anybody.  Don't sit on there unless you're
 5   buying.
 6       Q.  And that's what it says?
 7       A.  Yeah.
 8       Q.  Okay.  It says do not sit on the chairs?
 9       A.  Unless you're a customer buying.
10       Q.  Give me the -- I guess let me -- you give me the
11   proper wording.
12       A.  Do not sit on the chair unless you're a customer.
13       Q.  And where would that be placed?
14       A.  It would be in front of the chairs.
15       Q.  In front?
16       A.  Like, on the seat up here.
17       Q.  Okay.  And was it on all the chairs that day?
18       A.  Most of the chairs that day.
19       Q.  And was it on the seat that Mr. Johnson was in?
20       A.  Yes, ma'am.
21       Q.  And you saw that?
22       A.  Yeah.
23       Q.  You saw the sign?
24       A.  Yes, ma'am.
25       Q.  Okay.  And was Mr. -- do you know whether or not
```

7 (Pages 22 to 25)

APPENDIX 000611                    AhmedAllied 000724

Page 26

1    Mr. Johnson was buying the chair?
2        A.   No, he wasn't buying the chair.
3        Q.   Okay. And do you know whether or not he had
4    inquired about the chair?
5        A.   No, he did not inquire about the chair.
6        Q.   Do you know whether or not he inquired before you
7    got there?
8        A.   I don't know before I got there.
9        Q.   Okay. So, you don't know what he was buying or
10   what he did before you --
11       A.   Right.
12       Q.   -- got there?
13       A.   No.
14       Q.   Okay. And had you seen Mr. Johnson before that
15   day?
16       A.   I hadn't seen him that day, but the managers knew
17   about him. He had been coming by there.
18       Q.   You had not seen him?
19       A.   I hadn't seen him before that day, but the manager
20   saw him.
21       Q.   Okay. The manager saw him?
22       A.   They knew that he had been coming by there.
23       Q.   Which manager?
24       A.   Tammy seen him. Jesse seen him. Mike seen him.
25   They used to tell him to go.

Page 27

1        Q.   Okay.
2            MS. FAULKNER: I'm going to object as
3    nonresponsive.
4        Q.   (BY MS. FAULKNER) Had you seen Mr. Johnson before
5    the incident occurred and before that day?
6        A.   No, I hadn't seen him.
7        Q.   And what days are you off?
8        A.   I'm off weekends.
9        Q.   Okay. And you had never seen Mr. Johnson at H-E-B
10   before the incident occurred?
11       A.   Before the incident occurred, yes, ma'am, I had
12   never seen him.
13       Q.   Never seen him before. Okay.
14           You had never had any encounters with Mr. Johnson?
15       A.   No.
16       Q.   Okay. And on your -- you said that Mike, the
17   manager, told you about Mr. Johnson that day?
18       A.   Right.
19       Q.   You said about 5:00 o'clock?
20       A.   About 5:00 o'clock.
21       Q.   Okay. What did he tell you?
22       A.   He told me to tell Mr. Johnson he had to go
23   because, see, he panhandles.
24       Q.   Okay. He told you --
25       A.   To tell Mr. Johnson he got to go. He panhandles.

Page 28

1        Q.   Who panhandles?
2        A.   Mr. Johnson.
3        Q.   Was he panhandling when you saw him?
4        A.   Yeah. He begs.
5        Q.   Okay. But he was panhandling at the time you saw
6    him?
7        A.   Right. He didn't panhandle at the time I saw him.
8    But after, he started doing it.
9        Q.   Okay. Repeat your answer.
10       A.   Where we're at at H-E-B, they don't want homeless
11   people over there.
12       Q.   Okay.
13           MS. FAULKNER: Objection, nonresponsive.
14       Q.   (BY MS. FAULKNER) Let me repeat my question.
15       A.   Yeah.
16       Q.   When you see Mr. -- when the manager told you about
17   Mr. Johnson, what did he tell you about Mr. Johnson?
18       A.   Well, he called me and told me he got to go because
19   he's panhandling.
20       Q.   He called you on the site phone?
21       A.   Called me on the site phone.
22       Q.   Okay.
23       A.   I have to follow their instructions.
24       Q.   Okay. And what did he tell you?
25       A.   He said, "Tell him to go. He's panhandling."

Page 29

1        Q.   That's what Mike said?
2        A.   Yeah. "He's panhandling."
3        Q.   And he said, "Tell him he has to go"?
4        A.   Yeah.
5        Q.   Because ...
6        A.   "He's panhandling. He's begging."
7        Q.   And were you outside at the time?
8        A.   I was outside.
9        Q.   And when he called you, were you out near
10   Mr. Johnson?
11       A.   I was outside. I wasn't near Mr. Johnson, but I
12   was outside.
13       Q.   You were outside the building?
14       A.   Yeah.
15       Q.   Okay. And then your patrol or security is to
16   secure the outside of the building?
17       A.   To secure all the outside.
18       Q.   Outside?
19       A.   Yeah.
20       Q.   Do you have any security duties on the inside?
21       A.   No.
22       Q.   Okay. Just on the outside?
23       A.   Just on the outside.
24       Q.   Around the whole building?
25       A.   Around the whole building.

8 (Pages 26 to 29)

APPENDIX 000612                    AhmedAllied 000725

Page 30

1   Q. Including the parking lot?
2   A. Including the parking lot.
3   Q. Okay. So, Mike told you to ask Mr. Johnson to
4   leave –
5   A. Yeah.
6   Q. – because he is panhandling?
7   A. Right.
8   Q. Okay. When you saw Mr. Johnson – had you seen
9   Mr. Johnson before Mike called you?
10  A. I saw him before Mike called me.
11  Q. Okay. And you said he was sitting in the chair?
12  A. Yeah.
13  Q. Okay. But you did not see him panhandling at that
14  time?
15  A. No.
16  Q. Okay. And did you – what did you do – did Mike
17  tell you to go up to him?
18  A. No. I went up to him in a mild way. "Sir" –
19  Q. Hold on.
20      MS. FAULKNER: Objection, nonresponsive.
21      MR. BEGLEY: Hold on. I'm fine with you
22  objecting –
23      MS. FAULKNER: Okay.
24      MR. BEGLEY: – to the responsiveness after
25  he gives his answer. I understand –

Page 31

1       MS. FAULKNER: Sure.
2       MR. BEGLEY: – if you think he's not
3   answering your question, but let him finish his response.
4   Q. (BY MS. FAULKNER) Let me rephrase my question.
5   A. Okay.
6   Q. When you saw Mr. Johnson that day, was he
7   panhandling?
8   A. He was panhandling that day.
9   Q. When you first saw him?
10  A. Yeah, he was panhandling.
11  Q. Okay. You saw him panhandling?
12  A. Yeah.
13  Q. When you first saw him that day before Mike called
14  you?
15  A. Well, when I saw him, I was going to – I wasn't on
16  duty yet, but I was going to work.
17  Q. You were getting to the building?
18  A. Yeah.
19  Q. Okay. When you saw him – when you first saw
20  Mr. Johnson, was he panhandling when you first saw him?
21  A. He was panhandling when I first saw him.
22  Q. Okay. And do you know the person who he was – who
23  he pan – who allegedly –
24  A. I can't remember.
25      MR. BEGLEY: You've got to let her finish the

Page 32

1   question. I understand, Calvin.
2       THE WITNESS: Yeah.
3       MR. BEGLEY: But let her finish the question.
4   Q. (BY MS. FAULKNER) You didn't know who it was?
5   A. Huh-uh.
6   Q. The person who you say that he was allegedly
7   panhandling from, did that person complain to you?
8   A. No.
9   Q. Okay. And other than Mike, did anyone else come up
10  to you to say Mr. Johnson was panhandling?
11  A. Nobody else came up to me.
12  Q. Okay. And did any customers come up to you?
13  A. Nobody came complaining to me that day.
14  Q. I'm sorry. Say it again.
15  A. Nobody came complaining to me.
16  Q. And you're in uniform as a security officer; right?
17  A. Right.
18  Q. Okay. Do you have a pair of black pants, white
19  shirt or dark shirt?
20  A. I got black pants, silver shirt.
21  Q. Okay. And do you have an emblem on your shirt
22  somewhere?
23  A. Right.
24  Q. Okay. And you have your site phone?
25  A. Right.

Page 33

1   Q. Is that usually in your hand or on your waist or –
2   A. Usually in my hand.
3   Q. Okay. All right.
4       Could I, for instance, call you on your site phone
5   if I had the number?
6   A. Yeah.
7   Q. Okay. And could tell you – talk to you just like
8   a regular phone?
9   A. Yeah. But I can't – but we don't answer the phone
10  for anybody.
11  Q. I understand. But it's capable of –
12  A. It's capable of doing that.
13  Q. – receiving a call?
14  A. It's capable of receiving a call.
15  Q. And you can call out?
16  A. Yeah. But I don't do that.
17  Q. Right. But you're capable of calling?
18  A. Right.
19  Q. Okay. All right.
20      And, so, no customers had complained. And do you
21  know of any customers that had complained to Mike?
22      MR. BEGLEY: Objection, form.
23  Q. (BY MS. FAULKNER) You can answer.
24  A. I don't know.
25  Q. Okay. And when Mike told you that he was

9 (Pages 30 to 33)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000613                    AhmedAllied 000726

Page 34

1    panhandling, he did not name any customers or anything?
2        A.   No.
3        Q.   Okay.  And when you approached Mr. Johnson, where
4    was Mr. Johnson?
5        A.   When I approached Mr. Johnson, he was sitting in
6    the seat.
7        Q.   The same chair that you saw him in?
8        A.   Yeah.
9        Q.   Okay.
10       A.   But when I approached Mr. Johnson, I approached
11   Mr. Johnson in a nice manner.
12       Q.   Okay.  Now, when you approached him, where was he?
13       A.   "Sir, you got to leave."
14       Q.   No.  He was sitting in the seat?
15       A.   Yeah.  I said, "Sir" --
16       Q.   Hold on.  I haven't gotten that far.  He was still
17   sitting in the same chair?
18       A.   Right.
19       Q.   Okay.  And you walked up to him?
20       A.   Right.
21       Q.   Okay.  And did Mr. Johnson have any kind of walking
22   apparatus at the time?
23       A.   I can't remember all that.
24       Q.   Okay.  And how was he dressed?
25       A.   He had some kind of old clothes on, jeans and some

Page 35

1    shirt.
2        Q.   Okay.  And he looked just like a regular customer?
3            MR. BEGLEY:  Objection, form.
4        A.   Not really.
5        Q.   (BY MS. FAULKNER)  Okay.
6        A.   Not really.
7        Q.   To your understanding, what does a regular customer
8    look like?
9        A.   A regular customer carries theirself regular, you
10   know.  I can tell -- with homeless people, I can tell how
11   they look, all that, you know.  I know their face.  Now, as
12   far as me, when I saw Mr. --
13       Q.   A regular person?
14       A.   Right.
15       Q.   What does a regular person --
16           MR. BEGLEY:  Hold on.  Let him finish his
17   answer.
18           MS. FAULKNER:  Okay.
19           MR. BEGLEY:  Go ahead.
20       Q.   (BY MS. FAULKNER)  Let me rephrase the question.
21   What does a regular person look like to you?
22       A.   A regular person look like to me, he just dress
23   normal, normal shirt and pants or whatever they have on, just
24   normal.  I can observe if somebody homeless, how they carry
25   theirself.

Page 36

1        Q.   Okay.  So, Mr. Johnson did not look like a regular
2    person?
3        A.   He looked like a regular person.
4        Q.   He looked like a regular person to you?
5        A.   Yeah.
6        Q.   Okay.  And was he with anyone?
7        A.   No.
8        Q.   Okay.  He wasn't in a wheelchair or had a walker or
9    a cane at the time?
10       A.   I can't remember a cane, but he wasn't in a
11   wheelchair.  He was not in a wheelchair.
12       Q.   Okay.  You told me earlier, you said you remember
13   the day well, that incident well.
14       A.   Yeah.
15       Q.   But you don't remember whether or not he had a
16   walker or any --
17       A.   I can't remember.  It's been two years ago or
18   whatever.  It's been a long time.  I can't remember all that.
19       Q.   Okay.  And do you know what color his clothes were?
20       A.   I don't know.  I can't remember.
21       Q.   Okay.  Do you remember whether or not he had
22   glasses?
23       A.   I can't remember that.
24       Q.   Okay.  And you said he wasn't with anyone.
25       A.   No.

Page 37

1        Q.   To your knowledge?
2        A.   To my knowledge.
3        Q.   Okay.  Do you know whether or not he -- could he
4    even speak English?
5        A.   He spoke English.  He spoke good English.
6        Q.   Okay.  All right.
7            And he spoke to you?
8        A.   Yeah.  And he was rude.
9        Q.   Okay.  And when you approached him --
10       A.   Right.
11       Q.   -- what did you tell him?
12       A.   I said, "Sir, you got to go.  They don't want you
13   on the premises."  But do you know what he did?
14       Q.   I didn't ask you that yet.
15       A.   Okay.
16       Q.   You approached him, and he was still sitting in the
17   chair?
18       A.   Right.
19       Q.   And you were standing over him?
20       A.   I didn't stand over him.  I just walked close --
21   walked close --
22       Q.   Okay.
23       A.   -- to him.
24       Q.   You didn't sit down.  You're standing?
25           MR. BEGLEY:  Hold on.  Velda, you've got to

10 (Pages 34 to 37)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000614                              AhmedAllied 000727

Page 38

1　let him finish the answer.
2　　　　MS. FAULKNER: And he's got to let me finish
3　asking the question.
4　　Q. (BY MS. FAULKNER) Okay. Let me rephrase my
5　question. When you walked up to Mr. Johnson, did you sit
6　down in a chair beside him?
7　　A. No.
8　　Q. Okay. And when you walked up to Mr. Johnson, you
9　just walked up to him; is that correct?
10　　A. Yeah. I walked up to him –
11　　Q. Okay.
12　　A. – in a nice manner.
13　　Q. Okay. And when you walked up to him, what did you
14　first say?
15　　A. I said, "Sir" – first word I said is, "Sir, you
16　got to leave the premises."
17　　Q. Okay. He was still sitting in the chair?
18　　A. No. He went to cussing me out and carrying on.
19　　Q. Was he still sitting in the chair?
20　　A. No. He got up then.
21　　Q. He got up. Okay.
22　　And do you know how old Mr. Johnson was?
23　　A. I don't know how old he was.
24　　Q. How old did he look to you?
25　　A. I couldn't tell. Looked like he was in his 70s.

Page 39

1　　Q. Okay. So, he was elderly?
2　　A. Right.
3　　Q. Okay. And when he got up out of the chair, did he
4　need any assistance to get up?
5　　A. No.
6　　Q. Okay. And what did he get up and do?
7　　A. He got up and he cussed me out, called me MF's, all
8　kind of names.
9　　Q. Okay. And were there any witnesses around there?
10　　A. Someone must have saw it, yes.
11　　Q. Okay. Do you have their names?
12　　A. I can't remember their names, but someone – they
13　got witnesses that saw it.
14　　Q. Okay. Were there any H-E-B employees who were
15　witnesses?
16　　A. They was inside.
17　　Q. Okay. So, no witnesses other than yourself and
18　Mr. Johnson and other people walking by?
19　　A. Yeah, they got witnesses.
20　　Q. Okay. You don't know who they are?
21　　A. I don't know who they are.
22　　Q. And as a security guard, is it part of your duty
23　to – when an incident occurs like that, is it part of your
24　duty to make a report?
25　　A. It's my duty to make a report.

Page 40

1　　Q. Did you make a report that day?
2　　A. Yeah. I went and got them, and then I called my
3　manager.
4　　Q. You went to do what now?
5　　A. I went and got the MIC at the job.
6　　Q. Which is Jesse?
7　　A. Jesse. And Tammy came over.
8　　Q. And Tammy. Okay.
9　　You went and got both of them?
10　　A. Yeah.
11　　Q. You went inside the building?
12　　A. I went inside the building.
13　　Q. Okay. So, you left your post outside?
14　　A. That's my job.
15　　Q. Right. And you went inside to get the manager?
16　　A. Correct.
17　　Q. Okay. And did the witnesses give their names to
18　Jesse or Tammy?
19　　A. I don't know. I guess they did.
20　　Q. Okay. And in your report did you include names of
21　anyone?
22　　A. No.
23　　Q. Okay. Did you include Tammy and Jesse's name in
24　your report?
25　　A. Not really. I mean, I report – when I report

Page 41

1　stuff, my manager came over. I called him, and he came over.
2　　Q. Did you put in your report that Mike, the manager
3　of H-E-B, asked you to ask Mr. Johnson to leave?
4　　A. I didn't put it in the report.
5　　Q. Okay. And it was a written report that you signed?
6　　A. I signed a written report.
7　　Q. Okay. And did you – who did you give that report
8　to?
9　　A. My report, she got it. Tammy got the report.
10　　Q. You left it there at H-E-B?
11　　A. Yeah.
12　　Q. Okay. And do you give it also to – a copy of your
13　report to your company?
14　　A. I give it to my people. Now, that day I didn't put
15　it on the phone; but I didn't have nothing to hide. It's the
16　first time that happened. So, I didn't put it on the phone.
17　　Q. You put it on –
18　　A. I didn't put it on the site phone.
19　　Q. The site phone?
20　　A. Right.
21　　Q. Okay. But you made a written report, though?
22　　A. Right.
23　　Q. Okay. And you gave the written document to Tammy?
24　　A. Yes, ma'am.
25　　Q. Did you also give it to anyone at Allied?

11 (Pages 38 to 41)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000615

AhmedAllied 000728

Original Copy Office of Marilyn Burgess District Clerk

Page 42

1    A.  No.
2    Q.  Okay.  And where is that report today?
3    A.  I don't know.
4    Q.  Okay.  And you gave it to Tammy?
5    A.  Yeah.
6    Q.  But she has not -- she did not give you a copy of
7  it?
8    A.  No.
9    Q.  Do you know whether or not she turned it in to
10  her -- turned it in to Allied at all?
11    A.  I don't know.
12    Q.  Right.  And that was your statement as to what
13  occurred; is that right?
14    A.  Right.
15    Q.  Okay.  And is it the policy and procedure of Allied
16  to get a copy of the report?
17        MR. BEGLEY:  Objection, form.
18    A.  No.  If I send it on the site phone, I tell my
19  supervisor what happened.
20    Q.  (BY MS. FAULKNER)  If you tell them what happened?
21    A.  I told them what happened.  I told the supervisor
22  what happened.
23    Q.  Okay.  And, so, they would have information that
24  something occurred, that you were involved in?
25    A.  Right.

Page 43

1    Q.  Okay.  And did they -- was a written report filed
2  with Allied?  Do you know?
3    A.  I don't know for sure, but H-E-B filed one.
4    Q.  Okay.  And who did they give that report to or do
5  you know?
6    A.  They don't tell me.
7    Q.  Okay.  But you're an employee of Allied; is that
8  correct?
9    A.  Right.
10    Q.  Okay.  And what is Allied's procedure when a person
11  is involved in an altercation with a customer at H-E-B?
12    A.  It depend on -- if I hit somebody, I get fired,
13  like, that quick.
14    Q.  If you do what now?
15    A.  If I hit a person, I get fired.
16    Q.  Okay.  And on that day, did you touch Mr. Johnson at
17  all?
18    A.  No.
19    Q.  Okay.  And if there is a witness that says you did
20  touch Mr. Johnson, that witness would be wrong and you would
21  be right?
22        MR. BEGLEY:  Objection, form.
23    A.  Objection.  I'm going to make this real clear.  You
24  listen to me real --
25    Q.  (BY MS. FAULKNER)  And I'm going to listen to you.

Page 44

1  And you listen to my question and please answer.
2    A.  Okay.
3        MR. BEGLEY:  Wait.
4        Answer the question.  Go ahead.  Go ahead, Calvin.
5    A.  Mr. Johnson was told to get off the premises.
6  Mr. Johnson walked towards me real close.  I just pushed him
7  gently.  That's it.
8    Q.  (BY MS. FAULKNER)  You did touch him?
9    A.  Yeah, because he got in my space.  You can't get in
10  my space.  I just pushed him gently off.  That's it.  That's
11  all I did.  Nothing else happened.  I can do that.
12    Q.  You can do that?
13    A.  Yeah.  When you get in my space, I can do that.
14  That's in the training.
15    Q.  That's in the -- what does the training tell you to
16  do?
17    A.  If you're threatened with your life or anything
18  like that.  He walked in my space.  He kept coming.  He was
19  cussing verbal, saying all kind of bad things.  I just -- I
20  would not hit an old man.  I pushed him off.  That's it.
21    Q.  So, your training tells you when your life is
22  threatened, you can touch them and push a person away?
23    A.  No, no.  It depend.  If he come in my space.
24    Q.  Okay.  What's your space?  Define "your space."
25    A.  My space is close.  We were close like this here.

Page 45

1    Q.  Within -- define for the jury what is close?
2    A.  Like this, real close.
3    Q.  So, you're looking at probably about what?
4    A.  Maybe about a couple inches, about five or six
5  inches.
6    Q.  And he came up to you?
7    A.  Right.
8    Q.  Within five or six inches?
9    A.  He came close to me.
10    Q.  Okay.  And in your training manual, it says if your
11  life is threatened --
12    A.  Right.
13    Q.  -- you can touch another person?
14    A.  Yeah.  But the thing is I don't hit old people.
15  Okay?  I just push them out of my space.  That's it.
16    Q.  Okay.
17        MS. FAULKNER:  Objection, nonresponsive.
18    Q.  (BY MS. FAULKNER)  You're saying that Mr. Johnson
19  came within five or six inches of your body?
20    A.  Right.
21    Q.  Okay.  And at that point, that's when you pushed
22  him away?
23    A.  I just slowly pushed him out of the way.
24    Q.  You slowly --
25    A.  Yeah, pushed him out of the way.

12 (Pages 42 to 45)

NELL McCALLUM & ASSOCIATES, INC.  (713) 861-0203

APPENDIX 000616                                   AhmedAllied 000729

Page 46

1   Q.   Okay. When you pushed him, did his body move?
2   A.   I don't know. I didn't hurt him.
3   Q.   Okay. The push that you gave him —
4   A.   Was a light push.
5   Q.   Okay. Did it cause his body to move?
6   A.   He moved out of the way slowly.
7   Q.   Okay. All right.
8        And did Mr. — what happened to his body when you
9   pushed him?
10  A.   I just — he moved out of the way.
11  Q.   Okay. Did he fall to the ground?
12  A.   I didn't cause him to fall to the ground. Sorry,
13  but if he got hurt — he fell to the ground, but I didn't
14  cause it.
15  Q.   Okay.
16  A.   I didn't cause it.
17       MS. FAULKNER: Objection, nonresponsive.
18  Q.   (BY MS. FAULKNER) Did he fall to the ground when
19  you pushed him?
20  A.   He fell to the ground, yeah.
21  Q.   Okay. And do you know whether or not he sustained
22  any injuries as a result of the push and his fall?
23       MR. BEGLEY: Objection, form.
24  A.   No.
25  Q.   (BY MS. FAULKNER) You don't know?

Page 47

1   A.   Huh-uh.
2   Q.   Was the police called?
3   A.   Yeah, the police came.
4   Q.   Who called the police?
5   A.   H-E-B called the police.
6   Q.   And you didn't call the police?
7   A.   They called the police.
8   Q.   Okay. How did H-E-B know to call the police. When
9   you said "they called the police," you're talking about
10  H-E-B?
11  A.   H-E-B called the police. They know to call the
12  police when something going on.
13  Q.   Okay.
14  A.   And that's through me. They know to call the
15  police.
16  Q.   Because you told them?
17  A.   Yeah. They called the police.
18  Q.   Okay.
19  A.   They decided to call the police during all this —
20  in a situation like that.
21  Q.   Okay. You told someone at H-E-B to call the
22  police?
23  A.   They was outside. When he was laying down, they
24  called the police and called the ambulance. But he wasn't
25  hurt.

Page 48

1   Q.   Okay. When you pushed Mr. Johnson and he's on the
2   ground, did you call the police at that moment?
3        MR. BEGLEY: Objection, form.
4   A.   Objection. No.
5   Q.   (BY MS. FAULKNER) You didn't call the police?
6   A.   Huh-uh.
7   Q.   Okay. After Mr. Johnson was on the ground, what
8   did you do next?
9   A.   I called the manager.
10  Q.   Called which manager?
11  A.   I called Jesse. Then he called Tammy.
12  Q.   With your site phone?
13  A.   I went inside. They are right there.
14  Q.   Oh, you went inside?
15  A.   Yeah.
16  Q.   And you called him on what? You used what to call
17  him?
18  A.   At the desk they called them right quick. They
19  have stuff to call them.
20  Q.   At what desk?
21  A.   I saw Jesse. So, that's who I went and got.
22  Q.   Oh, you saw him with your — visibly?
23  A.   Yeah.
24  Q.   Okay. Where was Jesse?
25  A.   He was right in front of the store, inside the

Page 49

1   store, right in front of the store.
2   Q.   Okay. He was right inside in the front?
3   A.   Right.
4   Q.   So, you went to him?
5   A.   Right.
6   Q.   Okay. And where was Tammy at the time?
7   A.   She was probably sitting in the office, but then
8   they called her. She came down.
9   Q.   You didn't call her. Somebody else did?
10  A.   The manager went and got her.
11  Q.   Jesse?
12  A.   Yeah.
13  Q.   He left you and went to get Tammy?
14  A.   Right.
15  Q.   Okay. And where was Mr. Johnson when you went
16  inside?
17  A.   Mr. Johnson was on the ground, but he wasn't hurt.
18  Q.   Okay. Mr. Johnson was still laying on the ground?
19  A.   Yeah.
20  Q.   Okay. And who called — at what point was the
21  police called?
22  A.   The police was called maybe about two or three
23  minutes after.
24  Q.   Okay. And which person called the police?
25  A.   I don't know which one called them. Probably Jesse

13 (Pages 46 to 49)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000617                    AhmedAllied 000730

Page 50

1    or Tammy called them.
2        Q.   Can you use your site phone to call the police?
3        A.   I can call, yeah, if it's an emergency.
4        Q.   Okay. And you could have used your site phone to
5    call the police yourself; right?
6        A.   Yeah, I could have called them myself.
7        Q.   Okay. And nothing was preventing you from calling
8    the police; is that right?
9        A.   Right.
10        Q.   Okay. And it's part of your training that you can
11    use your site phone to call law enforcement; right?
12        A.   Right.
13        Q.   But you didn't do it that day?
14        A.   I let H-E-B handle it. They have more authority
15    than I have.
16        Q.   Okay. But you can use your site phone to call the
17    police?
18        A.   Yeah, I can use the site phone. I wasn't trying to
19    hide nothing. If I had to, I could call. That's not a
20    problem.
21        Q.   Okay. But you didn't?
22        A.   I didn't call.
23        Q.   Okay.
24        A.   They took care of that.
25        Q.   Okay. And instead of calling the police, you went

Page 51

1    inside, though?
2        A.   We report to the managers first. We have to report
3    to the managers first. They need to know what's going on
4    outside.
5        Q.   Sure. And if it's a -- even if it's a
6    life-threatening situation, you call the managers first?
7            MR. BEGLEY: Objection, form.
8        A.   They still need to know what's going on.
9        Q.   (BY MS. FAULKNER) Right. Okay. But if it's a
10    life-threatening situation, your training tells you to call
11    the managers or the police --
12        A.   No.
13            MR. BEGLEY: Objection, form.
14        Q.   -- first?
15        A.   No. A life-threatening situation, I have to
16    protect myself.
17        Q.   Okay. So, if a life-threatening situation comes
18    up, are you trained to call the managers first instead of the
19    police?
20        A.   I call the police. Anything that goes on at H-E-B,
21    my training is to call the managers first.
22        Q.   Okay. It's not to call law enforcement?
23        A.   No, not first.
24        Q.   Okay.
25        A.   We report to the managers first. They need to --

Page 52

1        Q.   For anything?
2        A.   Yeah. They need to know what's going on on their
3    property.
4        Q.   Okay. So, Mr. Johnson is on the ground. You're
5    inside the store talking to the managers. And Tammy is the
6    one you said called the police?
7            MR. BEGLEY: Objection, form.
8        A.   Objection. I don't know which one called. The
9    manager was out there in two minutes. It wasn't a long time
10    or nothing like that. He wasn't hurt.
11        Q.   (BY MS. FAULKNER) Who was out there?
12        A.   I came right back out there.
13        Q.   You said the manager. Which manager?
14        A.   The managers came out there.
15        Q.   Both?
16        A.   Jesse came with me.
17        Q.   Okay. Both Jesse and Tammy came?
18        A.   No. She came later.
19        Q.   Okay. So, the only person that came out first was
20    Jesse?
21        A.   Right.
22        Q.   Okay. Then Tammy came later?
23        A.   Right.
24        Q.   How much time passed before you and Jesse got back
25    over to Mr. Johnson?

Page 53

1        A.   Maybe about a minute.
2        Q.   About a minute. Okay.
3            And how long -- how much time passed before Tammy
4    walked outside?
5        A.   I can't remember.
6        Q.   Was it a long time, a short time?
7        A.   It wasn't a long time.
8        Q.   Okay. And Mr. Johnson was still on the ground?
9        A.   Yeah, he's still on the ground.
10        Q.   Okay. And when the police arrived -- do you know
11    how much time passed from the time that Mr. Johnson was on
12    the ground after you pushed him and the police arrived?
13            MR. BEGLEY: Objection, form.
14        A.   Objection. I didn't push him. Okay? Don't you
15    forget that.
16        Q.   (BY MS. FAULKNER) Now, you just told me --
17        A.   I didn't --
18        Q.   -- you said you --
19        A.   I pushed him to protect myself, but I didn't push
20    him down.
21        Q.   Right. Regardless of what happened --
22        A.   Okay.
23        Q.   -- you still pushed him. Am I right?
24        A.   I didn't push him hard.
25        Q.   I'm sorry?

14 (Pages 50 to 53)

APPENDIX 000618                    AhmedAllied 000731

Page 54

1  A. I didn't push him hard.
2  Q. Okay. But you still pushed him?
3  A. I didn't push him.
4  Q. Light or hard, soft or hard, you still pushed him?
5  A. It was soft.
6  Q. Okay. And how much time passed between the time
7  Mr. Johnson was on the ground and the police arrived?
8  A. I can't remember.
9  Q. Okay. Was it a long time?
10  A. No.
11  Q. Okay. All right.
12  When the police arrived, did they also arrive with
13  the ambulance?
14  A. No. They arrived by theirself.
15  Q. Just the police?
16  A. Yeah.
17  Q. Okay. And who called for an ambulance?
18  A. I don't know who called.
19  Q. Okay. How much time passed after the police
20  arrived did the ambulance arrive on the scene?
21  A. It wasn't that long.
22  Q. It wasn't that long. Okay.
23  Do you know how many ambulances arrived that day?
24  A. One.
25  Q. Just one ambulance?

Page 55

1  A. Yeah.
2  Q. Okay. And do you know whether or not they attended
3  to Mr. Johnson?
4  A. Yeah, they looked at him; but there wasn't nothing
5  wrong with him. They made him get up on the stretcher.
6  Q. Okay. Are you an EMT?
7  A. No.
8  Q. Okay. Do you have any medical training?
9  A. No.
10  Q. Any medical knowledge?
11  A. I know a little bit.
12  Q. Okay. What is your level of education? How far
13  did you go in school?
14  A. I finished high school.
15  Q. Okay. 12th grade?
16  A. I finished 12th grade.
17  Q. What year did you graduate?
18  A. 1980.
19  Q. Okay. Did you graduate with honors?
20  A. Not with honors.
21  Q. And do they train you medically at Allied or where
22  you — or the company that you're hired on with, did they
23  give you any medical training?
24  A. No.
25  Q. Do you know what to — are you trained,

Page 56

1  rather — scratch that.
2  Are you trained to look for any kind of medical
3  conditions for people that you have to approach or to notice
4  any kind of medical conditions that a person may have?
5  A. Well, when I look at a person, I kind of see his
6  condition, how he is. But I'm not — you know, I'm always
7  trying to see how a person look and how they carry theirself.
8  Q. Okay. And you said that you can tell when a
9  person —
10  A. Yeah, kind of.
11  Q. You can tell a person's medical condition?
12  A. Yeah, a lot of time.
13  Q. Okay. Could you tell, if you look at a person,
14  that they are suffering from, let's say, a migraine?
15  A. I can't tell that. Most of the time they'll say
16  their head hurt.
17  Q. Right. So, you wouldn't tell if a person is having
18  a migraine?
19  A. Right.
20  Q. Okay. And, so, in your training — this is what,
21  your training? You got this from your training or this is
22  just you personally?
23  A. Just me personally.
24  Q. Okay. From your training, what training did you
25  receive to determine whether or not a person may be suffering

Page 57

1  from some type of medical or mental disability?
2  A. Well, you have to really look at a person, how they
3  look and suffer from a medical condition. You can't —
4  people can look normal, and they can be sick.
5  Q. Sure. Did you get that from your training?
6  A. No.
7  Q. Okay. Did you get any training on that?
8  A. Not as I know. No, not to my knowledge.
9  Q. Okay. Allied didn't give you any training —
10  A. Right.
11  Q. — on how to approach a person if —
12  A. We always assume we approach them. We are trained
13  how to approach people.
14  Q. Okay. And what does your training tell you how to
15  approach a person?
16  A. Well, you have to approach a person very carefully.
17  Q. Okay. And carefully how? Describe for the jury
18  what's careful?
19  A. Very slowly.
20  MR. BEGLEY: Hold on. Let her finish,
21  Calvin.
22  THE WITNESS: Okay.
23  MR. BEGLEY: Just slow down. Take a deep
24  breath.
25  THE WITNESS: All right.

15 (Pages 54 to 57)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

AhmedAllied 000732

Page 58

1      MR. BEGLEY: Let her finish the question
2  before you respond. All right?
3      THE WITNESS: All right.
4  Q. (BY MS. FAULKNER) In your training, describe for
5  the jury how Allied told you to carefully approach a person.
6  A. You have to approach a person real slow. You can't
7  approach them fast. You got to approach them slow, see what
8  condition they're in. You can't go there. You can't go there
9  fast. You have to approach them real slow.
10  Q. Okay. So, do they tell you what you need to say to
11  that person?
12  A. Right, they teach you that.
13  Q. Okay. What do you need to say to a person? When
14  you approached Mr. Johnson at that time, when Mike told you
15  to ask him to leave, what training did you use to approach
16  Mr. Johnson as far as the wording?
17  A. Well, when I approached him, I said, "Sir, you need
18  to leave the premises. They want you to leave."
19  Q. Okay.
20  A. But he didn't respond like that. He got up
21  cussing, saying MF's, all kind of words.
22  Q. Okay. What training did you have in order to tell
23  Mr. Johnson -- or to notice whether or not Mr. Johnson had
24  any kind of medical or mental disability? He was already
25  sitting in a chair. He's an elderly gentleman.

Page 59

1  A. Right.
2  Q. What training did you activate in order to approach
3  Mr. Johnson?
4      MR. BEGLEY: Objection, form.
5  A. I activated in a normal way, a nice way. I wasn't
6  rude to this man. "Sir, you got to leave the premises."
7  That's all. All he had to do was leave the premises.
8  Q. (BY MS. FAULKNER) Okay.
9  A. He was cussing me, saying all kind of things,
10  saying all kind of MF, all kind of B, all that kind of stuff.
11  He was rude. Okay?
12      MS. FAULKNER: I'll object to that as
13  nonresponsive.
14  Q. (BY MS. FAULKNER) Mr. Brown, in your training,
15  what did Allied train you to do in order to approach someone
16  as elderly as Mr. Johnson was to make sure -- or to determine
17  whether or not he had or may not have a medical or mental
18  disability?
19      MR. BEGLEY: Objection, form.
20  A. I couldn't tell that. When I looked, he looked
21  normal. When I walked to him, he looked normal.
22  Q. (BY MS. FAULKNER) Did Allied train you to look for
23  any kind of medical --
24  A. Yeah. They train to look for any kind of signs if
25  a person ain't right. I do that very careful when I go to

Page 60

1  people. I went to him carefully. I went to him nicely. I
2  went to him mannerly.
3  Q. What did Allied tell you to look for in your
4  training to see whether or not a person may be suffering from
5  any medical or mental disability?
6  A. I couldn't tell if he was suffering a mental
7  condition.
8  Q. You said you could or could not?
9  A. I could not tell.
10  Q. You could not tell?
11  A. I could not tell.
12  Q. Were you trained to look for something?
13  A. Well, I was trained to look for something that's
14  suspicious.
15  Q. What does the training tell you to look for?
16  A. Look for something that's suspicious. That's it.
17  Q. What is suspicious?
18  A. How a person is behaving.
19  Q. Okay. He was sitting in a chair?
20  A. Yeah.
21  Q. You didn't see him panhandling; right?
22  A. I saw him panhandle before when I came -- when I
23  was coming to work.
24  Q. Okay. You just said you saw Mr. -- in your earlier
25  testimony --

Page 61

1  A. Yeah. He was in that chair, but --
2      MR. BEGLEY: Hold on.
3  Let's take a short break. We've been going for
4  about an hour. Let's take a quick break.
5      MS. FAULKNER: Can I get some water?
6      MR. BEGLEY: Some water? Yeah, absolutely.
7      MS. FAULKNER: I see it right there.
8      MR. BEGLEY: Yeah.
9  Let's go off the record for a little bit, and we'll
10  come back.
11      MS. FAULKNER: Thank you.
12      (Recess taken)
13      (Shawn Johnson is not present)
14      MS. FAULKNER: Okay. Back on the record.
15  Q. (BY MS. FAULKNER) Ready, Mr. Brown?
16  A. Yes, ma'am.
17  Q. Brown; right?
18  A. Yes, ma'am.
19  Q. Now, in your training with Allied, are you trained
20  to be able to notice or detect any kind of mental or medical
21  conditions or disabilities in anyone that you need to
22  approach?
23      MR. BEGLEY: Objection, form.
24  A. No, ma'am.
25  Q. (BY MS. FAULKNER) You're not. Okay.

16 (Pages 58 to 61)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000620                    AhmedAllied 000733

Page 62

1     And when you approached Mr. Johnson that day, you
2   didn't notice whether or not he was suffering from any mental
3   or physical disabilities, did you?
4         MR. BEGLEY: Objection, form.
5   A.  No, ma'am.
6   Q.  (BY MS. FAULKNER) Okay. And when he was -- did he
7   mention anything?
8   A.  No, ma'am.
9   Q.  Okay. Did he ask you to call anyone for him?
10  A.  No, ma'am.
11  Q.  Okay. And were there any witnesses that were there
12  that saw you approach Mr. Johnson or even touch Mr. Johnson?
13  A.  I don't know. I don't remember.
14  Q.  Right. If they were there, they didn't give you
15  their names and all that?
16  A.  Right.
17  Q.  Okay. Do you know whether or not -- when the
18  police arrived, how many police officers arrived?
19  A.  I can't remember. It was two years ago. I can't
20  remember all that.
21  Q.  Do you know how many police cars arrived?
22  A.  I can't remember.
23  Q.  Okay. And did the police speak with you?
24  A.  They talked with me.
25  Q.  Did you give them a statement?

Page 63

1   A.  I gave them a little statement, but I can't
2   remember all that.
3   Q.  Okay. And you told them what happened?
4   A.  Right.
5   Q.  Okay. And was Mr. Johnson charged with any
6   offense?
7   A.  No.
8         MR. BEGLEY: Objection, form.
9   A.  Objection. I don't know.
10        MR. BEGLEY: I'm going to say, "Objection,
11  form." You don't have to repeat it.
12        THE WITNESS: Okay.
13        MR. BEGLEY: You can just answer the
14  question.
15        THE WITNESS: Okay.
16        MS. FAULKNER: That's okay.
17        MR. BEGLEY: You're doing fine.
18        THE WITNESS: Okay.
19  Q.  (BY MS. FAULKNER) Have you ever given a deposition
20  before, Mr. Brown?
21  A.  No, I have not.
22  Q.  Okay. We understand. I understand.
23  A.  Yes, ma'am.
24  Q.  I understand.
25  A.  Okay.

Page 64

1   Q.  No harm, no foul on that one.
2   A.  Okay.
3   Q.  Okay. And Mr. Johnson was not arrested that day?
4   A.  No.
5   Q.  Okay. Did they charge him with any offense?
6   A.  No.
7         MR. BEGLEY: Objection, form.
8   Q.  (BY MS. FAULKNER) To your knowledge?
9   A.  To my knowledge.
10  Q.  Okay. And when the ambulance came, did Mr. -- was
11  Mr. Johnson -- was he treated at the scene by any of the
12  paramedics or EMTs?
13  A.  They treated him, but I don't know what they -- all
14  he did, he got on the stretcher. They just told him to get
15  on the stretcher there.
16  Q.  And he was able to get on the stretcher?
17  A.  He was able to get on the stretcher.
18  Q.  Okay. And did they -- was he -- did they drive off
19  with him on the stretcher?
20  A.  They drove off with him.
21  Q.  Okay. All right.
22      And you said -- and you're saying in your testimony
23  he wasn't hurt?
24  A.  He wasn't hurt.
25  Q.  Okay. Did you examine him at any point?

Page 65

1   A.  No.
2   Q.  Okay.
3   A.  I can't touch that man.
4   Q.  But you did touch him, though, when you pushed him?
5   A.  Yeah, but that was a slight push.
6   Q.  Okay. But it's still a touch; right?
7   A.  Right.
8   Q.  Okay. And do your rules and regulations say for
9   you not to touch him?
10        MR. BEGLEY: Objection, form.
11  A.  I ain't going to give an answer. Because I know
12  that in a certain space you can.
13  Q.  (BY MS. FAULKNER) I'm sorry. Say it again.
14  A.  If you get close enough, you know. Like a
15  supervisor said, they can't get in your space.
16  Q.  Okay. And that's in the rules and regulations,
17  that --
18  A.  Right.
19  Q.  -- if a person gets in your space?
20  A.  Get close to you, right.
21  Q.  It says that --
22  A.  If it's life-threatening, you know. That man can't
23  hurt me. But if it's life-threatening, you know, the way he
24  came towards me. He can't hurt me. I would never hurt no
25  old man. I wouldn't do that. I just slightly pushed him

17 (Pages 62 to 65)

APPENDIX 000621                    AhmedAllied 000734

Page 66

1  away. That's all.
2      Q.  Okay.  In your training manual, does it tell you to
3  touch the people who you are confronting?
4          MR. BEGLEY:  Objection, form.
5      A.  I ain't going to answer that question.  Because I
6  don't just touch people.  I confront them.  I don't do that.
7      Q.  (BY MS. FAULKNER)  Does the training manual tell
8  you to touch --
9      A.  If somebody confront you.
10         MR. BEGLEY:  Objection, form.
11     A.  Self-defense.
12     Q.  (BY MS. FAULKNER)  I'm sorry.  Say it again.
13     A.  Self-defense.
14     Q.  Okay.  You were defending yourself?
15     A.  Right.
16     Q.  Okay.  Did Mr. Johnson display a weapon?
17     A.  I can't remember.  I can't remember.
18     Q.  You don't remember?
19     A.  I don't remember.
20     Q.  Did you tell the police officer about a weapon?
21     A.  I didn't tell them about nothing.  I didn't tell
22  the police officer nothing.
23     Q.  Say it again.
24     A.  No, ma'am.
25     Q.  Okay.  And, so, did you see a weapon on

Page 67

1  Mr. Johnson?
2      A.  I can't remember.
3      Q.  Can't remember.  Okay.
4          Did Mr. Johnson tell you he had a weapon?
5      A.  He didn't tell me that.
6      Q.  Okay.  And you didn't see one?
7      A.  I can't remember.
8      Q.  Can't remember.  Okay.
9          Do you know whether or not the police did you
10  see the police take a weapon from Mr. Johnson?
11     A.  I didn't see them take nothing from him.
12     Q.  Okay.  And in your training, there different
13  levels of training that you have as far as approaching
14  someone that H-E-B --
15     A.  Right.
16     Q.  -- would tell you was causing a problem; is that
17  right?
18     A.  Right.
19     Q.  Okay.  And are you trained on the use of force?
20     A.  We're not trained on use of force, no.
21     Q.  You're not trained on use of force?
22     A.  Right.
23         MR. BEGLEY:  Objection, form.
24     A.  No.
25     Q.  (BY MS. FAULKNER)  Okay.  So, you don't know how

Page 68

1  much force to use and how much force not to use?
2          MR. BEGLEY:  Objection, form.
3      A.  I ain't going to say that and get into all that.
4      Q.  (BY MS. FAULKNER)  I'm sorry?
5      A.  I ain't going to answer that.
6      Q.  Okay.  You have to answer, Mr. Brown.
7      A.  I mean, I know how much force to use; but it's
8  not -- at all costs we have self-restraint, not to hit
9  nobody.  We don't do that unless somebody approach us in a
10  wrong way, unless it's life-threatening.
11     Q.  In your training, does the training manual tell you
12  how much force to use against another person?
13         MR. BEGLEY:  Objection, form.
14     A.  No.
15     Q.  (BY MS. FAULKNER)  It does not?
16         MR. BEGLEY:  Objection, form.
17     A.  No.
18     Q.  (BY MS. FAULKNER)  Okay.  When you get the training
19  manual, do you have to sign off that you received it?
20     A.  Right.
21     Q.  Okay.  And that means that you received it, you've
22  read it --
23     A.  I read it.
24     Q.  And you understood it?
25     A.  Right.

Page 69

1      Q.  Okay.  And you did receive a training manual?
2      A.  Right.
3      Q.  And you did sign off that you've read it and you
4  understood what it is --
5      A.  Yes, ma'am.
6      Q.  -- what you're to do?
7      A.  Yes.
8      Q.  Okay.  But it doesn't tell you how much force to
9  use?
10         MR. BEGLEY:  Objection, form.
11     A.  No.
12     Q.  (BY MS. FAULKNER)  Okay.  Does it tell you the
13  different levels, give you any idea of the different levels
14  of force to use?
15         MR. BEGLEY:  Objection, form.
16     A.  It tells, but you can't be too -- everything is
17  mostly self-restraint, unless your life --
18     Q.  (BY MS. FAULKNER)  It's what now?
19     A.  Most of the things are self-restraint, unless it's
20  life-threatening.
21     Q.  Okay.  Most of what things?
22     A.  Self-restraint, unless somebody threaten you or
23  approach you real close, your life in trouble.
24     Q.  Oh, that's what the manual says?
25     A.  Right.

18 (Pages 66 to 69)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000622                    AhmedAllied 000735

Unofficial Copy Office of Marilyn Burgess District Clerk

Page 70

1  Q.  Okay. For self-restraint, that you need to
2  restrain them or you need restraining yourself?
3  A.  Like, if somebody come close to me in my space, I
4  can generally push them off.
5  Q.  Okay. What does the self-restraint mean?
6  A.  Self-restraint at all costs. Don't touch nobody if
7  you can help it. Don't touch nobody.
8  Q.  For you to restrain yourself?
9  A.  Right.
10  Q.  Okay. To do whatever you need to do not to touch
11  anybody?
12  A.  Not to touch nobody.
13  Q.  Okay. And Mr. Johnson, who was in his 70s, when
14  he -- if it's as you allege, he was approaching you, was
15  there anything preventing you from walking away or backing
16  up?
17  A.  Not at that time.
18  Q.  Okay. But you didn't, did you?
19       MR. BEGLEY: Objection, form.
20  A.  No, I couldn't. It was by surprise.
21  Q.  (BY MS. FAULKNER) Okay. He caught you by
22  surprise?
23  A.  Right.
24  Q.  An elderly gentleman?
25  A.  Right.

Page 71

1  Q.  Okay. And did he -- he didn't do any -- he wasn't
2  running in a fast mode, was he?
3       MR. BEGLEY: Objection, form.
4  A.  He can't run.
5  Q.  (BY MS. FAULKNER) He couldn't run?
6  A.  He approached me.
7  Q.  Okay. And you couldn't back up?
8  A.  When I turned around, he came -- that's when he
9  came towards me, after I turned around, by surprise.
10  Q.  When you turned around?
11  A.  Yeah, by surprise.
12  Q.  So, your back was to Mr. Johnson?
13  A.  Yeah. Then I turned around, and he was coming
14  towards me.
15  Q.  Okay. So, he was -- was he leaving?
16  A.  No. He was coming towards me.
17  Q.  You said he -- when you turned around?
18  A.  Right.
19  Q.  Okay. When you turned around, he was coming
20  towards you?
21  A.  Yes, ma'am.
22  Q.  Okay. Did he have anything in his hand?
23  A.  I can't remember.
24  Q.  Can't remember. Okay.
25       Did you remember seeing anything, him coming

Page 72

1  towards you with any object?
2  A.  I can't remember.
3  Q.  Okay. And do you know what the term "dementia"
4  means, Mr. Brown?
5  A.  Dementia?
6  Q.  Dementia, yes.
7  A.  Okay. Is that what he had, a problem with
8  dementia?
9  Q.  I'm asking you, do you know what the term
10  "dementia" means?
11  A.  Not really.
12  Q.  Okay. So, you weren't trained to look for any
13  signs of dementia, then?
14  A.  I was trained to look for a situation if a person
15  have --
16  Q.  From Allied?
17  A.  Right.
18  Q.  Okay.
19  A.  Not from Allied. Universal Protection. That's who
20  I was working for.
21  Q.  Universal Protection taught you how to look for
22  signs of dementia?
23       MR. BEGLEY: Objection, form.
24  A.  Not as I remember.
25  Q.  (BY MS. FAULKNER) Okay. Or any -- did they --

Page 73

1  were you ever trained on looking for any mental signs that a
2  person may have?
3       MR. BEGLEY: Objection, form.
4  A.  I can't remember.
5  Q.  (BY MS. FAULKNER) You can't remember if you were
6  trained on that?
7  A.  You can tell mental signs by the way they act.
8  Q.  Okay.
9  A.  Actions they're taking, how they're doing or
10  whatever, you know. You can kind of -- you can pick up on
11  the way a person acts, you know, the way he carries hisself
12  or the way he acts.
13  Q.  Okay. So, what mental signs were you trained to
14  recognize?
15  A.  You can recognize if somebody not acting right by
16  their motions, how they're carrying theirself, if they're
17  drunk. You can just -- the way they're carrying theirself,
18  the way they talk or whatever they're doing.
19  Q.  Okay. What mental signs were you trained to look
20  for?
21       MR. BEGLEY: Objection, form. Velda, he's
22  answered the question five times now.
23       MS. FAULKNER: No, he hasn't.
24       MR. BEGLEY: Yes, he has. He just did.
25  Q.  (BY MS. FAULKNER) I'm asking you --

19 (Pages 70 to 73)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000623                                AhmedAllied 000736

Unofficial Copy Office of Marilyn Burgess District Clerk

Page 74

1    MR. BEGLEY: Answer the question one more
2  time. Go ahead.
3    Q. (BY MS. FAULKNER) What specific mental signs were
4  you trained to look for in a person that you approached while
5  working for Allied Protection [sic] —
6    MR. BEGLEY: Objection, form.
7    Q. — or Allied Universal?
8    A. If a person acting strange or how they're carrying
9  theirself when you watch and see them or how they —
10   Q. No particular name?
11     MR. BEGLEY: Wait. Let him finish the
12 answer.
13   Q. (BY MS. FAULKNER) No particular name?
14     MR. BEGLEY: Hold on. Stop.
15   Finish your answer.
16   Q. (BY MS. FAULKNER) Were you finished, Mr. Brown?
17   A. I'm through.
18   Q. Okay. But no particular name?
19   A. No.
20   Q. Okay. How about physical disabilities?
21   A. Well, I can tell somebody with a physical
22 disability. You can see that just about, the way they act
23 and the way they carry theirself.
24   Q. You didn't see any —
25   A. I noticed no signs, no, ma'am.

Page 75

1    Q. Okay. All right.
2      And when Mr. Johnson was on the ground, did you ask
3  him whether or not — scratch that.
4      When Mr. Johnson was on the ground, did you ask him
5  whether or not he was injured?
6    A. I asked him.
7    Q. And he answered you?
8    A. He talked like he was hurt, but he wasn't hurt.
9    Q. He did what now?
10   A. He said he was hurt, but he wasn't hurt. He told
11 me when he was on the ground, ma'am, he was going to sue
12 H-E-B.
13   Q. He said he was going to sue H-E-B?
14   A. Right.
15   Q. Okay. And I think you said he said he was hurt?
16   A. That's what he said.
17   Q. That's what he said?
18   A. Yeah.
19   Q. Okay. But you're saying he wasn't hurt?
20   A. No.
21   Q. Okay. If Mr. — if evidence shows that Mr. Johnson
22 suffered a broken hip, would you consider that an injury?
23   A. That's an injury.
24   Q. Okay. And would you say that that was caused by
25 your push?

Page 76

1    A. No.
2      MR. BEGLEY: Objection, form.
3    A. No.
4    Q. (BY MS. FAULKNER) Do you have any information to
5  give the jury to show that his broken hip was not caused by
6  you?
7      MR. BEGLEY: Objection, form.
8    A. No.
9    Q. (BY MS. FAULKNER) Okay. And I think you stated
10 earlier that when you did touch or push Mr. Johnson, he did
11 fall to the ground?
12   A. No.
13     MR. BEGLEY: Objection, form.
14   A. No.
15   Q. (BY MS. FAULKNER) He did not fall down?
16   A. He didn't fall down. I wish we would have had the
17 camera. This would be over.
18   Q. Okay. So earlier you said he fell to the ground
19 and you went back inside to get the manager.
20   A. Right, because he did — because he did it hisself.
21   Q. Okay. But he did fall to the ground?
22   A. But I didn't do it. He did it hisself.
23   Q. Okay. You're saying your push didn't do it?
24   A. No.
25   Q. But he fell down?

Page 77

1    A. Right.
2    Q. Okay. And when he — are you aware that he was
3  suffering from any kind of — he had any kind of medical
4  issues?
5    A. No, I was not aware.
6    Q. Okay. Do you know a person by the name of Captain
7  Alex — I think it's Warncke?
8    A. No.
9    Q. Do you know any of the EMTs and the medical
10 personnel that arrived on the scene?
11   A. No, ma'am.
12   Q. Okay.
13     (Shawn Johnson is present)
14   Q. And are you trained to consider a person's size
15 before you approach them or what you may have to do when
16 approaching them?
17   A. I try to consider any person, how they act and what
18 they do. As far as their size, yeah. Yes, ma'am, their size
19 or whatever, you know.
20   Q. Okay. How about their age?
21   A. Yeah.
22   Q. Okay. And how about their relative strength —
23     MR. BEGLEY: Objection, form.
24   Q. — the strength of a person?
25     MR. BEGLEY: Same objection.

20 (Pages 74 to 77)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000624                    AhmedAllied 000737

Page 78

1   A. No.
2   Q. (BY MS. FAULKNER) You're not taught to —
3   A. I'm taught to do that. But when I approach
4   anybody, I'm careful.
5   Q. Okay. Did you consider Mr. Johnson's size at the
6   time that you approached him?
7   A. I didn't consider that. I just considered to be
8   careful and talk nice to him and all that. That's it.
9   Q. Okay.
10  A. Real respectful.
11  Q. Okay. Were you considering his age at the time
12  when you approached him?
13  A. I consider all of them their age.
14  Q. Okay. Did you consider what his strength might be
15  when you approached him?
16  A. I don't know what strength. I know he was an old
17  man. So, he couldn't do, you know —
18  Q. Wasn't much of a threat?
19  A. No.
20      MR. BEGLEY: Objection, form.
21  A. No.
22  Q. (BY MS. FAULKNER) Okay. And on that day you said
23  your supervisor was Mr. Hall, who's no longer with Allied?
24  A. No, no more.
25  Q. Okay. Did you report the incident to Mr. Hall?

Page 79

1   A. I reported it to him.
2   Q. Okay. Do you know whether or not Mr. Hall made a
3   report and sent it in to the company?
4   A. I don't know.
5   Q. Okay. Did you write on your reports that you
6   turned in either to H-E-B or your call sheets what happened
7   during any particular time during the day or what happened
8   that time during the day or at any time during your shift at
9   H-E-B?
10      MR. BEGLEY: Objection, form.
11  A. No, I didn't.
12  Q. (BY MS. FAULKNER) You did not report it?
13      MR. BEGLEY: Objection, form.
14  A. I wasn't hiding nothing, though. I just didn't
15  report it at that time. First time it happened.
16  Q. (BY MS. FAULKNER) You did not report it?
17  A. Right.
18  Q. Okay. Any particular reason why you did not report
19  it?
20  A. I ain't got nothing to hide. I just forgot.
21  Q. Okay. Even with the police being called, a person
22  taken off in an ambulance, you did not report it?
23      MR. BEGLEY: Objection, form.
24  A. No.
25  Q. (BY MS. FAULKNER) Okay. All right.

Page 80

1       And is that according to the manual that you are to
2   do that?
3   A. Yeah, I do that. But at that time I just forgot to
4   do it. First time it happened.
5   Q. First time it happened?
6   A. First time I had that problem.
7   Q. Okay. First time with Mr. Johnson or first time
8   with anybody?
9   A. With him.
10  Q. Okay.
11  A. Or anybody, you know.
12  Q. Okay. But you had never seen him before that day?
13  A. Yeah. But he the one that gave me the problem.
14  Q. Right. But you had never seen Mr. Johnson?
15  A. I never had seen him before that day.
16  Q. The first day you saw Mr. Johnson was October 19th,
17  2015?
18  A. Yes, ma'am.
19  Q. At the time that the manager at H-E-B told you to
20  tell him to leave the premises?
21  A. Right.
22  Q. Okay. And are you — were you trained to use any
23  use of force against anybody that may be committing a crime
24  at H-E-B?
25      MR. BEGLEY: Objection, form.

Page 81

1   A. My job is to report.
2   Q. (BY MS. FAULKNER) Just to report?
3   A. Right.
4   Q. Not to use any use of force?
5   A. No.
6   Q. And as far as the report is concerned, you said you
7   were to file a report, but you just forgot that day?
8   A. Right.
9       MR. BEGLEY: Objection, form.
10  Q. (BY MS. FAULKNER) Okay. Now, is that a violation
11  of policy and procedure —
12      MR. BEGLEY: Objection, form.
13  Q. — or do you know?
14      MR. BEGLEY: Same objection.
15  A. No. I mean, it's a procedure; but it wasn't like I
16  was trying to forget. It's the first time it happened.
17  Q. (BY MS. FAULKNER) Okay. But is that a violation?
18      MR. BEGLEY: Objection, form.
19  A. No, ma'am.
20  Q. (BY MS. FAULKNER) Okay. All right.
21      And, so, you were not disciplined for not filing a
22  report?
23  A. No.
24      MR. BEGLEY: Objection, form.
25  Q. (BY MS. FAULKNER) Okay. Let me ask you this: Is

21 (Pages 78 to 81)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000625                    AhmedAllied 000738

Page 82

1  the reporting mandatory or is it voluntary?
2    A.  It's mandatory to report.
3    Q.  Okay.  But you didn't?
4    A.  I have nothing to hide, ma'am.
5    Q.  Right.  But you said you forgot that day?
6    A.  I forgot.  That's all.
7    Q.  Okay.  And when you touched Mr. Johnson, did you
8  have to make any drawings or sketches or anything?  Were you
9  required to do that?
10   A.  No, ma'am.
11   Q.  Okay.  And do you know whether or not any
12 investigation was done of this incident by Allied?
13   A.  I don't know.
14   Q.  Okay.  Did you request one?
15   A.  They didn't ask me to request.  They didn't ask me
16 to request.
17   Q.  Okay.  And nobody at Allied did one on their own,
18 to your knowledge?
19   A.  No.
20   Q.  Okay.  And do you know who your branch manager was
21 at the time?
22   A.  Her name Shree.
23   Q.  Shree?
24   A.  Yeah, Shree.  I think her name Shree Ross.
25   Q.  Spell "Shree" for me.  Do you know how to spell it?

Page 83

1    A.  It's S-h-r-e-e.
2    Q.  S-h-r-e-e?
3    A.  Yeah, Shree.  She's not there no more.
4    Q.  It's a lady?
5    A.  A lady, yeah.
6    Q.  Okay.  And what was her last name?
7    A.  I think Ross.
8    Q.  R-o-s-s?
9    A.  Right.
10   Q.  She was a branch manager?
11   A.  Right.
12   Q.  Where was her office?  Do you know where she was
13 located?
14   A.  She was at Wilcrest.  We was on Dairy Ashford and
15 Wilcrest at that time.
16   Q.  That's where Allied was located?
17   A.  That's where Universal Protection was located.
18   Q.  Okay.  Is it still there?
19   A.  No.
20   Q.  Okay.  Was it there on the day of this incident?
21   A.  Right, it was there on that day.
22   Q.  Okay.  But they have since moved?
23   A.  They have moved.
24   Q.  Okay.  Where is your location now?
25   A.  It's off 610 South, Ella.  610 East.  610 North,

Page 84

1  Ella.
2    Q.  Oh, Ella Boulevard?
3    A.  Right.
4    Q.  Okay.  And that's where your district or
5  reporting --
6    A.  Right.
7    Q.  -- office is --
8    A.  Right.
9    Q.  -- for Allied Universal?
10   A.  Right.  We branched in.  Universal Protection and
11 Allied branched in together --
12   Q.  Okay.  And, so, they --
13   A.  Right.
14   Q.  It's just one location on --
15   A.  Right.
16   Q.  -- 610 and -- you said 610 North and Ella
17 Boulevard?
18   A.  Right.
19   Q.  Okay.  And the branch manager over there is who?
20   A.  I don't know who the branch manager is now.
21   Q.  Okay.
22   A.  I don't know who is the branch manager.
23   Q.  Have you met the person after -- did you ever meet
24 the person after Shree Ross left?
25   A.  Never met them.

Page 85

1    Q.  And your branch -- the branch manager at the time
2  you said was Sherise?  Is it Sherise or Shree?
3    A.  Shree.
4    Q.  S-h-a-r-e-e?
5    A.  Right.
6    Q.  Okay.  And you still work for H-E-B?
7    A.  Right.
8        MR. BEGLEY:  Objection, form.
9    Q.  (BY MS. FAULKNER)  I'm sorry.  You still work for
10 Allied Universal?
11   A.  Right.
12   Q.  Okay.  And you still work at H-E-B for Allied
13 Universal?
14   A.  Right.
15   Q.  Okay.  And was any discipline -- did you face any
16 discipline procedures as a result of this incident?
17   A.  No, ma'am.
18   Q.  Okay.  Is there a -- if you need to report the use
19 of force or any incident to Allied, do they give you a form
20 or you have to just write it on a piece of -- any blank piece
21 of paper or anything?
22   A.  We report it to the supervisor, and they will
23 investigate it.
24   Q.  Okay.  And you could have called your site
25 supervisor, which would have been Mr. Hall?

22 (Pages 82 to 85)

Unofficial COPY Office of Marilyn Burgess District Clerk

AhmedAllied 000739

Page 86

1    A.  Yeah. He came.
2    Q.  He came?
3    A.  He came that day.
4    Q.  At the location?
5    A.  Right. He came to the location.
6    Q.  Was Mr. Johnson still there?
7    A.  No. He was gone.
8    Q.  Okay. And when Mr. Hall arrived, did he speak with
9    you?
10   A.  He spoke with me.
11   Q.  And what did you -- and you told him about what
12   happened?
13   A.  Right.
14   Q.  Okay. And did he write a report, to your
15   knowledge?
16   A.  I can't remember. He probably did, but I can't
17   remember.
18   Q.  Did he write one on-site in front of you?
19   A.  He didn't do it in front of me. I think he did. I
20   can't remember.
21   Q.  Can't remember. Okay.
22        Where would that report be kept?
23   A.  I don't know.
24   Q.  Okay. And I would need to contact somebody at 610
25   North and Ella Boulevard?

Page 87

1    A.  I don't know if the report kept or not. I couldn't
2    tell you.
3    Q.  Okay. All right.
4        And when you turn in a report about something
5    happening --
6    A.  I didn't turn in no report. I gave the -- H-E-B
7    got the report. That's all I signed.
8    Q.  Okay. Have you ever turned in a report before
9    since you've been working for Allied?
10   A.  No.
11   Q.  Okay. So, you have never been involved in an
12   incident where you had to make a report?
13   A.  No. That's the only incident there.
14   Q.  Say it again.
15   A.  That's the only incident there.
16   Q.  Okay. And have you ever been convicted of a felony
17   or a misdemeanor of moral turpitude within the last ten
18   years?
19   A.  No.
20   Q.  And you're not currently under indictment or
21   investigation that you know of?
22   A.  No, ma'am.
23   Q.  And how often do you have to go back for any
24   training with -- it's Allied Universal; right?
25   A.  Right.

Page 88

1    Q.  Okay. How often do you have to go back and get
2    refresher courses with Allied Universal?
3    A.  Maybe, like, two or three years. We don't go a
4    lot. Every once in a while. Not much.
5    Q.  Okay. And what do those courses consist of?
6    A.  Those courses, they consist of your surroundings,
7    know people around you, what's going on around you, what's
8    happening.
9    Q.  Okay. Do you have to sign off on those courses?
10   A.  We sign off on those courses.
11   Q.  And how long does a course last?
12   A.  They last about two or three hours. They show film
13   and stuff like that.
14   Q.  Okay. And do you have any role play with any
15   persons from Allied as to show if an incident, like, for
16   example, occurs, this is how you would react?
17   A.  We talk, yeah, some.
18   Q.  Okay. Did you have that in your training?
19   A.  We had a little bit of that.
20   Q.  A little bit of it. Okay.
21        And that was before this incident with Mr. Johnson?
22   A.  Only thing I had was knowing your surroundings at
23   the time and how to react. Most of the time our job is to
24   report and call.
25   Q.  Report and call?

Page 89

1    A.  Yeah. We call the -- first thing we do if we see
2    something wrong, we call the manager that's on duty.
3    Q.  And that would be, like, the manager at H-E-B?
4    A.  Right.
5    Q.  Okay. And do you --
6    A.  That's a site.
7    Q.  I'm sorry?
8    A.  That's a location.
9    Q.  Okay. Whoever is at the location?
10   A.  That's a location. If something get out of hand,
11   we go to the manager.
12   Q.  Okay.
13   A.  If people -- like, a lot of time if I tell somebody
14   to leave the parking lot, they don't want to leave, I go to
15   the manager. Our job is to go to the manager inside the
16   store.
17   Q.  Okay. And when Mr. Johnson didn't want to leave
18   that day, did you first go to the manager before touching
19   him?
20   A.  I didn't have time to go to the manager. He was
21   leaving. Then he turned around and came at me. When I
22   turned around, he came at me. So, I just pushed him back.
23   Q.  So, you didn't go to the manager?
24   A.  I went to the manager after that.
25   Q.  After. You didn't go to them --

23 [Pages 86 to 89]

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000627                    AhmedAllied 000740

Unofficial Copy Office of Marilyn Burgess District Clerk

Page 90

1    A.  No, because wasn't nothing going on till after
2  then.
3    Q.  Okay.  But your training tells you to go to the
4  manager first?
5    A.  If something wrong.
6        MR. BEGLEY:  Objection, form.
7    Q.  (BY MS. FAULKNER)  Okay.  Now, according to your
8  petition, your answer that you filed in the court, do you
9  want to tell the jury what acts or omissions that other
10  persons or other parties caused Mr. Johnson?
11    A.  I don't want to tell them nothing.
12    Q.  Okay.  So, are there any acts or omissions that
13  Mr. Johnson did --
14        MR. BEGLEY:  Objection, form.
15    Q.  -- other than being on the premises?
16        MR. BEGLEY:  Same objection.
17    A.  I ain't going to say much on that.  I'll take care
18  of that when that time come up.
19    Q.  (BY MS. FAULKNER)  No.  I'm asking you now under
20  oath.
21    A.  He took some bad action.  It wasn't me.
22    Q.  What actions did he take?
23    A.  He was cussing, carrying on.  He came and walked up
24  straight to me.
25    Q.  Okay.

Page 91

1    A.  He walked straight, and he didn't have to get that
2  close.  And really I would have got out of the way, but I
3  didn't see him.  I just had to turn around, and he came
4  towards me.
5    Q.  Okay.  And what did he fail to do?  What did he
6  omit to do?
7    A.  All he had to do was leave the parking lot.  That's
8  all he had to do.
9    Q.  Okay.  And according to you, he did not do it?
10    A.  He did not do it.
11    Q.  Okay.  Now, Mr. Brown --
12    A.  Yes, ma'am.
13    Q.  -- are you familiar with an Officer Crenshaw?
14    A.  I ain't familiar with none of them guys that came
15  out there.
16    Q.  None of the EMTs or police officers who responded?
17    A.  No.
18    Q.  Okay.  Did you speak with the EMTs or the
19  paramedics when they arrived there?
20    A.  No.
21    Q.  Did not?
22    A.  No.  They did what they had to do.
23    Q.  Okay.  They just spoke with Mr. Johnson?
24    A.  They talked to some of the managers.  They talked
25  to Mr. Johnson and some of the managers.

Page 92

1    Q.  Okay.  And when they spoke with some of the
2  managers, did they direct them to speak with you, to your
3  knowledge?
4    A.  No.
5    Q.  Okay.  And was Mr. -- do you know if Mr. Johnson
6  was taken to a hospital?
7    A.  They had to carry him to a hospital.  When he got
8  on the thing, they carried him to the hospital.
9    Q.  They did?
10    A.  Yeah.
11    Q.  Do you know which hospital they took him to?
12    A.  I don't know.
13    Q.  Okay.  And you didn't have to go, did you?
14    A.  No, ma'am.
15    Q.  Okay.  Do you know a Mr. Vernon Logan?
16    A.  I don't know Mr. Vernon Logan.  I might know him if
17  I see him, but a lot of people I can't remember.
18    Q.  Okay.  Did you ever speak to anybody who was a
19  witness or say what went on out there?
20    A.  I didn't speak to none of them.
21    Q.  You didn't speak to anybody else?
22    A.  No.
23    Q.  And you said you spoke to the police officers,
24  though?
25    A.  I spoke to one police officer.

Page 93

1    Q.  Okay.  Do you know whether or not that would have
2  been Mr. Crenshaw?
3    A.  I couldn't tell you for sure.  I don't know.
4    Q.  Okay.  Do you know how many officers arrived?  Do
5  you remember?
6    A.  I couldn't remember, ma'am.
7    Q.  Okay.  And did you have to sign anything for the
8  Police Department?
9    A.  No, ma'am.
10    Q.  Okay.  And you were never charged with any offense?
11    A.  No, ma'am.
12    Q.  Okay.  So, needless to say you were not taken to
13  court for this?
14    A.  No, ma'am.
15    Q.  Okay.  And did the officer file a report, to your
16  knowledge?
17    A.  I can't remember.
18    Q.  Okay.  Did you get a case number?
19    A.  No, ma'am.
20    Q.  You did not?
21    A.  I can't remember.  I might have, but I can't
22  remember.
23    Q.  Okay.  Do you know a Dr. Moore?
24    A.  No, ma'am.
25    Q.  Merlyn Moore?

24 (Pages 90 to 93)

APPENDIX 000628                    AhmedAllied 000741

Page 94

1    A.  No, ma'am.
2    Q.  And do you know a Dr. Fitzgibbons?
3    A.  No, ma'am.
4    Q.  Do you know a John Ortiz?
5    A.  No, ma'am.
6    Q.  Jeff Poncini?
7    A.  No, ma'am.
8    Q.  Benjamin Galloway?
9    A.  No, ma'am.
10   Q.  Macario Garcia?
11   A.  No, ma'am.
12   Q.  Michael Orosco?
13   A.  No, ma'am.
14   Q.  Do you know Dr. Adrian Zaharia?
15   A.  No, ma'am.
16   Q.  Do you know a Dr. Moon Choo?
17   A.  No, ma'am.
18   Q.  How about a Dr. William Harvin?
19   A.  No, ma'am.
20   Q.  Dr. Kumar Anushree?
21   A.  No, ma'am.
22   Q.  Dr. Hasan Gokal?
23   A.  No, ma'am.
24   Q.  A Dr. Wayne Modovan?
25   A.  No, ma'am.

Page 95

1    Q.  A Dr. Lin?
2    A.  No, ma'am.
3    Q.  A Dr. Heidi Matus?
4    A.  No, ma'am.
5    Q.  How about a Dr. Samani?
6    A.  No, ma'am.
7    Q.  Do you know any treating physicians that -- anyone
8    who treated Mr. Johnson for any injuries?
9    A.  Not one of them.
10   Q.  Okay. Did you ever speak to Mr. Johnson to see
11   whether or not he, in fact, was injured?
12   A.  I never did see if he was injured. When they
13   carried him on the ambulance, that's the last thing I
14   remember. That's it.
15   Q.  Okay. Did you say anything to Mr. Johnson as he
16   was being carried in the -- put in the ambulance?
17   A.  I didn't say nothing to him but, "I'm sorry."
18   Q.  You told him you were sorry?
19   A.  Yeah.
20   Q.  Okay. And did he respond to that or was he taken
21   off in the ambulance?
22   A.  He left in the ambulance, ma'am.
23   Q.  Okay. And did the ambulance drivers ever speak to
24   you about anything?
25   A.  No, ma'am.

Page 96

1    Q.  Okay. And I see you have certificates here.
2    A.  Yeah.
3    Q.  Were these certificates because you completed those
4    courses?
5    A.  Some of the courses, yeah. And some for being a
6    faithful worker.
7    Q.  Okay. All right.
8        And did you get them for -- you said being at work?
9    A.  Being a faithful worker, not in trouble, not giving
10   problems to the MICs at H-E-B and all that, not a problem
11   officer.
12   Q.  Okay. Have you ever had any commendations from any
13   customers?
14   A.  What do you mean by "commendations"?
15   Q.  Any glowing reviews or any positive words?
16   A.  Yeah. A lot of them tell me that.
17   Q.  Any --
18   A.  Customers, yeah, they're glad to see me. I've got
19   quite a few of them say, "How ya doing, Calvin? How's it
20   going?" Yeah.
21   Q.  Okay. Did they ever write your employer?
22   A.  I couldn't tell you none of that.
23   Q.  Okay. And if they did, you don't know it?
24   A.  No, ma'am.
25   Q.  Okay.

Page 97

1    A.  No, ma'am, I don't know.
2    Q.  And are you -- does the State of Texas have to
3    license you to become a security officer?
4    A.  Yes, ma'am.
5    Q.  Okay. And how long have you held that license?
6    A.  That license go for at least two years.
7    Q.  Okay. And you have to renew it?
8    A.  Yes, ma'am.
9    Q.  Okay. Do you know, what's the cost of renewal?
10   A.  I don't know. My company take care of that.
11   Q.  Okay.
12   A.  They take care of that.
13   Q.  Because you're licensed through the company?
14   A.  Right.
15   Q.  Okay. If you're going to be a security officer,
16   you have to be licensed through the company?
17   A.  Yes, ma'am.
18   Q.  Okay. And is your renewal up soon?
19   A.  No. I've got another year.
20   Q.  Another year. Because you said every two years?
21   A.  Right.
22   Q.  Okay. And with incidents like this, do you have to
23   report them to the State of Texas?
24   A.  No.
25   Q.  Okay. You said you do not?

25 (Pages 94 to 97)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

Unofficial Copy Office of Marilyn Burgess Harris County District Clerk

Page 98

1    A.   The only person might report it -- we don't, unless
2    the company do it, but I don't.
3    Q.   Okay. You don't report it personally?
4    A.   No.
5    Q.   Okay. And the address of the location, that is
6    11815 Westheimer Road; is that correct?
7    A.   Right. Yes, ma'am, that's it.
8    Q.   And is your shift still 4:00 to midnight?
9    A.   Yes, ma'am.
10   Q.   And do you -- are you involved in any other
11   lawsuits currently?
12   A.   No, ma'am.
13   Q.   Have you ever been sued?
14   A.   Yes, ma'am.
15        (Anki Johnson is not present)
16   Q.   And you have never sued anybody?
17   A.   No, ma'am. I don't do that. I'm better than that.
18   Q.   Okay. And you said the only medication you're on
19   was for hypertension?
20   A.   High blood pressure.
21   Q.   High blood pressure. Okay.
22        And you were on it on October 19th at the time of
23   this incident?
24   A.   Yeah. I take it in the mornings.
25   Q.   Okay. And you weren't taking any other medication?

Page 99

1    A.   No, ma'am.
2    Q.   Okay. And had you had anything to eat before
3    you -- and to drink before you reported to duty that day?
4    A.   Yes, ma'am.
5    Q.   Okay. Do you drink alcohol?
6    A.   No. I'm a Christian. Don't do that.
7    Q.   Okay. And Mr. Johnson didn't cause you to have any
8    injuries, did he?
9    A.   No, ma'am.
10   Q.   Okay. And other than your attorney, have you
11   spoken with anybody else about this case?
12   A.   No.
13   Q.   And have you made -- did you give any recorded
14   statements to anyone?
15   A.   No.
16   Q.   How about any written statements?
17   A.   No.
18   Q.   Okay. And at the time that this incident happened,
19   you were acting as an employee for Allied Universal?
20   A.   Universal Protection.
21   Q.   Universal Protection?
22   A.   Right. It's the same company now, though.
23   Q.   Say it again.
24   A.   It's still the same company.
25   Q.   When did Allied take over Universal Protection?

Page 100

1    A.   That had to happen around 2016, last year around
2    October.
3    Q.   Okay. All right.
4        And you were their employee?
5    A.   Right.
6    Q.   And you get a check that says it comes from them?
7    A.   Yeah, now.
8    Q.   Okay. Have you understood all my questions today?
9    A.   Yes, ma'am.
10   Q.   Okay. Have you answered them fully?
11   A.   Yes, ma'am.
12   Q.   Okay. Would your answers be the same in a court at
13   a trial of this case as they were today?
14   A.   Yes, ma'am.
15   Q.   Okay. All right,
16        Anything else you want to put on the record for the
17   jury?
18   A.   No, ma'am.
19   Q.   Okay.
20        MS. FAULKNER: Pass the witness.
21        MR. BEGLEY: We'll reserve our questions for
22   trial.
23        (Deposition concluded at 11:44 a.m.)
24
25

Page 101

1         CHANGES AND SIGNATURE
2    WITNESS NAME: CALVIN BROWN
3    DATE: OCTOBER 11, 2017
4    PAGE LINE    CHANGE         REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
20   I, CALVIN BROWN, have read the foregoing deposition and
21   hereby affix my signature that same is true and correct,
22   except as noted above.
23
24   _____
25        CALVIN BROWN

26 (Pages 98 to 101)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000630                      AhmedAllied 000743

Page 102

```
1    THE STATE OF TEXAS  )
2    COUNTY OF _____ )
3         Before me, _____, on this day
4    personally appeared CALVIN BROWN, known to me (or proved to
5    me under oath or through _____) (description of
6    identity card or other document) to be the person whose name
7    is subscribed to the foregoing instrument and acknowledged to
8    me that they executed the same for the purposes and
9    consideration therein expressed.
10        Given under my hand and seal of office this _____
11   day of _____, _____.
12
13
14              _____
15              Notary Public in and for
16              The State of Texas
17
18
19
20
21
22
23
24
25
```

Page 103

```
1              CAUSE NO. 2016-20704
2    ANKI JOHNSON (HEIR OF   )  IN THE DISTRICT COURT
3    ROBERT JOHNSON),        )
4         Plaintiff,         )
5    VS.                     )  HARRIS COUNTY, TEXAS
6    HEB GROCERY COMPANY, LP, )
7         Defendant.         )  113TH JUDICIAL DISTRICT
8
9
10            REPORTER'S CERTIFICATION
11          DEPOSITION OF CALVIN BROWN
12               OCTOBER 11, 2017
13
14        I, Robin Potts, Certified Shorthand Reporter in
15   and for the State of Texas, hereby certify to the following:
16        That the witness, CALVIN BROWN, was duly sworn by
17   the officer and that the transcript of the oral deposition is
18   a true record of the testimony given by the witness;
19        That the deposition transcript was submitted on
20   the _____ day of _____, _____, to the witness or
21   the attorney for the witness for examination, signature, and
22   return to me by the _____ day of _____, _____;
23        That the amount of time used by each party at the
24   deposition is as follows:
25        Ms. Velda R. Faulkner, 1 hour, 17 minutes
```

Page 104

```
1         That pursuant to information given to the
2    deposition officer at the time said testimony was taken, the
3    following includes counsel for all parties of record:
4
5    FOR THE PLAINTIFF:
6         Ms. Velda R. Faulkner
          Law Office of Velda R. Faulkner
7         6575 West Loop South, Suite 500
          Bellaire, TX 77401
8
9    FOR THE DEFENDANT HEB GROCERY COMPANY, LP:
10        Mr. Kip Patterson
          Baker & Patterson, LLP
11        601 Sawyer Street, Suite 110
          Houston, TX 77007
12
13   FOR THE DEFENDANTS ALLIED UNIVERSAL AND CALVIN BROWN:
14        Mr. Matthew R. Begley
          Lewis, Brisbois, Bisgaard & Smith, LLP
15        24 Greenway Plaza, Suite 1400
          Houston, TX 77046
16
17        I further certify that I am neither counsel for,
18   related to, nor employed by any of the parties or attorneys
19   in the action in which this proceeding was taken, and further
20   that I am not financially or otherwise interested in the
21   outcome of the action.
22        Further certification requirements pursuant to
23   Rule 203 of TRCP will be certified to after they have
24   occurred.
25        Certified to by me this _____ day of
```

Page 105

```
1    _____, _____.
2
3
4
5         Robin Potts, Texas CSR No. 2491
          Expiration Date: 12/31/17
5         Notary Expires: 4/27/20
6         Nell McCallum & Associates, Inc.
          718 Westcott Street
7         Houston, Texas 77007
          (713)861-0203/Fax(713)861-2324
8         Firm Registration No. 243
          Expiration Date: 12/31/18
9
10
11
12        FURTHER CERTIFICATION UNDER RULE 203 TRCP
13        The original deposition (___) was (___) was not
14   returned to the deposition officer on _____;
15        If returned, the attached Changes and Signature
16   page contains any changes and the reasons therefor;
17        If returned, the original deposition was
18   delivered to Ms. Velda R. Faulkner, Custodial Attorney;
19        That $_____ is the deposition officer's
20   charges to the Plaintiff for preparing the original
21   deposition transcript and any copies of exhibits;
22        That the deposition was delivered in accordance
23   with Rule 203.3, and that a copy of this certificate was
24   served on all parties shown herein on _____, _____.
25   and filed with the Clerk.
```

27 (Pages 102 to 105)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

APPENDIX 000631                    AhmedAllied 000744



Page 106

1          Certified to by me this _____ day of
2          _____, ____.
3
4
5
            Robin Potts, Texas CSR No. 2491
6           Expiration Date: 12/31/17
            Notary Expires: 4/27/20
7           Nell McCallum & Associates, Inc.
            718 Westcott Street
8           Houston, Texas 77007
            (713)861-0203/Fax(713)861-2324
9           Firm Registration No. 243
            Expiration Date: 12/31/18
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

28 (Page 106)

NELL McCALLUM & ASSOCIATES, INC. (713) 861-0203

                     AhmedAllied 000745

# Exhibit 14

# Allied emails concerning Twana Ahmed's reports of discrimination and harassment

| | |
|---|---|
| **From:** | Oliver, Wayne on behalf of Oliver, Wayne <Wayne.Oliver@aus.com> |
| **To:** | Freeney, Patrick |
| **Subject:** | couple of cases |
| **Date:** | Wednesday, June 1, 2022 10:56:00 AM |

Good morning Patrick,

Please send me all information you have on Twana Ahmed.  Also, please provide the job responsibilities for Nathan Hernandez, Frankie, Patrick Parham, and Maurico and the site where they are located?

Thanks,

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr.  | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: l wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

AUS 00803

| | |
|---|---|
| **From:** | Oliver, Wayne on behalf of Oliver, Wayne <Wayne.Oliver@aus.com> |
| **To:** | Freeney, Patrick |
| **Subject:** | case 36184, 36149 |
| **Date:** | Friday, June 3, 2022 9:43:21 AM |

Good morning Patrick,

Emailed you Wednesday and following up about the Twana Ahmed hotline complaint and the anonymous complaint involving your supervisors.

Thanks,

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr.  | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: | wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

AUS 00802

Please include the navex attachment.

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # C15802

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Friday, June 3, 2022 2:06 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** case information and paperwork for 36149, 36184

Good afternoon Kareem,

I have reached out to Patrick a couple of times on paperwork and statement on Twana Ahmed and a statement on an anonymous complaint on Nathan Hernandez,  Frankie, Patrick Parham, and Maurico.  Any help with this would be greatly appreciated.

Thanks,

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr.  | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: I wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

APPENDIX 000636

AUS 00799

| From: | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
|---|---|
| To: | McKinnon, Kareem |
| Subject: | RE: case information and paperwork for 36149, 36184 |
| Date: | Friday, June 3, 2022 3:03:36 PM |
| Attachments: | image001.png |

Working it, Kareem.

Patrick

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Friday, June 3, 2022 2:56 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Subject:** FW: case information and paperwork for 36149, 36184

Patrick,

Please jump on this.

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # C15802

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Friday, June 3, 2022 2:48 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case information and paperwork for 36149, 36184

Here you go sir.


Thanks,

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Friday, June 3, 2022 2:45 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case information and paperwork for 36149, 36184

APPENDIX 000637

AUS 00798

| From: | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
|---|---|
| To: | Oliver, Wayne |
| Cc: | McKinnon, Kareem; Gaussen, Matthew |
| Subject: | RE: case information and paperwork for 36149, 36184 |
| Date: | Saturday, June 4, 2022 3:26:03 PM |
| Attachments: | case_36149.doc.htm |
| | image001.png |
| | image002.png |

Gentlemen,

In reference to the attachment, I acknowledge the decision of delegating SOME responsibility in producing a forward schedule for the Elite Program to the subordinate Field Supervisors.  No abuse of authority or mismanagement of personnel was ever accomplished in this endeavor, nor have I conducted any of my duties behind the backs of my senior staff.  I have brought my concerns of the lack of proficient practices as it pertains to certain duty functions to the attention of the General Manager, the Director of Operations and the Regional Vice President.  I saw better ways to run the Elite Program, and was allowed to do so with positive remarks from my senior leadership.

I make no apologies for my decisions, and believe the program can run even more efficient with adjustments to particular routines in leadership roles.

If there are any questions or concerns regarding the response given, please don't hesitate to contact me using the information provided below.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
**Apply by phone! Text: Allied to 86754**
**There for our veterans https://jobs.aus.com/veterans**
www.AUS.com



HE>i

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Friday, June 3, 2022 2:56 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Subject:** FW: case information and paperwork for 36149, 36184

Patrick,

APPENDIX 000638                                          AUS 01399

**From:** Alyea, Katherine on behalf of Alyea, Katherine <Katherine.Alyea@aus.com>
**To:** Oliver, Wayne
**Subject:** RE: ***Attorney Client Priviledge*** UOF Twana Ahmed 04042022
**Date:** Monday, June 6, 2022 11:56:17 AM
**Attachments:** image003.png
image001.png
image002.jpg
image007.png

Did he provide you the termination paperwork?

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Monday, June 6, 2022 11:51 AM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** FW: ***Attorney Client Priviledge*** UOF Twana Ahmed 04042022

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121

**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Saturday, June 4, 2022 1:47 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** FW: ***Attorney Client Priviledge*** UOF Twana Ahmed 04042022

ALCON,

Please see attachments.

Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by me or anyone on my Supervisory team.  We have had verbal counselings when I appeared at a worksite to do meetings with an ALPM, but I have never addressed anyone with racists overtones, or threatened an employee with physical harm or danger to themselves.  Furthermore, Twana Ahmed was terminated for the unauthorized detention of a suspected shoplifter regarding an inappropriate UOF incident that took place on 4/4/2022 when he forcefully pushed a suspected shoplifter against the wall PRIOR to leaving the store, applied handcuffs to the individuals' wrists behind his back, and then walked him outside the store to be handed over to the police.  Because Ahmed never allowed the subject to actually leave the store, the theft of merchandise never technically took place, and the police were not able to affect an arrest.  A Root-Cause Analysis was completed in reference to this incident, and a Panel deemed it appropriate for him to be terminated due to the fact that the actions taken by Ahmed were not authorized nor approved of by any training or instruction during his time with Allied Universal.

If you have any questions, please let me know.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
Apply by phone! Text: Allied to 86754
There for our veterans **https://jobs.aus.com/veterans**
**www.AUS.com**

HE>i

---

**From:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>

AUS 01242

**Sent:** Monday, June 6, 2022 12:04 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>; Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Patrick please provide all documentation including write ups on Twana Ahmed.

Thanks,

**Wayne Oliver Jr.**
**Regional HR Rep**
**281-729-7121**



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Saturday, June 4, 2022 1:47 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

ALCON,

Please see attachments.

Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by me or anyone on my Supervisory team.  We have had verbal counselings when I appeared at a worksite to do meetings with an ALPM, but I have never addressed anyone with racists overtones, or threatened an employee with physical harm or danger to themselves.  Furthermore, Twana Ahmed was terminated for the unauthorized detention of a suspected shoplifter regarding an inappropriate UOF incident that took place on 4/4/2022 when he forcefully pushed a suspected shoplifter against the wall PRIOR to leaving the store, applied handcuffs to the individuals' wrists behind his back, and then walked him outside the store to be handed over to the police. Because Ahmed never allowed the subject to actually leave the store, the theft of merchandise never technically took place, and the police were not able to affect an arrest.  A Root-Cause Analysis was completed in reference to this incident, and a Panel deemed it appropriate for him to be terminated due to the fact that the actions taken by Ahmed were not authorized nor approved of by any training or instruction during his time with Allied Universal.

If you have any questions, please let me know.

Thanks in advance!

**Patrick G. Freeney**
**Elite Client Manager for HEB/Houston**
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
Apply by phone! Text: Allied to 86754
There for our veterans **https://jobs.aus.com/veterans**
**www.AUS.com**

HE>i

---

**From:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Sent:** Thursday, April 7, 2022 12:39 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Hi HEB Team,

In reviewing the attached and speaking with Patrick, it is my recommendation that the officer be terminated.  Here are some highlights from the attached:

- SP signed UoF checkpoint in the field with FS on 2/14/22 (pictured below).
- SP knowingly violated the policy by restraining a shoplifter that was not a threat to the SP or the public.
- SP refused to complete a written statement and did not submit a HeliAUS report following the incident (activity, event or incident).
- SP refused to sign disciplinary counseling.

| | |
|---|---|
| **From:** | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
| **To:** | Alyea, Katherine; Oliver, Wayne |
| **Cc:** | McKinnon, Kareem; Gaussen, Matthew |
| **Subject:** | RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022 |
| **Date:** | Monday, June 6, 2022 3:34:15 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.jpg |
| | image004.png |

Hi Katherine,

Alex Bergeron witnessed these counselings.  This was approved by Don Massey.

Patrick

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Monday, June 6, 2022 3:33 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Who are the witnesses on both of these documents, I cannot read the signature? Is there a reason as to why they are not typed, were these reviewed by a member of the HR team or Don?

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086

**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Monday, June 6, 2022 3:29 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>; Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Hi Katherine.

Please see attached, and let me know if you have any questions.

Patrick

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Monday, June 6, 2022 2:07 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Hello Patrick,
To confirm he was written up, terminated for the UOF violation?

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086

**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Monday, June 6, 2022 12:41 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>; Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Working it. Stand by........
Patrick

---

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>

AUS 00769

APPENDIX 000642
AUS 01232

Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by me or anyone on my supervisory team. We have had verbal counselings when I appeared at a worksite but I have never addressed anyone with racists overtones, or threatened

Please see attachments.

AICON,

**Subject:** FW: ***Attorney Client Priveildge*** UOF Twana Ahmed 04042022
**CC:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Saturday, June 4, 2022 1:47 PM
**From:** Freeney, Patrick <Patrick.Freeney@aus.com>

**WORK SAFE. LIVE SAFE. BE SAFE.**



281-729-7121
Regional HR Rep
**Wayne Oliver Jr.**

Thanks,

Patrick please provide all documentation including write ups on Twana Ahmed.

**Subject:** RE: ***Attorney Client Priveildge*** UOF Twana Ahmed 04042022
**CC:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>; Alyea, Katherine <Katherine.Alyea@aus.com>
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Monday, June 6, 2022 12:04 PM
**From:** Oliver, Wayne <Wayne.Oliver@aus.com>

Patrick

Working it. Stand by.........

**Subject:** RE: ***Attorney Client Priveildge*** UOF Twana Ahmed 04042022
**CC:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>; Alyea, Katherine <Katherine.Alyea@aus.com>
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Monday, June 6, 2022 12:41 PM
**From:** Freeney, Patrick <Patrick.Freeney@aus.com>

**WORK SAFE. LIVE SAFE. BE SAFE.**



713-321-0086
Senior Regional HR Manager
**Katherine Alyea  PHR, SHRM-CP**

To confirm he was written up, terminated for the UOF violation?

Hello Patrick,

**Subject:** RE: ***Attorney Client Priveildge*** UOF Twana Ahmed 04042022
**CC:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Monday, June 6, 2022 2:07 PM
**From:** Alyea, Katherine <Katherine.Alyea@aus.com>

Patrick

Please pardon my late response, but yes. I've got a total of two counseling's coming your way. One is for a uniform violation back in February. The other is for this UOF incident. As soon as I am done with this interview, I'll send the info.

Hi Katherine,

**Attachments:**  image001.png
  image002.png
  image003.png
  image004.png
**Date:** Monday, June 6, 2022 2:12:36 PM
**Subject:** RE: ***Attorney Client Priveildge*** UOF Twana Ahmed 04042022
**Cc:** McKinnon, Kareem; Gaussen, Matthew
**To:** Alyea, Katherine; Oliver, Wayne
**From:** Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com>

| **From:** | Alyea, Katherine on behalf of Alyea, Katherine <Katherine.Alyea@aus.com> |
|---|---|
| **To:** | Oliver, Wayne |
| **Subject:** | RE: Twana Ahmed |
| **Date:** | Monday, June 6, 2022 4:48:46 PM |
| **Attachments:** | image001.png |

You may want to call Alex to see if he can provide a statement as a witness.
Call me.

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Monday, June 6, 2022 4:41 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** Twana Ahmed

Spoke with Twana and he wants to rehired with Allied.  He states he has never seen a write up, and will be sending his statement to my email this evening.

Thanks,

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr.  | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

AUS 01219

| From: | Oliver, Wayne on behalf of Oliver, Wayne <Wayne.Oliver@aus.com> |
|---|---|
| To: | alexthexander247@gmail.com |
| Subject: | FW: signature |
| Date: | Wednesday, June 8, 2022 9:52:46 AM |
| Attachments: | 0937_001.pdf |
| | image001.png |

Here you go.  Is this your signature on the witness line?

Thanks,

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Oliver, Wayne
**Sent:** Tuesday, June 7, 2022 4:47 PM
**To:** Bergeron, Alexzander <Alexzander.Bergeron@aus.com>
**Subject:** signature

Hey Alex just reminding you about witness the statement needed.  I have attached the two Write ups on Mr. Ahmed, is that your signature on both forms?

Thanks,

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr.  | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: | wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

AUS 01064

| | |
|---|---|
| **From:** | Alexzander B on behalf of Alexzander B <alexthezander247@gmail.com> |
| **To:** | Oliver, Wayne |
| **Subject:** | Re: FW: signature |
| **Date:** | Wednesday, June 8, 2022 10:16:50 AM |
| **Attachments:** | image001.png |

No sir that is not my signature.


On Wed, Jun 8, 2022 at 9:56 AM Oliver, Wayne <Wayne.Oliver@aus.com> wrote:

Here you go.  Is this your signature on the witness line?


Thanks,


**Wayne Oliver Jr.**

Regional HR Rep

281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. Any and all rights to confidentiality and privilege are not waived, and are hereby specifically preserved. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, retention, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by return email or by telephone at the above number and delete the original message and its attachments from your system.


**From:** Oliver, Wayne
**Sent:** Tuesday, June 7, 2022 4:47 PM

APPENDIX 000645

AUS 01062

| | |
|---|---|
| **From:** | Oliver, Wayne on behalf of Oliver, Wayne <Wayne.Oliver@aus.com> |
| **To:** | alexthezander247@gmail.com |
| **Cc:** | Alyea, Katherine |
| **Subject:** | discipline forms |
| **Date:** | Wednesday, June 8, 2022 1:28:09 PM |
| **Attachments:** | 0937_001.pdf |

On the attached documents on Twana Ahmed are these your signatures as a witness?

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr. | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: | wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

AUS 01054

| | |
|---|---|
| **From:** | Alexzander B on behalf of Alexzander B <alexthezander247@gmail.com> |
| **To:** | Oliver, Wayne |
| **Cc:** | Alyea, Katherine |
| **Subject:** | Re: discipline forms |
| **Date:** | Wednesday, June 8, 2022 1:33:41 PM |
| **Attachments:** | IMG_0217.jpg |
| | image_123927839.JPG |

No sir this is not my signature. I have never signed any documents that way.

The two signatures i use are as follows.



This is the short form i use.



The long form of my signature is below my picture on my ID.

On Wed, Jun 8, 2022 at 1:28 PM Oliver, Wayne <Wayne.Oliver@aus.com> wrote:

> On the attached documents on Twana Ahmed are these your signatures as a witness?
>
> **Wayne Oliver Jr.**
>
> Regional HR Representative
>
> **Allied Universal**
>
> 2424 Wilcrest Dr. | Suite 200 | Houston, TX 77042
>
> C: 281-729-7121 | F: l wayne.oliver@aus.com
>
> www.AUS.com   TX License C15802
>
> **WORK SAFE. LIVE SAFE. BE SAFE.**
>
> This e-mail transmission and any documents, files or previous e-mail messages attached to it, are confidential and are protected by the attorney-client privilege and/or work product doctrine. Any and all rights to confidentiality and privilege are not waived, and are hereby specifically preserved. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, disclosure, retention, copying, dissemination, distribution or use of any of the information contained in, or attached to this e-mail transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify me by return email or by telephone at the above number and delete the original message and its attachments from your system.

AUS 01206

| From: | Oliver, Wayne on behalf of Oliver, Wayne <Wayne.Oliver@aus.com> |
| To: | Alyea, Katherine |
| Subject: | FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022 |
| Date: | Thursday, June 9, 2022 3:56:57 PM |
| Attachments: | Twana Ahmed UOF 04042022.pdf |
| | Root Cause Analysis (Ahmed 04042022).docx |
| | image001.png |
| | image002.png |
| | image003.png |

Hey he did provide a statement on Twana, check information below.  Do you want me to ask more direct questions about the beard and Ramadan and Alex's demotion?

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Saturday, June 4, 2022 1:47 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

ALCON,

Please see attachments.

Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by me or anyone on my Supervisory team.  We have had verbal counselings when I appeared at a worksite to do meetings with an ALPM, but I have never addressed anyone with racists overtones, or threatened an employee with physical harm or danger to themselves.  Furthermore, Twana Ahmed was terminated for the unauthorized detention of a suspected shoplifter regarding an inappropriate UOF incident that took place on 4/4/2022 when he forcefully pushed a suspected shoplifter against the wall PRIOR to leaving the store, applied handcuffs to the individuals' wrists behind his back, and then walked him outside the store to be handed over to the police.  Because Ahmed never allowed the subject to actually leave the store, the theft of merchandise never technically took place, and the police were not able to affect an arrest.  A Root-Cause Analysis was completed in reference to this incident, and a Panel deemed it appropriate for him to be terminated due to the fact that the actions taken by Ahmed were not authorized nor approved of by any training or instruction during his time with Allied Universal.

If you have any questions, please let me know.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
**License number: C15802**
Apply by phone! Text: Allied to 86754
There for our veterans **https://jobs.aus.com/veterans**
**www.AUS.com**

HE>i

---

**From:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Sent:** Thursday, April 7, 2022 12:39 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Hi HEB Team,

In reviewing the attached and speaking with Patrick, it is my recommendation that the officer be terminated.  Here are some highlights from the attached:

- SP signed UoF checkpoint in the field with FS on 2/14/22 (pictured below).
- SP knowingly violated the policy by restraining a shoplifter that was not a threat to the SP or the public.
- SP refused to complete a written statement and did not submit a HeliAUS report following the incident (activity, event or incident).
- SP refused to sign disciplinary counseling.

AUS 01194

APPENDIX 000649

AUS 00765

**From:** Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com>
**To:** Alvea, Katherine; Oliver, Wayne
**Subject:** Re: case 36184
**Date:** Thursday, June 9, 2022 5:41:17 PM
**Attachments:** image001.png

No apologies necessary Katherine. I understand. I am not certain of any other Supervisor that had a problem with Twana. I certainly didn't.

Wayne, right now, all support staff have left for the day. I will get either Clayton or Kenesha to retrieve his weapon turn-in sheet so that I can let you know exactly when he turned in his weapon on tomorrow. I will also respond to the specific questions that you asked at that time.

Patrick

Get Outlook for Android

**From:** Alvea, Katherine <Katherine.Alvea@aus.com>
**Sent:** Thursday, June 9, 2022 5:23:06 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>; Freeney, Patrick <Patrick.Freeney@aus.com>
**Subject:** RE: case 36184

Hi Patrick,

In his hotline complaint he speaks to a general supervisor, do you know who he is referencing? Sorry for the 20 questions, we are trying to address his allegations and close out his complaint.

Thanks,

**Katherine Alvea PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Thursday, June 9, 2022 3:59 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** Alvea, Katherine <Katherine.Alvea@aus.com>
**Subject:** case 36184

Afternoon Patrick,

In your email you stated Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by you or anyone on your supervisory team. Did you question Twana about his beard during Ramadan? And did you have issues with his language barrier and foreign name? Did you question his service in the military? Did Alex Bergeron get demoted from the UOF incident with Twana? When was Twana Terminated and when did he turn in his uniform and weapon?

| | |
|---|---|
| **From:** | Alyea, Katherine on behalf of Alyea, Katherine <Katherine.Alyea@aus.com> |
| **To:** | Oliver, Wayne |
| **Subject:** | RE: case 36184 |
| **Date:** | Thursday, June 9, 2022 4:12:48 PM |
| **Attachments:** | image001.png |

That's a whole lot of questions..

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Thursday, June 9, 2022 3:59 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** case 36184

Afternoon Patrick,

In your email you stated Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by you or anyone on your supervisory team. Did you question Twana about his beard during Ramadan?  And did you have issues with his language barrier and foreign name?  Did you question his service in the military?  Did Alex Bergeron get demoted from the UOF incident with Twana?  When was Twana Terminated and when did he turn in his uniform and weapon?

Please advise

**Wayne Oliver Jr.**
Regional HR Representative

**Allied Universal**
2424 Wilcrest Dr.  | Suite 200 | Houston, TX 77042
C: 281-729-7121 | F: | wayne.oliver@aus.com
www.AUS.com   TX License C15802

**WORK SAFE. LIVE SAFE. BE SAFE.**

| | |
|---|---|
| **From:** | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
| **To:** | Oliver, Wayne |
| **Cc:** | Alyea, Katherine |
| **Subject:** | RE: case 36184 |
| **Date:** | Friday, June 10, 2022 11:35:16 AM |
| **Attachments:** | image001.png |

Hi Wayne,

NO conversation was ever had about Twana's beard during Ramadan with him.  There was never a scheduling conflict that he ever presented to me concerning his religion that would have provoked a conversation of the sort.  During all of my conversations with Twana, there was never any confusion pertaining to his use of the English language, nor did I have an issue with his foreign name.  There was never any reason to question his military service….this topic never came up during any of my conversations with him.  Finally, Alex Bergeron was not demoted from this UOF incident, and Twana Ahmed is, nor was, in any position to take an active roll in the decision to have Alex returned to the field as a Security Professional.  Twana Ahmed was terminated upon the completion of a Root Cause Analysis and a Review Panel where all members agreed upon his association with Allied Universal on April 4, 2022.  He turned in his weapon on April 6, 2022.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
Apply by phone! Text: Allied to 86754
There for our veterans **https://jobs.aus.com/veterans**
www.AUS.com



HE>i

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Thursday, June 9, 2022 3:59 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** case 36184

Afternoon Patrick,

In your email you stated Twana Ahmed was never addressed in an inappropriate, unprofessional nor indignant manner by you or anyone on your supervisory team. Did you question Twana about his beard during Ramadan?  And did you have issues with his language barrier and foreign name?  Did



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Wednesday, June 15, 2022 8:22 AM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** Re: case 36184

Friday.

Regards,

Kareem McKinnon
Regional Vice President

Allied Universal
C: 832.687.9248

License #C15802

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 8:16:31 AM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Subject:** FW: case 36184

Good morning,
When is Patrick's last day?

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Friday, June 10, 2022 11:35 AM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

Hi Wayne,

AUS 01137

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # B24060601

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 8:55 AM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Subject:** RE: case 36184

Let me get with Wayne.
None of us are at the North office today.

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Wednesday, June 15, 2022 8:46 AM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

Ok. Can you do it today?

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # B24060601

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 8:24 AM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Subject:** RE: case 36184

We need to interview him concerning the falsification of the disciplinary.

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086

AUS 01136

AUS 01122

APPENDIX 00064

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Wednesday, June 15, 2022 2:59 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

I spoke with Alex and he states that Patrick has never been disrespectful.  But he does show a lack of regard towards officers and their personal life.

I've went through the SW's and the H and not coming up with anything that's related to how Mr. Ahmed said he was treated by Patrick.  Let me know if I am missing something.  This case seems like it is Patrick's word against Mr. Ahmed's word.

Thanks

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 8:25 AM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Subject:** FW: case 36184

Good morning,
What follow up questions do we need from Patrick?

**Katherine Alyea PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Friday, June 10, 2022 11:35 AM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Cc:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

Hi Wayne,

Are you at the North office tomorrow?

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Wednesday, June 15, 2022 1:48 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

Sounds good, thanks!

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # B24060601

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 1:47 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Subject:** RE: case 36184

I am trying to let Wayne handle it..
I'll update you shortly.
**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Wednesday, June 15, 2022 1:07 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

Katherine,
Dou want me to schedule this or will you handle?

APPENDIX 000655                                                    AUS 01135

**From:** McKinnon, Kareem, on behalf of McKinnon, Kareem < <Kareem.McKinnon@aus.com>
**To:** Alyea, Katherine
**Date:** Wednesday, June 15, 2022 1:55:58 PM
**Subject:** RE: case 36184
**Attachments:** image001.png
image002.png

Sounds good. See you then.

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # B24060601

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 1:55 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Subject:** RE: case 36184

Ok, I will probably see you there, I would prefer to speak to Patrick in person.

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Wednesday, June 15, 2022 1:54 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

I have a 10am meeting in the woodlands and will be in the office after that.

**Kareem McKinnon**
Regional Vice President

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # B24060601

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 1:49 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Subject:** RE: case 36184

| From: | Alyea, Katherine on behalf of Alyea, Katherine <Katherine.Alyea@aus.com> |
|---|---|
| To: | Oliver, Wayne |
| Subject: | RE: case 36184 |
| Date: | Wednesday, June 15, 2022 3:59:57 PM |
| Attachments: | image001.png |
| | image002.png |

Ok, I'll see you there tomorrow.

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Sent:** Wednesday, June 15, 2022 3:33 PM
**To:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Subject:** RE: case 36184

Yes the write ups.  I have a eye appointment at 930 tomorrow should I join you at the north office?

**Wayne Oliver Jr.**
Regional HR Rep
281-729-7121



**WORK SAFE. LIVE SAFE. BE SAFE.**

---

**From:** Alyea, Katherine <Katherine.Alyea@aus.com>
**Sent:** Wednesday, June 15, 2022 3:16 PM
**To:** Oliver, Wayne <Wayne.Oliver@aus.com>
**Subject:** RE: case 36184

That is true that it is a he said he said. What about the write ups?
Alex stated that he did not sign or witness them. I am going to the North office to discuss with Patrick tomorrow.

**Katherine Alyea  PHR, SHRM-CP**
Senior Regional HR Manager
713-321-0086



**WORK SAFE. LIVE SAFE. BE SAFE.**

APPENDIX 000657

AUS 01121

# Exhibit 15

# Patrick Freeney text — quitting

Patrick Freeny

Gentlemen,

It has been my extreme pleasure having had the opportunity to work for such an amazing organization such as this. Effective today, please accept my 2 weeks notice to vacate the Elite Client Manager position. My last day with the company will be June 17.



Received. Sorry to hear this news Patrick. Thank you for everything.

Patrick Freeny

You're very welcome.

AUS 001908

# Exhibit 16

# Patrick Freeney separation form

 (https://my.aus.com)

# Personnel Action Notice Admin Staff Separation: PANS2022-0617-2960

**Submitted By**

Katherine Alyea

**Submitted On**

Friday, June 17, 2022 6:09 PM

**Subject**

SEPARATION- 9345448-Freeney

**Selected Stakeholders**

Kareem McKinnon

## Details

**Employee Number:**

(9345448) Patrick Freeney

**State:**

TX

**Employee Name:**

Patrick Freeney

**Separation Type:**

Voluntary

## Attachments

| File Name | Description | Type |
| --- | --- | --- |

APPENDIX 000661    AUS 001906

| SPAN- Patrick Freeney.xlsx (https://my.aus.com) | SPAN- Patrick Freeney | PAN Separation Form | Open (/Attachments/OpenFile/1848665) |
|---|---|---|---|
| Patrick Freeney Resignation Text.pdf | Patrick Freeney Resignation Text | Attachment | Open (/Attachments/OpenFile/1848666) |

## Request History

| When | Added By | Notes |
|---|---|---|
| Over a year ago | Katherine Alyea | Please process- EE did not complete two weeks notice |
| Over a year ago | Larry Brown | Your separation is Complete. There was no payment needed at this time. No Vacation hours were owed. This employee will receive their final wages on their next check for weekending 06/23/22, dated 06/30/22.<br><br>If this employee was a **"Supervisor"** on a job(s) or for Admin/Salary Support personal- additional steps will need to be taken.  To update the **"Supervisor"** information on the Job level- submit a **General Inquiry** to the Contract Accounting team, provide the list of all job numbers impacted and the name of the replacement Supervisor. if this individual was a **"Supervisor"** for Admin/ Salary Support personal submit a **General Inquiry** to HR Transaction Processing team with the replacement Supervisor name. |

## Request Action History

| When | Actioned By | Action Taken |
|---|---|---|
| Over a year ago | Katherine Alyea | Request Submitted |
| Over a year ago | Larry Brown | Complete Request |

APPENDIX 000662

AUS 001907

# ALLIED**UNIVERSAL**

**Personnel Action Notice (Separation)**

| | |
|---|---|
| Employee Number: 9345448 | Date of Submission: 6/17/2022 |
| Job Number: 11361 | Branch/Location: Houston Commercial |
| Employee Name: Patrick Freeney | Supervisor: Don Massey |
| Employee Address: 17011 Colt Creek Dr Humble, TX 77346 | Employee Title: Client Manager |
| | Final Rate of Pay: $2,307.69 |
| | Date of Hire: 11/29/2021 |

**Eligible for Rehire:** ☐ YES  ☑ NO

**SEPARATION DATE:** Please refer to the "Guide-Determining Separation Date" tab to complete the accurate/official Separation Date below. Please contact your Region HR Director or Corporate Human Resources for any situation that is not described in the Guide tab and/or for clarification.

| | |
|---|---|
| SEPARATION DATE: | 6/18/2022 |
| LAST DAY WORKED: | 6/17/2022 |
| TWIC Reimbursement: | ☐ YES  ☐ NO |
| Enter $ Amount: | |

**SEVERANCE - PLEASE NOTE:** All severance packages MUST be discussed and pre-approved by the Corporate Vice President of Human Resources. If approved, the Legal Department will be notified to create the severance agreement. A Personnel Action Notice (Separation) must still be completed.

| | |
|---|---|
| Uniform Returned: | ☐ YES  ☑ NO |
| Billable Vacation: | ☐ YES  ☑ NO |
| If Yes, Complete "Vacation Bill Back" Tab | |

**IMPORTANT:** Your state may be mandated by law to issue final pays prior to next payday depending upon involuntary or voluntary separation. Please refer to the "Final Pay Requirements" tab and complete the "Check Request" tab dependent upon your specific state requirements.

## REASON FOR SEPARATION (Choose One)

**VOLUNTARY:**  Notice Given By Employee: ☐ YES  ☐ NO    Date of Notice: _____

| | | | |
|---|---|---|---|
| ○ Another Job | ○ Exhausted Leave of Absence | | ○ School Conflict |
| ○ Hired by Client | From: Personal Reason(s)  To: _____ | | ○ Transfer/Hours Problem |
| ○ Hired by New Vendor - AUS lost account | ○ Relocation | | ○ Unable to Contact Employee for Work |
| ○ Conflict with Full Time Job | ○ Refused Drug Test | | |
| ○ Deceased | ○ Refused Work (Job Offer form) | | |
| ○ Due to Demotion | ○ Retired - Voluntary | | |
| ● Job Abanonment-EE failed to maintain contact | | | |

**INVOLUNTARY:** ●

| | | |
|---|---|---|
| ○ Abandoned Post | ○ Failure to Provide Info/Invest | ○ Sleeping/Dozing while on duty |
| ○ Accepting Gift/Bribe | ○ Falsified Company Documents | ○ Smoking/Eating |
| ○ Criminal Record | ○ Gross Misconduct | ○ Soliciting |
| ○ Disclosure of Confidential Information | ○ I-9 Ineligible | ○ Theft |
| ○ Discourteous | ○ Inability to Perform Job Duties-lack skill/knowledge | ○ Unauthorized Entry |
| ○ Disorderly Conduct/Fighting | ○ Inappropriate Post/Altering Notices | ○ Unauthorized Persons Allowed |
| ○ End of Employment Contract | ○ Inappropriate Use of Time/Equipment | ○ Unauthorized Surveillance |
| ○ End of Seasonal/Temporary Assignment | ○ Insubordination | ○ Under the Influence of Drugs/Alcohol |
| ○ Entered Unauthorized Area | ○ License/Work Permit/Visa | ○ Unprofessional Conduct |
| ○ Excessive Absenteeism and/or Tardiness | ○ Location Closed | ○ Violation of Company Policy |
| ○ Failed Drug Test | ○ Misuse of Client/Company Property | ○ Violation of Uniform Standards |
| ○ Failure to Complete Reports | ○ Mutual Agreement - No Misconduct | ○ Willful Misconduct |
| ○ Failure to comply with job requirements | ○ No-Call/No-Show | |
| ○ Failure to Respond to Beeper | ○ Position Elimination | |
| ○ Failure to do Patrols | ○ Possession of Drugs/Alcohol on the Job | |
| ○ Failure to Provide Doctor's Note | ○ Possession of Unauthorized Weapon | |

**PAY** Week Ending:

| Job # | Hour Type | # Hours | Rate |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Other Earnings**

| Job # | Hour Type | # Hours | Rate |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**TERM** Week Ending:

| Job # | Hour Type | # Hours | Rate |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Special Handling Information**

APPENDIX 000663

AUS 001909

# Exhibit 17

# list of Allied Elite security officers,
# including Raymond Rodriguez,
# dated March 6, 2022

| | |
|---|---|
| **From:** | Zepeda, Mauricio on behalf of Zepeda, Mauricio <Mauricio.Zepeda@aus.com> |
| **To:** | Freeney, Patrick; Hernandez, Nathan; Bergeron, Alexander; Parham, Patrick |
| **Subject:** | Re: Urgent HEB Elite Safety Stand Down Sessions |
| **Date:** | Sunday, March 6, 2022 1:48:00 PM |
| **Attachments:** | image001.jpg |
| | image004.jpg |

Sounds good will do

Mauricio Zepeda

Field Supervisor

Allied Universal

11811 North Freeway | Unit 810 | Houston 77060

C: +1 (281)-347-1517 | mauricio.zepeda@aus.com

License # C15802

---

**From:** Parham, Patrick <Patrick.Parham@aus.com>
**Sent:** Sunday, March 6, 2022 1:44:34 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Hernandez, Nathan <Nathan.Hernandez@aus.com>; Bergeron, Alexander <Alexander.Bergeron@aus.com>; Zepeda, Mauricio <Mauricio.Zepeda@aus.com>
**Subject:** Re: Urgent HEB Elite Safety Stand Down Sessions

Will do, thank you.

Sent via the Samsung Galaxy S9, an AT&T 5G Evolution capable smartphone
Get Outlook for Android

---

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Sunday, March 6, 2022 1:38:41 PM
**To:** Hernandez, Nathan <Nathan.Hernandez@aus.com>; Bergeron, Alexander <Alexzander.Bergeron@aus.com>; Zepeda, Mauricio <Mauricio.Zepeda@aus.com>; Parham, Patrick <Patrick.Parham@aus.com>
**Subject:** Fwd: Urgent HEB Elite Safety Stand Down Sessions

See the attachments and the email chain.  We've got to get the documents uploaded into WT yesterday.  Please acknowledge receipt and have all of your officers sign the document.  If you have any questions please let me know.

Patrick

Get Outlook for Android

---

**From:** Westman, Mark <Mark.Westman@aus.com>
**Sent:** Sunday, March 6, 2022 12:20:29 PM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>; Don Massey <Don.Massey@aus.com>; Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** FW: Urgent HEB Elite Safety Stand Down Sessions

Hi Patrick.

I'm neck deep into the UOF audit in WT, and see that none of your officers (so far) have a signed checkpoint acknowledgement form uploaded into the system.

It looks like some of the supervisors went over the form in the field, or during the mandatory safety stand-down we had in early February,  and I'm hoping they have all the signed documents on hand (or that you have them). If so, it's just a matter of going back in and uploading them using the attached instructions.

Just FYI, quick compliance entries will not give us the data needed for proper compliance. Let me know if you have any questions. I'm here to assist.

Thank you!

Respectfully,

**S. Mark Westman- US Navy Vet**
Client Portfolio Director

AUS 01068

**Allied Universal Security**
3355 Cherry Ridge | Suite 200 | San Antonio, TX 78230
Cell / EPTT: 210-906-0591
mark.westman@aus.com



| BM/GM | AOW | EE# | EE Name | PayRate | UoF Paper Attachment | Notes |
|---|---|---|---|---|---|---|
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 6985287 | Alexzander Bergeron | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9191447 | Martin hernandez | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9304146 | Mauricio Zepeda | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9327760 | Patrick Parham | | No | Needs signed conf |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9285758 | Nathan Hernandez | | No | Needs signed conf |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9209180 | Stephen Garza | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9365165 | adrianne dewberry | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9370352 | Toby Thompson | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9370401 | NICHOLAS HATCHER | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 716575 | Curtis Wesley | | No | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 2681525 | Heather Rome | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9251546 | Raymond Rodriguez | | No | Needs signed conf. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9264319 | Derek Gonzalez | | No | Does not look like HEB. |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9273262 | Sterlin Hector | | No | FB? |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9369812 | Colin Jemison | | No | Needs signed conf uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9370982 | Jose Santana | | No | Needs signed conf uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9377342 | Matthew Holt | | No | Needs signed conf uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 6928822 | ANTHONY ILOCHI | | No | Needs signed conf. uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9247454 | Sean Whitney | | No | Needs signed conf. uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 227468 | Shakeria Radden | | No | Needs signed conf. uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9322290 | SAYE QUEEGLAY | | No | Needs signed conf. uploaded |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 6924675 | JYRONICA THOMAS | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9082702 | Rolande Morris | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9176503 | Kellen Powell | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9335396 | Luis Barba | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9341687 | GREGORY WILSON Jr | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9341699 | Brandon Confair | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9225987 | Jeremiah Ritzenthaler | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9337136 | Jeff Wachira | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9342864 | Leonard Torres | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9319214 | Bernard Yi | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9343419 | Jonathan Linares | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 633212 | JOSEPH CARRIER | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9310004 | Roberto Longoria II | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9319169 | Rodney Asquith | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 6949183 | DAVID GEORGE | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9323092 | William Higdon | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9305650 | Nathan Jordan | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 590904 | Steven Jackson | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9354570 | Joshua Dixon | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9321091 | Richard Welch | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9321623 | Christopher Douglas | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9337127 | David Lee | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9313659 | Daryl Boone | | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 817086 | Javen Bieniemy | | | |

APPENDIX 000666

AUS 01069

| | | | | | | |
|---|---|---|---|---|---|---|
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9193666 | Chris Carrillo | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 6997807 | CHRISTOPHER HODGES | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9307770 | WILLIAM BOYCE | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9346436 | Christian De Los Santos | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9328252 | Caleb Bridges | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 115956 | Anthony Hardeman | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 543080 | Barry Jones | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 787086 | Rochan Harris | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9132827 | JOHN TURNER | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9300030 | Samuel Mendoza | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9307853 | Edward Marigny | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 156550 | Michael Reese | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9352791 | Twana Ahmed | $21.00 | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9293070 | Jamaine Boyd | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9358826 | MIKE RODRIGUEZ | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9159327 | Martin Perez | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9339072 | Joseph Bernardez | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9172355 | Ernesto Rangel | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 203512 | Clarence Young Iii | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9311820 | Tanner Loos | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 285281 | Raj Sinha | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9295456 | Ja'Kendrick Davison | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 515503 | Jomel Wade | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9319779 | Franky Mattei Ayala | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9330822 | Nicholas Drake | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9327119 | Gerald Kirk | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9321622 | Dustin Maynard | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9301212 | Giovanni Garcia | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9313247 | Christopher Robinson | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9324701 | CHRISTIAN CURCIO | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 203460 | Patrick Price | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9320478 | Gabriel Rivera | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Gaussen, Matthew) | 9311756 | Donnell Stephens | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9351469 | Sebastian Almaguer | ███ | | |
| CE: TX Houston (Massey, Donald) | CE: AOW (Freeney, Patrick) | 9062152 | Damaso Mota | ███ | | |

**From:** King, Bill <Bill.King@aus.com>
**Sent:** Sunday, February 6, 2022 11:20
**To:** Don Massey <Don.Massey@aus.com>; Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>; Fortune, William <William.Fortune@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Cc:** Barnett, Michael <Michael.Barnett@aus.com>; Rekow, Dave <Dave.Rekow@aus.com>; McKinnon, Kareem <Kareem.McKinnon@aus.com>; Nagy, Justin <Justin.Nagy@aus.com>; Grant, James <James.Grant@aus.com>
**Subject:** Urgent HEB Elite Safety Stand Down Sessions
**Importance:** High

Don, Felicia, Robert – I am emailing to ask for your help with some immediate actions that are needed. Dave, Kareem and I have determined that we need to have a 2-hour Safety Stand-down in person session with all Elite officers between this Tuesday and Friday. Please be sure that you are able to facilitate at least the first 3 as our messaging has to be clear and consistent. Client/Service Managers should be present at each on along with 1-2 Field Supervisors.

# APPENDIX 000667

The HEB Command Center team will be jumping in to help identify good slots around your schedule and store working hours.

Here is a draft agenda – it may change and the final will be published on Monday.

**Safety Stand Down Agenda**

- **We care about your safety and do not want you to end up in trouble or in trouble with the law.**
- **Incident overview** (SP's are risking their safety and freedom)
  - Domestic disputes
  - Theft stops
  - Store leaders demanding action
  - Belligerent people
  - Store leaders demanding action
  - Using force to save groceries
- **How to stay safe and out of criminal trouble**
  - Always keeping 6-7 feet
  - Determining that immediate harm is occurring or will absolutely occur
  - Always detaining after going hands on
- **Re-signing of the UoF police Acknowledgement**
  - Please read through each item as a group (give examples of what this means at HEB) and have the employee check and initial
  - Please then upload to WT using the attached instructions

**Bill King**
Regional Vice President

Allied Universal Security Services
3355 Cherry Ridge St. | Suite # 200 | San Antonio, Texas 78230
C: 346.802.8305 | bill.king@aus.com
www.AUS.com | Blog | View my LinkedIn



# Exhibit 18

# Allied Incident Reporting & Response Policy

# Incident Reporting & Response
## Tab 07

**PURPOSE**

To provide direction for reporting and responding to incidents involving employee injury, vehicle damage, and near miss incidents.

**SCOPE**

This program outlines procedures for reporting, investigating and responding to incidents that result in, or could have resulted in personal injury and or property damage. Prompt reporting of incidents and thorough response will aid in determining the root cause of an incident and establishing corrective actions to prevent future incidents.

This program details the responsibilities of management, per federal law, to report certain types of severe incidents to OSHA within 8-hours of the occurrence.

**APPLICATION**

This program applies to all Allied Universal (AUS) offices and sites.

**RESPONSIBILITIES**

**Management:**

- Oversee program implementation so that incidents are reported and responded to in accordance with these guidelines.
- Manage compliance with this process and the corporate Whistleblower Protections policy so that no employee reporting a safety incident is subject to retaliation for doing so.
- Review incident responses for accuracy and verify timely completion of action items.
- Report all fatality or severe injury/illness events, per direction of this section, promptly to the Corporate Safety Management Team and then the local OSHA office.

**Managers/Supervisors:**

- Establish incident reporting procedures for the site and provide instruction to all employees on when and how to report a Near Miss, Injury, Illness or Vehicle Collision. Receive these reports and respond to incidents without retaliating against employees, as detailed herein and in the corporate Whistleblower Protections policy.
- Immediately report all fatality or severe injury/illness events up the management chain of command.
- Report all work-related Near Miss, Injury or Illness incidents and Vehicle Collisions to the Third Party Administrator (or monopolistic state organization) within 48 hours of receiving notification of the event; and to the client per local requirements.
- Report all vehicle collisions through the AUS vehicle accident process.
- Complete the Incident Reporting & Response training module(s) on the EDGE and be familiar with the corporate Whistleblower Protections policy.
- Conduct an incident response as described herein.
- Complete all assigned Corrective Actions within the specified time-period.



APPENDIX 000670

© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/13/19

# Incident Reporting & Response
# Tab 07

**Employees:**

- Report all Near Miss, Injury, Illness and Vehicle Collision incidents promptly– before the end of the shift in which the incident occurred.
- Cooperate and take part in the incident investigation process.
- Offer input as to how an incident could have been prevented for ongoing safety improvement.


## DEFINITIONS

**Employee Fatality –** Any situation which results in the death of an Allied Universal employee, including all heart attack deaths; the cause/circumstances of death (work-relatedness) should not be considered for OSHA reporting purposes.

**Immediate Cause –** The event or condition that directly led to the incident.

**Near Miss –** Incident, action or hazard encountered in the workplace which does not result in an injury, property damage, vehicle damage or other loss, but had the potential to do so.

**Root Cause –** The underlying reasons for why the immediate cause(s) existed.

**Severe Incident –** For OSHA reporting purposes, a severe incident is any incident resulting in a work-related fatality, in-patient hospitalization, amputation or loss of an eye of one or more employees.

> For internal investigation purposes, this definition should also include any incident that did or could have limited someone's ability to perform their normally assigned job duties, significant property damage or loss, or major deviation from accepted safe practices that could expose the company to liability.

**Solution Team –** The Solution Team is a small group of company representatives who gathers to complete the root cause analysis. The solution team includes a minimum of three people: the supervisor of the involved employee and the manager of that supervisor, and a subject matter expert (SME). Whenever possible the SME will be the involved employee; when the involved employee is not able to participate they may be replaced on the team by another employee who completes the same task/ job. The Solution Team will determine if any additional people should be invited to join the team on as needed.

**Vehicle Collision –** Incident which results in property damage, vehicle damage, or injury to a person, involving a licensed motor vehicle

**Work-related –** Any incident which occurs within the course and scope of employment.



APPENDIX 000671

© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

# Incident Reporting & Response
# Tab 07

**I.   INCIDENT REPORTING REQUIREMENTS**
   **A. Reporting Procedures for Employees and Supervisors**
   **B. Reporting Safety Concerns**
   **C. OSHA Notification of Severe Incidents**

**I.A.   Each site will establish an Incident Reporting procedure, which will outline:**

- Names of people who will receive incident reports, and how to contact each.
- Instructions for how to report incidents. Sites are encouraged to utilize Appendix 7.2, the Employee Incident Report Form to document incident reports.
- Off-hour reporting procedures, if these differ from routine reporting procedures.
- Supervisors/ Managers are responsible to inform each employee of their right to report a safety incident and of the reporting procedures in place initially upon the employee's assignment to the site and when the reporting procedure is modified.

**All employees will promptly report injuries, vehicle collisions, and/or near miss events to their manager/supervisor.** In most cases this will be done immediately, but in some situations this notification may be slightly postponed. In ALL situations, these events will be reported before the end of the shift in which they occur.

Employees may use the Employee Incident Report Form (Appendix 7.2) to document and report an incident. The employee statement providing a description of what happened is the first piece of information the investigator will have to begin the investigation phase of the response.

Every employee has the right to report a safety incident without fear of retaliation.  See the corporate Whistleblower Protections policy for further details.

**Upon notification of an injury, vehicle collision or near miss event, supervisors/managers will:**

- Promptly eliminate or guard access to hazards in the area where the incident occurred, to reduce risk to others.
- Discuss with the involved employee if medical care is needed. The employee may self-administer First Aid, First Aid care may be administered by a certified person, or off-site care may be sought. When off-site medical care is needed, supervisors/managers will provide employees with a list of local Panel Physicians (found on the internal SharePoint site), per state requirements.
- Report the incident to the client, per local procedures and contract requirements.
- Report all incidents to the Third Party Administrator (TPA) by phone or via monopolistic state specific requirements. The First Report of Injury form will be used to document necessary information prior to the call. The phone number for TPA is listed at the top of this form. This notification should be made by the end of the shift in which the incident is reported, but never later than 48 hours after the incident report.
  - Monopolistic States include:  Ohio, North Dakota, Washington, Wyoming


APPENDIX 000672

© Allied Universal Security Services; Universal Protection Service, LP. All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

# Incident Reporting & Response
## Tab 07

- Report all vehicle collisions, regardless of vehicle ownership, through the AUS vehicle accident reporting process.  This means that vehicle collisions are also reported to the TPA as a Near Miss if no injury resulted.

### I.B.     Methods to Report Safety Concerns (and Safety Incidents)

Employees with safety concerns can communicate with their site supervisor/manager, local Human Resource representative or send safety questions/concerns to safety@aus.com.  If further support is needed employees can also call **Allied Universal Employees First at 1-800-461-4330 in the United States, or at +1-720-514-4400 outside of the United States,** or make an anonymous report online at http://employeesfirst.aus.com if at any time when they:

- Do not feel comfortable contacting the designated supervisor;
- Do not feel your concern was appropriately addressed;
- Do not have the contact information for the appropriate person;
- Have not received a response to your concern within 10 business days.

Employees can make this call 24 hours a day, 7 days a week anonymously; however, providing a name will allow a more direct and personal response. The sole purpose of the Hotline is to get the concern to the appropriate person so that the issue can promptly be resolved.

Nothing in this manual prohibits employees from reporting possible violations of federal, state or local law or regulation to any government agency or entity and any agency inspector general, or making other disclosures that are protected under the whistleblower provisions of federal, state or local law or regulation.  While Employees are encouraged to bring any such possible violation to the attention of Allied Universal. Employees do not need the prior authorization of Allied Universal to make any such reports or disclosures to these entities.

In the event that an employee is unable to report an incident using the site reporting process, or is uncomfortable reporting a safety incident to their supervisor/manager, they may report such an incident via The SECURITY VIOICE HOTLINE, as described above.  Employees are encouraged to first use the established reporting process for their site and only report safety incidents via the hotline as needed.

### I.C.     OSHA Notification Requirements

**In the event of an employee fatality or severe injury/illness, management must provide prompt notification to the nearest OSHA office.**

**Upon notification of an employee fatality or severe injury/illness, supervisors/ managers will:**
- Immediately make notifications up the organizational chain of command. Prior to notifying OSHA, someone in the regional management team will notify the corporate Legal Service Group and Corporate Communications of the situation.
- Determine with upper management if and how notification will be made by an Allied Universal representative to the employee's emergency contact(s), to the media, and/or to the client.


APPENDIX 000673

© Allied Universal Security Services; Universal Protection Service, LP. All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

# Incident Reporting & Response
# Tab 07

- Provide prompt notification of a severe incident to the appropriate state or federal agency within the required time period.
- **Federal OSHA Notification:** Make notification to the local area OSHA office, or call 1-800-321-6742, as detailed in the below table. At the completion of the call request and document the name of the person you spoke with.

| TYPE OF SEVERE INCIDENT | Federal OSHA | | California Cal/OSHA | | Other State Plans** |
| --- | --- | --- | --- | --- | --- |
| | Scope | Deadline | Scope | Deadline | |
| Amputation of any body part | Work-related only | Within 24 hours | All severe incidents, including non-work related events must be reported.

California additionally requires notification of any 3rd degree burns and any permanent disfigurement/ disability. | Within 8 hours | Verify state-specific requirements as they may differ slightly from Federal OSHA Reporting requirements. Visit www.osha.gov/dcsp/osp/ for details |
| Hospitalization of 1 or more employees | Work-related only | Within 24 hours | | | |
| Loss of an Eye | Work-related only | Within 24 hours | | | |
| Fatality – other than those detailed below | Work-related only | Within 8 hours | | | |
| Fatality resulting from a heart attack | Report all | Within 8 hours | | | |
| Fatality resulting from a motor vehicle collision | No report required | N/A | | | |
| Fatality resulting from a suicide | No report required | N/A | | | |

- **\*\*Other State Plans:** Operators in the following states must consult state-specific requirements for fatality/severe incident reporting, which may differ slightly from Federal OSHA requirements.  Visit www.osha.gov/dcsp/osp/ for details:

  Alaska, Arizona, California, Connecticut, Hawaii, Illinois, Indiana, Iowa, Kentucky, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Puerto Rico, South Carolina, Tennessee, Utah, Vermont, Virgin Islands, Virginia, Washington, Wyoming.

**Note: in California non-work-related events which occur in the workplace must be reported**. Make notification as soon as possible, but within 8 hours.  At the completion of the call request and document the incident case number and/or identification number of the representative who received the report.



APPENDIX 000674

© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

# Incident Reporting & Response
# Tab 07

II. **INCIDENT RESPONSE**
   **A. Incident investigation,**
   **B. Root cause analysis and**
   **C. Corrective actions**

The purpose of an incident response is to gather facts about the incident so a root cause analysis and corrective actions may be implemented to prevent reoccurrence; not to identify fault or blame. An investigation which seeks to identify fault or blame is counterproductive and not in line with the company safety culture.

The investigator(s) will gather facts, to identify all potential causes, working without assumption or bias. The Solution Team will use this information to determine what corrective actions may be implemented to prevent reoccurrence. Allied Universal training on the responsibilities and process of how to conduct this phases of the incident response will be available on the Allied Universal **EDGE**.

All incidents, including Near Misses, will be responded to as soon as possible. The response to severe incidents will be initiated within 24 hours from the time the incident was reported. Local management will determine if a non-severe Near Miss report warrants a full response and involvement of a Solution Team or if the issue can be adequately responded to by an individual Manager/ Supervisor.

**II.A.  Incident Investigation Process**
An incident investigation is conducted to collect information about the incident and gain an understanding of what and how the incident occurred.  The steps of this process include:

   1. Survey the Scene
   2. Conduct Interview(s)
   3. Document the Facts

The following incident response procedure will be used, unless the client requires a local equivalent investigation process to be used:

**1. Survey the Scene:**

- Whenever possible the investigator will visit the location where the incident occurred. If this is not possible, photos will be taken at the scene to evaluate the physical conditions of the area. The investigator should survey for any/all factors that could contribute to the incident.
- Eliminate or guard against hazards in the area where the incident occurred to reduce risk to others in the area.  Any hazardous conditions shall be reported to the client or property owner.
- For serious incidents, evidence related to safety incidents will be collected, preserved and secured.



© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

# Incident Reporting & Response
## Tab 07

**2. Conduct Interviews:**

- A Human Resources representative or local manager will interview the employee(s) involved in the incident in a manner that conveys concern for the employee and with a goal to fix the problem that caused the incident. This is achieved through use of open-ended questioning and active listening skills.
- Ask questions that lead to facts, while avoiding opinions. Finish the interview by asking 'how do you think this incident could have been prevented?'
- Some incident investigations may involve additional interviews, including witnesses, or others with related work, etc.
- Interviewing employees after an incident can be difficult. Employees may be uncooperative if they are afraid of ridicule, worried about creating a bad impression, or concerned about disciplinary action. The following guidelines will help the investigator conduct a productive interview:
- Show concern for the employee's injury, no matter how minor.
- Explain the investigation process and that the goal is to understand what happened in order to prevent a future similar incident from occurring.
- Use a friendly/ cooperative approach.
- If possible, discuss the incident at the scene.
- Get the injured employee's story before asking questions.
- Check your understanding of the story.
- Listen carefully. Avoid interrupting.
- Use tact in clearing up discrepancies in employee's story.
- Avoid sarcasm, blame and threat.
- Discuss ways to prevent a recurrence.  Ask the involved/ affected employees for their suggestions.
- Avoid using the word 'why' when asking what people did. (It causes people to justify and defend their actions.)

**3. Document Facts:**

- Investigators will use the Incident Investigation Form (Appendix 7.1) to document the results of the investigation.
- Other documentation including notes, photos, etc. will be retained on file.
- Facts to be sought include (but are not limited to):
  - Who was involved?
  - What happened?
  - When and how did the event take place?
  - Did the employee complete the JSA Acknowledgement form upon assignment?
  - When was the JSA last updated,
  - What procedures applied to the work activity?
  - What equipment and/or PPE was used?
  - What related training was completed prior to the incident?
  - What (if anything) was abnormal prior to the incident?
  - What hazards were present, etc.?


APPENDIX 000676

© Allied Universal Security Services; Universal Protection Service, LP. All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

# Incident Reporting & Response
## Tab 07

- Photographs or video recordings should be utilized as necessary in conjunction with investigations of incidents involving personal injury, property damage (including motor vehicles), equipment or material failure, and all incidents that may even remotely involve third party action or omission. This builds defenses against liability claims.


- Photographs should be sufficient in number to adequately reflect the general area as well as pertinent details from a variety of angles. It is better to take too many than not enough. Photographs should be taken as soon as possible following the incident. Identify each print on its reverse side as follows:
  - Name of injured (if equipment damage, type; if property damage, location)
  - Date of incident
  - Photographer's name
  - Time photographs taken (date, if different from occurrence)
  - Direction facing and
  - Brief description of photo (i.e., what it shows)

## II.B.    Root Cause Analysis Process

The Analysis and Follow-up stage of the response is used to evaluate the underlying causes which can be addressed to prevent reoccurrence.

A Solution Team will be assembled to use the Fishbone (Ishikawa) method of Root Cause Analysis (RCA) to analyze what factors contributed to cause the incident.  The Solution Team will remain open-minded to the fact that more than one line or cause may result from this process.

**Conduct the Fishbone Root Cause Analysis:**

This process is used to identify the underlying causes of the incident, not the immediate causes. The purpose of conducting the RCA is to determine what system or process failed so that this incident could occur.  A RCA which points directly and solely to an employee behavior or error as the root cause of the incident should not be accepted without review by upper management.

Solution Team members will receive training on the Fishbone RCA process via the Incident Investigation module(s) on the EDGE.  Together the Solution Team will:

Step 1:     Write the problem statement.  This is a brief description of the negative outcome resulting from the incident being analyzed. The major categories (fish bones) will include: Environment/ Materials, Equipment, Process/ Management and People.

Step 2:     Brainstorm all possible causes, asking "why did this happen?" The list of questions (provided in Appendix 7.3) for each major category is a starting point, but the Solution Team is encouraged to consider other potential causes.  Sub causes will be added to the fishbone and causes.

© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19



APPENDIX 000677

# Incident Reporting & Response
## Tab 07

Step 3:      The Solution Team will write possible issues that contributed to the incident on the appropriate fish bone.  For each item noted the team will dig deeper through questioning to analyze how that issue contributed to the incident and what caused that issue.

Step 4:      The Solution Team will select between one-to-three causes from Step 3, ranking these in priority from the most significant to least significant issue that contributed to cause the incident.

**Determine Causes:**

The Solution Team will determine the Immediate and Root Causes for the incident. Even simple incidents may have multiple causes. Causes will be determined through the ranking process in step 4 of the RCA; there is no limit to how many causes may be identified. The purpose of identifying these causes is to generate improvement recommendations and effective corrective actions.

**II.C.    Implement Corrective Actions**

A repeat of the incident can be prevented when the underlying causes of an incident are identified and adequately addressed.

The Solution Team will propose corrective actions for each cause identified. Each corrective action will be assigned to an individual for implementation, to be completed as soon as possible following the incident. A due date shall be assigned to each corrective action and the resolution and date documented.

It is the responsibility of local management to manage this process and hold individuals accountable to complete the assigned corrective actions in a timely manner.


APPENDIX 000678

© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19
ALU8.00.023

# Exhibit 19

# Allied emails discussing Patrick Freeney's use of force report about Twana Ahmed

| | |
|---|---|
| **From:** | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
| **To:** | Force |
| **Cc:** | Gaussen, Matthew |
| **Subject:** | Twana Ahmed Use of Force (04042022) |
| **Date:** | Tuesday, April 5, 2022 2:37:13 PM |
| **Attachments:** | Twana Ahmed UOF 04042022.pdf |
| | image001.png |

ALCON,

See attached for the UOF incident that occurred on 04/04/2022.  Please contact me using the information provided below if you have any questions.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
www.AUS.com



HE>i

# Use of Force and Reporting Policy; Use of Force Report Form

**DATE ISSUED:**       **02/28/2005**
**DATE REVISED:**      **08/19/2021**

## Use of Force Incident Report

*Instructions*:  Security Professionals are required to complete this report within 24 hours of any incident involving the application of force as defined in the Allied Universal Firearms and Use of Force Policies.  Additionally, this form is to be forwarded by the Account Manager or Field Operations Manager over the Security Professional involved in the event to the Legal Services Group (force@aus.com) with copies to the supervisor's management chain (i.e. BM, RVP, RPs).
 If a firearm was discharged, do not complete this form; complete the *Preliminary Report of Firearm Discharge*.

| April 4, 2022      1945 | Filed: Report number unknown |
|---|---|
| Date and Time of Report: | Police Report No. (if known): |
| April 4, 2022    1730hrs | Houston, TX 77401 |
| Date and Time of Incident: | Location of Incident: |
| HEB (Store 738) | 204376 |
| Customer/Site Name | Job No. |
| Houston | Houston, Texas |
| Branch | Region |

Identity of all Allied Universal personnel involved:

SP Twana Ahmed EE# 9352791

Identity of Person(s) Restrained, Detained, or otherwise subject to Use of Force:

1 male, identity unknown.

CONFIDENTIAL AND PRIVILEGED
PREPARED AT THE REQUEST OF THE ALLIED UNIVERSAL LEGAL
DEPARTMENT

APPENDIX 000681

AUS 00892

CONFIDENTIAL AND PRIVILEGED
PREPARED AT THE REQUEST OF THE ALLIED UNIVERSAL LEGAL
DEPARTMENT

AUS 00893

Identity of all Witnesses to the Incident (include addresses and phone numbers):

HEB Manager in Charge, Mr. Kevin
5106 Bissonnet Street (Bellaire)
Houston, TX 77401
Phone number: (713) 218-1600

Description of Injuries to Allied Universal personnel:

No injuries noted.

Description of Injuries to other than Allied Universal personnel:

No injuries noted.

Description of Property Damage:

None

CONFIDENTIAL AND PRIVILEGED
PREPARED AT THE REQUEST OF THE ALLIED UNIVERSAL LEGAL
DEPARTMENT

APPENDIX 000683

AUS 00894

What instruments (compliance techniques, restraints, weapons, etc.) were employed and by whom?

AUS employee SP Ahmed (EE# 9352791) applied steel handcuffs to the shopper when he attempted to leave the store without rendering proper payment for merchandise received.

Brief Summary of Incident:

This incident occurred on April 4, 2022, inside the front entrance of the store (2nd level). SP Ahmed was alerted by the Store MIC (Kevin) that there was a potential shoplifter in the store. The MIC alerted him of this incident in an effort to gain assistance should the need arise. Bellaire Police were already notified. When the individual attempted to leave the store without rendering proper payment for the merchandise he received, SP Ahmed forcefully pushed the unknown shoplifter against the wall, and applied steel hand cuffs to his wrists behind his back. Since this individual did not technically leave the store, the police were unable to charge him with shoplifting.

At no time did SP Ahmed employ deescalation techniques, and no injuries were reported from this incident.

| Supervisor's Recommendation: |
| --- |
| ☐     Closed – No further action necessary |
| ☒     Further Investigation Recommended – Refer to Branch Manager |
| ☐     Further Investigation Recommended – Legal Services Group |

| _____ | _____ |
| --- | --- |
| Supervisor's Signature | Branch Manager Signature |
| _____ | _____ |
| Printed Name | Printed Name |
| _____ | _____ |
| Date | Date |

CONFIDENTIAL AND PRIVILEGED
PREPARED AT THE REQUEST OF THE ALLIED UNIVERSAL LEGAL
DEPARTMENT

AUS 00895

<Force@allieduniversalservices.onmicrosoft.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>; King, Bill <Bill.King@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

Given that this use of force appears to be outside of our established policies, please complete a Root Cause Analysis as defined in the Tab 7 Incident Reporting & Response policy and send it back, being sure to include your  management team.
This is attached for your review.
Please let me know if you have any further questions.
Thanks,
Jim

**Jim Grant**
Director, Weapons and Use of Force Policy

**Allied Universal**
111 Founders Plaza, Suite 1001
East Hartford, CT 06108
W: 484.351.1404 | C: 413.883.4675 | james.grant@aus.com
www.AUS.com

---

**From:** Freeney, Patrick
**Sent:** Tuesday, April 5, 2022 3:37 PM
**To:** Force <force@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** Twana Ahmed Use of Force (04042022)

ALCON,

See attached for the UOF incident that occurred on 04/04/2022.  Please contact me using the information provided below if you have any questions.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
www.AUS.com



HE>i

| | |
|---|---|
| **From:** | Grant, James on behalf of Grant, James <James.Grant@aus.com> |
| **To:** | Freeney, Patrick; Force |
| **Cc:** | Gaussen, Matthew; King, Bill |
| **Subject:** | RE: Twana Ahmed Use of Force (04042022) |
| **Date:** | Wednesday, April 6, 2022 9:24:33 AM |
| **Attachments:** | Tab 007 - Incident Reporting and Response.pdf |
| | image002.png |

Given that this use of force appears to be outside of our established policies, please complete a Root Cause Analysis as defined in the Tab 7 Incident Reporting & Response policy and send it back, being sure to include your  management team.

This is attached for your review.

Please let me know if you have any further questions.

Thanks,

Jim

**Jim Grant**
Director, Weapons and Use of Force Policy

**Allied Universal**

111 Founders Plaza, Suite 1001
East Hartford, CT 06108
W: 484.351.1404 | C: 413.883.4675 | james.grant@aus.com
www.AUS.com

---

**From:** Freeney, Patrick
**Sent:** Tuesday, April 5, 2022 3:37 PM
**To:** Force <force@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** Twana Ahmed Use of Force (04042022)

ALCON,

See attached for the UOF incident that occurred on 04/04/2022.  Please contact me using the information provided below if you have any questions.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | patrick.freeney@aus.com
License number: C15802
www.AUS.com



HE>i

APPENDIX 000686                                                    AUS 00871

HE>i

---

**From:** King, Bill <Bill.King@aus.com>
**Sent:** Wednesday, April 6, 2022 8:32 PM
**To:** Grant, James <James.Grant@aus.com>; Freeney, Patrick <Patrick.Freeney@aus.com>; McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

Hi Patrick. All UOF incidents for HEB really need to be reviewed by Felicia, Mark and me please. Please send me the report so that I can review with Kareem as well. We review these as a panel and then work to identify how we can keep our SP's safe and also how we handle out of policy challenges. I look forward to working with you on these moving forward.

**Bill King**
Regional Vice President

**Allied Universal**
C: 346.802.8305 | bill.king@aus.com

---

**From:** Grant, James
**Sent:** Wednesday, April 6, 2022 9:25 AM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Force <Force@allieduniversalservices.onmicrosoft.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>; King, Bill <Bill.King@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

Given that this use of force appears to be outside of our established policies, please complete a Root Cause Analysis as defined in the Tab 7 Incident Reporting & Response policy and send it back, being sure to include your  management team.
This is attached for your review.
Please let me know if you have any further questions.
Thanks,
Jim

**Jim Grant**
Director, Weapons and Use of Force Policy

**Allied Universal**
111 Founders Plaza, Suite 1001

---

APPENDIX 000687                                          AUS 00837

| | |
|---|---|
| **From:** | McKinnon, Kareem on behalf of McKinnon, Kareem <Kareem.McKinnon@aus.com> |
| **To:** | Freeney, Patrick |
| **Subject:** | Fwd: Twana Ahmed Use of Force (04042022) |
| **Date:** | Wednesday, April 6, 2022 8:52:30 PM |
| **Attachments:** | image002.png |

Hey Patrick,

Let's do this end if you have any use of force incidences call Felicia first, before sending one anyone a report. She's good at these things and will make sure that we have a buttoned up before communicating to anyone else internally.

Let me know if you have any questions.

Regards,

Kareem McKinnon
Regional Vice President

Allied Universal
C: 832.687.9248

License #C15802

---

**From:** McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Sent:** Wednesday, April 6, 2022 8:50:58 PM
**To:** King, Bill <Bill.King@aus.com>; Grant, James <James.Grant@aus.com>; Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** Re: Twana Ahmed Use of Force (04042022)

Thanks Bill. I'll connect with Patrick.

Regards,

Kareem McKinnon
Regional Vice President

Allied Universal
C: 832.687.9248

License #C15802

---

**From:** King, Bill <Bill.King@aus.com>
**Sent:** Wednesday, April 6, 2022 8:32:10 PM
**To:** Grant, James <James.Grant@aus.com>; Freeney, Patrick <Patrick.Freeney@aus.com>; McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

APPENDIX 000688

AUS 00845

| | |
|---|---|
| **From:** | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
| **To:** | King, Bill; Grant, James; McKinnon, Kareem |
| **Cc:** | Gaussen, Matthew |
| **Subject:** | RE: Twana Ahmed Use of Force (04042022) |
| **Date:** | Thursday, April 7, 2022 9:12:40 AM |
| **Attachments:** | image001.png |
| | image002.png |

Yes Sir!

**From:** King, Bill <Bill.King@aus.com>
**Sent:** Thursday, April 7, 2022 9:12 AM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Grant, James <James.Grant@aus.com>;
McKinnon, Kareem <Kareem.McKinnon@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

Thanks Patrick – I will ensure that a panel call is set up for tomorrow.

**Bill King**
Regional Vice President

**Allied Universal**
C: 346.802.8305 | bill.king@aus.com

**From:** Freeney, Patrick
**Sent:** Thursday, April 7, 2022 9:08 AM
**To:** King, Bill <Bill.King@aus.com>; Grant, James <James.Grant@aus.com>; McKinnon, Kareem
<Kareem.McKinnon@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

Received.

Yes Sir.  Going forward, I will ensure that she has eyes on this report prior to forwarding it up.
Currently, I am working on the Root Cause Analysis and will have that completed today.  I'll be in
touch with Felicia to ensure its accuracy.

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
www.AUS.com

APPENDIX 000689

AUS 00836

Thank you so much and have a *PHENOMENAL* day!

**Felicia Solis-Ramirez**
Branch Manager, San Antonio
C: 210.260.1355 | Felicia.Solis-Ramirez@aus.com

**From:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Sent:** Thursday, April 7, 2022 9:36 AM
**To:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Subject:** ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Thanks in advance!

**Patrick G. Freeney**
Elite Client Manager for HEB/Houston
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | **patrick.freeney@aus.com**
License number: C15802
www.AUS.com

HE>i

AUS 00826

| | |
|---|---|
| **From:** | King, Bill on behalf of King, Bill <Bill.King@aus.com> |
| **To:** | McKinnon, Kareem; Solis-Ramirez, Felicia |
| **Cc:** | Freeney, Patrick; Westman, Mark |
| **Subject:** | RE: ***Attorney Client Privilege*** UOF Twana Ahmed 04042022 |
| **Date:** | Thursday, April 7, 2022 1:55:06 PM |
| **Attachments:** | image002.jpg |
| | image004.png |

Approved on my end as well.

Felicia – Let's resubmitted this one via force@aus.com, Justin, etc. from you or me with our panel results and next steps.

Patrick – Sorry that this process may be a surprise to you. Long story short.

**Bill King**
**Regional Vice President**

**Allied Universal**
C: 346.802.8305 | bill.king@aus.com

**From:** McKinnon, Kareem
**Sent:** Thursday, April 7, 2022 12:49 PM
**To:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

While I hate to lose an Elite s/p. I totally agree.

This is a good review process. Thank you!

**Kareem McKinnon**
**Regional Vice President**

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # C15802

**From:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Sent:** Thursday, April 7, 2022 12:39 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Hi HEB Team,

In reviewing the attached and speaking with Patrick, it is my recommendation that the officer be terminated.  Here are some highlights from the attached:

- SP signed UoF checkpoint in the field with FS on 2/14/22 (pictured below).
- SP knowingly violated the policy by restraining a shoplifter that was not a threat to the SP or the public.
- SP refused to complete a written statement and did not submit a HeliAUS report following the incident (activity, event or incident).
- SP refused to sign disciplinary counseling.

**From:** Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com>
**To:** King, Bill; McKinnon, Kareem; Solis-Ramirez, Felicia
**Cc:** Westman, Mark
**Subject:** RE: ***Attorney Client Privilege*** UOF Twana Ahmed 04042022
**Date:** Thursday, April 7, 2022 1:56:52 PM
**Attachments:** image001.png
image002.jpg
image003.png

Mr. King,

Thank you for saying this.  Felicia and been beyond patient with me on today, but I am motivated to get this under my belt.  I look forward to the specifics on how this ends.

Thanks in advance!

**Patrick G. Freeney**
**Elite Client Manager for HEB/Houston**
**Allied Universal Security Services**
11811 North Freeway| Suite 810 | Houston, TX  77060
C: 762.524.1023 | patrick.freeney@aus.com
License number: C15802
www.AUS.com

HE>i

---

**From:** King, Bill <Bill.King@aus.com>
**Sent:** Thursday, April 7, 2022 1:55 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** RE: ***Attorney Client Privilege*** UOF Twana Ahmed 04042022

Approved on my end as well.

Felicia – Let's resubmitted this one via force@aus.com, Justin, etc. from you or me with our panel results and next steps.

Patrick – Sorry that this process may be a surprise to you. Long story short.

**Bill King**
**Regional Vice President**

**Allied Universal**
C: 346.802.8305 | bill.king@aus.com

---

**From:** McKinnon, Kareem
**Sent:** Thursday, April 7, 2022 12:49 PM
**To:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** RE: ***Attorney Client Priviledge*** UOF Twana Ahmed 04042022

While I hate to lose an Elite s/p. I totally agree.

This is a good review process. Thank you!

**Kareem McKinnon**
**Regional Vice President**

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # C15802

---

**From:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Sent:** Thursday, April 7, 2022 12:39 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** FW: ***Attorney Client Privilidge*** UOF Twana Ahmed 04042022

Hi HEB Team,

In reviewing the attached and speaking with Patrick, it is my recommendation that the officer be terminated.  Here are some highlights from the attached:

APPENDIX 000692

AUS 00991

| | |
|---|---|
| **From:** | Freeney, Patrick on behalf of Freeney, Patrick <Patrick.Freeney@aus.com> |
| **To:** | Solis-Ramirez, Felicia |
| **Subject:** | FW: Twana Ahmed Use of Force (04042022) |
| **Date:** | Thursday, April 7, 2022 6:00:38 PM |
| **Attachments:** | Root Cause Analysis (Ahmed 04042022).docx |
| | Root Cause Analysis Tab 7 (Ahmed 04042022).pdf |
| | image002.png |

Hi Felicia.

See attached. I completed this RCA. I just didn't want to have this hanging over my head. If this looks good, I'll forward it to Mr. Grant. Let me know what you think.

Patrick

**From:** Grant, James <James.Grant@aus.com>
**Sent:** Wednesday, April 6, 2022 9:25 AM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>; Force <Force@allieduniversalservices.onmicrosoft.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>; King, Bill <Bill.King@aus.com>
**Subject:** RE: Twana Ahmed Use of Force (04042022)

Given that this use of force appears to be outside of our established policies, please complete a Root Cause Analysis as defined in the Tab 7 Incident Reporting & Response policy and send it back, being sure to include your management team.
This is attached for your review.
Please let me know if you have any further questions.
Thanks,
Jim

**Jim Grant**
Director, Weapons and Use of Force Policy

**Allied Universal**
111 Founders Plaza, Suite 1001
East Hartford, CT 06108
W: 484.351.1404 | C: 413.883.4675 | james.grant@aus.com
www.AUS.com

**From:** Freeney, Patrick
**Sent:** Tuesday, April 5, 2022 3:37 PM
**To:** Force <force@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>
**Subject:** Twana Ahmed Use of Force (04042022)

ALCON,

**Incident Reporting & Response**
**Tab 07**

## Root Cause Analysis & Corrective Actions Worksheet – Appendix 7.4

| Incident Date: | 04042022 | Incident Title: | SP Twana Ahmed Inappropriate UOF |
|---|---|---|---|

| Solution Team Members: | B. King, J. Grant, K. McKinnon, P. Freeney, F. Soliz, |
|---|---|

**FISHBONE:**          **Cause(s)**          **Effect**



**Environment/ Materials**

The work enviornment was free from weather hazards, and was not a contributer to this incident.

**Equipment**

SP was issued appropriate equipment for the prescribed duties.

The SP used AUS equipment in an inappropriate manner that resulted in a UOF violation.

(Describe the outcome/results)

The SP failed to follow written instructions that are posted in the Site Post Orders. Because of this, he vacated his position to complete a tasi that he was not authorized to do. In doing so, he illegally detained a shopper who was known to shoplift, and prevented the normal process to complete an actual arrest by local authorities.

A job safety analysis wwas completed for this site. No hazards contributed to this incident.

Training for this incident was completed within the last 3 months. The SP disregarded those instructions.

The SP failed to follow instructions as outlined in post orders

The SP was able to perform the necessary functions, but failed to do so.

On-duty MIC gave instructions to the SP that were misaligned with the prescribed duties for that site.

**Process/ Management**          **People by Title**

| Root Causes: | Fishbone Section: |
|---|---|
| Blatant disregard of Post Order instructions on the part of the AUS-SP. | |
| | |
| | |

| Corrective Actions: | Assigned to: | Due Date: | Date Completed: |
|---|---|---|---|
| Create a Safety Share for this incident | | | |
| Recommendation: Termination | | | |
| Mandate all SP's retake UOF Training on the EDGE. New SP's will participate in a Safety-Standdown regarding Use of Force. | | | |
| | | | |

**ALLIEDUNIVERSAL**
*There for you.*

© Allied Universal Security Services; Universal Protection Service, LP.
All rights reserved.
V2.0. This copy valid only at the time of printing. Print date: 04/15/19

APPENDIX 000694

AUS 00817

# Root Cause Analysis

Employee Name: Twana Ahmed
Employee EE Number: 9352791
Hire Date: 12/15/2021

Management Team:   CM Patrick Freeney
                   FS Alexander Bergeron
                   FS Nathan Hernandez
                   FS Patrick Parham
                   FS Mauricio Zepeda

**1. Problem Statement:**

All Security Professionals that are local to the Houston, Texas Market were recently trained within the last 3 months on specific approved policies regarding:

- Proper/appropriate Use of Force techniques/De-escalation practices
- AUS Security Personnel's roll in loss prevention/shoplifting

In reference to the incident that involved UOF on April 4, 2022, SP Twana Ahmed disregarded his training, and blatantly ignored his post orders to implement maneuvers that were outside of the scope of his duties. Because of this, a shopper of HEB was illegally detained, and although this individual did shoplift, he was unable to be charged for the crime committed due to the fact that the SP prevented him from leaving the store with the merchandise without paying.

**2.  Why did this happen?**

SP Twana Ahmed was interviewed following this incident to determine his motivations from these actions. The SP stated that he was approached by the on-duty MIC to give assistance should the need arise from this known shoplifter being inside the store. The SP acknowledged this request and waited behind the door for the shoplifter to exit the store. Upon the shoplifter's exit, the SP committed the UOF infraction.

This incident occurred for two reasons:

- The SP willingly disregarded his duties and instructions given in the Site Post Orders
- The Store MIC requested a service from AUS personnel that is unauthorized and outside of the scope of our duties. It is this request that prompts the SP to fulfill the instructions given by senior HEB employees because it is believed to be an approved request. The SP also does not want to seem non-compliant.

APPENDIX 000695

AUS 00818

**3. Corrective Action**

In accordance with established company policy (Disciplinary Matrix), due to abuse of a customer, employee, visitor or other third party (physical, verbal or otherwise), including fighting, provoking a fight or other disorderly, careless or reckless conduct on or near company/customer property or in company uniform at any time.  This includes inappropriate use of force in violation of the Use of Force policy.  This AUS employee should be terminated.  This approach reverberates throughout the Houston area AUS Elite Program and provides insight as to what could happen should instances such as this be repeated.

| | |
|---|---|
| **From:** | King, Bill on behalf of King, Bill <Bill.King@aus.com> |
| **To:** | McKinnon, Kareem; Solis-Ramirez, Felicia |
| **Cc:** | Freeney, Patrick; Westman, Mark |
| **Subject:** | RE: ***Attorney Client Privilege*** UOF Twana Ahmed 04042022 |
| **Date:** | Thursday, April 7, 2022 1:55:06 PM |
| **Attachments:** | image002.jpg |
| | image004.png |

Approved on my end as well.

Felicia – Let's resubmitted this one via force@aus.com, Justin, etc. from you or me with our panel results and next steps.

Patrick – Sorry that this process may be a surprise to you. Long story short.

**Bill King**
**Regional Vice President**

**Allied Universal**
C: 346.802.8305 | bill.king@aus.com

**From:** McKinnon, Kareem
**Sent:** Thursday, April 7, 2022 12:49 PM
**To:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** RE: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

While I hate to lose an Elite s/p. I totally agree.

This is a good review process. Thank you!

**Kareem McKinnon**
**Regional Vice President**

**Allied Universal**
C: 832.687.9248 | kareem.mckinnon@aus.com
License # C15802

**From:** Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Sent:** Thursday, April 7, 2022 12:39 PM
**To:** McKinnon, Kareem <Kareem.McKinnon@aus.com>; King, Bill <Bill.King@aus.com>
**Cc:** Freeney, Patrick <Patrick.Freeney@aus.com>; Westman, Mark <Mark.Westman@aus.com>
**Subject:** FW: ***Attorney Client Privelidge*** UOF Twana Ahmed 04042022

Hi HEB Team,

In reviewing the attached and speaking with Patrick, it is my recommendation that the officer be terminated.  Here are some highlights from the attached:

- SP signed UoF checkpoint in the field with FS on 2/14/22 (pictured below).
- SP knowingly violated the policy by restraining a shoplifter that was not a threat to the SP or the public.
- SP refused to complete a written statement and did not submit a HeliAUS report following the incident (activity, event or incident).
- SP refused to sign disciplinary counseling.

AUS 00825

| | |
|---|---|
| **From:** | Solis-Ramirez, Felicia on behalf of Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com> |
| **To:** | King, Bill |
| **Subject:** | ***Attorney Client Privileged Communication*** |
| **Date:** | Friday, April 8, 2022 6:58:45 PM |
| **Attachments:** | Root Cause Analysis (Houston 4.4.22).pdf |
| | AUS Use of Force Report - HEB - Houston 4.4.22.pdf |
| | image001.jpg |

**Brief Summary:**

Our SP restrained a suspected shoplifter.

**Outcome of Panel Review:**

We have interviewed the SP, reviewed the scenario with our panel, and briefed the customer. The SP was made aware of our use of force policy and confirmed acknowledgement on 2/14/22. We feel the SP acted **outside** the use of force continuum and guidelines of the Use of Force Policy.

**Post Action Feedback:**

Our panel agrees that the SP violated the Use of Force policy and should be terminated.

Please reach out directly to me with any questions.

**Felicia Solis-Ramirez**
Branch Manager, San Antonio

**Allied Universal**
C: 210.260.1355 | Felicia.Solis-Ramirez@aus.com
**License #C15802** | www.AUS.com



| From: | King, Bill on behalf of King, Bill <Bill.King@aus.com> |
|---|---|
| To: | Grant, James; Freeney, Patrick |
| Cc: | Gaussen, Matthew; Solis-Ramirez, Felicia; Barnett, Michael; Nagy, Justin; Smidt, Mike; McKinnon, Kareem |
| Subject: | RE: ***Attorney/Client Privilege*** Twana Ahmed Use of Force (04042022) |
| Date: | Friday, April 8, 2022 7:05:06 PM |
| Attachments: | Root Cause Analysis (Houston 4.4.22).pdf |
| | AUS Use of Force Report - HEB - Houston 4.4.22.pdf |
| | image002.png |
| | image004.png |

Hi Jim – Just wanted to increase the audience and provide an additional summary. This Houston report was outside of our standard HEB process, hence why this summary and panel debrief is coming out much later.

**Brief Summary:**
Our SP restrained a suspected shoplifter.

**Outcome of Panel Review:**
We have interviewed the SP, reviewed the scenario with our panel, and briefed the customer. The SP was made aware of our use of force policy and confirmed acknowledgement on 2/14/22.  We feel the SP acted **outside** the use of force continuum and guidelines of the Use of Force Policy.

**Post Action Feedback:**
Our panel agrees that the SP violated the Use of Force policy and should be terminated.

**Bill King**
Regional Vice President

Allied Universal
C: 346.802.8305 | bill.king@aus.com

**From:** Grant, James
**Sent:** Friday, April 8, 2022 9:38 AM
**To:** Freeney, Patrick <Patrick.Freeney@aus.com>
**Cc:** Gaussen, Matthew <Matthew.Gaussen@aus.com>; King, Bill <Bill.King@aus.com>; Solis-Ramirez, Felicia <Felicia.Solis-Ramirez@aus.com>
**Subject:** RE: ***Attorney/Client Privilege*** Twana Ahmed Use of Force (04042022)

Does everyone concur with this conclusion?

**Jim Grant**
Director, Weapons and Use of Force Policy

**Allied Universal**
111 Founders Plaza, Suite 1001
East Hartford, CT 06108

APPENDIX 000699

| From: | King, Bill on behalf of King, Bill <Bill.King@aus.com> |
|---|---|
| To: | Smidt, Mike; Nagy, Justin |
| Cc: | Solis-Ramirez, Felicia |
| Subject: | RE: ***Attorney/Client Privilege*** Twana Ahmed Use of Force (04042022) |
| Date: | Saturday, April 9, 2022 1:32:59 PM |
| Attachments: | image001.png |
| | image002.png |

Mike – Excellent callout. This employee will be terminated.

Felicia – Lets also add HR to our panel for future cases that may not be as clear.


**Bill King**
Regional Vice President

**Allied Universal**
C: 346.802.8305 | bill.king@aus.com


**From:** Smidt, Mike
**Sent:** Saturday, April 9, 2022 6:09 AM
**To:** King, Bill <Bill.King@aus.com>; Nagy, Justin <Justin.Nagy@aus.com>
**Subject:** RE: ***Attorney/Client Privilege*** Twana Ahmed Use of Force (04042022)

Morning guys,

Just catching up on this from yesterday.

Maybe just one clarification I would ask when sending these off to corporate.

Bill your section below:

**Post Action Feedback:**
Our panel agrees that the SP violated the Use of Force policy and should be terminated.

It feels to me like you are asking for permission to fire this SP? To me this is 100% your call and if the panel feels the SP should be terminated, then your answer should have been firm. The SP will be terminated for violation of company policy.

Thanks,

*Mike*

Mike Smidt
Chief Operating Officer, West
Allied Universal Security Services
8950 Cal Center Drive #115

APPENDIX 000700

AUS 00959

# Exhibit 20

# Patrick Freeney's submission form terminating Twana Ahmed April 26, 2022

 (https://my.aus.com)

# Personnel Action Notice Service Staff Separation: PANHS2022-0426-1401

**Submitted By**

Patrick Freeney

**Submitted On**

Tuesday, April 26, 2022 11:43 AM

**Subject**

Twana Ahmed Termination

**Selected Stakeholders**

Ralon Hardy

Brenda Richmond

Deja Ingram

Matthew Gaussen

Catherine Barnes

## Employee Details

**Employee Number**

(9352791) Twana Ahmed

**Supervisor**

(9345448) Patrick Freeney

**Name**

Twana Ahmed

**Job Number**

(WE572174) HEB - UGS (Admin) Houston Supervision

APPENDIX 000702                                                    AUS 00700



(https://my.aus.com)

TX

## Separation Details

**Separation Date** ❶ **(https://my.aus.com/sites/SSO/Shared%20Documents /Guidelines%20for%20Determining%20Separation%20Date.xlsx)**

04/04/2022

**Last Day Worked** ❶

04/04/2022

**Separation Type**

Involuntary

**Separation Reason**

Terminated - Failure To Comply With Job Req

**Company Gave Notice?**

| Yes | No |

**Notice Date** ❶

mm/dd/yyyy

**Eligible for Rehire?**

| Yes | No |

## Check Request Details

**Unpaid Timekeeping** ❶

| Job | Work Date | Hours Type | Hours | Rate |
|-----|-----------|------------|-------|------|
| There are no unpaid timekeeping records available. | | | | |

**ALLIED UNIVERSAL** (https://my.aus.com)

**Other Compensations & Deductions** ❶                                    Add ➕

| Type | Job | Description | Amount |
|------|-----|-------------|--------|
| | | There is no withholding information available. | |

## Process On

| Next Check | Separate Check |
|---|---|

## Delivery Method

| Normal | Hand Delivered |
|---|---|

## Additional Details

## Schedule ❶                                                          Refresh ⟳

| Job | Work Date | Hours Type | Hours | Rate |
|-----|-----------|------------|-------|------|
| | | There are no scheduled work dates available. | | |

**Here's the remaining vacation and sick balances we know about, which will be paid out based on state and contractual requirements.**

## Sick

**Eligible**

| 0.00 |
|------|

## Vacation (Calendar 1-2=40 (0.7693),3-7=80 (1.5385),8+=120 (2.3077))

**Eligible**

| 2.30 |
|------|

**Scheduled**

| 0.00 |
|------|

**Balance**

| 2.30 |
|------|

**Vacation Billable?**

APPENDIX 000704                                            AUS 00702

**ALLIEDUNIVERSAL** Yes No (https://my.aus.com)

## Attachments

| File Name | Description | Type | |
|---|---|---|---|
| | | | |

## Request History

| When | Added By | Notes |
|---|---|---|
| | | |

## Request Action History

| When | Actioned By | Action Taken |
|---|---|---|
| Over a year ago | Patrick Freeney | Request Submitted |
| Over a year ago | kehess | Complete Request |

AUS 00703

# Exhibit 21

# Allied discipline form demoting Alex Bergeron

**ALLIEDUNIVERSAL**
*There for you.*

# COACHING – COUNSELING – DISCIPLINARY NOTICE

Security Professionals/Service Employees

| | | | |
|---|---|---|---|
| Employee Name | Alexander Bergeron | Employee ID | 6985287 |
| Position Title | Security Professional Field Supervisor | Branch/Department | Houston- Commercial |
| Client Site | HEB Houston | Supervisor | Patrick Freeney |
| Union ○ Yes ⊙ No | Union Name/Local | Probationary Period | ☐ Currently ☐ Past Union |

**WORK HISTORY** – Prior coaching/counselling or disciplinary action

| Type of Action(s) | | Date | Issued By | Description/Reason |
|---|---|---|---|---|
| ☒ | Verbal Warning | | Patrick Freeney | Failed to oversee work schedule in WinTeam. |
| ☐ | Written Warning | | | |
| ☐ | Final Warning/Suspension | | | |

**CURRENT SITUATION – INFRACTION/PERFORMANCE ISSUE(S)** – List as applicable. Attach additional pages if necessary.

| | | |
|---|---|---|
| ☐ | Work Rule Violation | |
| ☒ | Performance | Disregarded specific instructions given by Client Manager which resulted in improper reporting of UOF incident. |
| ☐ | Attendance | |

**FACTS** – Provide details of the situation (Who, What, Where, When, How). Attach additional pages if necessary.

On April 4, 2022, SP Twana Ahmed participated in an inappropriate UOF procedure while on shift at an Elite HEB site. Alex Bergeron was on duty, and functioned as the Field Supervisor who was in charge of supervising Ahmed. FS Alex Bergeron was instructed to ensure that SP Ahmed completed the Heliaus Report in reference to the incident that had occurred. Bergeron stated that he would accomplish this tasking. It did not get done. Because this incident was an improper UOF, this incident generated negative repercussion for Officer Ahmed which depended on the review of his completed report. Because FS Bergeron did not ensure this report was completed, negative attention was brought upon him, this office and the program.

**EXPECTATION** – Detail the future behavior that is expected. Attach additional pages if necessary.

Refer to AUS Employee Handbook.

**CORRECTIVE ACTION** – Determine next steps, follow-up and/or consequences. Attach additional pages if necessary.

Recommendation: Released from the HEB Elite Program.

**DOCUMENTATION OF CORRECTIVE ACTION**   Agree

| ☐ Verbal Warning | ☐ Written Warning | ☒ Final Warning | ☐ Termination | Effective Date | |
|---|---|---|---|---|---|
| ☐ Suspension* | Dates of Suspension | From | To | ○ Paid | ⊙ Unpaid |

*Unpaid disciplinary suspensions of greater than one day require review with Regional HR Manager or Director in advance

**ACKNOWLEDGEMENT**

I acknowledge that this Coaching-Counseling-Disciplinary Notice has been reviewed with me. By signing below, I acknowledge a copy has been given to me and that a copy will be placed in my personnel file. I understand that signing this document does not constitute agreement and I may provide a rebuttal statement which will also be placed in my personnel file. Any other performance deficiency and/or policy violations may result in further disciplinary action up to and including termination.       ○ Agree   ○ Disagree

| Employee Comments: | | | |
|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Employee Name | Alexander Bergeron | Employee Signature | | Date |
| Manager/Supervisor | Patrick G. Freeney | Manager/Supervisor Signature | | Date |
| Witness Name | | Witness Signature | | Date |

Original - Personnel File        Copy - Employee        Copy - Supervisor        Rev 17MAR2021

# Exhibit 22

# Civil Rights Act of 1866 (Section 1981)

## *42 USCS § 1981, Part 1 of 4*

Current through Public Law 118-209, approved December 23, 2024, with a gap of Public Law 118-159.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164)  >*
*CHAPTER 21. CIVIL RIGHTS (§§ 1981 — 2000h-6)  >  GENERALLY (§§ 1981 — 1996b)*

## § 1981. Equal rights under the law

**(a) Statement of equal rights.**  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined.**  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment.**  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

## History

**HISTORY:**

R.S. § 1977; Nov. 21, 1991, *P. L. 102-166*, Title I, § 101, *105 Stat. 1071*.

United States Code Service
Copyright © 2025 All rights reserved.

**End of Document**

# Exhibit 23

# Civil Rights Act of 1964
# (Title VII)

## *42 USCS § 2000e-2, Part 1 of 8*

Current through Public Law 118-209, approved December 23, 2024, with a gap of Public Law 118-159.

*United States Code Service > TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164) > CHAPTER 21. CIVIL RIGHTS (§§ 1981 — 2000h-6) > EQUAL EMPLOYMENT OPPORTUNITIES (§§ 2000e — 2000e-17)*

## § 2000e-2. Unlawful employment practices

**(a) Employer practices.** It shall be an unlawful employment practice for an employer—

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**(b) Employment agency practices.** It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

**(c) Labor organization practices.** It shall be an unlawful employment practice for a labor organization—

**(1)** to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

**(2)** to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

**(3)** to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

**(d) Training programs.** It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

**(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion.** Notwithstanding any other provision of this title [*42 USCS §§ 2000e* et seq.], (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other

persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

**(k) Burden of proof in disparate impact cases.**

    **(1)**

        **(A)** An unlawful employment practice based on disparate impact is established under this title only if—

            **(i)** a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

            **(ii)** the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

        **(B)**

            **(i)** With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

            **(ii)** If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

        **(C)** The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

    **(2)** A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this title.

    **(3)** Notwithstanding any other provision of this title [*42 USCS §§ 2000e* et seq.], a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (*21 U.S.C. 802(6)*), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act or any other provision of Federal law, shall be considered an unlawful employment practice under this title only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

**(l) Prohibition of discriminatory use of test scores.** It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices.** Except as otherwise provided in this title [*42 USCS §§ 2000e* et seq.], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders.**

# Exhibit 24

# Texas Commission on Human Rights Act (TCHRA)

## *Tex. Lab. Code § 21.001*

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

*Texas Statutes & Codes Annotated by LexisNexis® > Labor Code > Title 2 Protection of Laborers (Subts. A — E) > Subtitle A Employment Discrimination (Chs. 21 — 50) > Chapter 21 Employment Discrimination (Subchs. A — K) > Subchapter A General Provisions (§§ 21.001 — 21.010)*

## Sec. 21.001. Purposes.

The general purposes of this chapter are to:

**(1)** provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments (*42 U.S.C. Section 2000e* et seq.);

**(2)** identify and create an authority that meets the criteria under *42 U.S.C. Section 2000e-5(c)* and *29 U.S.C. Section 633*;

**(3)** provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments (*42 U.S.C. Section 12101* et seq.);

**(4)** secure for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, in order to protect their personal dignity;

**(5)** make available to the state the full productive capacities of persons in this state;

**(6)** avoid domestic strife and unrest in this state;

**(7)** preserve the public safety, health, and general welfare; and

**(8)** promote the interests, rights, and privileges of persons in this state.

## History

Enacted by *Acts 1993, 73rd Leg., ch. 269 (H.B. 752), § 1*, effective September 1, 1993; am. *Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 9.01(a)*, effective September 1, 1995.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

## *Tex. Lab. Code § 21.051*

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

*Texas Statutes & Codes Annotated by LexisNexis® > Labor Code > Title 2 Protection of Laborers (Subts. A — E) > Subtitle A Employment Discrimination (Chs. 21 — 50) > Chapter 21 Employment Discrimination (Subchs. A — K) > Subchapter B Unlawful Employment Practices (§§ 21.051 — 21.061)*

## Sec. 21.051. Discrimination by Employer.

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

## History

Enacted by *Acts 1993, 73rd Leg., ch. 269 (H.B. 752), § 1*, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

APPENDIX 000715

## *Tex. Lab. Code § 21.108*

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

*Texas Statutes & Codes Annotated by LexisNexis® > Labor Code > Title 2 Protection of Laborers (Subts. A — E) > Subtitle A Employment Discrimination (Chs. 21 — 50) > Chapter 21 Employment Discrimination (Subchs. A — K) > Subchapter C Application; Exceptions (§§ 21.101 — 21.129)*

## Sec. 21.108. Discrimination Based on Religion.

A provision in this chapter referring to discrimination because of religion or on the basis of religion applies to discrimination because of or on the basis of any aspect of religious observance, practice, or belief, unless an employer demonstrates that the employer is unable reasonably to accommodate the religious observance or practice of an employee or applicant without undue hardship to the conduct of the employer's business.

## History

Enacted by *Acts 1993, 73rd Leg., ch. 269 (H.B. 752), § 1*, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

## *Tex. Lab. Code § 21.110*

\*\*\* This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. \*\*\*

*Texas Statutes & Codes Annotated by LexisNexis® > Labor Code > Title 2 Protection of Laborers (Subts. A — E) > Subtitle A Employment Discrimination (Chs. 21 — 50) > Chapter 21 Employment Discrimination (Subchs. A — K) > Subchapter C Application; Exceptions (§§ 21.101 — 21.129)*

## Sec. 21.110. Discrimination Based on National Origin.

A provision in this chapter referring to discrimination because of national origin or on the basis of national origin includes discrimination because of or on the basis of the national origin of an ancestor.

## History

Enacted by *Acts 1993, 73rd Leg., ch. 269 (H.B. 752), § 1,* effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

### *Tex. Lab. Code § 21.125*

*** This document is current through the 2023 Regular Session; the 1st C.S.; the 2nd C.S.; the 3rd C.S. and the 4th C.S. of the 88th Legislature; and the November 7, 2023 general election results. ***

***Texas Statutes & Codes Annotated by LexisNexis® > Labor Code > Title 2 Protection of Laborers (Subts. A — E) > Subtitle A Employment Discrimination (Chs. 21 — 50) > Chapter 21 Employment Discrimination (Subchs. A — K) > Subchapter C Application; Exceptions (§§ 21.101 — 21.129)***

## Sec. 21.125. Clarifying Prohibition Against Impermissible Consideration of Race, Color, Sex, National Origin, Religion, Age, or Disability in Employment Practices.

(a)  Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a motivating factor for an employment practice, even if other factors also motivated the practice, unless race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force.

(b)  In a complaint in which a complainant proves a violation under Subsection (a) and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court may grant declaratory relief, injunctive relief except as otherwise provided by this subsection, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a complaint under Subsection (a), but may not award damages or issue an order requiring an admission, reinstatement, hiring, promotion, or back pay.

## History

Enacted by *Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 9.05(a)*, effective September 1, 1995; am. *Acts 1997, 75th Leg., ch. 1126 (H.B. 3048), § 1*, effective September 1, 1997.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**