IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Twana Ahmed, | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| | § | 4:23-cv-02823 |
| Universal Protection Service, LP, | § | Jury Trial Demanded |
| d/b/a Allied Universal | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

---

## PLAINTIFF TWANA AHMED'S WITNESS LIST

---

Attached is Plaintiff Twana Ahmed's witness list. If any other witnesses will be called at the trial, their names, addresses and the subject matter of their testimony will be reported to opposing counsel as soon as they are known. This restriction will not apply to rebuttal or impeachment witnesses; the necessity of whose testimony cannot reasonably be anticipated before trial.

**Plaintiff Twana Ahmed *Will Call*:**

| witness | brief statement<br>of the subject matter and substance of their testimony | deposed and type | sworn @ trial | testified @ trial |
|---|---|---|---|---|
| **1. Katherine Alyea**<br>Last known work:<br>Allied Universal<br>11811 N. Freeway, Suite 810<br>Houston, TX 77060<br>(713) 321-0086 | Defendant's Senior Regional HR Manager.<br><br>Defendant's HR systems, policies, and procedures. Her assignment of Defendant's HR Representative Wayne Oliver to speak with Twana Ahmed regarding Mr. Ahmed's discrimination report. | deposed fact witness | | |
| **2. Catherine Barnes**<br>Last known work:<br>Allied Universal<br>11811 N. Freeway, Suite 810<br>Houston, TX 77060<br>(832) 786-3911 | Defendant's HR Coordinator.<br><br>Defendant's HR systems, policies, and procedures. Receipt and process of handling Twana Ahmed's report of discrimination. | not deposed fact witness | | |

| **3. Universal Protection Service, LP d/b/a Allied Universal** 450 Exchange Irvine, CA 92602-5002 | Entity defendant.<br><br>Knowledge of defendant's policies and procedures, and events surrounding Mr. Ahmed's employment, suspension, and termination. Testifying via the stenographic and/or audio and video recording of its FRCP 30(b)(6) representative.<br><br>deposition transcript pages and lines: | deposed fact witness | | |

| page 5 lines 13-23 | page 59 lines 1, 13-25 | page 89 lines 5-25 |
|---|---|---|
| page 6 lines 15-23 | page 60 lines 1-15 | page 90 lines 1-18 |
| page 7 lines 11-17 | page 62 lines 16-25 | page 93 lines 18-25 |
| page 8 lines 6-9, 15-25 | page 63 lines 1-14 | page 94 lines 1-25 |
| page 9 lines 1-13 | page 64 lines 1-13, 21-25 | page 95 lines 1-25 |
| page 12 lines 22-25 | page 65 lines 1-7 | page 96 lines 1-21 |
| page 13 lines 1-6 | page 70 lines 18-21, 22-25 | page 98 lines 11-17, 21-25 |
| page 21 lines 4-7, 8-14 | page 71 lines 1-4, 5-8, 9-10, 12-19 | page 99 lines 1-4 |
| page 22 lines 21-25 | page 72 lines 9-24 | page 113 lines 23-25 |
| page 23 lines 1-2, 5 | page 75 lines 11-12, 17-25 | page 114 line 1 |
| page 27 lines 7-25 | page 76 lines 1-25 | page 115 11-13, 16-25 |

| | | | | | |
|---|---|---|---|---|---|
| | page 28 lines 1-7 | page 77 lines 1-5 | page 116 lines 1-7, 11-13, 14-16, 19-21, 22-23 | | |
| | page 36 lines 10-25 | page 78 lines 4-6 | page 117 lines 1-4, 7-12, 22-25 | | |
| | page 37 lines 1-16 | page 79 lines 4-8, 9-15 | page 118 lines 1-5, 6-9, 14-15 | | |
| | page 45 lines 8-11, 22-25 | page 80 line 25 | page 119 lines 6-8 , 9-18, 25 | | |
| | page 46 lines 1-3, 8 | page 81 lines 1-5, 22-25 | page 120 lines 1-15, 16-25 | | |
| | page 55 lines 17-25 | page 82 lines 1-25 | page 121 lines 1-14, 15-22 | | |
| | page 56 lines 1-5, 12-25 | page 83 lines 1-10 | page 122 line 25 | | |
| | page 57 lines 1-6 | page 85 lines 9-12, 14-25 | page 123 lines 1-4, 9-10, 17-20 | | |
| | page 58 lines 3-7, 20-25 | page 86 line 1, 2-23 | page 124 lines 2-6 | | |
| | these excerpts, highlighted, are attached to this witness list. | | | | |

| | | | | |
|---|---|---|---|---|
| **4. Wayne Oliver**<br>Last known work:<br>Allied Universal<br>11811 N. Freeway, Suite 810<br>Houston, TX 77060<br>(713) 321-0086 | Defendant's Regional HR Representative.<br><br>Knowledge concerning investigation into Twana Ahmed's reports of discrimination after Mr. Ahmed's termination, defendant's HR systems, policies and procedures. | not deposed fact witness | | |
| **5. Mauricio Zepeda**<br>Last known home:<br>11300 Regency Green Dr., Apt. 1307<br>Cypress, TX 77429<br>(832) 580-2829 | Defendant's Site Supervisor.<br><br>Knowledge concerning his supervision of Twana Ahmed for defendant, defendant refusing to accommodate Mr. Ahmed's religion concerning Mr. Ahmed's beard, Mr. Ahmed's work and qualifications, defendant's policies and procedures, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |
| **6. Alexander Bergeron**<br>Last known work:<br>Allied Universal<br>11811 N. Freeway, Suite 810<br>Houston, TX 77060 | Defendant's Field Supervisor.<br><br>One of defendant's employees who supervised Twana Ahmed. Knowledge of Twana Ahmed's work and qualifications, defendant's policies and procedures, and events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |

| | | | | |
|---|---|---|---|---|
| **7. Patrick Freeney**<br>Last known home:<br>17011 Colt Creek Court<br>Humble, TX 77346<br>(762) 524-1023 | Defendant's Client Manager.<br><br>One of defendant's employees who supervised Twana Ahmed. Knowledge of how defendant treated Twana Ahmed, defendant's policies and procedures, and events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |
| **8. Don Massey**<br>Last known work:<br>Allied Universal<br>1776 Woodstead Court, Suite 224<br>The Woodlands, TX 77380<br>(281) 725-8623 | Defendant's former General Manager.<br><br>Knowledge concerning Twana Ahmed's training with defendant, defendant's policies and procedures, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |
| **9. Kevin Middlebrooke**<br>Last known work:<br>Bunker Hill H-E-B<br>9710 Katy Freekay<br>Houston, Texas 77055<br>(713) 647-5900 | Defendant's Client and Manager in Charge at H-E-B<br><br>Knowledge concerning incident at H-E-B store, which Defendant is claiming resulted in Twana Ahmed's suspension and termination. | deposed fact witness | | |

| | | | | |
|---|---|---|---|---|
| **10. Felisha Solis-Ramirez**<br>Last known home:<br>165 S. Hill Dr.<br>Lytle, TX 78052<br>(210) 596-7456 | Defendant's former General Manager.<br><br>Knowledge and information concerning Twana Ahmed's suspensions and termination. | not deposed fact witness | | |
| **11. Jim Grant**<br>Last known work:<br>Allied Universal<br>111 Founders Plaza, Suite 1001<br>East Hartford, CT 06108<br>(413) 883-4675 | Defendant's Director of Weapons and Use of Force Policy<br><br>Knowledge concerning defendant's training, policies and procedures, generally and as applied to Twana Ahmed, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |
| **12. Kareem McKinnon**<br>Last known work:<br>Allied Universal<br>11811 North Freeway, Suite 810<br>Houston, TX 77060<br>(832) 687-9248 | Defendant's former Regional Vice President and current Senior Vice President.<br><br>Knowledge concerning defendant's policies and procedures, the investigation into Twana Ahmed's reports of discrimination and retaliation, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |

| | | | | |
|---|---|---|---|---|
| **13. Mauro Andres Siboldi**<br>Last known home:<br>4634 Hawk Meadow Dr.<br>Katy, TX 77449<br>(346) 316-0299 | Defendant's former Security Officer.<br><br>Knowledge concerning discrimination at defendant, the training that security officers went through, and the work environment. | not deposed fact witness | | |
| **14. Raymond Rodriguez**<br>Last known work:<br>Allied Universal<br>11811 N. Freeway, Suite 810<br>Houston, TX 77060<br>(832) 441-2052<br><br>Last known home address<br>[see ECF 34-1, p. 151]:<br><br>16402 Ashlyn Timbers Lane<br>Magnolia, TX 77355<br>(832) 513-0699 | Defendant's former Security Officer and current Field Supervisor.<br><br>Knowledge concerning the training that security officers went through with defendant, defendant's use of force policies, and the working environment. | not deposed fact witness | | |

| | | | | |
|---|---|---|---|---|
| **15. Manaure Bethencourt**<br>7500 Emmett F. Lowry Express<br>La Marque, TX 77591<br>(409) 354-8531 | Friend of Twana Ahmed.<br><br>Knowledge of how defendant harmed Twana Ahmed. | not deposed fact witness | | |
| **16. Twana Ahmed**<br>9919 Richmond Avenue, Apt. 1122<br>Houston, TX 77042<br>(832) 896-9276 | Plaintiff.<br><br>How defendant treated him as an employee and his damages. | deposed fact witness | | |
| | | | | |

**Plaintiff Twana Ahmed *May Call*:**

| witness | brief statement of the subject matter and substance of their testimony | deposed and type | sworn @ trial | testified @ trial |
|---|---|---|---|---|
| | **defendant's current or former employees** | | | |
| **Matthew Gaussen**<br>Last known work:<br>Allied Universal<br>11811 North Freeway, Suite 810<br>Houston, TX 77060 | Defendant's Director of Operations.<br><br>Knowledge concerning defendant's policies and procedures, the investigation into Twana Ahmed's reports of discrimination and retaliation, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |
| **Martin Hernandez**<br>Last known work:<br>Allied Universal<br>11811 North Freeway, Suite 810<br>Houston, TX 77060 | Defendant's Trainer.<br><br>Knowledge concerning how defendant treated Twana Ahmed in onboarding / training as an employee of defendant, and the company policies and procedures applied to Mr. Ahmed. | not deposed fact witness | | |

| | | | | |
|---|---|---|---|---|
| **Nathan Hernandez**<br>Last known work:<br>Allied Universal<br>11811 North Freeway, Suite 810<br>Houston, TX 77060<br>(281) 219-7191 | Defendant's Field Supervisor.<br><br>Supervised Twana Ahmed for Defendant. Knowledge concerning Mr. Ahmed's work and qualifications, defendant's policies and procedures, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed fact witness | | |
| **Chelsea Joseph**<br>3802 Simsbrook Drive<br>Houston, TX 77045<br>(832) 517-2371 | Defendant's former employee.<br><br>Knowledge concerning discrimination and retaliation at defendant, the training that security officers went through, and the work environment. | not deposed fact witness | | |
| **Monroe McClain**<br>Last known work:<br>Allied Universal<br>11811 North Freeway, Suite 810<br>Houston, TX 77060<br>(281) 881-4473 | Defendant's Regional Trainer.<br><br>Knowledge concerning training of Twana Ahmed, Mr. Ahmed's work and qualifications, and defendant's policies and procedures. | not deposed fact witness | | |

| | | | | |
|---|---|---|---|---|
| **Patrick Parham**<br>Last known work:<br>Allied Universal<br>11811 North Freeway, Suite 810<br>Houston, TX 77060 | Defendant's Field Supervisor.<br><br>Knowledge of his supervision of Twana Ahmed, Mr. Ahmed's work and qualifications, dedfendant's policies and procedures, and the events surrounding Mr. Ahmed's suspension and termination. | not deposed<br>fact witness | | |
| **Dwayne Trahan**<br>Last known work:<br>Allied Universal<br>11811 N. Freeway, Suite 810<br>Houston, TX 77060 | Defendant's former Client Manager.<br><br>Knowledge concerning the training that defendant's security officers went through, use of force policies, defendant's process of hiring Twana Ahmed, and the working environment. | not deposed<br>fact witness | | |
| **defendant's client** | | | | |
| **Justin Porter**<br>Last known work:<br>H-E-B<br>Houston, Texas | H-E-B Loss Prevention Manager<br><br>Knowledge of Defendant's request for surveillance video, storage of store surveillance video | not deposed<br>fact witness | | |

| | | | | |
|---|---|---|---|---|
| **Meredith Rodriques**<br>Last known work:<br>H-E-B<br>5895 San Felipe St.<br>Houston, TX 77057<br>(713) 278-8450 | H-E-B Manager in Charge.<br><br>Knowledge of H-E-B's security agreements with defendant, of Twana Ahmed's work, and report of man attempting theft / request for Twana Ahmed to stop the attempted theft at H-E-B store Ms. Rodrigues was managing. | not deposed fact witness | | |
| | | | | |
| **witness to security officer mistreatment** | | | | |
| **Kamesha Sterling**<br>Last known work:<br>5603 Fair Forest Dr.<br>Houston, TX 77088<br>(832) 526-0047 | Patron of a grocery store at which defendant contracted to provide security.<br><br>Knowledge of defendant's security officer mistreatment of patron at store, video she took of a defendant security officer at a Kroger on more than one occasion. | not deposed fact witness | | |

Plaintiff Twana Ahmed may also call any witness listed on Defendant's witness list.

ANNA SOJA - PMK                                    JOB NO. 1171182
SEPTEMBER 13, 2024

```
 1   for Universal Protection Service, LP, doing

 2   business as Allied Universal Security Services.

 3                    THE VIDEOGRAPHER:  Thank you,

 4   Counsel.

 5                Would the reporter please swear in

 6   the witness.

 7                    ANNA SOJA, PMK, a witness

 8   herein, having been first duly sworn, was

 9   examined and testified as follows:

10                         EXAMINATION

11   BY ATTORNEY HERNANDEZ:

12        Q.    Thank you.

13              Do you agree that companies must

14   protect employees from discrimination in the

15   workplace?

16        A.    Yes, I do.

17        Q.    Is that important?

18        A.    Yes, it is.

19        Q.    On a scale of 1 to 10 where 1 is not

20   important at all, and 10 is the most important,

21   how important is it that companies protect

22   employees from discrimination in the workplace?

23        A.    10.

24        Q.    Why is that important?

25        A.    It is important for us to be able to
```

 1  protect our employees from any discrimination

 2  based on any race, religion, national origin,

 3  or any protected classes as stated by the law.

 4      Q.    Is there any other reason why it's

 5  important besides the law?

 6      A.    Yes.  It is good for us to foster a

 7  safe and comfortable environment for all of our

 8  employees, to foster an inclusive and diverse

 9  environment for our employees.

10          So it is very important for us to be

11  able to have an environment where individuals

12  are able to come into work, feel comfortable

13  when they're in the work environment and the

14  individuals they are working with.

15      Q.    Do you agree that companies must

16  protect employees from retaliation when they

17  report discrimination?

18      A.    Yes, I do.

19      Q.    Is that important?

20      A.    Yes, it is.

21      Q.    On the same scale of 1 to 10, how

22  would you rate that?

23      A.    10.

24      Q.    And why is it important to protect

25  employees from retaliation?

1      A.    It is important for us to protect

2  employees from retaliation in order for them to

3  feel comfortable in the environment they are

4  working with and to protect them from any

5  lawful behaviors conducted by other

6  individuals.

7           And to make sure that they have an

8  environment that they could work in where they

9  don't fear that they will be retaliated against

10  if they brought any matters to our attention.

11      Q.    Do you agree that companies must

12  protect employees from retaliation when they

13  request religious accommodations?

14      A.    Yes, I do.

15      Q.    And on the same scale of 1 to 10,

16  how important is that?

17      A.    10.

18      Q.    And why is that important?

19      A.    It is important for us -- for our

20  companies -- or Allied Universal -- to ensure

21  that an individual is able to bring to our

22  attention a reasonable accommodation request

23  and for us to review the accommodation request

24  and be able to provide them with an interactive

25  conversation to protect their rights and for us

1   to be able to review all the information that

2   was provided to us to ensure that we are

3   protecting their rights and reviewing the

4   information they brought to us in regards to

5   any accommodations.

6        Q.    Do you agree that not protecting

7   employees from discrimination or retaliation

8   can be unsafe?

9        A.    I do.

10       Q.    Is it fine with you if I refer to

11  "Allied Universal" or "Universal Protection

12  Services, LP," as just "Allied"?

13       A.    Yes.  Yeah.

14       Q.    Thank you.

15             Are Allied's policies and procedures

16  mandatory?

17       A.    Yes, they are.

18       Q.    Allied has a zero-tolerance policy

19  for discrimination and harassment; correct?

20       A.    Yes, they do.

21       Q.    And Allied also has a zero-tolerance

22  policy for retaliation in the work place?

23       A.    That is correct, yes.

24       Q.    On a scale of 1 to 10, 1 being not

25  important at all and 10 being the most

1    important, how important is it to Allied that

2    it follow its policies and procedures?

3         A.    10.

4         Q.    Okay.  And on the same scale of 1 to

5    10, how important is it to Allied that there be

6    no discrimination in the workplace?

7         A.    10.

8         Q.    And same scale, that there be no

9    retaliation in the workplace?

10        A.    10.

11        Q.    And same scale, that there be no

12   harassment in the workplace?

13        A.    10.

14        Q.    How does Allied ensure that there is

15   no discrimination in the workplace?

16        A.    Well, Allied does provide several

17   trainings for all individuals for -- from every

18   level, from a security professional to senior

19   management, to ensure that they are well aware

20   of what is determined to be discrimination,

21   harassment, retaliation so they're well versed

22   and understand that.

23             And we also provide all of our

24   employees on every level a platform to report

25   any reports of discrimination, harassment,

1    It depends on how long they've been with the

2    organization, but there is continuous training.

3            We do have something that's called

4    core training, that they have to complete as

5    mandatory training, all paid.  There's several

6    levels of the training.  It depends on their

7    specific role.

8            So for example, for security

9    professionals, there's guidelines of what

10   training they are mandatory to complete.

11           There's also voluntary training

12   available for all of our security professionals

13   through an online platform.

14           There's also site-specific

15   client-requested training that security

16   professionals go through.

17           So it's continuous throughout their

18   employment.

19       Q.    And -- excuse me.

20           I probably asked the question

21   incorrectly.

22           But specific to training on

23   discrimination and retaliation, aside from the

24   new -- the new employee orientation module, are

25   employees required to take additional training

1   on discrimination and retaliation?

2        A.    Yes, if it's State mandated.

3        Q.    Okay.  So, for example, in Texas are

4   they required to?

5        A.    The State does not require it in

6   Texas.

7        Q.    Okay.  And so if so, Twana Ahmed who

8   was working at Allied, he would have completed

9   the module that you referred to when he was

10  initially hired?

11       A.    That is correct.

12       Q.    Okay.  And so would there be

13  evidence of that completion in the test that

14  was taken somewhere?

15       A.    So there is -- so there's a

16  compliance code that is entered into the

17  compliance tracker in their employee file, that

18  outlines that new employee orientation was

19  completed, and that means that it was

20  successfully completed because there is a final

21  exam at the end.

22            If an employee or new hire at new

23  employer orientation does not pass that exam,

24  we do not move forward with employment for

25  them.  So in Mr. Ahmed's situation, he would

```
 1        Q.    Was Patrick Freeney disciplined in
 2   any way during his time at Allied?
 3        A.    He was not.
 4        Q.    Okay.  Do you agree that
 5   discrimination in the workplace is a
 6   foreseeable danger to employees?
 7        A.    Yes, it is.  It could be, yes.
 8        Q.    Okay.  Why is that?
 9        A.    Well, it depends.  If an
10   organization becomes aware of such instance and
11   doesn't act on it, it could escalate between
12   the individuals involved.  So it could pose a
13   danger if the company doesn't become involved
14   in the matter.
15        Q.    In developing Allied's policies and
16   procedures applicable to preventing
17   discrimination and retaliation in the
18   workplace, did Allied consider any statistics
19   related to, say, the percentage of employees
20   that experience discrimination?
21        A.    I do not know.
22        Q.    In your experience as an HR
23   professional, have you encountered any studies
24   showing percentages of employees that report
25   having experienced discrimination?
```

1     A.     I do not.

2               ATTORNEY SHINE:  Objection to

3   outside the scope, Amanda.

4   BY ATTORNEY HERNANDEZ:

5     Q.     In your education and training and

6   experience, are you aware that oftentimes

7   employees that experience discrimination often

8   do not report it out of fear of retaliation?

9               ATTORNEY SHINE:  Again,

10  objection.  Outside the scope.

11  BY ATTORNEY HERNANDEZ:

12    Q.     You can still answer.

13              ATTORNEY SHINE:  To the extent

14  she has any knowledge, she can answer.

15              THE WITNESS:  And I'm sorry.

16  Can you rephrase the question?

17  BY ATTORNEY HERNANDEZ:

18    Q.     Sure.  At -- you are an HR

19  professional; correct?

20    A.     That is correct.

21    Q.     Okay.  How long have you been

22  working in HR?

23    A.     A little over 10 years.

24    Q.     And so in your experience as an HR

25  professional, are you aware that oftentimes

1   employees that experience discrimination will

2   not report it out of fear of retaliation?

3                   ATTORNEY SHINE:  My objection

4   stands.

5                   THE WITNESS:  Yes.

6                   ATTORNEY SHINE:  But she may

7   answer.

8                   THE WITNESS:  Yes.

9   BY ATTORNEY HERNANDEZ:

10      Q.    Okay.  Have you -- in your studies,

11  have you seen a report noted by the EEOC that

12  roughly 75 percent of employees that have

13  reported workplace conduct have experienced

14  retaliation?

15                  ATTORNEY SHINE:  Objection.

16  Outside the scope.

17              To the extent she has any personal

18  knowledge, she may answer.  However, this is

19  not the appropriate question for a 30(b)(6)

20  witness.

21  BY ATTORNEY HERNANDEZ:

22      Q.    You may answer.

23      A.    I do not.

24      Q.    How does Allied ensure the

25  discrimination and harassment is not occurring

1   administrative staff.

2       Q.    I'm sorry.  So that sounded like a

3   manager checking in with its security

4   professionals, but I believe you said that

5   Allied monitors its managers to ensure that

6   they are not engaging in discrimination.

7           How -- how does Allied monitor its

8   managers to ensure that they are not engaging

9   in discrimination?

10      A.    Well, we're just hosting meetings.

11  I mean, it would be very difficult for us to

12  determine whether a manager is behaving in a

13  discriminatory manner unless they fully display

14  that to us.

15          If there was a meeting held or a

16  site visit where a manager fully displayed that

17  they were discriminating against an employee,

18  making an inappropriate comment, it would be

19  addressed immediately.

20          Otherwise, if there's no signs that

21  a manager is, you know, being -- discriminating

22  against people or having -- or making

23  inappropriate comments that are not made to us

24  or being reported to us, it'd be difficult for

25  us to determine whether a manager is practicing

1   that without, you know, any reporting of it or

2   visible acts of it.

3        Q.    Okay.  So aside from, like, meetings

4   that the manager would have with their

5   superiors, there's no other way that Allied can

6   monitor the managers; true?

7        A.    That's correct.

8        Q.    Okay.  Do you agree that

9   discrimination in the workplace is preventable?

10       A.    I -- I mean, that's a difficult

11  question.  But, I mean, as much as we would

12  like for it to be prevented, no, I don't think

13  it's 100 percent preventable because we can't

14  control individuals.

15       Q.    Okay.  Why not?

16       A.    Well, you know, we can give all the

17  tools for a manager or individuals to be

18  successful and know, you know, the policies,

19  procedures, laws against preventing these type

20  of discriminatory acts, but as far as an

21  individual, what they -- when they do that,

22  it's hard for the organization to be able to

23  prevent that because we can't control an

24  individual's acts.

25            What we can do, from a company

1  payroll records.  They're responsible for

2  managing that employees are calling in, calling

3  out.  Responsible for ensuring that employees

4  are following company guidelines as far as

5  utilizing our technology while they're on post.

6          And interacting with clients and the

7  general public to make sure that our security

8  professionals are meeting company standards and

9  client requirements.

10      Q.    Was Patrick Freeney considered the

11 Elite account manager?

12      A.    He -- I don't -- I wouldn't say that

13 he was the Elite account manager.  He oversaw

14 the AGB account, and the Elite program was

15 embedded into that account.

16      Q.    And did he oversee that for all of

17 Houston?

18      A.    I do not know.

19      Q.    Okay.  Do you know how many security

20 professionals he managed?

21      A.    I do not know.

22      Q.    Did Pat -- did Patrick have

23 authority to hire new members to his team?

24      A.    Yes, he did.

25      Q.    Did he have authority to discipline

1    members of his team?

2         A.    Yes, he did.

3         Q.    Did he have authority to approve

4    whether members of the team worked overtime?

5         A.    Yes, he did.

6         Q.    And I think you said this already,

7    but he had authority to set employee schedules

8    or alter employee schedules?

9         A.    Yes.

10        Q.    And did he have authority to fire

11   members of his team?

12        A.    Yes.

13        Q.    It was Patrick Freeney that

14   recommended Twana Ahmed be fired from Allied;

15   true?

16        A.    Yes.

17        Q.    What is your title with Allied?

18        A.    Human resources director, regional

19   for the Midwest.

20        Q.    And how long have you worked with

21   Allied?

22        A.    Eight years.

23        Q.    Have you always been the human

24   resources director?

25        A.    No.

1   30(b)(6) witness.

2           To the extent you have personal

3   knowledge and would like to testify to that,

4   you may answer.

5           THE WITNESS:  Yes, I do.  I do

6   believe that it is important.

7   BY ATTORNEY HERNANDEZ:

8      Q.    Does Allied require that

9   investigations be conducted immediately when an

10  employee reports discrimination or harassment?

11     A.    Yes.

12     Q.    Okay.  Do you agree that it would be

13  wrong to ignore reports of discrimination or

14  harassment?

15     A.    Yes.

16           ATTORNEY SHINE:  Objection.

17  Outside the scope.

18           To the extent she has personal

19  knowledge, she may answer.

20           THE WITNESS:  Yes.

21  BY ATTORNEY HERNANDEZ:

22     Q.    Okay.  Would it be against Allied's

23  policies to ignore reports of discrimination or

24  harassment?

25     A.    Yes.

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

1        Q.    Do you agree that it would be -- do

2    you agree that it would be reckless to ignore

3    reports of discrimination or harassment?

4                    ATTORNEY SHINE:   Objection.

5    Outside the scope.

6                    To the extent she has personal

7    knowledge, she can answer.

8                    THE WITNESS:   Yes.

9    BY ATTORNEY HERNANDEZ:

10        Q.    I cannot remember if you already

11   answered this, but does Allied have or use any

12   manuals on how to conduct investigations into

13   reports of discrimination?

14        A.    Yes.   There are guidelines provided

15   on how to conduct an investigation.

16        Q.    Okay.   Is that, like -- where is

17   that housed?   Is it housed in an actual manual

18   like a physical book, or is it something

19   online?

20        A.    We are predominantly digital, so it

21   is housed on a company platform under human

22   resources categories, and it outlines and it

23   has -- there's a file that contains all that

24   information.

25        Q.    And so is there -- so is there -- is

1  against that individual.

2        Q.    Do you have experience spotting red

3  flags of discrimination?

4                  ATTORNEY SHINE:  Objection.

5  Outside the scope of the 30(b)(6) witness.

6                  To the extent she has personal

7  knowledge, she may testify in an individual

8  capacity.

9                  THE WITNESS:  I mean, I would

10  say, yes, I would look for patterns, and I

11  would look for if there's anything that sticks

12  out, that needs to be further looked at.  Yeah.

13  BY ATTORNEY HERNANDEZ:

14        Q.    Do any come to mind to you right

15  now?

16        A.    No.

17        Q.    Okay.  Could it be a red flag of

18  discrimination if, say, an employee's accent

19  was mocked?

20        A.    Yes, that could be.

21        Q.    Could it be a red flag of

22  discrimination if an employee was pressured to

23  shave his beard after indicating a religious

24  need to keep the beard?

25        A.    Yes.

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

1        Q.    Could it be a red flag of

2    discrimination if an employee was pressured to

3    shave his beard, but other employees were not

4    pressured to shave their beard?

5        A.    Yes.

6        Q.    Could it be a red flag of

7    discrimination if an employee was issued a

8    faulty weapon if others were issued working

9    weapons?

10        A.    I wouldn't say that was necessarily

11    discrimination.

12        Q.    Okay.  Could it be a red flag of

13    potential discrimination if an employee was not

14    issued equipment that other employees in the

15    same position were issued?

16        A.    Yes.

17        Q.    Could it be a red flag of

18    discrimination if an employee of a different

19    national origin was told to go back to his

20    country?

21        A.    Yes.

22        Q.    Could cussing at an employee be a

23    red flag of potential discrimination?

24        A.    Yes.

25        Q.    Could physical threats toward an

1    employee be a red flag of potential

2    discrimination?

3          A.     Yes.

4          Q.     Could racial slurs toward an

5    employee be a red flag of discrimination?

6          A.     Yes.

7          Q.     Could a failure to follow policies

8    be a red flag of discrimination?

9          A.     I guess I would -- I think it would

10   need to be a little more specific as to what

11   policies they were failing to follow to see if

12   it's related to discrimination because there

13   are several policies that could not be

14   followed.

15          So I guess it would depend on what

16   policy is not being followed.

17          Q.     Okay.  In your understanding of

18   employment retaliation, can disciplinary

19   decisions ever be applied in a way that's

20   retaliatory?

21                ATTORNEY SHINE:  Objection.

22   Outside the scope of a 30(b)(6) witness.

23                She may answer in an individual

24   capacity to the extent she has knowledge.

25                THE WITNESS:  Can you ask the

1    question again?

2    BY ATTORNEY HERNANDEZ:

3        Q.    Sure.  In your understanding of

4    employment retaliation, can disciplinary

5    decisions ever be applied in a way that's

6    retaliatory?

7        A.    Yes.

8        Q.    And so under Allied's policies and

9    procedures and training in looking for signs of

10   retaliation, under their procedures, is it --

11   is something to look for close timing between a

12   protected activity and the disciplinary action?

13                ATTORNEY SHINE:  Objection.

14   Calls for a legal conclusion.

15                To the extent she has personal

16   knowledge, she can answer.

17                THE WITNESS:  Yeah.  I do not

18   know.

19   BY ATTORNEY HERNANDEZ:

20       Q.    Okay.  Do you know what "protected

21   activity" means?

22       A.    Yes.

23       Q.    Is that defined in Allied's

24   policies?

25       A.    Yes, it is.  It's also included in

1    the new employee orientation training.

2         Q.    Okay.  And how -- so what is

3    protected activity?  What's the definition of

4    that protected activity?

5                   ATTORNEY SHINE:  Objection.

6    Outside the scope.  Calls for a legal

7    conclusion.

8              To the extent she has personal

9    knowledge or if you would like to rephrase with

10   respect to Allied's definition of protected

11   activity, she may answer.

12   BY ATTORNEY HERNANDEZ:

13        Q.    What is Allied's definition of

14   protected activity provided in the training?

15        A.    Well, Allied -- Allied's definition

16   of it would be -- any protected activity would

17   be any individual that, you know, brings to our

18   attention any religious -- for example,

19   religious accommodation requests.  Anything in

20   regards to their sexual orientation, national

21   origin, any protected classes.

22              And it would be our, you know,

23   responsibility to ensure that we are protecting

24   those individuals and those classes when they

25   bring any matters to our attention of any type

1    of, you know, activity that is outside the

2    policy.

3         Q.     And under those policies, would

4    reporting discrimination be a protected

5    activity?

6         A.     Yes.

7         Q.     Under Allied's policies, would

8    opposing discrimination be a protected

9    activity?

10               THE REPORTER:  I'm sorry.

11   Ma'am --

12               ATTORNEY HERNANDEZ:  I'm

13   sorry.  Did you answer?

14               THE WITNESS:  Yes, yes.  I

15   apologize if you guys couldn't hear me.

16   BY ATTORNEY HERNANDEZ:

17        Q.     Excuse me.

18               In the training that's you've

19   received or provided, are you taught to look

20   for signs of potential retaliation?

21               ATTORNEY SHINE:  Objection.

22   Outside the scope of a 30(b)(6) notice.

23               If it's directed to her personally

24   or as a company.

25               ATTORNEY HERNANDEZ:  Let me

```
 1   said.  He said", "she said.  She said," where
 2   we weren't able to fully substantiate the
 3   allegations due to a lack of evidence, and then
 4   subsequently, maybe the reporter then gets
 5   removed from a role that affects their pay or
 6   their schedule.  That would be another example.
 7        Q.    Okay.  Would close timing between
 8   the protected activity and then the discipline
 9   be a sign of retaliation?
10        A.    It would depend on what the
11   discipline would be.  Is it a warranted
12   discipline for a violation of policy, or if it
13   wasn't a warranted disciplinary action.  It
14   would have to be reviewed.
15        Q.    Sorry.  Let me rephrase.
16             Could it be a potential sign of
17   retaliation close timing between the protected
18   activity and then the discipline?
19        A.    It could be, but it would depend on
20   the circumstances of the discipline.
21        Q.    Okay.  Could ignoring reports of
22   discrimination be a sign of retaliation?
23        A.    Yes.
24        Q.    Could physical threats after a
25   protected activity be a sign of retaliation?
```

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

1       A.      Yes.

2       Q.      Could visible anger after protected

3   activity be a sign of retaliation?

4       A.      Yes.

5       Q.      Could threats to fire an employee

6   after protected activity be a sign of

7   retaliation?

8       A.      Yes.

9       Q.      Could threat to revoke an employee's

10  security license be a red flag of retaliation?

11      A.      Yes.

12      Q.      Could dispersant treatment be a sign

13  of retaliation?

14      A.      Yes.

15              ATTORNEY SHINE:   Objection.

16  Calls for a legal conclusion.

17  BY ATTORNEY HERNANDEZ:

18      Q.      For example, if someone was -- let's

19  say, if one employee was merely suspended for

20  violating a policy yet another employee that

21  engaged in protected activity was fired for

22  violating the same policy, could that be a

23  potential sign of retaliation?

24      A.      Can you rephrase the question,

25  please.

ANNA SOJA - PMK                                                JOB NO. 1171182
SEPTEMBER 13, 2024

1          Q.      Sure.  If one employee was suspended

2    for violating Allied's policy and another

3    employee was fired for violating the same

4    policy but they had engaged in protected

5    activity, could that be a sign of retaliation?

6          A.      Yes.

7          Q.      Could it be a sign of retaliation if

8    an employee's disciplinary form is falsified?

9          A.      Yes.

10         Q.      And could it be a sign of

11   retaliation if a manager lies about having a

12   witness present in a disciplinary meeting?

13         A.      Yes.

14         Q.      Okay.  Thank you.

15                 Do you agree that or -- does Allied

16   agree that all investigations into

17   discrimination or retaliation must be properly

18   documented?

19         A.      I'm sorry.  Can you ask the question

20   again?

21         Q.      Sure.  Does Allied agree that all

22   investigations into discrimination or

23   retaliation must be properly documented?

24         A.      Yes.

25         Q.      Okay.  And Allied has investigation

1    forms that it uses; correct?

2        A.    It does have investigation forms,

3    but they're not mandatory to be used.  They're

4    provided as a guideline.

5        Q.    Okay.  Are they considered the best

6    practice?

7        A.    Yes.

8        Q.    You mentioned earlier a scenario of

9    "He said.  She said" or "He said.  He said,"

10   what are investigators taught to do if an

11   employee reports one thing, but the manager

12   denies it?

13       A.    Well, those are the difficult ones.

14   Right.  But we do look for previous patterns.

15            So, for example, if we had a

16   situation where we -- it was brought to our

17   attention allegation of inappropriate

18   misconduct or inappropriate comments and we --

19   there was no witnesses, there's nothing that we

20   could substantiate that the conversation

21   even -- those conversations occurred,

22   unfortunately, we don't have enough to state

23   that, yes, this act occurred.

24            What we would do is look at any

25   previous -- if there was any previous complaint

1   that we find through the course of

2   investigation.  Right.

3            It's not really black and white when

4   these investigations are occurring.  The more

5   questions that we ask, the more patterns that

6   we are looking at, we are able to then possibly

7   determine what our next steps are.

8            So it really depends on each

9   situation.  There's not one -- there's no

10  situations that are all the same, so it really

11  would depend on what we are able to collect,

12  what we are able to find through the course of

13  these investigations.

14           So it's really difficult to say,

15  "Here's what the exact next step we would

16  take."  It would just depend on the information

17  we're able to collect.

18       Q.    Okay.  What is Allied's policy on

19  security professionals having beards?

20       A.    Our policy -- our standard policy is

21  they must be clean shaven.

22       Q.    Okay.  And if a security

23  professional must keep a beard for religious

24  purposes, is there an exception?

25       A.    Well, we do ask for a religious

1    accommodation to be completed so we have record

2    of it, but it would be the same thing.  They're

3    allowed to keep their beard.  It just has to be

4    clean shaven.

5         Q.    Can you define "clean shaven"?

6         A.    So I believe there's a standard

7    regarding, you know, them making sure it's

8    shaved correctly right above the collar line.

9         Q.    Okay.

10        A.    It's not, like, messy.  That it's,

11   you know, well groomed.

12        Q.    Okay.  So a beard is allowed as long

13   as it's above the collar line and not messy?

14        A.    Correct.

15        Q.    Okay.  Are supervisors and managers

16   trained that they should allow beards as long

17   as it's above the collar line and not messy?

18        A.    Yes.  It's provided in the grooming

19   standards.  Yes.

20        Q.    Okay.  If a security professional

21   tells his supervisor that he needs to keep his

22   beard for religious purposes, what should

23   happen?

24        A.    They could ask for a religious

25   accommodation, but it would have -- something

```
 1   to be reviewed depending on what they're
 2   requesting for their beard to be.  Are they
 3   saying that they can't shave, be clean shaven
 4   during this time, the kind of questions we
 5   would ask.
 6            But they would be allowed to have
 7   their beard.
 8       Q.   Okay.  That's probably -- I probably
 9   asked a bad question, but what should the
10   supervisor do if -- if the security
11   professional is indicating that they want to
12   keep their beard for religious purposes?
13       A.   They should be able to allow them as
14   it's not a violation of policy.
15       Q.   Okay.  So -- and it's -- it's
16   against policy for the supervisor to
17   continually pressure the employee to shave
18   after they've expressed that request to keep
19   the beard, right, for religious purposes?
20       A.   There wouldn't be an exact policy
21   saying that you can't continue to ask someone
22   that, but no, there would be -- there shouldn't
23   be a reason why a supervisor is pressuring
24   someone to do so.
25                ATTORNEY HERNANDEZ:  Okay.  If
```

1    that they felt that the investigation was

2    inadequately completed or we did our own review

3    and found the investigation was inadequately

4    completed, we review what was done what was not

5    done, and determine what level of discipline

6    based on what was not properly conducted during

7    that investigation.

8               So it depends on kind of the

9    circumstances surrounding it.

10   BY ATTORNEY HERNANDEZ:

11       Q.    Can you give me an example of

12   when -- of an improper investigation?

13                   ATTORNEY SHINE:  Objection.

14   Outside the scope.

15               To the extent she's answering from

16   her personal knowledge, she may testify.

17                   THE WITNESS:  Sure.  In one of

18   the experiences that I, you know, we've had, we

19   found that a manager didn't respond to a

20   complaint.  They received a text message of

21   concerns regarding their supervisors.  The

22   manager failed to even respond or act on it.

23               And then it was brought to our

24   attention later that the employee was leaving

25   the organization because they were not -- they

1    felt that we didn't do any actions to act on

2    their complaint.

3              And the manager was subsequently

4    placed on a final with additional training due

5    to failure to react to a complaint that was

6    brought to their attention.

7    BY ATTORNEY HERNANDEZ:

8         Q.    Okay.  But the manager was not

9    terminated?

10        A.    No, was not terminated.

11        Q.    So you mentioned -- what -- under

12   Allied's policies, what are managers supposed

13   to do when somebody reports discrimination?

14        A.    Managers are supposed to intake a

15   statement immediately from the reporting party.

16   They're also required to ask all the relevant

17   questions; who was involved, when did it occur,

18   has it happened previously, was this previously

19   reported, are there any witnesses.  Asking for,

20   you know, potential areas of where it was.  If

21   there's potential camera footage, they may go

22   review it.  It just depends if there is or

23   isn't.

24              They are to report it to HR

25   immediately.  And we partner with the managers

```
1    to conduct the investigation really depending

2    on what type of allegation it is.

3         Q.    Okay.  Is Allied's use of force

4    policy mandatory?

5         A.    Yes, it is.

6         Q.    Okay.  And so the use of force

7    policy allows security professionals to use

8    some force if they fear for their own safety or

9    the safety of others; true?

10        A.    No.  It has to be in a very extreme

11   level.  So it's not just if they feel that

12   there's harm, there has to be deadly threat

13   towards them or others in order for them to

14   engage into any physical activity with someone.

15   But it would have to be a threat of fatality.

16             So it's kind of hard to say yes if

17   that's the, you know, case.  It has to be an

18   extreme measure.

19        Q.    For any -- are you saying there has

20   to be a threat of deadly force for any level of

21   the continuum in the use of force policy?

22        A.    No.  That would be the final one.

23   There's several levels of the use of force

24   policy.  Our security professionals are trained

25   that they should never engage or physically
```

```
 1    touch another individual unless their life
 2    is -- their life or somebody else's life is
 3    being threatened or harmed.
 4         Q.    Okay.  So Allied issues guns to
 5    armed security professionals; true?
 6         A.    Yes.
 7         Q.    Okay.  Allied issues guns to armed
 8    security professionals in anticipation that
 9    there may be some circumstances in which the
10    officer may have to use deadly force; right?
11         A.    It's a deterrent.
12         Q.    So are the guns -- is a security
13    professional ever justified in using their gun
14    under the use of force policy?
15         A.    As a final, final measure after all
16    other options were exhausted and there's a
17    threat of harm to themselves or another
18    individual, then yes.  But it's the final
19    circumstance when all other options were
20    exhausted.
21         Q.    Okay.  But they are allowed to
22    use -- so security professionals are allowed to
23    use deadly force if all other avenues were
24    exhausted; right?
25         A.    And there's a threat of immediate
```

1   harm, yes.

2       Q.    And there's a threat of immediate

3   harm.  Okay.

4            Would the use of force policy allow

5   a security professional to use deadly force if

6   they were fearful that immediate deadly force

7   would be used on them?

8       A.    Yes.

9       Q.    Okay.

10      A.    There would have to be a

11  circumstance that shows whether there was a

12  weapon displayed -- or predominantly just that

13  there was a weapon displayed and that the

14  individual was, you know, walking towards them

15  to attack them or another individual.

16      Q.    Okay.  And Allied also issues tasers

17  to officers in anticipation that there may be

18  some circumstances where the officer has to use

19  the TASER; right?

20      A.    Yes, but again, that would be the

21  last and final solution to -- to a scenario.

22      Q.    So using a TASER would be -- would

23  be -- so let me back up.

24            On the use of force continuum, using

25  deadly force is the final step; right?

1        A.    Correct.

2        Q.    And that's considered Level 6 force;

3    right?

4        A.    Correct.

5        Q.    Okay.  Using a TASER under the

6    policy, is that considered on the same level as

7    deadly force?

8        A.    It would be right above that level.

9    Again, there would have to be a display of some

10   type of weapon or aggression that would --

11   that's going to harm someone or themselves for

12   them to be utilizing it.

13       Q.    Okay.  And so -- so based on that --

14   on the policy, that would be considered Level 6

15   force; right?

16       A.    That would be --

17       Q.    I'm sorry.  Level 5 force.

18       A.    Yes.

19       Q.    Okay.  6 is the highest; correct?

20            THE REPORTER:  I'm sorry,

21   ma'am.  Was that a "yes" or a "no"?  You just

22   nodded your head.

23            THE WITNESS:  It was a "yes."

24   BY ATTORNEY HERNANDEZ:

25       Q.    So based on the policy, I think you

1    said using a TASER is allowed if the

2    professional fears for his safety or the safety

3    of others and there's been a display of

4    aggression?

5         A.    Aggression or a weapon.

6         Q.    Or a weapon.  Okay.  Then the next

7    level below Level 5 is Level 4; right?

8         A.    Correct.

9         Q.    And so that can involve if the --

10   that can involve the use of pepper spray;

11   right?

12        A.    I believe so, or detaining at that

13   point, if I'm not mistaken.

14        Q.    Detaining?  Let me see.

15        A.    I would have to refer to the policy

16   to be exact, but I believe --

17        Q.    Okay.

18        A.    -- it would be right above that.

19        Q.    Let me see if I can share my screen.

20             Are you able to see --

21        A.    Yes, I can.

22        Q.    It says "Level 4," and this is Bates

23   marked AUS_00115.

24             Do you recognize this as Level 4 of

25   the use of force continuum?

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

1        A.       Yes, yes.

2        Q.       Okay.  So in looking at this, is

3    Level 4 allowing the use of pepper spray when

4    the officer has a fear for their own safety or

5    the safety of others?

6        A.       Yes.

7        Q.       Okay.  And so does Allied issue

8    pepper spray to its security professionals in

9    anticipation that there may be some

10   circumstances in which they would need to use

11   the pepper spray for their own safety or the

12   safety of others?

13       A.       Yes.  Extreme measures, yes.

14       Q.       Then the next level below that would

15   be Level 3; correct?

16       A.       Yes.

17       Q.       And so I think this is what you were

18   referring to before where there's -- it says,

19   "Use of hands, control hold, and restraints";

20   right?

21       A.       Yes.

22       Q.       And so Allied issues its security

23   professionals handcuffs in anticipation that

24   there may be some circumstances in which they

25   need to use the handcuffs; right?

1    A.    Yes.

2    Q.    And under the policy, are security

3  professionals allowed to use handcuffs if they

4  fear for their own safety or the safety of

5  others?

6    A.    Yes, but again, I would have to

7  be -- that has to be somebody posing a real

8  threat to them.

9         But, yes, that's what they would

10  need.

11    Q.    Okay.  And so under -- and then

12  below that is Level 2, which is just verbal

13  communication; right?

14    A.    Yes.  I wouldn't say "just."  This

15  is the key one.  This is what our security

16  professionals are predominantly trained on as

17  their best efforts is to verbally attempt to

18  de-escalate the situation.

19         They truly -- at this point, if

20  they're being unsuccessful with de-escalating a

21  situation with an individual, the police should

22  be involved in this matter.

23         All levels higher than this, these

24  are just extreme in a situation where there

25  is -- there's a threat of harm that poses a

1  situation by providing verbal commands to the

2  individuals and involving the police, as it

3  should be a police matter.  If that doesn't

4  work and the police maybe don't arrive in time

5  and the situation is escalating, then they move

6  on to the next levels.

7      Q.    Okay.  Excuse me.  I lost my train

8  of thought for a second.

9          These -- these levels allow for some

10  discretion on the part of the professional;

11  correct?

12      A.    Yes.

13      Q.    I'm going to stop sharing my screen.

14          Can you give me an example of when

15  it would be okay for the security professional

16  to use their TASER?

17      A.    If an individual displayed a weapon

18  such as a gun or a knife and attempted -- was

19  maybe, like, walking towards them or another

20  individual.

21      Q.    Can you give me an example of when a

22  security professional would be allowed to use

23  pepper spray?

24      A.    If an individual was potentially

25  charging at them in an aggressive manner or

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

```
 1    towards somebody else in an aggressive manner.
 2        Q.    Okay.  And can you give me an
 3    example of when the security professional is
 4    allowed to use handcuffs?
 5        A.    If the individual is charging at
 6    themselves or another individual in an
 7    aggressive manner.
 8        Q.    So is that -- that was the same
 9    example as Level 4; correct?
10        A.    Correct.  And that -- all armed
11    security officers have all means available to
12    them.  Some just might have a firearm and
13    handcuffs.  Some might just have TASERs and
14    handcuffs.  Some might just have OC spray and
15    handcuffs.  It depends on the contract.  It
16    depends on what the post orders and
17    requirements are.
18            So it's difficult to say that in
19    each scenario, they should use first their
20    handcuffs, then their OC spray, TASER, deadly
21    force, when not all of our armed security
22    officers may have all of those items available
23    to them per the contract requirement.
24        Q.    Okay.  So assuming they have all of
25    those items available, can you give me an
```

1    the use of force was justified or unjustified.

2    If there was no immediate harm to any persons

3    involved in the matter, then there wouldn't

4    really be a reason why to use the TASER.

5         Q.    Okay.  Do all violations of the use

6    of force policy result in termination?

7         A.    If they are justified.  I mean, I'm

8    sorry.  If it's an unjustified use of force.

9         Q.    Then if -- if it's an unjustified

10   use of force, then every security professional

11   is terminated --

12        A.    Correct.

13        Q.    -- at that point?  Okay.

14              Do all use -- do all -- excuse me.

15              Do all uses of force result in a

16   root cause analysis?

17        A.    No.

18        Q.    Okay.  When is a root cause analysis

19   used?

20        A.    First, the situation is evaluated.

21   In situations like a verbal or physical

22   altercation between, for example, two security

23   professionals, a root cause analysis would not

24   be used, but it is considered a use of force.

25              When there is an individual that is

1    engaging with maybe a customer or, for example,

2    engaging with, you know, an unruly -- a

3    customer and there has been made -- physical

4    contact to achieve a desired outcome, then a

5    root cause analysis would be conducted.

6        Q.    Okay.  And does Allied have written

7    policies and procedures on how to conduct a

8    root cause analysis?

9        A.    Yes.

10        Q.    Are those mandatory?

11        A.    Yes.

12        Q.    What is the purpose of the root

13    cause analysis?

14        A.    The purpose of the root cause

15    analysis is to review the circumstances of what

16    transpired in the incident to determine whether

17    or not the use of force was justified or

18    unjustified.

19        Q.    Okay.  And so if, during the root

20    cause analysis, it's determined that the use of

21    force was justified, then that would -- that

22    would not result in a termination; correct?

23        A.    After review, it would -- it depends

24    on the circumstances.  But if it was considered

25    a justified use of force and if we fully

1   from the security professional that was

2   involved, that doesn't just stop there.  We

3   have to do a full investigation into what

4   transpired.

5       Q.   Was there any video footage reviewed

6   when Allied conducted Twana Ahmed's root cause

7   analysis?

8       A.   From our understanding and review,

9   there was camera footage reviewed on property

10  following the incident.

11      Q.   Who reviewed that camera footage?

12      A.   Alex Bergeron.

13      Q.   Okay.  Skipping back to reports of

14  discrimination, who does Allied hold

15  accountable if HR ignores a report of

16  discrimination?

17      A.   Yes.

18      Q.   The question was:  Who does Allied

19  hold accountable if HR ignores a report of

20  discrimination?

21      A.   The individual that the report was

22  submitted to.

23      Q.   Okay.  And so how are they held

24  accountable?

25      A.   In determining the facts, then they

1   would determine which level of discipline is

2   warranted for that individual and additional

3   training.

4      Q.    Okay.   But that would not be a

5   termination?

6      A.    It's a case-by-case basis.   It would

7   determine, you know, how egregious was the

8   complaint, you know, how it was mishandled.

9   You know, is there a history of this.

10      It really depends, you know, if it's

11   a new employee that maybe just didn't know what

12   to do.   You know, we put that into perspective.

13   If it's a tenured employee that should have

14   known better, that would play into

15   circumstances.

16      So it would depend on the

17   circumstances surrounding that.

18      Q.    Can you clarify what you mean by if

19   it's an egregious complaint?

20      Does that mean that HR is allowed to

21   ignore complaints that are not considered as

22   egregious?

23      A.    No.

24      Q.    Okay.   Should any report of

25   discrimination ever be ignored?

ANNA SOJA - PMK
SEPTEMBER 13, 2024

JOB NO. 1171182

1          A.      No.

2          Q.      Okay.  What date was Twana Ahmed

3    suspended?

4          A.      I believe it was April 4, 2022.

5          Q.      And when was he terminated?

6          A.      The termination date that we have on

7    file is April 4, 2022.

8          Q.      What does that mean, "the

9    termination date that we have on file"?  Is

10   that the actual termination date?

11         A.      It's the -- it would be his last day

12   worked.  I don't know the exact date of when --

13   it was maybe processed.

14                 But the termination date we have on

15   file for Twana is April 4th.

16         Q.      So if Twana's root cause analysis --

17   if the root cause analysis was performed for

18   Twana after April 4th, how could he have been

19   terminated before the analysis was performed?

20         A.      I do not know.

21         Q.      Is it normal procedure for Allied to

22   first conduct the root cause analysis and get

23   approval for that termination before the

24   employee is terminated?

25         A.      Yes.

1    Q.    Okay.  Who has to approve the

2   termination once a root cause analysis is

3   performed?

4    A.    Once a root cause analysis is

5   performed, it is the 10-7 document that's

6   completed at the direction of our general

7   counsel, David Buckman.

8             We -- then it is reviewed by a panel

9   of individuals.  The manager overseeing that

10  security professional is the ultimate

11  decision-maker, but it is reviewed to determine

12  whether or not the use of force was justified

13  or unjustified.

14            Based on the determination of the

15  panel review, then the manager makes the final

16  decision on whether termination is warranted

17  based on our findings.

18   Q.    The manager makes the final

19  decision.  So in this situation -- in this

20  circumstance would be Patrick Freeney?

21   A.    Correct.

22   Q.    Under Allied policies, if an

23  employee is suspended for more than one day,

24  then an HR professional must be involved;

25  correct?

```
 1   expectation, but it doesn't necessarily mean

 2   that a manager would need to be involved -- an

 3   HR manager, HR director would have to be

 4   notified of every suspension in this policy.

 5        Q.   Okay.  So despite the word

 6   "required," you're saying this is not

 7   mandatory?

 8        A.   It's a guideline.

 9        Q.   Okay.  Who completed -- let me stop

10   sharing.

11        Who completed Twana's root cause

12   analysis?

13        A.   It would have been Patrick Freeney.

14   And the second reviewer was Felicia

15   Solis-Ramirez.  And Bill Keene was also

16   involved in the review.  The completion was

17   done by Patrick Freeney.

18        Q.   Okay.  And you're saying that's

19   normal procedure?

20        A.   Correct.

21        Q.   Was Patrick Freeney trained in how

22   to conduct root cause analysis -- analysis?

23        A.   He had to work in support of his

24   direct manager Felicia because that was his

25   first incident of a use of force incident.
```

1     Q.    Okay.  So the question was:  Was

2     Patrick Freeney trained in how to conduct root

3     cause analysis?

4     A.    I'm sorry.  I do not know.

5     Q.    Okay.  I want to ask about the --

6     just in general general background on some of

7     the supervisors for Twana.

8          I believe you mentioned Alex

9     Bergeron.  I -- is that how you pronounce his

10    last name?

11    A.    I believe so, yes.

12    Q.    Alex Bergeron, when was he first

13    hired with Allied?

14    A.    I do not recall the exact dates.  We

15    have records I can refer back to.  I can get

16    exact dates, but I do not recall at this time.

17    Q.    Would you be able to refer to it

18    right now?

19    A.    I would have to log into our systems

20    to review it, yeah.

21    Q.    Okay.  Does Alex Bergeron still work

22    for Allied?

23    A.    Yes, he does.

24    Q.    What is his title?

25    A.    His current title is an armed

```
 1   exact number of individuals she would have --
 2   she would have directly been involved with, but
 3   it would have been the branch staff.  We could
 4   definitely find that information out, as well,
 5   though.
 6        Q.    Did Patrick Freeney submit the
 7   hotline report?
 8        A.    No.
 9        Q.    Who submitted the report?
10        A.    It was another individual in the
11   branch.  I believe her name was Savannah.
12        Q.    Okay.  What was the date of that
13   investigation?
14        A.    I do not recall.
15        Q.    Okay.  I'm not sure if I asked this
16   before, but was Catherine Barnes the subject of
17   an investigation while during -- has she been
18   the subject of an investigation while at
19   Allied?
20        A.    I do not believe so, no.
21        Q.    Has she been issued any discipline?
22        A.    I do not know.
23        Q.    Was Catherine Barnes disciplined in
24   any way when she ignored Twana Ahmed's report
25   of discrimination?
```

1      A.      I do not know.

2      Q.      Would you be able to find out?

3      A.      Yes.

4      Q.      Could you find out right now?

5      A.      I would have to get in contact with

6   the Houston branch to do that.

7      Q.      Okay.  When a report of

8   discrimination is ignored, what could happen to

9   the employee?

10     A.      I believe we covered this a little

11  bit earlier, but it really depends on the

12  circumstances, what transpired, and you know,

13  it depends on the tenure of the individual as

14  well.

15             But there should be either a

16  coaching session or guidance provided,

17  retraining to an individual that has ignored

18  it.  It really would depend on the manager's

19  decision on that, but there should be some

20  level of coaching and above to an individual

21  that ignored a complaint.

22     Q.      So let me rephrase the question.  I

23  did not ask it in a great way.

24             When a report of discrimination is

25  ignored, what could happen to the employee

```
 1   that's reporting?
 2                   ATTORNEY SHINE:  Objection.
 3   Calls for speculation.  Outside the scope of
 4   the 30(b)(6).
 5                   To the extent she has personal
 6   knowledge, she may answer.
 7                   THE WITNESS:  I guess I don't
 8   understand the question, and I guess I don't
 9   know.
10   BY ATTORNEY HERNANDEZ:
11       Q.    What's the danger in ignoring
12   reports of discrimination to the employees that
13   are reporting?
14                   ATTORNEY SHINE:  Same
15   objection.
16                   THE WITNESS:  You know, in my
17   experience, you know, obviously, there -- there
18   is a concern if there's -- obviously, if
19   there's not action taken immediately to
20   investigate, because it is our standard to
21   immediately investigate concerns as they're
22   brought to our attention.  If somebody does
23   fail to act or escalate a concern that was
24   brought their attention, it is our -- you know,
25   from my experience, it is to either coach or
```

ANNA SOJA - PMK                                    JOB NO. 1171182
SEPTEMBER 13, 2024

1    discipline, depending, you know, case by case,

2    determining what level is warranted in that

3    situation.

4    BY ATTORNEY HERNANDEZ:

5         Q.    Could it create an unsafe working

6    condition for the employee -- for the

7    reporter --

8                        ATTORNEY SHINE:   Same

9    objection.

10   BY ATTORNEY HERNANDEZ:

11        Q.    -- if the report is ignored?

12        A.    Okay.   Can you rephrase the

13   beginning of that question?

14        Q.    Sure.   Could ignoring the report of

15   discrimination create an unsafe working

16   environment for the reporter?

17                        ATTORNEY SHINE:   Same

18   objection.

19                        THE WITNESS:   I mean, in my

20   experience, it could.

21   BY ATTORNEY HERNANDEZ:

22        Q.    Could it lead to continued

23   harassment?

24                        ATTORNEY SHINE:   Same

25   objection.

1        THE WITNESS:  In my

2   experience, it could.

3   BY ATTORNEY HERNANDEZ:

4        Q.    Could it lead to unfair discipline?

5        ATTORNEY SHINE:  Same

6   objection.

7        THE WITNESS:  In my

8   experience, it could.

9   BY ATTORNEY HERNANDEZ:

10       Q.    Do you understand what I mean when I

11  say the "N word"?

12       A.    Yes, I do.

13       Q.    Do you agree that the N word is a

14  racial slur?

15       ATTORNEY SHINE:  Objection.

16  Calls for a legal conclusion.  Outside the

17  scope of the 30(b)(6) witness.

18       To the extent she has any personal

19  knowledge, she may testify.

20       THE WITNESS:  Yes, I do.

21  BY ATTORNEY HERNANDEZ:

22       Q.    Under Allied's policies, is the N

23  word considered a racial slur?

24       A.    Yes, it is.

25       Q.    Is it against Allied's policies to

1    use the N word in the workplace?

2          A.    Yes, it is.

3          Q.    Is it against Allied's policies for

4    managers to call workers a "sand N word"?

5          A.    Yes, it is.

6          Q.    On a scale of 1 to 10, with 1 being

7    not harmful at all and 10 being extremely

8    harmful, how harmful is it to call someone a

9    sand N word?

10                ATTORNEY SHINE:  Objection.

11   Outside the scope of the 30(b)(6) notice.

12                To the extent she has personal

13   knowledge or experience, she may testify.

14                THE WITNESS:  In my

15   experience, yes.  I mean, sorry.  I apologize.

16                ATTORNEY HERNANDEZ:  Thank

17   you.  I'm just going to take a couple minutes

18   to look over my notes, but I think I'm about

19   ready to wrap up.

20                Take five minutes.

21                THE VIDEOGRAPHER:  We are now

22   off the record.  The time is 11:21 a.m. Central

23   Time.

24                (A recess was taken.)

25                THE VIDEOGRAPHER:  We are now

1   on the record.  The time is 11:24 a.m. Central

2   Time.

3   BY ATTORNEY HERNANDEZ:

4       Q.   Okay.  Just a few follow-up

5   questions on records.

6           How does Allied ensure that employee

7   notices of counseling are not backdated?

8       A.   I would not know.

9       Q.   Are is there any policy that

10  requires that the notices of counseling be

11  logged into a system somewhere or digitally

12  prepared?

13      A.   They are -- they could be digitally

14  prepared or handwritten.  There is no direction

15  in which they should do it in.

16          Once a disciplinary record is

17  completed, we should be logging it into our

18  NAVEX system for recordkeeping.

19      Q.   Okay.

20              THE REPORTER:  I'm sorry.

21  What's that system called?

22              THE WITNESS:  NAVEX.

23              THE REPORTER:  Thank you.

24  BY ATTORNEY HERNANDEZ:

25      Q.   So once a -- once a disciplinary

1    form is issued, it should be logged in that

2    same day that it's given?

3        A.    It doesn't necessarily need to be

4    logged in that same day, but it should be

5    logged in as quickly as possible.

6        Q.    Okay.  So then there's no -- there's

7    no way that Allied can ensure that the notices

8    are not backdated; true?

9        A.    We would trust that our managers are

10   putting the correct dates on there.

11       Q.    Okay.  But I don't think that

12   answered the question.  There's no way that

13   Allied can ensure that the notices of

14   counseling are not backdated; true?

15       A.    True.

16       Q.    Okay.  How does Allied ensure that

17   an employee is actually given the counseling?

18       A.    On the bottom portion of the -- of

19   the disciplinary notice, there's a section for

20   signatures where it requires the employee to

21   sign or the individual receiving the

22   discipline.

23            If they refuse to sign it, we would

24   write on the line that they refused to sign.

25       Q.    And so if the manager wrote down,

1    "Refused to sign," there's no way for Allied to

2    know that the employee actually received the

3    notice; correct?

4        A.    It would be based on the information

5    located at the bottom of the disciplinary

6    notice.  That's how we would be confirming it.

7        Q.    I'm sorry.  I don't think that

8    answered the question.

9            But if -- if the manager is the one

10   that writes down "Refused to sign" but doesn't

11   actually give the employee the notice, there's

12   no way for Allied to know whether the employee

13   actually got the notice; true?

14       A.    Correct.

15       Q.    Does Allied, as part of its

16   policies, require there to be a witness when an

17   employee is counseled?

18       A.    Yes.

19       Q.    Okay.  So is a witness to the

20   counseling one way that Allied can ensure that

21   the counseling actually happened?

22       A.    Yes.

23       Q.    Okay.  And so if -- if there's -- if

24   there isn't a witness, is that against Allied's

25   policies?

1        A.    No, not necessarily.  No.

2        Q.    Okay.  So sorry.  Going back, I

3   believe you just testified that it -- that a

4   witness is required when an employee is given a

5   notice of counseling.

6        A.    Yes.  On the bottom of the form, we

7   do have space that -- to provide where the

8   employee that's receiving the disciplinary, the

9   manager that's issuing, and then a witness

10  that's part of the -- that's in the room

11  witnessing the counseling or termination

12  transpiring should sign it, as well.

13       Q.    Okay.  Thank you.

14             If it's determined that a witness's

15  signature was falsified, is that a potential

16  red flag of retaliation?

17       A.    If a witness signature is falsified?

18       Q.    Yes.

19       A.    No, no.

20       Q.    Would that be a red flag at all to

21  you --

22       A.    It would be a red flag, yes.

23       Q.    What would it be a red flag of?

24       A.    Improper recordkeeping.

25       Q.    So if a manager wanted to retaliate

1    against -- retaliate against an employee by

2    creating a paper trail of concerns and forging

3    witness signatures, would that be a red flag to

4    you of potential retaliation?

5                    ATTORNEY SHINE:  Objection.

6    Outside the scope of the 30(b)(6) witness.

7                    To the extent you're asking for her

8    personal knowledge or opinion, she can answer.

9                    THE WITNESS:  Yeah.  And in my

10   personal opinion, yes, that would.

11   BY ATTORNEY HERNANDEZ:

12       Q.    Okay.  Is it against Allied's

13   policies for somebody to fake signatures on

14   counseling forms?

15       A.    I'm sorry.  Can you reask the

16   question?

17       Q.    Is it against Allied's policy for a

18   manager to fake signatures of witnesses on

19   counseling forms?

20       A.    Yes.

21       Q.    Is it against Allied's policies for

22   a manager to backdate counseling forms?

23       A.    I guess I would have to understand

24   what the backdate would be.  Is it backdating

25   to not the date of the actual meeting?  I would

1    just need to get clarity on that question.

2        Q.    Right.  Fair enough.  Is it

3    against's Allied's policy to -- for managers to

4    create counseling forms that were never

5    actually given?

6        A.    Yes.

7                    ATTORNEY HERNANDEZ:  Okay.

8    Pass the witness.

9                    ATTORNEY SHINE:  I have no

10   questions.

11                   THE VIDEOGRAPHER:  Okay.

12   Ms. Repsik, would you like to confirm

13   transcript orders first?

14                   THE REPORTER:  Yes.

15           Mr. Shine, do you need a copy of the

16   transcript?

17                   ATTORNEY SHINE:  Yes, please.

18                   THE REPORTER:  Does anyone

19   need a rough draft?

20                   ATTORNEY SHINE:  No.

21                   ATTORNEY HERNANDEZ:  No

22   thanks.

23                   THE REPORTER:  All right.

24   Thank you.

25                   THE VIDEOGRAPHER:  Okay.  And

Date: October 14, 2025

Respectfully submitted,

*/s/ Amanda Hernandez*

_____

Ms. Amanda C. Hernandez
Attorney-in-charge
Texas State Bar No. 24064411
Southern District Bar No. 1531045
amanda@ahfirm.com

AH Law, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057
T: (713) 588-4359
F: (281) 572-5370

*and*

Ms. Amy E. Gibson
Of Counsel
Texas State Bar No. 00793801
Southern District Bar No. 20147
amy@gwfirm.com

Mr. David L. Wiley
Of Counsel
Texas State Bar No. 24029901
Southern District Bar No. 34134
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Twana Ahmed*